# Item 4

# Defendants' Appendix Of Certain Documents Referred To In The Third Amended Complaints

DECLARATION

OF

TRUST

I, JOHN DICKINSON SCHNEIDER, of Stuarts Draft, Virginia, this 21st day of April, 1977, make this Declaration of Trust ("this instrument"), which shall be known as the JOHN D. SCHNEIDER PREFERRED SHARE TRUST. By acceptance of this instrument, the Trustee named in ARTICLE SEVENTH agrees to administer the trusts created by this instrument according to its terms.

ARTICLE FIRST

A.    References to my "wife" are to my wife, MINNIE R. SCHNEIDER.

B.    There are additional definitions and general provisions which bear upon the interpretation and construction of language used in this instrument and which appear in ARTICLE SECOND and in EXHIBIT A attached to this instrument prior to its execution and hereby made a part hereof and incorporated herein by reference.

ARTICLE SECOND

A.    I hereby transfer to the Trustee the property listed in Exhibit B attached hereto.

B.    My purpose in making this Declaration of Trust is stated below in this paragraph B.  Neither the creation of the trusts created by this instrument nor any provision of any such trust, however, is conditioned or contingent upon the accuracy of the statements and interpretations made, or the fulfillment of the expectations expressed, in this paragraph B.

1.    I presently own, hold in my name and am transferring to the Trustee 617,500 preferred shares of The Firm of John Dickinson Schneider, Inc., an Illinois corporation ("JDS Inc").

2.    The total outstanding capital stock of JDS Inc consists of approximately 757,807 shares, of which 712,600 are preferred shares and the balance are common shares.

3.    As a result, my 617,500 preferred shares (the "Shares") represent and constitute control of JDS Inc.

4.    JDS Inc and its predecessors ran a printing business from the 1920's until early 1973.

5.    I was one of the founders of that printing business, which was for most of those years a closely-held, family business.

6.    In the late 1940's and early 1950's, JDS Inc purchased the Franklin C. Hollister Company and began to manufacture and sell hospital products, beginning with birth certificates, footprinters and then Ident-A-Band bracelets.

7.    This business grew, prospered and diversified and ultimately was incorporated under the name Hollister Incorporated, an Illinois corporation ("Hollister"), which

- 2 -

is and always has been a wholly-owned subsidiary of JDS Inc. From the time JDS Inc purchased the Franklin C. Hollister Company until I resigned as President of Hollister in April 1972, I ran it in the manner of a sole proprietorship as I had run JDS Inc for many years.

8. In early 1973, JDS Inc sold its printing business to certain of its employees who were working the printing operations.

9. In the early 1960's, Hollister began to manufacture and sell ostomy products. The ostomy product business has done very well and Hollister has as a result grown remarkably in the last ten to twelve years.

10. Hollister has been successful to a degree far beyond any of my expectations. In 1976, the consolidated sales of Hollister and its subsidiaries were almost $39,000,000 and the after-tax profits of JDS Inc, Hollister and its subsidiaries were almost $5,000,000.

11. Hollister was growing so rapidly in the mid and late 1960's and early 1970's that I realized I would have to develop a management team to succeed me in running Hollister in case of my death or retirement. At that time, the three most capable people which I had working for Hollister were Arnold A. Rivin ("Rivin"), Donald K. Groneberg ("Groneberg") and William E. Kuehn ("Kuehn").

12. In April 1972, I resigned as President of Hollister and caused Kuehn to be elected as its President.

- 3 -

13.  In 1973, I moved from Chicago, Illinois, to Stuarts Draft, Virginia.  Since then I have visited Hollister's main office in Chicago for a few or more days every six weeks or so.  Also in 1973, Rivin decided that he would like to retire and move to Santa Fe, New Mexico.  In late 1973, Kuehn hired Richard T. Zwirner ("Zwirner"), at that time an associate attorney with our general counsel, Hubachek, Kelly, Rauch & Kirby, Chicago, Illinois, basically to replace Rivin.  In late 1974, however, Zwirner returned to Hubachek, Kelly, Rauch & Kirby.

14.  It has been one of my fundamental policies ever since JDS Inc was incorporated in 1956 to provide deserving employees of JDS Inc and later Hollister with an ownership interest in JDS Inc.  To that end, since 1956, I have been selling and causing JDS Inc to sell shares of JDS Inc to employees of JDS Inc and later Hollister.  My goal has been to reward those who are contributing the most to the success of the business by selling them shares at their current book value on which the employees can realize substantial gains at retirement.  The system I have devised includes various transfer restrictions and repurchase provisions in the Restated Articles of Incorporation ("Restated Articles") of JDS Inc which in effect require that each shareholder of JDS Inc who terminates his employment with JDS Inc or Hollister must resell all his shares to JDS Inc at their then current book value.  In order that the repurchase of shares from departing employees would not prohibit JDS Inc and Hollister

- 4 -

from being able to carry on their business, the Restated Articles provide that each former shareholder receives payment for his shares in the form of a subordinated promissory note of JDS Inc payable over a period of years. The subordinated promissory notes bear interest at 6% and payments are made once each calendar quarter.

15.    Under this system, if an employee came to work for Hollister and contributed significantly to its success, he or she would have the advantage of stable employment in a challenging job and fair compensation while employed.  Then, upon retirement, he or she would reap the benefit of the increase in value of JDS Inc shares through these quarterly installment payments on the subordinated promissory note. The system has worked well and enabled me to attract qualified, competent and able people.

16.    Under my last will and testament dated September 26, 1973 and the first codicil thereto dated May 10, 1974, as well as my January 29, 1957 trust, amended and restated on May 10, 1974 and amended on October 13, 1975, all of my Shares are at my death to be resold to JDS Inc.  Pursuant to the Restated Articles, they would be resold for $1 per share and then cancelled.  The result is that they would no longer be outstanding voting shares of JDS Inc.

17.    In early 1974, Zwirner and I began discussing the question of control of JDS Inc after my death.  In the event of my death and the repurchase and cancellation of the 712,600 preferred shares of JDS Inc which I then owned, the

- 5 -

remaining approximately 73,000 common shares were spread among more than 100 employees of Hollister with no one employee or small group of management employees having any significant concentration of common shares.  At that point I believe Rivin had approximately 15,000 common shares, Kuehn approximately 5,000, and Groneberg approximately 4,000. They were, together with one other employee, at that time the largest minority shareholders of JDS Inc.  When Rivin retired at the end of March 1974, he of course resold his 15,000 common shares to JDS Inc and Kuehn and Groneberg became two of the three largest minority shareholders.

18.  Zwirner and I discussed various plans for transferring some of my preferred shares to Kuehn and Groneberg so that they would be able to continue to manage Hollister in the event of my death, with continuity and without the disruption which might result from disputes among the JDS Inc shareholders and fights for control of JDS Inc's and Hollister's Boards of Directors.  I was really not aware of this potential problem at the time since I had for many years run JDS Inc in the manner of a closely-held corporation in which I had complete control.  Nevertheless, I could easily appreciate the potential for problems at my death.  Hollister was very profitable, was growing very quickly, and JDS Inc common shares were as a result very valuable.

19.  Also in early 1974, Kuehn, who had been President of Hollister for approximately two years, discussed with me

- 6 -

the same concern over control of the corporation after my death which was raised by Zwirner. Kuehn's basic concern was that he, as President, in the event of my death might not have the power to continue to run Hollister.

20. The result was that on May 9, 1974, I sold 95,100 of my preferred shares to Kuehn and Groneberg, 67,250 to Kuehn and 27,850 to Groneberg. Since Kuehn was President of Hollister, I thought he should have the larger number of shares.

21. The number of outstanding common shares of JDS Inc has been decreasing steadily due to repurchases by JDS Inc from former Hollister employees and the fact that, pursuant to Zwirner's advice with respect to compliance with federal and state securities laws, we have limited severely the numbers of common shares which JDS Inc has been selling to Hollister employees since 1973. To sell as many common shares to as many Hollister employees as I would like would require the filing of a registration statement with the federal Securities and Exchange Commission and state blue sky authorities and, at least up to this point, Kuehn, Groneberg and I have decided that we would not like to have the financial information with respect to Hollister filed with these agencies and therefore available to the public.

22. I intend shortly to ask Kuehn to resign as President of Hollister and, at that time, JDS Inc will repurchase his preferred and common shares. If I were to die prior to the repurchase from Kuehn and without executing

- 7 -

this Trust, however, my Shares would be repurchased and cancelled and Kuehn alone would control more than 50% of the voting shares of JDS Inc and would undoubtedly have the power to run or dispose of JDS Inc or Hollister or both as he sees fit.  If Kuehn in turn died and his shares were repurchased by JDS Inc, Groneberg would control almost 50% of the voting shares and would have undoubtedly the same prerogatives as Kuehn would have upon my death.  Thus my transfer of preferred shares to Kuehn and Groneberg in 1974 would have the effect of turning voting control over to one of them in the event of my death.

23.  Also, and totally aside from the question of control through voting shares of JDS Inc, Hollister has continued to grow and earn larger and larger profits and I have a situation where Kuehn, or Kuehn and Groneberg, through their positions as officers of Hollister, have a degree of power and authority which is greater than I have ever envisaged for any one or two men.

24.  Given this potential for voting control of JDS Inc by one individual and given the size to which Hollister has grown and the degree of this power and authority, I have decided to put some restrictions on the ability of whoever is managing Hollister after my death to dispose of it or to deviate from some of the key policies and principles which I have applied in building JDS Inc and Hollister and watching them grow to the point they have reached today.

- 8 -

25.    For this reason, I am altering my estate plan to provide that my Shares will not be resold to JDS Inc and cancelled upon my death but will be administered in accordance with the terms of this instrument.  The successor Trustees will be bound as provided in this instrument to honor the policies and principles which I have established for JDS Inc and Hollister and to vote and otherwise exercise the control represented by my Shares in accordance with these policies and principles.

## ARTICLE THIRD

A.    At any time and from time to time:

1.    I may alter, amend or revoke this instrument in whole or in part by notice in writing executed in the presence of two disinterested witnesses and delivered to the Trustee; provided that (1) no alteration of, partial revocation of, or amendment to this instrument shall be effective until accepted by the Trustee, and (2) the power to alter, amend or revoke this instrument is not exercisable and shall not be deemed to have been exercised by my Will.

2.    I may withdraw any property held by the Trustee.

3.    I, or any other person, may transfer any property to the Trustee to be administered as provided in this instrument or may subject the proceeds of any policies of insurance to the terms of this instrument by designating the Trustee as beneficiary thereof.

- 9 -

B.   I, or any other person, may by Will leave any property to the Trustee to be administered as provided in this instrument.

## ARTICLE FOURTH

During my life, the Trustee shall administer the trust estate as follows:

A.   The Trustee (1) shall pay all of the net income from the trust estate in convenient installments to me as long as I live and am not incapacitated, (2) may pay, if and as long as I am incapacitated, to myself and my wife all or so much of the net income as the Trustee deems proper, and (3) shall add to the principal any net income not thus paid.

B.   The Trustee shall distribute all or so much of the principal of the trust estate (1) to me, and (2) to or in trust for such person or persons, in such proportions and upon such terms, as I, while not incapacitated, direct in writing.

## ARTICLE FIFTH

After my death, the Trustee shall administer the trust estate as follows:

A.   The Trustee (1) may pay to my wife, if she survives me, all or so much of the net income as the Trustee deems proper, (2) shall, subject to paragraph A (3), accumulate and add to principal all net income not thus paid, and (3) may, at any time or times when the value of the trust estate (excluding shares of

- 10 -

JDS Inc) exceeds $750,000, pay any net income not thus paid or accumulated for such exclusively charitable, educational, religious or scientific purposes as the Trustee selects.

B.    At the first to occur of (1) the expiration of twenty-four years after the date of this instrument, or (2) the expiration of twenty years after the date of the death of the last to die of myself, my wife and all of the individuals I have specifically named in this instrument to act as Trustee or successor Trustees, the Trustee shall distribute the trust estate as follows:

1.    The Trustee shall distribute all shares of JDS Inc which form part of the trust estate to such persons as (1) are then living, (2) are then employees of Hollister, (3) then hold common shares of JDS Inc, and (4) agree in writing to abide by the same policies and principles as are imposed upon the Trustees as provided in ARTICLE SIXTH, in such proportions that each such person shall receive:

a.    That number of common shares of JDS Inc which bears the same ratio to the total number of common shares of JDS Inc then forming part of the trust estate as the number of common shares of JDS Inc then held by such person bears to the total number of common shares of JDS Inc then held by all such persons as a group.

b.    That number of preferred shares of JDS Inc which bears the same ratio to the total number of preferred shares of JDS Inc then forming part of the trust estate as the number of common shares of JDS Inc

- 11 -

then held by such person bears to the total number of common shares of JDS Inc then held by all such persons as a group.  The number of shares of each class of stock distributed to such persons as provided in this paragraph B 1 of this Article may be varied for the sole purpose of avoiding, and only to the extent necessary to avoid, the distribution to such persons of fractional shares.

2.    The Trustee shall distribute the balance of the trust estate for such exclusively charitable, educational, religious or scientific purposes as the Trustee selects.

## ARTICLE SIXTH

A.    Notwithstanding any other provisions of this instrument, the Trustees, after my death or during any period of my incapacity, shall retain all shares of capital stock of JDS Inc and, subject to paragraph B, vote and otherwise deal with all shares of capital stock of JDS Inc in order to further the following policies and principles:

1.    Except as provided in this instrument, JDS Inc and Hollister shall be continued as corporations in which the entire equity interest (presently the preferred and common shares of JDS Inc) is owned by employees of one or both of these corporations (this principle is herein referred to as "employee share ownership").  This employee share ownership

- 12 -

shall be a combination of both direct and indirect ownership and should include the following:

  a. JDS Inc should continue to sell its common shares for cash directly to selected employees of Hollister.  The selection of various employee-offerees and the determination of the number of shares offered to each shall be made by the Board of Directors of JDS Inc after due consideration of the recommendations of the chief executive officer of Hollister.  With Hollister's present structure and operations, selected employees include management personnel and various technical, professional and scientific personnel, members of the field sales force, and marketing research and development personnel.  Over time and with changes in the structure and operation of Hollister, this description of who constitute selected employees of Hollister will of course change.  Basically, however, the term selected employees should include those whose positions involve substantial responsibility, supervision of other employees, or exercise of discretion.

  For JDS Inc to sell common shares directly to those selected employees described above, JDS Inc or Hollister may be required to prepare and file a registration statement pursuant to the Securities Act of 1933 and applicable state blue sky laws and at some point in the future to register its common shares as a

- 13 -

class of equity security pursuant to Section 12 of the Securities Exchange Act of 1934. The Trustee and the Board of Directors of JDS Inc shall consider periodically the advisability of filing the necessary registration statements.

b.   Hollister should continue to maintain an employee share ownership plan such as the present Hollister Employee Share Ownership Trust. The benefits of indirect employee share ownership should in this or a comparable way be extended to as many employees of Hollister as possible excluding only, to the extent lawful, union employees.

2.   JDS Inc and Hollister shall continue their conservative financial and investment policies. JDS Inc and Hollister should continue to retain sufficient earnings to provide the funds necessary for capital development. JDS Inc and Hollister have consciously followed this form of capital development as opposed to borrowing money or using other sources of outside financing such as mortgages, bank borrowings and public offerings of stock or other securities. Presently JDS Inc's only long term debt is the subordinated promissory notes held by former employee-holders of its common shares.

One of the purposes of conservative financial and investment policies is to insure that the corporations do not make such financial commitments or other extensions of their resources or credit as would require them to seek

- 14 -

financing from sources outside the corporations (such as mortgages, bank borrowings or sales of securities) which would or could ultimately lead to a violation of the principle of employee share ownership.

3.    Growth in sales and expansion of operations should result primarily from the successful marketing of Hollister's existing products and related new products and from the natural expansion during the foreseeable future of the markets for those products.  Growth should not at any time be a goal in and of itself and should not be permitted to jeopardize efficient operations or continued application of the principles of employee share ownership and conservative financial and investment policies.

4.    Investments in plant and other assets in countries outside of the United States should be approached on a cautious and conservative basis.  Unsound investments in foreign countries could easily erode the corporations' financial resources and, as a result, foreign investments should only be made when anticipated retained earnings exceed anticipated working capital and other foreseeable needs.

Ordinarily, Hollister should develop conscientiously the markets for its products in the United States before introducing them elsewhere.  After careful consideration of the prospects for successfully selling products in a country or area and the political and economic risks involved, Hollister may invest in that country or area if it feels it

- 15 -

must in order effectively to produce, promote or sell the products there.

5.  The introduction of new and improved products and acquisitions of all kinds, including acquisitions of products, product ideas, intangibles with respect to potential products, and all other purchases of assets or business entities which may result in new or improved products, shall be judged by the following standards:

a.  Hollister shall at all times conscientiously develop to its optimum advantage the major markets for its existing products.

b.  New and improved products should ordinarily be logical extensions of the existing product line and otherwise compatible and consistent with Hollister's then existing sales program, sales force, channels of distribution, manufacturing processes and manufacturing facilities.

c.  Hopefully Hollister will be able to continue to promote and develop new and improved products which are necessary or useful to people, such as its ostomy products, other medical devices and health care products.  Extensions into other types of products should be approached on a cautious and conservative basis.

6.  The following general policies and philosophies should govern the operation of Hollister:

- 16 -

a.    Hollister products should always be of a very high quality.  JDS Inc and Hollister have for years used the expression "Only first class is good enough." This expression is a reflection of the quality products, quality employees and quality sales approach which are at the heart of the financial success of Hollister.

b.    Hollister should always hire competent employees and pay them commensurately.  Hollister's directors and officers should constantly evaluate and re-evaluate the management personnel, weeding out where necessary managers who do not display the competence and integrity associated with Hollister management. Further, the directors and officers shall promote the personal identification of all employees with the management that is often associated with smaller businesses.

c.    Hollister directors and officers should always be guided by the principle that Hollister is in business to provide quality service as well as products to its customers and to provide rewarding jobs with fair compensation to all of its employees, as well as financial gain of its employee-shareholders.

B.    The Trustee may deviate from the policies and principles specified in paragraph A only if the Trustee, after thorough, deliberate and careful consideration and discussion, determines that such a deviation is essential in order to

- 17 -

preserve the financial stability and soundness of either JDS Inc or Hollister or to continue the manufacture and distribution of high quality health care and other products.

C.    The Trustee shall exercise his best judgment to select suitable directors for JDS Inc and Hollister.  Subject to the foregoing and subject to any provision of the Illinois Business Corporation Act or other applicable corporation act, I direct that, after my death or during any period of my incapacity, the Trustees vote and otherwise deal with all shares of JDS Inc in such manner (1) as to maintain the number of directors of JDS Inc and Hollister at three or the smallest number in excess of three which the Trustees after due consideration deem consistent with the proper operation of such boards; (2) as to continue each of MICHAEL C. WINN ("WINN") and RICHARD T. ZWIRNER ("ZWIRNER") as a director of both JDS Inc and Hollister as long as he is a successor Trustee and is willing and able to serve as a director; (3)  as to insure, to the extent possible, that at all times one or more of the Trustees are serving as directors of JDS Inc and Hollister and that the Trustees serving as directors and such persons as the Trustees may designate in writing from time to time as their nominees shall together constitute at least a majority of each such board of directors; and (4) as to elect the chief executive officer of Hollister as a director of JDS Inc and Hollister if not already so serving by virtue of being a Trustee or Trustees' nominee.

## ARTICLE SEVENTH

- 18 -

A.    I appoint myself Trustee of every trust arising under this instrument.

B.    If I become unwilling or unable to act, LORETTA L. STEMPINSKI ("STEMPINSKI"), WINN and ZWIRNER shall act as successor Trustees.

C.    To the maximum extent possible, at any time I am not acting as a Trustee there shall be at all times three Trustees. If any Trustee other than myself is or becomes unwilling or unable to act as a Trustee, then the other Trustee or Trustees then acting shall, within 60 days of the vacancy and in their sole discretion, select and appoint the number of additional successor Trustees required to keep the number at three.  All successor Trustees shall be natural persons.  The appointment of any successor Trustee shall be made only after thorough, deliberate and careful consideration and discussion.  Any successor Trustee appointed shall have such experience and occupation or former occupation, such knowledge of Hollister and such judgment, integrity, independence and other personal qualities as would make him effective in insuring continued adherence to the policies and principles set forth in this instrument.

My designating in this instrument as successor Trustees persons who presently hold positions as officers or employees of JDS Inc or Hollister shall not be a precedent for designating as successors to them persons then holding the same or similar positions.  Further, I request but do not direct that those

- 19 -

successor Trustees appointing any other successor Trustee give due consideration to persons who have retired and whose last employment was with Hollister.

D.   At any time after I become unwilling or unable to act: (1) if only two Trustees are acting, the Trustees then acting shall have all of the powers of the Trustee hereunder until a third Trustee is appointed, and (2) if only one Trustee is acting, that Trustee shall not have any of the powers of the Trustee hereunder until a second Trustee is appointed except the power to appoint additional successor Trustees in accordance with paragraph C above.

E.   The Trustee or any successor Trustee may act as a director, officer or counsel of JDS Inc or Hollister or both and he or any firm of which he may be a member, or any corporation of which he may be a shareholder, director or officer, may contract with JDS Inc or Hollister or both, or be financially interested in any transaction to which JDS Inc or Hollister may be a party, or in which either such corporation may be in any way interested, as fully as though he were not a Trustee or successor Trustee.

F.   The Trustee or Trustees shall take all necessary action to be advised fully at all times with respect to the business, affairs and operation of JDS Inc and Hollister.  When more than one Trustee is acting, the Trustees shall meet in person at least once each calendar quarter to review the structure and operations of JDS Inc and Hollister to insure compliance with all of the provisions of this instrument.  Meetings shall be held at the principal executive office of Hollister unless otherwise agreed

- 20 -

by the Trustees.    At least ten days prior to each such meeting, WINN if he is a Trustee and, if not, ZWIRNER if he is a Trustee, and if not, ZWIRNER's successor as Trustee under this Instrument, shall forward to the other Trustees such financial statements, budgets, forecasts, plans and other documents of JDS Inc and Hollister which such person in his sole discretion deems necessary or proper for the purpose of such meeting.    In addition, at all reasonable times and places, each Trustee shall have full, complete and unimpeded access to all of the books, records, accounts and other documents of the corporations in order to inspect and copy any such document which such Trustee in his sole discretion deems appropriate.    No Trustee shall be required to state, in writing or otherwise, any purpose or other reason for requesting, inspecting or copying any such document.

For each meeting attended by a Trustee, the Trustee, in addition to reasonable compensation paid pursuant to paragraph 15 of EXHIBIT C attached to this instrument, shall receive special compensation to be determined by the Trustees in their sole discretion.    In addition, each Trustee shall be reimbursed for all reasonable expenses, including air fare or other transportation charges and lodging, incurred in attending any such meeting.

G.    Any successor Trustee shall, without any conveyance, transfer or order of court, have all of the right and title of this predecessor Trustee to the trust property and all of the rights, powers and discretions of such predecessor.    Any person or corporation dealing with any successor may, without liability

- 21 -

and without inquiring into the terms of this instrument, rely upon the written certification of the successor Trustee that the successor Trustee has become successor Trustee and has the power to act as stated in the written certification.

H.   No successor Trustee shall have any responsibility to inquire into the acts of any predecessor Trustee, nor shall any successor Trustee be liable for any act or omission of any predecessor Trustee of which the successor Trustee has no knowledge.

## ARTICLE EIGHTH

A.   Except as provided in this instrument, the Trustee, in addition to any other powers granted by law, shall have, with respect to each trust created by this instrument, the discretionary powers contained in EXHIBIT C, attached to this instrument prior to its execution and hereby made a part hereof and incorporated herein by reference, to be exercised without order of court.

B.   The powers set forth in paragraph A may be exercised for a reasonable period after the termination of any trust, but only to the extent and for so long as permitted by any applicable statute or rule of law concerning perpetuities or accumulations.

C.   No person paying money or delivering any property to the Trustee need see to its application, and no person dealing with the Trustee shall be obligated to inquire into the necessity or expediency of any act of the Trustee.

- 22 -

D.    Except as provided in paragraph D of ARTICLE SEVENTH, a majority of the Trustees authorized to take any action or to exercise any discretionary power may take the action or exercise the discretion and no non-participating Trustee shall be liable to any person on account of any action or decision of the participating Trustees.

E.    Any individual Trustee, by notice in writing to his co-Trustee, may (1) for a period or periods not exceeding six months in the aggregate in any calendar year, divest himself of his duties as Trustee and delegate his powers and duties to his co-Trustee, and (2) delegate to his co-Trustee the power to sign and endorse checks and to execute other instruments.  In case of any such delegation any third person may, without liability, rely on the written certification of the co-Trustee that the co-Trustee has the power to act without the concurrence of the delegating Trustee.

F.    No surety or other security shall be required on any bond furnished by the Trustee in any jurisdiction for any purpose.

G.    The validity and the provisions of this instrument shall be governed by and shall be interpreted and construed in accordance with the laws of the State of Illinois.

/S/ John Dickinson Schneider

John Dickinson Schneider

Accepted By:

- 23 -

/S/ John Dickinson Schneider

John Dickinson Schneider, Trustee

- 24 -

Witnessed By:


/S/ Daniel M. Schuyler
_____


/S/ Bruce K. Roberts
_____

<u>EXHIBIT A</u>

TO THE JOHN D. SCHNEIDER PREFERRED SHARE

TRUST DATED APRIL 21, 1977

Except as provided in this instrument:

A.   References to "JDS Inc" or to "Hollister" or both shall include any corporation or corporations which may succeed to all or a substantial part of (1) the shares of stock of, or (2) the assets and business of, The Firm of John Dickinson Schneider, Inc. or Hollister or both.  For any one or more of several reasons, it may become necessary or advisable to either merge JDS Inc into Hollister or to merge Hollister into JDS Inc or otherwise to consolidate or reorganize these two corporations or to transfer all or part of their assets to a new corporation or corporations.  The Trustee shall receive and hold under the trusts created by this instrument all stock of any such corporation received on account of the ownership by the Trustee of shares of JDS Inc held hereunder prior to any such merger, consolidation, reorganization or transfer and the terms "Shares" and "shares of JDS Inc" as used in this instrument shall be taken to include any stock which may be received by the Trustee in lieu of all or any part of the shares of JDS Inc.

B.   Where appropriate, words of the masculine gender include the feminine and neuter and words used in a plural or collective sense include the singular, and vice versa.

C.   Whenever a written notice or written direction is required to be given by this instrument to any person, the notice or other writing shall be deemed to have been delivered when (1)

- 26 -

it is delivered in person, or (2) a period of forty-eight hours has elapsed from the time it is placed in the United States mail, registered or certified mail, and addressed to the person entitled to receive it at his last known post office address.

D.    Any Trustee ("fiduciary") is "unwilling" to act when he gives written notice to his co-fiduciary, if any, or to his successor fiduciary that he is unwilling to act.  Any fiduciary is "unable" to act when he (1) is adjudicated incompetent or is otherwise incapacitated, or (2) except in the case of myself as Trustee, is found unable to transact business as a fiduciary by his co-fiduciary, if any, or by his successor fiduciary, with the written concurrence of two doctors familiar with his physical and mental condition.

E.    The term "Trustee" refers to the trustee or trustees originally named and to any successor trustee or trustees.

F.    The term "trust estate" refers to the principal of any trust that may arise under this instrument as it may from time to time be constituted.

G.    The words "principal" or "trust estate" when used in connection with any mandatory distribution of principal include income which has been collected but remains undistributed, income which is accrued but uncollected and income which has been accumulated.

H.    A person shall be considered "incapacitated" (1) if he is adjudicated incompetent, and until he is adjudicated competent, or (2) if two doctors familiar with his physical and mental condition with the concurrence of his wife and all of the

- 27 -

Trustees (excluding, if applicable, such person) certify in writing that he is unable to transact ordinary business, and until there is delivered to the Trustees a like certification that his incapacity has ended.

I.    Whenever a discretion is exercisable as the Trustee "deems proper" in respect of payments of income or distributions of principal to any beneficiary, the words "deems proper" shall be read "deems proper for the health, support and maintenance of the beneficiary." In the exercise of the discretion the Trustee shall take account of (1) the standard of living to which the beneficiary is accustomed, (2) his or her obligations, if any, to support others, (3) the obligation, if any, and the ability of others to support him or her, and (4) other income available for the foregoing purposes so far as known to the Trustee.

J.    Whenever the Trustee is given discretion to make distribution of principal or is given discretion or is directed to make payment of income to any person who (1) is known to the Trustee to be temporarily or permanently physically disabled, or (2) is incapacitated, the Trustee may apply all or so much of that income or principal for the benefit of that person as the Trustee deems proper and shall pay to him any income which is directed to be paid to him and is not thus applied.

K.    Whenever the Trustee is given discretion to make payments of income to any one or more persons of a group consisting of two or more persons, the Trustee (1) may make unequal payments, and (2) may exclude any person from any payment.

- 28 -

L.    Any (1) nontestamentary power in any person to direct the Trustee to make distributions of principal, or (2) discretion in the Trustee to make payments of income may be exercised at any time and from time to time during the continuance of the power or discretion.

- 29 -

EXHIBIT B

TO THE JOHN D. SCHNEIDER PREFERRED SHARE

TRUST DATED APRIL 21, 1977

Property transferred to Trustee:

617,500 Preferred Shares of The Firm of John Dickinson

Schneider, Inc., an Illinois corporation, standing in

my name and represented by Certificate No. P 362.

EXHIBIT C

TO THE JOHN D. SCHNEIDER PREFERRED SHARE

TRUST DATED APRIL 21, 1977


1.    To vote, in person or by proxy, or to refrain from voting, any shares of JDS Inc and any other corporate shares or securities; to consent or object to action or non-action of a corporation, or of the board of directors of a corporation, which issued or guaranteed any such shares or securities; to consent or object, or to unite with other owners of shares or securities to carry out a plan for the reorganization of any such corporation, including any consolidation, merger, dissolution, liquidation, or the readjustment of the capital or financial structure of such corporation, or any lease, or sale, or foreclosure of any of its properties, rights, privileges, or franchises; in connection with any such reorganization, to deposit any such shares or securities with any committee, representative, agent, depositary, or trustee; to pay fees, assessments, and expenses with respect to any such reorganization; to exchange any such shares or securities for new or additional shares or securities or other property, issued or deliverable in connection with any such reorganization or otherwise; to exercise or sell any rights to subscribe to any new or additional shares or securities issued in connection with any such reorganization or otherwise; and to accept and to retain as a proper investment hereunder, whether or not authorized by law for the investment of trust funds, any new or additional shares or securities or other property received

- 31 -

upon any such exchange or upon the exercise of any such subscription rights; and, generally, to take any action with respect to any shares or securities which may be necessary or appropriate for the proper and advantageous management and preservation of the trust estate.

2.    To vote any shares of JDS Inc or Hollister in favor of one or more of the Trustees as directors of either corporation and, as a director or directors, to vote for one or more of the Trustees (including Trustees serving as directors) as officers of either corporation; to vote in favor of, and for reasonable compensation and increases in compensation to, the Trustee or any employee of the Trustee as a director, officer or employee of any company the stock of which is held by the Trustee.

3.    To accept any property given to the Trustee by will or inter vivos instrument and add it to the assets; and to retain any such property for such time as the Trustee deems appropriate, although such property may not be of the character prescribed by law or this Article for the investment of assets and although it represents a large percentage or all of the assets.

4.    To invest and reinvest, and in connection with any investments to acquire and retain property as provided by Illinois Revised Statutes, Chapter 148, Section 105 (relating to investments by Trustees and in force at the date of this instrument), which by this paragraph is incorporated by reference.

- 32 -

5.     To sell any property, for cash or on credit, at public or private sale, to exchange any property for other property, and to grant options to purchase, all at fair market value.

6.     To unite with the owners of property or securities similar to any which may be held in the trust estate in carrying out any plan for the incorporation or reorganization of any corporation, company or association; to deposit securities in accordance with any such plan; and to pay any expenses which may be required with reference to any such plan.

7.     To hold any asset in the name of a nominee, in bearer form or otherwise, with or without the disclosure of any fiduciary relationship.

8.     To insure any property, the title thereto, the Trustee or any person having an interest in or responsibility for the care, management or repair of any property, against such risks (including personal liability) as the Trustee deems appropriate.

9.     To set aside reasonable reserves for depreciation, obsolescence and depletion, except that any applicable statute relating to the apportionment of receipts between principal and income and specifying the amount of any such reserves shall be controlling.

10.    To take any reasonable action to conserve or to realize upon the value of any property; to collect, pay, contest, compromise or abandon claims of any kind of or against the estate, wherever situated; and to execute contracts, notes, conveyances and other instruments, including instruments containing covenants and warranties binding upon and creating a

- 33 -

charge against any assets and excluding personal liability of the Trustee.

11. To institute and prosecute, or to defend, any action to interpret, construe or enforce any provision of this instrument; or to defend any action to contest the validity of this instrument or any provision hereof.

12. To make distributions and divisions of property in cash or in kind on the basis of fair market values at the time of distribution or division; and in so doing, to allot undivided interests in property and to allocate different kinds or disproportionate shares of property or interests therein.

13. To make payments and distributions to the conservator of any beneficiary; and to accept from any such person receipts, releases and acceptances of accounts which shall be binding upon the beneficiary without the approval of any court but which shall not enlarge or shift the beneficial interest of any beneficiary.

14. With the written approval of any beneficiary to whom the Trustee is given discretion or is directed to make payments of income or distributions of principal, to apply for that person's benefit all or any part of that income or principal; and the Trustee shall pay or distribute to that beneficiary any income or principal which is directed to be paid or distributed to him and which is not thus applied.

15. To pay all reasonable expenses of administration, including reasonable compensation to the Trustee and to persons employed by the Trustee.

- 34 -

16.  To enter into any transaction authorized by this instrument with trustees, executors or administrators of other trusts or estates in which any beneficiary hereunder has any interest; even though any such trustee or representative is also Trustee hereunder and even though any such transaction may involve the acquisition of, or the making of a loan secured by, property which is similar or identical to property which constitutes all or a large proportion of the assets.

17.  To make loans, adequately secured and at prevailing interest rates, to any person other than the Trustee, including any beneficiary; except that while I am acting as Trustee, I may make loans to myself without security or the payment of any interest.

18.  To borrow money, and to mortgage or pledge any property, even though the obligation incurred may extend beyond the termination of the trust.

19.  To employ attorneys, accountants, auditors and agents any of whom may be the Trustee or associated with or in the employ of the Trustee; to employ custodians, depositaries and professional investment counsel; and to rely, without liability, upon the advice of attorneys, accountants, auditors and investment counsel.

20.  To transfer the situs of the trust estate to such other place as the Trustee (except a Trustee appointed pursuant to this paragraph) deems to be in the best interests of the trust; in so doing to resign and appoint a successor Trustee which may delegate any or all Trustee powers, discretionary and

- 35 -

ministerial, to the appointing Trustee as agent; and to remove each successor Trustee appointed pursuant to this paragraph at any time and appoint another, including the original Trustee.

21. To reduce the interest rate on any mortgage; to consent to the modification or release of any guaranty of any mortgage; to continue mortgages upon and after maturity with or without renewal or extension; and to foreclose any mortgage securing any bond or note or to purchase the mortgaged property or acquire it by deed from the mortgagor without foreclosure.