*James P. DeFazio v. Hollister Incorporated et al.*
*Kathleen Ellis v. Hollister Incorporated et al.*
*Brenda Dimaro et al. v. Hollister Incorporated et al.*
Master Case No.: CIV.S-04-1358 WBS GGH
(Consolidated)


**Item 7**

of the


**Appendix of Documents Submitted In Support Of Defendants'
Motions For Summary Adjudication On Various Claims**


Compendium of Summaries of Meetings of the HolliShare Trustees
from February 1, 1999 to and including April 28, 1999
Analysis of the Proposal

<u>MINUTES OF MEETING OF</u>
<u>THE TRUSTEES OF THE HOLLISTER</u>
<u>EMPLOYEE SHARE OWNERSHIP TRUST</u>

**February 1, 1999**

A meeting of the trustees ("Trustees") of the Hollister Employee Share Ownership Trust ("HolliShare" or "HESOT") was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on February 1, 1999, at 3:20 p.m. The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Richard E. Michaels and Cheryl A. Kettler, attorneys with the firm of Schuyler, Roche & Zwirner ("SRZ"), K. Peter Schmidt, an attorney with the firm of Arnold & Porter ("A&P"), a Washington, D.C. law firm and Dian J. Thielitz, secretary to the Trustees, were also present.

Rick Michaels explained that the meeting's purpose was to have the Trustees meet Peter Schmidt of A&P. He provided a brief introduction of each of the attendees.

Confidential Discovery
Material

9

RZ 0004780

He said Peter was chairman of the ERISA Department at Arnold and Cheryl was an ERISA partner at SRZ. He said Jim McCormack was the Senior Vice President and Chief Financial Officer of Hollister Incorporated ("Hollister") and one of the ten largest individual shareholders of The Firm of John Dickinson Schneider, Inc. ("JDS Inc") and a HolliShare Trustee. He said that Jim Karlovsky was the Vice President of Human Resources and also one of the ten largest individual shareholders of JDS and HolliShare Trustee. He said Dick has been General Counsel of JDS Inc and Hollister since 1977, a Trustee of the John Schneider Trust and one of the drafters of that trust, a director of JDS Inc and Hollister and the second largest individual shareholder of JDS Inc. He said that Dick is a shareholder proponent of the new trust and would be a Trustee of the new trust and would remain a director of JDS Inc and Hollister after the year 2001. He also advised that Dick is a shareholder of SRZ.

Following the introductions, Rick explained that SRZ had provided legal advice to the Proponents in connection with the Proposal that the New Trust be permitted to become a JDS Inc shareholder. While SRZ attorneys are capable of evaluating the ERISA, legal and other issues raised by the Proposal and were convinced that the Proposal would be beneficial for HESOT's participants and beneficiaries, it was determined prudent for the HESOT Trustees to have the assistance of independent counsel in their deliberations over the proposal. For that reason SRZ attorneys contacted and interviewed a number of ERISA attorneys in Washington, DC, and recommended the hiring of A&P because Peter Schmidt and his colleagues offered the Trustees the best combination of experience, judgment and depth in the area. Thereafter, the Trustees engaged A&P.

Rick said Peter had joined A&P in 1975, had practiced in the ERISA area since beginning with the firm and had experience in litigation of ERISA and tax matters. Peter said that he and A&P are comfortable with handling the Trustees' needs. Jim McCormack asked what Peter's role in the process would be. Peter said that he would review the proposed documents and provide an opinion on the proposed amendments to the Restated Articles permitting the New Trust to be a shareholder of JDS Inc. He also said he would assist the Trustees in the proper exercise of their fiduciary duties. He advised the Trustees to determine a process for proceeding. They should explore their ability to discharge their fiduciary obligations free of acute conflicts, consider the Proposal, its pros and cons and the alternatives and their pros and cons. Peter outlined his relevant experiences in the ERISA area for the Trustees.

Rick described the process to be followed. Peter is to receive and review copies of relevant documents. One or more additional meetings between the Trustees and Peter will be arranged as the parties see fit. An oral opinion was requested for February 10—which date is prior to the tentative date of mailing of the Disclosure Document to direct employee common shareholders.

Jim McCormack commented that the timing could seem rushed. Peter responded that he would do the best that he could within the time frame and would work with those dates as his goals. Jim Karlovsky indicated that he also wanted Peter to have adequate time. Dick Zwirner

stated that he believed the Trustees could take whatever time they needed but that the Proponents would appreciate as much notice as possible if the Trustees needed time beyond February 17 to reach their comfort level. Peter agreed to get back to the Trustees on timing.

Peter noted that his research would not focus on a particular line of case law specifically applicable to the facts in question as the issues raised were somewhat unique. Instead he would examine general law discussing related issues. Peter said the opinion will set forth certain concerns and considerations but the decision will be the Trustees. Peter advised that the Trustees should act prudently and gather all information available to them. For example, cases such as Foltz v. USN&WR offered some helpful insights. Rick noted his view that, due to the unusual facts and circumstances, independent counsel would have to exercise judgment in advising the Trustees.

Jim McCormack asked if Peter is aware that the company had investigated an ESOP. Peter stated that in addition to independent legal advice, the Trustees could also get independent financial advice. Jim McCormack said that an outside party, Deloitte & Touche, had looked at the financial aspects during the capitalization study. Dick said that there is a strong financial group within the corporation and he did not feel uncomfortable with their analysis. Jim Karlovsky said he would like to familiarize himself with the capitalization study.

Peter described the decision facing the Trustees as one that required them to sort out their various roles and determine whether they could comfortably decide fiduciary issues as fiduciaries, i.e., solely and exclusively in the interest of participants and beneficiaries. If they could do so, their multiple roles need not bar them from making their decision as HESOT fiduciaries.

Jim McCormack mentioned the fact that the Department of Labor had not yet written to the Trustees with respect to the May 1998 audit. Peter responded that this was not necessarily a negative sign. The DOL does not ordinarily close a matter in such a way as to guarantee freedom from later examination. Silence or inactivity could be explained reasonably by a heavy caseload.

With respect to the "multiple roles" of, or, in ERISA practitioner's parlance, "2 hats" worn by the Trustees, Peter noted that ERISA acknowledges the existence of the conflicts presented by such overlapping duties but permits company officers to serve as plan fiduciaries even when the plan's assets are employer securities. These conflicts do not bar plan fiduciary action until they become acute, as was the case for the company president in Donovan v. Bierwirth. In that case, a tender offer was made for shares of the company. Its president made a speech in which he declared his unrelenting opposition to the tender. Then he went into a plan meeting and voted, as a plan fiduciary, to have the company's pension plan acquire sufficient shares (at a price elevated by the tender offer) to help prevent takeover. The court ruled that some acute views, formed in response to the tensions presented by one's role as an officer, could prove inconsistent with the performance of fiduciary duties.

Peter next outlined some factors tending to support a finding that the Trustees could vote to amend the Restated Articles:

1.    The issue presented is focussed. Should the Trustees vote to permit the New Trust to become a JDS Inc preferred shareholder? They are not asked to negotiate company share purchase prices nor are they asked to tender shares. These latter issues can be more problematic for plan fiduciaries. Moreover, the Trustees may vote on the Proposal as a package and are not required to negotiate individual points.

2.    The spectacular record of growth in book value suggests that the company's management has been successful.

3.    The Trustees may individually support and favor continued employee ownership.

4.    The Proposal will draw majority support among all shareholders. The preferred share class favoring the proposal will, if the ten initial Grantors support the proposal (and later become entitled to preferred shares as currently hypothesized), constitute owners of 75% or more of the preferred shares of the company.

Jim Karlovsky asked whether Dick could vote given his role as a proponent of the Proposal. Peter said that Dick could if the conflict did not become acute enough to prevent him from acting solely in the interests of HESOT and as long as he participated in an independent and scrupulous investigation.

Jim Karlovsky asked how the Trustees should interpret their fiduciary responsibility under ERISA. Peter agreed to address this later in his presentation.

The Trustees then explored some parameters of their responsibility as fiduciaries. Jim McCormack commented that the Trustees were "directed" with respect to certain of their duties to HESOT. The significance of the term "directed trustee" was discussed. Peter discussed the fact that a directed trustee served in a "ministerial" manner, taking instruction and exercising little or no discretion. The fact that plan trustees are selected and removable by a plan sponsor, like Hollister, does not make them "directed." An example of a directed trustee would be a bank hired to hold plan assets and execute trades as directed by a plan committee. It has little or no discretion to manage plan assets—yet there is authority that such persons are fiduciaries. In contrast, the Trustees are required to exercise discretion in administering the Plan consistent with the plan document and ERISA, e.g., in deciding whether to hold principally JDS Inc shares and how to vote HESOT's common shares.

Peter then explained that A&P's legal opinion letter would not relieve the Trustees of the need to exercise fiduciary discretion. He anticipated that, if facts and case law proved favorable, he would advise them as to whether support for the Proposal would be "per se" imprudent or prohibited but not whether it was a proper exercise of fiduciary discretion nor that it was not a

fiduciary breach. If he were to offer such an opinion, he and his firm would be assuming fiduciary's duties.

Peter then briefly discussed the three operative ERISA provisions that guide the HESOT Trustees:

1.    ERISA section 404, dealing with the duties to act prudently, consistently with the Plan and ERISA and solely in the interest of participants and beneficiaries;

2.    ERISA section 406(a) dealing with transactions between the plan and "parties in interest" that are prohibited by ERISA; and

3.    ERISA section 406(b), dealing with transactions in which fiduciaries engage in prohibited "self-dealing."

With respect to prudence issues, Peter explained that trustees generally must gather information about and come to understand the relevant facts before making decisions. Under the current circumstances, this requires them to become comfortable with the consequences of a favorable and an unfavorable vote on the Proposal. With respect to the consequences of an unfavorable vote, if it does not produce favorable results for participants and beneficiaries, it probably does not warrant excessive concern. As an example, Peter explained that, if the Trustees were to determine that even if they were to vote against the Proposal to amend the Restated Articles, the company would be foreclosed from selling its shares to a third party or in the public markets, by share transfer restrictions that HESOT alone cannot revoke, then the fact that sale of shares under such circumstances might garner a better price than book value would not tend to favor rejection of the proposed amendment of the Restated Articles.

Peter noted that, in this instance, sales of JDS Inc shares to third persons or in public markets was barred by JDS Inc share transfer restrictions. The restrictions cannot be eliminated without a two-thirds vote by the preferred shareholders, who would not favor such action.

While the repurchase of preferred shares from employee-beneficiaries of the John Schneider Trust could dissipate the class of preferred shares over time, as long as any preferred shares are outstanding, the preferred share class has the ability to block third-party or public sale unless two-thirds of them vote to remove the share transfer restrictions.

Several additional points were made about the significance of the Proposal:

1.    There are authorized and not outstanding preferred shares that the company could issue, from time-to-time, to persons committed to the employee ownership principle. Even 100 outstanding preferred shares voted to retain share transfer restrictions, could block the company's resort to third-party or public investors.

2.      Individuals who would own preferred shares directly, following termination of the JDS Trust, would be required to sign an Agreement to Vote that would require them to vote in favor of employee ownership and Hollister's continued commitment to quality against lifting share transfer restrictions for a number of years and bar them from disposing of the preferred shares to third parties.

3.      JDS Inc's Board could decline to exercise rights to repurchase preferred shares at the time an employee terminates employment to prolong ownership of the preferred shares subject to the Agreement to Vote.

4.      The Board of JDS Inc could allow employee-to-employee transfers of preferred shares, rather than repurchase them.

5.      Hollister's Board could terminate HESOT; JDS Inc could repurchase its common shares; and the remaining JDS Inc common shareholders could proceed to adopt the Proposal (or take the company in an entirely different direction). Peter mentioned that it might be desirable for the HESOT Trustees to obtain from the Proposal's proponents representations of their willingness to pursue such alternatives if HESOT's Trustees were to vote down the amendment of the Restated Articles. If they, or the JDS Inc Board, were to so act, then that could help the Trustees to grow comfortable with a conclusion that voting "no" might not be in the interest of the HESOT participants and beneficiaries.

Jim McCormack added that the Book Value System was an issue of concern in the DOL audit. Peter explained the effect of share transfer restrictions upon share value by analogy. A&P leased a building in D.C. for a number of years and obtained an option to buy it for about $60,000,000. During the term of the lease, the firm's attractive lease terms caused the building to be valued at $60,000,000. Absent the lease, the building might have been valued at $100,000,000. As a practical matter, no one would purchase the building for $100,000,000 unless A&P were to release the landlord from the lease. For this reason, when the landlord sought to sell and maximize his return, he had to agree to share some of the difference in the building's value with the law firm.

Like A&P's lease, JDS Inc's share transfer restrictions serve to limit share prices to book value and limit the ability of HESOT to seek and obtain higher share prices.

It was noted that SRZ and Deloitte & Touche have, in the past, agreed that the value of JDS Inc common shares is, under the circumstances, book value. Peter also agreed that the restrictions on share pricing are generally determinative. Rick noted that the share transfer restrictions applied to all shareholders in all transactions, further establishing their limiting effect on share pricing. Peter concluded that the HESOT Trustees must determine whether their vote to amend the Restated Articles gives them the power to "change the calculus." If the answer is "yes," then their decision involves more fiduciary risk than if the answer is "no." He also noted that, even if share prices were not set at book value, it might be the case that shares would be subject to a steep "minority interest" discount or similar discount.

Jim McCormack mentioned that his personal comfort with the share pricing formula and the employee ownership principle had been enhanced by his participation in the company's 1998 study of alternative financing structures. While he had favored study of an ESOP for its potential tax benefits to the company, HESOT participants and employee shareholders, he had been unable to advocate it for the company in light of the company debt and repurchase liability that would be associated with conversion to an ESOP under the circumstances. He noted that, of the participants in the study process, those who would have stood to benefit most in the short term from a higher price for shares had decided against it because it would have benefited neither the majority of the company's shareholders or employees nor the company in the long term.

Peter noted that, fiduciary issues tend to be less problematic when the interests of the participants and beneficiaries are "blended" or identical. If the growth in share value is enhanced by the employee ownership principle, then the interests of all may be benefited by proposals that continue the employee ownership theory. When interests of participants differ, then everyone may not benefit under an employee ownership theory.

Jim Karlovsky asked whether status as an initial Grantor could be viewed as inconsistent with status as a Trustee. Peter agreed to consider that issue as part of his representation. He reminded the Trustees of the Bierwirth case's focus on the "acuteness" of the conflict between some but not all corporate roles and fiduciary roles. As an initial matter, he asked whether there was a congruence of fiduciary and individual reasons that might cause a Trustee and an initial Grantor to vote in favor of the Proposal. For example, if the Proposal would maximize shareholder value, then a fiduciary's and individual's interests might be aligned in a manner that the DOL would find acceptable. Similarly, if the Proposal would not ensure (under any of the scenarios described above) the realization of a premium for shareholders through sale of JDS Inc shares to a third party or the public, then a vote in favor of the Proposal would not injure shareholders, including HESOT. The DOL and the courts would be unlikely to object to such a vote where it did no particular injury to participants and beneficiaries. However, if a Trustee were to favor the Proposal because it secured his position with the company, there would be no convergence of interests and a favorable vote by a Trustee in his fiduciary and personal capacities could call into question the Bierwirth analysis. The DOL and the courts could be expected to find such a decision improper.

Jim Karlovsky asked whether the generous motives of initial Grantors who would give up the value potentially realizable by them, in their individual capacity, in a sale of the company to preserve the employee ownership principle for future employees of the company could be in conflict with fiduciary duties. Peter responded that the initial Grantor's conveyance for such reasons was inconsistent with action by fiduciaries for self-interest. The making of a gift would be a positively viewed conveyance as compared with one made to enhance the Trustees' or other employees' job security. Jim pointed out that the support of the proposal by Mike Winn and Dick Zwirner was contrary to their interests as JDS Inc common shareholders as was the Proponents' decision not to distribute preferred shares to non-employee directors.

Jim McCormack noted that there were other examples of management declining opportunities to benefit themselves at the expense of employees generally. The company's evaluation of an ESOP as an alternative financing method had made it clear that current management would benefit substantially from a "pop" in share prices following the lifting of share transfer restrictions, but repurchase liability and debt of the company would rise, putting the interests of non-management and future employees in HESOT at risk. For that reason, the ESOP approach had been disfavored.

Jim McCormack also noted that the proposal could be expected to reduce JDS Inc common share price volatility, reducing risks to retirement income of HESOT participants and direct common shareholders. Rick echoed that point by referring to the fact that JDS Inc's book value per share has consistently risen while public markets have seen advances and declines in share values over the same periods.

Jim McCormack also noted that JDS Inc performed well in the long term, but it was not a company that experienced periodic spurts in growth. Its products are medical devices. The company would not be expected to produce a "Viagra" that would boost returns suddenly. Growth would be steady, not dynamic. In light of these realities, it would be expected that public market pricing of JDS Inc shares would experience few sharp peaks.

Peter reacted by saying that the Trustees' deliberations on the Proposal could take into account whether conventional alternatives to the Proposal (e.g., sale of JDS Inc shares to a third party or the public) were likely to make JDS Inc a "market darling" and produce sustained advantages for HESOT.

With respect to evaluation of alternative scenarios, Peter stated that the Trustees might consider whether to hire an independent financial advisor. He stated that the Trustees should evaluate their comfort with their own capabilities and competence to weigh financial benefits, or consequences of, alternatives to the Proposal. Peter would not say that the hiring of such an advisor was the "sine qua non" of reasonable fiduciary behavior. It was not something that, without which, fiduciary action might be called into question. The decision whether to hire such a person should be based, he said, on the amount of information available to the Trustees and their judgment of their own capacity and competence as a group to evaluate such information.

Rick noted that Deloitte & Touche had been asked—as Jim McCormack noted, by the JDS Inc Board—to review the company's internally produced findings on alternative financial structures. Deloitte came to no significant differences in either the financial analysis performed or the conclusions drawn with respect to alternative corporate structures. Dick added that he felt the Trustees had good financial analysis skills available in the company's Finance Department, particularly skills to evaluate financial contingencies. For that reason he did not favor the hiring of an independent financial advisor. Jim Karlovsky agreed but expressed interest in analyzing for himself the results of the capitalization study performed by JDS Inc.

Confidential Discovery Material                    16                    **RZ 0004787**

Jim Karlovsky also asked whether it might be problematic to vote for the Proposal based on its call for the New Trustees' defense of the book value share transfer restriction. He distinguished (1) the status quo—in which the Hollister Board has executed HESOT and thereby instructed the Trustees to accept book value; from (2) the Proposal, which calls for the Trustees to vote HESOT shares to permit the adding of the New Trust as a shareholder who that could be expected to commit the company to a book value pricing formula. The Trustees' support rather than acceptance of the book value formula was a new role for the Trustees.

Peter agreed to further consider this issue but explained that the Trustees were being asked to vote on a proposal with various elements, not to vote on each element. Also, the Proposal is consistent with current share transfer restrictions, which do not appear to be subject to change. It would be appropriate to consider the Proposal on balance and might be appropriate to vote for a proposal that was 90% favorable and 10% unfavorable because it was on balance good for HESOT. Alternatively, the Trustees might try to influence the Proposal, subject of course to the results of their analysis of alternatives to voting in favor of the Proposal. For example, if the vote is to continue use of book value and another corporate financial structure would improve share prices for shareholders, then the Trustees might vote against the proposal. They would, however, want to evaluate the prospects for actually producing a change in share pricing that would redound to the benefit of participants and beneficiaries.

Jim Karlovsky asked whether the Trustees might be obliged to negotiate with the Proponents. Peter responded that they could negotiate but were not constrained to do so by ERISA. The Trustees' response to the Proposal is a business judgment, not a legal judgment. They must assess the prospects for successful negotiation.

Dick also noted that the Proposal did allow the trustees of the New Trust to acquiesce in a challenge to the book value pricing formula. The trustees of the New Trust also could deviate from book value if all agreed to deviate from the policies/principals.

Jim Karlovsky focused on the Trustees' handling of a hypothetical situation in which book value declined. Cheryl noted that the HESOT Trustees could decline to buy more JDS Inc shares or could try to sell them to the company. Jim McCormack added that lifting book value restrictions also could worsen poor finances by increasing liabilities of the company upon repurchase.

Peter reiterated the need to actively consider HESOT's opportunities and options with respect to the Proposal.

It was discussed that Peter would consider his need for additional time to complete his work, his availability to meet again with the Trustees in Chicago or D.C. and his thoughts on the number of meetings to hold and contact Rick and Cheryl to arrange future meetings and discuss deadlines. Peter is unavailable to meet on February 9 and 10.

Jim Karlovsky confirmed with Peter that Peter's findings and advice would be independently generated, not a collaborative product with SRZ and would be communicated directly to the Trustees. Peter assured the Trustees that his views will be communicated directly to them. He will, assuming the Trustees do not object, communicate with SRZ on factual and legal issues as that firm has extensively studied the proposal and legal issues. This reduces costs and time spent in replicating understanding, but he will independently advise the Trustees of his independent conclusions. Jim Karlovsky also asked whether Peter would advise on the substantive actions and related risks or simply recommend a direction for the Trustees' review. Peter said it would be the latter. He will guide the Trustees with a procedure. They must decide the Proposal's merits.

Jim Karlovsky asked whether all of the Trustees would vote on the Proposal. Dick noted that voting of the HESOT shares would be determined by a majority vote of the Trustees. The Trustees agreed that the Trustees would seek unanimity. The issue of abstention by Dick was raised as well. Dick explained that he generally abstains from voting as a Trustee to elect himself as a director. Peter agreed to consider the issue, but, as an initial reaction, did not see the vote to amend the Restated Articles to admit the New Trust as a new shareholder to be a vote that, subject to conflict of interest analysis, required such abstention, even if the New Trust might be expected to vote to continue the election of Dick as a nondisinterested director in the future.

Jim McCormack decided to defer an individual meeting with Peter until a later date.

At this point in the meeting, Peter and Cheryl left for the airport.

Dick said he wanted to discuss the relevance of the capitalization study to the Trustees. He distributed a copy of a base case projection to each of the Trustees. He said that if the capitalization study as a whole aids the Trustees' deliberations then Jim Karlovsky should see the study. Also he said that Rick could study the relevance of the capitalization study to the issue of the Trustees' vote for or against amendment of the Restated Articles if the Trustees felt that it would be helpful.

There being no further business, the meeting was adjourned at approximately 5:50 p.m.

MINUTES OF TELEPHONE CONFERENCE
OF THE TRUSTEES OF THE
HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

**February 10, 1999**

A telephone conference of the Trustees of the HESOT was held on February 10, 1999, at 9:00 a.m. The following, being all of the Trustees, participated: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Cheryl A. Kettler, attorney with SRZ, K. Peter Schmidt and Doug Pelle, attorneys with A&P, also participated.

Preliminary Matters

The HESOT Trustees confirmed with counsel the following schedule of discussions (all times CST):

- Lunch meeting Thursday, February 11 -- Noon at the Company's H.R. Conference Room
  Trustees meeting alone

- Friday, February 12 -- 1:30 p.m. group telephone conference call placed by Dick Zwirner

- Monday, February 15 – 1:00 p.m. group meeting at offices of Schuyler, Roche & Zwirner (lunch will be served). Jim Karlovsky will ask Dian Thielitz to attend upcoming discussions to take notes.

Main Discussion

Peter opened the discussion by outlining the agenda:

1.    Conflicts issues

2.    Manner of Trustees' action

3.    Other topics

Research Findings

The first order of business for the Trustees is to clearly identify their fiduciary role and responsibilities and to determine whether each is capable of fulfilling that responsibility when evaluating the Proposal. Peter summarized research findings as to the appropriate fiduciary role and responsibilities as follows:

Confidential Discovery
Material                      19                            RZ 0004790

Conflicts: While there is much precedent or authority with respect to the general fiduciary and ERISA issues examined, it is still fair to say that there is nothing precisely on point. The most helpful authorities have involved corporate control contests, hostile takeovers and/or proxy fights. The Second Circuit case of Donovan v. Bierwirth (discussed at the February 1st meeting) is one of the leading cases in this area. The fact that JDS Inc has no such corporate control contest ongoing does not make such cases completely distinguishable. Peter then explained the holdings of some of the cases in the corporate control contest area.

Bierwirth: In a hostile takeover defense, the company's president swore to fight "on the beaches" to block takeover. He then walked into a defined benefit plan meeting and voted to acquire a block of company shares at a "takeover-inflated" share price. When the takeover failed and share prices dropped again, the plan held over-priced shares. This case makes two points: (1) if conflicts become so acute that a fiduciary cannot make his decision looking solely at the interests of participants and beneficiaries as such, he should step aside; and (2) he should undertake a scrupulous and independent investigation. On the first point, it is important to analyze when you have made up your mind on voting. Most cases do get to the second test.

Walsh v. Northrop/
Grumman Corp.:

On behalf of a plan, company officials accepted a tender for merger when their large personal holdings made it difficult for them to act solely in the interest of plan participants and beneficiaries.

Leigh v. Engle: (Seventh Circuit Case, Circuit includes Illinois): Greenmailers caused plans to invest in the same securities as did the greenmailers. The plans benefited, but it was determined that the greenmailers used the plans' assets to benefit themselves.

Another potentially helpful line of cases involves ESOP beneficiaries who fail to diversify a plan during a precipitous slide in share prices. In such cases, plan fiduciaries possessed facts that would tend to persuade that further plan investments would be imprudent.

None of the foregoing cases have facts similar to ours, because (1) JDS Inc has no corporate control contest underway, (2) JDS Inc faces no drop in share prices, (3) no JDS Inc or Hollister officers face threat of job loss, (4) no potential buyer has offered to buy JDS Inc Shares, and (5) HESOT owns its high volume of JDS Inc shares in compliance with a prohibited transaction exemption that allows certain individual account plans to hold company securities in excess of 10% of all plan assets. However, these cases discuss issues that are relevant to the Trustees' review of the proposal to amend JDS Inc's Restated Articles.

Confidential Discovery
Material

20

RZ 0004791

Moreover, these are the types of cases that one who would challenge action by the HESOT Trustees would try to apply to HESOT's situation if JDS Inc's financial well-being were to suffer at some future time. As a result, the Trustees should anticipate any future changes in facts and circumstances, misunderstandings and disputes that could lead to second-guessing of their decision and anticipate how the terms of the proposal will address such changed facts and circumstances.

Fortunately, ERISA does not make fiduciaries the guarantors of investments that prove disappointing after unanticipated events transpire. Instead, fiduciaries are required to act prudently. The Department of Labor and courts generally focus on how carefully alternatives were considered and how carefully fiduciaries chose between alternatives. The HESOT Trustees are obligated under ERISA to (1) determine appropriate factors, (2) consider such factors appropriately and (3) act appropriately on the basis of their findings.

Unfortunately, the reality of fiduciary claims is that fiduciaries must make their decisions in the best interest of participants and beneficiaries <u>as participants and beneficiaries</u>. Personal considerations of the HESOT Trustees and considerations of participants and beneficiaries other than in their capacity as participants and beneficiaries (such as job security) are not relevant to fiduciary decision making and should not in any way influence fiduciary decision making.

Jim McCormack commented that such views were consistent with his initial thinking on the nature of the decision to be made.

Peter then addressed the issue of whether ERISA fiduciaries are subject to conflicts rules that should be considered as part of the HESOT Trustees' deliberations. He began by explaining that, under the traditional law of trusts, the multiple roles of trust fiduciaries would be problems. ERISA removes the per se violation of the traditional fiduciary obligation not to have dual loyalties. Accordingly, company officers may serve, frequently serve and predominantly serve as company plan fiduciaries. However, ERISA does not relieve plan fiduciaries of their entire obligation to avoid serving dual loyalties. When dual loyalties give rise to acute conflicts between multiple roles of plan fiduciaries, it is appropriate to recuse oneself, resign or support temporary appointment of an independent fiduciary. This rule should be kept in mind at all times.

Peter again discussed the <u>Bierwirth</u> case. In that case, the court doubted the fiduciary's ability to wear company and fiduciary "hats" in light of the acute conflict presented by his opposition to takeover in his capacity as company president.

The court approved a two-step approach to dual loyalty matters: (1) fiduciaries should abstain or be replaced when issues become so acute that dual loyalties are called into acute conflict; and (2) fiduciaries should engage in independent and scrupulous investigation in the interest of participants and beneficiaries, not driven by considerations of other roles served.

Confidential Discovery Material                21                RZ 0004792

In Bierwirth, the court found fault with respect only to the last step, but came close to finding fault on the first step as well. The company president was found not to have brought an open mind to his deliberations as a plan fiduciary.

Peter next discussed what it meant to bring an open mind to fiduciary deliberations. The Beirwirth case involved egregious facts: (1) the corporate control contest; (2) the effect of that contest on share prices paid by the plan when it bought more shares (e.g., $30 v. $20); (3) the lack of arbitrage motivation because the plan did not make its purchases to capitalize on the possible gains that would be realized if shares eventually were tendered at $40; and (4) the acuteness of conflict that existed once the company president committed to fighting the takeover.

Few cases have ruled that fiduciaries had no option but to step aside. However, some courts have indicated that they would prefer that fiduciaries step aside to having to step in when fiduciaries have not. In the case of Danaher Corporation v. Chicago Pneumatic Tool Company, the Federal District Court for the Southern District of New York considered a case in which the plan's fiduciary received a tender offer. The fiduciary resigned his position to let replacement fiduciaries handle the battle. Then the company and the party who sought the takeover went to court over the identity of the replacement fiduciaries. The court favored the first fiduciary's resignation in light of the potential for conflict of interest.

Manner of HESOT Trustees' Action: In Newton v. Van Otterloo, a case that cites Leigh v. Engle, the court ruled that fiduciaries should ask themselves whether they have engaged in intensive and independent investigation for participants and beneficiaries.

For these reasons, Peter recommends that the HESOT Trustees: (1) determine whether their views of the proposal are so solidified that they cannot step back and consider only facts and circumstances in the interest of participants and beneficiaries; and (2) assuming that they can do so, engage in an intensive, scrupulous and independent investigation.

There is little authority that discusses what constitutes an intensive, scrupulous and independent investigation. It is defined in terms of facts and circumstances. For example, in the Northrop/Grumman matter, the fiduciaries hired an independent investment manager to determine that the tender offer was a fair price and adequate consideration for the plan's shares. The court nevertheless suggested there could have been a fiduciary breach because the fiduciaries stood to benefit under rich severance agreements. The case was for equitable relief in the form of a preliminary injunction and the court found that the plaintiffs (who challenged plan fiduciaries) had proven reasonable prospects of success on the merits. Thus, no fiduciary breach was, in fact, found by the court. The court may have so held to encourage the parties position to negotiate a settlement. As already stated, hiring an independent financial adviser can be helpful.

Hiring independent counsel is often recommended for plan fiduciaries. Of course, this is not a sufficient protection from fiduciary liability as plan fiduciaries must exercise their fiduciary discretion to come to a conclusion on any proposal before them.

Certainly the Trustees' decision to retain A&P to independently investigate options and advise the Trustees is part of their intensive, scrupulous and independent investigation.

Additionally, the participation of Dick and Jim McCormack in the capitalization study and Jim Karlovsky's review of its results are further evidence of consideration of the consequences of the current and proposed plans.

Peter informed the Trustees that he had given consideration to whether HESOT could claim entitlement to preferred shares under the John Schneider Trust. Certainly, if HESOT could claim such entitlement, it would obtain control of 69% of the preferred shares and two-thirds control of both classes of equity. The Proponents do not have any written opinions on the issue but did provide some analysis. Peter will look at whether any good arguments can be made that HESOT has a claim to the preferred shares.

Other Matters: Peter then asked the Trustees whether it was their current thinking that the proposal was in the best interest of participants and beneficiaries. He explained that it was reasonable to ask whether the Trustees had made up their minds and, if so, when. None of the Trustees have done so.

Peter was asked about timing. He indicated that the plan fiduciaries in the Bierwirth case took 20 minutes. That was thought to be inadequate. Peter then addressed a question from Jim Karlovsky and Dick from the February 1st meeting. He said that it would be helpful—from a conflicts standpoint—if the Trustees formed an initial opinion before the mailing of the Proposal to Employee/Beneficiaries by the Proponents. That letter would publicly tie the three Trustees with the proposal in their individual capacities. Peter asked the Trustees to elaborate on their current thinking.

Dick thanked Peter for his overview on the issues. He stated that he thought his decision making process was somewhat unique. He has been working on the John Schneider Trust's termination plans for three years with intensive review of plans underway for two years. He has been drafting the proposal for one year. He believes the Proposal is in the best interests of all employees, whether direct common shareholders or otherwise.

During this intensive process, Dick has sought the advice of Rick Michaels, Bob Michalak and Cheryl Kettler of Schuyler, Roche & Zwirner on ERISA issues. He asked them the rhetorical question: "What are my ERISA duties here?" He tests his views against those duties.

If Dick approves the Proposal, he believes the New Trust will continue the support of such concepts. If he rejects the Proposal, he feels that public sale of JDS Inc shares will be an unlikely result because John Schneider's policies and principles still will be followed in this regard. With respect to public sale of shares, Dick had two concerns. First, it would deprive employees generally of the financial benefits of a shrinking common share base, which he feels explains in part the attractive trend in prices of, and returns on, JDS Inc common shares. He believes this lost benefit would be greater than the attained benefit of free transferability. He

explained his view by explaining the finding of the company's capitalization team that book values are rising at a pace far greater than earnings. The difference is the result of a shrinking common share base. For example, if in 199+ $25,000,000 in shares were outstanding and in 199+ $75,000,000 in shares were outstanding, there would be three times as much stock outstanding by value in 199+, but book value would have more than tripled over the same period and the number of shares outstanding would have declined. He believes the closed market for JDS Inc shares accordingly provides an economic substitute for the increase in value that might be realized if JDS Inc shares became publicly traded.

Second, as set forth in the draft Disclosure Document, JDS Inc's growth in common share values over its last 22 years has outpaced the values of certain surrogate baskets of publicly traded shares of similarly sized companies. Dick considers this to be an important or pivotal factor.

Peter commented that this elaboration on the findings of the company's capitalization team was helpful and offered some concrete reasons for Dick to reach the conclusion that he could support the Proposal. He asked whether Dick would articulate these as reasons that the proposal was in the best interest of participants and beneficiaries in their capacity as participants and beneficiaries. Dick confirmed that, but said that, in this regard, he thought the Proposal would benefit all employees of Hollister in a similar manner. It would produce a general financial benefit for all of the company's shareholders, including HESOT—i.e., enhanced well-being and growth of the company—which would affect everyone's share-based interests.

Because Dick wears the most "hats," Peter added that Dick should scrutinize whether his support of the Proposal:

1.      stemmed from any personal financial interest;

2.      stemmed from any personal interest in being a trustee of the New Trust;

3.      stemmed from a desire to continue as general counsel to the company; or

4.      stemmed from any desire to some day be eligible to collect a fee for serving as a trustee of the New Trust.

With respect to the last point, Peter acknowledged that the $30,000 fee collectible by some trustees of New Trust would be a small sum as compared with Dick's current compensation, but a potential challenger could find it at least relevant. Dick's firm also has a relationship with Hollister. Peter stated that he did not mean to single out Dick in this line of concern. Of course, he noted, voting for the Proposal did not secure anyone's job. Mr. Kuehn (a shareholder of JDS Inc in the mid-1970's) also had once thought share ownership made his position secure only to find it did not. He also noted that the desires of John Schneider and JDS Inc were irrelevant to the Trustees' decision.

Confidential Discovery Material

24

RZ 0004795

Dick asked whether ERISA case law's support of employee ownership principles provided a permissible rationale for supporting the Proposal.

Peter responded that financial considerations probably should be paramount but, if they were favorable, ERISA's support of employee ownership could offer a further basis for approving the Proposal.

Dick and Peter then discussed language in the Disclosure Document that indicates that the Proposal will benefit employees. Peter asked if it was fair to say that the benefits to employees were the same or different from the benefits to participants and beneficiaries in their capacity as participants and beneficiaries. Dick responded that the Disclosure Document meant to refer to more or less undifferentiated financial benefits that would be available to employees in their capacity as direct or indirect common shareholders, the same thing as benefits realized in their capacity as participants and beneficiaries.

He elaborated by saying that the Proponents were not proposing the amendment of the Restated Articles to secure employment of anyone. Hollister generally pursues a policy of avoiding unnecessary turnover and lay-offs. Indeed, the only three layoffs that came to mind were business motivated (Abbott, Rondout and Shadownet). Peter suggested that the Disclosure Document could reflect that. Jim Karlovsky clarified the point of saying that he viewed stability of employment as an issue important to employees in their individual capacities and a "given" under both scenarios (voting in favor of or against the Proposal). He did not believe that it was a legitimate objective of the Trustees to act to preserve employee jobs. However, he acknowledged that if employee stability could be identified as one of the reasons for company success and return on HESOT's investments, he would view the issue differently.

Jim Karlovsky then asked what else might be appropriate to take into account. Peter responded that his firm's research to date had not produced any definitive list of considerations, but he did suggest a procedure that would serve. The Trustees should consider each element of the Proposal and determine a favorable or unfavorable view of it. If any elements were viewed unfavorably, they could be treated as: (1) acceptable if offset by benefits of the Proposal; (2) cause to negotiate with the Proponents or other parties if, on balance, they made the Proposal unattractive to the Trustees; or (3) cause to reject the Proposal. Moreover, in deciding whether to negotiate an element, the Trustees could decline to negotiate if they thought it would not get them anywhere. Jim Karlovsky stated that this advice suggested that, under the right circumstances, the HESOT Trustees could vote for a proposal that contained at least one element that they disfavored. Peter confirmed this.

The Trustees next discussed with Peter the nature of their role as a JDS Inc shareholder. Peter explained that HESOT is a substantial shareholder of the company. As such, it can negotiate with other shareholders. At this point, Peter drew the Trustees' attention to Section 11.01(4)(c) of HESOT, which provides that the Trustees may:

> exercise every power, election and discretion, give every
> notice, make every demand and do every act in respect to
> any shares of stock, bonds, notes, debentures or other
> obligations or securities held in the Trust Fund which the
> Trustees could or might do if they were the absolute owners
> thereof.

Jim McCormack remarked that he considered that language as well but asked Peter how it might be interpreted in light of the instruction in Section 11.01(1) that:

> It is expressly understood that under normal circumstances
> and to the maximum extent practicable and advisable, the
> Trustees are to:
>
> (i)     invest the Trust Fund in Common Shares of JDS
>         Inc.; and
> (ii)    purchase from JDS Inc. and from Employees,
>         former Employees and personal representatives of
>         former Employees of the Company and/or JDS Inc.,
>         Common Shares of JDS Inc. offered or made
>         available to the Trustees subject, however, to
>         compliance with or exemption from the prohibited
>         transactions rules.

Jim McCormack asked how the Trustees could be at the same time "absolute owners" of property and required to acquire and hold the property "to the maximum extent practicable and advisable"? Peter answered this concern by referring to ESOP case law that suggests that plan fiduciaries must balance or reconcile the sometimes inconsistent by expressly endorsed ERISA policies that favor employee ownership and require fiduciaries to act prudently. In general, in a plan like HESOT, neither policy should overcome the other. For that reason, ERISA expressly relieves plan beneficiaries like the Trustees from the fiduciary obligation to diversify plan assets. This language does not override prudence concerns, but it does indicate existence of a strong public policy in favor of employer share ownership by plans like HESOT.

Dick explained that, when Hollister adopted and amended HESOT, in the early years, he, as the plan's drafter, recognized that the Trustees would need authority to diversify in unusual circumstances such as if JDS Inc common shares experienced declines in returns or if JDS Inc lacked cash flow to repurchase its shares from HESOT. The first sentence of Section 11.01(1) was intended to give the Trustees that option.

Peter commented that the Trustees should follow the express language of the trust, favoring specific instructions over general ones, specific limitations over general ones and ERISA requirements over the trust requirements.

RZ 0004797

Dick expressed the view that the trust was drafted consistent with ERISA, making the trust's express language the best guide of action. He reads that language as saying that the Trustees are instructed not to diversify plan assets unless, for example, book value of JDS Inc common shares falls below returns from portfolios invested elsewhere. Jim Karlovsky added that even when returns are better in another investment, it might be advisable to continue substantial investments in JDS Inc common shares to reduce volatility of returns.

On this point all of the Trustees agreed: the HESOT participants have in the past voiced their support for the maximum investment in JDS Inc common shares, stating that even repurchases to fund benefit payouts increase the performance of the trust.

Peter described Donovan v. Walton, a Florida case involving a collectively bargained plan that owned a building and leased it to the union. The DOL challenged the investment because the building constituted 63-70% of the plan's assets. The court held for the plan's trustees on the grounds that it would then have been imprudent for the trustees to diversify under the circumstances. Interestingly, the plan was not an eligible individual account plan, like HESOT, that is expressly excused from the general ERISA fiduciary's obligation to diversify plan assets. While the Walton case is not a "usual" case, it does support lack of diversification when a plan has the opportunity to hold a desirable asset.

The Trustees then addressed the possible ERISA ramifications of any negotiation with the Proponents or the Board of JDS Inc. Such negotiations would give rise to direct conflicts of interest not otherwise existing. For example, Dick's continuation as a trustee would not be permissible. One or more of the Trustees might recuse themselves and call for appointment of one or more new, independent trustees to negotiate the matter. Peter added that he did not believe that any of the trustees would be required to recuse themselves at this time. Dick's role as a primary proponent of the Proposal and Jim McCormack and Jim Karlovsky's roles as initial grantors to the New Trust, were actions undertaken in their individual capacities as JDS common shareholders. Since ERISA permits plans like HESOT to invest in JDS Inc common shares and permits other shareholders to serve as trustees for HESOT, there was no per se violation of ERISA if the Trustees continued in their roles as such. Also, ERISA permits trustees to be directors, officers or employees of JDS Inc or its subsidiaries. He cautioned, however, that an adverse party could point to multiple roles as a factor that might favor a recusal. On the other hand, some factors favored the Trustees' continuation as Trustees, including their collective expertise and understanding of the company. Of course, Peter allowed, because Hollister retirees are cashed out under HESOT, a retiree also might be a neutral and knowledgeable independent trustee.

The Trustees then outlined their plan for a further meeting, without counsel, to be held on February 11, 1999. They would endeavor to cover such topics as:

1.      The basis on which they would cast votes, i.e., by majority vote or by consensus or unanimity; and

2.      Their individual views on favorable and unfavorable factors in the Proposal and otherwise.

Peter advised the Trustees also to consider what would happen if HESOT were to reject the Proposal. If proponents of the Proposal can override such action in some manner, voting against the Proposal could be a futile act. The Trustees are not obligated to take futile steps. If, however, HESOT's rejection of the Proposal would make it very difficult or impossible for the proponents of the Proposal to move forward, this would favor negotiation of any unfavorable elements of the Proposal.

The Trustees next discussed their different reactions to the company's report on its capitalization.

They discussed:

1.      the fact that the company had analyzed and rejected a number of alternatives to its current capitalization and determined that they were not feasible or not attractive when compared with the current book value/transfer restriction system;

2.      the company had not necessarily considered all alternatives because of its assumption that the company's shareholders were committed to continuation of it as an independent and employee-owned entity; and

3.      the company's analysis of an ESOP approach (assuming JDS Inc remained an independent and employee-owned entity) was helpful but not the last word on such alternatives as going public, sale of shares to a non-employee in such circumstances.

Peter encouraged the Trustees to consider the possibility of asking the Proponents, or even Mike Winn, CEO and the employee/beneficiary with the largest projected holdings of preferred shares, for a representation as to the prospects for "countermeasures" that could or might be undertaken if the Trustees were to reject the Proposal.

The Trustees then discussed time constraints on their decision, and Dick offered to discuss with Mike options for extending the period of review if desirable.

The Trustees asked for a copy of <u>Donovan v. Bierwerth</u>. Cheryl agreed to send it out.

The call ended.

Confidential Discovery
Material          28          RZ 0004799

## MINUTES OF MEETING OF
## THE TRUSTEES OF THE
## HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

### February 11, 1999

A meeting of the Trustees of HESOT was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on February 11, 1999, 12:00 noon.

The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Jim Karlovsky acted as secretary of the meeting.

Jim Karlovsky advised that the purpose of the meeting was to deliberate on issues related to voting for a proposed amendment to the restated articles of incorporation which would permit the new trust to become a holder of the shares of JDS Inc. The Trustees conducted the meeting with an open agenda and raised the following concerns:

**Jim Karlovsky:**

Jim summarized his views and concerns as follows:

1.    Fundamentals of the Proposal:

a.    As is the case with the John Schneider Trust, the New Trust calls for the company to be maintained as independent, employee-owned and otherwise operated consistent with John Schneider's policies and principles.

b.    The Proponents do not believe that HESOT qualifies for any of the preferred shares based on its not being an individual employed by Hollister.

2.    Discussion of the Proposal in operation:

a.    What will the Trustees do if the company under performs?

(1)    Go to Board to request action (e.g., repurchases, establishment of a sinking fund or other arrangement to enhance liquidity, authority to sell shares to a third party, adoption of a "put" option under the plan, authority under the plan to distribute shares to anyone who retires when there is insufficient liquidity to cash out).
(2)    Stop acquiring more JDS Inc shares, but HESOT mandates purchases of shares, but ERISA may override if that would be prudent.
(3)    Offer to sell a third party (undesirable competitor may have interest)
(4)    Sell to a third party if only choice, share transfer restrictions excused;
(5)    Resign as Trustees;
(6)    Go to court to request guidance consistent with ERISA; or

Confidential Discovery
Material

29

RZ 0004800

(7)    Request an advisory opinion letter from the DOL or a private letter ruling from the IRS.

b.    As an alternative, the Trustees can consider pursuing other approaches before a share return decline occurs:

(1) Obtain representations from the Company's Board that the Trustees can rely upon; or
(2) Pursue ability to negotiate out the "Book Value" clause in the New Trust.

c.    It was recommended that the Trustees define when "stable employment" is a valid consideration of a fiduciary like the Trustees.

d.    The Trustees should determine whether ERISA permits fiduciaries, like the Trustees, to consider both long and short-term effects of their decisions.

e.    While HESOT growth rates are comparable in one-, three- and five- year horizons and stronger over 10 years, this does not address what absolute valuation level growth rates are based on (i.e., market vs. book). Charts included in the Disclosure Document do not take into account compounding. However, charts with that information can be provided by SRZ. They prepared charts that were not included in the final Disclosure Document.

f.    If the Trustees faced a tender offer of three times book value today, which would they take? Right now, the Trustees would submit the shares to JDS Inc under its right of first refusal. If JDS Inc repurchased, the Trustees could accept the lower offer from JDS Inc because the transfer restrictions call for that behavior. If JDS Inc declined repurchase, the Trustees would have to seek another permissible purchaser. The share restrictions would bar a sale at three times book value as long as the transfer restrictions existed. Not even ERISA would compel the Trustees to sell if to do so would be barred by corporate principles. Thus, even if the Trustees would like to accept three times book value, they could not. If the Trustees could accept such an offer and would consider accepting an offer of three times book value, how could they vote to preclude ever having that choice in the future?

g.    What happens over time if profitability decreases or losses incurred?
Can we sell shares to the company—will they buy them?
Will balances decrease without ability to protect accounts?
Will we have precluded giving Board and Trustees freedom to act to protect employee accounts?

If the Board says no, what happens?

h.    Do we need to consider diversification since we cannot do it effectively?

i.    Think of how Trustees should vote if things went sour.

j.    The history of John Schneider and his wishes is not relevant, put it aside. This is a safe base to proceed from.

k.    Look at whole package and the consequences of a yes or no vote, especially the "no".

l.    Jim Karlovsky and Jim McCormack are initial Grantors - are their personal, professional interests preventing them from acting with objectivity?

3.    Preliminary analysis of pros and cons:

| Vote | Pros | Cons |
|---|---|---|
| Yes | Continue profitable past system | Take the company off the market unless conditions permit the trustees of the New Trust to deviate from John Schneider's policies and principles |
| No | Discontinue profitable past system (Proponents might succeed anyway through countermeasures)<br><br>Allows the company access to the public markets if they can overcome the share transfer restrictions (Agreement to Vote, fact that share transfer restrictions can't be overturned without two-thirds vote of preferred class, opportunities for board to issue more preferred shares and other countermeasures available may make this moot) | Could create instability in company direction and focus<br><br>One time boost to unencumbered market value would be unsettling to balance sheet based on capitalization study<br><br>Expected returns could be at least less reliable |
| If negotiate | Could weaken book value defenses | Could undermine defenses of overall system and its performance (i.e., return and stability |

**Jim McCormack:**

Jim McCormack described his views and concerns as follows:

1.  The Trustees are guided by duties that sometimes overlap and may appear to conflict. They have their general responsibilities under ERISA, but are restricted in how they live up to these responsibilities by other provisions of ERISA and by the plan, especially in how they can invest, in the choice of securities, diversification and in the valuation of that security. For example, there is a general fiduciary obligation to diversify a plan's assets but HESOT is an eligible individual account plan that is specifically permitted to concentrate its assets in employer securities. The Trustees' duty to diversify is limited. The duty to diversify does not come into play until prudence requires diversification, e.g., negative returns, possibly, but not certainly for reduced or constant returns.

    a.  The Trustees' job has been to see that the Plan is administered fairly, consistently, efficiently and legally.

    b.  The "ambiguity" has no bright line resolution in law because decisions are evaluated on a facts and circumstances basis. If everything goes all right, the Trustees have limited liability. If things would turn sour, they would be exposed, but this should be limited by the many factors that favor stable governance of the company support of the Proposal by HESOT. The truth is that fiduciaries' decisions are subject to Monday morning quarterbacking. It is a risk inherent in their acceptance of the responsibility.

    c.  The Proposal illustrates the risks. One of the Trustees is a proponent of the New Trust, the other two Trustees are initial Grantors. They are being asked to approve a governance structure that would, among other things, perpetuate the book value methodology used to value company shares (which has always been consistently utilized). They must be convinced that the Proposal <u>overall</u> is solely in the best interest of the participants and their beneficiaries and vote the shares as if they were the absolute owners thereof.

    d.  In many ways, the New Trust is a codification of the past practices of the company. In some ways, it improves upon the John Schneider Trust and practices by requiring trustees who are not directors, disinterested and nondisinterested trustees and expanding the number of trustees and directors. It also requires unanimous votes to change the corporate structure, specifies that no more than 10% of common shares can be held by one individual, and precludes any windfall to a trustee or director should a governmental agency or other party force a change from book value methodology.

Confidential Discovery Material

32

RZ 0004803

e.   The Trustees, in their position as a fiduciary, are really powerless to stop the New Trust from being installed.  They are a minority shareholder, even though they own most of one class of shares.  They could frustrate and delay, but the Proponent have the power to overcome and do things the way they want.

f.   Furthermore, the various options that have been explored through the capitalization study, such as an ESOP, would not work because of the debt levels and cash flow burden that would be imposed and complexities that other alternatives explored would bring.  Even a public offering would be problematic since most HESOT beneficiaries and other shareholders would probably leave if the stock were sold at say, three times book value or even more.  There would be a "run on the bank" that would seriously undermine the value of the stock in a relatively small market.  The entire structure of the company would be changed, including its values and its performance.  While this would enhance the net worth of the major current shareholders and HESOT beneficiaries (including notably the Trustees) smaller participants and shareholders would be saddled with a high level of debt or ownership by a third party who may or may not be interested in continuing as an employee owned company. In fact, he believes this is what would happen as Hollister is worth more as an asset play, and a buyer would consolidate facilities and sell nonessential assets, especially real estate.  Also, what are the consequences of the Proponents deviating from John Schneider's principles in the future?  Could the company go public to resolve problems in competing in its market?  The answer is yes.

g.   Furthermore, absent the New Trust, what happens?  Probably a lack of focus as the present system would result in several shareholders having a substantive percent of votes but not control and some may vie for a broader role for which they may not be qualified or would mistakenly focus away from their real responsibilities.  They may be acting against the best interests of all employees and place the Trustees in a difficult position as they attempt to protect the assets of the participants.

h.   The whole thing is moot anyhow as the proponents and the Proponents have the ability to reorganize as they see fit.  Nonetheless, the New Trust has so many positives that it is better than the present structure and should enhance the HESOT beneficiaries' interests.

i.   This is an opportunity for the Trustees to communicate to the proponents of the New Trust and to obtain any verbal or written understanding of the intent. The proponents must know that the Trustees are doing this because of conviction, not to please the proponents.

j.   It is also an opportunity for the Trustees to negotiate some agreement on repurchase in case things went sour, whether this be part of the deliberations on

the Proposal or just an understanding to be reaffirmed. This would be beneficial for both the proponents and the Trustees and should be communicated to the trustees of the New Trust and perhaps the board of directors.

2.    Principles from HESOT Trust (and ERISA)

    a.    The Trustees should vote solely in the interests of the participants and their beneficiaries.

    b.    The Trustees should exercise every power, election and discretion with respect to the shares that the Trustee could or might do if they were the absolute owners thereof.

**Dick:**

Dick outlined his concerns as follows:

1.    The Company's not being able to go public, i.e., no access to public market for raising capital

Derivative Concern: If the Company went public, HESOT could get more than book value for its common shares or, if kept, they would be worth more.

2.    Without the New Trust, the preferred shares are redeemed and cancelled (not reissuable) on the distributee employee-common shareholder's retirement, i.e., at the end of the line only common are outstanding and HESOT owns 69% of common, controls the company.

Are the Trustees (is HESOT) giving up future control of the company?

3.    Are the parts of the Proposal the Trustees don't like (e.g., foreclosure of public trading status) so important to them that they feel a duty to ask for or negotiate for changes in the Proposal?

4.    Employee ownership is one of the three fundamental reasons/goals/purposes behind the Proposal.

Access to public markets is inconsistent with it to a substantial degree.

The proponents will not agree to access to public markets, i.e., the ability to go public because it is inconsistent with one of their fundamental purposes.

Employee ownership benefits HESOT participants and beneficiaries. Indirect ownership is called for in the first policy/principle of John Schneider. HESOT is

specifically mentioned in the John Schneider Trust. Returns to participants on employer securities have been very good. This is all perpetuated and mandated in the New Trust.

There being no further business the meeting was adjourned at approximately 3:00 p.m.

MINUTES OF TELEPHONE CONFERENCE
OF THE TRUSTEES OF THE
HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

**February 12, 1999**

A telephone conference of the Trustees of the HESOT was held on February 12, 1999, at 1:30 p.m. The following, being all of the Trustees, participated: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Dian J. Thielitz, as secretary to the Trustees, Cheryl A. Kettler, attorney with SRZ, K. Peter Schmidt and Doug Pelle, attorneys with A&P, also participated.

Main Discussion

Dick Zwirner began the call with a report on the February 11 meeting of the HESOT Trustees. He reported that the Trustees would like to be in a position to support the Proposal based on its likelihood of continuing JDS Inc's trend of providing stable growth and above-average returns on HESOT's investment. However, all of the Trustees are feeling the great weight of their ERISA responsibilities to participants and beneficiaries. The Trustees acknowledged that, in their capacities as individual JDS Inc common shareholders and in some of their other capacities, they could identify benefits to the Proposal that would not be relevant to their deliberations as HESOT Trustees. However, they did not believe that these extraneous considerations limited their ability to act solely in the interest of HESOT's participants and beneficiaries.

The Trustees then proceeded to relate some of their initial thoughts about the Proposals. Jim Karlovsky and Dick agreed that:

1.    Allowing the New Trust to hold preferred shares could deprive JDS Inc's board of directors and officers of the ability to take the company public, assuming it would be financially advisable to do so;

2.    However, the New Trust, unlike the John Schneider Preferred Share Trust, would permit deviation from what have been referred to as the "John Schneider policies and principles" on an additional basis. The John Schneider Preferred Share Trust permits deviations (a) for preservation of financial stability and soundness of either JDS Inc or Hollister; or (b) to continue the manufacture and distribution of high quality health care and other products. The New Trust also permits deviation

(c) to compete in the marketplace occupied by JDS Inc or Hollister's principal competitors.

3.  Continued pursuit of the employee ownership principle is desirable if it makes the company more successful.

Jim Karlovsky's and Jim McCormack's greatest concern is that the Proposal makes the Book Value System perpetual. In particular, Jim McCormack is concerned as to how the Book Value System might affect the HESOT Trustees' decision making if they ever received an offer in excess of book value for the Trust's common shares. Dick explained that the Trustees had considered what they might do if faced with declining rates of growth, or negative growth in book value.

The Trustees identified the following options available to them in the event that JDS Inc common share returns proved lackluster:

1.  Offer JDS Inc common shares for redemption by JDS Inc and/or sale to another permissible party;

2.  Demand that JDS Inc redeem JDS Inc common shares;

3.  Attempt to sell JDS Inc common shares to an impermissible party to determine whether other JDS Inc shareholders would continue to support the share transfer restrictions or whether that would persuade JDS Inc to redeem the JDS Inc common shares;

4.  Use new contributions, in excess of liquidity needs, if any, to acquire other plan assets to diversify the trust; or

5.  Resign as HESOT Trustees.

Peter commented that, with respect to the approach of resigning as HESOT Trustees, if JDS Inc declined to replace the HESOT Trustees, it could take a petition to and order from a federal court to relieve the HESOT Trustees of their fiduciary responsibilities. Under ERISA, plan assets must be held in trust and the HESOT Trustees may not act contrary to ERISA. Thus, they could be compelled to "stay in office."

On evaluation of these alternatives, all of the participants in the call felt that those approaches could fail to permit or accomplish diversification of HESOT's plan assets if the company's board of directors declined to repurchase shares in sufficient amounts at appropriate times.

The HESOT Trustees next considered what would be the consequences of rejecting the Proposal. They began by considering what were the consequences for HESOT, its participants

and its beneficiaries if the John Schneider Preferred Share Trust were to terminate in 2001 and employee/beneficiaries were to receive JDS Inc preferred shares subject only to their signing the Agreement to Vote.

For purposes of this discussion, the HESOT Trustees agreed that, from HESOT's viewpoint, there is no intrinsic, quantifiable value to continued employee ownership except to the extent it preserves the existence of HESOT for the benefit of HESOT's current and future participants. Dick Zwirner stated that, in his view, 100% employee ownership was a weak counterweight to access to public markets if the company needed that access, but he was not sure the denial of access to public markets was a consequence of voting for the Proposal in light of the permitted deviation from the principle of employee ownership under the New Trust.

In light of all of the HESOT Trustees' discomfort with the "permanence" of the Book Value System in the New Trust, Dick commented that the HESOT Trustees should consider whether to pose a question to the proponents (who include Dick) about their willingness to reconsider the permanence that aspect of the Proposal.

It was agreed that if the HESOT Trustees followed this course of action Dick would abstain from any further role in the matter. In that event, Jim McCormack, Jim Karlovsky and Peter would proceed to a meeting.

Each of the HESOT Trustees then expressed the view that, based on their deliberations to date, they did not expect to end up in a negotiation over the Proposal. However, they might open a dialogue with JDS Inc's board about the company's commitment to repurchase its shares if book value were to decline or if there were negative returns.

The HESOT Trustees then considered the timing of their decision. They decided to reserve committing to support or reject the Proposal until the April annual meeting of JDS Inc shareholders to conclude their independent analysis of the Proposal.

Peter agreed with the HESOT Trustees that they were under no pressure to announce their vote in advance of the April 30th meeting. He reminded the Trustees that the mailing of the Disclosure Document (and the disclosure therein that all three HESOT Trustees favor the Proposal in their individual capacities) could give an impression that the Trustees have decided how to vote when that is not the case. But Peter and other participants in the discussions can testify as to continued deliberations and pursuit of the issues.

Peter asked whether he could reserve his legal opinion as well. This matter was deferred.

Jim McCormack acknowledged that it could be problematic for some employee/beneficiaries if the HESOT Trustees were to reject the Proposal but support it when voting individually. If the final vote by the HESOT Trustees is the same as their current thinking, however, this should not be a problem. He asked Peter to clarify the guidance from the Bierwerth case on acuteness of conflicts for him to let him reassure himself that his announcing

his role as an initial Grantor was unlike the CEO's role in announcing he would fight a tender "on the beaches."

Peter repeated the court's views and added that the core issue is—can you put aside your personal feelings and consider the Proposal's effects on HESOT, its participants and its beneficiaries? Jim McCormack stated that he still could do so.

Jim McCormack then raised the issue of the Department of Labor's May 1998 audit of HESOT. He asked whether the Department's failure to issue any final report but generally favorable comments at the auditor's exit interview suggested there was any legal objection to the book value pricing system. Peter responded that no one could say for certain what significance to assign to the Department's silence. He thought that it might be reasonable to treat it as some risk or exposure but was not sure that it had any bearing on the procedure to be followed by the HESOT Trustees. The Trustees have legal support for the book value pricing system if they are challenged. Jim McCormack added that it was his desire to make a correct, legal, fair and consistent decision on the Proposal. Every important issue should be raised and considered.

Dick asked the other HESOT Trustees what they considered to be the issue before them: whether to amend the Restated Articles of Incorporation or whether to support the whole Proposal, including all the values it represents? He expressed the view that the Trustees' don't have to approve of any shareholder's entire value set. That's the role of an employee/beneficiary. He views the Trustees' role as less momentous than that. They can act on one piece—the Restated Articles—if it suits the participants and beneficiaries and leave the rest of the Proposal to others (or themselves in other capacities) to evaluate.

Peter suggested that the Trustees could vote in favor of the amendment to the Restated Articles if, on balance, it helps participants and beneficiaries, short-term and long-term, and has no material negative consequences.

Jim McCormack said that—under that view—he could vote "yes."

Jim Karlovsky said that voting "yes" would focus management on its goals, decrease instability/distraction caused by lack of a plan for terminating the John Schneider Trust, and could stem some early retirements by good persons who thought the company would change hands in 2001.

Peter commented that there must be others who were aware that, when John Schneider wanted to retire, the transition did not go well—at first. Mr. Kuehn thought he would "take over" and change the company. It took Mr. Schneider's trust to change that. He favored weighing stability in evaluating the Proposal.

Peter then asked, did the Trustees want to sit down with Mike Winn or others to discuss their concerns about permanence of the transfer restrictions/Book Value System.

RZ 0004809

Dick did not think the Trustees were ready to ask for such a meeting. It would be a futile act before the Trustees had finished enumerating their concerns, discussing the Proposal as a whole, as well as balancing the various and relative factors involved.

Jim McCormack said that he and Jim Karlovsky agree, a meeting would be desirable if the Trustees could convince Mike Winn to back away from "permanent" commitment to the transfer restrictions/Book Value System. His greatest concern about the Proposal is that the New Trust will bind the company to resist changing its transfer restrictions to respond to a competitor's offer of, say, three times book value, which could limit the Trustees' ability to accept such an offer. He's looking for some comfort that he can support this and, at the same time, comply with ERISA.

Peter responded by asking—who would offer three times book value knowing share transfer restrictions like JDS Inc's exist? The potential third party would drop the idea once his due diligence showed that the company's transfer restrictions would bar such a takeover and that the HESOT Trustees lack the votes required to amend the Restated Articles of JDS Inc. The "purchaser" would have to enlist the preferred shareholders—who would be constrained by the Agreement to Vote.

Peter suggested that the HESOT Trustees enumerate pros and cons on the "permanence" issue and discuss whether impermanence is an advantage. For example, if the ability to abandon share transfer restrictions means that shares can be sold at a multiple of book value: will this produce company debt load that might cause JDS Inc to abandon the concept of employee ownership altogether, injuring future classes of Hollister employees. Does the short-term gain outweigh long-term losses? Is the short-term gain concentrated amongst a handful of people and the long-term injury visited upon the many?

Jim McCormack thought there was evidence that Peter's speculation would prove right. He described Peter's assumptions as being reasonable.

Peter added there is case law to the effect that trustees need not injure future participants to capture the "bump" up in share prices for current shareholders.

Dick commented, too, that the New Trust commits the board of directors to continuing HESOT. Any scenario that leads to third party, non-employee party ownership, could dilute HESOT's vote or lead to its termination. He advised the other Trustees to remember that, once an initial "bump" in price has been accomplished, the task of the Trustees is to concentrate on rate of return. Once Hollister's share pricing system changes, HESOT must buy at higher prices to continue selling at higher prices. If post-bump prices don't grow at the same rate as pre-"bump" book value rises.., there would be long term problems.

Jim McCormack said that the long-term participant focus weighs for voting for the Proposal. He asked Peter whether the Trustees could consider future participants.

Confidential Discovery
Material                    39                                RZ 0004810

Peter confirmed this. He related the facts of <u>Braniff.</u> In that case Braniff was in bankruptcy. Under its bankruptcy plan, the retirement plan could terminate and participants' benefits would be paid by the PBGC at a lower level than called for under their retirement plan. The trustees had to consider a proposal that they keep the retirement plan going for senior pilots, and give younger pilots nothing but the PBGC-guaranteed benefits. The trustees considered which approach was best for all pilots under the circumstances. They went to the court for instructions and learned that they had a fiduciary responsibility to current and "future" participants.

All three HESOT Trustees agreed that, based on current discussions, future participants would benefit from the Proposal.

Peter also related facts of a case, in which a court ruled that fiduciaries could refuse a tender offer at a premium above market value if, in their informed judgment, it appeared that the company's real value exceeded that premium. Jim Karlovsky asked whether the court had focussed on long-term vs. short-term participants. Peter answered that they did not.

Jim McCormack commented that, based on his own readings, it appeared that HESOT stood a better chance of continuing because the New Trust expressly committed the company to employee ownership.

Peter noted as well that current HESOT participants have accrued large balances without having to make contributions or deferrals out of their salaries. They have been well-served by the company's policies.

Jim McCormack asked whether it mattered if a plan fiduciary managed a defined benefit or defined contribution plan?

Peter said it was tough to distinguish the two sets of facts. What he did feel comfortable saying was that defined contribution plans that pay as well as HESOT usually involved a combination of employer and employee contributions.

The Trustees then reviewed plans for Monday, February 15, 1999. The Trustees would meet at 1:00 p.m. with Peter at SRZ's offices. To prepare for that meeting: (1) Jim McCormack would synthesize his thoughts, come to some preliminary conclusions and review those at the meeting; (2) Jim Karlovsky would continue his review of the company's capitalization report and sort through issues; and (3) Dick will do the same.

Dick asked whether the Trustees could meet at noon before counsel arrived? They could not.

Peter asked whether the Trustees could reach a preliminary conclusion by Monday. They thought they could do so.

Jim Karlovsky thought it would help in this regard to briefly discuss the Trustees' options if the Department were to issue an audit report between April 1999 and April 21, 2001, when the New Trust might be in existence without power to hold (and vote) the JDS Inc preferred shares. He thought that the vote to admit the New Trust in 2001 would commit the company to defend its share transfer restrictions and book value pricing system. Dick thought these principles were as "sacred" to JDS Inc in February 1999 as they would be between April 1999 and Aril 21, 2001. Jim Karlovsky thought that a vote for the amendments to the Restated Articles could make things more awkward for the Trustees, even if the company were unchanged. However, he expressed his view that decisions by the Trustees should be made to benefit participants and beneficiaries and not to give the Trustees "comfort."

All the Trustees expressed concern that a vote against the Proposal would:

1.      Injure employee relationships with Hollister and could lead to reduced performance and loss of shareholder value; and

2.      Distract employees from achieving corporate financial success, introduce instability and lead to declines in company financial success.

The Trustees characterized the Proposal as a codification, and—from the viewpoint of HESOT—an improvement of the status quo:

1.      An increase from three to five New Trust trustees means broader viewpoints on issues;

2.      Inclusion of "disinterested" trustees and directors means different backgrounds and skills brought to bear;

3.      Lack of 100% overlap between trustees and board means there could be some opportunity for shareholders other than the New Trust to influence board voting;

4.      The 10% limit on individual common shareholdings means no one individual can try to control the company; and

5.      Deviation from John Schneider's policies and principles will be permitted on at least one more basis than under the John Schneider Trust.

On the issue of the timing of Peter's opinion, the Trustees asked that Peter preview for them, at the February 15th meeting, what his opinion would say. He could then defer his written opinion to account for discussions occurring before the vote on the amendments to the Restated Articles of Incorporation.

The call adjourned.

RZ 0004812

## MINUTES OF MEETING OF
## THE TRUSTEES OF THE
## HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

### February 15, 1999

A meeting of the Trustees of HESOT was held on February 15, 1999, at 1:45 p.m. in the Board Room at the Law Firm of Schuyler, Roche & Zwirner at One Prudential Plaza, 130 East Randolph Street, Chicago, Illinois 60601.

The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Richard E. Michaels and Cheryl A. Kettler, attorneys with the firm of SRZ, K. Peter Schmidt, an attorney with the firm of A&P, a Washington, D.C. law firm and Dian J. Thielitz, secretary to the Trustees, were also present.

### Agenda

The Trustees opened the meeting with the following agenda:

1.  Conducting an independent financial analysis of the Proposal;

2.  Evaluating the status of the May 1998 DOL audit;

3.  Timing of the Trustees' decision on the Proposal;

4.  Evaluating the tax treatment of the transfers of preferred shares;

5.  Open discussion of the Proposal; and

6.  Nature of A&Ps' legal opinion.

### Main Discussion

Independent Financial Analysis:  The Trustees have not determined whether to perform their own independent financial analysis of the Proposal or whether to hire an independent financial advisor to prepare a report for them.

Peter responded that he was comfortable with the Trustees' decision making process but posed a few questions to help them to further explore their views. He explained that the hiring of an independent financial advisor was not the "sine qua non" of prudent fiduciary behavior, but if there were a challenge to the Trustees' vote on the Proposal, the Trustees would need to be comfortable with their answers to these questions:

Confidential Discovery
Material

42

RZ 0004813

> (1) What is your ability to evaluate the financial aspects of the Proposal; and
>
> (2) What is your exposure if the DOL or a participant or beneficiary later challenges the Trustees' action.

Dick asked Peter to articulate what the scope of work of a financial advisor would be under the circumstances. Dick expressed the view that the only possible assignment could be to help the Trustees determine if the Proposal was as good or better than the current arrangement because alternative scenarios did not suggest that such things as going public or selling an interest to a third party were feasible.

Peter responded that Dick could have the right view. He and his firm have given thought to the role of a financial advisor when there is no share pricing issue and no specific economic risk to measure. But Peter could recommend Steve Hester, a former partner at A&P, now a principal at American Capital Strategies with experience in putting together ESOP deals and financings. Steve is experienced with employer plans invested in employer securities and appreciative of the advantages of employee ownership. He could help to define the financial advisor's role.

Jim McCormack commented that he knew many similar people. Dick asked whether the other Trustees wanted to hire someone. Jim McCormack did not rule it out. He said that, despite his financial background, he found some financial realities in the employee benefit plan area to be unique. An advisor might help the Trustees develop greater understanding. Jim Karlovsky said that he thought it would help to further discuss the topic. There are some economic alternatives to the Proposal and there needs to be some analysis of balancing or trade-offs with these various scenarios in mind. He felt his own financial review remained too incomplete for him to say whether he needed assistance to evaluate the Proposal.

The issue was tabled for later discussion.

Status of the DOL Audit:  Peter next addressed the issue of how to handle concerns over the still pending report from the DOL with respect to the May 1998 audit. Peter's usual advice in a case like this one would be to "Let sleeping dogs lie." If the Trustees are concerned about the status of the audit and this is affecting their decision making with respect to the Proposal, Peter would advise that Jerry Saxon make contact with the auditor to express his concerns or to offer more information if it was required.

There are several possible outcomes of any further inquiry by HESOT Trustees: (1) the Auditor could say that there is nothing required i.e., and no issues to resolve a neutral result; (2) Hollister could make the request and the DOL could still continue to defer an answer; and (3) the auditor might indicate that she does have concerns and begin to follow up on those concerns.

If this is an important concern of the Trustees, they could ask Jerry Saxon to contact the auditor and inquire as to the status of the audit. However, Dick opined that the status of the audit

is relevant only to the issue of Trustee exposure and not to the analysis of the Proposal. Even if the DOL auditor were to report that no issues were being raised at this time, that would not be an impediment to later development of an inquiry by the DOL.

Jim Karlovsky asked for clarification if it was possible that the DOL might not ever indicate its final status with respect to the audit. Peter responded that he has known clients to wait many more months than HESOT has waited without receiving an auditor's final report and some never do.

Jim McCormack expressed concern that one of the elements of the New Trust is a requirement that the Board of Directors resist any effort to change the share pricing mechanism for the company from book value. His concern was that the commitment of the Board to resist a change from a book value mechanism might cause the HESOT Trustees greater concern than it would be for the New Trust's Trustees. Peter agreed that if the DOL were to determine that a pricing mechanism other than book value had to be used under ERISA, the HESOT Trustees would be required to comply. Jim McCormack expressed the view that two years will pass before the New Trust becomes an actual shareholder of JDS Inc. Accordingly, there would appear to be sufficient time for any issues that are raised by the DOL to surface and be dealt with before any stronger policy in favor of book value is effective.

Cheryl indicated that there is strong research to support the continued use of the book value pricing mechanism. In particular, there is legal authority that the existence of transfer restrictions that effect every purchase and sale of the Company stock is a sufficient means for determining the value of the shares. Moreover, there is no intention of the parties to violate ERISA by committing expressly to support for the book value share pricing mechanism.

Dick asked whether Hollister or the Trustees would have the ability to control the direction of any follow-up to the DOL audit. Both Cheryl and Rick commented that the company would control the audit through its position as sponsor and to the extent that it serves as the Plan Administrator for HESOT. Accordingly, it would appear that this would be a corporate function rather than a HESOT function.

Jim McCormack indicated that he had met with the auditor and could make a call himself to ask about the status of the audit but it probably would not be necessary to do so. The legal position of the Trustees has always been that the book value share pricing mechanism is soundly grounded in legal authority. The book value pricing mechanism has been consistently applied universally.

Timing of the Trustee's Decision:  Peter suggested that as the Trustees continue with their analysis of the Proposal and they be sure to focus on what their response would be in the event that the company's performance were to "sour."

Peter certainly would suggest that in the next formal plan communication after the April 30, 1999 annual meeting of the shareholders of JDS Inc, the Trustees communicate to

HESOT participants and beneficiaries the action taken with respect to the Proposal. A formal communication using a routine vehicle for communication would likely begin the running of the statute of limitations with respect to the vote on the Proposal. Peter then reviewed the statute of limitations that would apply. His conclusion was that the period would run three years from the date of actual knowledge of the Trustees' decision; six years in the absence of actual knowledge; and a longer period in the event of any fraud by fiduciaries. Dick suggested that the communication be made in the HolliShare Highlights, wherein the Trustees routinely discuss activities of the prior year. The only other routine communication would be the Summary Annual Report which does not generally include sufficient text for this to be a normal part of that communication. Specifically, Dick favored including the discussion in the Trustees' report to the participants and beneficiaries section of the Highlights.

Tax of Transferees of Preferred Shares: Peter then related that he had spoken to Cheryl during the week about the recommended tax treatment of distributions from the John Schneider Trust, to employee beneficiaries and the contribution of preferred shares by such employee/beneficiaries to the New Trust. She had alerted him to a possible argument for ERISA purposes. After reviewing a memorandum sent to him by Cheryl, Peter indicated that there were complicated tax issues for initial Grantors and that his initial reaction was any ERISA challenge based on those complicated tax issues probably would be unlikely. He was, however, concerned by certain collateral issues raised by the tax analysis that he read. For example, the memorandum discussed the issue of whether or not grantors to the New Trust were making a gift to all shareholders or only to other direct common shareholders. That raised for him the question of whether the gift has a fair market value that is solely based on the ownership incidence of the preferred shares or might also be a function of the value of common shares. To the extent that the value of the preferred shares increases as a result of the Proposal and the value of the common shares decreases, that would cause the Proposal to succeed at the expense of the common shareholders and, accordingly, at the expense of the participants and beneficiaries. Cheryl has indicated to Peter that based on her research the value of the preferred shares would not affect the value of the common shares, so as to make this a non-issue.

Peter reserved until a later day his view on this analysis in order that he might be able to bounce the issue off some of his colleagues. Dick indicated that if it were requested by the HESOT Trustees, he thought that a representation could be made to them by the Proposal's proponents that there would be no increase in value of the preferred shares as a result of the Proposal and that, even if an increase were possible, it would not be at the expense of the common shares.

Peter then discussed the opposing theory for tax treatment of grantors which he described as the compensation theory. Under this theory, a grantor to the New Trust contributes his preferred shares to the capital of the company. The company then pays those shares to recipient shareholders in the form of the New Trust. It is conceivable that someone might use this theory to argue that the company actually redeems the shares, albeit by gift or some other type of transfer, and as a result, one might ask why under the Restated Articles the preferred shares are not cancelled. If the preferred shares were treated as redeemed and then cancelled, only the

RZ 0004816

common shares would remain outstanding. Peter reacted in several ways to this analysis. He indicated that the John Schneider Trust already contemplates that there will be a distribution of the preferred shares to employees and that the company will not cancel the shares. Moreover, the Proposal itself calls for an amendment of the Restated Articles to make it clear that there will be no cancellation of the preferred shares as a result of any of the contemplated transactions. For that reason, Peter is not concerned that voting for the Proposal will necessarily do any injury to HESOT, its participants or its beneficiaries.

Open Discussion of Proposal:  Prior to Peter's outlining the substance of his planned legal opinion, Jim McCormack indicated that his mental state with respect to the Proposal was that he does not think he would have any difficulty separating his personal concerns about the Proposal from those concerns that he has in his capacity as a Trustee. It is possible for him to make a decision in his capacity as a Trustee based solely on the interests of participants and beneficiaries. His other point would be that the Trustees still need to do some additional work in terms of thinking of how they might react in the event that the company's performance went "sour." With respect to future financial performance of the company, Peter indicated that there were no cases on point that might help the Trustees determine how to proceed. Bierwirth v. Donovan discusses certain relevant points. Jim interjected that he had reviewed the case in detail and understood that the behavior prompting the lawsuit in Bierwirth v. Donovan was the cavalier attitude of the plan fiduciaries. They did hire outside legal counsel, however they never adopted a process for systematically reviewing the tender offer. Moreover, they committed early to fight and use plan assets to fight the tender.

Peter indicated that the facts at hand were distinguishable because there is no tender offer before the Trustees. There is no purchase or disposition of employer securities that would raise pricing issues. In cases involving tender offers and exchanges of employer securities, there is higher exposure for participants than would be present in our case. Moreover, there is no per se limitation on the wearing of multiple hats by company officials. Accordingly, Jim indicated that when he makes up his mind, and he has yet to make up his mind as of this time, it would be after engaging in a scrupulous and independent investigation of the facts. He intends to take into account only matters appropriate for an ERISA trustee to consider. If at this point, based on what he has reviewed, he believes that the Proposal is in the best interests of the participants and beneficiaries. Jim McCormack also clarified that, if there was an acute conflict in roles, Trustees would need to withdraw from certain activities, e.g., a Trustee could not negotiate with himself in a corporate or other adverse role.

He clarified with Peter that while there is a conflict for one to serve as a plan fiduciary and company officer, this conflict is not prohibited by ERISA. Indeed, it is the predominant practice among plans like HESOT. Still, the Trustees must be cautious about conflicts. They must scrupulously review their alternatives. They also should identify for the record when in the process they have actually come to a decision as to how they will vote.

What James J. McCormack found most helpful in evaluating the alternatives available is a comparison of benefits and disadvantages under both a short-term and a long-term horizon.

Cheryl interjected that there is a fair amount of authority to indicate that a Trustee who is a fiduciary for a plan can consider both the short-term and long-term beneficiaries' interests as well as the present and future interests of both current and future participants.

Dick asked whether he was correct in concluding that John Schneider's principles are irrelevant to the Trustees' decision making. Peter stated that they arguably are irrelevant. They may be more properly the concern of other shareholders.

Jim McCormack plans to look at the entire package and the consequences of a "yes" or "no" vote, not ignoring the reasons for the "no" vote. Exploring the alternatives is important.

Peter then discussed the need to look at alternatives in voting on the Proposal. This includes the consequences of rejecting the Proposal and the alternatives available to the Proponents for accomplishing their objectives without HESOT's vote. Of course, there is no need to consider in detail any alternative that is not capable of occurring. For example, if voting HESOT's shares to reject the Proposal would be a futile effort to take the company public because the Proponents could effectuate their goals through other means, then assessing the consequences of taking the company public is futile.

Jim McCormack characterized the Proposal as being an effort: (1) to determine corporate control and (2) to make things better. Jim Karlovsky would agree except that the control has been and would remain with the employees, who also are participants and beneficiaries. Ordinarily, corporate control refers to the concentration of voting power in the hands of a few persons, not necessarily persons actively engaged in the business.

The Trustees next discussed a form for recording their deliberations. They decided to prepare a report that would incorporate everyone's thoughts and analysis. Dick said that he had a suggestion for Jim Karlovsky and Jim McCormack. He said that they had been having good discussions and exchanges and suggested that they meet with Cheryl to discuss the ERISA issues.

There followed an extended discussion of the implications of a "yes" vote or a "no" vote. Dick noted that a "yes" vote would memorialize the John Schneider Trust and the Book Value System as it is now. A "no" vote might bring an end to the employee owned company. It would also bring a lot of turmoil to the company and a fragmented and spiraling down of the working relationship of management.

There was a discussion of whether JDS Inc has an obligation to repurchase shares from Hollishare. Peter explained that the report could be discoverable by participants in a dispute because the lawyers for the plan have been described by some courts as providing services to the beneficiaries. Some courts look at whether the plan itself paid for the advice. If it did, the participants may obtain plan records, including communications with counsel. The DOL appears to be sympathetic with this approach. Dick noted that the company pays all fees, rather than the plan itself.

Jim McCormack asked Peter to reiterate the conditions upon which the court in <u>Bierwirth</u> thought was appropriate for a fiduciary to step aside. Peter reiterated that, if the "conflict" associated with wearing multiple hats is not so acute as to interfere with making a decision solely in the interest of participants and beneficiaries, the fiduciary(ies) should use scrupulous, intensive and independent investigation.

Peter told the Trustees that if they couldn't be impartial, he would have advised them to step aside. But they assured him that they could. It is appropriate to at least discuss stepping aside because it might be argued that the vote involves corporate control issues, somewhat similar to issues raised in a tender offer.

Jim asked for clarification that hiring outside counsel was a good step but not an absolute exemption from fiduciary liability. Peter confirmed this. His advice is process oriented, not substantive. For example, hiring an independent financial adviser is helpful, but the Trustees must review the substance of the transaction themselves and exercise their discretion as fiduciary.

Jim McCormack has been examining his own ability to think objectively about the issues. He believes that he can separate his roles as an initial Grantor and as a trustee. He has asked himself if there really is any inherent conflict? He thinks not.

Dick sees the issue as requiring balancing of short-term and long-term considerations. Some participants and beneficiaries will be helped. If the Proposal is denied, then all shareholders will, in his view, suffer depressed long-term returns. He bases this analysis in part on the capitalization report's discussion of the ESOP. Of course, that scenario did not evaluate a sale of shares to one or more third parties. He has his own convictions based on the record to date. He would describe the alternatives as follows:

Voting "yes" means the status quo continues. A vote for "no" means the status quo continues if scenarios for the trustee of the John Schneider Trust exercise certain "countermeasures." Voting "no" also can mean material differences. As an example, Mike Winn might take his 45% of preferred shares and not retire. He could join with one or more others and control the business himself. Others might try to challenge indirect employee ownership via this, giving rise to chaos, fractionalization, liquidation. There might be a retreat from support for indirect employee ownership via HESOT. The distraction presented by a real battle for control could reduce earnings, returns. If a sale to a third party were to occur, it probably would be to a competitor at a less attractive price than if there had been no battle for control.

Jim believes that the New Trust provides enhancements over those present under the status quo. For example, it permits sale of company shares to a third party or other deviations from John Schneider's policies and principles on terms more liberal than those that apply now.

Peter advised the Trustees to articulate the pros and cons of different realistic scenarios.

Cheryl asked whether Peter would consider Deloitte & Touche to be an independent financial adviser. Peter thought it would be better to use someone with fewer connections if an independent advisor were to be sought.

Dick felt that Deloitte could do a good job since they understand and recognize that, under current circumstances, fair market value of the common shares is book value.

Dick stated that he currently would support the book value pricing system even if the Trustees received a letter tomorrow from the DOL asking them to change the book value pricing mechanism.

Jim Karlovsky described the status quo's commitment to a book value pricing mechanism as a commitment to support the mechanism because of its fit within the current provisions of the relevant statutes. In the event of a challenge, the company probably would appeal because the facts strongly suggest that book value is the only price one can pay or receive for the common shares. Dick added that the Proposal would change this formula only to the extent of committing the company to resist a change in the pricing mechanism. But the company's response would otherwise be the same. The company's commitment to defend the mechanism would not commit the Trustees to additional risk. The New Trust only commits the company to act. Jim McCormack hoped that the Trustees would not be committed to "fight" the DOL. Dick noted that the company could accede to a new mechanism, again, no different from the status quo. Thus, the board of directors would be committed only to resist, or to make an appeal. Rick commented that there was no commitment to take the case to the Supreme Court if it seemed imprudent to do so.

Jim McCormack asked Rick to enumerate the other so-called "counter measures" that the Proposal's supporters might use if the Trustees rejected the Proposal.

Rick commenced with a non-exclusive list. He began with a summary of current shareholdings: There are issued and outstanding 61,750,000 preferred shares, 71,260,000 are authorized, accordingly, 9,510,000 are authorized and could be issued. Because it takes a two-thirds vote of each class of shares to change the transfer restriction portion of the Restated Articles (Article IV. C and D), HESOT can block the implementation of more restrictions, but the preferred share class can block a release from those restrictions. The board could issue more preferred shares to an employee, subject to a written agreement to vote the shares consistent with the current restrictions. Even 100 preferred shares outstanding are a sufficient protection for the restrictions if two-thirds of them are committed by agreement to retaining the restriction. Jim McCormack asked whether there are enough preferred shares authorized to continue the preferred share class as the majority of all shareholders. Rick speculated that this could continue without the necessity of authorizing more preferred shares for at least five generations of employees because there are only 1,932,482 common shares outstanding and 9,500,000 preferred shares that can be issued.

Confidential Discovery
Material

49

RZ 0004820

Moreover, Rick pointed out that the Agreement to Vote would bind current preferred shares to supporting the restrictions for many years before there would be any necessity of issuing more preferred shares. This, Rick said, makes a change in the company's transfer restrictions a remote event under any analysis or scenario.

Rick also explained that the Proponents had determined they had the authority to require employee/beneficiaries to sign voting trusts, including, if the board were to agree, a perpetual voting trust. Illinois law limits such trusts to terms of ten years, but if the company were to reincorporate in Delaware, it could have a perpetual-term voting trust. A voting trust could bind the voting of preferred shareholders on issues in addition to support for the current share transfer restrictions.

Alternatively, the board could decline to repurchase preferred shares from certain holders and let those persons transfer their shares to other employee/shareholders who would agree to continue support for the transfer restrictions. This would extend the "life" of the currently issued preferred shares and prevent their cancellation through redemption.

The company also might adopt a benefit plan that could buy the preferred shares from retiring employees and hold them for an extended period of time.

An extreme response would be to terminate HESOT and repurchase its common shares to remove HESOT as a block to the Proposal. Dick asked whether Rick viewed the latter as an action that would make rejection of the Proposal by the HESOT Trustees a futile act. If fighting the Proposal was in the interest of participants and beneficiaries, a "no" vote that brings on a termination of the plan accomplishes nothing positive. It merely frustrates HESOT's objectives of providing retirement benefits. Jim McCormack agreed.

Dick asked whether the board could issue the shares to a plan and avoid ERISA. Rick responded that a top-hat plan could be outside of ERISA's fiduciary requirements.

Jim Karlovsky thought that it might be consistent with John Schneider's policies and procedures for the board to replace HESOT with a plan that allows investment in a diversified portfolio, including JDS Inc common shares. If HESOT were to reject the Proposal, that might give the board an incentive to do so.

Dick thought this might be a definite possibility.

Peter asked the Trustees if they would like to see Rick's points in writing.

Jim Karlovsky felt there was no doubt but that it was Mike Winn's intent to perpetuate the commitment to such things as employee ownership. He would assume that Mike would ask counsel for a list of his options and make a decision to proceed under at least one of them. Mike is committed to the idea that the John Schneider policies and principles enhance company

Confidential Discovery
Material

50

RZ 0004821

performance and contribute to the welfare of its employees. He approaches many company decisions with that same determination. There would be no question as to his resolve.

Jim McCormack said he could think of more ways to circumvent a negative vote by the Trustees. He thought that the employees themselves would have something to say if the Trustees were to reject a plan that would secure for them the benefits of employee ownership.

Dick asked the group to explore some of the "going sour" scenarios. He asked whether the Trustees were entitled to assurance from the company of necessary liquidity if performance went sour. He thought the issue was, perhaps, one that should be settled before 2001 because the changing composition of the board might bring a change in the current support for repurchases to fund retirement benefits.

Peter is aware of other plans that have gotten such commitments. Cheryl commented that, in her experience, these usually were in the form of "put" provisions in plans.

Jim Karlovsky asked what kind of commitment Dick had in mind. For example, how long might such a commitment extend? Would it require the company annually to look at the balance sheet and determine that its creditworthiness was sufficient to support large repurchases? Dick proposed that the Trustees look into the suggestion and explore it.

Dick also wanted to discuss the Trustees' duty to diversify under ERISA. Jim McCormack also was interested in this topic. He understands that the plan calls for maximum investment in the common shares but wondered whether it might be possible to diversify somewhat. He attributed some recent early retirements to attempts to diversify by retiring, taking a benefit and reinvesting it in a balanced portfolio.

Peter is aware of other businesses where that happens.

Rick pointed to an article in the Wall Street Journal about United Airlines having a pilot shortage when the market dropped for its shares, affecting ESOP returns and preempting retirements.

Dick commented that this trend was a basis for a good argument for daily valuation of plan benefits in publicly traded companies' plans.

Dick next asked how people felt about hiring a financial advisor. Jim Karlovsky said that he has been doing some catch-up on financial issues. He still is sorting out his thoughts on the issue. He thought it might help to go over some of his thoughts. His focus has been limited to how the Proposal affects the participants and beneficiaries as participants and beneficiaries.

       1.     A financial advisor could validate his thinking, ensure completeness.

Confidential Discovery
Material

51

RZ 0004822

2.    Such a person could review and comment on the documents and schedules in the disclosure.

3.    His additional thoughts are that:
There is long-term value in adopting the Proposal.
Gains have historically been very strong. The company has been stable in its growth. There has and would continue to be less volatile fluctuation in returns than in a diversified portfolio of publicly traded investments. These characteristics of HESOT have been beneficial for participants and beneficiaries. It is difficult to visualize a balanced retirement portfolio in which every asset has the type of positive returns on investment that HESOT has achieved. The fact that shares are in a retirement plan is especially significant. Retirement monies should be invested to reduce volatility, especially as employees near retirement and need more security. It would be prudent for the Trustees to inform themselves about the returns experienced by advisors who manage funds targeting growth or other investment results.

4.    Jim is wrestling with the prospect of a one-time boost in returns if the company did go public or make a sale to a single acquire or. Taking an arbitrary number, e.g., three times book value, the returns could be compelling. But if making that deal were to reduce future earnings of the plan, then the market "boost" would be to the detriment of future participants and beneficiaries. He is mulling over how to balance interests of current and future participants, also long- and short-run effects.

5.    Jim also thinks about the advantage HESOT offers in benefit stability. Because book value does not fluctuate unpredictably, there have been no negative or fluctuating account balances.

6.    Jim also has thought about whether a diversified retirement plan is necessarily better. A comparative study of other baskets of funds, such as a family of mutual funds, may not be relevant to what HESOT should do. Such baskets always have a diversified investment scheme that introduces lower risk investments and accept the drag that they put on increases in value. Here, there is more stability than in the public trading sector.

7.    While motives of initial Grantors are not relevant to the HESOT Trustees, he does believe that these people are not acting in their personal economic interest. They could take the money and run. Instead, they are leaving value for those who will follow them, and HESOT is as much a beneficiary of that generosity as others. It may not be something that can be tangibly measured, but it means performance and stability are perpetuated. The company has more resources to secure the retirement

benefits of future retirees. Everyone participates in the equity growth that comes from having a book value formula. Jim has looked at the capitalization study. In an ESOP scenario, changing the formula increases the debt load and limits plan performance. Increased risk, lessened ability to adapt to changes in market conditions competitively, the pressure to respond to short term events to boost earnings at the expense of overall financial success --these are things that happen in public markets.

Jim McCormack said, "Well said. I agree completely."

Jim Karlovsky originally thought there might be a conflict between being an initial Grantor and a Trustee, but he now believes there is a personal sacrifice being made by initial Grantors and that the prime beneficiary is HESOT. Initial Grantor are doing something for HESOT that the Trustees cannot do for HESOT without the initial Grantors. That does not necessarily make for a conflict between the roles of initial Grantors and Trustees. The initial Grantor makes a gift to shareholders and the Trustees are the collateral beneficiaries of it. Everyone values the benefit of the gift the same way – in long-term stability and growth in earnings. They may vote for the Proposal for different reasons, but they could vote the same way to reap the same economic benefits. This reconciles the apparent conflict consistent with the Trustees' commitment to act exclusively for the benefit of participants and beneficiaries.

Jim wonders whether a financial advisor can validate these thoughts. Could an outsider, validate the systemic process at work? If this could be done, then would the Trustees be in a position to assign values to short-term and long-term benefits and disadvantages of the alternatives? He wondered how someone could quantify the supposition that "public market" type fluctuation without diversification means more risk than would book value without fluctuation and no diversification. He thinks the only way to have low fluctuation and more diversification is to amend the plan or be in a position where there is a combination of a book value formula and buying other investments with a portion of the trust. And, if that course of action were pursued, wouldn't the plan have to pay "middle man" expenses and fees, perform or buy more analysis and take on more overhead? Wouldn't that diminish returns for the plan? How could it add on value for the participants?

Dick agreed that hiring a Cigna-type manager means add-ons to expenses that drag down plan returns in some cases. Performance may be hurt, but that's not the only relevant issue. The Trustees can diversify under the status quo if practicable. What does making the company's shares freely transferable bring to the equation? He has looked at the returns of small and mid-size capitalization companies. This seems to be the relevant group to look at, and they have a history of lower returns, not even accounting for compounding.

Jim Karlovsky took the analysis one step further. If HESOT were still invested in JDS Inc, then a "boost" in value might be okay. But if HESOT diversified, it could lose its rate of tripling balances and pay more in fees. At some point, diversification could cost HESOT more money than the initial price "boost" brings.

RZ 0004824

Dick agreed that it was unclear the company was disadvantaged by lack of free marketability. Jim Karlovsky agreed that returns are probably greater and have more stability without any negatives.

Peter asked whether JDS Inc has been compared to indexed companies, like the S&P. Does employee ownership compare favorably to that? Dick felt that JDS Inc held up under the comparison. He explained that a shrinking share base for JDS Inc caused remaining shareholders to experience increases in share returns that were larger than increases in company earnings. This is demonstrated in the capitalization study report and quantifies for Jim the concept he earlier discussed – how the initial Grantors leave something that benefits HESOT. Jim McCormack agreed. Jim Karlovsky summed up his evolving view that voting for the Proposal continues a system that has, in the past, and is expected in the future, to provide a stable, desirable retirement income for participants and beneficiaries. A "market" approach may mean instability of corporate direction, chaos in management, interruption of long-term plans and investments, a switch to short-term and reactive thinking and lessened success. Even a doubling of the share pricing formula could unsettle balance sheets. There appears to be data available to the Trustees that pursuit of the option to go to market is not necessary to help anyone maximize benefits except for persons who would get a one-time short-term "boost" from a change in the pricing mechanism. Does ERISA really call for acting with such a short-term motivation and such long-term disadvantages? If anything, the Proposal seems to strengthen the defenses for a book value mechanism. What would be helpful for Jim Karlovsky would be to discuss at another meeting, in more detail, how to strike the balance on the trade-offs identified when comparing scenarios.

Dick complimented Jim Karlovsky on his summary of the facts and analysis to date.

Peter reiterated that HESOT has performed better than the market comparables, assuming their shares were held in a similar plan. Indeed, the results have been strikingly better. Results have been greater than those of the benchmarks. For example, if you look at $1 compounded for 10 years under JDS Inc, small to mid-size capitalized companies and small-capitalized companies, JDS Inc outperforms all of them:

$1 → 10 years compounded          486% JDS Inc
                                   393% Mid/Small Capitalization
                                   358% Small Capitalization

Peter asked, "Which is more representative?"

Jim Karlovsky answered that a representative comparison would assume 10 years as plans cannot defer vesting for more than seven years and most plans assume that one who has seven years of vesting will stay for another 10, 15 or 20 years.

RZ 0004825

Dick informed the other Trustees that Rick and Cheryl had prepared other comparisons but the Proponents had decided to be conservative and use only the charts shown in the Disclosure Document. They could provide their further analysis if the Trustees wanted to see it.

Jim Karlovsky also favors looking only at the last 10 years of JDS Inc performance because that includes the non-Abbott historical data, as opposed to the Abbott era. During those years, there were "artificial sales and a build up in inventories" that goes along with being manufacturer but not distributor. In three to six years, this was burned off, producing in the early 90's artificially low earnings. Thus, inclusion of these years gives a *conservative* view of true intrinsic performance and stable and no negative returns achieved under the current system.

Peter did caution that, in making comparisons of alternatives, the Trustees not assume that going public saddles the company with more debt. It pushes the debt's costs out to the public. However, going public provides no assurance that the rate of return after shares become freely transferable will be as high as it is now.

Jim McCormack also hypothesized that, in the going public scenario, HESOT's existence might be threatened. Certainly public companies are unused to providing as richly for their employees.

Cheryl pointed out that, in the "going public" scenario, it is not just the cost of repurchases from HESOT that could move out to the public. The direct common shareholders could sell their shares to the public and deprive the company of the financial benefits of repurchasing them at book value for a certain amount of cash and a subordinated note. The cost of capital would be altered fundamentally.

Peter commented on how evident it was that the Trustees had thought about the issues.

Dick asked about timetables. The consensus was that everyone was becoming increasingly comfortable with a "yes" vote, but they wanted more time to consider the issues. No one felt any commitment to provide an answer to the proponents of the Proposal as to how they would vote before the mailing of the Disclosure Document.

Jim McCormack returned to the issue of the financial advisor. It, is, he said, problematical. The Trustees, if they hired an advisor, could have another view, but they would have to educate the advisor before he could advise them. They are already well informed and have resources they can call on. The timing of introducing another outsider to the facts could drag on. He could speculate on the timing, selection, type of firm, scenarios to look at (ESOP, go public), need for independence, need for specialized knowledge and the waste of time presented when the advisor just wants to sell his product. When he weighs these factors, he doesn't feel that he needs a financial advisor.

Dick also doesn't need one but will defer to any Trustee who wants one. Each needs to feel he has informed himself to make his decision under the procedure outlined by Peter.

Confidential Discovery
Material

55

RZ 0004826

Jim McCormack expressed his view that by April 21st he would be able to vote. Dick said that he knows certain things about the company in his role on the board and is convinced that JDS Inc's returns are pretty damn good. Nevertheless, his decision is likely to come down to non-quantifiable matters having to do with trade-offs between scenarios and pros and cons.

Jim Karlovsky said that, in his capacity as a trustee of some foreign pension plans, he hires managers and measure their returns relative to other investment managers on different funds. He thought that the Trustees could look for some comfort in similar domestic data. They could look at money management data for pension funds in diversified fund.

Peter reminded the Trustees of the possibility of working with his former partner, Steve Hester.

Cheryl asked whether independence is so important when the situation does not involve a tender, purchase or sale. Would Deloitte be able to help? Peter did not think they would be viewed as independent. Jim McCormack objected to their expense in light of what he considered to be unimaginative assistance.

Peter suggested that, when a decision is reached, the Trustees articulate why it was not thought to be helpful to bring in someone else.

Nature of A&P's Legal Opinion: Peter next addressed the scope of the A&P opinion. A&P is not a fiduciary. Its opinion will address the following points:

1.      Despite the Trustees' other hats, if they are able to decide on behalf of the plan prudently and solely in the interest of participants and beneficiaries, they need not recuse themselves. (Bierwirth)

2.      The Trustees were conducted through a discussion of relevant facts and circumstances that Peter would like to include in the opinion and, assuming the correctness of those facts, they can conclude: (a) there is no conflict requiring them to step aside; and (b) they have complied with their fiduciary duties in determining how to vote their HESOT shares.

The opinion will address some caveats, e.g., the Trustees should document their deliberations, supportive facts for their beliefs, the procedure undertaken, meetings, conference calls etc.

The opinion will address relevant law in the areas or proxies or control and conflicts, tender offers; sections 408(c)(3) (allowing corporate officers to be fiduciaries), Bierwirth and Leigh (dealing with conflicts that become acute); competing duties under section 404 (a)(1)(D) (dealing with the obligation to enforce the plan consistent with ERISA); and USNWR.

Cheryl asked if he would address whether there is any per se violation of ERISA under section 406 (dealing with prohibited transactions). He will. Dick asked if he would address the eleemosynary motives of the initial Grantors. He will, briefly. Dick asked if he would address the need to view the totality of the transaction and strike a balance. He will. Jim Karlovsky requested that Peter address in the opinion the fact that fiduciaries could account for short-term and long-term concerns of participants as participants. Also, present and future participants. Peter agreed to do this.

There being no further business, the meeting adjourned at 6:30 p.m.

Observations:

a. In the long term, there is greater value with the current system (see track record on page 25 of Disclosure Document).

b. There is more stability of performance (all positive changes in value) for retirement security.

c. Rate of increase of account balances: at 20% growth per year, balance triples in 5 years; if growth is 25%, it triples in 4 years. This faster multiplying of balances offsets failure to "capture" a boost from going public. Continuing with the current system offsets short-term boost from the market and maintains long-term performance opportunity and more stability.

d. Maintaining system helps preserve employee ownership which lets participants directly receive equity appreciation without middleman brokerage and investment management fees.

e. New Trust takes effect in April 21, 2001 when it controls the preferred shares given to it. If the DOL audit does turn up any problem, there are two years to deal with it under the current book value restrictions.

f. From HESOT alternative investment viewpoint, the track records of mid- and small-capitalization businesses are not all that relevant. Trustees would not choose a single company's or market segment's basket as a replacement investment. They also would not limit themselves to equities. They would diversify into bonds and fixed income vehicles. The replacement investments would include some equities with better returns and some with lower returns, because fixed, lower returns reduce risks associated with economic cycles.

g. Jim Karlovsky can separate his personal and fiduciary responsibilities.

h. Proponents of the Proposal and initial Grantors are not acting in their personal economic interest (and the possibility exists that they could do so by holding

preferred shares). The value they forgo is shared with HESOT to ensure stability and positive future performance returns.

i.     Jim Karlovsky has not yet made a determination as to how he will vote with respect to HESOT. He continues to play catch-up: learning about the Proposal, about fiduciary responsibilities as they relate to the Proposal, about the capitalization study.

j.     He does not see a conflict as necessarily existing here between the roles of Trustee and initial Grantor. Initial Grantors are acting for benevolent reasons to enhance everyone's economic interests at the expense of personal gain. The Trustees are voting solely in the interests of participants and beneficiaries. The Trustees garner for HESOT out of the Proposal longer term benefits assuming a "yes" vote and assuming a "no" vote: growth, stability, lower operational costs for HESOT.

### MINUTES OF MEETING OF
### THE TRUSTEES OF THE
### HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

**March 4, 1999**

A meeting of the Trustees of HESOT was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on March 4, 1999, 12:00 noon.

The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Cheryl Kettler of SRZ also attended.

Dick began the meeting by expressing his view that, based on analysis done to date, he still believed that it would be possible for him to support the Proposal. He asked whether the other Trustees were prepared to make a decision about whether to conduct their own independent financial analysis of the Proposal and its alternatives or to retain the services of a financial adviser. His own view would be that the company's internal finance functions could provide the data that would assist him in his deliberations. He would vote for retaining an independent adviser if any other Trustee expressed an interest in doing so. No one called for retaining an independent adviser.

Dick explained his views about the financial adviser as follows: Because the issue under consideration does not involve a tender or a purchase or sale of shares, issues where a skilled valuation is required by law, he did not believe that an adviser would have a defined role to play. Also, the type of data that is needed is something internal finance people could prepare. Finally, he did not feel that financial data not yet developed would turn out to be a significant input in his decision making.

Confidential Discovery
Material

58

RZ 0004829

Dick would rely more on his business judgment, on the identification of ways in which the other JDS Inc shareholders could implement their plans even if HESOT voted against the Proposal, and on his level of comfort that JDS Inc would repurchase common shares as necessary to fund benefits even if the business went "sour."

With respect to alternative means available to other shareholders, Dick asked that Rick Michaels prepare a letter detailing for the Trustees the litany of options available to the Proposal's proponents. He added that Jim McCormack and his staff were preparing certain financial analyses as well. This research could be added to other materials to develop a picture of the effects of the Proposal and alternatives on participants and beneficiaries.

He also supports voicing to the board of directors some recommendations for appropriate responses to any "going sour" scenario. If the company were to spiral down, limiting company liquidity, Dick favors having a plan for the HESOT Trustees to recognize early warning signs and establish targets for going to the board looking for security for HESOT benefits. He already has alluded to this issue with other board members. Finance has been authorized to look further at this issue.

What still needs to be discussed is what minimum period of time the company's commitment needs to be in order for the Trustees to be comfortable. Three years? Five years? Ten years? He asked the other Trustees what their views were on the critical horizon.

Jim Karlovsky felt that horizons in terms of time could be problematic because of the difficulty of predicting a typical rate of retirements (which affect HESOT's liquidity needs). Any slowing or decline in the company's financial performance could be expected to trigger large numbers of early retirements because quitting or staying are the only means participants have available to freeze or grow their HolliShare accounts.

Indeed, when HolliShare's returns were 15-20% and some reports existed of 30% returns available through an aggressive public market investment strategy, participants left for unplanned early retirement. Their approach to retirement planning probably was high risk and irrational when they had available to them a pretty stable form of investment in HESOT, but Jim's real point was that past behavior would suggest that even single digit HolliShare returns could cause large increases in retirements in a financial market like the current one. Accordingly, it was hard for Jim Karlovsky to define the Trustees' horizon in time. He thought that it might be preferable to set a measure such as "company liquidity" must equal at least the amount necessary to fund retirements totaling half the fund over a two-year period. Even that horizon needs some further analysis.

Jim McCormack added that Finance's report to the HESOT Trustees would provide the type of data that should help with setting horizons. Their study is already underway and Jim expects to have data for the Trustees to review at their next meeting on March 15th.

Confidential Discovery Material                    59                    RZ 0004830

Jim Karlovsky stated that, if the HESOT Trustees could develop a horizon or similar tool for monitoring and reacting to company liquidity changes, he would definitely move toward a "yes" vote on the Proposal.

Dick asked how the other Trustees felt about the timing of their deliberations. He suggested a schedule:

| Action | Date |
|---|---|
| Meeting of Trustees | March 15 |
| • Financial report<br>• Draft report from legal | |
| Conclude report | March 31 |
| • 1998 4Q results in<br>• 1999 1Q results in<br>• HESOT Trustees vote | |
| Proxy signed | April 22 – 25<br>(approximate) |
| Annual Shareholders Meeting | April 30 |

This schedule would permit the Trustees to reach a conclusion in time for some of them to be out of the office in April for other commitments.

The Trustees then discussed whether to engage in dialogue with the board about their horizon analysis and HESOT responses to it before or after April 30. Dick would be open to a post-April 30 date as he does not see the board's response as a "deal breaker" on the Proposal and he favors having more time to consider what proposal to make to the board.

Jim Karlovsky commented that the HESOT investment strategy probably warrants looking for some commitment from the board to maintain company liquidity for common share repurchases. The board's control over repurchases by the company would pose less risk to account balances if the board were to commit to maintaining liquidity to meet some targets.

Dick said that the issue had been discussed before at board meetings but no formal commitment exists in writing. One question to consider is whether a more formal commitment from the board was required as well as a more specific one. His view was that a more formal commitment was desirable. Now that the board has increased to five persons, including at least one disinterested person and the New Trust calls for there to be two disinterested directors in the future, Dick would support more specificity and formality to the commitment.

Cheryl asked whether this commitment would be a concession requested as a condition to voting for the Proposal.

Dick would suggest a different approach. At the March board meeting, the board would likely approve a repurchase of common shares from HESOT. That would be a good time to open discussion of the subject. Jim Karlovsky said that the commitment should be something more substantial than a conclusion implicit from a track record of repurchases. This would be in the best interest of participants and beneficiaries. He would look for the company to acknowledge its obligation to maintain HESOT liquidity. Jim McCormack agreed, the company's commitment has not been explicit before. Dick favors mixing the new approach in with the Trustees' usual approach rather than asking for a "concession." Jim Karlovsky thought it could make sense to deal with the issue now but not necessarily as part of the deliberative process on the Proposal. Jim McCormack said that his vote on the Proposal would not be contingent on this issue. But he favors communicating at this time to the board the Trustees' concerns, the analysis process that is underway and, once it is completed, their recommendations for proceeding.

Dick asked what would be the downside to negotiating the issue at this time. Jim McCormack said that the recommendations were likely to set forth certain ratios, desired actions and allow certain caveats. If the issue were viewed as HESOT attempting to insert itself into the company's operations, the effort's success might be compromised.

On the other hand, Jim McCormack would feel greater comfort, as a fiduciary, if the issue were settled now. He raised again the difficulties involved in reconciling the plan's direction to invest in JDS Inc common shares to the maximum extent practicable with its power to buy and sell plan assets. Company commitments would help him reconcile the general goal of diversifying investments with the plan's instruction to maximize JDS Inc common share ownership.

Dick would not describe HESOT's request for a company commitment that would protect participants and beneficiaries in the event of a downturn as inserting HESOT into the company's operations, not in light of the size and type of plan investments that the company, as drafter of the Plan, has instructed the Trustees to hold.

Jim McCormack raised some issues for later consideration by the Trustees:

1.      How do other fiduciaries for similar plans balance the duty to invest in employer securities and the duty to be prudent and diversity?

2.      Can HESOT be amended to allow more diversification?

Jim McCormack's particular concern with the "commitment" approach is that a commitment to maintain liquidity for HESOT could conflict with the company's goals for growth for the next ten years.

Confidential Discovery          61
Material

RZ 0004832

Dick thought that view confirms Jim Karlovsky's concern. Jim McCormack also expressed the view that Hollister remains a "one line" business. Statistics that show 62% of sales come from ostomy products ignore the fact that it would be 70% if TVM's distributions of ostomy products were included.

Jim Karlovsky's reaction was that the Trustees should continue the process of determining their cash needs and evaluate for themselves whether the company's performance and future plans for investments and acquisitions were in conflict.

Dick commented that he did not expect the Trustees' analysis to have resulted in a definition of liquidity parameters by April 30th. Jim Karlovsky agreed and would be satisfied if the subject were raised with the board and some acknowledgement of the obligation to protect the interests of participants and beneficiaries obtained before April 30th. Quantification of the commitment could come later.

Dick asked Cheryl to draft for the Trustees a brief memorandum to Mike Winn raising the subject of the Trustees' investigation in progress, their objective of recommending a quantifiable commitment of support, and a request for conceptual confirmation that the company will provide repurchase liquidity to fund retirements of participants. The goal of this action should be to obtain agreement in principle to beginning a dialogue at the board's March 26th meeting that will result in a quantifiable commitment to maintain HESOT liquidity.

Jim Karlovsky would find comfort in a commitment from the board to approach the issue with an open mind. Dick estimated that the process of getting to liquidity parameters would take at least 90 days.

The Trustees next considered some data on HESOT. As of December 31, 1998, it had 860 participants, of which 82 participants have balances over $500,000; 170 have balances of $100,000-$499,000; 606 have balances of less than $100,000. Jim Karlovsky requested that Jim McCormack provide an estimate of the aggregate amount of account balances in each of these categories. If there were a "run on the bank" scenario, it would be the top group of people who would cause it.

The Trustees discussed a scenario in which a competitor would acquire Hollister. Jim Karlovsky believes that a new pension plan would be adopted to reduce company contributions or accruals to a fraction of their current levels. Many people would lose their jobs, but, from HESOT's view, the more disturbing result would be that employees who stayed would see a decline in returns and an increase in risk. Dick speculated that termination of HESOT would lower employer costs and reduce employees' share of earnings otherwise available to an acquirer.

These scenarios signified a need for board reassurance for Jim Karlovsky. Dick speculated that HESOT could do some short-term diversification but that, if returns were to

RZ 0004833

decline or become negative, it might take more than liquidity parameters to provide benefit security. It might take a new plan design. Jim Karlovsky asked whether the Trustees have the power to make such a change. Cheryl answered that a design change effected by plan amendment required board action (possibly with the Trustees' approval). Dick agreed that the Trustees could do some short-term diversification to the extent of HESOT's liquidity and any repurchases the board would agree to make. But this would not be a long-term approach. A plan design change would be needed. Jim McCormack added that diversification at the current time, when liquidity is not a problem, would cause problems because participants value maximum investment in JDS Inc common shares and reduced JDS Inc investments give a windfall to direct common shareholders. When times are bad, the company's repurchases will decrease cash and further reduce the value of common shares still held by HESOT. This could make large repurchases imprudent.

Dick reacted by saying that the Trustees bear normal trustee responsibilities. They have to administer HESOT and exercise the discretion given to them under the plan subject to certain limits. In most cases, it is the trust document, state law and common law. Here, the limits are the plan and ERISA. The Trustees are not directed trustees; they are trustees vested with discretion. But their discretion is limited, and the Trustees must learn to reconcile their different duties within those limits. Jim McCormack expressed an interest in seeing a more detailed discussion of this issue from Cheryl.

Jim Karlovsky asked Cheryl to provide some publicly available data comparing performance of various pension fund managers for the March 15 meeting.

The meeting adjourned at 3:00 p.m.

## MINUTES OF MEETING OF
## THE TRUSTEES OF THE
## HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

**March 19, 1999**

A meeting of the Trustees of HESOT was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on March 4, 1999, 10:00 a.m.

The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. William Sauerland of the Finance Department at Hollister Incorporated and Cheryl Kettler of SRZ also attended. Dian J. Thielitz, secretary to the Trustees, also was present.

The meeting covered matters relating to other pension plans as well as HESOT. With respect to HESOT, the Trustees discussed the following:

1.      Possible methods for monitoring liquidity of JDS Inc to fund repurchases of JDS Inc common shares from the Plan;

2.      The Trustees' request to Michael C. Winn that the Board of JDS Inc commit to maintaining liquidity to fund repurchases of JDS Inc common shares;

3.      The fiduciary duties of trustees of a plan that invests in employer securities;

4.      Surveys of performance of diversified portfolios for plan investment;

5.      The draft letter from Rick Michaels regarding available countermeasures should the Trustees vote against the Proposal; and

6.      Manner for proceeding.

Jim McCormack asked Bill Sauerland to present his discussion of alternative means for monitoring liquidity for the company. Bill reviewed his issues and four methods for managing concerns about performance and liquidity, including: (1) maintaining the existing program; (2) maintaining the existing program with ability to increase short-term liquidity; (3) maintaining the existing program with the ability to address the Board of Directors on performance/liquidity concerns; and (4) implementing a program to increase the diversification of the assets of HESOT.

The Trustees initially favored the third approach, but requested from Bill information with respect to current and normal performance of JDS Inc using the various indicators of liquidity that Bill identified.

Dick passed out a draft memorandum from the Trustees to Mike Winn, requesting that the Board of JDS Inc reaffirm its commitment to repurchase shares as necessary to fund retirement benefits. The Trustees discussed the language and agreed to further review it over the weekend and discuss it again on Monday before Dick's release of it.

Cheryl presented a brief discussion of the fiduciary duties of trustees of a plan that invests as HESOT does in employer securities. The Trustees reviewed it and requested that the discussion be expanded as it relates to the greater risks inherent in decisions to purchase more employer securities in the face of a declining share value than to continue to hold shares already owned. The Trustees discussed the fact that they had not purchased more JDS Inc common shares for the last 18 years, and had submitted shares for repurchase every other year or more frequently if needed to fund retirees' payments.

Cheryl distributed performance data for various diversified portfolios of mutual fund investments in order that the Trustees might compare the performance of JDS Inc common shares with the performance of plans with diversified portfolios. The Trustees discussed the fact that a diversified portfolio often minimized risk at the expense of returns.

Dick and Cheryl discussed the draft letter from Rick Michaels that outlines countermeasures that the Proponents of the Proposal could pursue in the event that the Proposal does not pass. Cheryl agreed to distribute the letter once it was received by facsimile from her office.

The Trustees discussed how to proceed. Jim Karlovsky will be out of town in the coming week. Dick discussed the report that has been drafted by SRZ to detail the deliberations of the Trustees. It will be sent out to the Trustees for their review and remarks. Cheryl reported that Peter Schmidt has indicated that he will have a draft of his opinion ready during the last week of March. The Trustees agreed that they all remain favorable to the Proposal but would like to review the opinion before reaching a final decision as to their vote on the Proposal. At this point Cheryl was excused and the meeting continued with other subjects.

### MINUTES OF MEETING OF
### THE TRUSTEES OF THE
### HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

### April 8, 1999

A meeting of the Trustees of HESOT was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on April 8, 1999, 9:30 a.m.

The following being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Cheryl Kettler of SRZ and Dian J. Thielitz, Secretary to the Trustees, also were present.

The Trustees began the meeting with discussion of items relating to HESOT. The Trustees discussed their current views on the Proposal starting with Jim McCormack who indicated that he had reviewed but was still going over for a second time the letter from Rick Michaels relating to countermeasures available to the Proponents, the Arnold & Porter opinion and the memorandum prepared by Cheryl regarding the diversification issue so as to prepare his final comments on the Proposal.

Jim Karlovsky indicated that he also was continuing to go over several key documents including the Arnold & Porter opinion and the narrative of the deliberations by the Trustees.

Both Jim McCormack and Jim Karlovsky continued to favor adoption of the Proposal by HESOT. Dick concurred.

Dick began with a report on his discussions with respect to JDS Inc and HESOT liquidity with the Board of Directors of JDS Inc, particularly Mike Winn. Dick indicated that he had shared with Mike Winn the draft memorandum prepared and approved by the Trustees at their March 19, 1999 meeting regarding liquidity and the purchases of JDS Inc shares.

Mike Winn understood that the Trustees' request for reassurance was reasonable. He had some concerns about whether the Trustees were attempting to subject purely operational decisions to some form of reporting to the Trustees. Dick clarified to Mike that this was not the intention and the memorandum was revised to reflect their discussions, as set forth in the attachments.

Dick then was asked by Mike to draft resolutions for the Board of Directors to consider at their April 30, 1999 meeting. In the interim, the Board met on March 26, 1999. At that meeting, there was some discussion of what level, or for what period, reassurance could be provided that would both give comfort to the Trustees and be acceptable to the Board of Directors.

There was some sense among directors who plan to resign in the year 2001 that providing a ten-year commitment was too long a commitment because they would not be in a position to direct the company in the capacity of directors during that period of time. There also was discussion of whether the reassurance that was being requested was in the nature of a contract. It was determined by the directors that was not the nature of the commitment to be made.

At this point in Dick's discussion of the issue, the Trustees agreed that the requested commitment was in the nature of a representation of the company's intention and not a binding contract to repurchase shares. Because this was a one-sided agreement, the company could change its commitment but the company would be expected to provide the Trustees with notice of such a change in order that they might take such further action as might be required under HESOT and ERISA.

The directors also discussed the fact that both the ten-year plan and the Capitalization Study's estimates as to growth indicated that there were adequate resources to repurchase shares for the entire ten-year period.

The draft resolution was distributed to the directors and discussed. There was discussion as to whether or not it was necessary for the Board to make a commitment; whether or not the commitment was a continuation of previously made commitments; and what the length of the commitment should be.

As a result of these discussions the resolution was edited as shown in the attached draft. There are two components to the commitment that has been made to HESOT. The first is a restatement of the historic commitment of the company to repurchase its stock and the second is a new, three-year commitment that is subject to renewal annually.

RZ 0004837

At this point, Jim Karlovsky said that he would have thought that the Board of Directors would be in a position to predict its ability to repurchase for a period of five to ten years but it would be satisfactory to him to have a three-year commitment with a rolling process of renewing that commitment for three years. He expressed his desire to see a more explicit commitment to a rolling renewal of the commitment. Dick explained that Mike Winn had remarked that, if the resolutions were to be adopted, he intended to ask Jim McCormack to review on an annual basis the Capitalization Study's conclusions and reassure him that repurchases could be funded for a ten-year period. This conclusion would be compared with any conclusions reached by the committee that generates the ten-year plan. Based on these analyses, the Board would vote whether to extend its three-year commitment for one or more additional years.

Dick also indicated that the obtaining of a three-year commitment as opposed to a longer commitment should be considered in light of the fact that the company also is a fiduciary with respect to HESOT, and that having the company assume the primary responsibility for planning to achieve necessary liquidity to fund the repurchase obligation was highly desirable as opposed to having the Trustees be the initiating party. The Trustees would be better off being provided with a liquidity plan that the company believes is sufficient and reacting to it as to whether or not it is sufficient than to have to generate that comprehensive an analysis on their own each year.

Jim Karlovsky favored this approach as well, but requested that Dick follow up that the rolling renewal of a three-year commitment be reduced to writing as part of the resolution.

Over all, Jim Karlovsky felt that the development was good, that there had been a rich dialogue sharing points of view at the Board of Directors level. He was satisfied that some conscious attention would be given to the issue of repurchases in the future.

Dick concurred that the process would establish an opportunity for the Trustees to have a regular dialogue with the Board of Directors on the subject of liquidity, a formality of reporting, as well as more definition in the form of reporting. Jim Karlovsky added that the Trustees' duties to HESOT are not ministerial, that they have an actual fiduciary role to play. Dick concurred and reported that at the April 6, 1999 Board of Directors meeting, the Board adopted a specific resolution, the language of which is attached hereto. This action on the resolution arose because Mike Winn wanted to discuss the quantification issue immediately and he requested that the deliberations proceed immediately. Dick indicated that he thought this would be helpful for the Trustees to have before they voted on the Proposal.

Accordingly, the Board deliberated and adopted the resolutions. These resolutions call for both a general commitment and a three-year commitment to make repurchases. It is intended that the quantified commitment be renewed annually. Dick indicated that he would work with the Board to adopt the express rolling renewal commitment at the April 30, 1999 meeting of the directors.

Dick also indicated that it was anticipated that the renewal of the commitment would be made by the Board annually after the adoption of a new ten-year plan and Jim McCormack's

RZ 0004838

updating of the Capitalization Study. This would put the timing of Board action at about November or December, in time for the Trustees to reflect the nature of the company's commitment in the HolliShare Highlights booklet that is released during the first quarter of the year.

There was some discussion then between the Trustees with respect to what would be the consequences of a failure to renew commitment. In Jim Karlovsky's view, failure to renew commitment would mean that the Trustees had only two years to respond to a withdrawal of commitment. Dick's view was that the first resolution with its general commitment would still provide them with the reassurance that they would need and he felt that it would take a great deal of stress on the company, particularly on its cash flow, in order for there to be any threat to the renewal of the quantified commitment. Jim Karlovsky's view was that it only took a slight downturn for people to have an incentive to leave, which would escalate the need for repurchases.

Dick felt that a downward spiral was unlikely to occur based on current forecasts and that the Trustees would have an opportunity to respond even if they saw one developing. Moreover, he thought that it was principally the duty of the company to meet its repurchase obligations and that the Trustees did have some short-term steps that they could take to respond if the company appeared as if it would fail to meet its commitment. For example, the Trustees could request a plan redesign, they could change their communications with employees to alert them to the failure of the company to affirm its repurchase intentions, they could sell a large number of shares during a two-year period when the repurchase commitment would continue, and they could resign or file suit asking for guidance from the Courts.

Jim McCormack said that he felt that the financial strength of the balance sheet was such that, at least in the short term, the company would be in a position to renew its commitment. He also added that the Trustees should remember that this is a defined contribution plan and not a defined benefit plan. Accordingly, there is no commitment on the part of the company to pay a particular benefit as long as they are repurchasing shares.

Jim Karlovsky in particular distinguished between the obligation to repurchase and the obligation repurchase at any particular price and felt that the commitment that was being sought from the Trustees was not a commitment to maintain a book value but a commitment to continue repurchases. Dick felt strongly that the three-year commitment was, at a minimum, an improvement over the precision of the company's previous commitment and suggested, too, that in the coming months the Trustees might consider whether to advise the company of the need to amend the plan to commit it to more diversification of investments so as to make the Trust less vulnerable in the event of a downward turn in company profits.

Dick then circulated Arnold & Porter's legal bills, which have been approved for payment and sent to Jim McCormack with Mike Winn's approval of payment. Dick also indicated that future bills would be submitted to the Trustees for their review as they are received.

Confidential Discovery Material

68

RZ 0004839

At this point the Trustees determined that all three of them continue to support the Proposal and accordingly they would approve the language of the Notice to Shareholders with respect to the Annual Meeting. In particular, this language in the Notice indicates that the Trustees of HESOT intend to vote for the Proposal. All three Trustees agreed to this action and approved the notice as drafted.

The Trustees authorized Cheryl to prepare an agenda for a meeting on the morning of April 21, 1999 at 8:00 a.m. That meeting will be scheduled to discuss any comments that the Trustees and counsel have on the Arnold & Porter opinion; to review the narrative of the Trustees' deliberations; and determine what additional work is required to conclude their report on their deliberations. Cheryl was authorized to draft a conclusion section for the narrative based on the Trustees' deliberations to date and to circulate such additional minutes as she prepares them. Jim McCormack indicated that he had some additional financial data that he would like to have included in the report and that he will send this to Cheryl's attention for inclusion in the next draft. Jim Karlovsky provided several comments on the current draft narrative, which comments Cheryl took and will make on the next draft. Cheryl was excused from the meeting at 12:00 noon.

**[Attachments omitted from this draft.]**

**NEW MINUTES**

<u>MINUTES OF MEETING OF</u>
<u>THE TRUSTEES OF THE</u>
<u>HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST</u>

**April 21, 1999**

A meeting of the Trustees of HESOT was held in the Human Resources Conference Room at 2000 Hollister Drive, Libertyville, Illinois on April 21, 1999, 8:30 a.m.

The following being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Cheryl Kettler of SRZ also was present.

The Trustees discussed initial comments with respect to Arnold & Porter's draft opinion. Jim McCormack's initial reaction was that the opinion's discussion of legal authorities begins with a discussion of authorities that appeared to be ambivalent or somewhat unfavorable to the Proposal, but concluded with favorable authorities and favorable analysis of the legal issues. He suggested that the other Trustees consider whether they viewed the initial portion of that analysis as being overly negative in light of later discussed cases and conclusions. The other Trustees agreed to analyze this aspect of the opinion.

Jim McCormack also expressed an interest in having the opinion reflect that HESOT is an eligible individual account plan that may invest in employer securities in excess of the usual 10% limit. He thought that the description of the Plan did not discuss sufficiently the mandate

Confidential Discovery
Material

69

RZ 0004744

that there be optimal investment in employer securities. Cheryl pointed out the language in the draft opinion that indicates that Arnold & Porter is not opining as to this point. The Trustees then asked SRZ to provide an opinion as to this issue, on which Arnold & Porter could rely to permit them to expand on Jim McCormack's point.

The Trustees next discussed Cheryl's memorandum regarding the overlapping responsibilities of trustees with respect to eligible individual account plans. They would like to have the issue addressed therein brought to Arnold & Porter's attention as this might be helpful in Arnold & Porter's efforts to respond to Jim McCormack's foregoing point.

Jim McCormack added that the opinion also should reflect the fact that the Plan mandates that the Trustees comply with the Book Value System, consistent with ERISA, and also that the Book Value System is established in the Restated Articles and By-laws; it is not imposed by the HESOT Trustees. Appropriate provisions of these documents should be cited in the opinion.

Jim McCormack also asked that the opinion's discussion of the issue of whether or not it is appropriate to consider employee job security be further refined. All of the Trustees agree that it would be inconsistent with their role as ERISA trustees to make decisions for the plan to preserve their employment or to preserve the employment of employees generally. However, when employment security is a factor that influences company profitability and, thus, the return on the Plan's investment in employer securities, employee job security can have some relevance to their decision making. For example, as Dick pointed out, to the extent that HESOT's sustained high returns over the period of an employee's tenure with the company provide attractive retirement income, the role of the plan in attracting and retaining valuable employees to continue that trend is a relevant consideration. The Trustees' assessment of the performance of the company and the Plan does strongly suggest that they have secured for participants and beneficiaries good long term returns that, over the length of an individual's employment, should discourage employee turnover.

Jim Karlovsky commented that the Plan does not have its role the securing of employment for anyone, but it should secure attractive benefits for those whose job performance has enhanced company and Plan performance and thereby has made their jobs secure. Dick added that in light of the company and Plan's twenty-two year history of performance, the Plan has been responsive to the retirment income needs of employees whose work is valued.

Jim Karlovsky noted that this is an example of when enhanced job security is a benefit engendered concomitantly with high returns. If a trade-off existed between the two, the HESOT Trustees' duty would be clear. Plan returns would be the appropriate consideration under those circumstances.

Dick suggested that the Arnold & Porter opinion also emphasize that the Trustees have considered not only the interests of participants with long tenure but also the interests of participants with fewer years of service and lower balances. The Trustees have considered whether alternatives available to them would treat such participants unfavorably as compared

RZ 0004745

70

Confidential Discovery
Material

with those with more years of service and higher balances. Jim added that the Plan's census data indicates that newer employees with lower balances predominate amongst participants and beneficiaries.

The Trustees discussed a goal of incorporating all of their comments to the narrative report by April 30 to permit completion of the report before or close in time to the vote on the Proposal at the April 30th shareholder's meeting. The Trustees also decided to provide notice to all participants and beneficiaries of their vote in the August annual report mailing.

Cheryl circulated copies of the draft final report for further review by the Trustees. The Trustees requested additional time to review materials and scheduled another meeting before April 30th to get comments in to Cheryl to be incorporated before that interim meeting, if possible.

The Trustees agreed to review it and provide further comments to Cheryl before their next meeting on April 28, 1999 at 10:00 a.m. at Hollister.

RZ 0004746

71

Confidential Discovery Material

## MINUTES OF MEETING OF THE TRUSTEES OF

## HOLLISTER EMPLOYEE SHARE OWNERSHIP TRUST

## APRIL 28, 1999

A meeting of the Trustees of the Hollister Employee Share Ownership Trust ("HolliShare") was held at 2000 Hollister Drive, Libertyville, Illinois on April 28, 1999 at 11:30 a.m. The following, being all of the Trustees, were present: James A. Karlovsky, James J. McCormack and Richard T. Zwirner. Cheryl A. Kettler, an attorney with the law firm of Schuyler, Roche & Zwirner, and Dian J. Thielitz, Secretary to the Trustees, were also present.

The first item of business was to approve the signing of the proxy for the Annual Meeting of Shareholders of The Firm of John Dickinson Schneider, Inc. (the "Corporation") to be held April 30, 1999.

Mr. Karlovsky asked if the other trustees had any concerns or issues related to the draft opinion letter issued by the law firm of Arnold & Porter. He said he did not have anything further to add to what was addressed at their last meeting. Mr. Zwirner said he would like to read the opinion given by Arnold & Porter and the narrative based on the Trustees' deliberations one more time. He proposed that the Trustees review the opinion and narrative and if anyone had a point that needed discussion they should contact Ms. Kettler no later than May 7, 1999. He said if Ms. Kettler did not hear from any of the Trustees by May 7, 1999 she would have the authority to finalize the documents. Mr. Zwirner asked if the Trustees had any comments on the narrative. Mr. McCormack said he thought it was good. Mr. Karlovsky agreed and said he was still reviewing it. Mr. Zwirner agreed with the other two trustees and said that when the narrative was finalized it would become their record behind their vote taking into account only the interest of Trust participants and beneficiaries. Mr. Karlovsky commented that the Arnold & Porter opinion stated that the Trustees should not act in self interest. He noted that the proposed New Trust is not in the Trustees' self interest and that clearly a vote in favor would not be in their self interest.

Mr. Zwirner said he was further considering publishing an announcement to the participants of HolliShare. He said that Mr. Winn had advised him that a special issue of the Hollister Highlights was going to be published about the New Trust. He said he would propose that an announcement be put in the special issue of the Highlights and next year's HolliShare Highlights instead of a separate announcement. Ms. Kettler advised that the Hollister Highlights would be the appropriate vehicle to convey notice to the participants.

After a brief discussion, the trustees voted on the proposed Amendment to the Corporation's Restated Articles of Incorporation set forth in the Notice of Annual Meeting of Shareholders, which amendment added the New Trust as a permissible holder of shares of the Corporation. Upon motion made by James A. Karlovsky and seconded by James J. McCormack, the Amendment set forth in Exhibit A to the Notice of the Annual Meeting of Shareholders was unanimously approved.

Confidential Discovery Material

RZ 0004762

The trustees then voted on the proposed Amendment to the Corporation's Restated Articles of Incorporation set forth in the Notice of Annual Meeting of Shareholders, which Amendment created an exception to the transfer restrictions/repurchase provisions for transfers of preferred shares. Upon motion made by James A. Karlovsky and seconded by James J. McCormack, the Amendment set forth in Exhibit A to the Notice of the Annual Meeting of Shareholders was unanimously approved.

The trustees then voted on the proposed Amendment to the Corporation's Restated Articles of Incorporation set forth in the Notice of Annual Meeting of Shareholders, which limited common share ownership by a natural person to 10% of the class. Upon motion made by James J. McCormack and seconded by James A. Karlovsky, the Amendment set forth in Exhibit A to the Notice of the Annual Meeting of Shareholders was unanimously approved.

The trustees then voted on the proposed Amendment to the Corporation's Restated Articles of Incorporation set forth in the Notice of Annual Meeting of Shareholders which Amendment deleted provisions applicable to John D. Schneider and his wife. Upon motion made by Richard T. Zwirner and seconded by James A. Karlovsky, the Amendment set forth in Exhibit A to the Notice of the Annual Meeting of Shareholders was unanimously approved.

The trustees then voted on the election of the directors of the Corporation. Richard I. Fremgen, Alan F. Herbert, Loretta L. Stempinski, Michael C. Winn and Richard T. Zwirner had been nominated. Upon motion made by James A. Karlovsky and seconded by James J. McCormack, with Mr. Zwirner abstaining because he is a nominee for director of The Firm of John Dickinson Schneider, Inc., the trustees approved voting for Mr. Fremgen, Mr. Herbert, Miss Stempinski, Mr. Winn and Mr. Zwirner as directors to serve until the next annual meeting of shareholders or until his/her successor shall have been elected and qualified. The trustees approved and directed the signing of the proxy by all the Trustees. A copy of the proxy is attached to these minutes as Exhibit A.

Mr. Zwirner asked if there was any additional business. There was none.

There being no further business the meeting was adjourned at approximately 12 noon.

————————————————————

Dian J. Thielitz
Secretary to the Trustees

RZ 0004763

Confidential Discovery
Material

## XI.   Trustees' Analysis of the Proposal

CHANGED
TYPEFACE
TO ITALICS

*On April 8, 1999, the Trustees unanimously decided to vote the JDS Inc common shares in favor of the Proposal at the April 30, 1999 annual shareholders' meeting. They voted after over two months of research and deliberation, including consultation with independent counsel K. Peter Schmidt of Arnold & Porter and receipt from him of a draft of the opinion that is reproduced above.*

*The Trustees' final deliberations are summarized in the following statement.*

RZ 0004747

72

Confidential Discovery
Material

### Comparison of Short-Term and Long-Term Effects of the Proposal on the Interests of HESOT, its Participants and its Beneficiaries

**Revised**

As the Trustees for HESOT, our exclusive focus in analyzing the Proposal has been to compare the short-term and long-term effects of the Proposal on the interests of HESOT, its participants and beneficiaries. As part of our short- and long-term analysis, we have considered the effects of the Proposal on (1) both current and future participants and beneficiaries and (2) among current participants and beneficiaries, both those with many years of service and relatively high account balances and those with fewer years of service and lower balances. With respect to this last point, we have noted that the Plan's census data suggests that persons with fewer years of service and lower balances comprise a majority of current participants. As of December 31, 1998, HESOT had 860 participants, of which 82 participants have balances over $500,000; 170 have balances of $100,000-$499,000; 606 have balances of less than $100,000.

*Selection of Scenarios to Compare with the Proposal.* As an initial step, we considered what scenario or scenarios would be appropriate for comparison with the Proposal. The sharpest differences would appear to arise if rejection of the Proposal were to lead to the distribution of the preferred shares to direct common shareholders that would, at some point, be entitled to sell their shares to a non-employee third party or in a public offering. This scenario also would permit HESOT to sell its shares to such other parties and could, if the Book Value System also were reformed, entitle HESOT to sell at prices in excess of the book value of the shares. In light of our fiduciary obligations to participants and beneficiaries, we wanted to identify and analyze any feasible approach that would permit us to maximize the plan's returns on JDS Inc common shares.

Assuming that, if we were to reject the Proposal, the trustees of the John Schneider Trust would require employee/beneficiaries to sign the Agreement to Vote, we have concluded that, in the short-term, the direct common shareholders would be committed to status quo policies and procedures including employee ownership and the Book Value System. We made this assumption based on disclosures about the Agreement to Vote in the Proposal and because that approach was mentioned by Rick Michaels in his letter to us dated April ___, 1999. However, under this assumption, in the long-term, the repurchase of preferred shares by JDS Inc could lead to complete attrition over time of the current class of preferred shares.

Once the number of common shares held by HESOT exceeds preferred shares outstanding, HESOT would have an opportunity to elect directors who might be favorable to changes in the JDS Inc's (1) transfer restrictions; (2) permissible class of investors; and (3) Book Value System. Amendment of these provisions of the Restated Articles could open the way for sales of JDS Inc shares to the public or to third parties by common shareholders, including HESOT. It also could lead to sale of HESOT's common shares at a price in excess of book value.

*Obstacles to a Scenario in which JDS Inc Shares May Be Sold to Third Parties or Publicly Traded.* We have identified obstacles to the realization of this scenario. As set forth more fully

RZ 0004748

73

Confidential Discovery Material

in Rick Michaels' letter, the Proponents of the Proposal have available to them several alternative means of accommodating their objectives. It appears reasonable to conclude that one or more of these strategies, used alone or in combination, could prevent the sale of JDS Inc shares to a third party or the public.

*Short-Term Obstacles to Change.* This certainly would be the case in the short-run. The Agreement to Vote would be the first short-term obstacle to change. Assuming the trustees of the John Schneider Trust were to proceed to distribute the preferred shares as outlined in the Proposal, future holders of the shares would be bound by the terms of the Agreement to Vote until they submitted their shares for repurchase or other permissible transfer. Paragraph 2 of that Agreement, in relevant part, provides that the:

> Employee/Beneficiary shall vote and otherwise deal with all preferred shares received by him from the Trustees [here referring to the trustees of the John Schneider Trust], and any other preferred shares which he may hereafter own or hold, in accordance with the policies and principles set forth in ARTICLE SIXTH of the Trust.

Paragraph A of ARTICLE SIXTH requires the holder to vote and otherwise deal with the shares to further Mr. Schneider's policies and principles. These policies and principles include the ownership of "the entire equity interest" by employees directly and indirectly.

Additionally, compliance with Paragraph A.2. of ARTICLE SIXTH rules out "financing from outside the corporations," which would include "mortgages, bank borrowings on *sales of securities.*" (Emphasis added.)

While these provisions do not also commit JDS Inc preferred shareholders to the Book Value System, Paragraph 5.a. of the Agreement to Vote commits the preferred shareholders to compliance with the Restated Articles, including transfer restrictions set forth therein (see Paragraph 5.a. of the Agreement to Vote). According to Paragraph 4 of the Agreement to Vote, any employee/beneficiary or JDS Inc may enforce this provision of the Agreement to Vote.

We recognize that Paragraph 5.a. does not necessarily require employee/beneficiaries to vote to retain the Book Value System. However, as a practical matter, even if an argument can be made that the Book Value System is not a part of the Schneider policies and principles, the prospects for changing that portion of the status quo depend upon adoption of an amendment of the Restated Articles. Passage would require a vote of two-thirds of both classes of JDS Inc shares. At this time, based on the signatures obtained for the New Trust, 100% of the other members of the common share class could oppose such action. Thus, the views of the current members of the preferred share class would have to change for this to occur.

We recognize that the attrition of the current preferred share class and development of support for a change from the Book Value System are possible over time. If Mike Winn and others choose to retire in 2001, the composition of the class could change in a manner that might

74

RZ 0004749

Confidential Discovery
Material

bring about relaxation of some transfer restrictions, including those that relate to the Book Value System.

However, other possible short-term obstacles to change exist. For example, reform of the Book Value System might be undesirable as long as the class of permissible JDS Inc shareholders is limited to employees, directors and officers of Hollister and its subsidiaries. The Capitalization Study conducted by the company in 1997 and 1998 looked at alternative scenarios in which the principal change in the status quo was a change from the Book Value System to a discounted cash flow or other formulaic appraisal approach. The results of that study, which two of the Trustees steered, indicate that such action could destabilize the business financially by causing it to take on, in short order, prohibitively high levels of debt upon the repurchase of its shares. Accordingly, even if the Book Value System could be reformed, this could be undesirable (and, accordingly, unlikely) during the period when the preferred shareholders remain subject to the Agreement to Vote, including provisions that require them to preserve the employee-ownership principle.

Of course, even if the Capitalization Study had produced different results, results that would encourage or compel us, as HESOT Trustees, to support a reform of the Book Value System, other short-term obstacles to change have been identified. For example, Mike Winn and others who are committed to John Schneider's policies and principles would be free to defer their retirements beyond 2001 to further defer change in the short term. Alternatively, Mike Winn might retire from Hollister employment but continue as a director and JDS Inc shareholder. His substantial holdings of preferred shares alone could block amendment of the Restated Articles until his death. No matter how few preferred shares remain outstanding at any point in time, in the short term, 75% of the preferred shares must be voted to amend the Restated Articles for change to occur.

*Long-Term Obstacles to Change.* Moreover, Proponents of the Proposal have available other means of preserving all or most of the status quo's obstacles to the third-party or public sale of JDS Inc shares in the long-term. As Rick's letter and Arnold & Porter's opinion indicate, there are at least 9,510,000 preferred shares that have been authorized but not issued by the company. The Board could issue them to managers who would commit to upholding employee ownership, the Book Value System and other aspects of the status quo—further extending the period when HESOT would be incapable of amending the Restated Articles. During this period, the Board also could authorize more preferred shares without the approval of a majority of the common shareholders, namely HESOT. As long as the number of preferred shares committed to John Schneider's policies and principles outnumber HESOT's common shares, the preferred share class also can control selection of the company's directors.

Attrition of the preferred share class also depends on the repurchase of the preferred shares by the company as preferred shareholders terminate employment. As Rick's letter points out, attrition would be delayed if the Board were to decline to exercise the company's rights to repurchase shares from terminating employees. This would open the door to employee-to-employee transfers that would be subject to whatever commitment to the status quo could be

RZ 0004750

75

Confidential Discovery
Material

enforced by the Agreement to Vote and private contract. For example, Paragraph 4 of the Agreement to Vote calls for its terms to be enforceable with respect to successors, as well as the employee/beneficiaries.

The Board also could adopt a nonqualified benefit plan not subject to ERISA's fiduciary duties that could hold preferred shares subject to status quo restrictions. As just one example, a new plan might be structured as a bonus plan. The plan could hold a pool of preferred shares that would be subject to claims of company creditors. The plan could pay to managers or other key employees an annual bonus using dividends payable on the preferred shares. The plan could vote its shares consistent with status quo policies and principles. Constituted as such, the plan could defer attrition indefinitely because no repurchases would be required to fund benefits.

If the Proposal were to be rejected by us, the trustees of the John Schneider Trust also could decide *not* to require the signing of the Agreement to Vote. As noted in Rick's letter and Arnold & Porter's opinion, if the company were to reincorporate under Delaware law and the trustees of the John Schneider Trust were to require the signing of a perpetual voting trust (in place of the Agreement to Vote), those trustees could not only commit the preferred share class to the current transfer restrictions, they also could commit them to the Book Value System. This would mean that, even if it were possible for HESOT to identify a different method for valuing common shares than those examined under the Capitalization Study, a method that did not threaten company stability, preferred shareholders would be powerless to vote for it. Even under Illinois law, a voting trust could prevent amendment of the Book Value System for at least 10 years.

The most extreme response available to Proponents of the Proposal would be to amend or terminate HESOT to cause divestment of enough of HESOT's common shares to reduce its holdings below two-thirds of outstanding common shares. Without control of two-thirds of the common shares, HESOT alone could not effectuate amendment of the Restated Articles even if the preferred share class could be persuaded and have the means to vote for the amendments. While we do not believe this approach would be adopted by the company or its shareholders, it is yet another reason why we have determined that further analysis of scenarios in which JDS Inc shares are sold to third parties, to the public or at prices in excess of book value would be futile.

Based on advice from Arnold & Porter, we feel confident that we need not engage in a futile rejection of the Proposal to garner benefits too speculative to measure. Accordingly, any scenario that cannot be effectuated for many years, if at all, was excluded from further detailed consideration.

*Scenario Compared with the Proposal*. We have compared the Proposal to a scenario in which the status quo is preserved by and large with no changes except that its Proponents could take the steps outlined above to reinforce current restrictions on the transfer of common shares.

*Short-Term and Long-Term Results of Comparing the Proposal with the Status Quo*. Under the foregoing set of assumptions, we have come to the following conclusions about the

RZ 0004751

Confidential Discovery
Material

76

short-term and long-term effects of the Proposal as compared with continuation of the status quo. For reasons already stated, under both scenarios, both in the short and long run:

1.    Transfer restrictions would remain in place; and
2.    The Book Value System would remain in effect.

Under the status quo scenario, in the long and short term deviation from Mr. Schneider's policies and principles would be prohibited except to preserve the financial stability of JDS Inc or Hollister or to continue the manufacture and distribution of high quality health care and other products.

In contrast, under the Proposal, there actually would be an *additional* permissible basis for selling the company. Sale to the public or a third party could be approved if JDS Inc or Hollister were unable to compete in the marketplace occupied by their principal competitors. *Thus, the Proposal could offer a more liberal "exit strategy" than exists with the status quo.*

In the short run, the status quo also could offer significant disadvantages as compared with the Proposal. For example, if all or some of the Proposal's Proponents were to pursue the countermeasures described in Rick's letter, there could be -- even for a short period of time -- a fight for control of the company, a loss of management control and direction, factionalization of employees and lack of management stability. These consequences could have a direct, negative effect on the company's financial performance and, predictably, on HESOT's financial performance.

In the face of periodic or sustained downward fluctuations in book value, the company could lose valuable employees and the plan could find itself forced to move to a more diversified allocation of its investments among other forms of investment. This would be the case because the majority of Hollister employees' retirement income comes from employer securities. These participants cannot direct the manner of investment of their shares and, under section 11.01(1) of the Plan, our discretion also is constrained unless prudence dictates diversification of HESOT's assets. Accordingly, the only means by which participants can control the investment of their retirement benefits is by terminating employment and rolling over their HESOT balances to other qualified plans or IRAs.

We have considered whether ERISA requires us to diversify HESOT's portfolio or pursue a course of action that might cause us to need to diversify the portfolio. We do not have authority to amend the plan to require or encourage diversification. Under Article XII of the Plan, the right to amend or terminate HESOT is reserved to the Company. Moreover, while a diversified portfolio is generally more prudent, based upon our review and comparison of the performance of JDS Inc and diversified portfolios in the public market, diversification can mean lower returns on at least a portion of the portfolio than the plan has customarily achieved by investing to the greatest extent practicable in JDS Inc common shares. Moreover, diversification can mean higher costs to manage the plan. Of course, the company now absorbs plan management expenses. However, if the company experienced higher transaction and plan

RZ 0004752

77

Confidential Discovery
Material

management costs, it could reduce its rate of annual contribution from the current average of 8.0 to 8.5% of compensation to a lower percentage. This is permissible under the current terms of the plan.

In contrast, adoption of the Proposal could produce unique advantages in the short and long run for HESOT, its participants and beneficiaries. First, this would be expected to continue facts and circumstances that have produced consistently positive annual returns since 1977 for the plan.

We have compared the historical returns of JDS Inc with those of companies listed on the S&P 500, mid to small capitalization companies and small capitalization companies. JDS Inc's historical returns show a consistent trend of positive returns while other baskets of equities have shown more volatile and, generally, lower average and cumulative rates of return. We also have looked at the performance of JDS Inc as compared with diversified funds offered to other types of retirement plans. JDS Inc compares favorably with a balanced portfolio of these funds. Finally, we have considered the returns experienced by retirement plans of publicly traded companies that invest in employer securities. With respect to this latter group, while it is not possible to generalize their performance, it is evident that many of them experience volatility, invest in employer securities to a lesser extent than does HESOT and, during periods when they experience returns better than those experienced by HESOT, appear either to be much larger and more diversified companies or in sectors that have experienced growth at rates not common in Hollister's market sector, e.g., computers.

Adoption of the Proposal also would be expected to protect for participants and beneficiaries an interest in the financial benefits that flow from a shrinking share base.

As we learned from the Capitalization Study, JDS Inc's repurchase of common shares at book value leaves fewer employees holding an even more attractive stake in the company. As long as the rate of company returns exceeds the interest payable on the subordinated notes issued to direct common shareholders for their shares, fewer remaining shareholders also hold a larger interest in unrealized appreciation on company assets should the company dissolve or liquidate. Thus, the Proposal preserves the financial resources of the company to support benefits for future HESOT participants and beneficiaries even in an economic downturn. While HESOT continues to own 69% of JDS Inc's common shares, it is the primary beneficiary of this phenomenon.

Moreover, adoption of the Proposal and avoidance of short-term instability for the company allows the company to pursue long-term financial growth strategies instead of making strategic changes that sacrifice long-term growth to meet the short-term objectives of shareholders.

Our general observation of competitors and the economy in general indicates that a long-term growth strategy can be critical to the achievement of long-term growth and economic returns for shareholders.

RZ 0004753

78

Confidential Discovery
Material

For these reasons, we believe that voting for the Proposal better achieves long-term and short-term financial goals of HESOT, its participants and beneficiaries.

*Obstacles to Control of the Preferred Share Class by HESOT.* We are mindful of the fact that, if HESOT could control the preferred share class, it might be in a position to reject the Proposal and avoid some or all of the above-described short-term instability for the company. However, as set forth in Rick's letter dated April __, 1999, HESOT is not an eligible beneficiary of the John Schneider Trust. Our own reading of that trust, including the provisions cited by Rick and others, suggest that Mr. Schneider meant only to benefit employees and not HESOT participants. Moreover, that trust does not limit the trustees' discretion to interpret trust terms in a way that would permit us to argue that they have abused their discretion by excluding HESOT from distribution of the preferred shares.

Finally, even if HESOT could attain control of both classes of shares, it is possible that we might still find it reasonable to continue current transfer restrictions and the Book Value System. As already discussed, our observations of the publicly traded market suggest that publicly traded companies tend to hold a lower percentage of employer securities than HESOT does. Also, these companies generally do not repurchase their shares from direct common shareholders on terms as attractive as those that apply to JDS Inc's direct common shareholders. Such companies often borrow funds at public market interest rates, increasing costs of capital and reducing company earnings.

Moreover, shares of publicly traded companies generally fluctuate up _and down_ in value throughout the year as well as over the course of years. This volatility of publicly traded shares could tend to produce several undesirable results in the long run:

1. As long as HESOT principally holds employer securities, decreases in share value will tend to spur terminations by valuable employees whose only means of reducing risk for their retirement accounts is to leave the company; and

2. If the plan has to be amended to increase diversification to minimize departures, then returns may further drop and/or contributions may decline for reasons noted above.

**Revised** Of course, an initial public offering could mean a temporary or sustained jump in share values, but as noted below, this is likely to produce a windfall for some participants in the short term but will not necessarily do so on a sustained basis. Realistically, Hollister is not viewed by us, as Trustees, as being a "market darling" that can achieve a rate of return much in excess of the current rate simply because of sales of shares to the public. Moreover, an increase in share prices means not only an increase in prices on share repurchase, but also an increase on share purchase. After the windfall is divided up by current shareholders and HESOT participants, future HESOT participants will receive rates of return that will not share with them the "pop" in value that is sometimes achievable when a company first goes public. Moreover, the greatest windfall benefit would be experienced by the minority of participants and beneficiaries with

RZ 0004754

Confidential Discovery
Material

79

many years of service and high HESOT balances and impose the greatest long-term disadvantages on the majority of HESOT participants with fewer years of service and lower account balances.

## Comparison of Effects of the Proposal on Current and Future HESOT Participants and Beneficiaries .

As set forth in the opinion received from Peter Schmidt, trustees have a duty to deal impartially with participants and beneficiaries, whether they are currently, or will in the future be, in "pay" status.

In light of this obligation, we have undertaken the analysis of the effects of the Proposal on participants retiring in the near and long term.

Assuming for the moment that we had not identified the above-stated obstacles to sale of JDS Inc shares to a third party or to the public through registration of shares and assuming that such sales would occur at a value determined using a formula other than book value, discounted cash flow or a price-earnings ratio, it is possible that rejection of the Proposal could permit HESOT to garner a higher price for its JDS Inc common shares than would be available under the Proposal. Moreover, because the New Trust is intended to be perpetual, it is reasonable to assume that voting for the Proposal foregoes this option perpetually, absent circumstances that would permit deviation from John Schneider's policies and principles. Based on the past performance of the company and our own assessments of company plans, including those set forth in the Capitalization Study, we do not at this time foresee a need to deviate from John Schneider's policies and principles.

We are in agreement that initial public offerings of securities have permitted many shareholders to earn higher rates of return for a period of time right after the offering. In some cases, these returns have been sustained, but, we are aware of cases in which they have not been sustained. We have considered the nature of our obligation to HESOT participants and beneficiaries and believe that, as long as the company continues to produce consistently positive returns, that we are not obliged under ERISA to take steps that could capture for current participants and beneficiaries a windfall if we believe that the interests of current participants (with few years of service and lower HESOT balances) and future participants and beneficiaries could be jeopardized.

For reasons already stated, while it is difficult to point to quantifiable risks to retirement benefits of future participants from a change in the Book Value System or third-party or public sale of JDS Inc shares, we have considered the following:

1.    With respect to a change in the Book Value System, use of a multiple of book value in place of a book value formula, without sale to a third party or to the public reduces the performance of the company for future participants and beneficiaries. This is illustrated by the results of the Capitalization Study scenario

80

RZ 0004755

Confidential Discovery
Material

involving an ESOP. The alteration of the book value formula would alter the price of repurchases from direct and indirect common shareholders. It would add to the company's debt, reducing the growth of share value for future plan participants.

2.    With respect to a third-party or public sale, this can benefit a minority or current participants at the expense of future participants if it leads to greater volatility, a more prudent and less profitable allocation of HESOT investments and lower annual contributions to the plan by Hollister. These points are discussed in greater detail above.

**Revised**    In the absence of an obligation to prefer the interests of current participants with higher HESOT balances and beneficiaries over current beneficiaries with fewer years of service and lower balances future ones and in light of authority noted by Arnold & Porter in its opinion that suggests that it is permissible or even desirable to balance the interests of both groups of participants and beneficiaries, we believe that the Proposal will better protect the interests of all participants and beneficiaries, as participants and beneficiaries. Moreover, we believe that all current participants and beneficiaries now enjoy a desirable rate of return on their account balances.

### Pros and Cons of the Proposal

We summarize the pros and cons of the Proposal as follows:

1.    *Pros*:

    a.    Stabilizes JDS Inc by reassuring employees that there will be no unpredictable changes when the John Schneider Trust terminates in 2001. This stability permits the company to retain valuable employees who contribute to the company's and HESOT's positive performance.

    b.    Stabilizes HESOT's performance by permitting the plan to continue to capture the comparatively high growth in share values that have characterized HESOT's investment in JDS Inc common shares since 1977.

    c.    Reduces volatility of HESOT's performance because HESOT's continued investment in JDS Inc common shares (as opposed to a diversified portfolio) shields the plan from fluctuations up and down in returns experienced in public markets and the economy generally.

    d.    Retains for HESOT the primary interest in any appreciation of assets over their book value in the event of a liquidation of the unlikely company.

RZ 0004756

81

Confidential Discovery
Material

e.    Retains for HESOT the primary interest in returns that result from a shrinking JDS Inc share base.

f.    May sustain the level of Hollister's annual contributions to the plan at 8.0 to 8.5% by lowering the employer's costs associated with the plan.   With respect to this advantage, we have concerned ourselves only with Hollister's cost savings as they affect participants and beneficiaries' account balances and not as they affect other parties.

**Revised**

g.    Offers the company an additional basis for deviating from Mr. Schneider's policies and principles, as compared with the status quo scenario because it permits deviation from such policies and principles in the event that JDS Inc or Hollister is unable to compete in the marketplace with its competitors.  This is in addition to deviations permitted under the status quo scenario (a) for preservation of financial stability and soundness of either JDS Inc or Hollister; or (b) to continue the manufacture and distribution of high quality health care and other products.

2.    *Cons*:

a.    In the absence of a basis for deviating from John Schneider's policies and principles, limits JDS Inc's access to financing through sale of equities to third parties or the public.

b.    Makes perpetual the commitment of the company to John Schneider's policies and principles and the Book Value System.

## Pros and Cons of Alternative Scenarios if the Proposal Fails

We summarize the pros and cons of rejecting the Proposal as follows:

1.    *Pros*:

a.    Allows adoption of alternative share pricing approaches under circumstances where a change in pricing would produce a manageable increase in company debt.

b.    Could lead to diversified investment of HESOT balances.

2.    *Cons*:

**Revised**

a.    More narrowly limits JDS Inc's access to financing through sale of equities to third parties or the public because it permits deviation from Mr. Schneider's principles on only two conditions: (a) for preservation of

RZ 0004757

Confidential Discovery Material

82

financial stability and soundness of either JDS Inc or Hollister; or (b) to continue the manufacture and distribution of high quality health care and other products.

b.     Makes perpetual the commitment of the company to John Schneider's policies and principles and the Book Value System.

c.     Could produce company instability if there were a struggle for company control following rejection of the Proposal.

d.     Could interrupt or halt stable growth of HESOT account balances.

e.     Could lower HESOT returns due to prudent allocation of investments to lower return bonds or equities due to diversification of investments.

f.     Could introduce volatility to HESOT returns by leading to diversification of HESOT's holdings.

e.     Could lead to reduced levels of plan contributions by Hollister to reflect rising costs of a diversified investment by HESOT.

## Relative Benefits and Costs (or Disadvantages) of the Proposal

With respect to the foregoing "cons" of the Proposal, we first note that they are not unique to the Proposal but are true of the status quo as well. We have made an effort to quantify them in order to examine trade-offs under the Proposal. It is difficult to quantify the effects of the extra limitation on the company's alternative means of financing growth under the status quo. On the one hand, JDS Inc's conservative financial policies (which will continue to be pursued if the Proposal passes) are intended to ensure the availability liquidity to fund growth. Our review of the Capitalization Study suggests that, in the short and long run, there will be sufficient working capital for significant acquisitions. The company's subordinated note program is a source of competitively priced financing for company growth. The Finance Department's contributions to the Capitalization Study also point to significant borrowing power available to the company if borrowing is required to fund growth through acquisitions or research and development. Under the circumstances, the Proposal does appear to somewhat lighten, rather than add weight to, any burdens on the company's prospects for financing.

With respect to the perpetual nature of the Proposal, we have considered whether the permissible bases for deviating from John Schneider's policies and principles will give the company, and HESOT as its largest shareholder by value of shares, sufficient flexibility. As long as we are not constrained by ERISA to prefer the interests of current participants and beneficiaries over future ones, current constraints on the pricing of JDS Inc shares do not appear to produce quantifiable disadvantages for the plan. Even though we have determined that public

RZ 0004758

83

Confidential Discovery
Material

sale or third-party sale is too remote for our serious consideration, we also have discussed the foregoing of such action as a possible disadvantage of the Proposal.

The assessment of this possible disadvantage of the Proposal has received a great deal of attention from us. We are aware that perpetual ownership of the preferred shares by a trust committed to John Schneider's policies and principles bars HESOT's becoming the company's majority shareholder based on the number of shares. However, we do not believe that we can achieve majority status merely by voting to reject the Proposal. Indeed, we could invite action of the Proposal's Proponents that could jeopardize the plan if we vote to reject the Proposal. Additionally, we have been unable to identify concrete disadvantages of perpetual ownership of the preferred shares by the New Trust.

Under the circumstances, we have concluded that the Proposal's benefits outweigh its disadvantages.

We also believe that the Proposal's benefits outweigh the benefits of the status quo scenario. While we subscribe to the general view that the company should maintain its flexibility to respond to changing financial circumstances, voting to reject the Proposal does not appear to measurably enhance the company's flexibility. Indeed, compared with the status quo scenario, we believe that the Proposal increases flexibility. Moreover, our discussions have highlighted reasons why the Proposal could be superior even to a scenario that more readily permitted sale to the public. In light of the company's current financial strength, working capital resources and financing options, the necessity of a third party investor or registration of JDS Inc securities is speculative. Moreover, the company can make use of these options if necessary to preserve the financial stability of JDS Inc or Hollister, to continue the manufacture and distribution of high quality healthcare and other products or to preserve the companies' ability to compete in the marketplace with their competitors. At this point, we have not identified prospects for needing the added flexibility that comes from abandonment of either the employee ownership principle or the Book Value System that would not support a deviation from John Schneider's policies and principles or any lost opportunities due to support of the employee ownership principle.

We also have considered how we would respond in the event that the company ceased to perform well, whether that change resulted from our rejection of the Proposal or facts and circumstances unrelated to our vote and not currently foreseeable. Certainly, as a shareholder of the company and the largest holder of common shares, we would urge the company's directors and officers to deviate from John Schneider's policies and principles if they were permitted by the New Trust's terms to do so. Additionally, we would urge the company to amend the plan if an amendment would permit us to better protect HESOT's participants and beneficiaries. Such an amendment might alter the language of Plan section 11.01(1) to permit or require us to invest in a more diversified portfolio. Of course, diversification requires liquidity and we would need to be able to sell JDS Inc shares to JDS Inc (as required by the company's transfer restrictions) to be in a position to diversify.

RZ 0004759

84

Confidential Discovery
Material

Accordingly, we have engaged in a dialogue with the company's CEO and the Board of Directors and have obtained both an affirmation of JDS Inc's historic, general commitment to repurchase its shares from the Plan and a new commitment from JDS Inc to repurchase its shares from the Plan for at least the next three years. This latter commitment will be subject to extension under a rolling renewal method. We believe that the dialogue that produced these commitments also served to focus the attention of the company on various indicators of company liquidity that, if monitored regularly, would provide us and the company with an "early warning system" for any insecurity of the Plan associated with limited repurchase options, whether they arise because of poor financial performance of the company or aggressive, leveraged growth.

Additionally, we have considered some of our other options in the event that company performance threatens HESOT performance. These include:

1.    an attempt to sell JDS Inc common shares to an impermissible party to determine whether other JDS Inc shareholders would continue to support the share transfer restrictions or whether that would persuade JDS Inc to redeem the JDS Inc common shares;

2.    use of new contributions, in excess of liquidity needs, if any, to acquire other plan assets to diversify the trust; or

3.    resignation as HESOT Trustees.

With respect to the first of these options, we understand that, under Illinois corporate law, an attempt to sell shares of a closely held corporation to an impermissible party can, but will not necessarily, cause the issuer to repurchase its own shares to enforce its transfer restrictions. With respect to the use of new contributions, we have acknowledged that new contributions to HESOT have been required to fund retirements and generally do not provide the plan additional liquidity. Accordingly, it is not likely to be a useful technique in the event of a financial downturn. Finally, Peter has informed us that resignation of trustees does not always stimulate a favorable company response as a court may require trustees to continue in office until their replacements are in office. Based on the foregoing, the company's renewed and enhanced commitment to repurchase its shares from HESOT provides the plan its best security in the event of financial downturn. Of course, we also could go to court to seek instruction as to an appropriate response to a financial downturn. And we intend to consider in the future the appropriateness of some diversification of HESOT assets even at the current time, within the scope of discretion afforded to us by Plan section 11.01(1) and ERISA's general fiduciary requirement of prudence.

By far, the most influential factors considered by us have been the company's consistently positive performance and the evidence that a shrinking share base enhances share values. The **Revised** Capitalization Study points to the likely continuation of these circumstances if we support the Proposal. We believe that both of these factors serve to benefit both current and future participants and beneficiaries and both current participants with many years of service and high HESOT account balances and those with fewer years or service and lower account balances,

RZ 0004760

85

Confidential Discovery Material

allowing us to support a position that balances the interests of the broadest cross-section of present and future classes of beneficiaries instead of helping one class at the expense of the other.

Finally, we believe that the disadvantages of rejecting the Proposal outweigh the disadvantages of the Proposal. Our examination of the possible disadvantages of the Proposal have not turned up concrete risks to interests of HESOT's participants and beneficiaries. In contrast, our vantage point as Trustees and as company directors, officers and/or employees with substantial operational roles, have allowed us to evaluate what contributes to the company's and HESOT's success.

In our collective view, formed in financial, human resources, legal and business disciplines, rejection of the Proposal could produce company instability if there were a struggle for company control following the distribution of preferred shares in 2001. This instability could encourage valuable employees to secure their retirement benefits by departing the company even if this instability did not reverse company growth but merely slowed it. If company growth were interrupted or halted, this certainly would have an undesirable effect on HESOT account balances. Our efforts to avert risk to HESOT balances could further lower HESOT returns due to prudent allocation of investments to lower return bonds or equities due to diversification of investments. Moreover, public trading of JDS Inc shares or diversification of HESOT's holdings could introduce volatility to HESOT returns. This could produce more early retirements and terminations. Also, diversification could lead in the future to reduced levels of plan contributions by Hollister to reflect rising costs of a diversified investment by HESOT.

We find these adverse scenarios to be sufficiently concrete and foreseeable as to make them more disadvantageous than the non-unique disadvantages of the Proposal.

On balance, we find the Proposal favorable compared with the status quo.

RZ 0004761

86

Confidential Discovery
Material