UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| JAMES P. DEFAZIO, et al., | NOS. CIV. 04-1358 WBS GGH |
| | 05-0559 WBS GGH |
| Plaintiffs, | 05-1726 WBS GGH |
| | CONSOLIDATED |
| v. | MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' MOTION TO STRIKE CLASS ACTION ALLEGATIONS, AND PLAINTIFFS' MOTION TO REMOVE PLAN TRUSTEES |
| HOLLISTER, INC., et al., | |
| Defendants. | |

----oo0oo----

Plaintiffs James P. DeFazio, Theresa Beetham, Brenda DiMaro, DeLane Humphries, Hallie Lavick, Michael McNair, Sonya Pace, Judy Seay, Nancy Russell Stanton, Cindy Worth, and Kathleen Ellis filed these consolidated actions against defendants Hollister, Inc. ("Hollister"), Hollister Employee Share Ownership Trust ("HolliShare"), The Firm of John Dickinson Schneider, Inc. ("JDS"), Samuel Brilliant, Richard I. Fremgen, Donald K. Groneberg, Charles H. Gunderson, Alan F. Herbert, James A. Karlovsky, Lori Kelleher, James J. McCormack, Charles C.

1

Schellentrager, Loretta L. Stempinski, Michael C. Winn, and

Richard T. Zwirner alleging violations of the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1144.

Presently before the court are plaintiffs' and defendants' cross-

motions for partial summary judgment, defendants' motion to

strike class action allegations, and plaintiffs' motion to remove

the plan trustees.

I.   Factual and Procedural Background[1]

        In a fourteen-month period between 2004 and 2005, three

groups of the current makeup of plaintiffs--former participants

and beneficiaries of HolliShare, a defined contribution plan[2]

established by Hollister (see 1st Zwirner Decl. (Docket No. 399)

¶ 7)--independently filed complaints against defendants

Hollister, its parent company JDS, the HolliShare trustees, and

various members of the boards of directors of both companies.

The cases were consolidated by court order on May 25, 2006.

(Docket No. 87.)  Currently, the plaintiffs are divided into two

groups based upon the two operative complaints in this

litigation.  Ten of the plaintiffs ("DeFazio/DiMaro plaintiffs")

are represented by the same counsel and filed their Fifth Amended

Complaint ("HAC") on July 22, 2008.  (See Docket No. 368.)

Ellis, the only plaintiff represented by separate counsel, filed

---

[1]    The following facts are undisputed unless otherwise
noted.

[2]    A "defined contribution plan" or "individual account
plan" pays the participant the value of his or her retirement
account at retirement.  LaRue v. DeWolff, Boberg & Assocs., Inc.,
128 S. Ct. 1020, 1022 n.1 (2008).  In contrast, a "defined
benefit plan," not at issue in this case, pays the participant a
fixed level of retirement income.  Id.

her Fourth Amended Complaint ("FAC") on January 23, 2008.[3]  (See Docket No. 314.)  Though they differ in some respects--most notably, the HAC contains class action allegations while the FAC does not--the allegations asserted against defendants are substantially similar in both the HAC and FAC.

The claims in this case are based upon the alleged misconduct by the fiduciaries of HolliShare.  HolliShare is funded through contributions by Hollister from the company's profits; participants are not permitted to make personal contributions.  (See Defs.' 1st App'x (Docket Nos. 486-488) Ex. 1 ("Trust Instrument") §§ 6.01, 6.02.)  Hollister is a privately-held Illinois corporation that manufactures and markets healthcare products.  (1st Zwirner Decl. (Docket No. 399) ¶¶ 4, 8.)  It is the operating subsidiary of JDS, an Illinois corporation that holds all of Hollister's capital stock.[4]  (Id. ¶ 5.)  Consistent with the terms of the HolliShare Trust Instrument, the plan's principal investment is common shares of

_____

[3]   As used in this Order, the term "plaintiffs" refers collectively to all eleven plaintiffs unless otherwise noted.

[4]   The parties have filed numerous purported evidentiary objections to the materials submitted in support of the parties' respective motions.  The bulk of these so-called objections do not raise cognizable arguments under the Federal Rules of Evidence, and many consist simply of argument on the merits of the motions.  To the extent that the objections concern evidence not relied upon, they are moot.  The court will address only those specific objections raising cognizable evidentiary objections to material relied upon in the court's analysis.
     Here, plaintiffs do not dispute the facts concerning the structure of Hollister and JDS, but object to this evidence on relevance grounds.  (Pls.' Reply to Disputed Material Facts (Docket No. 540) No. 2.)  The court overrules this objection, as these facts are relevant to a background understanding of the relationship between the various entities in this litigation.

3

1  JDS.[5]  (Trust Instrument § 11.01(1); 2d Zwirner Decl. (Docket No.
2  494) ¶ 8.)

3       In their papers on the instant motions, the parties
4  have divided plaintiffs' claims into three rough categories
5  according to the three primary factual bases upon which they are
6  premised: the prohibited transactions between HolliShare and JDS,
7  the 1999 Transaction (a series of events culminating in the
8  transfer of all of the preferred shares of JDS to a new trust),
9  and the DeFazio-Ellis divorce proceedings.[6]  Though these
10 categorizations overlap in certain areas, given the complexity of
11 the factual issues in this case, the court will follow the
12 convention adopted by the parties.

13      A.   Prohibited Transactions

14      JDS has two classes of shares, preferred and common,
15 neither of which has a generally recognized public market.  (2d
16 Zwirner Decl. ¶¶ 10-11.)  The JDS Articles of Incorporation ("JDS
17 Articles") provide several restrictions on JDS shares relevant to
18 this case.[7]  First, pursuant to article five, paragraph II.C

19

20

21      [5]   Under the terms of the Trust Instrument, participants'
   accounts are not valued in numbers of shares of JDS common stock.
22 Instead, HolliShare invests in JDS common stock with
   contributions from Hollister, and participants' accounts are
   valued based on their proportional interest in the total value of
23 that trust fund.  (Trust Instrument § 7.02(1).)

24      [6]   In contrast, plaintiffs in their complaints have
   divided their claims by the specific provisions of ERISA that
25 defendants allegedly breached.  Each claim is then premised on
   multiple factual bases.
26

27      [7]   The JDS Articles were amended multiple times between
   1978 and 1999.  (See Defs.' 1st App'x Ex. 4.)  Unless otherwise
   noted, the cited paragraphs of JDS Articles are common to all of
28 the versions.

                                4

("paragraph II.C"), only certain persons and entities are entitled to own JDS shares, including holders of shares as of May 5, 1978, employees of JDS and/or Hollister, and any deferred benefit plan maintained by JDS and/or Hollister.[8]  (Defs.' 1st App'x Ex. 4 ("JDS Articles") 9.)

Second, article five, paragraph II.D ("paragraph II.D") restricts the manner in which holders of JDS stock may transfer ownership.  Specifically, paragraph II.D.2 gives JDS a first right of refusal by requiring that any holder of JDS stock who intends to transfer one or more shares to another must first offer to sell those shares to JDS.  (JDS Articles 10.)  Paragraph II.D.3 further provides that the price paid for any common share purchased by JDS "shall be its book value as of the end of the calendar month in which the Repurchase Date occurs. . . .  The book value of each common share shall be computed in accordance with generally accepted accounting principles . . . ."[9]  (Id. 12.)  Despite these requirements, paragraph II.D.7 provides that:

> "Under exceptional circumstances and in the discretion of the Corporation's Board of Directors, shares may be repurchased by the Corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the

---

[8]    Paragraph II.C was amended in 1984 to allow certain directors and officers of JDS and Hollister to own stock and again in 1999 to allow The Firm of John Dickinson Schneider, Inc. Preferred Share Trust April 21, 1999 to hold shares.  (JDS Articles 35, 51.)

[9]    As noted in an earlier Order, "book value" refers to a method used to value corporate stock, but the term has no generally accepted definition.  DeFazio v. Hollister Employee Share Ownership Trust, 406 F. Supp. 2d 1085, 1087 n.2 (E.D. Cal. 2005) (Karlton, J.) (citing 51 A.L.R. 2d 606 § 2).  "[T]he term contemplates a theoretical value resulting from depreciation or appreciation as computed upon an originally determined base."  Id.

1    Corporation and the owner or holder of such shares may
2    from time to time agree."

3 (JDS Articles 15.)

4        JDS common shares are HolliShare's primary investment,

5 and HolliShare must sell those shares in order to raise the cash

6 needed to pay benefits to participants and beneficiaries.  (3d

7 Zwirner Decl. (Docket No. 515) ¶ 7.)  Since the mid-1980s,

8 HolliShare has sold its holdings of JDS common shares to JDS

9 pursuant to the "exceptional circumstances" provision of

10 paragraph II.D.7, not the first right of refusal embodied in

11 paragraph II.D.2.  (Pls.' Stmt. of Undisputed Facts Ex. B

12 ("Zwirner Dep.") 237:19-238:8; 3d Zwirner Decl. ¶¶ 9, 16, 18.)

13 Defendants contend that HolliShare and JDS entered into an

14 agreement ("mid-80s buy-back agreement") that has since governed

15 JDS's repurchase of common shares from HolliShare in order to

16 avoid certain complications.  (See 3d Zwirner Decl. ¶ 16.)

17        The JDS Articles provide that when JDS repurchases

18 shares pursuant to the first right of refusal, it is obligated to

19 pay a only minimal amount in cash (set originally at $5,000 and

20 then increased to $250,000 in 1999) and can pay the remainder

21 with a promissory note.  (JDS Articles 12, 44.)  Because

22 HolliShare, as an ERISA plan, is prohibited from accepting a

23 promissory note as payment from an employer, see 29 U.S.C. §

24 1106(a)(1)(B), and HolliShare's cash needs often exceeded the

25 $5,000 and $250,000 minimums, HolliShare could not have sold its

26 shares to JDS under the terms of that provision.  (3d Zwirner

27 Decl. ¶ 15.)  If JDS did not waive its right of refusal,

28 HolliShare would thus have been unable to sell its JDS stock to

1  anyone pursuant to paragraph II.D.2.   (Id.)

2         To avoid this problem, and to allow JDS to plan ahead

3  for its cash flow needs, HolliShare and JDS agreed in the mid-

4  1980s that: 1) JDS would repurchase HolliShare's common shares

5  entirely for cash (i.e., would not tender promissory notes); 2)

6  the price employed would be the most recent audited December 31

7  per share book value rather than the month-end book value from

8  the date of the transaction, as provided in paragraph II.D.3; and

9  3) such transactions would take place only once a year.   (3d

10 Zwirner Decl. ¶ 16.)

11        Plaintiffs contend that these repurchases of JDS common

12 shares from HolliShare using book value violated defendants'

13 statutory duties under ERISA.   Particularly in light of evidence

14 that JDS common shares may have had a value in the "outside

15 world" of up to three-times book value (Pls.' Stmt. Disputed

16 Facts Ex. F ("Winn Dep.") 91:15-92:13), plaintiffs assert that

17 defendants breached their fiduciary duties, 29 U.S.C.

18 1104(a)(1)(B), and violated the provision on prohibited

19 transactions, id. § 1106(a)(1)(A).[10]

20     B.   1999 Transaction

21        HolliShare does not invest in JDS preferred shares.

22 John Schneider, the founder of JDS, owned a majority of the

23 outstanding preferred shares until he placed all of his holdings

24

---

25        [10]   Though plaintiffs have only moved for partial summary
   judgment based on the sales of JDS common shares to JDS to raise
26 cash for its obligations, the overall impact of the book value
   method was broader.   The book value method was also used to
27 determine the annual value of both the HolliShare trust as a
   whole and the proportionate value of each participant's account.
28 (Trust Instrument §§ 7.02, 7.03.)

into a trust in 1977 ("1977 Schneider Trust").  (2d Zwirner Decl. ¶ 24; Defs.' 1st App'x Ex. 3 at 2-3.)  Because those shares comprised a controlling interest in JDS, the 1977 Schneider Trust, through its trustees, effectively controlled JDS.[11]  (2d Zwirner Decl. ¶ 24.)  After 1981, defendants Winn, Stempinksi, and Zwirner became trustees of the trust.  (Id. ¶ 29.)

The terms of the 1977 Schneider Trust provided that it would expire on April 21, 2001.  (Defs.' 1st App'x Ex. 3 at 11.) Upon its expiration, the trust called for its corpus of preferred shares to be distributed to employees of Hollister who then owned common shares and agreed to abide by certain principles in governing JDS.[12]  (Id.)  These employee-beneficiaries would have received a number of preferred shares in proportion to their relative holdings of JDS common shares.  (Id.)  Several years before the 1977 Schneider Trust was set to expire, however, its trustees considered the impact of the distribution of preferred shares on the company.  (2d Zwirner Decl. ¶ 32.)  Defendants contend that the trustees perceived several adverse effects from the distribution, including the possibility that a small number of employees might form an insulated controlling bloc, the prospect that the employees might vote to take JDS public, and

---

[11]   Each share of preferred and common stock is entitled to one vote.  (2d Zwirner Decl. ¶ 13.)  However, since 1977, there have been 61,750,000 outstanding preferred shares compared with only about 400,000 to 3,000,000 common shares.  (2d Zwirner Decl. ¶ 14.)

[12]   The listed principles included such policies as pursuing conservative financial and investment strategies, introducing new and improved products, continuing to sell common shares directly to certain employees, and maintaining standards of quality and service.  (See Defs.' 1st App'x Ex. 3 at 13-17.)

the potential that votes to appoint members of the JDS and

Hollister boards of directors could lead to factionalism in the

company. (Id.)[13]

Ultimately, Winn, Stempinski, and Zwirner proposed that

a new trust ("1999 Preferred Share Trust") be created to hold the

preferred shares that would otherwise be distributed to the

employee beneficiaries of the 1977 Schneider Trust. (See 2d

Zwirner Decl. ¶ 34; Winn Decl. (Docket No. 492) ¶ 28.)  On

February 17, 1999, they sent a letter ("1999 Proposal Letter") to

all employees of Hollister who then owned JDS common shares,

stating that the trustees believed that the 1999 Preferred Share

Trust was desirable to maintain the independent and employee-

owned nature of Hollister and adherence to the principles of John

Schneider. (Defs.' 1st App'x Ex. 5 ("1999 Proposal Letter") at

2; 2d Zwirner Decl. ¶ 37.)  The letter requested that the

recipients transfer the preferred shares to which they would

otherwise be entitled to the new trust.  (Id.)  The letter

further informed recipients that they would either need to sign

an enclosed "Agreement to Vote," which stated that the signatory

---

[13]   Plaintiffs object to this evidence on grounds of lack
of personal knowledge, relevance, and hearsay. (Pls.' Opp'n
Stmt. Undisputed Facts (Docket No. 523) No. 64.)  The court
overrules this objection.  Zwirner, who was one of the trustees
of the 1977 Schneider Trust, has personal knowledge of the
trustees' considerations.  This evidence is relevant to
defendants' positions concerning the legality of the 1999
Transaction.  Finally, there is no hearsay because the evidence
does not consist of an out of court statement offered for its
truth.
      Plaintiffs simply repeat these same objections to all
of the evidence concerning the trustees' proposal of the 1999
Trust without providing any particularized argument for each
objection.  (See Pls.' Opp'n Stmt. Undisputed Facts (Docket No.
523) Nos. 66, 67, 69.)  For the same reasons, the court overrules
these objections.

1  agreed to adhere to the principles specified by the 1977

2  Schneider Trust, or the "Consent," which stated that the

3  signatory agreed to transfer the preferred shares he or she would

4  have been entitled to receive to the 1999 Preferred Share Trust.

5  (1999 Proposal Letter 27; id. Enclosures 4, 5.)

6          On April 21, 1999, all of the recipients of the 1999

7  Proposal Letter agreed to transfer their prospective preferred

8  shares to the 1999 Preferred Share Trust.[14] (Zwirner Decl. ¶ 43;

9  Winn Decl. ¶ 41.)  In order to effect the transfer of shares

10  between the 1977 Schneider Trust and the 1999 Preferred Share

11  Trust at the expiration of the former in 2001, however, the JDS

12  Articles had to be amended to allow the 1999 Preferred Share

13  Trust to own JDS shares.  Because the JDS Articles provided that

14  any changes to the stock restrictions required a two-thirds vote

15  of all classes of shares--rather than simply a majority of all

16  outstanding stock (JDS Articles 27)--votes from the shares held

17  by HolliShare (approximately 69% of all common shares) were

18  necessary to effect the amendment.  (See Thielitz Decl. (Docket

19  No. 493) ¶ 4; 2d Zwirner Decl. ¶ 49.)

20          At a meeting on April 28, 1999, the HolliShare

21  trustees--who at that time were Zwirner, Karlovsky, and

22  McCormack--agreed to vote HolliShare's JDS common shares in favor

23  of the amendment to the JDS Articles.  Ultimately, at the April

24

25          [14]  The record does not indicate the exact number of
employees who would have received preferred shares at the
26  expiration of the 1977 Schneider Trust.  Nonetheless, the 1999
Proposal Letter indicates that ninety-one employees owned common
shares in 1999, and at least eighty-one employees signed the
27  consent form transferring the shares they would have received to
the 1999 Preferred Share Trust.  (See 1999 Proposal Letter 4;
28  Pls.' Stmt. Undisputed Facts Ex. P at 6-11.)

10

30, 1999 JDS shareholders' meeting, JDS shareholders voted
unanimously to amend the JDS Articles, and those amendments were
filed with the Illinois secretary of state on June 14, 1999. (2d
Zwirner Decl. ¶ 65; JDS Articles 51-52.)  The propriety of the
vote to approve the amendments, as well as the adequacy of the
trustees' decisionmaking process, form the basis of plaintiffs'
claims related to the 1999 Transaction.  Plaintiffs essentially
argue that, but for the 1999 Transaction, HolliShare would have
become the majority shareholder of JDS and its holdings would
have experienced an increase in value.

        For purposes of the instant motions, plaintiffs contend
that all of the HolliShare fiduciaries who voted in favor of the
1999 Transaction violated ERISA by engaging in a self-dealing
transaction, 29 U.S.C. § 1106(b), and breaching their fiduciary
duties, id. §§ 1104, 1105.

        C.   DeFazio-Ellis Divorce Proceedings

        Particular to plaintiffs DeFazio and Ellis, the HAC and
FAC also assert claims against all defendants based upon
Hollister's compliance with a series of domestic relations orders
(DROs) issued by the Superior Court of Sacramento as part of
DeFazio and Ellis's divorce proceedings.  (HAC ¶¶ 132-34; FAC ¶¶
69-71.)

        The marriage of DeFazio and Ellis was dissolved by
court order on March 1, 1999.[15]  (Defs.' Req. Judicial Notice

───────────────

        [15]  Defendants have requested that the court take judicial
notice of various filings and orders in the DeFazio-Ellis divorce
proceedings before the Superior Court of Sacramento.  Plaintiffs
have not opposed this request.  Because the specified documents
comprise public records of a related court proceeding, the court

1   (Docket No. 530) Ex. A at 14.)  In that order, the Superior Court

2   reserved decision for a later date on the division of Ellis's

3   retirement assets and the amount of DeFazio's share of those

4   assets that would be held as security for the payment of child

5   support.  (Id. at 6-8.)  The issue of the division of Ellis's

6   retirement account with HolliShare was finally determined by a

7   March 29, 2002 stipulation and order ("March 2002 order").  In

8   that order, entitled "Stipulated Qualified Domestic Relations

9   Order," DeFazio and Ellis agreed that DeFazio was entitled to

10  one-half the value of Ellis's HolliShare account as community

11  property, and HolliShare was ordered to hold DeFazio's share in a

12  segregated account.  (Req. Judicial Notice Ex. G ("March 2002

13  order") ¶¶ 4-5.)  The order further provided that the Superior

14  Court "retains jurisdiction over Husband's Share in the entire

15  amount up to One Million Five Hundred Thousand and No/100 Dollars

16  ($1,500,000.00), pending resolution of child support and property

17  settlement issues between Husband and Wife," and ordered

18  HolliShare to retain possession of those funds "pending further

19  order of this court."  (Id. ¶ 7.)  The March 2002 order also

20  stated that "this Order is intended to be a Qualified Domestic

21  Relations Order, as that term is defined in [the Internal

22  Revenue] Code section 414(p) and section 206(d)(3) of the

23

24  takes judicial notice of the filings and orders from the Superior
    Court proceedings.  See United States ex rel. Robinson Rancheria

25  Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.
    1992) ("[W]e may take notice of proceedings in other courts, both

26  within and without the federal judicial system, if those
    proceedings have a direct relation to matters at issue."

27  (internal quotation marks omitted)); see also Kourtis v. Cameron,
    419 F.3d 989, 994 n.2 (9th Cir. 2005) (taking judicial notice of

28  an unpublished decision from another court), overruled on other
    grounds by Taylor v. Sturgell, 128 S. Ct. 2161 (2008).

12

1    Employee Retirement Income Security Act." (Id. 1:26-28.)

2            Pursuant to the March 2002 order, the Superior Court

3    issued six subsequent orders ordering HolliShare to distribute

4    payments to Ellis that comprised child support payments that

5    DeFazio failed to make and advances on future anticipated child

6    support obligations, as well as associated attorneys fees and

7    costs for the collection of past-due child support payments.

8    (See id. Exs. I (order dated August 5, 2002), J (order dated

9    April 2, 2003), K (order dated May 4, 2004), N (order dated June

10   20, 2004), T (order dated November 9, 2005), U (order dated

11   December 13, 2007).)[16]

12           Presently before the court are the parties' seven

13   separate motions: 1) defendants' motion to strike plaintiffs'

14   class action allegations (Docket No. 495); 2) defendants' motion

15   for partial summary on claims barred by the statute of

16   limitations (Docket No. 483); 3) defendants' motion for partial

17   summary judgment on the fiduciary status of the Hollister Board

18   and JDS (Docket No. 484); 4) plaintiffs' motion for partial

19   summary judgment on claims related to the prohibited transactions

20   and 1999 Transaction (Docket No. 477); 5) defendants' motion for

21   partial summary judgment on the claims related to the 1999

22   Transaction (Docket No. 489); 6) DeFazio's motion for partial

23   summary judgment on claims related to the divorce proceedings

24

25

26   _____

27       [16]   The Superior Court also issued an order dated December
     28, 2002, correcting the March 2002 stipulation's division of
28   Ellis's HolliShare account by reducing DeFazio's community
     property portion by $53,750. (Req. Judicial Notice Ex. H ¶ 1.)

1  (Docket No. 474);[17] and 7) plaintiffs' motion to remove the plan

2  trustees (Docket No. 475).

3         Before turning to the merits of these motions, the

4  court notes that despite the submission of twenty briefs and

5  hundreds of pages of evidence in support of the instant motions,

6  the parties have declined to address numerous claims and have

7  chosen not to discuss specific arguments and factual issues.

8  Plaintiffs in particular expressly chose to withhold certain

9  theories and evidence in their motions.  (See Docket No. 537 at

10  20:3-9 ("[P]laintiffs are smarter than that.  Our motion for

11  partial summary judgment of the prohibited transaction claims was

12  tailored to narrow questions of law. . . .  We also intentionally

13  avoided disputed factual questions . . . .").  Even assuming the

14  wisdom of this strategy, the parties have pursued it haphazardly,

15  creating a disjointed record and often confusing each other as to

16  whether certain issues had been raised or whether plaintiffs had

17  abandoned particular claims.  The rationale underlying this

18  strategy is not immediately apparent.  Nevertheless, the court

19  shall confine its analysis to the particular theories and

20  arguments presented in the parties' moving papers.

21  II.  Discussion

22       A.   Motion to Strike Class Allegations

23         Defendants move to strike the DeFazio/DiMaro

24  plaintiffs' class allegations, which were first alleged in the

25

26         [17]   Though Ellis also asserts claims based on defendants'
    compliance with the Superior Court orders, she does not join
27  DeFazio's motion.  (See Docket No. 476 (joining only plaintiffs'
    motion for partial summary judgment on claims related to the
28  prohibited transactions and 1999 Transaction).)

1   Fourth Amended Complaint filed on January 23, 2008.  (<u>See</u> Docket

2   No. 312 ¶¶ 13-20.)  With discovery now closed and the trial date

3   approaching, plaintiffs have not yet moved for class

4   certification, and defendants contend that they have suffered

5   prejudice as a result of the DeFazio/DiMaro plaintiffs' delay in

6   doing so.  (<u>See</u> Docket No. 495 2:20-26); <u>Siskind v. Sperry Ret.</u>

7   <u>Program, Unisys</u>, 47 F.3d 498, 503 (2d Cir. 1995) ("[F]undamental

8   fairness requires that a defendant named in a suit be told

9   promptly the number of parties to whom it may ultimately be

10  liable for money damages." (citing <u>McCarthy v. Kleindienst</u>, 741

11  F.2d 1406, 1412 (D.C. Cir. 1984))); <u>see also Sterling v. Envtl.</u>

12  <u>Control Bd. of N.Y.</u>, 793 F.2d 52, 58 (2d Cir. 1986) (holding that

13  a plaintiff's "failure to move for class certification until a

14  late date is a valid reason for denial of such a motion").

15          In response to defendants' motion to strike, the

16  DeFazio/DiMaro plaintiffs submitted a statement of non-

17  opposition.  (Docket No. 533.)  Having considered defendants'

18  arguments and in light of plaintiffs' non-opposition, the court

19  will grant defendants' motion to strike the DeFazio/DiMaro

20  plaintiffs' class allegations.  <u>See, e.g.</u>, <u>Rones v. N.A.A.C.P.</u>,

21  170 F.R.D. 80, 82 (D.D.C. 1997); <u>Roberson v. Danny Ontiveros</u>

22  <u>Trucking</u>, No. 08-552, 2008 WL 4809960, at *6 (E.D. Cal. Nov. 3,

23  2008) (O'Neill, J.); <u>Valdez v. St. Francis Mem'l Hosp.</u>, No. 78-

24  2174, 1979 WL 146, at *1 (N.D. Cal. Jan. 17, 1979); <u>see also</u> <u>Read</u>

25  <u>v. Input/Output, Inc.</u>, No. 05-108, 2005 WL 2086179, at *2-3 (S.D.

26  Tex. Aug. 26, 2005).  Accordingly, paragraphs twelve through

27  nineteen of the HAC shall be stricken.

28          B.   <u>Cross-Motions for Partial Summary Judgment</u>

1    Summary judgment is proper "if the pleadings, the
2    discovery and disclosure materials on file, and any affidavits
3    show that there is no genuine issue as to any material fact and
4    that the movant is entitled to judgment as a matter of law."
5    Fed. R. Civ. P. 56(c).  A material fact is one that could affect
6    the outcome of the suit, and a genuine issue is one that could
7    permit a reasonable jury to enter a verdict in the nonmoving
8    party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
9    248 (1986).  The moving party bears the burden of demonstrating
10   the absence of a genuine issue of material fact.  <u>Id.</u> at 256.  On
11   issues for which the ultimate burden of persuasion at trial lies
12   with the nonmoving party, the moving party bears the initial
13   burden of establishing the absence of a genuine issue of material
14   fact and can satisfy this burden by presenting evidence that
15   negates an essential element of the nonmoving party's case or by
16   demonstrating that the nonmoving party cannot produce evidence to
17   support an essential element of its claim or defense.  <u>Nissan</u>
18   <u>Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099,
19   1102 (9th Cir. 2000).

20        Once the moving party carries its initial burden, the
21   nonmoving party "may not rely merely on allegations or denials in
22   its own pleading," but must go beyond the pleadings and, "by
23   affidavits or as otherwise provided in [Rule 56,] set out
24   specific facts showing a genuine issue for trial."  Fed. R. Civ.
25   P. 56(e); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324
26   (1986); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir.
27   1989).  On those issues for which it will bear the ultimate
28   burden of persuasion at trial, the nonmoving party "must produce

1  evidence to support its claim or defense." <u>Nissan Fire</u>, 210 F.3d
2  at 1103.

3        In its inquiry, the court must view any inferences
4  drawn from the underlying facts in the light most favorable to
5  the nonmoving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith</u>
6  <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986). The court also may not
7  engage in credibility determinations or weigh the evidence, for
8  these are jury functions. <u>Anderson</u>, 477 U.S. at 255.

9        When the parties submit cross-motions for summary
10 judgment, the court must consider each motion separately to
11 determine whether either party has met its burden, "giving the
12 nonmoving party in each instance the benefit of all reasonable
13 inferences." <u>ACLU of Nev. v. City of Las Vegas</u>, 333 F.3d 1092,
14 1097 (9th Cir. 2003); <u>see also</u> <u>Fair Hous. Council v. Riverside</u>
15 <u>Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001) (when parties submit
16 cross-motions for summary judgment, "each motion must be
17 considered on its own merits" and "the court must review the
18 evidence submitted in support of each cross-motion").

19        1.   <u>Defendants' Motion on the Statute of Limitations</u>
20        Defendants move for partial summary judgment on several
21 of plaintiffs' claims as time barred.[18]  ERISA's statute of
22 limitations provides:

23        No action may be commenced under this subchapter with
          respect to a fiduciary's breach of any responsibility,
24        duty, or obligation under this part, or with respect to
          a violation of this part, after the earlier of--
25

26        [18]   As part of their motion, defendants argue that
   plaintiffs' claims related to the 1999 Transaction are barred by
27 the statute of limitations. The parties' contentions regarding
   the 1999 Transaction, including the related amendments to the JDS
28 Articles, are addressed in Section II.B.4, <u>infra</u>.

(1) six years after (A) the date of the last action which
constituted a part of the breach or violation, or (B) in
the case of an omission the latest date on which the
fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the
plaintiff had actual knowledge of the breach or
violation;

except that in the case of fraud or concealment, such
action may be commenced not later than six years after
the date of discovery of such breach or violation.

29 U.S.C. § 1113 (emphasis added).

Unless the "fraud or concealment" exception applies, a plaintiff must file a claim within six years of the date of the last act constituting a part of the alleged violation, regardless of when the plaintiff actually learned of the violation. Kanawi v. Bechtel Corp., 590 F. Supp. 2d 1213, 1225 (N.D. Cal. 2008). "The fraud or concealment exception applies only when an ERISA fiduciary either misrepresents the significance of facts the beneficiary is aware of (fraud) or . . . hides facts so that the beneficiary never becomes aware of them (concealment)." Barker v. Am. Mobil Power Corp, 64 F.3d 1397, 1401 (9th Cir. 1995) (quoting Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919 F.2d 1216, 1220 (7th Cir. 1990)); see Ranke v. Sanofi-Synthelabo Inc., 436 F.3d 197, 204 (3d Cir. 2006) (stating that an ERISA fiduciary must "have taken affirmative steps to hide an alleged breach of fiduciary duty from a beneficiary in order for the 'fraud or concealment' exception to apply").

Some courts have recognized that the "fraud or concealment" exception to § 1113 incorporates the common law doctrine of "fraudulent concealment." Barker, 64 F.3d at 1402. Under that common law doctrine, passive concealment alone may

18

toll the statute of limitations if the defendant has a duty to disclose material information. <u>Thorman v. Am. Seafoods Co.</u>, 421 F.3d 1090, 1092 (9th Cir. 2005). Courts that have considered the question, however, have rejected the doctrine of passive concealment as applied to § 1113. <u>See, e.g.</u>, <u>Larson v. Northrop Corp.</u>, 21 F.3d 1164, 1174 (D.C. Cir. 1994) ("While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would still fall short of the fraudulent concealment that courts have required for purposes of § 1113."); <u>Schafer v. Ark. Med. Soc'y</u>, 853 F.2d 1487, 1491 (8th Cir. 1988) (holding that active concealment under § 1113 requires "more than merely a failure to disclose").

The Ninth Circuit in <u>Barker</u> also implicitly found passive concealment insufficient to toll the six-year statute of limitations. In holding that the defendants in that case did not engage in "fraud or concealment," the <u>Barker</u> court focused only on whether the defendants had affirmatively concealed their breach, <u>see</u> 64 F.3d at 1401, even though the Court of Appeals recognized that an ERISA fiduciary generally has a duty to disclose accurate information to beneficiaries, <u>see</u> <u>id.</u> at 1403 (noting the fiduciary's duty "to convey complete and accurate information material to the beneficiary's circumstance"). The "fraud or concealment" exception, therefore, does not apply simply because an ERISA fiduciary fails to disclose material information.[19]

---

[19]   In their opposition to defendants' motion, plaintiffs request that the court grant summary judgment <u>sua sponte</u> in their favor based on the absence of evidence of complete and accurate

1        a.   Amendments to the JDS Articles

2              Defendants first move for summary judgement on

3    plaintiffs' claims based upon HolliShare trustees' votes in favor

4    of amending the JDS Articles in 1978, 1980, 1984, and 1999.

5    (Docket No. 483 7:9-16.)   According to the complaints,

6    defendants' breached their fiduciary duties by voting for these

7    amendments, which allegedly harmed HolliShare's assets.   For

8    example, the 1978 amendments reinstated the stock transfer

9    restrictions on repurchases of JDS common shares.   (HAC ¶ 66; FAC

10   ¶ 50.)   The 1980 amendment allegedly reduced JDS cash reserves

11   and thus JDS's ability to repurchase HolliShare's holdings, while

12   the 1984 amendment allegedly reduced the reliability of JDS

13   audits.   (See HAC ¶¶ 67-68; FAC ¶¶ 51-52.)   The 1999 amendments--

14   the votes for the last of which were cast on April 30, 1999--

15   indemnified corporate directors from suit by shareholders and

16   prohibited any natural persons from owning more than 10% of JDS

17   stock.   (See HAC ¶¶ 69-70, 76; FAC ¶¶ 53; Thielitz Decl. ¶ 40.)

18             The first of the complaints in this consolidated action

19   was filed on July 15, 2004.   (Docket No. 1.)   However, the first

20   complaints that asserted claims related to these amendments were

21   not filed until April 19 and 20, 2007 (see Docket Nos. 182-183),

22   more than six years after the vote for the last amendment at

23

24   disclosures by HolliShare fiduciaries.   (Docket No. 532 at 7:9-
     13.)   The statute of limitations defense presented in defendants'
25   motion does not involve the duty to disclose.   The court will not
     enter summary judgment in favor of plaintiffs under these
26   circumstances.   See Kassbaum v. Steppenwolf Prods., Inc., 236
     F.3d 487, 495 (9th Cir. 2000) (noting that "great care" must be
27   exercised in granting summary judgment to a non-movant on certain
     claims to ensure that the movant has had an adequate opportunity
28   to respond).

1  issue.  Based on the record before the court, there is no

2  evidence from which a reasonable inference could be drawn that

3  defendants took steps to conceal any of the votes in favor of the

4  amendments.  Furthermore, all of the amendments to the JDS

5  Articles were filed with the Illinois Secretary of State.  (See

6  JDS Articles 6, 32, 40, 42, 49.)  Though it does not appear that

7  HolliShare fiduciaries affirmatively disclosed to beneficiaries

8  and participants that they had voted HolliShare's holdings of JDS

9  common shares in favor of these amendments, such passive

10 concealment does not qualify for the "fraud or concealment"

11 exception of § 1113.  Accordingly, because there is no dispute

12 that the first complaints to assert claims based on votes in

13 favor of amendments to the JDS Articles were filed after the six-

14 year limitations period expired for the 1978, 1980, 1984, and

15 certain 1999 amendments, defendants are entitled to summary

16 judgment on plaintiffs' claims based upon any fiduciary's

17 affirmative vote in favor of these amendments.

18      Nonetheless, plaintiffs have also asserted claims

19 pursuant to 29 U.S.C. § 1105(a)(3), which makes a fiduciary

20 liable for the breach of another fiduciary if "he has knowledge

21 of a breach by such other fiduciary, unless he makes reasonable

22 efforts under the circumstances to remedy the breach."  The

23 failure to remedy such a breach constitutes a separate breach of

24 duty.  See Dep't of Labor Opinion No. 76-95 (Sept. 30, 1976)

25 (providing that the failure to take action to cure the breaches

26 of another fiduciary despite knowledge constitutes a separate

27 breach of fiduciary responsibility of a successor fiduciary).

28 Pursuant to § 1113(1)(B), the six-year statutory period does not

21

1    begin to run in the case of a fiduciary omission until the date

2    on which the fiduciary "could have cured the breach or

3    violation."

4          One form of remedying the breaches of a co-fiduciary

5    would be to file a suit against the breaching co-fiduciary to

6    restore the losses to the plan or redress any violations of

7    ERISA.  See Fernandez v. K-M Indus. Holding Co., 585 F. Supp. 2d

8    1177, 1185 (N.D. Cal. 2008) (holding that the statute of

9    limitations did not begin until the last day defendant could have

10   brought an action against co-fiduciaries for engaging in a

11   prohibited transaction).  See generally Concha v. London, 62 F.3d

12   1493, 1500 (9th Cir. 1995) (holding that 29 U.S.C. § 1132(a)(2)-

13   (3) authorizes suits by fiduciaries against co-fiduciaries

14   seeking relief on behalf of the plan).

15         Assuming HolliShare fiduciaries had actual knowledge of

16   the votes at the time they were cast and that such votes

17   constituted ERISA violations, they would have had three years to

18   file a suit.  29 U.S.C. § 1113(2).  With regard to votes in favor

19   of the 1999 amendments at issue, that three-year period would

20   have expired in April 2002, and there is no evidence indicating

21   that any fiduciary took steps to remedy the breach in question.

22   Since the complaints asserting claims based on these votes were

23   filed on April 19 and 20, 2007, plaintiffs' § 1105(a)(3) claims

24   related to the votes in favor of the 1999 amendments are not time

25   barred.

26         As part of their motion for partial summary judgment,

27   defendants have also requested that Gunderson be dismissed as a

28   defendant from this action because no basis for his liability

                                   22

appears in the record. (Docket No. 483 at 7:17-8:3.) In
response, plaintiffs have not identified any conduct for which
Gunderson could be liable other than a purported failure to
challenge the 1978 amendments while he served as a HolliShare
trustee in 1979. (Docket No. 532 at 14:27-15:8.) Since claims
based on the conduct of fiduciaries associated with the 1978
amendments are time barred, however, the court will grant
defendants' request to dismiss Gunderson as a defendant in this
action.

b. <u>DiMaro, Humphries, and Seay</u>

Defendants also move for summary judgment on the claims
asserted by DiMaro, Humphries, and Seay related to HolliShare's
use of book value both in the calculation of the balance of
individual accounts and in the sales of JDS common shares to JDS
(the prohibited transactions). (Docket No. 483 at 8:6-12:11.)
They contend that, because these plaintiffs terminated their
employment with Hollister more than six years before they filed
suit, any claims based on the use of book value that affected
these plaintiffs' retirement accounts are time barred.[20] (Docket
No. 483 at 11-23.) The record shows that Humphries' employment
with Hollister terminated on January 3, 1998; Seay's employment
terminated on July 16, 1999; and DiMaro's employment terminated
on September 30, 1999. (Thielitz Decl. ¶ 4.)

The statute of limitations must be applied separately
to the claims concerning the valuation of individual accounts and

_____

[20]    Defendants do not contend in the instant motion that
Humphries, DiMaro, and Seay had actual knowledge of their claims,
which would invoke the shorter three-year limitations period.

the use of book value in the prohibited transactions, as these
claims are based on distinct facts.  With regard to the use of
book value to determine the value of individual accounts, the
Trust Instrument provides that, when participants become "former
participants"--such as by terminating their Hollister employment
(Trust Instrument § 3.14)--their account balances are determined
using the most recent December 31 valuation preceding the
employee's termination date.  (Id. § 7.02(2).)  Those
calculations are apparently not made until after the annual audit
of JDS year-end financial statements is available, usually by
late April or May.  (3d Zwirner Decl. ¶ 10.)  Thus, the last use
of the book value method that affects the determination of a
terminated employee's account occurs in the middle of the year
following the December 31 preceding termination.  Consequently,
the ERISA violations applicable to the claims at issue occurred,
at the latest, by late April or May 1998 for Humphries and late
April or May 1999 for DiMaro and Seay.

DiMaro did not file a complaint until August 25, 2005
(Case No. 05-1726, Docket No. 1), and Humphries and Seay did not
assert claims in this action until April 19, 2007 (Second Am.
Compl. (Docket No. 183))--both more than six years after the last
valuations of their respective accounts.  Furthermore, the "fraud
or concealment" exception does not apply, as plaintiffs have not
identified acts by defendants that concealed or misrepresented
the fact that HolliShare accounts are valued using book value.
Accordingly, defendants have demonstrated an absence of genuine
issues of material fact concerning the expiration of the statute
of limitations for DiMaro's, Humphries', and Seay's claims

24

Case 2:04-cv-01358-WBS-GGH   Document 559   Filed 06/29/09   Page 25 of 69

1  related to HolliShare's valuations of their accounts using book

2  value, and defendants are entitled to judgment as a matter of law

3  on those claims.

4       These plaintiffs have also asserted claims pursuant to

5  § 1105(a)(3) based on the valuations of their accounts.  As

6  described earlier, fiduciaries with knowledge of the breaches of

7  a co-fiduciary have three years to bring suit to remedy the

8  breach, and there is no indication in the record that any

9  fiduciary took steps to remedy the breaches in question.

10       Even assuming that all HolliShare fiduciaries were

11  aware of the valuations at the earliest possible date, the

12  limitations period did not begin to run for the § 1105(a)(3)

13  claims until three years after the last valuation of the

14  accounts--i.e., late April or May 2001 for Humphries and late

15  April or May 2002 for DiMaro and Seay.  DiMaro's complaint filed

16  on August 25, 2005, and Seay's complaint filed on April 19, 2007,

17  were thus timely for their § 1105(a)(3) claims.  Humphries'

18  complaint, filed on April 19, 2007, may have been filed more than

19  six years after the last date on which a co-fiduciary could have

20  brought suit in late April or May 2001, assuming that all

21  HolliShare fiduciaries had knowledge of the valuation when it was

22  made in 1998.  However, in the absence of evidence of the exact

23  date on which Humphries' account was valued in 1998 and the date

24  on which all co-fiduciaries acquired knowledge of that valuation,

25  defendants have not shown that her claims are barred as a matter

26  of law.  Accordingly, defendants are not entitled to summary

27  judgment on the § 1105(a)(3) claims asserted by DiMaro,

28  Humphries, and Seay related to the use of book value in

1  calculating the balances of their accounts.

2          With regard to claims based upon the use of book value
3  in the prohibited transactions, the last violation occurred on
4  the date of HolliShare's annual sale of JDS common shares to JDS
5  preceding the final valuation of DiMaro's, Humphries', and Seay's
6  accounts, as that is the last sale of plan assets that could have
7  affected the balances of those plaintiffs' accounts.  Those sales
8  took place in the middle of the year after the completion of
9  JDS's year-end audit.  (3d Zwirner Decl. ¶ 11.)  Thus, the last
10 sale that affected Humphries' account took place in mid-1997, and
11 the last transaction that affected DiMaro's and Seay's accounts
12 took place in mid-1998.  Because these plaintiffs did not file
13 complaints until more than six years later on August 25, 2005,
14 and April 19, 2007, their claims are time-barred unless acts of
15 "fraud or concealment" tolled the statute of limitations.

16         Plaintiffs seek to toll the statute of limitations by
17 identifying disclosures made to HolliShare participants that
18 appear to misrepresent the circumstances and conditions of sales
19 of JDS common shares by HolliShare to JDS.  For example, the
20 HolliShare trustees provide each HolliShare participant with an
21 annual publication entitled "HolliShare Highlights."  (See 2d
22 Zwirner Decl. ¶ 25; Defs.' 1st App'x Ex. 9.)  That publication,
23 at least since 1997, has stated that "[JDS common shares] are
24 subject to severe transfer restrictions which require that the
25 Trust [i.e., HolliShare] first offer them to JDS at their book
26 value.  To date, JDS has repurchased common shares from the Trust
27 at their book value to provide the plan with needed cash."
28 (Ellis's App'x (Docket Nos. 513, 517, 519-20) Ex. E at 7 (1997

26

1  edition); Pls.' Stmt. Undisputed Facts Ex. C at 1 (1999 edition);

2  Defs.' 1st App'x Ex. 9 at 1 (2005 edition).)

3        Upon reading these two sentences, a recipient of

4  "HolliShare Highlights" could have reasonably believed that

5  HolliShare sold its holdings of JDS common shares pursuant to the

6  sale price specified in the "transfer restrictions" of the JDS

7  Articles.  Under paragraph II.D.3 of the JDS Articles, those

8  restrictions require the use of month-end book value from the

9  month in which the transaction occurs.  The evidence shows,

10  however, that all sales since the mid-1980s have occurred

11  pursuant to the mid-80s buy-back agreement whereby the prior

12  December 31 book value is used.  (Zwirner Dep. 237:19-238:8; 3d

13  Zwirner Decl. ¶¶ 9, 16, 18.)

14        In addition, because this disclosure references the

15  stock restrictions in connection with the sale of JDS common

16  shares, it appears to conceal the fact that HolliShare's sales to

17  JDS occurred pursuant to a negotiated agreement under the

18  "exceptional circumstances" provision of paragraph II.D.7 rather

19  than the absolute right of first refusal contained in paragraph

20  II.D.2.  These disclosures could thus be read to misrepresent not

21  only the sale price used in HolliShare's sales of JDS common

22  shares, but also the flexibility and discretion HolliShare

23  fiduciaries may have had in setting the terms of those sales.

24  Making inferences in favor of plaintiffs, such misrepresentations

25  could have reasonably hindered DiMaro, Humphries, and Seay from

26  discovering the alleged breaches of fiduciary duty.  See Montrose

27  Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 789

28  (3d Cir. 2001) (finding that a fiduciary's misrepresentations as

1    to the reasons justifying particular transactions could have

2    inhibited the plaintiffs' capacity to discovery the breaches of

3    fiduciary duty).

4          Defendants have identified another disclosure made to

5    HolliShare participants that appears to disclose the use of the

6    December 31 book value in sales of JDS common shares.  (See 3d

7    Zwirner Decl. Ex. A at 16.)  This other, seemingly conflicting

8    disclosure, however, simply provides additional evidence of a

9    genuine issue of material fact over whether the information

10   provided to HolliShare participants affirmatively misrepresented

11   or concealed facts concerning the use of book value in the

12   prohibited transactions.

13         Despite evidence of "fraud or concealment," the statute

14   of limitations would not be tolled as to claims asserted against

15   defendants who did not actually engage in the acts designed to

16   conceal the alleged fiduciary breaches.  See Barker, 64 F.3d at

17   1402 (noting that the "fraud or concealment" exception applies

18   only when "the defendant himself has taken steps to hide his

19   breach").  The evidence does not indicate whether all of the

20   defendants played a role in the production or distribution of the

21   disclosures in question.  Nevertheless, in light of evidence that

22   at least some of the defendants, including individuals who served

23   as HolliShare trustees, were responsible for the disclosures in

24   question, the court cannot determine as a matter of law that all

25   of the claims related to the use of book value in the sales of

26   JDS common shares asserted by DiMaro, Humphries, and Seay are

27   time barred.

28         Finally, assuming defendants did engage in acts of

28

"fraud or concealment," the statute of limitations was tolled
only until the point at which plaintiffs could have discovered
the breaches or misrepresentations with reasonable diligence.
See Bulger, 243 F.3d at 788 ("The statute of limitations is
tolled until the plaintiff in the exercise of reasonable
diligence discovered or should have discovered the alleged fraud
or concealment." (internal quotation marks omitted)); Schaefer v.
Ark. Med. Soc'y, 853 F.2d 1487, 1491-92 (8th Cir. 1988)
(providing that, under the "fraud or concealment" exception to §
1113, the plaintiffs had to show that "despite their exercise of
due diligence or care, they were not on notice of [defendant's]
breach of duty").

        The evidence indicates that the minutes of the annual
JDS Board of Directors meetings state that JDS repurchased JDS
common shares from HolliShare at December 31 book value based on
the recommendation of the HolliShare trustees. (See, e.g., Pls.
Stmt. Disputed Facts Ex. A at H02445.) Those Board minutes could
have put plaintiffs on notice of the purported concealment of the
facts concerning the circumstances of HolliShare's sales of JDS
common shares. The record, however, does not indicate whether
(or when) plaintiffs or other HolliShare participants had access
to these JDS Board minutes. Making inferences in favor of
plaintiffs, there thus exists a genuine issue of material fact
concerning whether DiMaro, Humphries, and Seay could have
discovered the alleged breaches and acts of concealment more than
six years before they filed their claims in this action, and
defendants are not entitled to summary judgment on these claims.

        Defendants are also not entitled to summary judgment on

29

these plaintiffs' § 1105(a)(3) claims related to the use of book value in the prohibited transactions for the same reasons that the § 1105(a)(3) claims related to the valuation of plaintiffs' accounts survive summary judgment.

Accordingly, defendants are entitled to summary judgment only on the non-§ 1105(a)(3) claims asserted by DiMaro, Humphries, and Seay related to the valuation of their accounts using the book value method.

c.   Ellis

Defendants claim that Ellis had actual knowledge of her claims related to HolliShare's valuation of her account and the use of book value in the sales of JDS common shares more than three years before she filed her complaint on March 22, 2005. (Docket No. 483 at 9:15-18; see Case No. 05-559, Docket No. 1.) Actual knowledge of a breach or violation starts the shorter three-year statute of limitations pursuant to 29 U.S.C. § 1113(a)(2).   See Ziegler v. Conn. Gen. Life Ins. Co., 916 F.2d 548, 552 (9th Cir. 1990).   Unlike the "fraud or concealment" exception, under which a plaintiff's constructive knowledge may start the statutory period, J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir. 1996), actual knowledge requires that "a plaintiff [] know of the essential facts of the transaction or conduct constituting the violation."   Martin v. Consultants & Adm'rs, Inc., 966 F.2d 1078, 1086 (7th Cir. 1992); see Waller v. Blue Cross of Cal., 32 F.3d 1337, 1341 (9th Cir. 1994) (holding that knowledge of a transaction that was not inherently a breach of fiduciary duty was not the equivalent of actual knowledge of the breach of the

30

duties of care and loyalty).

Whether a plaintiff had actual knowledge more than three years before filing a claim involves a two-step analysis: "first, when did the alleged 'breach or violation' occur; and second, when did [plaintiff] have 'actual knowledge' of the breach or violation?" Ziegler, 916 F.2d at 550.

With regard to Ellis's claims related to the valuation of her account, the alleged breach or violation occurred in late April or May each year when book value of JDS common shares was used to value her account. As for Ellis's knowledge of that violation, the evidence shows that Ellis was in receipt of several letters beginning in 1997 discussing HolliShare's use of book value to calculate account balances. First, on May 25, 1997, Ellis drafted a letter to the HolliShare plan administrator asking whether book value was "a fair representation of the value of the Company." (Defs.' 2d App'x Ex. 5 at 45.) Though Ellis wrote the letter, DeFazio, her husband at the time, instructed her what to write. (Ellis's App'x Ex. I ("Ellis Dep.") 67:5.) Ellis then received a reply to this letter from Hollister, which stated that "the fair value of HolliShare's investment in JDS Inc. shares is the book value of such shares," and that any "hypothesis as to what JDS Inc. might be sold for as an entity is highly speculative and irrelevant given the [Trust Instrument]." (Id. Ex. K at 1.)

In addition, on December 24, 1997, Ellis received and read a copy of a September 26, 1997 letter sent by DeFazio to Hollister. (Ellis Dep. 83:14-19.) That letter described DeFazio's concern over the use of the book value method "as the

31

basis for determining account balances," and how "all the tax
attorneys and pension consultants [DeFazio] discussed this matter
with say that this is definitely an incorrect practice." (Defs.'
2d App'x Ex. 5 at 49.)  The letter goes on to say that the
"current value should reflect what the stock would sell for."
(Id.)  Finally, in the DeFazio-Ellis divorce proceeding, Ellis
filed a declaration on September 20, 2001, in which she indicated
that DeFazio had been labeled a "whistle blower" at Hollister
with respect to his investigation into the value of Ellis's
HolliShare account.  (Id. at 53.)

        The collection of letters from 1997 provides sufficient
evidence of Ellis's actual knowledge of her claims related to the
use of book value to calculate the balance of her HolliShare
account.  Even though she testified that she did not understand
the distinctions between book value and fair market value at the
time she drafted the May 25, 1997 letter (Ellis Dep. 68:1-2),
DeFazio's September 26, 1997 letter, which Ellis read, explained
DeFazio's opinion that book value is not an appropriate measure
of JDS stock.  These letters were sufficient to give Ellis
awareness that HolliShare used book value to determine the value
of her account, that HolliShare relied upon the Trust Instrument
and JDS Articles to justify the use of book value, and that there
was a question as to whether that method represented the market
value of the stock.  That knowledge constituted the essential
facts underlying her claims related to HolliShare's valuation of
her account.

        Whether Ellis knew or agreed with DeFazio that the
facts surrounding HolliShare's use of book value to value her

32

account constituted a violation of ERISA is irrelevant.  <u>See</u>
<u>Blanton v. Anzalone</u>, 760 F.2d 989, 992 (9th Cir. 1985) (holding
that the ERISA statute of limitations is triggered by "knowledge
of the transaction that constituted the alleged violation, not by
[] knowledge of the law").  Furthermore, even though the final
valuation of Ellis's account occurred in 2004, the year of the
termination of her employment, the three-year statute of
limitations began to run at the latest in 1997, as that was the
earliest time she became aware of the breaches in question.  <u>See</u>
<u>Phillips v. Alaska Hotel & Rest. Employees Pension Fund</u>, 944 F.2d
509, 520 (9th Cir. 1991) (holding that, pursuant to § 1113(2),
the statute of limitations begins to run upon the earliest date
that the plaintiff becomes aware of any breach in a series of
breaches of the same character).  Finally, the plan
administrator's denial of wrongdoing does not constitute an act
of fraud or concealment.  <u>See</u> <u>Whitlock Corp. v. Deloitte &</u>
<u>Touche, L.L.P.</u>, 233 F.3d 1063, 1066 (7th Cir. 2000) ("Simple
denials of liability do not toll the period of limitations or
estop the adverse party to rely on it.").

        Ellis's knowledge in 1997 therefore started the three-
year statute of limitations, and her claims filed on March 22,
2005, related to HolliShare's use of book value to calculate the
balance of her account and the failure to correct that practice
are time-barred.

        With regard to Ellis's claims related to the use of
book value in the prohibited transactions, the relevant violation
occurred each year when HolliShare sold shares to JDS for the
allegedly improper sale price.  As for Ellis's knowledge, the

33

1  evidence does not indicate that she had actual knowledge of the

2  essential facts related to the use of book value in the

3  prohibited transactions more than three years before she filed

4  her complaint on March 22, 2005.  None of the correspondence

5  identified by defendants describes the circumstances of the sales

6  of JDS common shares by HolliShare; instead, the letters focus on

7  the use of book value in calculating the balance of individual

8  accounts and the value of HolliShare's holdings generally.  (See,

9  e.g., Defs.' 2d App'x Ex. 5 at 50 (describing DeFazio's concern

10  only with "the practice of using the book value of the JDS stock

11  as the current value for that stock in the annual report of the

12  plan, and more important as the basis for determining the account

13  balances and the amount of the distributions to former

14  employees").)

15       Furthermore, Ellis's declaration submitted in her

16  divorce proceedings references the "valuation of HolliShare" (id.

17  at 49) and does not indicate that she was aware of the use of

18  book value in the annual sales of JDS common shares to JDS.  The

19  evidence therefore does not show that Ellis had actual knowledge

20  of the essential facts underlying her claims related to the use

21  of book value in the sales of JDS common shares.

22       Accordingly, defendants are entitled to summary

23  judgment only on Ellis's claims related to HolliShare's use of

24  book value in calculating the balance of her account.

25              d.   DeFazio

26       Defendants move to dismiss DeFazio's claims based on

27  HolliShare's alleged mishandling of his alternate payee account

28  by not providing the same return as other HolliShare accounts.

34

1   (Docket No. 483 at 12:20-13:3.)   They argue that DeFazio had
2   actual knowledge of his claim in 1997.   In his September 26, 1997
3   letter, DeFazio expressed some concern regarding HolliShare's
4   handling of alternate payee accounts, stating, "I believe the
5   plan automatically invests the account balances of former
6   employees or alternate payees in an investment, similar to a
7   money market account, until those balances are paid out."
8   (Defs.' 2d App'x Ex. 5 at 49.)   The letter also expressed that
9   "this is not a correct practice."   (Id.)   In response to an
10  inquiry from DeFazio, Hollister sent a letter on October 18,
11  2002, stating that his "funds are in a segregated account within
12  HolliShare earning the 90-Commercial Paper Rate as per the Wall
13  Street Journal."   (Pls.' Supplemental Stmt. Undisputed Facts
14  (Docket No. 528) Ex. HH at 2.)

15          DeFazio appeared to recognize as early as 1997 that he
16  would not be receiving the same increase in value on his
17  alternate payee account as did HolliShare participants, and
18  claims based only on that difference are time barred.
19  Nevertheless, his letter does not demonstrate that he had actual
20  knowledge that the plan retained possession of the funds within
21  HolliShare.   That distinction is an essential fact to any claim
22  that HolliShare fiduciaries retained the difference in interest
23  between the shares held in DeFazio's alternate payee account and
24  the 90-day commercial paper rate, which DeFazio has identified as
25  his basis for asserting claims based upon the segregation of his
26  alternate payee account.   (See Docket No. 532 at 11:17-24.)
27  Moreover, the evidence does not indicate that DeFazio became
28  aware of this distinction before he received Hollister's letter

                                    35

1  on October 18, 2002.  Since he filed his first amended complaint

2  containing allegations related to the segregation of his

3  alternate payee account on October 6, 2004, his claims are not

4  time barred.  Accordingly, defendants are not entitled to summary

5  judgment on DeFazio's claims.

6              2.   Defendants' Motion on the Fiduciary Status of JDS

7                   and the Hollister Board

8              Defendants move for summary judgment on all claims

9  asserted against certain individual defendants in their

10  capacities as members of the Hollister Board of Directors on the

11  basis that these defendants properly discharged their duties

12  under ERISA.  They also move to dismiss the claims asserted

13  against JDS, contending that the company does not qualify as a de

14  facto ERISA fiduciary.  (Docket No. 484 1:19-2:2.)

15              a.   Hollister Board

16              To qualify as an ERISA fiduciary, an individual or

17  entity may either be named as a fiduciary under the terms of an

18  ERISA plan, see 29 U.S.C. § 1102(a), or act as a functional or de

19  facto fiduciary by exercising discretionary control over the

20  management or administration of the plan or its assets, see 29

21  U.S.C. § 1002(21)(A).  When an individual or entity is a named

22  fiduciary, that fiduciary's liability may be limited pursuant to

23  provisions of a plan instrument that allocate responsibility

24  among named fiduciaries.  See Walker v. Nat'l City Bank of

25  Minneapolis, 18 F.3d 630, 633 (8th Cir. 1994) ("[U]nless ERISA

26  mandates otherwise, division of authority in the plan determines

27  the duties of the various fiduciaries."); 29 C.F.R. §

28  2509.75-8(D-4) (noting that a plan instrument may allocate

                              36

1  responsibility among named fiduciaries).

2       Here, the Trust Instrument specifies Hollister, the
3  HolliShare trustees, and the Hollister Board as named
4  fiduciaries.  (Trust Instrument § 11.11.)  Hollister is
5  responsible for plan administration (id.), the trustees are
6  responsible for management of the plan's assets (id. §§ 11.01,
7  11.02), and the Hollister Board has the authority to appoint and
8  remove trustees, (id. §§ 11.05-11.07).  The Board also has the
9  authority to inspect and audit plan records and receive reports
10  from the plan trustees.  (Id. § 11.04.)  The parties do not
11  dispute that the Hollister Board's potential liability therefore
12  arises from its fiduciary duty to appoint and monitor the
13  HolliShare trustees.  (See Docket No. 484 3:24-25; Docket No. 531
14  20:1-3); Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1325
15  (9th Cir. 1985) (per curiam) (holding that an employer who
16  appointed the plan administrator was only a fiduciary and liable
17  as such with respect to the selection of the administrator); In
18  re Calpine Corp., No. 03-1685, 2005 WL 1431506, at *3 (N.D. Cal.
19  Mar. 31, 2005) (noting that the "power of appointment gives rise
20  to a limited duty to monitor").

21       Plaintiffs do not dispute that over the years, the
22  Hollister Board appointed competent individuals as trustees,
23  including the General Counsel of JDS and Hollister (Zwirner),
24  Hollister's Chief Financial Officers (Gunderson, McCormack, and
25  Brilliant), and Hollister's heads of human resources (Simon,
26  Schellentrager, Karlovsky, and Kelleher).  (2d Zwirner Decl. ¶
27  70; Winn Decl. ¶ 57.)  The Hollister Board received annual
28  reports from the trustees covering the performance of HolliShare

assets, its benefit obligations, and the sales of JDS common shares.  (2d Zwirner Decl. ¶ 71; Winn Decl. ¶ 58.)  The Board also monitored the returns on HolliShare's investments, including the annual increases in the book value of JDS common shares.[21] (2d Zwirner Decl. ¶ 72; Winn Decl. ¶ 59.)

The adequacy of such monitoring, however, depends largely on the factual circumstances of the plan's investments and the trustees' conduct.  See 29 C.F.R. § 2509.75-8 (FR-17) ("[T]rustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards . . . .").  The evidence shows that the vast majority of HolliShare's holdings consisted of JDS common shares (2d Zwirner Decl. ¶ 8), meaning that most of the plan's transactions fell explicitly within the ERISA's prohibited transaction provision.  See 29 U.S.C. § 1106(a)(1)(A) (prohibiting transactions "between the plan and a party in interest"); id. § 1002(14) (defining "party in interest" to include "an employer any of whose employees are covered by such plan").  The HolliShare trustees may therefore have had conflicts of interest in those transactions, especially since at least one trustee--Zwirner--also held positions with JDS and Hollister.

---

[21]   Plaintiffs object to this evidence for lack of foundation and lack of personal knowledge.  (Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 128.)  The court overrules this objection.  Winn and Zwirner, who have both served as Hollister Board members, have sufficient personal knowledge to give evidence as to the Board's monitoring of the annual change in book value.

1    The Hollister Board would have reasonably been aware of

2  these potential conflicts of interest since they flowed directly

3  from the formal positions held by the parties to the

4  transactions.  The Hollister Board should have known that ERISA

5  required that the trustees perform a good faith determination of

6  the fair market value of plan assets.  In light of these

7  circumstances, a factfinder could reasonably infer that the

8  Hollister Board's limited annual monitoring of HolliShare

9  trustees was insufficient.  See Leigh v. Engle, 727 F.2d 113,

10  135-36 (7th Cir. 1984) (holding that appointing fiduciaries who

11  were aware of the plan trustees' conflicting loyalties in certain

12  transactions were obliged to take extra measures to monitor the

13  trustees' actions).  A genuine issue of material fact thus exists

14  as to the adequacy of the Hollister Board's monitoring of the

15  plan trustees.

16              b.   JDS

17       The Trust Instrument does not make JDS a named

18  fiduciary.  Nevertheless, to the extent that JDS exercised

19  discretionary control or authority over the management of

20  HolliShare's assets, it can be considered a de facto, or

21  functional, fiduciary of the plan.  See Wright v. Or.

22  Metallurgical Corp., 360 F.3d 1090, 1100 (9th Cir. 2004) (citing

23  29 U.S.C. § 1002(21)(A)); Beddall v. State Street Bank & Trust

24  Co., 137 F.3d 12, 18 (1st Cir. 1998) ("The key determinant of

25  whether a person qualifies as a functional fiduciary is whether

26  that person exercises discretionary authority in respect to, or

27  meaningful control over, an ERISA plan, its administration, or

28  its assets . . . .").

39

Here, though JDS did not actually manage HolliShare's assets, the evidence indicates that JDS exercised discretion over HolliShare's sales of its primary asset--JDS common shares.  It is undisputed that, as a result of the JDS stock ownership and transfer restrictions, no generally recognized market exists for HolliShare's holdings of JDS common shares.  (See 1st Zwirner Decl. ¶ 10; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 5.)  Zwirner stated in his declaration that, given the number of shares that HolliShare must sell each year to meet its cash needs, HolliShare might not be able to sell its holdings for even book value without JDS's commitment to purchase its shares.[22]  (1st Zwirner Decl. ¶ 50.)

This evidence alone is sufficient to create a genuine issue of material fact as to JDS's discretionary control over HolliShare's holdings of JDS common shares.  If, for example, HolliShare had a particularly strong need for cash in a particularly lean year for JDS, JDS could choose not to repurchase HolliShare's shares or to repurchase fewer than all of the shares HolliShare sought to sell.  According to Zwirner, HolliShare would thereafter be forced to sell its holdings for a lower price.  JDS has, of course, agreed to repurchase HolliShare's holdings pursuant to the mid-80s buy-back agreement and currently through three-year commitments.  (See id. ¶ 49).  Defendants contend that under those arrangements, HolliShare

---

[22]  Plaintiffs object to this evidence for lack of personal knowledge.  The objection is overruled.  Zwirner, who serves not only as a HolliShare trustee but also as a JDS Board member (1st Zwirner Decl. ¶¶ 6-7), has sufficient personal knowledge of the market for JDS common shares and HolliShare cash needs to testify thereto.

40

1  trustees determine the number of shares that JDS will repurchase

2  in a given transaction.  (2d Zwirner Decl. ¶ 77.)  Nevertheless,

3  no evidence suggests that those commitments are legally binding

4  on JDS, and a reasonable factfinder could infer that HolliShare

5  would have no recourse if JDS decided to stop or reduce its

6  repurchases.

7        Accordingly, because there exist genuine issues of

8  material fact regarding the fiduciary status of the Hollister

9  Board and JDS, defendants are not entitled to partial summary

10  judgment in their favor, and the court must deny their motion.

11              3.   <u>Prohibited Transactions</u>

12        Plaintiffs move for partial summary judgment on their

13  claims arising out of the annual sales of JDS common shares by

14  HolliShare to JDS.  Specifically, plaintiffs argue that

15  HolliShare's sales of JDS common shares to JDS for per-share book

16  value breached ERISA's fiduciary duty of prudence and violated

17  the prohibition on certain types of transactions.  (Docket No.

18  479 at 6:10-8:26); <u>see</u> 29 U.S.C. §§ 1104(a)(1)(B), 1106(a)(1)(A).

19              a.   <u>Good Faith Determination</u>

20        ERISA establishes a blanket prohibition on certain

21  transactions, including the sale or exchange of property between

22  an ERISA plan and a "party in interest," because such

23  transactions "entail a high potential for abuse."  <u>Donovan v.</u>

24  <u>Cunningham</u>, 716 F.2d 1455, 1465 (5th Cir. 1983) (discussing 29

25  U.S.C. § 1106(a)(1)).  As used in this section, a "party in

26  interest" includes the employer of the employees covered by the

27  ERISA plan in question.  29 U.S.C. § 1002(14).  Nevertheless,

28  ERISA provides an exemption for transactions that meet certain

1   requirements.  Section 1108(e) provides an exemption for the sale

2   or acquisition by a plan of employer stock if the sale price is

3   for "adequate consideration."  When a security has no generally

4   recognized market, the term "adequate consideration" means "the

5   fair market value of the asset as determined in good faith by the

6   trustee or named fiduciary pursuant to the terms of the plan and

7   in accordance with regulations promulgated by the Secretary [of

8   Labor]."  Id. § 1002(18); see also 29 C.F.R. § 2550.408e (cross-

9   referencing 29 U.S.C. § 1002(18) in defining "adequate

10  consideration" for purposes of § 1108(e)).

11       In addition to prohibiting certain transactions with

12  plan assets, ERISA also imposes a general duty on fiduciaries to

13  act for the exclusive benefit of plan beneficiaries "with the

14  care, skill, prudence, and diligence . . . that a prudent man

15  acting in a like capacity and familiar with such matters would

16  use in the conduct of an enterprise of a like character and with

17  like aims."  29 U.S.C. § 1104(a)(1)(B).  Thus, when an ERISA plan

18  transacts in employer securities, its fiduciaries bear the burden

19  of showing that the transaction satisfies the requirements of

20  both §§ 1104(a)(1)(B) and 1108(e).  See Howard v. Shay, 100 F.3d

21  1484, 1488 (9th Cir. 1996).

22       Whether a particular transaction with an interested

23  party complies with both §§ 1104(a)(1)(B) and 1108(e) depends

24  upon the conduct of the fiduciaries.[23]  See Howard, 100 F.3d at

25

26       [23]  In addition to the thoroughness of investigation, the
    assessment of the transaction ordinarily includes consideration
27  of "the merits of the transaction."  Howard, 100 F.3d at 1488.
    Plaintiffs, however, have moved only on the basis that the
28  HolliShare fiduciaries did not engage in an adequate

1488 (citing <u>Donovan v. Cunningham</u>, 716 F.2d 1455, 1467-68 (5th Cir. 1983)). Fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options." <u>Id.</u> at 1488-89; <u>see Cosgrove v. Circle K Corp.</u>, 915 F. Supp. 1050, 1064 (D. Ariz. 1995) ("Good faith requires that the trustees of the Plan have used a prudent method of determining value."), <u>aff'd</u>, 107 F.3d 877 (9th Cir. 1997). Nevertheless, the precise scope and nature of the required investigation depends upon the circumstances surrounding the transaction and the asset. <u>See</u> <u>Keach v. U.S. Trust Co.</u>, 419 F.3d 626, 637 (7th Cir. 2005) (evaluating the sufficiency of the fiduciary's investigation "within the context of the totality of the circumstances"); <u>Cunningham</u>, 716 F.2d at 1467-68 (noting that fiduciaries may satisfy their burden by showing they determined fair market value based upon "a prudent investigation in the circumstances then prevailing"); <u>see also</u> <u>Henry v. Champlain Enters., Inc.</u>, 445 F.3d 610, 619 (2d Cir. 2006) ("Whether a fiduciary has made a proper determination of fair market value depends on whether the parties are well-informed about the asset and the market for that asset." (internal quotation marks omitted)).

Here, plaintiffs contend that HolliShare fiduciaries inadequately investigated whether JDS common shares could be sold at a sale price above the December 31 book value employed under the mid-80s buy-back agreement given their awareness of higher estimates of the value of JDS common shares. (Docket No. 479 at

investigation, not that they did not receive sufficient value in exchange for the JDS shares. (<u>See</u> Docket No. 479 at 7:23-25; Docket No. 537 at 20:9-12.)

3:8-10.)  For example, plaintiffs direct the court's attention to a 1997 memorandum in which Zwirner stated that he discussed with McCormack, another HolliShare trustee (<u>see</u> Defs.' 2d App'x Ex. 9 at 17:24-18:24), an "analysis" performed by First Union that estimated the value of JDS to be 3.34 times the book value. (Pls. Stmt. Undisputed Facts Ex. H at 1.)  Additionally, Winn, who served on the Hollister Board of Directors until 2001 (Winn Decl. ¶ 2), testified that he knew that JDS common shares had a value in the "outside world" of up to three-times book value. (Winn Dep. 91:15-92:13.)  Though the record does not contain a description of the bases for these higher estimates of the value of JDS common shares or whether they included consideration of the applicable stock restrictions, this evidence suggests that multiple defendants had knowledge that JDS common shares could have a value higher than book value.

       Defendants respond that the existence of such estimates does not render their determination of the fair market value inadequate in light of the stock ownership and transfer restrictions applicable to JDS common shares.  (Docket No. 511 at 5:20-24.)  It is undisputed that these restrictions limited the market for JDS common shares.  (<u>See</u> 1st Zwirner Decl. ¶ 10; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 5.)  The restricted nature of JDS common shares thus provides part of the relevant context for the investigation into the fair market value of that asset.  <u>See</u> <u>Krueger Int'l, Inc. v. Blank</u>, 225 F.3d 806, 812 (7th Cir. 2000) ("Before the accounting rules of an ERISA plan can be applied, the basic terms of the asset to be accounted for must be determined.  That is what the [shareholder agreement]

44

does--it defines the bundle of rights to which a [] shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled."); see also Foltz v. U.S. News & World Report, Inc., 865 F.2d 364, 370-71, 374 (D.C. Cir. 1989) (upholding a plan's valuation of closely-held stock based upon the valuation method specified in the corporation's certificate of incorporation).

          The parties also do not dispute that the HolliShare trustees were well-informed regarding the restrictions applicable to JDS common shares held by HolliShare as a consequence of their roles in Hollister and JDS. (Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) No. 40.)   The three trustee positions have been filled by the Hollister General Counsel, Chief Financial Officer, and head of human resources. (1st Zwirner Decl. ¶ 28.) Plaintiffs do not dispute that the trustees were also aware of JDS's historical practice of redeeming common shares offered to it pursuant to the right of first refusal. (1st Zwirner Decl. ¶ 22; Pls.' Resp. Defs.' Stmt. Disputed Facts (Docket No. 540) Nos. 17, 40.)

          Zwirner stated in his declaration that the HolliShare trustees consciously considered these factors whenever they decided the amount of shares to sell to JDS and the price they would receive pursuant to the mid-80s buy-back agreement. (1st Zwirner Decl. ¶¶ 41-42.)   Furthermore, Zwirner testified that he determined the fair market value for any particular sale of shares to JDS by taking into account "the totality of the circumstances" then prevailing. (Zwirner Dep. 21:23-22:9.)   Even though conditions changed from year to year, he testified that no

1  such changes "led [him] to reconsider the agreement in practice."

2  (Id. at 22:10-14.)

3       This evidence of the HolliShare trustees' general

4  consideration of the market for JDS common shares in light of the

5  applicable stock restrictions is sufficient to create a genuine

6  issue of material fact regarding the adequacy of the

7  investigation into the possibility of selling JDS common shares

8  at prices higher than book value.  Plaintiffs are therefore not

9  entitled to summary judgment in their favor on the claims related

10 to the prohibited transactions.

11      In addition to their arguments that defendants failed

12 to conduct an adequate investigation, plaintiffs also argue that,

13 because ERISA's exemption to 29 U.S.C. § 1106(a)(1)(B) requires

14 that the value of the asset be determined "by the trustee or

15 named fiduciary," 29 U.S.C. § 1002(18), the sales of common

16 shares to JDS constituted per se violations of § 1106(a)(1)(B)

17 because book value was determined solely by JDS, which is neither

18 a trustee or named fiduciary.  (Docket No. 479 at 7:10-22.)  As

19 discussed, however, the record suggests that the HolliShare

20 fiduciaries performed an investigation to determine whether the

21 repurchase price of JDS common shares represented the fair market

22 value for JDS common shares.[24]

23

24      [24]  Focusing on defendants' response to certain
   interrogatories, plaintiffs contend that defendants believed they
25 lacked the power to "assign a value" to JDS common stock.
   (Docket No. 479 8:18-22 (citing Docket No. 375).)  This evidence
26 is at best ambiguous, since in the context of the
   interrogatories, it is not clear whether defendants' answers
27 address the ability to perform an investigation into the price or
   the ability to set the price of JDS common stock.  Furthermore,
28 given the evidence of the HolliShare trustees' consideration of

1          Plaintiffs' argument further fails to recognize that

2    book value is simply a particular method of calculating the value

3    of corporate stock.  The JDS articles do not empower JDS

4    management to simply determine the repurchase price of its

5    shares; rather, the JDS articles, at least since 1978, establish

6    book value as the method of valuation for the repurchase of JDS

7    shares.  (JDS Articles 12.)  Though the parties have not

8    submitted evidence of the precise formula underlying that method,

9    they do not dispute that the book value was computed from audited

10   JDS financial statements.  (Pls.' Resp. Defs.' Stmt. Undisputed

11   Facts (Docket No. 540) No. 53.)  The increase in book value from

12   year-to-year is also apparently driven by the profitability of

13   Hollister.  (1st Zwirner Decl. ¶ 36.)  There is no evidence

14   suggesting that the book value employed for any particular

15   transaction was simply a figure chosen by JDS--rather than the

16   valuation method called for in the JDS Articles--and thus

17   plaintiffs' argument that JDS determined the repurchase price is

18   unsupported by the record.[25]

19                    b.   ERISA Preemption

20          Plaintiffs contend that, because specific provisions of

21   _____

22   the market for the asset, the interrogatory responses at best
     create a genuine issue of material fact concerning the adequacy
23   of investigation.

24        [25]  Plaintiffs' additional argument that HolliShare
     trustees may not rely on section 7.03 of the Trust Instrument,
25   which provides that the assets of HolliShare "shall be valued . .
     . at their respective fair market values as of each December
26   31st," to excuse their statutory duty of a good faith
     determination is moot because defendants do not rely on that
27   provision to justify a complete absence of investigation into the
     transactions with JDS.  Rather, evidence suggests that the
28   December 31st valuation date influenced the timing of sales to
     JDS.  (3d Zwirner Decl. ¶ 10.)

                                    47

1    the JDS Articles and the mid-80s buy-back agreement set the

2    repurchase price of JDS common shares at book value, the

3    provisions prevent HolliShare trustees from performing their

4    duties under the statute and are therefore preempted by ERISA.

5    (Docket No. 479 at 14:18-15:11.)  Plaintiffs request that the

6    court order these provisions stricken "in their entirety[] so

7    that plan fiduciaries can fulfill their duties under ERISA."

8    (Id. at 15:10.)

9         ERISA provides that it "shall supersede any and all

10   State laws insofar as they may now or hereafter relate to any

11   employee benefit plan."  29 U.S.C. § 1144(a).  Though ERISA's

12   "pre-emption clause is conspicuous for its breadth," FMC Corp. v.

13   Holliday, 498 U.S. 52, 58 (1990), its applicability is plainly

14   limited by its terms to "State laws," defined as "decisions,

15   rules, regulations, or other State action having the effect of

16   law."  29 U.S.C. § 1144(c); see Associated Gen. Contractors of

17   Am. v. Metro. Water Dist. of So. Cal., 159 F.3d 1178, 1182 (9th

18   Cir. 1998) ("'ERISA [] does not preempt state action which

19   relates to an ERISA plan so long as the state action does not

20   have the effect of law.'" (quoting Minn. Chapter of Associated

21   Builders & Contractors, Inc. v. County of St. Louis, 825 F. Supp.

22   238, 243 (D. Minn. 1993)); see also id. at 1184 (holding that

23   ERISA did not preempt a state entity's contracts requiring

24   vendors to participate in employee benefit funds because the

25   contracts did not qualify as "State laws" under 29 U.S.C. §

26   1144(c)).

27        Here, plaintiffs have failed to identify any

28   "decisions, rules, regulations" or other state action having the

48

effect of law that requires or condones the JDS stock
restrictions or the mid-80s buy-back agreement as applied to JDS
shares held by HolliShare.  Instead, plaintiffs argue that the
JDS Articles and the mid-80s buy-back agreement--agreements and
arrangements created by private parties--qualify as state laws
for the purposes of ERISA preemption because they are purportedly
enforceable under Illinois law.  (Docket No. 479 at 14:18-21.)
The Ninth Circuit, however, has expressly rejected the argument
that an instrument's enforceability under the authority of a
state confers upon that instrument the status of "State laws"
under § 1144(c).  See Associated Gen. Contractors of Am., 159
F.3d at 1183 n.2 ("We see no merit in [plaintiff's] argument that
simply because a contract is legal and enforceable it has the
effect of law of a state.").

        Because neither the JDS stock restrictions nor the mid-
80s buy-back agreement qualify as "State laws" pursuant to §
1144(c), they are not preempted by ERISA.  Cf. Krueger Int'l,
Inc. v. Blank, 225 F.3d 806, 813 (7th Cir. 2000) (holding that
ERISA did not preempt a shareholder agreement providing the
corporation with a repurchase option because ERISA does not
preempt state law except where "ERISA and the state law conflict
regarding the distribution of an already defined sum").

        Alternatively, plaintiffs contend that if ERISA does
not preempt the JDS stock restrictions, HolliShare fiduciaries
breached their duty of prudence by failing to diversify the
plan's investments rather than continuing to hold an asset with
such limited marketability.  (Docket No. 537 at 15:24-17:6); see
In re Syncor ERISA Litig., 516 F.3d 1095, 1102 (9th Cir. 2008)

1  (noting that, even though the employee stock ownership plan at
2  issue was designed to invest primarily in employer stock, plan
3  fiduciaries may have breached the prudent man standard of care by
4  investing in that stock when they knew it had an artificially
5  inflated price).  However, because plaintiffs raised this
6  argument for the first time in their reply brief, defendants did
7  not have an opportunity to respond or submit evidence on these
8  points.  The court will therefore not consider the merits of this
9  argument for the purposes of the instant motion.  See Ass'n of
10 Irritated Residents v. C & R Vanderham Dairy, 435 F. Supp. 2d
11 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider
12 arguments raised for the first time in a reply brief.") (Ishii,
13 J.).[26]

14      Accordingly, the court will deny plaintiffs' motion for
15 partial summary judgment on the claims related to the prohibited
16 transactions.

17          4.  1999 Transaction

18      Both plaintiffs and defendants have moved for partial
19 summary judgment on the claims related to the 1999 Transaction.
20 Defendants first argue that plaintiffs lack constitutional
21 standing to assert their claims.  To satisfy "the irreducible
22 constitutional minimum of standing," a plaintiff must establish
23 three elements: (1) the plaintiff "suffered an injury in fact--an
24 invasion of a legally protected interest which is (a) concrete
25 and particularized, and (b) actual or imminent, not conjectural

26

27      [26]  Along similar lines, the court will not consider
plaintiffs' argument, raised in their reply brief, that 29 U.S.C.
§ 1110(a) renders the mid-80s buy-back agreement void as against
28 public policy.  (Docket No. 537 at 9:4-11:16.)

50

or hypothetical"; (2) the existence of a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted).  "The burden of establishing Article III standing remains at all times with the party invoking federal jurisdiction." <u>Scott v. Pasadena Unified Sch. Dist.</u>, 306 F.3d 646, 655 (9th Cir. 2002) (citing <u>Lujan</u>, 504 U.S. at 561).

Defendants chiefly contend that plaintiffs claims fail to satisfy the element of redressability.[27]  Redressability requires that plaintiffs show that they "would benefit in a tangible way from the court's intervention." <u>Warth v. Seldin</u>, 422 U.S. 490, 508 (1975) (footnote omitted); <u>see</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").  Essentially, the redressability prong requires that plaintiffs have a stake in the recovery.  <u>See</u> <u>Paulsen v. CNF Inc.</u>, 559 F.3d 1061, 1073 (9th Cir. 2009).  When a plaintiff seeks prospective relief, redressability requires "that

---

[27]   Defendants also argue in passing that plaintiffs have not suffered an injury in fact, but it is well-established that statutory violations qualify as an injury in fact so long as the statute in question "creates correlative procedural rights in a given plaintiff." <u>Fernandez v. Brock</u>, 840 F.2d 622, 630 (9th Cir. 1988).  Here, plaintiffs assert that defendants violated 29 U.S.C. §§ 1104 and 1106; ERISA grants participants and beneficiaries a cause of action to prosecute violations of these provisions even before a plan incurs losses.  <u>See</u> <u>Ziegler v. Conn. Gen. Life. Ins. Co.</u>, 916 F.2d 548, 551 (9th Cir. 1990); <u>M & R Inv. Co. v. Fitzsimmons</u>, 685 F.2d 283, 287 (9th Cir. 1982).

1  prospective relief will remove the harm." <u>Warth</u>, 422 U.S. at

2  505.

3          Plaintiffs seek two forms of relief from this court

4  with respect to the 1999 Transaction.  First, pursuant to 29

5  U.S.C. §§ 1109 and 1132(a)(2), which together provide that plan

6  fiduciaries may be held personally liable to make good the losses

7  to a plan resulting from the breach of their duties, plaintiffs

8  seek make-whole monetary relief in the form of a revaluation of

9  their accounts as if the 1999 Transaction had not occurred.[28]

10  (Docket No. 531 at 6:19-21; HAC 66:7-9; FAC 41:7-9.)  Second,

11  pursuant to § 1132(a)(3), plaintiffs seek equitable relief for

12  their claims based upon the 1999 Transaction in the form of a

13  redistribution or cancellation of the JDS preferred shares.[29]

14  (Docket No. 531 at 7:21-24; HAC 65:20-22; FAC 40:20-21.)

15          Turning first to plaintiffs' request for monetary

16  relief, in the ordinary case, losses to an ERISA plan are

17  measured by the difference between what beneficiaries received

18  and what they would have received absent the plan fiduciary's

19

20      [28]   Under 29 U.S.C. § 1132(a)(2), the Secretary of Labor, a
21  participant, a beneficiary, or a fiduciary may bring an action
   for relief under 29 U.S.C. § 1109.  Section 1109 in turn
22  provides that plan fiduciaries may be held personally liable "to
   make good to [the] plan any losses to the plan resulting from
23  such breach [of the responsibilities, obligations, or duties
   imposed upon fiduciaries by this subchapter]."

24      [29]   Pursuant to 29 U.S.C. § 1132(a)(3), an ERISA plaintiff
25  may bring an action "(A) to enjoin any act or practice which
   violates the provisions of this subchapter or the terms of the
26  plan, or (B) to obtain other appropriate equitable relief (I) to
   redress such violations or (ii) to enforce any provisions of this
27  subchapter or the terms of the plan."  This provision authorizes
   the grant of equitable relief such as injunction, mandamus, and
28  restitution, but not compensatory damages.  <u>See McLeod v. Or.</u>
   <u>Lithoprint Inc.</u>, 102 F.3d 376, 378 (9th Cir. 1996).

breaches.  This lost value may be ascertained "through expert testimony or other evidence regarding investment returns during the relevant period."  <u>Vaughn v. Bay Envtl. Mgmt., Inc.</u>, --- F.3d ---, 2009 WL 1545124, at *5 (9th Cir. June 4, 2009).

Here, plaintiffs' theory as to how the alleged breaches associated with the 1999 Transaction would have affected the monetary value of their HolliShare accounts is premised on the assumption that, if the 1999 Transaction had not been consummated, HolliShare would have ultimately achieved a controlling position in JDS as the company eventually repurchased and cancelled the preferred shares issued to the employee beneficiaries of the 1977 Schneider Trust.[30]  (Docket No. 479 at 3:24-26; Docket No. 531 at 14:18-27; HAC ¶¶ 43-46; FAC ¶¶ 25-27.) HolliShare's holdings of JDS common shares would thereafter allegedly increase in value due to a control premium, which HolliShare would realize in a sale of its holdings after it voted to remove the stock ownership and transfer restrictions contained in the JDS articles.  (<u>See</u> Docket No. 531 at 6:21-23, 14:23-27; Docket No. 479 at 4:4-8.)

The evidence indicates, however, that it is far from certain that HolliShare would have eventually controlled a majority of JDS voting shares and obtained the theoretical increase in monetary value therefrom.  At the time of the creation of the 1999 Transaction and in 2001 (the year in which

---

[30]    Pursuant to paragraph II.D, the employee beneficiaries of the 1977 Schneider Trust would have been required to offer their holdings of preferred shares to JDS when they retired or their employment was otherwise terminated.  (JDS Articles 20.) JDS, in turn, would have been required to cancel those shares upon repurchase under article five, paragraph II.G.  (<u>Id.</u> at 27.)

the 1977 Schneider Trust would have expired), the 1977 Schneider

Trust held 61,750,000 JDS preferred shares--constituting 97 to

98% of all JDS outstanding shares between 1999 and 2001--compared

to HolliShare's holdings of between 758,027 and 1,128,027 JDS

common shares.  (2d Zwirner Decl. ¶ 14; Thielitz Decl. ¶ 4.)  As

of the distribution of preferred shares to the eligible employee

beneficiaries in 2001, therefore, HolliShare's holdings would

have represented a very small percentage of all outstanding

voting shares.[31]  The holdings of preferred shares would of

course have decreased as employee beneficiaries of the 1977

Schneider Trust terminated their employment over time, but the

evidence shows that the complete repurchase of preferred shares

would have taken years.  For example, as of December 31, 2008,

almost a decade after the 1999 Transaction, at least fifty of the

employee-beneficiaries who would have been entitled to receive

_____

[31]    Plaintiffs dispute these figures, claiming that
HolliShare and another trust (for foreign-based employees) could
also have received shares from the 1977 Schneider Trust.  (Pls.'
Opp'n Stmt. Undisputed Facts (Docket No. 523) No. 103.)  In
support of this contention, plaintiffs cite two documents, the
"Arnold & Porter opinion" and a page of discovery numbered RZ
1908, without identifying where in the record either document is
located.  After reviewing the materials submitted in connection
with the parties' cross-motions, the court is unable to locate
either document and will therefore not consider plaintiffs'
contentions based upon them.  See Hoffman v. Constr. Protective
Servs., Inc., No. 03-1006, 2006 WL 6105639, at *6 (C.D. Cal. Aug.
25, 2006) ("While there may be evidence in the record to support
such a finding, '[j]udges are not like pigs, hunting for truffles
buried in [the record].'" (quoting Entm't Research Group, Inc. v.
Genesis Creative Group, Inc., 122 F.3d 1211, 1217 (9th Cir.
1997))).
        Furthermore, plaintiffs' argument that HolliShare could
have received preferred shares is not supported by the text of
the 1977 Schneider Trust, which provides that the corpus of the
trust shall be distributed to "such persons as (1) are then
living, (2) are then employees of Hollister . . . and (4) agree
in writing to abide by [certain policies and principles]."
(Defs.' App'x Ex. 3 at 11 (emphasis added).)

1  preferred shares from the 1977 Schneider Trust were still

2  employed with Hollister.  (Thielitz Decl. ¶ 13.)[32]

3          The date on which HolliShare could have become the

4  majority holder of all outstanding shares could have also been

5  affected by factors other than the gradual repurchase of

6  preferred shares.  HolliShare's voting power may not have

7  proportionately increased as the number of preferred shares

8  decreased, as the evidence indicates that the number of JDS

9  common shares held by HolliShare has steadily decreased since

10  1999.  (See id. ¶ 4 (stating that HolliShare holdings have

11  decreased from 1,128,027 shares in 1999 to 458,027 shares in

12  2008).)  In addition, pursuant to article five of the JDS

13  Articles, which authorizes the company to issue up to 71,260,000

14  shares of preferred stock (JDS Articles 2), JDS could also have

15  issued an additional 9,510,000 shares of preferred stock, thereby

16  diluting HolliShare's voting power.[33]

17          Making all inferences in favor of plaintiff, this

18  evidence shows that although the exact date on which HolliShare

19

20      [32]    Plaintiff objects to this evidence based on Federal
Rule of Evidence 602 (personal knowledge).  (Pls.' Opp'n Stmt.
21  Undisputed Facts (Docket No. 523) No. 104.)  The court overrules
this objection.  Dian Thielitz, who currently serves as the
22  Assistant Secretary of Hollister and the corporate Secretary of
JDS (Thielitz Decl. ¶ 2), has sufficient personal knowledge of
23  Hollister employee records to testify as to the number of
employees who were employed with Hollister as of December 31,
24  2008, and who would have met the share ownership requirements to
be employee beneficiaries of the 1977 Schneider Trust at its
25  expiration in 2001.

26      [33]    The holders of the preferred shares could also have
amended article five, paragraph I to change the number of
27  preferred shares and common shares that JDS was authorized to
issue.  (JDS Articles 19; see also id. at 27 (providing that only
the ownership and transfer restrictions required a two-thirds
28  vote for each class of shares).)

would become the majority holder of all outstanding JDS shares is
uncertain, it is possible that HolliShare would indeed have
eventually become the majority holder.   Nevertheless, plaintiffs
have not identified evidence from which a reasonable inference
could be drawn that HolliShare would have experienced any change
in value during the period that any plaintiff had an account with
HolliShare.[34]   To enjoy the increase in value associated with a
control premium, the stock ownership and transfer restrictions
contained in the JDS Articles would have had to be amended.   To
do so under the JDS Articles requires a two-thirds vote of every
class of shares, including the preferred shares.   (See JDS
Articles 27.)

As of December 31, 2008, approximately five months
before HolliShare distributed the balance of the last of the
plaintiffs' accounts, at least fifty employee beneficiaries who
would have been entitled to receive preferred shares from the
1977 Schneider Trust were still employed with Hollister.   So long

---

[34]   The plaintiffs who were employees of Hollister
terminated their employment on the following dates: Humphries
(January 3, 1998), Seay (July 16, 1999), DiMaro (September 30,
1999), Lavick (January 7, 2000), McNair (November 17, 2001),
Stanton (March 1, 2002), Pace (May 2, 2003), Ellis (June 1,
2004), Wirth (March 31, 2006), Beetham (May 19, 2006).   (Thielitz
Decl. ¶ 4.)   All of these plaintiffs thereafter received a
distribution of their vested HolliShare account balance.   (See
Defs.' 2d App'x (Docket Nos. 490-491) Ex. 1 at 69; id. Ex. 4 at
46; id. Ex. 5 at 43; id. Ex. 6 at 42-44; id. Ex. 8 at 41; id. Ex.
10 at 35; id. Ex. 11 at 86; id. Ex. 12 at 10; id. Ex. 13 at 20;
id. Ex. 14 at 42.)
DeFazio is the only plaintiff who was not a Hollister
employee; he was an alternate payee for the account of Ellis, his
ex-wife.   In its April 23, 2008 order, the Sacramento Superior
Court presiding over the DeFazio-Ellis divorce proceedings
ordered HolliShare to distribute the balance of DeFazio's
alternate payee account to DeFazio.   (Req. Judicial Notice Ex. W
at 4.)   At oral argument, the parties confirmed that HolliShare
distributed the balance of DeFazio's account on May 15, 2009.

1    as any of these employee-beneficiaries still owned any preferred

2    shares, HolliShare would have been unable to change the stock

3    ownership and transfer restrictions contained in the JDS Articles

4    without their support.   Therefore, even though as former

5    participants, plaintiffs could have statutory standing to pursue

6    their claims, see LaRue v. DeWolff, Boberg & Assocs., Inc., 128

7    S. Ct. 1020, 1026 n.6 (2008), such an attenuated theory

8    underlying a request for plan fiduciaries to restore losses to

9    the plan simply does not satisfy the redressability requirement

10   of constitutional standing.

11        For example, in Glanton ex rel. ALCOA Prescription Drug

12   Plan v. Advancepcs Inc., 465 F.3d 1123, 1127 (9th Cir. 2006), the

13   Ninth Circuit held that medical benefits plan participants could

14   not satisfy the redressability requirement in a suit for monetary

15   relief pursuant to §§ 1109 and 1132(a) because whether the

16   plaintiffs would have enjoyed reduced plan costs in the absence

17   of the alleged fiduciary breaches depended on the conduct of a

18   third party who exercised independent discretion.   See also

19   Paulsen v. CNF Inc., 559 F.3d 1061, 1073-74 (9th Cir. 2009)

20   (holding that pension plan participants' make-whole claims did

21   not support redressability when their theory of recovery was

22   premised on the Pension Benefit Guaranty Corporation increasing

23   benefits when it was not legally compelled to do so).   Similarly,

24   under plaintiffs' theory of monetary relief, whether HolliShare

25   would have realized a control premium while plaintiffs still had

26   HolliShare accounts depends entirely on the assumption that

27   holders of two-thirds of the preferred shares would have voted to

28

57

remove the JDS stock restrictions.[35]

As plaintiffs recognize, it is of course impossible to prove exactly what would have happened if HolliShare fiduciaries had not approved the 1999 Transaction.  (See Pls.' Opp'n Stmt. Undisputed Facts (Docket No. 523) Nos. 102, 104-06.) Nonetheless, the breach alleged here--the disloyal and imprudent vote of the JDS common shares held by HolliShare--does not inherently support a claim for losses to plaintiffs' retirement

---

[35]    In their opposition papers, plaintiffs urge the court to explore a new, heretofore unmentioned theory by which HolliShare could have become the majority holder of all outstanding JDS stock.  They highlight that, at the time paragraph II.C of the JDS Articles was amended in 1999 to allow the 1999 Preferred Share Trust to hold JDS shares, the same set of amendments eliminated article five, paragraph II.E, which allowed the 1977 Schneider Trust to hold JDS shares.  (Compare JDS Articles 27, with id. at 52.)  Plaintiffs argue that the 1977 Schneider Trust was therefore an unauthorized holder of JDS shares between June 14, 1999 and its expiration on April 21, 2001, and the HolliShare trustees could have brought an action to strip it of its shares.

Similar to plaintiffs' original theory, this new theory is built upon multiple assumptions about the conduct of outside parties.  It presumes that such a suit against the 1977 Schneider Trust would have been successful despite the fact that participants in the 1999 Transaction envisioned that the 1977 Schneider Trust would continue to hold its shares until its expiration on April 21, 2001, at which point the shares would be transferred to the 1999 Preferred Share Trust.  It also assumes that the court hearing the suit would have ordered any repossessed shares cancelled or not otherwise issued to other authorized holders.  Finally, plaintiffs' new hypothetical assumes that the 1977 Schneider Trust would not have filed a reasonable counterclaim against the person or entity bringing such action to have the JDS Articles corrected to allow the trust to hold shares again.  See 805 Ill. Comp. Stat. 5/12.56(a)-(b) (providing a shareholder of a non-public corporation with a cause of action to seek cancellation or alteration of the articles of incorporation if the directors or those in control of the corporation have acted "in a manner that is illegal, oppressive, or fraudulent").

accounts.[36]  Instead, plaintiffs' theory relies on conjecture

regarding what independent third parties might have done--perhaps

employee beneficiaries of the 1977 Schneider Trust would have,

for some reason, declined to receive their preferred shares, or

perhaps HolliShare trustees could have convinced enough preferred

share holders to vote for changes to the JDS articles.  In light

of these ambiguities, plaintiffs, who bear the burden of showing

constitutional standing, have "not demonstrated that it is

'likely,' and not merely 'speculative,' that their injury will be

redressed by a favorable decision" from this court.  Paulsen, 559

F.3d at 1074.

        With regard to plaintiffs' request for equitable

relief, defendants contend that the termination of all of the

plaintiffs' HolliShare accounts since the filing of this action

has rendered their requests for equitable relief moot.  "While

standing is determined on the facts as they existed at the time

the complaint was filed, a case becomes moot--and, hence, non-

justiciable--if the requisite personal interest captured by the

standing doctrine ceases to exist as any point during the

litigation."  Jacobs v. Clark County Sch. Dist., 526 F.3d 419,

425 (9th Cir. 2008) (citations and internal quotation marks

omitted); see GTE Cal., Inc. v. FCC, 39 F.3d 940, 945 (9th Cir.

1994) ("To satisfy the Article III case-or-controversy

requirement, a litigant must have suffered some actual injury

---

[36]     In contrast, plaintiffs' claims based upon prohibited transactions, for example, are premised on allegedly disloyal investment decisions and improper sales of HolliShare assets that, by definition, would have changed the value or composition of plaintiffs' accounts.

1 that can be redressed by a favorable judicial decision. . . .

2 Where events have occurred that prevent us from granting

3 effective relief, we lack jurisdiction and must dismiss the

4 appeal." (internal quotation marks and citations omitted)).

5        Assuming the ERISA violations at issue regarding the

6 1999 Transaction warrant the equitable relief requested--the

7 cancellation or redistribution of JDS preferred shares--such

8 relief would only provide benefits to HolliShare beneficiaries

9 prospectively.  Because none of the plaintiffs still have an

10 account with HolliShare, they could not possibly benefit from an

11 order affecting HolliShare's current or future voting power in

12 JDS shares.[37]  See Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 267-

13 68 (D. Mass. 2008) (holding that a plaintiff who was no longer a

14 participant in a defined contribution plan had no standing to

15 seek purely prospective relief).  Nor does the record indicate

16 that other types of equitable relief, such as disgorgement or

17 restitution, would redress the alleged injury in the absence of

18 evidence that plan fiduciaries profited from the alleged

19 violations at the plan's expense.  See Horvath v. Keystone Health

20 Plan East, Inc., 333 F.3d 450, 456 (3d Cir. 2003) (holding that a

21 plaintiff must demonstrate individual loss to have standing to

22 seek restitution and disgorgement).  Equitable relief simply

23 would not "remove the harm" or otherwise provide plaintiffs with

24 a tangible benefit.

25        Therefore, since neither revaluation of their accounts

26

27    [37]    Nor are any of the plaintiffs employee-beneficiaries of
the 1977 Schneider Trust who would be entitled to receive
28 preferred shares.  (2d Zwirner Decl. ¶ 41; Winn Decl. ¶ 37.)

60

1   nor equitable relief will redress the ERISA violations at issue

2   regarding the 1999 Transaction, plaintiffs "have no stake in the

3   recovery and cannot satisfy the redressability requirement of

4   constitutional standing." <u>Paulsen</u>, 559 F.3d at 1073.

5   Furthermore, plaintiffs cannot satisfy the redressability

6   requirement by purporting to seek relief on behalf of the plan as

7   a whole.   Though participants in an ERISA plan may, in general,

8   seek relief on behalf of the plan, plaintiffs may only do so if

9   they "otherwise meet the requirements for Article III standing."

10  <u>Glanton</u>, 465 F.3d at 1127.   Because plaintiffs do not have

11  standing themselves to seek relief for the claims based on the

12  1999 Transaction, they cannot do so on behalf of HolliShare.

13  Accordingly, the court must grant defendants' motion for summary

14  judgment on the 1999 Transaction claims.[38]

15              5.   <u>DeFazio-Ellis Divorce Proceedings</u>

16              DeFazio moves for partial summary judgment based on

17  HolliShare's compliance with certain domestic relations orders

18  ("DROs") issued by the Sacramento Superior Court presiding over

19  the DeFazio-Ellis divorce proceedings.   He argues that these

20  orders did not satisfy the requirements of a "qualified domestic

21  relations order" ("QDRO") as that term is defined in 29 U.S.C. §

22  1056(d)(3)(D), and that by complying with those orders,

23  HolliShare fiduciaries breached their duties under §

24  1104(a)(1)(D) to administer the plan in accordance with the terms

25  _____

26      [38]   In light of the court's holding that plaintiffs lack
    constitutional standing to seek relief for the 1999 Transaction,
27  the defendants' other arguments and plaintiffs' cross motion for
    partial summary judgment on claims related to the 1999
28  Transaction are moot.

of the plan instrument.  (Docket No. 474 at 4:10-13.)

Though pension benefits may not, in general, be assigned or alienated, 29 U.S.C. § 1056(d)(1), ERISA authorizes certain state court-ordered assignments of plan benefits to former spouses and dependents.  Section 1056(d)(3) provides that pension plans "shall provide for the payment of benefits in accordance with the applicable requirements of any [QDRO]." QDROs are a type of domestic relations order, which relate "to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent of a plan participant . . . made pursuant to a State domestic relations law."  Id. § 1056(d)(3)(B)(ii).  A DRO is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan."  Id. § 1056(d)(3)(B)(I).  In addition, the DRO may not (1) require the plan to provide any type of benefit not otherwise provided, id. § 1056(d)(3)(D)(I); (2) require the plan to provide increased benefits, id. § 1056(d)(3)(D)(ii); or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO, id. § 1056(d)(3)(D)(iii).[39]

These QDRO provisions are designed to provide simple,

---

[39]  A QDRO must also specify the name and mailing address of the alternate payee and the affected plan participant, the amount or percentage of the participant's benefits to be paid or the means by which that amount will be determined, the number of payments or time period to which the order applies, and the plan to which the order applies.  29 U.S.C. § 1056(d)(3)(c).  DeFazio does not contend that the DROs in question failed to satisfy these requirements.

certain rules for plan administrators to follow.  <u>See</u> <u>Kennedy v.</u>
<u>Plan Adm'r for DuPont Sav. & Inv. Plan</u>, 129 S. Ct. 865, 874
(2009) ("And the cost of less certain rules would be too plain.
Plan administrators would be forced to examine a multitude of
external documents that might purport to affect the dispensation
of benefits . . . ." (internal quotation marks omitted)); <u>Carmona</u>
<u>v. Carmona</u>, 544 F.3d 988, 999 (9th Cir. 2008) (noting that the
QDRO requirements "allow a plan administrator to more easily
administer the plan and reduce the risk of making improper
payments").

        Here, DeFazio argues that the Superior Court's March
2002 order violated certain requirements of a QDRO.  That order
provided that HolliShare was to segregate DeFazio's community
property share of Ellis's HolliShare account, but further
specified that Ellis "shall have a lien and security interest in
[DeFazio's] share for unpaid child support." (Req. Judicial
Notice Ex. G at 3.)  The court consequently retained jurisdiction
over DeFazio's share and ordered the HolliShare administrator to
retain possession of $1,500,000 of DeFazio's account pending
further order of the Superior Court.  (<u>Id.</u>)  DeFazio contends
that this order violated § 1056(d)(3)(D)(i) because it did not
allow the HolliShare administrator to immediately distribute the
balance of DeFazio's alternate payee account in accordance with
the terms of the Trust Instrument.  (Docket No. 474 at 3:7-16.)
In particular, section 9.01(3)(d) of the Trust Instrument
provides that, for an alternate payee account exceeding $5,000,
the account "shall be distributed upon the earliest to occur of
(I) the date directed in the QDRO, (ii) the date selected in

1   writing by the Alternate Payee, or (iii) the 'earliest retirement
2   age' (as defined in [26 U.S.C. § 414(p)]) of the Participant from
3   whose Account the Alternate Payee's Account was created." (Trust
4   Instrument 33.)   Section 414(p)(4)(B) in turn defines an
5   employee's "earliest retirement age" as the later of age fifty or
6   the earliest date on which the participant could start receiving
7   benefits under the plan if the participant separated from
8   service.

9          It is undisputed that Ellis was over the age of fifty
10  at the time of the March 2002 order, and she could have received
11  benefits under the terms of the plan if she had terminated her
12  employment. (See Req. Judicial Notice Ex. G at 1 (noting Ellis's
13  year of birth as 1951); Trust Instrument § 8.02 (providing that a
14  Hollister employee's account fully vests after seven years of
15  employment).)   Thus, DeFazio was entitled to an immediate
16  distribution of his account under section 9.01(3)(d) of the Trust
17  Instrument.   Nevertheless, the March 2002 order did not violate §
18  1056(d)(3)(D)(i), which provides that a DRO meets the
19  requirements of a QDRO only if it "does not require a plan to
20  provide any type or form of benefit . . . not otherwise provided
21  under the plan."   29 U.S.C. § 1056(d)(3)(D)(i) (emphasis added).
22  The plain language of this provision only bars a QDRO from
23  requiring a plan to affirmatively afford a type or form of
24  benefit not established under that plan.   See Patton v. Denver
25  Post Corp., 326 F.3d 1148, 1152 (10th Cir. 2003) ("For example,
26  benefits of a type or form not otherwise provided is best
27  understood as referring to a lump sum payout rather than regular
28  payments over a period of years."); see also, e.g., Dickerson v.

64

Dickerson, 803 F. Supp. 127, 134 (E.D. Tenn. 1992) (holding that a divorce decree was not a QDRO because it ordered the payment of retirement benefits before the time authorized under the terms of the plan).

The effect of the March 2002 order was simply to delay the timing of DeFazio's distribution described in section 9.01(3)(d) of the Trust Instrument.  Though the HolliShare administrator could not have delayed the distribution under the terms of the Trust Instrument alone, to do so in accordance with a DRO did not require the administrator to affirmatively provide DeFazio with a form or type of benefit to which DeFazio would not have otherwise been entitled.  The failure of the March 2002 order to provide for the immediate distribution of DeFazio's alternate payee account therefore did not violate § 1056(d)(3)(D)(i).

Alternatively, DeFazio argues that the March 2002 order was inconsistent with the distribution methods of the Trust Instrument because it "contemplated a series of distributions for child support." (Docket No. 474 at 3:17-18.)  Section 9.01(1) of the Trust Instrument provides participants, former participants, and alternate payees with only limited forms of payment, including lump sum single cash payment, direct rollover to an eligible retirement plan, certain annuities, and combinations of the three.  While DeFazio accurately identifies that section 9.01(1) does not allow periodic payments from a HolliShare account, the March 2002 order itself did not order such payments. The order only specified that the HolliShare administrator was to retain possession of DeFazio's account pending future order of

1  the Superior Court.  It may have "contemplated" multiple payments

2  from DeFazio's account in the future, but it did not order that

3  HolliShare provide them.  DeFazio's alternative argument that the

4  March 2002 order violated § 1056(d)(3)(D)(I) thus also fails.

5          Finally, DeFazio argues that the DROs subsequently

6  issued pursuant to the March 2002 order violated §

7  1056(d)(3)(D)(iii), which provides that a DRO qualifies as a QDRO

8  only if it "does not require the payment of benefits to an

9  alternate payee which are required to be paid to another

10  alternate payee under another order previously determined to be a

11  qualified domestic relations order."  He contends that the

12  subsequent DROs concerning DeFazio's child support obligations

13  ordered payments from DeFazio's account to DeFazio's children--

14  i.e., other alternate payees.  (Docket No. 474 at 4:1-8.)

15          This argument misconstrues the terms of the subsequent

16  DROs.  Those DROs ordered HolliShare to make payments from

17  DeFazio's alternate payee account directly to Ellis.  (See, e.g.,

18  order dated August 5, 2002 at 2 ("Plan Administrator shall

19  distribute the amounts set forth above to Petitioner [Ellis]").)

20  Though the payments satisfied DeFazio's child support

21  obligations, they were not payed to the children as alternate

22  payees.  Rather, the subsequent DROs simply adjusted the division

23  of Ellis's HolliShare account between Ellis and DeFazio.

24  DeFazio's argument that the subsequent DROs violated §

25  1056(d)(3)(D)(iii) is thus not supported by the terms of those

26

27

28

66

1  orders.[40]

2          Though there is an absence of a genuine issue of

3  material fact, DeFazio has failed to show that he is entitled to

4  judgment as a matter of law on his claims based upon HolliShare's

5  compliance with the Superior Court orders.   Accordingly, the

6  court must deny his motion for partial summary judgment.[41]

7          6.   Liability Amendments to JDS and Hollister Articles

8          Plaintiffs also move for partial summary judgment on a

9  factual basis unconnected to the 1999 Transaction, prohibited

10  transactions, or the DeFazio-Ellis divorce proceeding.  (Docket

11  No. 479 at 13:7-16).  Plaintiffs contend that certain amendments

12  to the JDS Articles and the Hollister Articles of Incorporation

13  violate ERISA, which provides that "any provision in an agreement

14  or instrument which purports to relieve a fiduciary from

15  responsibility or liability for any responsibility, obligation,

16  or duty under this part shall be void as against public policy."

17  29 U.S.C. § 1110(a).

18          The amendments to the corporate articles at issue state

19  that "[n]o director of the Corporation shall be personally liable

20  to the Corporation or its shareholders for monetary damages for

21  breach of fiduciary duty as a director."  (JDS Articles 45; Pls.'

22  Stmt. Disputed Facts Ex. Z at 11.)  By their terms, these

23

24          [40]   Because the issue has not been presented by the instant
25  motion, the court does not hold that the March 2002 order or the
    subsequent DROs were in fact QDROs under ERISA.

26          [41]   In light of the court's holding that DeFazio has failed
    to show that he is entitled to judgment as a matter of law, the
27  court does not reach defendants' arguments concerning the
    applicability of collateral estoppel, judicial estoppel, the
28  Rooker-Feldman doctrine, or the Colorado River doctrine.

1   provisions are expressly limited in scope to a director's

2   liability "as a director" to the corporation or shareholders.

3   They do not purport to limit the liability of the directors as

4   ERISA fiduciaries to an ERISA plan, beneficiaries, or

5   participants.  While these provisions might limit a suit by

6   HolliShare as a shareholder against Hollister or JDS directors,

7   they do not limit such suits to the extent they are based on

8   breaches of ERISA duties.  Accordingly, 29 U.S.C. § 1110(a) does

9   not render these provisions void as against public policy.

10          C.   <u>Plaintiffs' Motion to Remove the Plan Trustees</u>

11               In addition to their motion for partial summary

12  judgment, plaintiffs also request that the court order the

13  removal of the HolliShare trustees and appoint a neutral trustee

14  to manage HolliShare's assets.  (Docket No. 475 at 2:28-3:2.)

15  Such removal constitutes a form of prospective equitable relief.

16  As described earlier, <u>see</u> <u>supra</u> Section II.B.4, plaintiffs have

17  no standing to seek prospective relief on behalf of themselves or

18  HolliShare.  Accordingly, the court must deny plaintiffs' motion

19  to remove the plan trustees.

20               IT IS THEREFORE ORDERED THAT:

21               1) Defendants motion to strike plaintiffs' class action

22  allegations (Docket No. 495) be, and the same hereby is, GRANTED;

23               2) Defendants' motion for partial summary on claims

24  barred by the statute of limitations (Docket No. 483) be, and the

25  same hereby is,

26                    A) GRANTED in part with respect to claims related

27  to the 1978, 1980, and 1984 amendments to the JDS Articles; non-§

28  1105(a)(3) claims related to the 1999 amendments; DiMaro's,

68

1 Humphries', and Seay's non-§ 1105(a)(3) claims related to the

2 valuations of individual accounts using the book value method;

3 Ellis's claims related to the valuations of her account using the

4 book value method; and the dismissal of Gunderson as a defendant;

5 and

6             B) DENIED in all other respects;

7       3) Defendants' motion for partial summary judgment on

8 the fiduciary status of the Hollister Board and JDS (Docket No.

9 484) be, and the same hereby is, DENIED;

10       4) Plaintiffs' motion for partial summary judgment on

11 claims related to the prohibited transactions and 1999

12 Transaction (Docket No. 477) be, and the same hereby is, DENIED;

13       5) Defendants' motion for partial summary judgment on

14 the claims related to the 1999 Transaction (Docket No. 489) be,

15 and the same hereby is, GRANTED;

16       6) DeFazio's motion for partial summary judgment on

17 claims related to the divorce proceedings (Docket No. 474) be,

18 and the same hereby is, DENIED; and

19       7) Plaintiffs' motion to remove the plan trustees

20 (Docket No. 475) be, and the same hereby is, DENIED.

21       As discussed at the June 22, 2009 hearing, within ten

22 days of the date of this Order, the parties shall agree upon and

23 submit to the court a proposed trial date.

24       IT IS SO ORDERED.

25 DATED:  June 26, 2009

26

27 WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

28

69