WILKE, FLEURY, HOFFELT, GOULD & BIRNEY
WILLIAM A. GOULD (SBN 035446)
DANIEL L. BAXTER (SBN 203862)
400 Capitol Mall, Twenty-Second Floor
Sacramento, California 95814
Tel:    (916) 441-2430
Fax:    (916) 442-6664

Attorneys for Defendants, THE FIRM OF JOHN DICKINSON SCHNEIDER, INC., HOLLISTER INCORPORATED, SAMUEL P. BRILLIANT, RICHARD I. FREMGEN, DONALD K. GRONEBERG, ALAN F. HERBERT, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER, LORETTA L. STEMPINSKI, MICHAEL C. WINN and RICHARD T. ZWIRNER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES P. DeFAZIO,<br><br>             Plaintiff,<br><br>      vs.<br><br>HOLLISTER, INC.; et. al.,<br><br>             Defendants. | Case No.: CIV.S-04-1358 WBS GGH<br>[Consolidated Master Case Number]<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Rule 52, *Fed. R. Civ. P.*<br>Local Rule ***16-281***<br><br>Judge William B. Shubb<br><br>Date:      June 29, 2009<br>Time:      2:00 PM<br>Room:      5<br><br>Complaint<br>Filed:         July 15, 2004 |
| KATHLEEN ELLIS,<br><br>             Plaintiff,<br><br>      vs.<br><br>HOLLISTER INCORPORATED et al.,<br><br>             Defendants. | Complaint<br>Filed:         March 22, 2005 |

| | |
|---|---|
| BRENDA DIMARO and HOLLIE LAVICK,<br><br>Plaintiffs,<br><br>vs.<br><br>HOLLISTER INCORPORATED, et al.,<br><br>Defendants. | Complaint<br>Filed:          August 25, 2005 |

## Table Of Contents

I. Findings of Facts ................................................................................. 1

   A.   The Parties ................................................................................ 1

       1.   Plaintiffs ......................................................................... 1

       2.   Defendants ...................................................................... 2

   B.   Background Regarding JDS, Hollister, And The Growth Of Hollister's Business ................................................................... 3

   C.   Since JDS's Incorporation In 1956, Its Shares Have Been Subject To The Same Ownership And Transfer Restrictions, Rights Of Repurchase, And Pricing Formula. ............................................ 4

   D.   Mr. Schneider's Business Policies And Principles And His Decision To Use Book Value To Calculate The Value Of JDS's Shares ........................................................................................ 8

   E.   HolliShare, Its Trustees, And Its Operations ............................. 10

   F.   The 1977 Preferred Share Trust ................................................ 16

   G.   Transfer Of The JDS Preferred Shares In The 1977 Preferred Share Trust To The 1999 Preferred Share Trust ........................ 17

   H.   The 1999 Amendments To The JDS Articles .............................. 19

   I.   The Mid-1980's Agreement ....................................................... 20

   J.   HolliShare's Practices Regarding The Valuation Of Its Participants' Accounts Have Been Fully And Consistently Disclosed To The Plan Participants. ............................................ 29

i

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

K.   The Monitoring Of HolliShare And Its Trustees By Hollister's Board Of Directors ............................................................................. 30

L.   The Plaintiffs Have Prospered In Their HolliShare Accounts ..................... 33

1.   Kathleen Ellis ............................................................................. 34

2.   Judy Seay ................................................................................... 34

3.   Nancy Stanton ........................................................................... 35

4.   Sonia Pace ................................................................................. 35

5.   Theresa Beetham ....................................................................... 36

6.   Delane Humphries ..................................................................... 36

7.   Cynthia Wirth ............................................................................ 37

8.   Brenda DiMaro .......................................................................... 37

9.   Hallie Lavick ............................................................................. 37

10.  Michael McNair .......................................................................... 38

M.   The Orders Entered In The Ellis/DeFazio Divorce Proceedings ................. 38

1.   Background ................................................................................ 38

2.   The Judgment On Reserved Issues Entered On July 27, 2000 ........... 40

3.   The Entry Of The "Temporary QDROs" ......................................... 40

4.   A Permanent QDRO Was Entered On March 29, 2002 And DeFazio's HolliShare Alternate Payee Account Was Created. ............... 40

5.   Thereafter, Numerous Supplemental QDROs Were Entered As A Result Of DeFazio's Repeated Defaults On His Obligations To Ellis. ....................................................................................... 41

6.   DeFazio's Initial Objection To The Use Of QDROs To Rectify His Defaults And His Institution Of Litigation In This Court .................... 41

7.   DeFazio Uses Yet Another QDRO, During The Pendency Of This Action, To Avoid Yet Another Finding Of Contempt .......................... 42

8.   The December 13, 2007 QDRO, Hollister's January 2008 Motion, And The April 23, 2008 Order ........................................... 43

ii

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

9.   The Distribution Of DeFazio's HolliShare Alternate Payee Account Balance ...........................................................................44

II. Conclusions of Law............................................................................ 44

A.   Jurisdiction And Parties.............................................................. 45

B.   Overview Of Plaintiffs' Claims.................................................... 45

C.   This Court Lacks Subject Matter Jurisdiction Over This Action Because Plaintiffs Are Not Plan Participants And Thus Lack Standing Under ERISA.................................................................. 47

D.   The Claims Asserted In This Action Are Not Authorized Under ERISA........................................................................................... 56

E.   Plaintiffs' Claims Predicated Upon The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA Are Barred By The Settlor Doctrine. ......................................................................... 59

F.   The Standards Applicable To Plaintiffs' Claims Based On The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA.............. 64

1.   The Goals Of ERISA, "Prohibited Transactions" Under ERISA, And The Statutory Scheme..............................................................64

2.   Plaintiffs' Claims Under 29 U.S.C. §§ 1106(a) And (b) ("ERISA §§ 406(a) And (b)") ...............................................................................65

3.   The Exemption Of 29 U.S.C. § 1108(e) ("ERISA § 408(e)").................66

4.   Plaintiffs' Claims That Defendants Violated The Prudent Man Standard Of Care Under 29 U.S.C. § 1104(a)(1)(B) ("ERISA § 404(a)(1)(B)") ...............................................................................68

5.   Plaintiffs' Claims That Defendants Breached Their Duty Of Loyalty Under 29 U.S.C. § 1104(a()1)(A) ("ERISA § 404(a)(1)(A)")..........69

6.   Plaintiffs' Burden of Proof..............................................................69

G.   The Fiduciary Defendants Conducted A Reasonable and Thorough Investigation Of The Fair Market Value Of JDS's Common Shares. ................................................................................. 71

1.   The Circumstances Prevailing In 1973 .............................................71

2.   The Circumstances Prevailing After 1973 .........................................73

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

3.   The Good Faith And Prudent Investigation Conducted By The Defendant Fiduciaries Has Been Effectively Ratified By HolliShare's Two Regulators. ..........................................................77

    a. The D.O.L. ......................................................................... 77

    b. The I.R.S. ............................................................................ 80

        1)   Minnie Schneider's Federal Estate Tax Return................... 82

        2)   Franklin Dewey Walker's Federal Estate Tax Return.......... 82

H.   The Ownership And Transfer Restrictions, JDS's Rights of Repurchase, JDS's Rights Of Repurchase, And The Pricing Formula In The JDS Articles Are Valid And Fully Enforceable.  As Such, They Independently Establish That The Book Value Of JDS's Common Shares Is "Adequate Consideration" Under ERISA §408(e) And Is Their Fair Market Value Under ERISA § 404(a). ................. 84

    1.   The Ownership And Transfer Restrictions, JDS's Rights Of Repurchase, And The Price Formula In JDS's Articles Are Valid And Enforceable And Restrict The Fair Market Value Of JDS's Common Shares. ...............................................................84

    2.   JDS's Inclusion Of Ownership And Transfer Restrictions, Rights Of Repurchase, And A Pricing Formula In Its Articles Is Expressly Authorized Under Illinois Law And Has Been Uniformly Enforced By Illinois Courts. .............................................85

    3.   Courts In Other Jurisdictions Have Also Consistently Upheld And Enforced Similar Stock Restrictions And Repurchase Prices Based On Book Value. ................................................................88

    4.   Repurchase Prices Fixed By Stock Restrictions Are Upheld Even If They Are Significantly Less Than The Shares' Unrestricted Fair Market Value. ................................................................90

    5.   Enforcement Of Valid Stock Restrictions, Including A Pricing Formula, Does Not Constitute A Breach Of Fiduciary Duty................92

    6.   The Stock Restrictions In The JDS Articles Were Fair And Reasonable When Made. ................................................................93

I.   Applicable Federal Estate Tax Provisions, Treasury Regulations, And Decisional Law Also Establish That The Book Value Of JDS Common Shares Is "Adequate Consideration" Under ERISA § 408(e) And Is Their Fair Market Value Under ERISA § 404(a). .................. 95

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

1. Background - The Applicable I.R.C. Provisions And Treasury Regulations ("Treas. Regs.")......................................................95

    a. The Federal Estate Tax Is Based On The Fair Market Value Of All Property In A Decedent's Gross Estate. ........................... 95

    b. I.R.C. § 2031, Treas. Reg. § 20.2031-2(h), And Revenue Ruling 59-60 ................................................................ 96

2. Interpretations And Applications Of § 8 Of Revenue Ruling 59-60 And Treas. Reg. § 20.2031-2(h) Are Controlling Here. ...................97

    a. Under I.R.C. § 2031, Treas. Reg. § 20.2031-2(h), And Applicable Decisional Law, The Restrictions In The JDS Articles Constitute A Bona Fide Business Arrangement, Were Made For A Legitimate Business Purpose, And Fix The Fair Market Value Of JDS's Common Shares As Their Book Value. .............................................................. 100

    b. Judicial Decisions Which Have Applied Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) To Restricted Stock Agreements, Such As The JDS Articles, Establish That The Fair Market Value Of JDS Common Shares Is Their Book Value. .............................................................. 102

    c. Even If The Repurchase Price Or Formula In A Restricted Stock Agreement Results In A Price That Is Only A Fraction Of The Unrestricted Fair Market Value Of The Same Shares, The Formula Price Will Still Be Upheld And Enforced – Provided That The Repurchase Price Or Price Formula Was Fair When Created........................................... 111

    d. The Expert Testimony At Trial Supports The Court's Conclusion....................................................................... 115

J. Plaintiffs' Claims Based On Defendants' Alleged Breaches Of Their Fiduciary Duties Of Prudence And Loyalty Under ERISA Are Precluded On Numerous Other Grounds............................................. 120

1. The Standards To Be Applied And The Factors To Be Considered .....120

2. In Determining Whether They Breached Their Duties Under ERISA, The Defendant Fiduciaries Are Presumed To Have Acted Prudently And Diligently.  Plaintiffs Have Failed To Rebut This Presumption. ...........................................................................123

v

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

3.    Analogous Decisions Under ERISA Support The Defendants' Compliance With Their Fiduciary Duties Of Prudence And Loyalty.........................................................................127

4.    Plaintiffs' Have Failed To Establish That They Suffered Any Damage Or Harm As A Result Of The Matters Complained Of...........133

5.    Plaintiffs' Legal Arguments Are Flawed And Their Authorities Are Distinguishable.........................................................135

K.    Defendants Did Not Violate The Prohibited Transaction Provisions Of ERISA § 406 Or Their Fiduciary Duties Under ERISA § 404(a) By Entering Into The Mid-1980s Agreement. ........................................ 140

1.    Plaintiffs' Claims ...............................................................140

2.    Defendants' Position ..........................................................141

3.    The Defendant Fiduciaries Were Given Broad Discretion Which Authorized Them To Enter Into And Implement The Mid-1980s Agreement. ....................................................................144

L.    Plaintiffs Have Failed To Prove They Suffered Any Harm Or Damages Due To The Mid 1980s Agreement........................................ 152

M.    Defendants Are Entitled To Judgment On Plaintiffs' Other ERISA Claims...........................................................................155

1.    Defendants Did Not Violate 29 U.S.C. §§ 1103(a) and (c)(1) ("ERISA §§ 403(a) and 403(c)(1)")............................................155

2.    Plaintiffs' Claims Under 29 U.S.C. § 1104(a)(1)(C) ("ERISA § 404(a)(1)(c)") Are Not Tenable. ..............................................158

3.    Brilliant And Kelleher Cannot Properly Be Held Liable For Their Predecessor Trustees' Votes In Favor Of The 1999 Amendments To The JDS Articles...........................................................160

a. The Votes At Issue Were Prudent And Thus Did Not Violate ERISA. ................................................................. 160

b. The January 28, 1999 Amendments..................................... 160

c. The April 30, 1999 Amendments ........................................ 162

d. Co-Fiduciary Liability For The 1999 Amendments .................. 162

4.    Defendants Did Not Conceal The Existence Of Other Potential Markets For JDS Common Shares. .............................................164

vi

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

a. The Schneider And The 1957 Schneider Trust ........................ 165

b. The Charitable Trust ............................................................ 165

c. The 1977 Preferred Share Trust ........................................... 166

d. Defendants Made No Misrepresentations ............................. 167

5. Defendants Did Not Discriminate Against Ellis And DeFazio In Violation Of 29 U.S.C. § 1140 ("ERISA § 510"). ............................... 168

6. JDS's Board Of Directors Is Not A Fiduciary Under ERISA, And Its Purchases Of The Plan's JDS Common Shares Were Not Fiduciary Acts ................................................................................ 171

7. The Hollister Board Of Directors Did Not Breach Its Limited Liability Fiduciary Duties Under The Plan. ..................................... 174

8. Defendants Did Not Violate 29 U.S.C. §§ 1056(d)(3) Or 1105(a) ("ERISA §§ 206(d)(3) And 405(a)") Because The March 29, 2002 DRO And The Subsequent DROs Are QDROs Under ERISA. ............. 180

a. ERISA's QDRO Provisions .................................................... 180

b. The March 29, 2002 Order Recognized DeFazio's Status As An Alternate Payee In Accordance With ERISA § 206(d)(3)(D)(i). .............................................................. 181

c. The Subsequent DROs Entered By The Superior Court Recognized DeFazio's Right As An Alternate Payee To Receive A Portion Of Ellis's HolliShare Account And Thus Were QDROs. .................................................................. 182

d. The DROs At Issue Did Not Require HolliShare To Provide Any Type Of Benefit Not Otherwise Provided ......................... 183

e. The DROs Did Not Require HolliShare To Provide Increased Benefits. .............................................................................. 184

f. The DROs Did Not Require Benefits To Be Paid To An Alternate Payee Which Were Required To Be Paid To Another Alternate Payee. ..................................................... 184

g. DeFazio's And Ellis's QDRO Claims Are Also Barred On Numerous Other Grounds ..................................................... 185

1) Under The *Rooker-Feldman* Doctrine, This Court Lacks Subject Matter Jurisdiction Over DeFazio's And Ellis's QDRO Claims. ....................................................... 185

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

2)     DeFazio's And Ellis's QDRO Claims Are Also Precluded By Collateral Estoppel. ................................................... 187

3)     DeFazio's And Ellis's QDRO Claims Are Also Barred By The Doctrine Of Judicial Estoppel. ................................. 188

4)     Under The *Colorado River* Doctrine, This Court Also Declines To Adjudicate DeFazio's And Ellis's QDRO Claims. ............................................................................ 189

9.     Defendants Did Not Violate ERISA By Crediting DeFazio's HolliShare Alternate Payee Account With A Short-Term Rate of Interest. .............................................................................190

N.     Defendants Are Entitled To An Award Of Attorneys' Fees........................ 191

III. Conclusion .......................................................................... 198

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

## **Table Of Authorities**

**Cases**

*40235 Washington St. Corp. v. Lusardi,* 976 F.2d 587 (9th Cir. 1992) ................. 190

*Abattie v. Alta Health Life Ins. Co.,* 458 F.3d 955 (9th Cir. 2006)........................ 146

*Adamson v. Armco, Inc.*, 44 F.3d 650 (8th Cir. 1995) ............................................ 54

*Akins v. Rodriguez,* 15 F.3d 883 (9th Cir. 1994)................................................... 189

*Aldridge v. Lily-Tulip, Inc.,* 953 F.2d 587 (11th Cir. 1992).................................... 158

*Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 564 (1981) ..................................... 99

*Allen v. Biltmore Tissue Corp.,* 141 N.E.2d 812 (N.Y. 1957).................................... 91

*Allen v. The Katz Agency Inc. Employee Stock Ownership Plan,*
    677 F.2d 193 (2d Cir. 1982)....................................................................130, 191

*Am. Rubber & Plastics Corp. v. First Nat'l Bank,* 277 N.E.2d 840 (Ill. 1971) ........... 86

*Amschwand v. Spherion Corp.,* 505 F.3d 342 (5th Cir. 2007) ............................... 59

*Arentsen v. Sherman Towel Service Corp.,* 185 N.E. 822 (Ill. 1933) ....................... 86

*Assoc. in Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir.
    1991)...................................................................................................... 172

*Astor Chauffeured Limousine v. Runnfeldt Inv. Corp.*, 910 F.2d 1540 (7th Cir.
    1990) ...................................................................................................... 188

*B & B Land Acquisition, Inc. v. Mandell,* 714 N.E.2d 58, 62 (Ill. App. Ct. 1999).... 173

*Baltimore Nat'l Bank v. United States,* 136 F. Supp. 642 (D. Md. 1955) ............... 101

*Battaglia v. Battaglia,* 596 N.E.2d 712 (Ill. App. Ct. 1992)................................... 86

*BE&K Construction Co. v. NLRB,* 536 U.S. 516, 524-25 (2002) ........................... 169

*Beaudry Motor Co. v. ABKO Props., Inc.*, 780 F.2d 751 (9th Cir. 1986)................. 194

*Beck v. Pace Int'l Union,* 551 U.S. 96 (2007)........................................................ 63

*Becker v. Mack Trucks, Inc.*, 281 F.3d 372 (3d Cir. 2002) ..................................... 50

*Becker v. Weinberg Group Inc. Pension Trust,* 473 F. Supp. 2d 48 (D.D.C.
    2007).......................................................................................................... 99

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998) ..................... 174

*Bell v. Pfizer, Inc. Stock & Incentive Plan,* 626 F.3d 66, 74, 77 (2d Cir. 2010)....... 167

*Bins v. Exxon Co.,* 220 F.3d 1042 (9th Cir. 2000)................................................. 60

*Bird Chevrolet Co. v. Jackson,* 336 N.E.2d 487 (Ill. App. Ct. 1975)........................ 87

*Blank v. Chelmsford Ob/Gyn., P.C.,* 649 N.E.2d 1102 (Mass. 1995)................89, 92

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173 (9th Cir. 2005).................................................................................................................. 146

*Brandt v. Grounds,* 502 F. Supp. 598 (N.D. Ill. 1980), *aff'd*, 687 F.2d 895 (7th Cir. 1992)....................................................................................................... 163

*Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609 (7th Cir. 2001) ....................................................................................................... 50

*Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848 (N.D. Ill. 2009) ............................. 151

*Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987)............................................ 163

*Bugna v. McArthur,* 33 F.3d 1054 (9th Cir. 1994)............................................... 187

*Bunch v. W.R. Grace & Co.,* 556 F.3d 1 (1st Cir. 2009) ...................................... 159

*Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016 (9th Cir. 2008)..................................................................................... 146

*California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972)........... 169

*Carl Haas Automobile Imports, Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381 (N.D. Ill. 1996) ........................................................... 173

*Carmona v. Carmona,* 544 F.3d 988 (9th Cir. 2008)....................................181, 185

*Cement & Concrete Workers Council v. Ulico Casualty,* 387 F. Supp. 2d 175 (E.D.N.Y. 2005) ............................................................... 63

*Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002)..................................69, 137

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006)...................................................... 151

*Childers v. Medstar Health*, 289 F. Supp. 2d 714 (D. Mass. 2003)...................... 197

*Claire v. Wigdor,* 266 N.Y.S.2d 6 (N.Y. App. Div. 1965)......................................... 88

*Clayton v. James B. Clow & Sons*, 327 F.2d 382 (7th Cir. 1964) .......................... 87

*Collins v. Pension & Ins. Comm. Of So. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279 (9th Cir. 1998).............................................. 132

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976).... 189

*Comm'r v. Bensel,* 100 F.2d 639 (3d Cir. 1938) ................................................... 101

*Concord Auto Auction, Inc. v. Rustin,* 627 F. Supp. 1526 (D. Mass. 1986) .............. 92

*Cook v. Campbell,* 482 F. Supp. 2d 1341 (M.D. Ala. 2007) ................................... 59

*Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050 (D. Ariz. 1995) .............................. 68

*Covey v. Covey's Little America, Inc.,* 378 P.2d 506 (Wyo. 1963) .......................... 92

*Cowden v. Montgomery County Soc'y For Cancer Control,* 653 F. Supp. 1072 (S.D. Ohio 1986) ............................................................ 197

*Crawford v. Lamantia*, 34 F.3d 28 (1st Cir. 1994) ............................................... 54

*Curran v. Camden Nat'l Corp.*, 477 F. Supp. 2d 247 (D. Me. 2007)....................... 58

x

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Custer v. Sweeney,* 89 F.3d 1156 (4th Cir. 1996) .............................................. 174

*Cutter Labs., Inc. v. Twining,* 34 Cal. Rptr. 317 (Cal. Ct. App. 1963) ..................... 91

*D.C. Ct. of App. v. Feldman,* 460 U.S. 462 (1983) .............................................. 185

*Darvell v. Life Ins. Co. of N. Am.,* 597 F.3d 929 (8th Cir. 2010) ........................... 146

*DeFazio v. Hollister Employee Share Ownership Trust,*
406 F. Supp. 2d 1085 (E.D. Cal. 2005) ...................................................48, 64

*DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045 (E.D. Cal. 2009) ................... passim

*DeFazio v. Hollister, Inc.,* No. 04-1358, 2007 WL 3231670 (E.D. Cal. Nov. 1,
2007) ..............................................................................................48, 60, 68

*DeFazio v. Hollister, Inc.,* No. S-04-1358, 2008 WL 5113654 (E.D. Cal. Dec.
1, 2008) ..............................................................................................70, 169

*DeLuca v. Blue Cross of Michigan,* 628 F.3d 743 (6th Cir. 2010) ......................... 174

*Dickerson v. Feldman,* 426 F. Supp. 2d 130 (S.D.N.Y. 2006) ................................ 55

*Doe & Assocs. Law Office v. Napolitano,* 252 F.3d 1026 (9th Cir. 2001) .............. 185

*Dominick v. Vassar,* 367 S.E.2d 487 (Va. 1988) ..................................................... 89

*Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir. 1983) .............................. passim

*Draper v. Baker Hughes Inc.* 892 F. Supp. 1287 (E.D. Cal. 1995) ...................68, 192

*Early v. Moor,* 144 N.E. 108 (Mass. 1924) ............................................................ 89

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127, 136 (1961) ....................................................................169, 170

*Eckelkamp v. Beste,* 315 F.3d 863 (8th Cir. 2002) ...........................................69, 70

*Edgar v. Avaya,* 503 F.3d 340 (3d Cir. 2007) ..................................................... 124

*Edgar v. MITE Corp.,* 457 U.S. 624 (1982) ........................................................... 85

*Eggert v. Merrimac Paper Co. Inc.,*
311 F. Supp. 2d 245 (D.C. Mass. 2004) ............................................................ 99

*Ellis v. Hollister, Inc. et al.,* No. S-05-559,
2006 WL 1132377 (E.D. Cal. Apr. 14, 2006) ................................................ 194

*Empress LLC v. City & County of San Francisco,*
227 F.3d 1052 (9th Cir. 2005) ...................................................................... 169

*Estate of Amlie v. Comm'r,* 91 T.C.M. (CCH) 1017 (2006) .............................109, 111

*Estate of Bischoff v. Comm'r,* 69 T.C.M. (CCH) 32 (1977) .................................. 104

*Estate of Blount v. Comm'r,* 428 F.3d 1338 (11th Cir. 2005) ................................ 97

*Estate of Blount v. Comm'r,* 87 T.C.M. (CCH) 1303 (2004),
*aff'd in part and rev'd in part on other grounds* .............................................. 100

*Estate of Carpenter v. Comm'r,* 64 T.C.M. (CCH) 1274 (1992) ........104-105, 109, 111

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Estate of Davis v. Comm'r,* 37 T.C.M. (CCH) 341 (1978)................................104, 111

*Estate of Gloeckner v. Comm'r,* 152 F.3d 208 (2d Cir. 1998).................101, 104, 111

*Estate of Godley v. Comm'r,* 80 T.C.M. (CCH) 158 (2000).....................................101

*Estate of Hall v. Comm'r,* 92 T.C. 312 (1989)............................... 104, 107, 108, 109

*Estate of Harrison v. Comm'r,* 52 T.C.M. (CCH) 1306 (1987).............................. 104

*Estate of Kaplan v. M.S. Kaplan Co.,* 384 N.E.2d 874 (Ill. App. Ct. 1978) .............. 86

*Estate of Lauder v. Comm'r,* 64 T.C.M. (CCH) 1643 (1992)................................. 100

*Estate of Littick v. Comm'r,* 31 T.C.M. (CCH) 181 (1958) ..............................101, 111

*Estate of Meller v. Adolf Meller Co.,* 554 A.2d 648 (R.I. 1989).............................. 93

*Estate of Seltzer v. Comm'r,* 50 T.C.M. (CCH) 1250 (1985)....................101, 103, 105

*Estate of Stone v. Comm'r,* 86 T.C.M. (CCH) 551 (2003)....................................... 104

*Estate of Weil v. Comm'r,* 13 T.C.M. (CCH) 653 (1954)........................................ 101

*Evangelista v. Holland,* 537 N.E.2d 589 (Mass. App. Ct. 1989)............................ 93

*Evans v. Akers,* 534 F.3d 65 (1st Cir. 2008)........................................................ 159

*Eyler v. Comm'r,* 88 F.3d 445 (7th Cir. 1996)...................................................... 138

*Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288 (7th Cir. 1989)........................................................................................................ 172

*Felix v. Lucent Techs., Inc.*, 387 F.3d 1146 (10th Cir. 2004) ................................. 50

*Fink v. Nat'l Sav. & Trust Co.,* 772 F.2d 951 (D.C. Cir. 1985)............................. 134

*Fiorito v. Comm'r,* 33 T.C. 440 (1959)..........................................................101, 111

*Fireman's Fund Ins. Co. v. Quackenbush,* 87 F.3d 290 (9th Cir. 1996) ............... 189

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989) ................................. 49

*First Nat'l Bank of Montclaire v. Coldwell,* 145 N.Y.S.2d 674 (N.Y. App. Div. 1955)............................................................................................................... 88

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611 (1983) ..................................................................................................... 85

*Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364 (D.C. Cir. 1989)........... *passim*

*Fox v. Herzog, Heine, Geduld, Inc.,* 01 CV1827, 2005 WL 3542464 (D.N.J. Dec. 27, 2005) ................................................................................................ 134

Gaffney v. McCarron, 360 N.E.2d 508 (Ill. App. Ct. 1977) .................................. 173

*Gallagher v. Lambert,* 549 N.E.2d 136 (N.Y. 1989) ............................................. 93

*Gannon v. NYSA-ILA Pension Trust Fund & Plan,* No. 09-cv-10368, 2011 WL 868713 ........................................................................................................... 64

*Garrett v. City & County of San Francisco,* 818 F.2d 1515 (9th Cir. 1987)............ 187

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323 (9th Cir. 1985) .................174, 180

*George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992 (N.D. Ill. 2010) .............. 151

*Gifford v. Rich,* 208 N.E.2d 47 (Ill. App. Ct. 1965) ................................................ 87

*Goble v. Dotson,* 203 Cal.App.2d 272 (1st Dist. 1962) ......................................... 173

*Goodin v. Innovative Technical Solutions, Inc.*, 489 F. Supp. 2d 1157 (D.C. Haw. 2007) ............................................................................................................ 99

*Grandon v. Amcore Trust Co.*, 588 N.E.2d 311 (Ill. App. Ct. 1992) ........................ 86

*Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002) .................... 57

*Green v. UPS Health, Welf, Package for RET. Employees,* 595 F.3d 734 (7th Cir. 2010) ........................................................................................................... 146

*Groves v. Prickett,* 420 F.2d 1119 (9th Cir. 1970) ................................................. 87

*Hardt v. Reliance Standard Life Ins. Co.,* 130 S.Ct. 2149 (2010) ..................191, 192

*Harris v. Amgen, Inc.*, 573 F. 3d 728 (9th Cir. 2009) ......................................51, 54

*Harris v. Amgen, Inc.*, No. 07-CV-5442, 2010 WL 744123 (C.D. Cal. Mar. 2, 2010) ..........................................................................................................160, 167

*Helfrich v. PNC Bank, Kentucky, Inc.,* 267 F.3d 477 (6th Cir. 2001) ...................... 58

*Helvering v. Salvage*, 297 U.S. 106 (1936) ......................................................... 105

*Henderson v. UPMC,* 640 F.3d 524 (3rd Cir. 2011) .............................................. 174

*Henry v. Champlain Enters., Inc.*, 445 F.3d 610 (2d Cir. 2006) ............................ 71

*Henry v. Frontier Indus., Inc.*, 863 F.2d 886 (9th Cir. 1988) ............................... 175

*Herman v. Mercantile Bank,* 143 F.3d 419 (8th Cir. 1998) ...................120, 121, 145

*Holliday v. Xerox Corp.,* 732 F.2d 548 (6th Cir. 1984) ........................................ 157

*Hollister v. Fiedler,* 92 A.2d 52 (N.J. Super. Ct. App. Div. 1952) ......................... 90

*Holtzscher v. Dynegy, Inc.*, No. Civ. A. H-05-3293, 2006 WL 626402 (S.D. Tex. Mar. 12, 2006) ....................................................................................... 55

*Hooven v. Exxon Mobil Corp.*, 465 F.3d 566 (3d Cir. 2006) ................................. 50

*Howard v. Shay,* 100 F.3d 1484 (9th Cir. 1996) ......................................68, 70, 137

*Howell v. Motorola,* 633 F.3d 552 (7th Cir. 2011) ..........................................69, 175

*Hughes Aircraft Co. v. Jacobsen,* 525 U.S. 432 (1999) .....................................60, 63

*Hummell v. S.E. Rykoff & Co.*, 634 F.3d 446 (9th Cir. 1980) ............................... 191

*Ignacio v. Judges of the U.S. Court of App., Ninth Circuit,* 453 F.3d 1160 (9th Cir. 2006) ............................................................................................................ 185

*In re American Exp. Co. ERISA Litig.,* 762 F. Supp. 2d 614 (S.D.N.Y. 2010) .......... 126

*In re American Express Co. ERISA Litig.,* 762 F. Supp. 2d 614 (S.D.N.Y. 2010) .... 175

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 756 F. Supp. 2d 330 (S.D.N.Y. 2010) ..............................................................................178, 180

*In re Bear Stearns Cos.*, 763 F. Supp. 2d 423 (S.D.N.Y. 2008)......................127, 178

*In re Calpine Corp. ERISA Litig.*, No. C-03-1685, 2005 WL 1431506 (N.D. Cal. Dec. 5, 2005) .................................................................... 134, 160, 180

*In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006) .......... 56

*In re Citigroup ERISA Litig.*, No. 07 Civ 9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009)..............................................................................126, 127

*In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323 (S.D.N.Y. 2006)............................................................................................. 99

*In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861 (S.D. Tex. 2004) ............62, 175

*In re Enron Corp. S.E.C. Derivative & 'ERISA' Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) ...............................................................................60, 135, 163

In re *Estate of Halas*, 529 N.E.2d 768 (Ill. App. Ct. 1988) ................................... 86

*In re Huntington Bancshares ERISA Litig.*, 620 F. Supp. 2d 842 (S.D. Ohio 2009)....................................................................................................... 178

*In re Lehman Bros. Sec. & ERISA Litig.,* 683 F. Supp. 2d 294 (S.D.N.Y. 2010)126, 174

*In re Marriage of Levingston,* 16 Cal. Rptr. 2d 100 (Cal. Ct. App. 1993) ............... 186

*In re Marriage of Oddino,* 16 Cal. 4th 67 (Cal. 1997) ........................................ 186

*In Re Marriage of Padgett,* 172 Cal. App. 4th 830 (Cal. Ct. App. 2009)................. 186

*In re Marriage of Parker,* No. H023121, 2002 WL 31031645 (Cal. Ct. App. Sept. 11, 2002) .................................................................................. 186

*In re Marriage of Zamos,* No. D038380, 2002 WL 31358971 (Cal. Ct. App. Oct. 21, 2002)..................................................................................... 186

*In re Mather's Estate,* 189 A.2d 586 (Pa. 1963) ................................................. 90

*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812 (N.D. Cal. 2005).................................................................................................... 178

*In re Patterson Cos. Inc. Sec. Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014 (D. Minn. 2007) ................................................................................55, 56

*In re RCN Litig.*, No. 04-5068, 2006 WL 753149 (D.N.J. Mar. 21, 2006)..........55, 180

*In re Suntrust Bank Inc. ERISA Litig.,* 749 F. Supp. 2d 1365 (N.D. Ga. 2010)....... 159

*In re Syncor ERISA Litig.*, 351 F. Supp. 2d 970, *rev'd on other gds.,* 516 F.3d 1095 (9th Cir. 2008) ............................................................................ 178

*In re Syncor ERISA Litig.,* 516 F.3d 1095 (9th Cir. 2008) ................................... 125

*In re UBS AG ERISA Litig.,* No. 08 Civ. 6696, 2011 WL 1344734, at *6-*9 (S.D.N.Y. Mar. 24, 2011) ...................................................................... 126

*In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996)..................................... 69

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2010 WL 3081359 (W.D.N.C. Aug. 6, 2010) ................................................................................................. 126

*In re Weinsaft's Estate*, 647 S.W.2d 179 (Mo. Ct. App. 1983) ................................ 92

*In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d 1328, 1338-39 (N.D. Okla. 2003) ................................................................................................. 175

*In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745 (S.D.N.Y. 2003) ............... 63

*Jackson v. City of Los Angeles,* 70 Cal. Rptr. 2d 96 (Cal. Ct. App. 1997) ............. 188

*Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184 (7th Cir. 1994) .......................... 174

*Jones v. Harris,* 388 P.2d 539 (Wash. 1964) ..................................................... 89, 91

*Jordan v. Northrup Grumman Welfare Benefit Plan,* 370 F.3d 869 (9th Cir. 2004) ................................................................................................. 120, 145

*Joseph v. New Orleans Elec. Pension & Ret. Plan*, 754 F.2d 628 (5th Cir. 1985) ................................................................................................. 53

*Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008) ..................................... 52

*Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984) ................................................... 133

*Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005) ........................................... 71

*Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938 (8th Cir. 1999) .......................... 59

*Kirshbaum v. Reliant Energy*, 526 F.3d 243 (5th Cir. 2008) ................................ 124

*Klinker v. Klinker,* 132 Cal. App. 2d 687 (Cal. Ct. App. 1955) ............................. 187

*Krueger Int'l, Inc. v. Blank*, 225 F.3d 806 (7th Cir. 2000) ......................... 65, 87, 129

*Kuntz v. Reese*, 758 F.2d 1410 (9th Cir. 1986) ................................................ 49, 51

*Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995) ............................................. 69, 124

*Lake Cable, Inc. v. Trittler,* 914 S.W.2d 431 (Mo. App. 1996) ............................... 89

*Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272 (D.R.I. 2003), *aff'd in part, rev'd in part on other grounds*, 369 F.3d 1 (1st Cir. 2004) ............................... 157

*LaRue v. DeWolff, Boberg & Assocs., Inc. et al.*, 552 U.S. 248 (2008) .................... 52

*Lockheed Corp. v. Spink,* 517 U.S. 882 (1996) .................................. 60, 61, 63, 120

*Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480 (D. Del. 1998) .......................... 197

*Mack v. Kuckenmeister,* 619 F.3d 1010 (9th Cir. 2010) ...................................... 186

*Martin v. Feilen,* 965 F.2d 660 (8th Cir. 1992) ................................................... 132

*Martin v. Graybar Elec. Co.,* 285 F.2d 619 (7th Cir. 1961) ..................................... 87

*Maschmeier v. Southside Press, Ltd.,* 435 N.W.2d 377 (Iowa Ct. App. 1988) .......... 92

*Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134 (1985) ..................................... 52

*Mata v. E.I. DuPont de Nemours & Co.*, 456 F. Supp. 2d 612, 622 (D. Del. 2006) ................................................................................................. 63

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Mathews v. United States,* 226 F. Supp. 1003 (E.D.N.Y. 1964) ........................... 101

*May v. McGowan,* 194 F.2d 396 (2d Cir. 1952) .................................................. 101

*McCabe v. Capital Mercury Apparel,* 752 F. Supp. 2d 396 (S.D.N.Y. 2010)....147, 150

*McCreery v. R.S.A. Mgmt., Inc.,* 287 S.E.2d 203 (Ga. 1982)................................... 92

*McDonald v. Provident Indemnity Life Ins. Co.,* 60 F.3d 234 (5th Cir. 1995) ........... 69

*Mead Corp. v. Tilley,* 490 U.S. 714 (1989) ....................................................... 77

*Mertens v. Hewitt Assocs.,* 508 U.S. 248 (1993) .................................................. 57

*Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75 (1984)......................... 187

*Miller Waste Mills, Inc. v. MacKay,* 520 N.W.2d 490 (Minn. Ct. App. 1994) ........... 93

*Mine Workers v. Illinois Bar Ass'n,* 389 U.S. 217 (1967) ..................................... 169

*Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965) ................................169, 170

*MJT Inc. v. Adcom Exp., Inc.,* 39 F.3d 1187 (9th Cir. 1994)................................. 190

*Monacan Hills, Inc. v. Page,* 122 S.E.2d 654 (Va. 1961)....................................... 87

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1 (1983).............. 189

*Nachman Corp. v. PBGC,* 446 U.S. 359 (1980) ...................................................... 64

*Nakash v. Marciano,* 882 F.2d 1411 (9th Cir. 1989)............................................. 190

*Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96 (2d Cir. 2005) ........................53, 58

*Nelson v. Hodowal,* 512 F.3d 347 (7th Cir. 2008)............................................... 134

*Nelson v. IPALCO Enters., Inc.,* 480 F. Supp. 2d 1061 (S.D. Ind. 2007)............... 152

*Netbula, LLC v. BindView Dev. Corp.,* 516 F. Supp. 2d 1137 (N.D. Cal. 2007)...... 173

*Newton v. Van Otterloo,* 756 F. Supp. 1121 (N.D. Ind. 1991) ............................. 175

*Nichols Const. Corp. v. St. Clair,* 708 F. Supp. 768 (M.D. La. 1989), *aff'd,* 898
   F.2d 150 (5th Cir. 1990) ..................................................................... 93

*Owens v. Soundview Fin. Group, Inc.,* 54 F. Supp. 2d 305 (S.D.N.Y. 1999) .......... 130

*Pedroza v. Coca-Cola Co.,* 456 F. Supp. 2d 1262 (N.D.Ga. 2006)....................... 127

*Pegram v. Herdrick,* 530 U.S. 211 (2000) .........................................171, 174, 179

*Pension Fund-Mid Jersey Trucking Industry - Local 701 v. Omni Funding
   Group,* 731 F. Supp. 161 (D.N.J. 1990) ................................................... 163

*People ex rel. Rudaitis v. Galskis, et al.,* 233 Ill. App. 414 (Ill. 1924) .................... 87

*Potter v. Potter,* 513 N.E.2d 423 (Ill. App. Ct. 1987)............................................ 87

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49
   (1993) ........................................................................................... 170

*Pugh v. Tribune,* 521 F.3d 686 (7th Cir. 2008) ................................................. 124

*Quan v. Computer Scis. Corp.,* 623 F.3d 870 (9th Cir. 2010)........................ passim

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Quick v. Campbell,* 412 So. 2d 264 (Ala. 1982)...................................................... 92

*Raymond v. Mobil Oil Co.,* 983 F.2d 1528 (10th Cir. 1993) .................................... 53

*Register v. Cameron & Barkley Co.,* 481 F. Supp. 2d 471 (D.S.C. 2007)............54, 56

*Rego v. Westvaco Corp.,* 319 F.3d 140 (4th Cir. 2003)............................................ 58

*Renberg v. Zarrow,* 667 P.2d 465 (Okla. 1983) ...................................................... 93

*Rhee v. Witco Corp.,* 762 F. Supp. 211 (N.D. Ill. 1991) .......................................... 51

*Righter v. United States,* 439 F.2d 1204 (Ct. Cl. 1971)........................................... 84

*Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910 (2d Cir. 1987) ..................... 99

*Rosiny v. Schmidt,* 587 N.Y.S.2d 929 (N.Y. App. Div. 1992).................................. 91

*Roth v. Sawyer-Cleator Lumber Co.,* 16 F.3d 915 (8th Cir. 1994) .......................... 70

*Roth v. United States,* 511 F. Supp. 653 (D.C. Mo. 1981) .............................104, 111

*Rudolph v. United States,* 93-1 U.S.T.C. ¶60130 (S.D. Ind. 1993) ........................ 111

*S.C. Pohlman Co. v. Easterling,* 27 Cal. Rptr. 450 (Cal. Ct. App. 1962).................. 89

*Saltarelli v. Bob Baker Group Med. Trust,* 35 F.3d 382 (9th Cir. 1994) ................. 191

*Sanson v. General Motors Corp.,* 966 F.2d 618 (11th Cir. 1992) ............................ 54

*Saylor v. Parker Seal Co.,* 975 F.2d 252 (6th Cir. 1992) ...................................... 157

*Schaffer v. Below,* 278 F.2d 619 (3d Cir. 1960) ..................................................... 89

*Silverman v. Mut. Benefit Life Ins. Co.,* 138 F.3d 98 (2d Cir. 1998)..........70, 134, 163

*Simon v. Value Behavioral Health, Inc.,* 208 F.3d 1023 (9th Cir. 2000) ................. 48

*Siskind v. Sperry Ret. Program, UNISYS,* 47 F.3d 498 (2d Cir. 1995)..................... 63

*Slocum v. United States,* 256 F. Supp. 753 (S.D.N.Y. 1966) .......... 101, 112, 113, 114

*Smith v. Delta Air Lines, Inc.,* 422 F. Supp. 2d 1310 (N.D.Ga. 2006) .................... 127

*Smith v. Grand Canyon Expeditions Co.,* 84 P.3d 1154 (Utah 2003)....................... 88

*Snyder's Estate v. United States* 285 F.2d 857 (4th Cir. 1961) ............................. 88

*So. Cal. Thrift & Loan v. Sylvania Elec. Products, Inc.,* 56 Cal. Rptr. 706 (Cal. App. Ct. 1967) ..................................................................................................... 173

*St. Louis County Bank v. United States,* 674 F.2d 1207 (8th Cir. 1982).........101, 111

*Stein v. Smith,* 270 F. Supp. 2d 157 (D. Mass. 2003) .......................................... 171

*Steinman v. Hicks,* 352 F.3d 1101 (7th Cir. 2003)............................................69, 70

*Stern v. Birnbaum,* 615 N.Y.S.2d 62 (N.Y. App. Div. 1994)................................... 89

*Summers v. State St. Bank & Trust Co.,* 453 F.3d 404 (7th Cir. 2006)................. 126

*Sutton v. Warner,* 12 Cal.App.4th 415 (1st Dist. 1993)....................................... 173

*Swain v. Swain,* 58 Cal. Rptr. 83 (Cal. 1967) .................................................... 188

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Taylor v. KeyCorp,* N.D. Oh., No. 1:08 CV 1927, Aug. 12, 2010.......................... 135

*Taylor v. United Techs. Corp.,* No. 06-cv-1494, 2009 WL 535779 (D. Conn. Mar. 3, 2009), *aff'd,* 555 F.3d 1 (1st Cir. 2009) ........................................132, 150

*Teagardener v. Republic-Franklin Inc. Pension Plan,* 909 F.2d 947 (6th Cir. 1990)................................................................................................................. 53

*Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan,* 439 F. Supp. 2d 337 (D. Del. 2006)...................................................................................... 58

*Tripp v. Comm'r,* 337 F.2d 432 (7th Cir. 1964) ................................................... 108

*Tully v. Ethyl Corp.,* 861 F.2d 120 (5th Cir. 1988) ............................................... 99

*Ulico Cas. Co. v. Clover Capital Mgmt.,* 217 F. Supp. 2d 311 (S.D.N.Y. 2002) ....... 133

*Unigroup, Inc. v. O'Rourke Storage & Transfer,* 980 F.2d 1217 (8th Cir. 1992) ....... 93

*United States v. Cruikshank,* 92 U.S. 542 (1876)................................................. 169

*United States v. Land,* 303 F.2d 170 (5th Cir. 1962) ........................................... 101

*Vaughn v. Bay Envtl. Mgmt., Inc.,* 567 F. 3d 1021 (9th Cir. 2009).......................... 51

*Verity Corp.,* 516 U.S. 489 (1996) ....................................................................... 174

*Vogel v. Melish,* 203 N.E.2d 411 (Ill. 1964)........................................................... 86

*Walker v. Nat'l City Bank of Minneapolis,* 18 F.3d 630 (8th Cir. 1994)................ 174

*Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517 (9th Cir. 1993).................... 59

*Wells Fargo & Co. & Subsidiaries v. Comm'r,* 224 F.3d 874 (8th Cir. 2000)........... 81

*Wilson v. Bowers,* 57 F.2d 682, 683 (2d Cir. 1932) ............................................ 101

*Wilson v. Venture Fin. Group, Inc.,* No. 09-5768, 2010 WL 2028088 (W.D. Wash. May 18, 2010) ................................................................................... 167

*Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090 (9th Cir. 2004)............... passim

*Yancy v. Am. Petrofina, Inc.,* 768 F.2d 707 (5th Cir. 1985) ................................... 51

*Yeng Sue Chow v. Levy Strauss & Co.,* 122 Cal. Rptr. 816 (Cal. Ct. App. 1975)................................................................................................................ 90

**Statutes**

26 U.S.C. ("I.R.C.") § 2033................................................................................... 95

26 U.S.C. § 401(a) ............................................................................................... 80

ERISA, 29 U.S.C. § 1001*et seq.* ................................................................. *passim*

29 U.S.C. § 1002 (14)(E)....................................................................................... 65

29 U.S.C. § 1002 (26)........................................................................................... 78

29 U.S.C. § 1002(18) ........................................................................................... 98

29 U.S.C. § 1002(7) ("ERISA § 3(7)") .................................................................. 45

29 U.S.C. § 1002(8) ("ERISA § 3(8)") .............................................................47, 48

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

29 U.S.C. § 1056(d)(3) ("ERISA § 206(d)(3)")..............................................39, 181

29 U.S.C. § 1102(21)(A) ("ERISA § 3(21)(A)")................................................ 171

29 U.S.C. § 1103(a) ("ERISA §§ 403(a)") ...................................................... 156

29 U.S.C. § 1104(a) ("ERISA §404(a) ............................................................ 84

29 U.S.C. § 1104(a)(1)(A) ("ERISA § 404(a)(1)(A)") ...............................46, 61, 69, 143

29 U.S.C. § 1104(a)(1)(B) ("ERISA § 404(a)(1)(B)")...............................46, 68, 70, 143

29 U.S.C. § 1104(a)(1)(b) ("ERISA § 404(a)(1)(D)") .................................... 180

29 U.S.C. § 1104(a)(1)(C) ("ERISA § 404(a)(1)(c)") ................................... 158

29 U.S.C. § 1106(a) ("ERISA § 406(a)")................................................... passim

29 U.S.C. § 1106(b) ("ERISA § 406(b)") .................................................. passim

29 U.S.C. § 1107(d)(3)(A) ("ERISA § 407(d)(3)(A)")...................................... 66

29 U.S.C. § 1108(e) ("ERISA §408(e)") ........................................................ 84

29 U.S.C. § 1109 ("ERISA § 409")..........................................................47, 56

29 U.S.C. § 1110 ERISA § 404 .................................................................. 160

29 U.S.C. § 1110 ERISA § 410 .................................................................. 160

29 U.S.C. § 1132 ("ERISA § 502") ......................................................... passim

29 U.S.C. § 1132(a)(2) ("ERISA § 502(a)(2)") ............................................... 45

29 U.S.C. § 1140 ("ERISA § 510")........................................................168, 171

29 U.S.C. §§ 1103(c)(1) ("ERISA § 403(c)(1)") ........................................... 155

805 Ill. Comp. Stat. 5/6.66 (2010) ............................................................. 85

Cal. Corp. Code § 204(b) (2009)................................................................. 86

Del. Code Ann. Tit. 8, § 202 (2011)............................................................ 86

Fla. Stat. Ann. § 607.0627(1) (2010)........................................................... 86

Ga. Code Ann. § 14-2-627(c) (2011)........................................................... 86

I.R.C. § 2001 (a) ..................................................................................... 95

I.R.C. § 2031................................................................................95, 100

I.R.C. § 2051........................................................................................... 95

I.R.C. § 414 (26 U.S.C. § 414)................................................................... 42

Kan. Stat. Ann. § 17-6002(b)(1) (2009) ....................................................... 86

N.C. Gen. Stat. Ann. § 55-6-27 (2010) ........................................................ 86

N.Y. Bus. Corp. Law § 514 (2010).............................................................. 86

Tex. Bus. Corp. Act Ann. art. 2.22 (Vernon 2007)........................................... 86

Wash. Rev. Code § 23B.06.270 (2011).......................................................... 86

xix

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**Other Authorities**

1 O'Neal and Thompson, Close Corporations and LLCs: Law and Practice § 7:28 (Rev. 3d ed. 2006) ....................................................................... 90

1 O'Neal, *Close Corporations*, § 7:30 at 141 (3d ed. 1994) ..................................... 88

13 Am. Jur. *Corporations* §§ 333-34 (2008) .......................................................... 87

13 Ill. Law & Practice *Corporations* § 142, 363................................................... 87

18 C.J.S. *Corporations* § 391 (2008) ..................................................................... 87

*Amicus* Brief in *In re Worldcom, Inc. ERISA Litig.*, No. 02-Civ-4816 (DLC) (S.D.N.Y. Jan. 16, 2002), *available at:* http://www.dol.gov/sol/media/briefs/worldcom-1-16-04.htm (emphasis added) ............................................................................................................ 176

Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Private Pension Plan Bulletin: Abstract of 2008 Form 5500 Annual Reports* (Version 1.0, December 2010), *available at* http://www.dol.gov/ebsa/PDF/2008pensionplanbulletin.PDF........................ 195

*Fletcher Cyclopedia of the Law of Private Corporations*, § 5483 (West supp. 2008)..................................................................................................................... 87

I.R.S. P.L.R. 8541005 (1985) ............................................................................... 110

I.R.S. P.L.R. 9141043 (July 16, 1991)................................................................... 97

I.R.S. P.L.R. 9248026 (Sept. 1, 1992) ................................................................... 97

I.R.S. P.L.R. 9432017 (May 16, 1994)................................................................... 97

I.R.S. P.L.R. 9620017 (Feb. 15, 1996)................................................................... 97

I.R.S. Revenue Ruling 54-76, 1954-1 CB 194 ...................................................... 110

Rev. Proc. 83-19 (4)............................................................................................... 83

Revenue Ruling 59-60............................................................................................ 97

Social Security Admin., Historian's Office, Research Note #1: *Origins of the Three-Legged Stool Metaphor for Social Security* (1996), *available at* http://www.ssa.gov/history/stool.html. ......................................................... 196

Social Security Admin., Summary of Performance and Financial Information Fiscal Year 2010 ...................................................................................... 196

Treasury Reg. § 20.2031-2(h) ............................................................................... 97

Treas. Reg.  § 20.2031-1(b) .................................................................................. 96

Treas. Reg. § 20.2031-2(h) .......................................................................100, 102

Treas. Reg. § 25.2703-2 ........................................................................................ 97

U.S. Dep't of Commerce, Bureau of Econ. Analysis, *Personal Income and Outlays*, *available at* http://www.bea.gov/newsreleases/release_archive.htm ............................... 196

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Pursuant to this Court's October 23, 2009 (Dkt. 583-584), December 21, 2009 (Dkt. 592) and October 18, 2010 (Dkt. 620) Orders, and Local Rule *16-281*, defendants, The Firm of John Dickinson Schneider, Inc. ("JDS"), Hollister Incorporated ("Hollister"), Samuel P. Brilliant, Richard I. Fremgen, Donald K. Groneberg, Alan F. Herbert, James A. Karlovsky, Lori J. Kelleher, James J. McCormack, Charles C. Schellentrager, Loretta L. Stempinski, Michael C. Winn, and Richard T. Zwirner, by their respective attorneys, submit herewith their Proposed Findings of Fact and Conclusions of Law.

## I.   Findings of Facts

This consolidated case was tried in a bench trial over [TO BE INSERTED] days between August 16, 2011 and September ___, 2011.  Prior to trial, the parties submitted Proposed Findings of Fact and Conclusions of Law.  The court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. To the extent any findings of fact are deemed conclusions of law, they shall be considered conclusions of law and *vice versa*.

### A.   The Parties

#### 1.   Plaintiffs

Each plaintiff, other than plaintiff James DeFazio, is a former Hollister employee and a former participant in the Hollister Employee Share Ownership Trust ("HolliShare" or the "Plan"). With the exception of DeFazio, each plaintiff had, before this action was commenced, voluntarily decided to terminate his or her employment with Hollister and to accept a lump sum distribution of the full amount of the benefits to which he or she was entitled to receive under the terms of the Plan – long before asserting any claim against defendants.

DeFazio was married to plaintiff Kathleen Ellis until they divorced in 1999.  A Domestic Relations Order ("DRO") was entered in the divorce proceedings in March

-1-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

2002, which was submitted to Hollister as the Plan Administrator of HolliShare. (DX 725.)  Hollister determined that the Order was a Qualified Domestic Relations Order ("QDRO") under the applicable provisions of the Employee Retirement Income Security Act ("ERISA").  In accordance with the directive in the March 2002 Order, Hollister established a separate alternate payee HolliShare account for DeFazio's benefit, and transferred into his HolliShare account a portion of the balance of Ellis's HolliShare account.  In May 2009, at DeFazio's direction, Hollister distributed the entire balance in DeFazio's alternate payee HolliShare account (with accrued interest) to an individual retirement account maintained by DeFazio. (DX 748-750.)

### 2. **Defendants**

There are two corporate defendants – JDS and Hollister.  JDS is a holding company that owns 100% of the capital stock of Hollister.  JDS is an Illinois close corporation, as is Hollister.   Hollister develops, manufactures, and markets healthcare products, principally for stoma, continence, and wound care.  Both JDS and Hollister are privately-held.   Since its incorporation in 1956, JDS has been employee-owned.

The remaining defendants are all individuals who, at one time or another, were employed by Hollister or were members of JDS's and/or Hollister's Boards of Directors.[1]

Several of these individual defendants also served, at different times, as Trustees of HolliShare and are also named as defendants in that capacity.[2]

_____

[1] In its Memorandum Opinion and Order of June 29, 2009, *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045 (E.D. Cal. 2009), the court identified HolliShare as a defendant.  The operative complaints are unclear as to whether this is so.  (Dkt. 368, ¶21; Dkt. 314, ¶11.)

[2] See *infra* at Section I.E.

-2-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**B.     Background Regarding JDS, Hollister, And The Growth Of Hollister's Business**

JDS's predecessor company was founded in 1921 by John Dickinson Schneider as a family limited partnership. Born in 1898 and dying in 1983, John Dickinson Schneider was a printer by trade, whose education did not extend beyond high school. In 1948, Mr. Schneider's company purchased the Franklin C. Hollister Company, and in 1956, JDS became incorporated in Illinois. For the first 35 years of its existence, JDS was essentially a closely-held, family business.

Until early 1973, JDS was primarily conducted as a printing business. However, in the 1940s, it had also become involved with healthcare products, beginning with heirloom-quality birth certificates, initially printed for its then customer, the Franklin C. Hollister Company. After its acquisition by Mr. Schneider's company in 1948, the Franklin C. Hollister Company was incorporated by JDS in 1959 under the name "Hollister Incorporated." Since that time, Hollister has operated and continues to operate as a wholly owned subsidiary of JDS. After its acquisition, Hollister continued to manufacture and sell a growing and diverse line of medical products.

When purchased by Mr. Schneider's company, the products manufactured and sold by Hollister included the Ident-A Band patient identification bracelet. The Ident-A Band bracelet helped set hospital standards for patient identification in the United States. Another successful product Hollister manufactured and sold in the 1950s was the "Disposable Footprinter", a product which enabled nurses to make clear, reliable prints of newborn babies' feet. Later, Hollister expanded its products to include a hospital signage system, an umbilical cord clamp, and a circumcision device.

In the mid-1960s, because Mr. Schneider believed that the ostomy products available at that time were of inferior quality, Hollister began developing ostomy care products for patients who had undergone ostomy surgery. The ostomy care

-3-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

products later manufactured and distributed by Hollister developed into Hollister's principal product line, and Hollister's business grew significantly as a result. In 1965, Hollister opened a major production facility in Kirksville, Missouri. In the 1970s, Hollister opened two new manufacturing facilities, one in Ireland and one in Virginia. In early 1973, JDS sold its printing business to certain of its employees who had been working in its printing operation.

Throughout this period, Hollister's corporate "headquarters" was in Chicago, Illinois. In the 1960s, the office consisted of one large room on the second or third floor of an older building in Chicago that had been a warehouse. That office housed Mr. Schneider and 20 to 30 employees. The office was located on the second floor, at the same level as Chicago's elevated railroad tracks (the "El"). During the 1960s, the noise and wind created by the passing El trains were so strong and disruptive that papers were often blown off the desktops in the office.[3]

As Hollister's business grew, in the late 1960's, it moved its office to downtown Chicago, and later to its own facility in Libertyville, Illinois, which it built and has occupied since 1981.

**C.**  **Since JDS's Incorporation In 1956, Its Shares Have Been Subject To The Same Ownership And Transfer Restrictions, Rights Of Repurchase, And Pricing Formula.**

JDS has two classes of shares – preferred and common. No generally recognized market has ever existed for either class. Each JDS preferred share, and each common share, is entitled to one vote. Between 1974 and the present, the JDS preferred shares constituted between 92% and 99% of JDS's outstanding voting shares.

---

[3]  Because the building had no air conditioning, the windows were kept open when the weather was warm; however, the passing El trains not only caused papers to be blown off the desks, but also stirred dirt and dust on the office floor which often wound up settling on the tops of desks.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

While certain matters require an affirmative vote (either by a majority or a super-majority) of each class of shares voting as a class, control of JDS has always rested with its preferred shareholders. Historically, Mr. Schneider controlled the outstanding preferred shares. By 1977, he owned all the preferred shares of JDS and, as explained below, transferred these shares into a trust, which, at his direction, required that the JDS preferred shares be voted in accordance with certain policies and principles articulated in the trust instrument. When that trust expired in 2001, the preferred shares were transferred into a new trust which owns them now. The terms of that trust requires its Trustees to vote the preferred shares in accordance with John Schneider's policies and principles, including maintaining JDS as an independent, employee-owned entity.

Mr. Schneider strongly believed that deserving employees of JDS (and later of Hollister) should be provided with an equity interest in the company. To that end, JDS was incorporated in 1956. It has been the established practice of JDS to sell its shares at their book value to those employees (and later to employees of Hollister) whom Mr. Schneider believed, and now whom present management believes, should be rewarded for their contributions to the success of the business. Mr. Schneider believed this practice would also incentivize these employees to continue to contribute to the success of the business going forward. When this practice was first adopted, at Mr. Schneider's instance, shares of JDS stock were given (and later sold) to employees of JDS (and later of Hollister) and when those employees retired or terminated their employment at Hollister, the shares were repurchased by JDS at their book value.

In order to preserve and perpetuate the benefits of employee ownership, since JDS's incorporation in 1956 and at Mr. Schneider's direction, certain ownership and transfer restrictions and rights of repurchase were incorporated into JDS's corporate by-laws. This was done to ensure that JDS shares could only be owned

-5-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

by Mr. Schneider, his family[4] and employees of the company.  In 1972, in order to highlight the importance of these restrictions, Mr. Schneider had them moved from JDS's by-laws to its Restated Articles of Incorporation.[5]  The JDS Articles were filed with the Illinois Secretary of State and thus the transfer restrictions and repurchase rights became a matter of public record.  As with JDS's corporate by-laws, the book value method of valuing JDS's stock has been included in every amended or restated version of JDS's Articles.

The JDS Articles severely restricted the persons who may own JDS shares.  Article Five, Paragraph II.C of the JDS Articles provided that:

> C.  Restriction of Classes of Persons Entitled to Hold Shares
>
> Subject to the exception set forth in paragraph E below, the following are the only classes of persons entitled to be holders of shares of any class: holders of shares of the Corporation [JDS] as of May 5, 1978; directors and officers of the Corporation or of Hollister Incorporated who (in the opinion of the Corporation's Board of Directors) have performed substantial and continuing services for the Corporation or Hollister Incorporated; employees of the Corporation, of Hollister Incorporated or of any other corporation controlled by one or more of such corporations; and any deferred benefit plan maintained by any one or more of such corporations for the exclusive benefit of employees of any one or more of them.

(DX 531, HO2144.)[6]

Second, Article Five, Paragraph II.D of the JDS Articles set forth the transfer restrictions and the repurchase rights to which JDS shares, common and preferred, were subject.  The introductory provision of Paragraph D stated:

> Except as provided in this paragraph D and subject to the restrictions set forth in paragraph C above, shares of the Corporation shall not be

---

[4]  Mr. Schneider and his wife Minnie had no children.  When JDS was incorporated in 1956, his only family consisted of his mother, Eva Schneider, and two sisters, none of whom were involved in JDS's business.

[5]  Since its incorporation in 1956, JDS's Articles of Incorporation have, on numerous occasions, been amended and restated.  Unless the context dictates otherwise, the Articles of Incorporation will be referred to herein as the "JDS Articles".

[6]  In 1999, this provision was amended to permit the new trust to own the JDS preferred shares.

-6-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

transferred, directly or indirectly, to any person, firm, corporation, trust, entity or other holder, whether by cash sale, contract, deed, gift, operation of law, sale pursuant to lien, pledge, security agreement or judicial process, or otherwise.  No transfer or attempted transfer of any one or more shares of the Corporation, or of any interest, legal or equitable, or claimed interest in such shares, shall be effective unless and until the following conditions shall have been satisfied...

(DX 531, H02144.)

Those "conditions" provided that before any JDS shareholder could transfer his or her shares, he or she was required to comply with the right of first refusal, which was given to JDS in Paragraph II.D.2.a., which provided that:

If any owner, person, personal representative, firm, corporation, trust, entity or other holder desires or intends to transfer any one or more shares of the Corporation, or to create any interest, legal or equitable, in such shares, such holder shall first offer in writing, at least 30 days prior to such transfer or creation of an interest, to sell to the Corporation all shares of the Corporation which such holder desires or intends to transfer, or in which such holder desires or intends to create an interest, at the price and in the manner set forth in [subsequent provisions of the JDS Articles].

(DX 531, H02145.)

The JDS Articles provided that any amendment of the ownership and transfer restrictions and repurchase rights of Article Five of the JDS Articles must be approved by a two-thirds vote of each class of shares, each voting as a class.  (DX 531, H02162.)

Finally, JDS's by-laws (and now its Articles) effectively provided that JDS common shares could only be sold at their book value.  Article Five, Section II.D.3.b of the JDS Articles of Incorporation currently provides:

The price of each common share shall be its book value as of the end of the calendar month in which the Repurchase Date occurs, plus the amount of any dividends declared but not paid prior to the Repurchase Date.  The book value of each common share shall be the book value as reflected on the books of the Corporation and a report by an independent certified public accountant retained by the Corporation stating such book value shall be conclusive proof thereof, regardless of whether the accountant's opinion is qualified.

-7-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

(DX 533, 8/13/84 Amendment to Articles of Incorporation, Article Five, § II.D.3.b.)[7]

At all times since the creation of HolliShare on January 1, 1973, these ownership and transfer restrictions, rights of repurchase, and book value pricing formula have been in full force and effect.  Between HolliShare's formation, and the present, all purchases and sales of JDS common shares have been made for book value.

### D.   Mr. Schneider's Business Policies And Principles And His Decision To Use Book Value To Calculate The Value Of JDS's Shares

After JDS acquired the Franklin C. Hollister Company, and as Hollister began to expand its business operations in the 1950s and the 1960s, Mr. Schneider wanted to develop a management team to succeed him in running Hollister after his death or retirement.

Defendant Richard Zwirner began providing legal services to JDS and Hollister in 1969, and began working directly with Mr. Schneider in 1972, when Mr. Schneider was 74 years old.  From 1972 until 1981, when Mr. Schneider became incapable of managing his business affairs, Zwirner testified that he discussed with Mr. Schneider, on numerous occasions, Mr. Schneider's business policies and principles.  On these occasions, Mr. Schneider consistently expressed his intentions to keep Hollister and JDS independent, employee-owned, and private.  He told Zwirner that the book value method for valuing JDS's shares, the ownership and transfer restrictions, and JDS's right to repurchase JDS's shares had been specially designed (1) to promote continuity in management, (2) to avoid outside appraisals and interference from third parties (including competitors), (3) to support the continuation of employee ownership, and (4) to maintain independence.

---

[7]  Prior to 1984, repurchases at book value were required to be based upon only the book value reflected in unqualified opinions of a certified public accountant.  Notwithstanding this change, all opinions used for repurchases of JDS common shares have been based upon the book value reflected in unqualified opinions.

-8-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Throughout the mid and late 1970s, Mr. Schneider had similar conversations with defendant Michael Winn, who later became Hollister's President, CEO and Board Chairman.

HolliShare became effective on January 1, 1973, and on numerous occasions thereafter, Schneider discussed with both Zwirner and Winn his business policies and principles. As both Zwirner and Winn testified, these policies and principles included: (1) Mr. Schneider's intention to keep JDS and Hollister independent, employee-owned, and private companies; (2) his conservative fiscal policies, such as minimizing bank loans and maintaining sufficient liquidity in the business; (3) his reluctance to enter into new product areas and foreign markets, as opposed to expanding Hollister's existing product lines and markets, to ensure that the company maintained a strong balance sheet with enough cash and liquid assets to face any business contingency that might arise; (4) his belief that the growth and success of his previous printing business had been due to his creation of a sense of ownership among the employees; and (5) his desire to hire quality employees and provide quality products and quality services ("Mr. Schneider's Policies and Principles").

Schneider also told both Winn and Zwirner that to accomplish these goals, for many years, JDS had sold its shares to select employees at their then current book values and then repurchased those shares back from those employees at their book value when they retired or terminated their employment. In this way, Schneider repeatedly told Winn and Zwirner, he believed that he was both rewarding and incentivizing Hollister's employees by permitting them to share in the profitability of the business as part owners. He also told them that JDS's common shares should be made available to the employees because, unlike preferred shares whose value was fixed, the common shares reflected the company's earnings, appreciated if the

-9-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

company was profitable, and, unlike the preferred shares, paid dividends which would permit the employees to share in a tangible manner in the company's profits.

To increase the availability of JDS common shares for the employees, between 1970 and 1972, Mr. Schneider had the JDS Articles restated to eliminate ownership of the preferred shares by employees and instituted a capitalization program through which the preferred shares previously owned by employees were converted to JDS common shares.

Schneider also told both Winn and Zwirner that he had decided, many years earlier, that the use of book value was the best available method for determining the fair market value of the shares of JDS because: (1) the use of book value, combined with the ownership and transfer restrictions, provided the only available market for the repurchase of the JDS common shares; (2) if the business prospered, because the book value of the common shares was required to be re-calculated as of the end of each calendar year, the employees would share in the profits by receiving dividends and benefitting from the increases in the book value of the JDS common shares; (3) the use of book value helped protect the liquidity of JDS and Hollister by permitting them to project their cash needs; (4) the use of book value avoided the expense and cost of outside appraisals which neither JDS nor Hollister could afford at that time;[8] and (5) the use of book value was simple, fair to both the company and to the employee-shareholders, and provided certainty.

### E.    HolliShare, Its Trustees, And Its Operations

HolliShare is a non-contributory, tax qualified defined contribution profit sharing plan designed to provide retirement benefits to Hollister's U.S. non-union employees.  It was created in 1972, became effective as of January 1, 1973 (over a

---

[8]  Zwirner testified that Mr. Schneider had several bad experiences with appraisers and felt that their opinions could be so disparate and radically different that the use of appraisals would result in uncertainty and could easily lead to litigation.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

year before ERISA became effective), and has been subject to ERISA since ERISA's enactment in 1974. Once ERISA became effective, the Plan was immediately modified to be ERISA compliant.

The origins of HolliShare can be traced to Arnold Riven, then a Vice President of Hollister, who, with Mr. Schneider's full support, wanted to expand employee ownership through a retirement plan. In September 1974, when ERISA was enacted, HolliShare received 11,950 common shares of JDS. In exchange for those shares, HolliShare assumed the obligation to pay the promissory notes issued to the former shareholders so that there were no further ongoing obligations by HolliShare to JDS. HolliShare has never purchased any JDS shares since that time. The number of JDS common shares held by HolliShare subsequently increased due to two 100-for-1 stock splits, and a 9-for-1 stock dividend.

Since HolliShare's inception, all Hollister employees in the United States, except those who are members of the collective bargaining unit for union workers at Hollister's Kirksville, Missouri plant, have been eligible to participate in the Plan. An eligible employee is enrolled as a HolliShare participant on either January 1 or July 1, following the completion by that employee of one year of service at Hollister. HolliShare currently has approximately 1,000 participants.

HolliShare is funded solely through cash contributions by Hollister made each year from its profits. HolliShare participants are neither required nor permitted to contribute to HolliShare. In recent years, Hollister's contribution has ranged from 7.5% to 8.5% of each participant's eligible compensation to HolliShare, which is more than the minimum contribution of 5% required by the terms of the Plan. (DX 776.) Indeed, since 1990, Hollister has contributed to HolliShare approximately $33 million over the specified minimum.

HolliShare has three Trustees (the "HolliShare Trustees"), each of whom is appointed by Hollister's Board of Directors. The management of HolliShare involves

-11-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

financial, legal, and personnel matters. Accordingly, over the years, the practice developed whereby Hollister's Board of Directors appointed Hollister's Chief Financial Officer, its General Counsel, and the Head of its Human Resources Department as HolliShare's Trustees.

At HolliShare's inception, the HolliShare Trustees were Arnold A. Rivin, Loretta L. Stempinski, and L. Victor Dickinson. Richard Zwirner has served as Hollister's General Counsel since 1977 and became a HolliShare Trustee that same year. He has continued to serve as a HolliShare Trustee from that time, continuing to the present. Since 1979, Hollister's Chief Financial Officers also served as HolliShare's Trustees. They have been (in succession): Charles Gunderson, James McCormack, and Samuel Brilliant. Beginning in the late 1970s, and continuing to the present, the Heads of Hollister's Human Resources Department have also served as HolliShare Trustees. In succession, they have been Simon, Schellentrager, Karlovsky, and Kelleher. (Dkt. 492, filed 7/30/09, ¶57.)

Since HolliShare's creation, Hollister has served as the Plan's Sponsor and Plan Administrator. Since that time, the Hollister Board of Directors has appointed the HolliShare Trustees and monitored their performance; along with Hollister, they are also "named fiduciaries" of the Plan. The individual HolliShare Trustees who have been named as defendants in this action and their terms of service are:

| Name | Hollister Position | Period of Service as a HolliShare Trustee |
|---|---|---|
| Richard T. Zwirner | General Counsel | 1977 to the present |
| Charles Gunderson[9] | Chief Financial Officer | 1979 through 1981 |

---

[9] Mr. Gunderson passed away on November 21, 2009 and has been dismissed from this action. (Dkt. 594, filed 5/12/2010.)

-12-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| Name | Hollister Position | Period of Service as a HolliShare Trustee |
|---|---|---|
| James J. McCormack | Chief Financial Officer | 1981 through 2000 |
| Samuel Brilliant | Chief Financial Officer | 2000 to the present |
| Howard Simon[10] | Head of Human Resources | 1979 through 1985 |
| Charles C. Schellentrager | Head of Human Resources | 1979 through 1989 |
| James A. Karlovsky | Head of Human Resources | 1989 through 2004 |
| Lori J. Kelleher | Head of Human Resources | 2004 through 2011 |

An individual account is maintained for each HolliShare participant. The balance in each participant's account is generally based on the participant's *pro rata* percentage of the value of the entire HolliShare Trust Fund. The value of HolliShare's assets, *i.e.,* Trust Fund, and the balance of each participant's HolliShare account, is determined once a year, as of December 31 of the prior year. Upon the termination of a HolliShare participant's employment with Hollister, that person becomes entitled to a distribution of an amount equal to the vested portion of his or her HolliShare account balance as of December 31 of the prior year, *i.e.,* the year preceding the employee's termination of employment plus interest. (DX 501, § 12.02(2).) The Plan has been amended and restated on numerous occasions. As is required under ERISA, each amended or restated version of the Plan has been submitted to the Internal Revenue Service ("I.R.S.") for determination, and has always been approved by the I.R.S., thereby maintaining the Plan's continued tax-qualified status.

//

---

[10]  Mr. Simon passed away on October 31, 2008 and has been dismissed from this action. (Dkt. 434, filed 12/22/2008; Dkt. 559, filed 6/29/2009, p.23.)

-13-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

HolliShare's principal asset is JDS common shares.  The HolliShare Plan mandates that "under normal circumstances and to the maximum extent practicable, the [HolliShare] Trustees are to (i) invest the Trust Fund in Common Shares of JDS Inc...".  (DX 501, § 11.01(1)(i).)  Consistent with this mandate, HolliShare's investment in JDS common shares typically comprises in excess of 95% of the value of the HolliShare Trust Fund.  The JDS common shares held by HolliShare are owned by HolliShare.  HolliShare participants have no legal or equitable ownership interest in any of the HolliShare assets, including (without limitation) the JDS common shares owned by HolliShare.  (DX 501, § 11.03.)

The JDS common shares owned by the HolliShare Trust Fund are valued at their respective fair market value, which the Plan states to be their book value as of their valuation date. (DX 501, H01380-H01381.)  Because HolliShare invests primarily in JDS's common shares, the principal factor that determines the change in value of each HolliShare participant's account is the annual decline or appreciation in the book value of JDS's common shares.  According to the terms of the Plan, the value of a HolliShare participant's account is also affected by: (a) Hollister's cash contributions to the Plan; (b) gains or loss on the comparatively small amount of the HolliShare Trust Fund that is invested in the assets other than JDS common shares; (c) the allocation of forfeitures of the unvested portions of the account balances of former HolliShare participants; and (d) any expenses incurred by HolliShare (essentially none, as all are paid by Hollister). These factors, however, pale in significance when compared to the impact that changes in the book value of the JDS common shares held by HolliShare have upon individual account balances.

Periodically, HolliShare sells some of its JDS common shares to JDS. These sales are made so that HolliShare has sufficient cash available to pay benefits to departing participants.  Typically, HolliShare sells JDS common shares to JDS once a year, and only sells the number of shares necessary to generate cash proceeds

-14-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

sufficient to cover the HolliShare Trustees' detailed projection of the Plan's vested benefit payment obligations for the next year.  HolliShare is required to sell its JDS common shares in accordance with the JDS Articles.

When selling JDS common shares, the trustees sell the JDS common shares to JDS at their fair market value.  To determine their fair market value, the HolliShare Trustees annually calculate, in good faith, the price of the shares in accordance with the terms of the Plan.  They take into consideration all of the circumstances that may be relevant to the sale, including, but not limited to: (a) the impact of the ownership and transfer restrictions and the repurchase rights of JDS on the price attainable by HolliShare for its JDS common shares; (b) the value that HolliShare could otherwise obtain for the JDS common shares; (c) the business prospects for Hollister, including a review of its financial statements, balance sheet and general business conditions; (d) HolliShare's cash needs for the forthcoming year; (e) the provisions of the HolliShare trust instrument; (f) potential buyers; (g) the rate of return to the participants that is being generated by the sale; (h) the book value of JDS common shares as reflected by Hollister's audited financial statements; (i) whether there have been any changes in the law, particularly in ERISA, that would affect the Plan; (j) the historical returns generated by investments in JDS common shares; (k) the lack of any objection from the D.O.L. following its multiple audits of the Plan; (l) the issuances of multiple I.R.S. determination letters essentially reaffirming that the Plan complies with Internal Revenue Code ("I.R.C.") and ERISA regulations; and (m) any other changes that would warrant a change in their conclusion.

After considering each of these factors, the HolliShare Trustees have consistently concluded that book value is the fair market value of the JDS common shares because it is the only price obtainable for the JDS common shares held by the Plan.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**F.      The 1977 Preferred Share Trust**

On April 21, 1977, Mr. Schneider established the John D. Schneider 1977 Preferred Share Trust ("the 1977 Preferred Share Trust").  This was done in order to memorialize and implement his Policies and Principles, to promote the benefits of employee ownership, and to preserve the book value pricing system.  At that time, he owned all the outstanding JDS preferred shares, which represented control of JDS.  In connection with the execution of the 1977 Preferred Share Trust, and one of its subsequent amendments, Mr. Schneider gave a detailed statement before a court reporter and others.  According to Mr. Schneider's transcribed statement, he created the 1977 Preferred Share Trust because: (a) he wanted the Hollister business to continue beyond the time that he could manage it; (b) he had put in place a profit sharing plan in one fashion or another for a number of years and wanted the employees who had helped make the company successful to be able to continue to share in the success of the company; (c) he wanted Hollister to continue to be a business in which a large number of people could be "operating in a small business way, with opportunities for a number of young people"; and (d) he did not want Hollister to be sold to "a big corporation just for money". (DX 636, RZ 07131.)

Mr. Schneider also stated that he wanted the employees to benefit for a long period of time, and that he firmly believed that the only way to accomplish that was to have a trust in which no one person, or even two people, could "sell it out" or benefit personally at the expense of everyone else.   (DX 636, RZ 07132.) Importantly, Mr. Schneider also stated that he did not want to create a system where it only mattered how many dollars could be taken out of the company, but rather "to see if you can have the pleasure of developing yourself and developing other people and have a happy working condition". (DX 636, RZ 07145-RZ 07146.) Accordingly, the 1977 Preferred Share Trust obligated the Trustees of that trust to elect JDS directors who were committed to the Schneider Policies and Principles,

-16-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

which were expressly set forth in the 1977 Preferred Share Trust Instrument.  (DX 635, 1977 Preferred Share Trust, Article Sixth.)

To this end, Mr. Schneider placed all of his outstanding JDS preferred shares in the newly established 1977 Preferred Share Trust.  Those preferred shares represented control over JDS, and, by the Trust's terms, were to be held in the Trust for 24 years.  Mr. Schneider was the initial trustee of that trust.

### G.    Transfer Of The JDS Preferred Shares In The 1977 Preferred Share Trust To The 1999 Preferred Share Trust

In 1981, Mr. Schneider became incapable of managing his own affairs, and Winn, Stempinski, and Zwirner became the Trustees of the 1977 Preferred Share Trust.

By its terms, the 1977 Trust was to expire on April 21, 2001.  (DX 635, 1977 Preferred Share Trust, Article Fifth, Paragraph B.)  The 1977 Preferred Share Trust provided that upon its expiration, the JDS preferred shares owned by it were to be distributed to those Hollister employees who then personally owned JDS common shares, and who agreed in writing to abide by the Schneider Policies and Principles.

For several years prior to April 21, 2001, Winn, Stempinski, and Zwirner discussed the potential impact of the expiration of the 1977 Trust on the future operations of Hollister.  In 1997 and 1998, a team comprised of Hollister personnel, accountants from Deloitte & Touche, and lawyers from the law firm of Schuyler, Roche & Zwirner conducted a "Capitalization Study" to explore various alternatives to the historical practice of having JDS common shares sold to employees for book value and JDS's repurchases of those shares from those employees at book value.  Multiple possibilities were considered, including a public offering of JDS common shares and the formation of an employee stock ownership plan ("ESOP").  The Capitalization Study concluded that the continuation of the book value pricing system was the most effective method to perpetuate the Schneider Policies and

-17-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Principles and provided the best overall combination of incentives and rewards for Hollister employees while maintaining the degree of financial liquidity needed by Hollister to continue its growth, development, and profitability.

After extensive discussions and deliberations, and after carefully considering the implications to JDS, to Hollister, and to HolliShare and its participants and beneficiaries, Winn, Stempinski, and Zwirner proposed to the employee/shareholder beneficiaries of the 1977 Preferred Share Trust that they consent to the transfer of the JDS preferred shares from that trust to a newly formed trust ("the 1999 Preferred Share Trust").  Winn, Stempinski, and Zwirner proposed that the new trust be perpetual in duration and that it require its trustees to agree in writing to adhere to the Schneider Policies and Principles.  Article 5, section D of the 1999 Preferred Share Trust also required its trustees to "use [their] best efforts to cause JDS Inc. to continue to sell and repurchase the common shares only at prices equal to their book value." (DX 641, H10969.)  This provision was designed to insure that HolliShare continued to comply with the ownership and transfer restrictions and JDS's rights of repurchase; any attempt to avoid them would cause JDS to enforce its rights and make sales to anyone other than JDS at a price other than book value impossible.

After soliciting and obtaining input from key members of Hollister's management (each of whom concurred with the proposal), the proposal was unanimously agreed to by all the contingent employee/beneficiaries.  The new trust, The Firm of John Dickinson Schneider, Inc. Preferred Share Trust, was signed April 21, 1999.

In order to implement the terms of the 1999 Preferred Share Trust, it was necessary for the JDS shareholders to approve an amendment to the JDS Articles. An amendment to the JDS Articles required a two-thirds vote by each class of JDS

-18-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

shares, voting as a class.   Given the number of common shares owned by HolliShare, any amendment to the JDS Articles necessarily required its approval.

Under the HolliShare trust instrument, the HolliShare Trustees were solely responsible for determining how HolliShare would vote its shares.   At the time this amendment was proposed, and throughout 1999, the HolliShare Trustees were McCormack, Karlovsky, and Zwirner.

### H.    The 1999 Amendments To The JDS Articles

Several amendments were approved at a Special Meeting of the JDS shareholders held on January 28, 1999.  The following amendments were approved:

a. An amendment which (i) increased the amount of cash paid by JDS to individual common shareholders from whom JDS redeems its common shares from $5,000.00 to the greater of $250,000 or 10% of the amount of the transaction; and (ii) increased the interest rate payable on promissory notes provided in connection with such redemptions from a range of 6% to 9% to a range of 8% to 12%.

b. An amendment which added a new Article Six to the JDS Articles, and provided as follows:

No director of the Corporation shall be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 8.65 of the Business Corporation Act, or (4) for any transaction from which the director derived an improper personal benefit.  If, after adoption by the shareholders of this ARTICLE SIX, the Business Corporation Act is amended to permit the further elimination or limitation of the personal liability of directors, then the liability of directors of the Corporation shall be eliminated or limited to the fullest extent permitted by the Business Corporation Act as so amended.  This ARTICLE SIX shall not eliminate or limit the liability of a director of the Corporation for any breach of fiduciary duty occurring before March 19, 1999.  The right set forth in this ARTICLE SIX is in addition to: any indemnification or other right eliminating or limiting the personal liability of directors to which a director may be entitled by any by-law, agreement, vote of shareholders or disinterested directors, or otherwise...

(DX 535.)  The amendments approved at the January 28, 1999 Special Meeting of the JDS shareholders were filed with the Illinois Secretary of State on March 19, 1999, and have been a matter of public record since that time.

-19-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

At the April 30, 1999 JDS Annual Shareholders' Meeting, the JDS shareholders (including HolliShare) unanimously voted in favor of an amendment to the JDS Articles that permitted the 1999 Preferred Share Trust to own JDS shares. (DX 646, Minutes of April 30, 1999 Meeting.)  At that meeting, the JDS shareholders also approved an amendment to the JDS Articles which provided that no natural person would be permitted to own more than 10% of the outstanding JDS common shares.  An amendment that deleted Article Five, Paragraph II.E (an exemption from the otherwise applicable transfer restrictions and repurchase rights in the JDS Articles for John D. Schneider, Minnie R. Schneider, and trustees designated in writing by either or both of them) was also approved because there was no one left to whom this exemption applied.  The amendments approved at the April 30, 1999 JDS Annual Shareholders' Meeting were filed with the Illinois Secretary of State on June 14, 1999.  (DX 536.)  They have been a matter of public record since that time. The HolliShare Trustees who voted HolliShare common shares in favor of these amendments were Karlovsky, McCormack, and Zwirner.

On April 21, 2001, all of the JDS preferred shares were transferred from the 1977 Preferred Share Trust to the 1999 Preferred Share Trust, where they remain today.

## I.      The Mid-1980's Agreement

Since the mid-1980s, the per share price used to calculate the amount to be paid by JDS to HolliShare for its annual sales of JDS common shares has been the December 31 per share audited book value for the year preceding the payment to participants of their vested Plan benefits.  This practice resulted from an agreement which evolved in the 1980s between the HolliShare Trustees and JDS as the result of numerous growing concerns that were shared by both parties.

Their concerns initially arose when HolliShare's benefit payment obligations spiked dramatically due to the increasing number of HolliShare participants, the

-20-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

remarkable increase in the book value of the JDS common shares, and a large number of retirements.  These factors created uncertainty among JDS and HolliShare as to the expected number of retirees each year, and correspondingly, the amount of funds that would be required to pay future vested benefits to Plan participants and their beneficiaries.

In addition, HolliShare participant account balances had grown to levels at which the amount of the annual vested benefits being paid to former HolliShare participants substantially exceeded the amount of Hollister's annual cash contributions to HolliShare.  This required HolliShare to request that JDS repurchase its JDS common shares more frequently in order to fund its payments of vested benefits.  Consequently, the HolliShare Trustees were approaching the JDS Board for the payment of sizable amounts of money to repurchase larger and larger blocks of JDS common shares held by HolliShare, thereby requiring JDS to divest a significant amount of its cash to this purpose, rather than using the cash for other aspects of its business.

By the mid-1980's, the cash needs of the Plan were increasing at an accelerated and unpredictable rate. The Plan's sales of JDS shares in 1980, 1981, and 1982 were all less than $1 million, and the Plan did not have to sell any JDS shares at all in 1983 or 1984.  In 1985, the amount of vested benefits to be paid required what was then the largest sale of JDS common shares held by HolliShare - - a sale that exceeded $1 million.  In 1986, however, the Plan needed to generate **twelve times** that amount of cash through sales of JDS common shares, and in 1987, **nine times** the 1985 amount.  The total proceeds generated from the sales by HolliShare to JDS of JDS common shares between 1979 and 1987 were as follows:

| 1979 | $0 |
|------|-----------|
| 1980 | $791,700 |
| 1981 | $997,227 |
| 1982 | $723,140 |

-21-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| 1983 | $0 |
|------|------|
| 1984 | $0 |
| 1985 | $1,047,800 |
| 1986 | $12,619,800 |
| 1987 | $9,756,000 |

Clearly, a serious problem existed that had to be addressed. Hollister needed to be able to project its future cash needs which also included operating capital to fund its expanding business operations.

During this same period, other concerns surfaced. According to the defendant Winn, the early and mid-1980's was a period of "unbelievable change" for Hollister. Hollister was expanding from an essentially domestic company to one with international operations. During this period, Hollister was building a distribution network throughout Europe which required Hollister's executives to spend substantial time abroad. Winn testified that he once visited five countries in six days. It also became more difficult for Hollister to project its liquidity needs due to the often drastic (even daily) fluctuations in the exchange rates of foreign currencies.

Further, according to Winn, another problem arose during this period which imposed even more pressure on Hollister's cash needs. In 1982-1987, Hollister became embroiled in a significant, protracted arbitration proceeding against Abbott Laboratories. Abbott Laboratories had been a major, if not the major, distributor of Hollister's products. The arbitration therefore generated great uncertainty at Hollister, and dragged on for five years. The arbitration was very disruptive, requiring Hollister to incur substantial attorneys' fees and to devote significant resources (time and management personnel) to it. This created yet another drain on Hollister's cash flow.

Under these circumstances, Winn became extremely worried about Hollister's and JDS's ability to project and satisfy their liquidity needs going forward. He strongly believed that Hollister and JDS had to maintain strong cash reserves to

-22-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

support Hollister's continued growth and expansion.  But, the funding of Hollister's international expansion, its pursuit of the Abbott arbitration, and JDS's repurchases of rapidly and unpredictably growing numbers of JDS common shares to fund HolliShare's benefit payments, all served, in his mind, to undermine Hollister's cash flow and its continued growth.  At the same time, the HolliShare Trustees became concerned that a decline in Hollister's business performance would reduce or even eliminate the enhanced returns that were being enjoyed by the Plan participants as a result of the increasing book value of the JDS common shares held by the Plan.

Winn's and Zwirner's cash flow concerns were also exacerbated because of the interaction between ERISA and the JDS Articles.  The JDS Articles gave JDS the right to pay for its purchases of JDS common shares by tendering a combination of cash and a subordinated promissory note for the balance.  Article Five, Section II.D.4.a of the Articles of Incorporation provided:

> The aggregate price of any common shares repurchased by the Corporation shall be paid as follows:  The first $5,000 (or the aggregate price if it is less than $5,000) shall be paid in cash and the balance shall be paid in the form of a promissory note of the Corporation payable (1) to the holder of such common shares, (2) at the principal office of the Corporation, (3) in equal quarterly installments of principal (plus interest), and (4) over a period of time determined in accordance with the schedule below....

(DX 531, 1978 Restatement of the JDS Articles, Article Five, § II.D.4.)

For example, for a $1 million purchase, JDS could pay $5,000 cash and $995,000 in a subordinated promissory note payable over 10 years.  However, if JDS were to purchase HolliShare's shares on that basis, this limited amount of cash would leave HolliShare without the funds it needed to meet its growing vested benefit payment obligations.  In addition, HolliShare could not enter into such a transaction because to do so would be a "prohibited transaction" under 29 U.S.C. § 1106(a) ("ERISA § 406(a)").  Knowing that JDS would never waive its right of first

-23-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

refusal (it never had), HolliShare would have been unable to sell its JDS common shares to anyone other than JDS. Indeed, Zwirner testified that HolliShare would not have been able to continue to operate if JDS insisted that its repurchase of JDS common shares be paid with cash and a promissory note (as JDS was entitled to do under the JDS Articles).

To avoid violating ERISA, in the early years of the Plan, a practice had developed where HolliShare sold its JDS common shares to JDS on an irregular basis for cash, sometimes at their month-end book value, sometimes at the prior month-end value or sometimes at the prior year's-end book value. This practice was authorized by Article Five, Section II.D.7.a of the JDS Articles which provided that:

> Under exceptional circumstances and in the discretion of the Corporation's [JDS's] Board of Directors, shares may be repurchased by the corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner or holder of such shares may from time to time agree.[11]

(DX 531, H02160-H02161.)

JDS and HolliShare's Trustees determined that HolliShare's sales of its common shares to JDS presented "exceptional circumstances" in that: (a) they were by far the largest share repurchases made by JDS; (b) they were made for the benefit of a large group of employees, rather than for the benefit of individual shareholders; and (c) if made in strict adherence with the JDS Articles, they would violate the prohibited transaction provisions of ERISA. In making this decision, the JDS Board and the other HolliShare Trustees also relied on the advice of Hollister's General Counsel, Zwirner, who had drafted Article Five, Section II.D.7.a.

As construed and interpreted by JDS and the HolliShare Trustees, Section II.D.7.a of the JDS Articles authorized the use of the prior year end book value to calculate the per share repurchase price to be paid to HolliShare. JDS and

---

[11] This provision, written by Zwirner, was added in the 1974 Restated Articles.

-24-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

HolliShare did not, however, believe it authorized a departure from the use of book value to determine the price to be paid by JDS in repurchasing JDS common shares because any deviation from the use of the book value system to determine the repurchase price would be an abuse of the discretion granted the JDS Board by Article Five, Section II.D.7.a of the JDS Articles. Their belief was based on the totality of the circumstances, in particular (1) the approximate 30 year history of JDS always repurchasing its shares for their book value, (2) the Schneider Policies and Principles, (3) the uniformity and certainty generated by using book value, and (4) their liquidity concerns. They decided that an abandonment of the use of book value would undermine each and every factor which Mr. Schneider had considered when he determined that the fair market value of JDS's shares was their book value – a determination he made in 1956 when he incorporated JDS and again in 1973 when HolliShare was formed.

The HolliShare Trustees, through Zwirner, and JDS, through Winn, discussed these issues often throughout the early 1980s. With the passage of time, their concerns grew and became more acute. Eventually, they agreed that: (a) in order to allow JDS to plan ahead for its own cash flow needs, HolliShare would provide JDS with reasonable advance notice of the estimated amount of HolliShare's sales of JDS shares; (b) the price to be paid by JDS would be the per share book value of JDS common shares as determined by the most-recently audited December 31 year-end financial statements; (c) JDS would accommodate HolliShare's cash needs by buying whatever number of its common shares HolliShare recommended it buy and paying for those shares in a single annual lump sum payment of cash; and (d) HolliShare and JDS would engage in only one such transaction each year (the "Mid-1980s Agreement").

The Mid-1980s Agreement ensured that HolliShare would have the cash it needed to fund its vested benefit payment obligations. JDS's willingness to make a

-25-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

lump sum cash payment rather than standing on its right to tender a much smaller cash payment together with a long-term, subordinated promissory note, was vital to HolliShare.  Even if HolliShare could legally accept a promissory note from JDS (which it could not), HolliShare required cash in order to pay vested Plan benefits. Moreover, since a note could be converted into cash only at a substantial discount from its principal amount, HolliShare's Trustees believed that the economic value of a payment entirely in cash far exceeded that of a small cash payment coupled with a long-term subordinated note.[12]

The Mid-1980s Agreement also avoided the ERISA prohibition against HolliShare's acceptance of promissory notes from JDS.  By limiting the transactions to a single transaction each year, the Mid-1980s Agreement also allowed JDS to plan ahead and budget its own liquidity and cash needs.  This benefited the Plan because JDS would then have the liquidity needed to purchase JDS common shares from HolliShare so that it could, in turn, pay the substantial vested plan benefits triggered by the continuing appreciation in the book value of the Plan's JDS common shares.  As such, the agreement not only gave HolliShare an assurance that JDS would be willing to purchase the Plan's JDS shares, but that it would conduct its business in a manner which assured JDS had the means of doing so.

Finally, by setting the price of the JDS common shares held by HolliShare at their per share book value as determined by the most recently audited December 31 year-end financial statements, the Mid-1980s Agreement provided uniformity and accuracy that repurchases by JDS of its common shares at different month end

_____

[12]  As both Zwirner and Winn testified, at some point in the early or mid-1980s, Winn requested that JDS repurchase some of his JDS common shares so that Winn could make a charitable donation.  JDS did so, purchasing the shares with $5,000 in cash and the balance with a promissory note. Since Winn wished to make his contribution in cash, he sold his note to a bank that was familiar with Hollister, its business operations, and its financial condition.  Nonetheless, Winn was disappointed to learn that the bank paid him cash which was only between 88% and 90% of the note's principal amount of the note.

-26-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

book values would not. JDS's fiscal year ends on December 31, and the year-end book value was computed from JDS's year-end audited financial statements. Its year-end financial statements were audited annually by internationally recognized public accounting and auditing firms (Arthur Andersen from the inception of the Plan until 1984, and Deloitte & Touche from 1985 to present).

In contrast, JDS's interim month-end financial statements were simply not as reliable. Unlike the audited year-end financial statements, they did not include comprehensive adjustments and accruals. For example, the interim month-end statements did not include deferred taxes, write-offs of uncollectible receivables, or the foreign exchange rate fluctuations which were troubling Winn.

According to Winn, the use of a year-end, audited book value "removed uncertainty" from the book value calculations. Indeed, under Article Five, Section IV.D.3.b of the JDS Articles, the audited year-end book value is "conclusive" and thus not subject to challenge or dispute. (DX 533 at 9.) Furthermore, the evidence established that the difference between the vested benefit payments the Plan participants received based on the year-end book value calculations and the month-end book valuations for each repurchase transaction, if any, was unknown. In entering into the Mid-1980s Agreement, the HolliShare Trustees also considered the fact that the December 31 book value was the most reliable and accurate book value available to them.

Although the Mid-1980s Agreement was never memorialized, as Zwirner testified, its terms were frequently discussed and agreed to by himself, Winn, other members of JDS's Board of Directors, and the other HolliShare Trustees. Documentation of the agreement was not required by ERISA, JDS's Articles, or by the Plan, and, because of everyone's involvement in its creation, such documentation was not considered necessary. Beginning in 1999, in order to strengthen JDS's liquidity, the JDS Board has annually adopted a resolution

-27-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

providing HolliShare with JDS's three-year rolling commitment to repurchase the number of JDS common shares annually requested by HolliShare. (DX 643.)

The Mid-1980s Agreement has been beneficial to HolliShare and its participants because the Plan has, over the past 24 to 25 years, obtained the cash it needed every year to pay Plan participants their vested benefits.  In addition, each year, Zwirner testified that he reviewed the terms of the agreement, considered whether the circumstances which led to the agreement had changed, and each year concluded that it was in JDS's and the Plan's best interests to continue its implementation.

With the passage of time, the agreement has enabled the Plan to satisfy its continually expanding and still volatile cash needs.  In 2010, the Plan's cash needs required a sale of over **30 million dollars** of JDS shares. Between 1993 and 2010, the proceeds from HolliShare's sales of JDS common shares to JDS have been as follows:

| | |
|---|---:|
| 1993 | $25,830,000 |
| 1994 | $0 |
| 1995 | $14,697,300 |
| 1996 | $10,000,013 |
| 1997 | $9,863,100 |
| 1998 | $31,468,500 |
| 1999 | $21,332,000 |
| 2000 | $18,679,500 |
| 2001 | $29,590,000 |
| 2002 | $7,174,300 |
| 2003 | $8,490,418 |
| 2004 | $11,908,000 |
| 2005 | $6,335,120 |
| 2006 | $8,717,440 |
| 2007 | $34,006,770 |
| 2008 | $12,117,750 |
| 2009 | $24,617,925 |

-28-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| 2010 | $30,069,600 |
| 2011 | $30,998,948 |

Moreover, Zwirner, Brilliant, and Herbert each testified that the cash needs of the Plan have become even more burdensome than they were in the mid-1980's, even with sufficient advance notice. Without the benefit of the advance notice provisions and the other provisions in the Mid-1980s Agreement, JDS would not have been able to project Hollister's cash needs, which would have, in turn, reduced Hollister's profitability. By the same token, without the agreement, HolliShare would never have been able to continue to pay vested benefits and, as Zwirner testified, most probably would not have survived.

### J. HolliShare's Practices Regarding The Valuation Of Its Participants' Accounts Have Been Fully And Consistently Disclosed To The Plan Participants.

The HolliShare Trustees have consistently disclosed to HolliShare participants the manner in which their accounts are valued. Since 1984, each participant has been provided annually with a booklet entitled *HolliShare Highlights*. While the title of the booklet varied, a substantively identical booklet was also provided during the period 1977 to 1983. It was titled *Summary Annual Report* in 1977 and 1978, *HolliShare Highlights* in 1979, 1980 and 1981, and *Annual Report* in 1982 and 1983. (DX 649-655.) The *HolliShare Highlights* booklets were distributed to all HolliShare participants and provided a summary of the financial results of the HolliShare Trust Fund for the prior year.

The *HolliShare Highlights* booklets describe the nature of JDS's common shares and HolliShare's valuation of those shares as follows:

**Closely Held Nature of JDS Stock**

JDS common shares, which are valued at their book value, are not publicly traded. They are for all practical purposes not transferable to any person or entity other than JDS itself. They are subject to severe

-29-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

> transfer restrictions which require that the Trust [HolliShare] first offer them to JDS at their book value.
>
> To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with needed cash.  Both the Trustees and JDS expect to continue in this manner, in order to maintain the necessary liquidity and financial integrity of HolliShare.

(DX 680, *2008 HolliShare Highlights*, H22196.)

Furthermore, HolliShare's practice of selling its common shares to JDS at their per share December 31 book value has been disclosed to HolliShare participants since at least 1990, when each participant received a Summary Plan Description which disclosed this practice.  (DX 512, H03694.)

### K.   The Monitoring Of HolliShare And Its Trustees By Hollister's Board Of Directors

Since HolliShare became effective on January 1, 1973, as required by the Plan, the Hollister Board of Directors has appointed and monitored the activities of the HolliShare Trustees.  In this role, the Hollister Board has interacted annually with the HolliShare Trustees in numerous respects.

Initially, the Hollister Board determined the amount of Hollister's annual contribution to HolliShare.  Hollister's Board of Directors also was constantly updated by one of its members, Zwirner, of the ongoing investigation conducted by the HolliShare Trustees to assure themselves that the fair market value of the JDS common shares was their book value.  See *supra* Section E, pp. 10-15.

The Hollister Board also received and reviewed a report, at least annually, from Hollister's Corporate Deferred Benefits Committee, whose individual members also served as HolliShare Trustees.  (DX 682-688.)  That report typically addressed issues pertaining to HolliShare and the various other benefit plans maintained by Hollister.  Included in the report regarding HolliShare was information concerning the current size of the HolliShare Trust Fund, the number of JDS common shares sold by HolliShare to JDS in the prior year, and the proceeds realized by HolliShare as a result of that sale.  In addition, the Hollister Board closely monitored the

-30-

returns generated by HolliShare's investments.  In particular, the Hollister Board carefully reviewed and assessed the annual year-to-year variations in the book value of HolliShare's JDS common shares.

The percentage annual increases in the book value of JDS common shares have, in the vast majority of years, exceeded the increases in the S&P 500 index and other commonly accepted indices of mid-cap and small cap stocks.  Between 1977 and 2010, the book value of JDS's common shares, and the value of various stock indexes, have increased (or decreased, in the case of the indexes in some years) as follows:

| Year | JDS Common Shares[13] | S&P 500 Index[14] | Mid-Cap Index[15] | Small Cap Index[16] |
|---|---|---|---|---|
| 2010 | 17.65% | 12.78% | 24.85% | 24.98% |
| 2009 | 16.40% | 23.45% | 35.00% | 23.78% |
| 2008 | 25.40% | (38.49)% | (37.28)% | (31.99)% |
| 2007 | 21.87% | 3.53% | 6.69% | (1.22)% |
| 2006 | 20.91% | 13.62% | 8.99% | 14.07% |
| 2005 | 14.24% | 3.00% | 11.27% | 6.65% |
| 2004 | 20.91% | 8.99% | 15.16% | 21.59% |
| 2003 | 25.53% | 26.38% | 34.02% | 37.53% |
| 2002 | 22.31% | (23.37)% | (15.45)% | (15.32)% |
| 2001 | 15.33% | (13.04)% | (1.63)% | 5.78% |
| 2000 | 8.01% | (10.14)% | 16.21% | 10.86% |

[13]  JDS Book Value figures for the years, 1977 to 1996, are from a February 17, 1999 letter sent by Richard Zwirner, Michael Winn, and Loretta Stempinski sent to each of the contingent employee-beneficiaries of the 1977 John D. Schneider Preferred Share Trust. The information for the years 1997-2007 is from Duff & Phelps report; for 2008-2010 from *HolliShare Highlights.*

[14]  S&P Index values from historical price information on *Yahoo! Finance.*

[15]  For the years 1992 through 2010, the Mid-Cap Stock Index reflects annual changes in the year-end value of the S&P Mid-Cap 400 Index, as obtained from *Yahoo! Finance.*  For the years 1977 through 1991, the information provided is set forth in the February 17, 1999 letter described in n.13.   The comparative information pertaining to Mid-Cap securities utilized in that letter was obtained from the University of Chicago, Center for Research in Security Price, as reprinted in John F. Merrill, *Outperforming the Market* (McGraw Hill 1998).

[16]  For the years 1992 through 2010, the Small Cap Stock Index reflects annual changes in the year-end value of the S&P Small Cap 600 Index, obtained from *Yahoo! Finance.*  For the years 1977 through 1991, the information provided is set forth in the February 17, 1999 letter described above in n.13.

-31-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| Year | JDS Common Shares | S&P 500 Index | Mid-Cap Index | Small Cap Index |
|---|---|---|---|---|
| 1999 | 16.75% | 19.53% | 13.35% | 11.63% |
| 1998 | 25.41% | 26.67% | 17.68% | (2.10)% |
| 1997 | 16.41% | 31.01% | 30.44% | 24.53% |
| 1996 | 21.99% | 20.26% | 17.32% | 20.13% |
| 1995 | 22.25% | 34.11% | 28.56% | 34.46% |
| 1994 | 20.96% | (1.54)% | (5.54)% | 3.11% |
| 1993 | 17.60% | 7.06% | 11.72% | 20.98% |
| 1992 | 15.18% | 4.46% | 10.28% | 23.35% |
| 1991 | 13.31% | 26.31% | 44.30% | 44.63% |
| 1990 | 17.37% | (6.56)% | (12.90)% | (21.56)% |
| 1989 | 9.67% | 27.25% | 23.10% | 10.18% |
| 1988 | 41.34% | 12.40% | 13.30% | 22.87% |
| 1987 | 48.67% | 2.03% | (1.50)% | (9.30)% |
| 1986 | 39.15% | 14.62% | 13.30% | 6.85% |
| 1985 | 33.18% | 26.33% | 31.80% | 24.66% |
| 1984 | 29.36% | 1.40% | (1.20)% | (6.67)% |
| 1983 | 33.18% | 17.27% | 28.70% | 39.67% |
| 1982 | 59.80% | 14.76% | 26.00% | 28.01% |
| 1981 | 56.84% | (9.73)% | 3.50% | 13.88% |
| 1980 | 26.88% | 25.77% | 31.90% | 39.88% |
| 1979 | 32.78% | 12.31% | 37.10% | 43.46% |
| 1978 | 46.36% | 1.06% | 12.50% | 23.46% |
| 1977 | 57.83% | (11.50)% | 7.50% | 25.38% |

```
Mean 1977-2010:    26.79%    8.88%    14.09%    15.24%
Median 1977-2010:  22.12%   12.35%   13.32%    20.56%
Mean 1989-2010:    18.43%    8.88%    12.55%    12.09%
Median 1989-2010:  17.63%   10.89%   14.25%    12.85%
```

For the years 1977 through 2010, the mean of the above percentages was 26.79% for JDS common shares, as contrasted with (a) 8.88% for the S&P 500 Index, (b) 14.09% for the Mid-Cap Index, and (c) 15.24% for the Small Cap Index. Because the mean can be affected by unusually large or small values, the medians of the figures reflected in the above chart were also considered by the Court. During the entire 34 year period covered by the chart, the medians were 22.12% for JDS common shares, 12.35% for the S&P 500, 13.32% for the Mid-Cap Index, and 20.56% for the Small Cap Index.

The court has also evaluated the figures by ignoring the extraordinarily high returns on JDS shares for the years prior to 1989. If only the period from 1989 to

-32-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

2010 is considered, JDS common shares still outperformed the stock indexes, as follows: (a) JDS common shares, mean of 18.43% and median of 17.63%; (b) S&P 500 index, mean of 8.88% and median of 10.89%; (c) Mid-Cap Index, mean of 12.55% and median of 14.25%; and (d) Small Cap Index, mean of 12.09% and median of 12.85%.

The increase in the book value of JDS common shares has always been the primary factor contributing to the steady increases in the account balances of HolliShare's participants, and, ultimately, the vested benefits that they received. Dozens of former HolliShare participants have expressed to HolliShare Trustees over the years their unbridled appreciation of the amount of the distributions they have received from HolliShare after they retired. Based on its annual monitoring of HolliShare, each year, the Hollister Board concluded that HolliShare was a properly-functioning, stable plan that provided significant benefits to its participants and beneficiaries.

### L.    The Plaintiffs Have Prospered In Their HolliShare Accounts

The account balances of plaintiffs' HolliShare accounts have increased as reflected by the tables set forth below.[17]  Even a cursory review of the data shows the extraordinary benefits received by HolliShare participants, including the plaintiffs.  For example, for each of the last 10 years of her Hollister employment, Ellis's HolliShare account increased annually by more than $100,000 – an amount which exceeded her total compensation (*i.e.,* salary and cash bonus).

//
//
//
//

---

[17]  DX 755 shows the growth of these account balances in greater detail.

-33-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 1. Kathleen Ellis[18]

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1978 | $0.00 | $2,427.08 | 10% | $242.71 |
| 1979 | $2,427.08 | $5,395.09 | 20% | $1,079.02 |
| 1980 | $5,395.09 | $9,090.03 | 30% | $2,727.01 |
| 1981 | $9,090.03 | $17,604.06 | 40% | $7,041.62 |
| 1982 | $17,604.06 | $31,580.35 | 50% | $15,790.18 |
| 1983 | $31,580.35 | $45,332.69 | 60% | $27,199.61 |
| 1984 | $45,332.69 | $61,198.08 | 70% | $42,838.66 |
| 1985 | $61,198.08 | $86,594.21 | 80% | $69,275.37 |
| 1986 | $86,594.21 | $123,738.22 | 90% | $111,364.40 |
| 1987 | $123,738.22 | $173,574.56 | 100% | $173,574.56 |
| 1988 | $173,574.56 | $243,852.62 | 100% | $243,852.62 |
| 1989 | $243,852.62 | $313,615.09 | 100% | $313,615.09 |
| 1990 | $313,615.09 | $366,869.09 | 100% | $366,869.09 |
| 1991 | $366,869.09 | $421,403.18 | 100% | $421,403.18 |
| 1992 | $421,403.18 | $489,920.43 | 100% | $489,920.43 |
| 1993 | $489,920.43 | $568,112.94 | 100% | $568,112.94 |
| 1994 | $568,112.94 | $685,579.46 | 100% | $685,579.46 |
| 1995 | $685,579.46 | $836,078.20 | 100% | $836,078.20 |
| 1996 | $836,078.20 | $1,020,811.20 | 100% | $1,020,811.20 |
| 1997 | $1,020,811.20 | $1,194,450.60 | 100% | $1,194,450.60 |
| 1998 | $1,194,450.60 | $1,488,210.76 | 100% | $1,488,210.76 |
| 1999 | $1,488,210.76 | $1,733,612.36 | 100% | $1,733,612.36 |
| 2000 | $1,733,612.36 | $1,869,554.37 | 100% | $1,869,554.37 |
| 2001 | $1,869,554.37 | $2,139,548.57 | 100% | $2,139,548.57 |
| 2002 | $2,139,548.57 | $2,399,504.88 | 100% | $2,399,504.88 |
| 2003 | $2,399,504.88 | $2,760,623.09 | 100% | $2,760,632.09 |
| 2004 | $2,760,632.09 | | | |
| **Final Vested Balance** | | $2,760,632.09 | | |

### 2. Judy Seay

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1980 | $0.00 | $957.21 | 10% | $95.72 |
| 1981 | $957.21 | $3,772.62 | 20% | $754.52 |
| 1982 | $3,772.62 | $8,645.82 | 30% | $2,593.75 |
| 1983 | $8,645.82 | $14,218.14 | 40% | $5,687.26 |
| 1984 | $14,218.14 | $21,367.06 | 50% | $10,683.53 |
| 1985 | $21,367.06 | $32,640.25 | 60% | $19,584.15 |
| 1986 | $32,640.25 | $48,700.38 | 70% | $34,090.27 |

_____

[18] Ellis's balance is calculated without the consideration of the impact of the DeFazio QDROs.

-34-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1987 | $48,700.38 | $70,461.17 | 80% | $56,368.94 |
| 1988 | $70,461.17 | $101,263.31 | 90% | $91,136.98 |
| 1989 | $101,263.31 | $134,721.26 | 100% | $134,721.26 |
| 1990 | $134,721.26 | $160,449.76 | 100% | $160,449.76 |
| 1991 | $160,449.76 | $186,953.12 | 100% | $186,953.12 |
| 1992 | $186,953.12 | $220,369.29 | 100% | $220,369.29 |
| 1993 | $220,369.29 | $259,786.58 | 100% | $259,786.58 |
| 1994 | $259,786.58 | $318,272.17 | 100% | $318,272.17 |
| 1995 | $318,272.17 | $390,760.25 | 100% | $390,760.25 |
| 1996 | $390,760.25 | $480,599.60 | 100% | $480,599.60 |
| 1997 | $480,599.60 | $566,343.14 | 100% | $566,343.14 |
| 1998 | $566,343.14 | $710,465.43 | 100% | $710,465.43 |
| 1999 | $710,465.43 | | | |
| **Final Payout of Vested Balance** | $710,465.43 | | | |

### 3.  Nancy Stanton

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1989 | $0.00 | $3,320.53 | 25% | $830.13 |
| 1990 | $3,320.53 | $7,375.90 | 40% | $2,950.36 |
| 1991 | $7,375.90 | $11,668.96 | 55% | $6,417.93 |
| 1992 | $11,668.96 | $17,209.18 | 70% | $12,046.43 |
| 1993 | $17,209.18 | $24,029.93 | 85% | $20,425.44 |
| 1994 | $24,029.93 | $32,597.21 | 100% | $32,597.21 |
| 1995 | $32,597.21 | $43,735.36 | 100% | $43,735.36 |
| 1996 | $43,735.36 | $57,327.85 | 100% | $57,327.85 |
| 1997 | $57,327.85 | $72,378.19 | 100% | $72,378.19 |
| 1998 | $72,378.19 | $96,419.37 | 100% | $96,419.37 |
| 1999 | $96,419.37 | $118,144.46 | 100% | $118,144.46 |
| 2000 | $118,144.46 | $132,197.10 | 100% | $132,197.10 |
| 2001 | $132,197.10 | $157,489.61 | 100% | $157,489.61 |
| 2002 | $157,489.61 | | | |
| **Final Payout of Vested Balance** | $157,489.61 | | | |

### 4.  Sonia Pace

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1990 | $0.00 | $1,620.75 | 25% | $405.19 |
| 1991 | $1,620.75 | $5,037.71 | 40% | $2,015.08 |
| 1992 | $5,037.71 | $9,511.79 | 55% | $5,231.48 |
| 1993 | $9,511.79 | $15,056.00 | 70% | $10,539.20 |

-35-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1994 | $15,056.00 | $21,539.07 | 85% | $18,308.21 |
| 1995 | $21,539.07 | $29,928.74 | 100% | $29,928.74 |
| 1996 | $29,928.74 | $40,853.17 | 100% | $40,853.17 |
| 1997 | $40,583.17 | $53,293.65 | 100% | $53,293.65 |
| 1998 | $53,293.65 | $71,885.94 | 100% | $71,885.94 |
| 1999 | $71,885.94 | $88,718.51 | 100% | $88,718.51 |
| 2000 | $88,718.51 | $100,994.01 | 100% | $100,994.01 |
| 2001 | $100,994.01 | $121,474.25 | 100% | $121,474.25 |
| 2002 | $121,474.25 | $154,830.26 | 100% | $154,830.26 |
| 2003 | $154,830.26 | | | |
| **Final Payout of Vested Balance** | | $154,830.26 | | |

### 5.    Theresa Beetham

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1994 | $0.00 | $3,009.97 | 25% | $752.49 |
| 1995 | $3,009.97 | $9,309.80 | 40% | $3,723.92 |
| 1996 | $3,309.80 | $14,702.22 | 55% | $8,086.22 |
| 1997 | $14,702.22 | $22,560.60 | 70% | $15,792.42 |
| 1998 | $22,560.60 | $33,363.45 | 85% | $28,358.93 |
| 1999 | $33,363.45 | $43,385.41 | 100% | $43,385.41 |
| 2000 | $43,385.41 | $52,146.91 | 100% | $52,146.91 |
| 2001 | $52,146.91 | $64,866.53 | 100% | $64,866.53 |
| 2002 | $64,866.53 | $85,417.28 | 100% | $85,417.28 |
| 2003 | $85,417.28 | $113,416.84 | 100% | $113,416.84 |
| 2004 | $113,416.84 | $145,556.85 | 100% | $145,556.85 |
| 2005 | $145,556.85 | $172,408.95 | 100% | $172,408.95 |
| 2006 | $172,408.95 | | | |
| **Final Payout of Vested Balance** | | $172,408.95 | | |

### 6.    Delane Humphries

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1988 | $0.00 | $3,077.42 | 25% | $769.36 |
| 1989 | $3,077.42 | $7,390.65 | 40% | $2,956.26 |
| 1990 | $7,390.65 | $11,876.83 | 55% | $6,532.26 |
| 1991 | $11,876.83 | $17,689.44 | 70% | $12,382.61 |
| 1992 | $17,689.44 | $25,481.72 | 85% | $21,659.46 |
| 1993 | $25,481.72 | $35,195.32 | 100% | $35,195.32 |
| 1994 | $35,195.32 | $47,396.71 | 100% | $47,396.71 |
| 1995 | $47,396.71 | $63,274.88 | 100% | $63,274.88 |

-36-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1996 | $63,274.88 | $81,849.67 | 100% | $81,849.67 |
| 1997 | $81,849.67 | $101,143.69 | 100% | $101,143.69 |
| 1998 | $101,143.69 | | | |
| **Final Payout of Vested Balance** | | $101,143.69 | | |

### 7.    Cynthia Wirth

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1998 | $0.00 | $3,577.97 | 25% | $894.49 |
| 1999 | $3,577.97 | $9,076.06 | 40% | $3,630.42 |
| 2000 | $9,076.06 | $15,827.41 | 55% | $8,705.08 |
| 2001 | $15,827.41 | $23,235.20 | 70% | $16,264.64 |
| 2002 | $23,235.20 | $33,790.36 | 85% | $28,721.81 |
| 2003 | $33,790.36 | $49,373.92 | 100% | $49,373.92 |
| 2004 | $49,373.92 | $66,913.61 | 100% | $66,913.61 |
| 2005 | $66,913.61 | $82,410.73 | 100% | $82,410.73 |
| 2006 | $82,410.73 | | | |
| **Final Payout of Vested Balance** | | $82,410.73 | | |

### 8.    Brenda DiMaro

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1994 | $0.00 | $3,303.54 | 25% | $825.89 |
| 1995 | $3,303.54 | $7,883.46 | 40% | $3,153.38 |
| 1996 | $7,883.46 | $13,298.42 | 55% | $7,314.13 |
| 1997 | $13,298.42 | $19,577.05 | 70% | $13,703.94 |
| 1998 | $19,577.05 | $28,389.92 | 85% | $24,131.43 |
| 1999 | $28,389.92 | | | |
| **Final Payout of Vested Balance** | | $28,389.92 | | |

### 9.    Hallie Lavick

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1997 | $ 0.00 | $ 5,226.71 | 25% | $1,306.68 |
| 1998 | $ 5,226.71 | $10,696.74 | 40% | $4,278.78 |
| 1999 | $10,696.74 | $17,173.06 | 55% | $9,445.18 |
| 2000 | $17,173.06 | | | |
| **Final Payout of Vested Balance** | | $9,445.18 | | **Note: 55% vested at termination** |

-37-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 10.   Michael McNair

| Year | Value of Account at Beginning of Year | Value of Account at End of Year | Vested Percent | Vested Balance |
|---|---|---|---|---|
| 1999 | $0.00 | $2,652.83 | 25% | $663.21 |
| 2000 | $2,652.83 | $8,532.68 | 40% | $3,413.07 |
| 2001 | $8,532.68 | $4,692.97 | 55% | |
| **Final Payout of Vested Balance** | | $4,692.97 | | **Note: 55% vested at termination** |

The foregoing tables reveal that unlike millions of other Americans who participate in thousands of different forms of retirement accounts, no Hollister participant, including each of the plaintiffs, has ever experienced a decline in the value of his or her account from one year to the next.   The stability and certainty provided by HolliShare to its participants is attributable to the book value methodology, which pegs changes in the value of HolliShare's participant accounts only to Hollister's financial performance, rather than to the volatile vagaries and vicissitudes of the stock market.

### M.   The Orders Entered In The Ellis/DeFazio Divorce Proceedings

#### 1.   Background

The genesis of the controversy involving DeFazio and Ellis, and the Superior Court Orders which Hollister accepted as QDROs under ERISA, is traceable to the DeFazio and Ellis divorce proceeding.  On March 1, 1999, the Sacramento Superior Court entered a judgment dissolving DeFazio's marriage to Ellis, but retained jurisdiction over certain reserved issues. (DX 718; Dkt. 522, ¶2.)  Under that judgment, DeFazio's community property share of Ellis's HolliShare account was to be determined by the Superior Court and was to be frozen as security for the payment of DeFazio's future child support obligations. (Dkt. 522, ¶3.)

Thereafter, Ellis filed three citations on three separate occasions, totaling sixty-six separate counts of contempt wherein she asked the Superior Court to find DeFazio in contempt for his failures to comply with his payment obligations under

-38-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

the March 1, 1999 judgment.  (DX 719; Dkt. 522, ¶5.)  Specifically, DeFazio had failed to pay for: (a) child support; (b) his children's private schooling; (c) child care; (d) his children's health-care costs; and (e) a health club membership.  (Dkt. 522, ¶6.)

Through his attorney, DeFazio brokered an agreement under which he pled guilty to 20 counts of contempt *in lieu* of a possible sentence of 330 days in the Sacramento County jail.  (Dkt. 522, ¶10.)  At a hearing held on August 26, 1999, pursuant to his agreement, DeFazio was placed on probation for two years, and the remaining 46 contempt charges were withdrawn.  (Dkt. 522, ¶¶10-11.)  In exchange for Ellis's and the court's leniency, DeFazio agreed that a qualified domestic relations order ("QDRO") could be used that would permit the balance of DeFazio's pending arrearages to be paid from Ellis's HolliShare account, with the amounts being offset against a later distribution to DeFazio of a portion of Ellis's HolliShare account.  (Dkt. 522, ¶¶9-10, 12; Dkt. 559, pp. 65-66.) [19]

Pursuant to DeFazio's continuing commitment to agree to the entry of QDROs, DeFazio and Ellis also stipulated on February 18, 2000 to the entry in the Superior Court of a QDRO providing for a "Temporary Division" of DeFazio's share of Ellis's HolliShare account.  (Dkt. 522, ¶12.)  This QDRO, yet again, bailed DeFazio out of potential exposure for contempt; it authorized the payment of $45,000.00 to Ellis for past child support arrearages and pre-paid DeFazio's ongoing child and other support obligations from his share of Ellis's HolliShare account.  (Dkt. 522, ¶12.)  The Superior Court directed that DeFazio's ultimate share of Ellis's HolliShare account was "to be determined by the Court in a final QDRO."  (Dkt. 522, ¶13.)

---

[19]  As Plan Administrator, on advice of counsel, Hollister determined that all Domestic Relations Orders ("DROs") at issue were QDROS as defined in 29 U.S.C. § 1056(d)(3) ("ERISA § 206(d)(3)").

-39-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**2.      The Judgment On Reserved Issues Entered On July 27, 2000**

On July 27, 2000, the Superior Court entered a judgment on the issues reserved in the March 1, 1999 judgment of dissolution.  (Dkt. 522, ¶14.)  In that judgment, the court ordered that QDROs were to be entered which: (a) permanently awarded DeFazio "one-half of the community interest in Wife's [Ellis's] retirement acquired through her employment known as HolliShare"; (b) assisted DeFazio in paying child support arrearages; and (c) provided that "Husband's [DeFazio's] share will be set up in a separate account, and that the QDRO will reserve to each party the ability to elect the timing and form of the distribution of their respective portions of the retirement benefits."  (Dkt. 522, ¶15.)

**3.      The Entry Of The "Temporary QDROs"**

Thereafter, QDROs similar to the QDRO entered on February 18, 2000 were also entered.  These QDROs also periodically allowed DeFazio to pay child support arrearages by adjustments to his future share of Ellis's HolliShare account.  Such payments were authorized by QDROs entered on December 26, 2000 ($62,500.00) and June 1, 2001 ($47,878.80).  (DX 722, 724; Dkt. 522, ¶¶19-20) ("Temporary QDROs").

**4.      A Permanent QDRO Was Entered On March 29, 2002 And DeFazio's HolliShare Alternate Payee Account Was Created.**

On March 29, 2002, a "permanent" QDRO was entered, again with the consent of both DeFazio and Ellis.  That order explicitly provided that it was, in fact, a QDRO.  (Dkt. 522, ¶21.)  The March 29, 2002 QDRO awarded DeFazio 50% of Ellis's HolliShare account ("DeFazio's Share"), less sums that had been previously distributed through the entry of Temporary QDROs to allow DeFazio to pay child support and other divorce judgment obligations.  (Dkt. 522, ¶22.)  The Superior Court also directed that DeFazio's share of Ellis's HolliShare account be placed in a HolliShare account for DeFazio's benefit as an alternate payee.  (Dkt. 522, ¶23; Dkt.

-40-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

559, pp. 64-65.)  The Superior Court retained jurisdiction over DeFazio's share of Ellis's HolliShare account, and its March 29, 2002 order required Hollister, as HolliShare's Plan Administrator, to retain up to $1,500,000.00 of DeFazio's share of Ellis's HolliShare account pending the parties' resolution of child support and property settlement issues.  (Dkt. 522, ¶24.)

Pursuant to the March 29, 2002 QDRO, Hollister informed DeFazio and Ellis that it would transfer $905,798.56 from Ellis's HolliShare account to establish the DeFazio's "alternate payee" account.  A computational mistake in the March 29, 2002 QDRO was corrected by the entry of an Order dated December 18, 2002, and as a result, the principal balance of DeFazio's "alternate payee" account was adjusted to $841,707.34.

**5.      Thereafter, Numerous Supplemental QDROs Were Entered As A Result Of DeFazio's Repeated Defaults On His Obligations To Ellis.**

Thereafter, the Superior Court entered Supplemental QDROs based on the March 29, 2002 QDRO.  (Dkt. 522, ¶¶29-34, 41-43.)  These Supplemental QDROs directed Hollister to pay funds from DeFazio's alternate payee account directly to Ellis, principally to rectify DeFazio's continuing defaults in the payment of his child support obligations.  (Dkt. 559, pp. 66-67.)  Supplemental QDROs were entered on August 5, 2002 and April 2, 2003.  (Dkt. 559, pp. 66-67.)

**6.      DeFazio's Initial Objection To The Use Of QDROs To Rectify His Defaults And His Institution Of Litigation In This Court**

On May 4, 2004, the Superior Court approved yet another Supplemental QDRO which directed that yet another distribution be made directly to Ellis from DeFazio's alternate payee account for outstanding child support. (DX 732; Dkt. 522, ¶38.)

On May 13, 2004, DeFazio (proceeding *pro per*) filed an action in this court (Case No. Civ.S-04-0934) in which he alleged that the Superior Court's May 4, 2004

-41-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

order violated I.R.C. § 414 (26 U.S.C. § 414). DeFazio asked this court "to stop the distribution of the $24,407.44 as directed by the order dated May 4, 2004." (Dkt. 522, ¶39.)

Hollister responded to DeFazio's initial federal court complaint by filing a motion to dismiss.[20] Hollister also filed an interpleader complaint in the Superior Court. (Dkt. 522, ¶40.) In response to Hollister's Superior Court interpleader, DeFazio provided the Superior Court with the Declaration of James Crawford ("Crawford"), an attorney who concentrates on ERISA matters. In his Declaration, Crawford set forth his legal opinion regarding the putative illegalities of the previously entered QDROs based on their non-compliance with various requirements of ERISA. (DX 735; Dkt. 522, ¶42.) After reviewing Crawford's Declaration – wherein he asserted that the Superior Court QDROs had the very same defects under ERISA that are now alleged by DeFazio and Ellis – on June 30, 2004, the Superior Court overruled DeFazio's objections and approved the issuance of yet another QDRO. (Dkt. 522, ¶¶41-42.)

Shortly thereafter, on or about July 15, 2004, DeFazio voluntarily dismissed his prior federal court action, and filed his initial complaint in this action. (*See* Dkt. 1.)

**7.   DeFazio Uses Yet Another QDRO, During The Pendency Of This Action, To Avoid Yet Another Finding Of Contempt**

Despite his challenges to the validity of the QDROs previously entered by the Superior Court and accepted by Hollister as QDROs, in October 2005, DeFazio was again in default with respect to the payment of his child support obligations. On October 11, 2005, the Superior Court entered an Order to Show Cause why DeFazio should not (again) be held in contempt. (DX 740; Dkt. 522, ¶48.)

On November 9, 2005, a Stipulation and Order was signed by Ellis, DeFazio,

---

[20]  (Dkt. 5, Case No. Civ.S-04-0934 LKK PAM (now titled S-04-0934-LKK-GGH).)

-42-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

and Ellis's attorney, and entered by the Superior Court. (DX 741-742; Dkt. 522, ¶¶49-50, Ex. S.) That Order was submitted to Hollister and Hollister determined that it was a QDRO. (DX 741-742; Dkt. 522, ¶50.) As a result, the contempt charges against DeFazio were dropped. (Dkt. 522, ¶50.)

### 8. The December 13, 2007 QDRO, Hollister's January 2008 Motion, And The April 23, 2008 Order

On December 13, 2007, yet another order was entered by the Superior Court which provided for a disbursement from DeFazio's HolliShare alternate payee account directly to Ellis in order to satisfy DeFazio's obligations to Ellis. (DX 743; Dkt. 522, ¶51.) After having been accused for over three years of violating ERISA by complying with the Superior Court's Orders, Hollister retained Nancy Perkovich, a certified specialist in Family Law, to represent its interests in the divorce case. Through Ms. Perkovich, Hollister filed on January 18, 2008 a motion in the Superior Court seeking *vacatur* of the December 13, 2007 order. (Dkt. 522, ¶52; DX 744, the "January 2008 Motion".) In addition, because the March 29, 2002 QDRO precluded Hollister from disbursing any amount from DeFazio's alternate payee account that would reduce the account balance below $1,500,000, Hollister also sought authorization to distribute the balance of the funds in the DeFazio alternate payee account to DeFazio. Through the January 2008 Motion, Hollister sought to eliminate the anomalous situation in which it was required to determine whether Superior Court orders, entered with the stipulation and consent of DeFazio and Ellis, were QDROs, but then, after determining that that were, being accused of ERISA violations by DeFazio and Ellis even though they had previously agreed they were valid QDROs in the Superior Court. (Dkt. 522, ¶52; DX 744.)

Hollister's January 2008 Motion was heard on April 1, 2008 before Judge Peter McBrien. (Dkt. 522, ¶53.) At the hearing, Ellis and DeFazio stipulated to the *vacatur* of the December 13, 2007 order, but objected to the entry of an order

-43-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

distributing the balance of DeFazio's alternate payee account to him. (Dkt. 522, ¶54.) Judge McBrien nevertheless granted that part of Hollister's January 2008 Motion seeking authorization to distribute to DeFazio the funds in his HolliShare alternate payee account. (DX 745; Dkt. 522, ¶54.) In so ruling, Judge McBrien stated that he was "disgusted" by Ellis's and DeFazio's practice of obtaining orders from the Superior Court to pay DeFazio's obligations to Ellis, and then utilizing those very same orders as the basis for the ERISA claims they have, for the last several years, been pursuing against Hollister in this consolidated action. (Dkt. 522, ¶54.)

### 9.    The Distribution Of DeFazio's HolliShare Alternate Payee Account Balance

Judge McBrien's rulings were memorialized in his Findings and Order dated April 23, 2008. (DX 745.) Hollister approved the April 23, 2008 order as a QDRO, and notified Ellis and DeFazio of its determination. (Dkt. 522, ¶58.) In December 2008, DeFazio notified Hollister that he had reached a tentative agreement with Ellis's counsel concerning a "trustee to trustee" transfer of the funds in his HolliShare alternate payee account. (Dkt. 522, ¶57.) DeFazio thereafter provided Hollister with a request for a direct rollover of his Hollister alternate payee account balance into a traditional IRA account. (Dkt. 522, ¶57.) After Hollister notified Ellis's counsel of DeFazio's request and received no objection, Hollister honored DeFazio's request with the *caveat* that DeFazio was, as required by the April 23, 2008 order, to subject the funds distributed to him to a lien to secure his remaining obligations to Ellis. (DX 746, 750; Dkt. 522, ¶58.)

//

//

//

-44-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

## II.   Conclusions of Law

### A.   Jurisdiction And Parties

Plaintiffs in this matter allege defendants violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA", 29 U.S.C. § 1001 *et seq.*).   Defendants have challenged the court's jurisdiction over this action on the basis that plaintiffs lack statutory standing to sue, in that they are not "participants".   *See* 29 U.S.C. §§ 1002(7), 1132(a)(2) ("ERISA § 3(7)" and "ERISA § 502(a)(2)").   If this court has subject matter jurisdiction under 28 U.S.C. § 1331, venue is proper in that certain plaintiffs reside in this District.

### B.   Overview Of Plaintiffs' Claims

In this action, plaintiffs have asserted a *potpourri* of claims under ERISA.[21] The epicenter of plaintiffs' claims is that defendants improperly undervalued HolliShare's holdings of JDS common shares by using the per share book value of JDS common shares to calculate (a) the per share price to be paid by JDS to HolliShare in HolliShare's annual sales to JDS of JDS common shares to fund the vested benefit payments of HolliShare, and (b) the amount of the vested benefits to be paid to participants individually upon termination of their employment at Hollister.   Using the book value evaluation as their springboard, plaintiffs have charged defendants, primarily, with four inter-related core violations of ERISA: (1) the "prohibited transaction" provisions of 29 U.S.C. § 1106(a) ("ERISA § 406(a)");[22] (2) the "prohibited transaction" provisions of 29 U.S.C. § 1106(b) ("ERISA §

---

[21]   The trial had before this court involved the allegations made in the Fifth Amended Complaint ("HAC") in which all plaintiffs joined except Ellis. (Dkt. 368.) Ellis's most recently filed complaint is her Fourth Amended Complaint ("FAC"). (Dkt. 314.) Collectively, the HAC and the FAC embody twenty-four different counts, all of which are brought under ERISA.

[22]   (Dkt. 368, HAC, Count XI-XII; Dkt. 314, FAC, Count X.)

-45-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

406(b)");[23] (3) the statutory duty of an ERISA plan fiduciary under 29 U.S.C. § 1104(a)(1)(B) ("ERISA § 404(a)(1)(B)") to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man would act with, etc.;[24] and (4) the statutory duty of an ERISA plan fiduciary under 29 U.S.C. § 1104(a)(1)(A) ("ERISA § 404(a)(1)(A)") to act for the exclusive purpose of providing benefits to the plan participants and their beneficiaries.[25]

Numerous other ERISA violations are also alleged. These other violations are essentially based upon the same operative facts as the foregoing primary claims, together with the Mid-1980s Agreement and certain other isolated actions by the defendants. While some of the claims in the HAC and the FAC are duplicative, many are not. In addition, many of the counts in each of the two amended complaints are brought against different defendants. As a result, on October 23, 2009, the court directed plaintiffs' counsel to submit a "Supplemental Pre-Trial Statement" ("SPTS") which identified each of the counts being asserted, their statutory or common law basis, their requisite elements of proof, and the defendants against whom each count was being asserted.

Plaintiffs' claims will be discussed in turn.[26]

//
//
//
//
//

_____

[23] Plaintiffs made no mention of this count in either the HAC or FAC, but they did list it in their Supplemental Pretrial Statement on p. 13.

[24] (Dkt. 368, HAC, Count III; Dkt. 314, FAC, Count III.)

[25] (Dkt. 368, HAC, Count II; Dkt. 314, FAC, Count II.)

[26] Plaintiffs Ellis and DeFazio have also asserted similar claims, personal to them, based upon the actions of certain defendants in approving, as QDROs under ERISA, various DROs issued by the Sacramento Superior Court. These claims are separately addressed *infra*.

-46-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**C.** **This Court Lacks Subject Matter Jurisdiction Over This Action Because Plaintiffs Are Not Plan Participants And Thus Lack Standing Under ERISA.**

The "civil enforcement" provisions of ERISA restrict the persons who may bring suit for alleged ERISA violations, and specify the types of suits that may be brought. 29 U.S.C. § 1132 ("ERISA § 502") specifies, in pertinent part, that:

A civil action may be brought -

(1)    by a *participant or beneficiary* -

    (A)    for the relief provided for in subsection (c) of this section, or

    (B)    to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2)    by the Secretary, or by a *participant, beneficiary* or fiduciary for appropriate relief under section 1109 of this title;[27]

(3)    by a *participant, beneficiary,* or fiduciary

    (A)    to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or

    (B)    to obtain other appropriate equitable relief

        (i)    to redress such violations or

        (ii)    to enforce any provisions of this subchapter or the terms of the plan; ... [emphasis added].

Thus, by its terms, ERISA standing is limited to participants, beneficiaries, and fiduciaries. Plaintiffs are not fiduciaries, so that term does not apply. "Participant" and "beneficiary" are defined terms. Under 29 U.S.C. § 1002(7) ("ERISA § 3(7)"):

The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

---

27   29 U.S.C. § 1109 ("ERISA § 409") renders fiduciaries personally liable for breaches of their fiduciary responsibilities imposed by ERISA. No claims under ERISA § 409 are alleged anywhere in the HAC or the FAC, in the Final Pre-Trial Order, or in the SPTS.

-47-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

29 U.S.C. § 1002(8) ("ERISA § 3(8)") defines "beneficiary" as:

> [A] person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

As the Ninth Circuit noted in *Simon v. Value Behavioral Health, Inc.*, "[t]he Supreme Court has construed Section 502 narrowly to permit only the parties enumerated therein to sue directly for relief." 208 F.3d 1023, 1081 (9th Cir. 2000) (*citing Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983)), *amended by* 234 F.3d 428 (9th Cir. 2000).  Here, no plaintiff claims that he or she is a HolliShare "fiduciary" and no plaintiff other than DeFazio could or does claim to be a "beneficiary".  Thus, the standing of the plaintiffs other than DeFazio to sue under ERISA depends solely upon whether they may properly be deemed to be Plan "participants".[28]  For the reasons that follow, the court concludes that none of the plaintiffs are "participants" under ERISA, and therefore lack standing to bring this action.

As noted in the court's November 1, 2007 Order (the "November Order"), the Ninth Circuit has held that retirees, who have been paid their full account balances in lump-sum payments, as have the plaintiffs here, are no longer "participants" and lack standing to sue for damages.  *DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670, at *3 (E.D. Cal. Nov. 1, 2007) (*citing Kuntz v. Reese*, 758 F.2d 1410, 1411 (9th Cir. 1986)).  The court then pointed out that a subsequent Ninth Circuit decision carved out an exception to the *Kuntz* rule when allegations are made that plan fiduciaries have personally profited through the misuse of Plan assets.

---

[28] Although DeFazio may have "statutory" standing to sue under ERISA, the point is moot because this Court has held that his fiduciary breach and prohibited transaction claims are barred by the applicable statute of limitations.  *DeFazio,* 636 F. Supp. 2d at 1058; *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1092 (E.D. Cal. 2005). Moreover, the amount of his alternate payee account was not affected by the purported ERISA violations alleged by the other plaintiffs.  As such, based on the principles articulated in the court's ruling pertaining to the parties' summary judgment motions, *DeFazio*, 636 F. Supp. 2d at 1072, DeFazio lacks constitutional standing under ERISA.

-48-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*DeFazio,* 2007 WL 32316770, at *3 (*citing Amalgamated Clothing v. Murdock,* 861 F.2d 1406, 1418 (9th Cir. 1988)).   The court determined in its Memorandum, Opinion, and Order of June 29, 2009 that plaintiffs had sufficiently alleged that defendants personally profited from the alleged ERISA violations and consequently denied defendants' motion to dismiss on this ground.   However, the court also found that there was no evidence "that plan fiduciaries profited from the alleged violations at the plan's expense."   *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045, 1076-77 (E.D. Cal. 2009).   As a result, the court denied plaintiffs' motion for summary judgment on this claim under ERISA § 409.

No evidence was submitted at trial that even remotely suggests any defendant personally profited from any of the alleged violations of ERISA.   The court therefore concludes that plaintiffs are not "participants" under *Kuntz* and *Amalgamated Clothing,* and thus lack standing to bring this action under ERISA.   The court therefore lacks subject matter jurisdiction over this action, and judgment is entered in favor of defendants on all counts.

Applicable decisional law strongly supports the court's conclusion.   The Supreme Court, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117 (1989), set forth the pertinent test for determining who is a "participant" under ERISA. Under the *Firestone* test, participants include only: (1) employees in, or reasonably expected to be in, currently covered employment; (2) former employees who have a reasonable expectation of returning to covered employment; or (3) former employees who have a colorable claim to vested benefits.   *Id.*

The evidence at trial established that no plaintiff is in currently covered employment (*i.e.,* currently employed by Hollister).   Also, no plaintiff has any reasonable expectation of returning to his or her Hollister employment.   Thus, plaintiffs are only "participants" under the *Firestone* test if they have a colorable claim for a vested benefit.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

To qualify as a person who has a colorable claim for a vested benefit, the *Firestone* Court determined that a claimant must (1) have a colorable claim upon which he or she will prevail in a suit for vested benefits, or (2) satisfy eligibility requirements which will be fulfilled in the future. *Id.* at 117-18. Here, the evidence demonstrated that no plaintiff will fulfill their eligibility requirements in the future. Thus, the key issue in this analysis is whether plaintiffs have a colorable claim upon which each of them will prevail in this action for a vested benefit.

The court concludes that plaintiffs do not have any colorable claim for any vested benefit for two principal reasons. First, the evidence demonstrated that all plaintiffs have received every single vested benefit to which they were entitled to under the Plan. Second, for the reasons detailed *infra*, plaintiffs are not entitled to the difference between the book value and the fair market value of the JDS common shares because none exists.

Plaintiffs would not be entitled to the difference between the fair market value and book value of the JDS common shares even if such a difference existed because that amount would not be a *vested* benefit. As stated in *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 575 (3d Cir. 2006):

> Where the plan provides that an employee is irrevocably entitled to a certain benefit, and where all the conditions precedent to the employee's receipt of that benefit have been satisfied, "that benefit is said to have accrued (or 'vested' or 'ripened') and cannot be taken away by plan amendment or termination." ABA Section of Labor & Employment Law, *Employee Benefits Law* 1052 (2d ed. 2000).

*See also Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1162 (10th Cir. 2004) (plaintiffs held to have no claim for vested benefits "as they do not claim that they are entitled to benefits under the terms of their plan *as it existed at the time of their retirement*" (emphasis added)); *Becker v. Mack Trucks, Inc.*, 281 F.3d 372, 378-79 (3d Cir. 2002) ("contingent benefits do not establish a colorable claim to vested benefits under the *Firestone* standard"); *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 612 (7th Cir. 2001) (plaintiff lacked standing where he had "received the

-50-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

full benefits to which the plan documents entitled him"); *Rhee v. Witco Corp.*, 762 F. Supp. 211, 214 (N.D. Ill. 1991) (defining "vested" benefits as those that are fixed, accrued, settled, and absolute).

Plaintiffs received all vested benefits to which they were entitled under HolliShare. The additional benefits plaintiffs claim might have accrued but for the alleged improper valuation are not vested but are purely speculative. They are not benefits to which they are entitled under the terms of the Plan, and therefore they are not vested benefits under ERISA. *Yancy v. Am. Petrofina, Inc.*, 768 F.2d 707, 708-09 (5th Cir. 1985) (finding that "participant" encompasses only those former employees who are owed vested benefits and that alleged additional benefits that *may have* accrued were speculative and not vested benefits).

*Kuntz v. Reese*, 758 F.2d 1410 (9th Cir. 1986), remains dispositive of plaintiffs' claims. In *Kuntz*, the Ninth Circuit squarely held that:

> We are now persuaded that the Kuntz plaintiffs are not participants because, as former employees whose vested benefits under the plan have already been distributed in a lump sum, the Kuntz plaintiffs were not eligible to receive a benefit, and were not likely to become eligible to receive a benefit, at the time that they filed the suit. Because, if successful, the plaintiffs' claim would result in a damage award, not in an increase in vested benefits, they are not plan participants.

*Id.* at 1411.[29]

Here, any recovery by plaintiffs would not qualify as a vested benefit from the Plan, but instead as a simple damage award. In other words, if a judgment is

---

[29] In *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1023-25 (9th Cir. 2009) and *Harris v. Amgen, Inc.*, 573 F.3d 728, 733 (9th Cir. 2009), the Ninth Circuit held that a former employee has standing to sue as a "participant" under ERISA where it is alleged that he or she "did not receive everything that was due to him under the [defined contribution] Plan…" *Harris*, 573 F.3d at 733 (*quoting Vaughn*, 567 F.3d at 1023). Here, unlike the situation extant in *Vaughn* and *Harris*, plaintiffs received everything to which they were entitled under the HolliShare Plan as it was written. Thus, plaintiffs are not seeking amounts due *under the Plan*, but rather money damages based on their position premise that a methodology other than that specified by the Plan should have been used. As such, plaintiffs here are not seeking any vested benefits they would have received under the HolliShare Plan.

-51-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

entered in favor of plaintiffs under which they receive the incremental difference between the benefits already paid to them by HolliShare and a larger amount based upon some theoretical fair market value of JDS common shares, that judgment would merely constitute a classic, traditional money judgment, not the payment of a vested plan benefit.  If such a judgment was entered, plaintiffs would also receive nothing as a Plan participant because no plaintiff currently has a HolliShare account.

In *LaRue v. DeWolff, Boberg & Assocs., Inc. et al.*, 552 U.S. 248 (2008), the Supreme Court did not overrule either this widely-accepted tenet of ERISA law or the holding in *Kuntz*.  *LaRue* simply expanded the relief available under ERISA § 502(a)(2).  Before *LaRue,* recovery under § 502(a)(2) was limited to the plan and individual participants could not recover for their individual losses.  *See Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134 (1985).  The *LaRue* Court recognized that defined contribution plans had become more prevalent and thus expanded the relief available under § 502(a)(2), so that recovery can now be had when a participant demonstrates fiduciary misconduct that affected his or her individual account.  552 U.S. at 256; *see also Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 1060-07 (N.D. Cal. 2008).  Neither the *LaRue* Court nor the *Russell* Court addressed whether the respective plaintiffs were, in fact, participants as defined by ERISA § 3(7).  Moreover, the *LaRue* Court specifically excluded from its holding situations where, as here, plaintiffs lacked standing because they had already received all of the vested benefits to which they were contractually entitled to receive.   552 U.S. at 254 (*citing Russell*, 473 U.S. at 136-37).

Indeed, in *Kuntz,* the nexus between the money sought by plaintiffs and a vested benefit under the plan was far closer than is the case here.  There, plaintiffs claimed that the defendant-fiduciaries had misled them concerning the amount of the retirement benefits they would receive by participating in the plan at issue.

-52-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Here, plaintiffs do not and cannot allege that they were deprived of any vested benefit to which they were entitled under the terms of the HolliShare Plan since the Plan expressly mandates that HolliShare's JDS common shares are to be valued at their per share book value. Thus, unlike the plaintiffs in *Kuntz*, plaintiffs are not seeking any benefit which they were entitled to receive by virtue of their participation in the Plan.

Numerous other federal appellate courts have also held that former plan participants, who have already received all of the vested benefits promised them by ERISA plans, lacked standing to sue under ERISA. In *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100-01 (2d Cir. 2005), one of the plaintiffs was no longer covered under an ERISA governed health insurance plan when she filed suit. As a result, the *Nechis* Court held that she was no longer a plan participant, and thus lacked standing to sue under ERISA. *Accord Raymond v. Mobil Oil Co.*, 983 F.2d 1528, 1535 (10th Cir. 1993) (plaintiffs who were no longer employees of the plan sponsor and had received all the vested benefits to which they were entitled under the plan at issue, they lacked standing to pursue any claim under ERISA); *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 952 (6th Cir. 1990) (the Sixth Circuit held that the term "participant" does not include "retirees who have accepted the payment of everything due them in a lump sum, because these erstwhile participants have already received the full extent of their benefits and are no longer eligible to receive future payments" (*quoting Joseph v. New Orleans Elec. Pension & Ret. Plan*, 754 F.2d 628, 630 (5th Cir. 1985))); *Yancy v. Am. Petrofina, Inc.*, 768 F.2d 707, 708-09 (5th Cir. 1985) (former plan participant who received a lump sum payment lacked standing to bring an action under ERISA because he was no longer

-53-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

a plan participant and because the additional benefits he sought were speculative and therefore were not "vested").[30]

Numerous district court decisions reinforce the conclusion that plaintiffs lack standing because they are no longer Plan participants. The decision in *Register v. Cameron & Barkley Co.,* 481 F. Supp. 2d 471 (D.S.C. 2007), *reconsideration denied,* 481 F. Supp. 2d 479 (D.S.C. 2007), is particularly compelling. In *Register,* plaintiffs – like plaintiffs here – alleged a breach of fiduciary duty in connection with the valuation of the employer's stock held in an ERISA plan. The *Register* Court concluded that the plaintiffs were not seeking vested benefits but rather speculative damages, stating, "Even if plaintiffs can definitively prove the correct valuation of the CSI stock at the time of the spin-off, the court can only speculate as to what the value of the assets *following* the spin-off would have been but for the incorrect valuation." 481 F. Supp. 2d at 477 (emphasis in the original).

As here, plaintiffs in *Register* did not allege that their distributions had been improperly computed. Rather, they only alleged that they would have received a greater distribution if a valuation other than that specified by the Plan had been used to calculate their vested benefits. The *Register* Court determined that, "The

---

[30] *See also Sanson v. General Motors Corp.,* 966 F.2d 618, 621 (11th Cir. 1992) (plaintiff had no cognizable ERISA claim where he opted for and accepted benefits available under an ERISA early retirement plan, even though plaintiff alleged his decision was motivated by fraudulent representations that benefits under an alternative program would not be offered to employees at the facility where he worked); *Crawford v. Lamantia,* 34 F.3d 28, 32-33 (1st Cir. 1994) (even though plaintiff was an employee when he commenced the action, he was no longer a plan participant once he received a distribution of stock from an ERISA plan, and therefore had no standing to sue under ERISA); *Adamson v. Armco, Inc.,* 44 F.3d 650, 655 (8th Cir. 1995) (claimants, whose loss of participant status resulted from their own actions, do not have standing to sue under ERISA; while some courts extend standing to plaintiffs who would have received greater benefits "but for" the alleged ERISA violation, "[t]his exception only applies when the fiduciary's breach of duty has deprived the ... plaintiff of participant status. It does not apply to claimants whose loss of participant status resulted from their own actions."); *cf. Harris v. Amgen, Inc.,* 573 F.3d 728, 734-35 (9th Cir. 2009) (former employee had standing under ERISA § 502 (a)(2) but only because he was, unlike the instant plaintiffs, seeking benefits he claimed were miscalculated under the plan *as written*).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

difference between what plaintiffs' accounts *might have been worth* had the CSI stock been properly valued during the spin-off and what the accounts actually were worth at the time of distribution is not a benefit that is promised under the terms of the ESOP [plan]". *Id.* at 478 (emphasis in the original).  As a result, plaintiffs were held to lack standing to sue under ERISA.

Similarly, the plaintiff in *In re Patterson Cos. Inc. Sec. Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014 (D. Minn. 2007), was a former employee who cashed out her plan account after she filed suit.  She alleged that the plan fiduciaries should have divested the plan's holdings of employer stock when they learned that the employer was going to miss its earnings target (which resulted in a steep drop in the price of the stock).  Because plaintiff was seeking the difference between the value of the employer's stock after it dropped in price and what the plaintiff and the Plan could have earned elsewhere, the court held that she was not seeking "a readily ascertainable amount"; consequently, she was not making a claim for a "vested benefit" and therefore lacked standing under ERISA.  *Id.* at 1044; a*ccord Holtzscher v. Dynegy, Inc.*, No. Civ. A. H-05-3293, 2006 WL 626402, at *4 (S.D. Tex. Mar. 12, 2006) (plaintiffs sued for the difference between what they received for their employer stock through the plan and what the stock would have been worth but for the defendants' alleged misconduct. Characterizing plaintiffs' claims as seeking "additional, speculative sums that might have accrued but for the defendants' alleged misconduct," they were held to lack standing because their claims were claims for damages and not vested benefits); *In re RCN Litig.*, No. 04-5068, 2006 WL 753149, at *5, *15 (D.N.J. Mar. 21, 2006) (because claims based on fiduciaries' breaches of fiduciary duties are not claims for vested benefits promised under an ERISA plan, plaintiffs lack standing); *Dickerson v. Feldman*, 426 F. Supp. 2d 130, 135 (S.D.N.Y. 2006) (plaintiff, who had already accepted a final lump sum payment of all his vested benefits, lacked standing because even if the action was successful

-55-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

and benefits were paid to the plan, he could not receive any benefits because he no longer had an account); *In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002, 1026 (S.D. Ohio 2006) (plaintiffs were no longer participants in an ERISA plan; they had disguised their claims for money damages as claims for equitable relief through which they would receive a "refund" and therefore lacked standing under ERISA).

Like plaintiffs in *Register, Patterson Cos.,* and the other cited cases, the plaintiffs here seek to recover the difference between (a) the account balances they were paid by HolliShare, calculated on the basis of the book value of the JDS common shares credited to their accounts, and (b) some arbitrary amount based on a higher, speculative, hypothetical "fair market value" of those shares calculated (with different results) by their experts. As established by the foregoing decisions, plaintiffs' claims are simply not claims for "vested benefits", and they therefore lack standing to sue under ERISA.

### D.     The Claims Asserted In This Action Are Not Authorized Under ERISA.

The causes of action that may be brought by an ERISA participant are exclusively listed in ERISA § 502(a). The only provision of ERISA §502(a) upon which plaintiffs rely here is ERISA §502(a)(3),[31] which permits a participant, beneficiary or fiduciary to bring an action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

//

_____
[31] ERISA Section 502(a)(2) authorizes an action to be brought "for appropriate relief under section 1109 [ERISA §409] of this title 11." In the SPTS, plaintiffs were to identify the ERISA provisions upon which their claims are based; ERISA §409 is nowhere identified or even mentioned. Thus, the only subsection of ERISA §502(a) applicable to plaintiffs' claims is §502(a)(3).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Section 502(a)(3) does not authorize a suit for money damages; yet, that is precisely what this action is – a naked attempt to recover money damages.   To avoid the money damage limitation, plaintiffs couch their action as a request that this court, presumably pursuant to its inherent equitable power, *inter alia*, compel HolliShare: (1) to correct all prohibited transactions and disgorge all profits; (2) to revalue the JDS common shares held by the Plan; (3) to revalue all retired participants' accounts as of the date of distribution and distribute the remaining balances; and (4) to recover any tax loss incurred.  (Dkt. 368, HAC, p. 66, ¶¶7-10; Dkt. 314; FAC, p. 41, ¶¶7-10.)  Plaintiffs' attempts to circumvent the limitations of ERISA § 502(a)(3) fail.

Specifically, ERISA § 502(a)(3) authorizes a plan beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other *appropriate equitable relief*."  29 U.S.C. § 1132(a)(3) (emphasis added).  The Supreme Court has construed this provision narrowly, and has excluded claims for money damages "since that statute's [ERISA's] carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 254 (1993) (*quoting Mass. Mut. Life. Ins. Co. v. Russell,* 473 U.S. 134, 146-47 (1985)) (emphasis in original).  The Supreme Court has limited the equitable relief available under this provision to "categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens,* 508 U.S. at 256 (emphasis in original); *see also Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 210 (2002).

No matter how plaintiffs disguise their claims, they effectively seek compensatory damages.  They want to be "made whole" through a *retroactive "surcharge" based upon a revaluation* of their previously-existing plan account – one that

-57-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

would be based upon a judicial adjudication, not upon the terms of the Plan. (Dkt. 368, HAC, p. 66, ¶¶7-10; Dkt. 314; FAC, p. 41, ¶¶7-10.)  Plaintiffs simply seek funds *in addition* to the lump sum cash payments they have already received – *i.e.,* money damages.

Individual claims for money damages are not cognizable under ERISA.  As the Supreme Court stated in *Great-West Life*:

> Almost invariably … suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.  And money damages are, of course, the classic form of *legal* relief.

534 U.S. at 210 (emphasis in original); *see also Mertens*, 508 U.S. at 255 (the term "appropriate equitable relief" as used in ERISA § 502(a)(3) does not encompass claims, however characterized, that are in reality requests for money damages); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 103 (2d Cir. 2005) (where plaintiff was not seeking recovery from any  separate, segregated fund, plaintiff's claim was one for money damages, not one for equitable relief cognizable under ERISA).[32]

Courts have consistently held that such "make whole" relief is not cognizable under ERISA § 502(a)(3). *Rego v. Westvaco Corp.,* 319 F.3d 140, 143-44 (4th Cir. 2003) (ERISA § 502(a)(3) only authorizes "those categories of relief that were typically available in equity (such as injunction, mandamus and restitution), but not compensatory damages;" thus, plaintiff lacked standing under ERISA § 502(a)(3) to pursue his claim against defendants for not distributing his holdings in a savings plan in a timely manner); *accord Helfrich v. PNC Bank, Kentucky, Inc.,* 267 F.3d 477, 480 (6th Cir. 2001) (plaintiff not entitled to recover money damages under ERISA §

_____

[32]  *See also Curran v. Camden Nat'l Corp.*, 477 F. Supp. 2d 247, 255 (D. Me. 2007); *Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan*, 439 F. Supp. 2d 337, 342 (D. Del. 2006).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

502(a)(3) when he sued for the amount he would have earned had the plan administrator followed his investment instructions at the appropriate time); *Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938, 945 (8th Cir. 1999) (plaintiff not entitled to recover difference between the return that he could have earned on funds during the time the plan administrator wrongfully withheld payment and the return that the plan earned during that period); *Amschwand v. Spherion Corp.*, 505 F.3d 342, 348 (5th Cir. 2007) (plaintiff's request for "a form of make-whole damages" were outside the scope of ERISA § 502(a)(3)); *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1359-60 (M.D. Ala. 2007) (ERISA § 502(a)(3) did not afford plaintiffs relief for equitable estoppel claims because the remedy sought was really a legal remedy); *Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517, 1527-28 (9th Cir. 1993).

Clearly, plaintiffs do not seek "typical" or "traditional" equitable relief. There is no evidence that any specific, identifiable funds have been set aside for the purpose of paying plaintiffs the difference between the book value of their JDS common shares and their higher "fair market value". Plaintiffs are simply seeking money damages from the commingled assets in Hollister's and JDS's general coffers.

For this additional reason, the relief sought by plaintiffs is not cognizable under ERISA § 502(a)(3), and the claims asserted in this action are precluded under ERISA.[33]

//

---

[33] As the court recognized in its summary judgment ruling, to the extent that the plaintiffs seek relief affecting the current or future operations of HolliShare, because the plaintiffs no longer have HolliShare accounts, they have no standing to obtain any prospective injunctive relief. *DeFazio*, 636 F. Supp. 2d at 1076 (*citing Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 267-68 (D. Mass. 2008)).

-59-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**E.    Plaintiffs' Claims Predicated Upon The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA Are Barred By The Settlor Doctrine.**

This court also concludes that the terms of the Plan do not violate ERISA. As a result, application of the settlor doctrine bars all plaintiffs' claims for violations of the prohibited transaction provisions of ERISA §§ 406(a) and (b) and for breach of any fiduciary duty under ERISA § 404(a).

Under the settlor doctrine, decisions concerning the design and structure of an ERISA plan are not fiduciary acts; instead, an employer acts as a plan settlor in making such decisions. *E.g., Hughes Aircraft Co. v. Jacobsen,* 525 U.S. 432, 444 (1999). Consequently, defendants cannot be held liable under ERISA's prohibited transaction or fiduciary duty provisions for design decisions when the fiduciary is acting in his or her settlor capacity. *See DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670, at *4 (E.D. Cal. Nov. 1, 2007) (*citing Hughes*, 525 U.S. at 444; *Lockheed Corp. v. Spink*, 517 U.S. 882, 890-91 (1996)); *Bins v. Exxon Co.*, 220 F.3d 1042, 1047 (9th Cir. 2000)). Indeed, because ERISA neither requires employers to provide retirement plans nor dictates the retirement benefits to be provided:

> Congress sought to encourage employers to set up plans voluntarily by offering tax incentives, methods to limit fiduciary liability, means to contain administrative costs, and giving employers flexibility and control over matters such as whether or when to design a plan, how to amend a plan, when to terminate a plan, all of which are generally viewed as business decisions of a settlor, not of a fiduciary, and thus not subject to fiduciary obligations.

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 284 F. Supp. 2d 511, 551 (S.D. Tex. 2003) (*citing Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).

In its November 1, 2007 Order, this court held that the settlor doctrine does not insulate defendants from liability for following the terms of the HolliShare trust instrument if those terms violate ERISA. *DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670, at *4 (E.D. Cal. Nov. 1, 2007). Having now found, after trial,

-60-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

that plaintiffs have failed to establish that any terms of HolliShare violate ERISA, the court concludes that the settlor doctrine is applicable and insulates defendants from any liability for any allegedly fiduciary acts under ERISA which arose from their adherence to the "design", *i.e.,* the terms of the Plan.

The settlor doctrine has been long recognized as applicable to both cases – those involving alleged violations of the prohibited transaction provisions of ERISA § 406 *and* those involving alleged breaches of fiduciary duty under ERISA § 404(a).  In *Lockheed Corp.,* for example, the Supreme Court specifically addressed the applicability of the settlor doctrine to ERISA § 406 prohibited transaction claims, emphasizing that a fiduciary can only be liable for a prohibited transaction if it engages in the allegedly prohibited transaction while acting in a fiduciary capacity. 517 U.S. at 888-92.  There, an employee brought an action against his employer and several officers and directors, alleging that an amendment to the employer's retirement plan requiring a waiver of claims against the employer as a condition to receiving early retirement benefits violated, among other provisions, ERISA's fiduciary duty and prohibited transaction provisions, ERISA §§ 404(a) and 406(a) and (b).  *Id.* at 885-86.  In determining whether the employer and the officers and directors acted as ERISA fiduciaries when they adopted the amendment at issue, the court explained that "plan design", including the act of amending the terms of a plan, are settlor functions and, thus, concluded that the employer acted not as a fiduciary but as a settlor when it amended the terms of the plan.  *Id.* at 890-91. Because "the only transactions rendered impermissible by § 406(a) are transactions caused by fiduciaries," the court found that this requirement of ERISA § 406(a) was not met because there were no fiduciary acts (as opposed to settlor acts) that violated the prohibited transaction provisions of ERISA.  *Id.* at 889-91.[34]

---

[34] The prohibitions in ERISA §§ 406(a)(1) and 406(b) are limited, on their face, to actions by "a fiduciary."

-61-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Similarly, in *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101-02 (9th Cir. 2004), the Ninth Circuit applied the settlor doctrine in assessing liability for violations of ERISA's prohibited transaction and fiduciary duty provisions. At issue in *Wright* was a stock bonus plan, under which each participant's plan account was credited with a proportionate share of the securities held by that plan. Under the terms of the plan, participants were precluded from selling 15% of the amount of employer stock credited to their accounts. When a merger resulted in an increase in the value of the employer's stock, certain participants requested that the plan fiduciaries authorize participants to sell the remaining 15%, but the fiduciaries refused. Those participants then brought ERISA claims against the plan fiduciaries, claiming that their refusal to modify the limitation on the sale of employer stock violated ERISA's fiduciary duty and prohibited transaction provisions. In affirming the dismissal of these claims, the *Wright* Court held that "plan design" is a "settlor" not a fiduciary function under ERISA, and that, as a result, no claim under ERISA for a violation of its prohibited transaction or breach of its fiduciary duty provisions was actionable. *Id.* (*citing Lockheed*, 517 U.S. at 893; *Hughes*, 525 U.S. at 444).

*In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861 (S.D. Tex. 2004), also entailed settlor issues similar to those present here. There, the court dismissed an ERISA claim which alleged that plan fiduciaries "may not blindly follow the plan document if doing so leads to an imprudent result." *Id.* at 891. In *Dynegy*, the ERISA plan at issue provided that the employer's contributions to the plan were to be made in the form of stock in the employer. That stock had declined precipitously in value after accounting improprieties by the employer had been uncovered and disclosed. One count of plaintiff's complaint alleged that the committee that administered the plan had violated its fiduciary duties by continuing to accept employer contributions in the form of employer stock, the value of which had been shown to have been artificially inflated. Nonetheless, the *Dynegy* Court still rejected

-62-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

this claim, holding that the design of the plan was a settlor function that did not implicate fiduciary duties imposed by ERISA.  Consequently, the court held the plan committee had neither the responsibility nor the ability to depart from the mandates of the plan design, and dismissed that count of the complaint based on the committee's failure to do so.  *Id.* at 890-92.

In this case, the "plan design" of HolliShare requires the HolliShare Trustees to invest virtually all of the Plan assets in JDS common shares, and specifies that those shares are to be valued at their per share book value.  The decision to value JDS common shares at their book value was a "design" decision made when the Plan was created 38 years ago.  The use of book value has been an integral component of the Plan's design from its inception.  To encourage the formation of a retirement plan, ERISA affords an employer flexibility in designing a benefit plan.  The settlor doctrine is a recognition of this principle.  Thus, designing a plan (as opposed to administrating it) simply does not invoke ERISA fiduciary duties or obligations.  *See, e.g., Beck v. Pace Int'l Union*, 551 U.S. 96, 101-02 (2007); *Lockheed*, 517 U.S. at 893; *Hughes*, 525 U.S. at 444; *Wright*, 360 F.3d at 1102; *Siskind v. Sperry Ret. Program, UNISYS*, 47 F.3d 498, 507 (2d Cir. 1995).[35]

Moreover, given that the "plan design" of HolliShare mandates the investment to be made, and the valuation procedures to be followed by Plan Trustees, any decision to override those terms would, in effect, constitute amending the Plan as it concerns the composition and design of the plan itself.  The settlor doctrine case law also establishes that the act of amending, or failing to amend, a plan is not a fiduciary act but instead a settlor act under ERISA.  *See, e.g., Hughes*, 525 U.S. at 444; *Lockheed*, 517 U.S. at 890-91; *Wright*, 360 F.3d at 1101-02; *Gannon v. NYSA-*

---

[35] *See also Cement & Concrete Workers Council v. Ulico Casualty*, 387 F. Supp. 2d 175, 187 (E.D.N.Y. 2005); *Mata v. E.I. DuPont de Nemours & Co.*, 456 F. Supp. 2d 612, 622 (D. Del. 2006); *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*ILA Pension Trust Fund & Plan*, No. 09-cv-10368, 2011 WL 868713, at *13-16 (S.D.N.Y. Mar. 11, 2011) (granting defendants' motion to dismiss a claim of breach of fiduciary duty under ERISA for failure to amend an employee welfare benefit plan, concluding that the act of amending, or failing to amend, is a settlor function free from ERISA's fiduciary obligations).  As such, any decision to amend the Plan or not to amend the Plan constitutes a design decision free from fiduciary liability, and could not support a claim for a violation of the prohibited transaction provisions of ERISA § 406 or a violation of the fiduciary duty provisions of ERISA § 404(a).

Under the clear and explicit holdings of the foregoing cases, coupled with the requirement of ERISA § 404(a)(1)(D) that plans be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]...", the settlor doctrine bars plaintiffs' claims for violations of the prohibited transaction provisions and breach of fiduciary duty provisions of ERISA.

### F. The Standards Applicable To Plaintiffs' Claims Based On The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA

Even if this court has subject matter jurisdiction over plaintiffs' claims that defendants violated the prohibited transaction provisions of ERISA §§ 406(a) and 406(b), and their fiduciary duties under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A), the court denies those claims on their merits.

#### 1. The Goals Of ERISA, "Prohibited Transactions" Under ERISA, And The Statutory Scheme

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1091-92 (E.D. Cal. 2005) (*quoting Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)); *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980).  In that regard, ERISA encourages the creation of retirement plans that, like HolliShare, give employees a financial stake in the

-64-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

success of their employers.  *Quan v. Computer Scis. Corp.,* 623 F.3d 870, 879 (9th Cir. 2010); *Wright,* 360 F.3d at 1097.

However, ERISA serves only to protect and preserve employees' rights to their promised retirement benefits; it does not mandate that employees be provided with any minimum level of benefits, or for that matter, any benefits at all.  *Wright,* 360 F.3d at 1100 (*quoting Collins v. Pension & Ins. Comm'n of S. Cal. Rock Products & Ready Mixed Concrete Ass'n,* 144 F.3d 1279, 1282 (9th Cir. 1998)); *Foltz v. U.S. News & World Report, Inc.,* 865 F.2d 364, 370-71, 374 (D.C. Cir. 1989); *Krueger Int'l, Inc. v. Blank,* 225 F.3d 806, 812 (7th Cir. 2000).  Nor does ERISA impose upon plan trustees any duty to maximize financial benefits. *Id.*

Section 406 of ERISA (29 U.S.C. § 1106) does, however, establish a blanket prohibition on certain transactions, including the sale or exchange of property between an ERISA plan and a "party in interest", because such transactions "entail a high potential for abuse." *Donovan v. Cunningham,* 716 F.2d 1455, 1465 (5th Cir. 1983).  Specifically, ERISA § 406(a)(1)(A) precludes a plan fiduciary from causing the plan to engage in a transaction that "constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest."  As the parent corporation of Hollister, JDS is, under ERISA, a "party in interest".  *See* 29 U.S.C. § 1002 (14)(E).  ERISA § 406(b)(2) provides that an ERISA fiduciary shall not "in his individual, or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries...."

**2.    Plaintiffs' Claims Under 29 U.S.C. §§ 1106(a) And (b) ("ERISA §§ 406(a) And (b)")**

Plaintiffs allege defendants engaged in prohibited transactions in violation of ERISA § 406(a)(1)(A) based upon (1) HolliShare's annual sales of JDS common shares to JDS for less than adequate consideration (as defined by ERISA § 3(18)),

-65-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

and (2) HolliShare's assumption in 1974 of promissory notes payable by JDS by former Hollister employees/JDS common shareholders.  (Dkt. 368, HAC, Count XI; Dkt. 314, FAC, Count X; Dkt. 588, SPTS, p. 12.)[36]  Plaintiffs also claim defendants violated the prohibited transaction provisions of ERISA § 406(b)(2) by calculating the amount of their vested benefits under the Plan based upon the book value of the JDS common shares which was used to calculate their HolliShare account balances. (Dkt. 588, SPTS, p. 13.)

### 3.    The Exemption Of 29 U.S.C. § 1108(e) ("ERISA § 408(e)")

Section 408(e) of ERISA creates an exemption for transactions in employer securities that essentially swallows the "prohibited transaction" rule.   ERISA § 408(e) provides that:

Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities ...

(1)    if such acquisition, sale, or lease is for adequate consideration ...
(2)    if no commission is charged with respect thereto,[37] and
(3)    if -
(A)    the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title),...

HolliShare is an eligible individual account plan ("EIAP") under ERISA because JDS's stock common shares constitute a "qualifying employer security". 29 U.S.C. § 1107(d)(3)(A) ("ERISA § 407(d)(3)(A)") provides:

The term eligible individual account plan means an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on September 2, 1974, and which on such date invested primarily in qualifying employer securities....

---

[36]    Since it is not disputed that this transaction occurred prior to the effective date of the amendment to ERISA in January, 1975, which included the prohibited transaction provision, this claim is dismissed on its face.

[37]    There is no evidence in the record that any commission is charged on transactions between JDS and HolliShare involving JDS common shares.

-66-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

An "employer security" is "a security issued by an employer of employees covered by the plan, or by an affiliate of such employer" (ERISA § 404(d)(1)), and if an "employer security" consists of stock, it is thereby a "qualifying employer security" (ERISA § 404(d)(5)(A)).  HolliShare qualifies as such a plan.  It provides for annual contributions by Hollister to the Plan, employees do not contribute to the Plan, and the Plan requires that its assets be invested, to the maximum extent practicable, in JDS stock. (DX 500, § 6.02; DX 501, § 11.01.)

EIAPs enjoy a favored status under ERISA.  For example, in *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1097 (9th Cir. 2004) (*quoting Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 956 (D.C. Cir. 1985)), the Ninth Circuit observed that "EIAPs are exempt from certain ERISA provisions because of the strong policy and preference in favor of investment in employer stock."  Consequently, the *Wright* Court held that defendants did not violate their fiduciary duties under ERISA by refusing to permit the liquidation of an employer's stock in an EIAP even though the liquidation would have allowed the plan and its participants to benefit from an appreciation in the stock's value as a result of a recent acquisition.

Defendants rely upon the exemption of ERISA § 408(e) as a defense to plaintiffs' prohibited transaction claims.  Thus, the jugular issue here is whether, under the circumstances, the sales by HolliShare of JDS common shares to JDS, at their book value, were for "adequate consideration".

Under ERISA, when a security, as here, has no generally recognized market, the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18); *see also* 29 C.F.R. § 2550.408e (cross-referencing 29 U.S.C. § 1002(18) in defining "adequate consideration" for purposes of § 1108(e)).

-67-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

No regulations have yet been promulgated by the Secretary of Labor.[38]  Whether a particular transaction with an interested party is exempted under ERISA § 408(e) depends upon the conduct of the fiduciaries at the time of the challenged transaction.  *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (*citing Donovan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir. 1983)); *Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050, 1064 (D. Ariz. 1995) ("Good faith requires that the trustees of the Plan have used a prudent method of determining value."), *aff'd*, 107 F.3d 877 (9th Cir. 1997).

### 4. Plaintiffs' Claims That Defendants Violated The Prudent Man Standard Of Care Under 29 U.S.C. § 1104(a)(1)(B) ("ERISA § 404(a)(1)(B)")

ERISA § 404(a)(1)(B) requires that an ERISA plan fiduciary act

> solely in the interest of the [plan] participants and beneficiaries and ... with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Defendants are alleged to have violated their fiduciary duties under this section of ERISA primarily by: (1) valuing the JDS common shares held by the Plan at book value; (2) engaging in prohibited transactions by directing the Plan to sell its JDS common shares to JDS at a price equal to their book value; and (3) entering into the Mid-1890s Agreement and selling JDS common shares to JDS at their book value calculated on the basis of the December 31 book value of the year preceding

---

[38]  Plaintiffs rely upon the Department of Labor's "Proposed Regulation Relating to the Definition of Adequate Consideration", 53 Fed. Reg. 17632 (May 17, 1988).  As the court previously held, courts "decline to take cognizance of the proposed regulations . . . because a proposed regulation does not represent an agency's considered interpretation of its statute." *DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670, at *10 (E.D. Cal. Nov 1, 2007); *see Draper v. Baker Hughes Inc.*, 892 F. Supp. 1287, 1293 (E.D. Cal. 1995) (the court disregarded a proposed regulation issued by the Department of the Treasury relating to the COBRA statute, noting that "almost a decade has passed since COBRA's Enactment, and the promised regulatory guidelines have not materialized.").

-68-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

the repurchases, and not the book value calculated at the end of the month of each repurchase transaction.

**5.    Plaintiffs' Claims That Defendants Breached Their Duty Of Loyalty Under 29 U.S.C. § 1104(a()1)(A) ("ERISA § 404(a)(1)(A)")**

ERISA § 404(a)(1)(A) requires that an ERISA fiduciary act

(A)    for the exclusive purpose of:

> (i)    providing benefits to participants and their beneficiaries...

> Plaintiffs allege that defendants breached their fiduciary duty to them individually under ERISA § 404(a)(1)(A) by valuing their individual HolliShare accounts based on the book value of JDS's common shares in calculating their vested benefits. (Dkt. 368, HAC, Counts I, XII; Dkt. 314, FAC, Counts I, X; Dkt. 588, SPTS, p. 6.)

Stripped to their bare bones, plaintiffs' claims under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A) are based on defendants' failure to maximize the vested benefits of the Plan participants and plaintiffs' own vested benefits by not calculating those benefits at a per share value for JDS's common shares higher than their book value.  For the numerous reasons detailed below, these claims have not been sustained.

**6.    Plaintiffs' Burden of Proof**

To establish a breach of fiduciary duty claim under ERISA § 404(a), the burden is on a plaintiff to prove (1) a breach of a fiduciary duty and (2) loss or damage to the Plan resulting from the breach.  *Howell v. Motorola,* 633 F.3d 552, 565 (7th Cir. 2011); *Eckelkamp v. Beste*, 315 F.3d 863, 867 (8th Cir. 2002); *Chao v. Hall Holding Co.,* 285 F.3d 415, 430-38 (6th Cir. 2002); *Kuper v. Iovenko*, 66 F.3d 1447, 1459-60 (6th Cir. 1995); *McDonald v. Provident Indemnity Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *see also Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 (3d Cir. 1996); *Silverman*

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105-06 (2d Cir. 1998); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994).  As Judge Hollows noted in his December 1, 2008 Order, plaintiffs bear the burden of proof with respect to their ERISA breach of fiduciary duty claims. *DeFazio v. Hollister, Inc.*, No. S-04-1358, 2008 WL 5113654, at *5 (E.D. Cal. Dec. 1, 2008).  The burden shifts to defendants if, and only if, plaintiffs meet their initial burden.  Then, defendants must establish that no loss or damage was caused by the particular breach of fiduciary duty. *Eckelkamp,* 315 F.3d at 867; *Roth*, 16 F.3d at 917.

Cases such as this, which involve decisions by ERISA fiduciaries to invest in employer securities, require an analysis of whether the fiduciaries acted "in good faith" to exempt their conduct under ERISA § 408(e) from violations of ERISA §§ 406 (a) and (b), and whether they complied with the "prudent man" and "loyalty" standards of ERISA §§ 404(a)(1)(B) and 404(a)(1)(A).  While couched in different terms, the test to be applied to prohibited transaction and breach of fiduciary duty claims is essentially the same and calls for a two-step analysis: (a) did the fiduciaries act in good faith (under ERISA § 408(e)) and prudently and loyally (under ERISA § 404(a)) by conducting a reasonable, thorough, and prudent investigation of the use of book value; and (b) did the fiduciaries' decision to use book value to valorize JDS common shares, on its merits, result in the payment to HolliShare (and to the individual plaintiffs in the valuation of their vested benefits) of adequate consideration (under ERISA § 408(e)) or fair market value (under ERISA § 404(a))? *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045, 1068 (n. 23) (E.D. Cal. 2009); *Howard,* 100 F.3d at 1488; *Donovan,* 716 F.2d at 1467-68.

Based on the evidence introduced at trial, the court concludes that defendants passed both tests: (1) they acted "in good faith", prudently and loyally as required by ERISA §§ 408(e) and 404(a); and (2) their decision to use book value to value JDS common shares resulted in the payment to HolliShare and its

-70-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

participants, including plaintiffs, of adequate consideration and the fair market value of JDS's common shares.

**G.    The Fiduciary Defendants Conducted A Reasonable and Thorough Investigation Of The Fair Market Value Of JDS's Common Shares.**

The precise scope and nature of an investigation to determine fair market value depends upon the circumstances that existed at the time of the challenged transaction. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 637 (7th Cir. 2005) (the sufficiency of the fiduciary's investigation should be evaluated "within the context of the totality of the circumstances"); *Donovan*, 716 F.2d at 1467-68 (noting that fiduciaries must determine fair market value based upon "a prudent investigation in the circumstances then prevailing"); *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("whether a fiduciary has made a proper determination of fair market value depends on whether the parties are well-informed about the asset and the market for that asset." (internal quotation marks omitted)).

In conducting its analysis, the court therefore looks initially to the "circumstances then prevailing" in 1973, which was when HolliShare was first established and when the book value method of valuation was first put in place. This is the "challenged transaction" effectively under scrutiny here – a transaction that has been confirmed and repeated over the past 38 years.

**1.    The Circumstances Prevailing In 1973**

In 1973, Mr. Schneider had been utilizing the book value system with success for 17 years. Zwirner testified that, as of 1973, Mr. Schneider firmly believed that the book value system had provided a market for the repurchase of the JDS common shares where one did not otherwise exist, had allowed the employees to reap the profits if the business prospered, had helped protect the liquidity of JDS and Hollister, and had avoided the expense and unpredictability of using outside

-71-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

appraisals which neither JDS nor Hollister could afford at that time. Most importantly, Mr. Schneider had found book value to be simple, straight-forward, fair, and consistent with his Policies and Principles.

In 1973, Hollister was not the global company it is today. In 1973, Hollister had only recently moved its office from a former warehouse. At that time, Hollister was a small company with approximately 200 employees and was just beginning to grow.

In 1973, Mr. Schneider was also familiar with the annual appreciation the book value of JDS common shares had enjoyed between 1956 and 1973. He knew the future business prospects for Hollister depended on the efforts of its employees, and if their efforts were successful, the book value of JDS's common shares would continue to appreciate, thereby generating more benefits for its employees. Strongly committed to the belief that if the employees were given an ownership interest in the company, they would become more dedicated and should therefore be entitled to reap the benefits of their efforts, he selected JDS common shares as the principal investment for HolliShare. History has proven he was prudent to do so.

The court concludes that under the circumstances prevailing in 1973, Mr. Schneider's investigation into the determination of the fair market value of the JDS common shares was prudent, adequate, reasonable, and thorough.

Similarly, as set forth above, the ownership and transfer restrictions, rights of repurchase, and the book value pricing requirement, are valid, enforceable, and severely limited the market for JDS common shares. In 1973, these provisions had been in place for 17 years and had also served JDS, Hollister, and their employees well. The restricted nature of JDS common shares, HolliShare's primary asset, was carefully considered by Mr. Schneider when he conducted his 1973 investigation into the fair market value of JDS's common shares. *See DeFazio,* 636 F. Supp. 2d at 1069 ("Before the accounting rules of an ERISA plan can be applied, the basic

-72-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

terms of the asset to be accounted for must be determined. That is what the [shareholder agreement] does – it defines the bundle of rights to which a shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled." (*quoting Krueger Int'l, Inc. v. Blank*, 225 F.3d 806, 812 (7th Cir. 2000)); *see also Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 370-71, 374 (D.C. Cir. 1989) (upholding a plan's valuation of closely-held stock based upon the valuation method specified in the corporation's certificate of incorporation).

The court concludes that the investigation conducted in 1973 by John Schneider, and the HolliShare Trustees, to determine the fair market value of JDS common shares was conducted in good faith in compliance with ERISA § 408(e) and with the care, skill, prudence, and loyalty required by ERISA §§ 404(a)(1)(B) and 404(a)(1)(A).

### 2.    The Circumstances Prevailing After 1973

After 1973, after HolliShare became effective, every year, the HolliShare Trustees considered:

(a) the transfer restrictions, JDS's rights of repurchase, and the book value pricing system in the JDS Articles;[39]

(b) the restrictions in the JDS Articles regarding the limited eligibility of those who could own JDS shares;

(c) the lack of any generally recognized market for JDS common shares;

(d) the consistent, uniform practice of JDS of redeeming any JDS common shares that were offered for sale at the book value of those shares;

(e) the affirmative obligation of the Trustees of the 1999 Preferred Share Trust (JDS's majority shareholder) to cause the JDS Board of Directors to enforce the transfer restrictions and repurchase rights and price formula of the JDS Articles;

---

[39] With regard to the original trustees, ERISA requires plan fiduciaries to comply with the terms of the plan provided they conform to ERISA. 29 U.S.C. § 1104(a)(1)(D). Thus, when HolliShare was created, its trustees were *required* to invest HolliShare's assets principally in JDS common shares. And when they did, they took those shares as they found them.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

(f) the provisions of the HolliShare trust instrument, which required any sales of JSD common shares to be made in accordance with the JDS Articles;

(g) HolliShare's cash and liquidity needs;

(h) JDS's financial condition based on its most recent audited financial statements and balance sheets;

(i) the positive historical returns generated by investment in JDS common shares, which had consistently been above the returns generated by comparable market indices;

(j) the general conditions of Hollister's business and its prospects, its plans, projected sales, product lines, and financial indicators;

(k) whether there had been any changes in ERISA or other laws that would affect HolliShare's right to sell its JDS common shares to JDSA at book value; and

(l) Mr. Schneider's Policies and Principles.

Zwirner, McCormack, Brilliant, and Kelleher each testified that the HolliShare Trustees carefully considered the factors enumerated above each year when they decided the amount of JDS common shares to sell to JDS and the price they would receive, and they did this both before and after the Mid-1980's Agreement. Their careful consideration of these factors establishes that the HolliShare Trustees conducted a prudent, diligent, and loyal investigation of the fair market value of JDS's common shares. The HolliShare Trustees also received and relied on Zwirner's legal advice regarding the validity and enforceability of the JDS restrictions, and his input, as a Hollister Board member, regarding Hollister's business prospects and business operations.

In light of the circumstances existing at the time of each sale by HolliShare of JDS common shares to JDS, the HolliShare Trustees' continued consideration of these factors led them to determine, in good faith, prudently, and loyally, that the book value of JDS common shares was the "fair market value" of those shares.

The HolliShare Trustees were also kept well-informed regarding the restrictions applicable to JDS common shares held by HolliShare as a consequence of their active roles in Hollister and JDS. These restrictions had been in place since

-74-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

JDS's incorporation in 1956, long before any of the fiduciary defendants had become affiliated with Hollister. Moreover, throughout their employment at Hollister, they knew these restrictions never changed, and, given their roles at Hollister, they were intimately familiar with their operation. Zwirner has been a HolliShare Trustee since 1977; he has also been a director of JDS since 1978 and has served as its General Counsel for 34 years. Hollister's Chief Financial Officer ("CFO") was James McCormack from 1981 to 2000, and Samuel Brilliant from 2000 to the present. Both also served as HolliShare Trustees. The third trustee, James Karlovsky, served as the Head of Hollister's Human Resources, and as a HolliShare Trustee, from 1984 to 2004. Karlovsky's successor, Lori Kelleher, served as a HolliShare Trustee from 2004 through June, 2011.

By virtue of their respective corporate positions, these HolliShare Trustees have been conversant with the business of Hollister, including (without limitation) the ownership and transfer restrictions, JDS's repurchase rights, and the book value formula in the JDS Articles. As long-term, high-ranking Hollister managers, they also knew that JDS's historical practice was to always exercise its right to pay book value for any JDS common shares offered for sale. The Trustees were also aware of JDS's consistent, historical practice of redeeming any JDS common shares that were offered for sale for the book value of those shares. They also knew that since HolliShare's inception, every purchase and sale of a JDS common share had, over decades, complied with the various restrictions in the JDS Articles. They knew that each and every vested benefit payable by HolliShare had, since 1973, been paid in full. They also believed that compliance with the JDS ownership, transfer, and repurchase restrictions, and the book value pricing system were consistent with the Schneider Policies and Principles, and that continued adherence to those Policies and Principles had been and would continue to be vital to Hollister's finances and its business success.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Zwirner also testified that the HolliShare Trustees considered, as discussed below, the lack of regulatory action by the D.O.L after conducting multiple audits of HolliShare, the issuance by the I.R.S. of determination letters pertaining to HolliShare, and the acceptance by the I.R.S. of estate tax returns in which the decedent's holdings of JDS common shares were valued at the book value.

Under these prevailing circumstances, the HolliShare Trustees and other defendant fiduciaries have, each year, in good faith in compliance with ERISA § 408(e), conducted a reasonable, adequate, and prudent investigation and they have done so with the care, skill, prudence, and loyalty required by ERISA §§ 404(a)(1)(B) and 404(a)(1)(A).

Plaintiffs did not offer any evidence that (a) JDS had ever stopped or ever intended to stop exercising its repurchase rights; (b) JDS had ever waived those rights (or would do so in the future); or (c) any book value computation by JDS had ever been made which was not in compliance with GAAP. Plaintiffs have also failed to prove how or why any "investigation" by the HolliShare Trustees of the value of JDS common shares could have reasonably led to the conclusion that those shares could be sold for more than their book value – even if some hypothetical, ostensible "fair market" valuation of those shares exceeded their book value. Under the totality of the circumstances which existed from 1973 to the present, the HolliShare Trustees and the other defendant fiduciaries have conducted a reasonable and thorough investigation of the fair market value of the common shares of JDS, and have acted in good faith, prudently, and loyally in deciding that their fair market value was equal to their book value.

//

//

//

//

-76-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 3.   The Good Faith And Prudent Investigation Conducted By The Defendant Fiduciaries Has Been Effectively Ratified By HolliShare's Two Regulators.

The good faith and adequacy of the investigation conducted by the defendant fiduciaries has been effectively ratified by HolliShare's two regulators, the D.O.L. and the I.R.S.[40]

### a.   The D.O.L.

Since 1974, the financial statements of JDS and HolliShare have been audited annually, as of December 31 of each year, by prominent, internationally-recognized accounting firms – Arthur Andersen from 1974 to 1984 and Deloitte and Touche ("Deloitte") from 1985 to the present.   From 1985 to date, with one exception, Deloitte has rendered an unqualified audit opinion on the Plan's financial statements.  (DX 567-581.)  At all times, Deloitte reported that the fair market value of the JDS shares held by the Plan as their book value.

In 1991, Deloitte issued a qualified opinion in connection with its audit of the Plan, based upon its concerns over the use of book value for valuing the JDS common shares held by the Plan.   This qualified opinion initially resulted in the D.O.L.'s rejection of the Plan's 1991 Annual Report on Form 5500.[41]  In its Notice of Rejection, relying upon the qualified opinion of Deloitte, the D.O.L. determined that

---

[40]  The I.R.S. and the D.O.L. are the two administrative agencies responsible for enforcing and interpreting ERISA.  *Mead Corp. v. Tilley*, 490 U.S. 714, 720 (1989).

[41]  The Form 5500 is an annual report submitted by an employee benefit plan regarding its financial condition, investments and operations. *See Form 5500 Series*, available at http://www.dol.gov/EBSA/5500MAIN.html.  The Form 5500 is required to be filed under Sections 104 and 4065 of ERISA and Sections 6039D, 6057(b), and 6058(a) of the I.R.C. The Form 5500 is part of ERISA's overall reporting and disclosure requirements.  These requirements are intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided with, or have access to sufficient information to protect the rights and benefits of participants. *Id.*

Attached every year to the Form 5500 is an independent auditors' financial statement report (performed by Deloitte for most of the relevant years).  The end of term audit report is required by D.O.L.'s Regulation 29 CFR Section 25.20.103-1(b).

-77-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

HolliShare's investment in JDS common shares "was not properly presented at fair value, and violated the D.O.L.'s Regulation which required employee benefit plans to list its net assets available to plan benefits at 'current value.'" (DX 592.)  In rejecting HolliShare's listing of its holdings of JDS common shares at their "current value", the D.O.L. had, in effect, determined that HolliShare's use of book value in determining the value of its JDS common share holdings was not supported by "adequate consideration". [42]

On May 26, 1993, Deloitte amended its report, stating:

[I]t has been determined that the fair value of the Trust's investment in the common shares of JDS equals the book value of such shares because of the restrictions on the sale of such shares under the terms of the JDS Articles, and because the terms of the Trust Agreement require the Trustees to comply with those restrictions.

(DX 595, H22236.)  Deloitte also withdrew its "qualified" opinion and instead issued an "unqualified" opinion.  (DX 595.)

HolliShare sent a letter on June 10, 1993 to the D.O.L. attaching Deloitte's unqualified opinion and amended Form 5500s for the calendar years 1990 and 1991.  (DX 596.)  On June 15, 1993, the D.O.L. issued to HolliShare its "Withdrawal of Notice of Rejection of the HESOT (92-DAS-361)".  (DX 597.)  The D.O.L. then accepted HolliShare's amended Form 5500 filings which again utilized a book-value methodology in reporting the fair market value of the JDS common shares.  The D.O.L.'s Notice of Withdrawal thus effectively determined that HolliShare's book value methodology accurately listed its JDS common shares at their "current value".  By agreeing that the book value of JDS's common shares was their "current value",

_____

[42]   The term "current value" is defined in ERISA in terms virtually identical to ERISA's definition of "adequate consideration."   ERISA defines "current value" as follows:

"The term 'current value' means fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary ... pursuant to the terms of the plan and in accordance with regulations of the Secretary, assuming an orderly liquidation at the time of such determination ...".  29 U.S.C. § 1002 (26).

-78-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

given the virtual identical definitions of "current value" and "adequate consideration", the D.O.L. effectively determined that the book value price of JDS's common shares constituted "adequate consideration".[43]

No other Form 5500s for HolliShare, either before or after 1991, have ever been questioned by the D.O.L.

On January 20, 1998, the HolliShare Trustees received a letter from a lawyer representing James DeFazio, regarding Ellis's HolliShare account, and stating that all recent correspondence between Hollister and DeFazio had been sent to the D.O.L. and the I.R.S. "for evaluation and analysis." A month later, on February 20, 1998, Jean Bracken of the D.O.L. contacted Dian Thielitz to schedule an appointment in April 1998 to review the HolliShare Plan documents.[44] On May 12, 1998, Bracken reviewed HolliShare documents at Hollister's office.

Prior to her review of documents at Hollister, Bracken requested that numerous documents be made available for her inspection. She requested, among other documents, the following:

    a. Signed originals of the Plan Documents, Trust Agreements, and all amendments;

    b. Summary Plan Descriptions;

    c. Hollister's Articles of Incorporation;

    d. The latest I.R.S. Determination letters;

    e. Summary Annual Reports; and

    f. Form 5500s and the accompanying Deloitte Reports.

(DX 584.) All of these documents were produced.

---

[43] The documentation related to these series of events is set forth in DX 596 and 597.

[44] Zwirner testified that he believed that the audit was triggered by DeFazio's inquiries to the D.O.L. (*See also* Declaration of Richard T. Zwirner filed in Opposition to Plaintiff's Motion for Partial Summary Judgment, p. 17, ¶65.)

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

During Bracken's review of HolliShare, she met on or about July 9, 2001 with defendant James J. McCormack, a HolliShare Trustee and Hollister's C.F.O. Bracken discussed with McCormack HolliShare's valuation of JDS common stock at book value.  Not long thereafter, Hollister was notified by the D.O.L. that its investigation was closed and that it did not intend to take any action.  (DX 586.) While there was no formal approval rendered by the D.O.L. of the book value methodology utilized by HolliShare, clearly, the methodology was reviewed by Bracken when she spoke to McCormack and conducted her onsite review of HolliShare documents, particularly the Deloitte reports attached to the Form 5500s. The decision by the DOL not to take any action under these circumstances constituted an implied approval by the D.O.L. of the book value methodology, and it was reasonably perceived by the HolliShare Trustees as such.

Under these circumstances, coupled with the fact that several years had passed since the D.O.L. had proposed its Regulations in 1988 but had never taken any steps to have them enacted, HolliShare's Trustees reasonably relied in "good faith" on the D.O.L.'s acceptance of book value as the sole determinant of the "fair market value" of the JDS common shares held by HolliShare.

### b.  The I.R.S.

The defendants also relied in "good faith" upon numerous I.R.S. determinations.  On at least ten separate occasions, the I.R.S. has determined that the form of the Plan, which included a detailed description of its book-value valuation of JDS's common shares, complied with all applicable I.R.S. requirements. Consequently, the I.R.S. determined that HolliShare could continue to maintain its tax qualified status under § 401(a) of the I.R.C. (26 U.S.C. § 401(a)).

From December 20, 1973 (before ERISA became effective) through October 28, 2002, HolliShare received ten favorable Determination Letters from various district

-80-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

directors of the I.R.S.[45]  A favorable Determination Letter: (1) is issued by the I.R.S. in response to a request by a Plan Sponsor seeking a determination that its retirement plan is qualified under 26 U.S.C.A. § 401(a); (2) expresses the I.R.S.'s opinion regarding the form of the Plan; (3) is issued based on the applicable Cumulative List at the time the application is received; and (4) applies only to the employer and the Plan participants on whose behalf the determination letter was issued.[46]

Determination Letters are entitled to consideration because they "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." *Wells Fargo & Co. & Subsidiaries v. Comm'r*, 224 F.3d 874, 886 (8th Cir. 2000) (*citing Hanover Bank v. Comm'r*, 369 U.S. 672, 686 (1962) (unpublished rulings that were not even rendered against a party may nevertheless be used to demonstrate the I.R.S.'s interpretation of the I.R.C)).  The I.R.S. determinations that HolliShare complied with all applicable requirements of the I.R.C. necessary to maintain its tax qualified status reinforces the court's conclusion that defendants acted in "good faith" and prudently in continuing to believe that the Plan was in full compliance with all regulatory requirements – under both ERISA and the I.R.C.

In addition, on two other occasions, the I.R.S. has effectively agreed that the book value of JDS's common shares is their fair market value.  The estates of two JDS common shareholders, each of whom died while owning JDS common shares, reported the fair market value of those shares on their federal estate tax returns at

---

[45]  *See* DX 513-522.

[46]  *See, e.g.,* Internal Revenue Service, Determination Letters (June 24, 2008), *available at* http://www.irs.gov/retirement/article/0,,id=128037,00.html.  All documents related to the Internal Revenue Service's Determination Letters and its onsite audit are included in DX 513-521.

-81-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

their book value.  In each instance, the I.R.S. accepted those valuations by issuing Closing Letters accepting those valuations.

### 1)      Minnie Schneider's Federal Estate Tax Return

Minnie Schneider, the widow of JDS's founder, died in 1993.  Her 27,700 common shares of JDS (which were held in a Trust she created) were included on Schedule B of her federal estate tax return.  These shares were valued, as of September 30, 1993 (the end of the month during which she died), at their book value of $390.09 per share.  Later, in response to various questions raised by the I.R.S. Estate Tax Group Auditor in the course of his audit, a 20-page listing of all sales and redemptions of JDS common shares over the preceding 5 years were provided to him.  This listing reflected purchases and sales of JDS common shares, as well as the repurchases by JDS of the JDS common shares owned by Minnie Schneider's estate, all at their book values.

On June 26, 1995, a "Closing Letter" was issued by the I.R.S. District Director.  The Closing Letter accepted the valuation of all JDS common shares at their book value.[47]

### 2)      Franklin Dewey Walker's Federal Estate Tax Return

Franklin Dewey Walker was a former participant in HolliShare.  On August 4, 1992, an executor for the Estate of Franklin Dewey Walker filed an I.R.S. Form 706, a federal estate tax return. Schedule B of his federal estate tax return listed 1,425 JDS common shares owned by Mr. Walker as estate assets.  Those shares were valued as of November 30, 1991 (the end of the month during which Walker died) at $293.14 per share, their book value on that date.  The total book value of these

---

[47]  The pertinent documentation relating to Minnie Schneider's federal estate tax return is included in DX 631-632.

-82-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

shares ($417,724.50) comprised more than 22% of the $1,842,498.77 total gross value of Walker's estate. The basis for this valuation is detailed in a letter from Dian Thielitz to Hollister's outside counsel, Schuyler, Roche & Zwirner, dated July 28, 1992. A copy of that letter was attached to Walker's federal estate tax return. As that letter states, "[t]he valuation date of the stock was November 30, 1991. The book value as of that date was $293.14 per common share."

A Closing Letter was issued by the I.R.S. District Director on June 26, 1995. That letter reflected no adjustment whatsoever to the estate tax return as filed. In effect, the Closing Letter accepted the valuation of the JDS common shares at book value, as listed on Schedule B of the return.[48] While the Closing Letter did not expressly adopt the valuations, it did state: "This letter is evidence that the Federal tax return for the estate has either been accepted as filed, or has been accepted after an adjustment that you agreed to." (DX 629.) This Closing Letter is effectively an acceptance by the I.R.S. of the valuations. The letter explains, "This is not a formal closing agreement under section 7121 of the Internal Revenue Code. We will not reopen this case, however unless Revenue Procedure ("Rev. Proc.") 83-19 applies."[49] (DX 629.) A Closing Letter effectively approves the valuations barring application of the extraordinary circumstances that must exist before the case is reopened. Given the passage of 16 years, the approvals provided in the two Closing Letters are now effectively "final."

//

_____

[48] The pertinent documentation regarding Walker's federal estate tax return is included in DX 629-630.

[49] Rev. Proc. 83-19 lists the circumstances under which a case closed after examination by the District Director of the Internal Revenue Service may be reopened to make an adjustment unfavorable to the taxpayer. Under Rev. Proc. 83-19, the I.R.S. will not reopen any case closed after examination unless: (1) there is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of fact; (2) the prior closing involved a clearly defined substantial error based on an established Service position; or (3) a failure to reopen would be a serious administrative omission. Rev. Proc. 83-19 (4).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

While the I.R.S. is not technically bound by its determinations in its Closing Letters, these determinations are nevertheless admissible as evidence of the fair market value of JDS's common shares. *Righter v. United States,* 439 F.2d 1204, 1212 (Ct. Cl. 1971) ("It is our opinion and we hold that while the values placed on this stock by the I.R.S. in the other estates is not determinative of the question of value, in a case such as this where there is no sure way of arriving at the true market value, the value so placed by the I.R.S. in the other estates is some evidence which may be considered.").

The court concludes that the actions of HolliShare's two regulators reinforces its conclusion that the Plan fiduciaries acted in good faith and prudently in their investigation of whether their calculation of benefits annually payable by HolliShare and the amounts of the account balances of the individual plaintiffs based upon the book value of JDS common shares was a proper method of determining fair market value. For the same reasons, their investigation was prudent, loyal, and conducted in good faith within the meaning of ERISA §§ 408(e) and 404(a).

> **H.  The Ownership And Transfer Restrictions, JDS's Rights of Repurchase, JDS's Rights Of Repurchase, And The Pricing Formula In The JDS Articles Are Valid And Fully Enforceable. As Such, They Independently Establish That The Book Value Of JDS's Common Shares Is "Adequate Consideration" Under ERISA §408(e) And Is Their Fair Market Value Under ERISA § 404(a).**
>
> **1.  The Ownership And Transfer Restrictions, JDS's Rights Of Repurchase, And The Price Formula In JDS's Articles Are Valid And Enforceable And Restrict The Fair Market Value Of JDS's Common Shares.**

The court will now address the second part of the test: did HolliShare and the plaintiffs, based on the decision of the defendants to value JDS common shares at their book value, receive adequate consideration or the fair market value for their JDS common shares?

//

-84-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The starting point for this analysis is the validity and enforceability of the various restrictions imposed upon JDS common shares. Ownership and transfer restrictions, repurchase rights, or price formula in the corporate charters, by-laws, articles of incorporation, or shareholder or buy/sell agreements of close corporations have been and are common, time honored, and have been historically held to be valid and enforceable.[50] The validity and enforceability of transfer restrictions, rights of repurchase, and price formulae regarding the stock of a corporation are determined under the law of the state of incorporation, which in this case is Illinois. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 621 (1983) (application of the law of the state of incorporation achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation).

**2.    JDS's Inclusion Of Ownership And Transfer Restrictions, Rights Of Repurchase, And A Pricing Formula In Its Articles Is Expressly Authorized Under Illinois Law And Has Been Uniformly Enforced By Illinois Courts.**

The Illinois Business Corporation Act expressly authorizes the inclusion of stock restrictions in corporate charters, by-laws, and shareholder agreements. 805 Ill. Comp. Stat. 5/6.66 (2010). In 1978, JDS elected to become a "Close Corporation" under the Illinois Business Corporation Act. Once JDS elected to become a "Close Corporation", any transfer restrictions previously applicable to JDS's stock under § 6.55 of the Illinois Business Corporation Act remained valid and in full force and effect. Accordingly, the law applicable to the enforceability of

---

[50] Courts draw no distinctions between these different types of written instruments. Thus, they will often be collectively referred to herein as a "restricted stock agreement".

-85-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

the transfer restrictions and repurchase rights set forth in JDS's original, and later amended, Articles of Incorporation is that of Illinois.[51]

Given express statutory authorization, Illinois courts have consistently enforced ownership and stock transfer restrictions and/or price formulae similar or identical to those present here.  Often, the price formula is, as here, based on **book value**. *See, e.g., Am. Rubber & Plastics Corp. v. First Nat'l Bank,* 277 N.E.2d 840, 842 (Ill. 1971) (corporation's right of first refusal to buy corporate stock in a closely held corporation held binding upon all subsequent distributees, including third person purchasers); *Vogel v. Melish,* 203 N.E. 2d 411, 413 (Ill. 1964) (shareholder agreement which gave shareholders in a closely held corporation a right of first refusal to buy others' shares based upon a maximum price not to exceed 115% of the shares' **book value** held valid and fully enforceable); *Arentsen v. Sherman Towel Service Corp.,* 185 N.E. 822, 826-27 (Ill. 1933) (provisions in a corporation's articles of incorporation authorizing the corporation to repurchase stock from an employee at **book value**, held valid and specifically enforceable in Illinois); *Battaglia v. Battaglia,* 596 N.E.2d 712, 719 (Ill. App. Ct. 1992); *Grandon v. Amcore Trust Co.,* 588 N.E.2d 311, 314 (Ill. App. Ct. 1992); *In re Estate of Halas,* 529 N.E.2d 768, 770 (Ill. App. Ct. 1988) (the Chicago Bears Football Club, Inc. properly exercised its right of first refusal to purchase shares from the successor executor of George S. Halas, Jr.'s estate); *Estate of Kaplan v. M.S. Kaplan Co.,* 384 N.E.2d 874, 880 (Ill. App. Ct. 1978) (repurchase provision which provided that the purchase price was to be calculated on the basis of the shares' "**book value** … determined by the certified public accountants regularly employed by the Company" held valid and

---

[51] Many other states, by statute, also expressly authorize the inclusion of similarly restrictive clauses in a corporation's articles of incorporation. *See, e.g.,* Kan. Stat. Ann. § 17-6002(b)(1) (2009); Del. Code Ann. Tit. 8, § 202 (2011); Cal. Corp. Code § 204(b) (2009); Fla. Stat. Ann. § 607.0627(1) (2010); Ga. Code Ann. § 14-2-627(c) (2011); Wash. Rev. Code § 23B.06.270 (2011); N.Y. Bus. Corp. Law § 514 (2010); N.C. Gen. Stat. Ann. § 55-6-27 (2010); Tex. Bus. Corp. Act Ann. art. 2.22 (Vernon 2007).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

enforceable); *Bird Chevrolet Co. v. Jackson,* 336 N.E.2d 487, 490 (Ill. App. Ct. 1975) (repurchase price of closely held stock based upon "90% of its **book value**" held valid and enforceable); *People ex rel. Rudaitis v. Galskis, et al.*, 233 Ill. App. 414, 420 (Ill. App. Ct. 1924) (under Illinois law, a corporation's right of first refusal to purchase its stock before it may be offered or sold by a shareholder to any outsider is lawful, stating, the practice "has been considered lawful in Illinois for many years")[52]; 13 Ill. Law & Practice *Corporations* § 142, 363; 1A *Corbin on Contracts*, § 266; William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations*, § 5483 (West supp. 2008); 18 C.J.S. *Corporations* § 391 (2008); 13 Am. Jur. *Corporations* §§ 333-34 (2008).

Thus, the Illinois legislature and Illinois courts have consistently authorized, upheld, and sustained the validity and enforceability of transfer restrictions, rights of repurchase, and purchase or repurchase prices similar to those contained in the JDS Articles.[53]    The court has already held that the ownership and transfer restrictions and repurchase rights are not pre-empted by ERISA.  *DeFazio,* 636 F. Supp. 2d 1045, 1071 (E.D. Cal. 2009); *see also Krueger,* 225 F.3d 806, 812 (7th Cir. 2000) (stressing that stock encumbered by restrictions is fundamentally different than unrestricted stock, even if held in an ERISA plan).

_____

[52]  *Accord Potter v. Potter*, 513 N.E.2d 423, 427 (Ill. App. Ct. 1987) (shareholders' buy/sell agreement restricting the transfer of shares in a closely held corporation is valid and enforceable; accordingly, the sale by one of the shareholders in violation of the transfer restrictions was improper, and the shares were ordered to be held in trust for the benefit of the corporation); *Gifford v. Rich,* 208 N.E.2d 47, 50 (Ill. App. Ct. 1965); *Clayton v. James B. Clow & Sons*, 327 F.2d 382, 388 (7th Cir. 1964).

[53]  Even where there exists no statute authorizing stock restrictions, courts in other jurisdictions have historically validated similar stock restrictions.  *See Groves v. Prickett,* 420 F.2d 1119, 1122 (9th Cir. 1970) (applying California law, court explained, "A bylaw reserving a right of first refusal for other shareholders does not unreasonably restrict the right of alienation nor deprive the shareholder of a substantial right."); *Martin v. Graybar Elec. Co.,* 285 F.2d 619, 625 (7th Cir. 1961) (applying New York law); *Monacan Hills, Inc. v. Page,* 122 S.E.2d 654, 656-57 (Va. 1961).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 3. Courts In Other Jurisdictions Have Also Consistently Upheld And Enforced Similar Stock Restrictions And Repurchase Prices Based On Book Value.

While there is no universally accepted method to determine the fair market value of closely held corporate stock,[54] the method most commonly used in a restricted stock agreement has been to tie the fair market value to the shares' **book value**. *Claire v. Wigdor,* 266 N.Y.S.2d 6, 8-9 (N.Y. App. Div. 1965) (when accepted accounting principles are used, "a **book value** for closely-held stock was objectively ascertainable and thus sufficiently provided a standard for the granting of equitable relief."); *First Nat'l Bank of Montclaire v. Coldwell,* 145 N.Y.S.2d 674, 678-79 (N.Y. App. Div. 1955) (close corporation's right upheld to enforce voting trust agreement which gave it the right to repurchase its shares at their **book value** as determined by the corporation's directors).

Furthermore, where the repurchase price of closely held shares is to be determined by their book value, it is also common for a by-law, or shareholders' agreement, etc., to provide that the book value is to be determined, as here, according to "generally accepted accounting principles" or a similar provision.[55] Such provisions have uniformly been upheld. *See, e.g., Smith v. Grand Canyon Expeditions Co.,* 84 P.3d 1154, 1160 (Utah 2003) (**book value** standard for valuing closely held shares to be calculated "according to generally accepted accounting principles" was sustained, the Utah Supreme Court noting: "(B)y selecting compliance with GAAP as the valuation methodology, Mr. Smith and Grand Canyon

---

[54] "The valuation of closely held corporate stock for purposes of a buyout or repurchase pursuant to a transfer restriction is not an exact science, and does not lend itself to any specific formula or textbook calculation." *Snyder's Estate v. United States,* 285 F.2d 857, 861 (4th Cir. 1961).

[55] Calculating the book value as of the end of an accounting period rather than as of the purchasing date has been described as preferable: "Ordinarily, in order to avoid closing books, making an audit and taking inventory, it is preferable to provide that book value will be calculated as of the end of the last preceding fiscal or calendar year or some other accounting period." 1 O'Neal, *Close Corporations*, § 7:30 at 141 (3d ed. 1994).

-88-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

substantially narrowed the role of any implied legal or factual elements in defining their shared expectations."); *Blank v. Chelmsford Ob/Gyn, P.C.,* 649 N.E.2d 1102, 1105-06 (Mass. 1995) (close corporation's right to repurchase a shareholder's shares at their **book value** held valid and enforceable); *Dominick v. Vassar,* 367 S.E.2d 487, 490 (Va. 1988) (repurchase provision in corporate by-law and shareholders' agreement which provided for the repurchase at **book value** of stock in a closely held corporation upheld as valid and entitled to specific performance even though 17 years had passed since the execution of the agreement and the corporation had "acquired substantial assets" in the interim); *Jones v. Harris,* 388 P.2d 539, 542-43 (Wash. 1964) (the term "**book value**" has a "generally accepted meaning", and is enforceable as a determinant of the repurchase price of shares in a closely held corporation: "'Book value' normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities."); *Early v. Moor,* 144 N.E. 108, 109 (Mass. 1924) (repurchase price based upon the **"fair book value"** of the corporation's shares held to be "free from doubt or ambiguity" and would be enforced); *Lake Cable, Inc. v. Trittler,* 914 S.W.2d 431, 436 (Mo. App. 1996) ("**book value**" restriction on a corporation's stock determined by "general accounting principles consistently applied in accounting for the corporation's operations" was supported by sufficient consideration, was unambiguous and would be enforced); *Stern v. Birnbaum,* 615 N.Y.S.2d 62, 63 (N.Y. App. Div. 1994) (repurchase price of closely held shares based upon their "**book value**" was "not an ambiguous term"; application of book value in accordance with accepted accounting practices held final and binding upon the parties); *S.C. Pohlman Co. v. Easterling,* 27 Cal. Rptr. 450, 450-51 (Cal. Ct. App. 1962) (valuation provision based solely on **book value**, excluding unrealized profits on outstanding contracts, was held proper and binding); *Schaffer v. Below,* 278 F.2d 619, 625 (3d Cir. 1960) (provision in shareholders' agreement which provided for the repurchase

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

of a deceased stockholder's shares at "**book value**" was enforceable since the "[t]erm 'book value', when applied to corporate stock, 'ordinarily means the net value, as shown on the corporate books of account of all the assets of the corporation after deducting all of its liabilities.'"); *Hollister v. Fiedler,* 92 A.2d 52, 57 (N.J. Super. Ct. App. Div. 1952) (the use of "**book value**" to value the price of the shares in a closely held corporation "is not an arbitrary value that may be entered upon the books of a corporation but is predicated on the market value of the assets of a corporation after deducting its liabilities" [citation omitted]).[56]

### 4.    Repurchase Prices Fixed By Stock Restrictions Are Upheld Even If They Are Significantly Less Than The Shares' Unrestricted Fair Market Value.

Courts in Illinois and elsewhere have consistently enforced stock restrictions and repurchase price formulae, even if enforcement results in a valuation and a sale of the restricted shares at a price significantly less than the shares' unrestricted fair market value – provided that the formula price per share *was fair at the time the restriction was created.*

For example, in *Yeng Sue Chow v. Levy Strauss & Co.,* 122 Cal. Rptr. 816 (Cal. Ct. App. 1975), the corporation's right to repurchase shares at **book value** was upheld despite the fact that the value of the shares tripled 10 months later when the corporation went public.  The court so held because the shares were in a close corporation and thus the book value price was fair and justified.  *Id.* at 820-21.

Similarly, in *In re Mather's Estate,* 189 A.2d 586 (Pa. 1963), the Pennsylvania Supreme Court enforced a shareholders' agreement which required a deceased shareholder's estate to sell the decedent's shares in a close corporation to the surviving shareholders at $1 per share – even though the shares were, at the time of

---

[56] Other cases to the same effect are collected at 1 O'Neal and Thompson, *Close Corporations and LLCs: Law and Practice* § 7:28 (Rev. 3d ed. 2006); Annotation, *Meaning of Book Value of Corporate Stock,* 51 A.L.R.2d 606 (1957).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

the repurchase, on an unrestricted basis, worth $1,060 per share and, even though, when the shareholders' agreement was created, they were worth $50 per share. In enforcing the restricted stock agreement, the Pennsylvania Supreme Court noted that the purpose of the agreement, to keep the family business in the Mather family, was a legitimate and *bona fide* business reason which validated the agreement. *Id.* at 590; s*ee also Allen v. Biltmore Tissue Corp.,* 141 N.E.2d 812, 815 (N.Y. 1957) (stock price restriction upheld because "…[t]he validity of the restriction on transfer does not rest on any abstract notion of intrinsic fairness of price. To be invalid, more than mere disparity between option price and current value of the stock must be shown. [citation omitted] … Since the parties have in effect agreed on a price formula which suited them, … the restriction is reasonable and valid."); *Cutter Labs., Inc. v. Twining,* 34 Cal. Rptr. 317, 325 (Cal. Ct. App. 1963) (stock buy-back provision enforced even though the corporation repurchased its stock for $36,000 when its unrestricted market value was $800,000).

Even though a radical disparity may exist between the actual or "fair market" value of the stock and the formula price when the restrictions are applied, the price restrictions will be sustained *provided that the restrictions were fair at the time they were made.* Thus, in *Jones,* 388 P.2d at 563, the Washington Supreme Court enforced a restricted stock agreement which required minority shareholders to sell their stock back to the majority shareholders at **book value,** even though the book value of the shares was $91,000 and their unrestricted fair market value, established by experts at trial, was $2.5 million; the court noted that the agreement was *fair and equitable when made by the parties.* And in *Rosiny v. Schmidt,* 587 N.Y.S.2d 929, 932 (N.Y. App. Div. 1992), a stock restriction which required the estate of two deceased shareholders in a close corporation to sell their shares to the surviving shareholders at **book value** even though the book value of the shares was

-91-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

$200 per share and the unrestricted fair market value was $4,225 per share was upheld because it was fair when made.[57]

In sum, a restricted stock agreement, which requires the owner of stock in a closely held corporation to give the corporation or the other stockholders an option to purchase his stock under certain circumstances at a specified price, which often is its existing **book value**, is valid, reasonable, and fully enforceable provided that the agreement was fair and reasonable when made.

### 5. Enforcement Of Valid Stock Restrictions, Including A Pricing Formula, Does Not Constitute A Breach Of Fiduciary Duty.

It is also well established that enforcement of a restricted stock agreement does not constitute a breach of the fiduciary duty of loyalty or good faith by the enforcing party even when the agreed upon repurchase or buyout price for the corporation's shares is substantially less than their unrestricted fair market value. *Blank v. Chelmsford Ob/Gyn, P.C.,* 649 N.E.2d 1102, 1106 (Mass. 1995) (questions of good faith and loyalty do not arise when all the stockholders in advance enter into agreements concerning the purchase of stock of a withdrawing or a deceased stockholder because the stockholders receive all that they had bargained for which in this instance was the stock's **book value**); *Gallagher v. Lambert,* 549 N.E.2d 136,

---

[57] *Quick v. Campbell,* 412 So. 2d 264, 267 (Ala. 1982) (**book value** price enforced even though it was less than one half of shares' unrestricted fair market value); *McCreery v. R.S.A. Mgmt., Inc.,* 287 S.E.2d 203, 205 (Ga. 1982) (book value price of "0" upheld and enforced); *Covey v. Covey's Little America, Inc.,* 378 P.2d 506, 513 (Wyo. 1963) (**book value** repurchase price upheld even though it "failed ... to approach market value."); *In re Weinsaft's Estate*, 647 S.W.2d 179, 182-83 (Mo. Ct. App. 1983) (presently unreasonably low repurchase price upheld because *there was no evidence that would support a conclusion that the price of the stock was unreasonable when the agreement was made.*" (emphasis added)); *Evangelista v. Holland,* 537 N.E.2d 589, 592-93 (Mass. App. Ct. 1989) (fact that the price established by a stockholders' agreement may be less than the appraised or market value is unremarkable); *Maschmeier v. Southside Press, Ltd.,* 435 N.W.2d 377, 382-83 (Iowa Ct. App. 1988) (formula price for stock enforced even though it was significantly less than the shares' unrestricted fair market value); *Concord Auto Auction, Inc. v. Rustin,* 627 F. Supp. 1526, 1531 (D. Mass. 1986) (a valid and reasonable transfer restriction is not unenforceable because the price at which it is enforced is inadequate or excessive compared to the unencumbered fair market value of the stock).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

137-38 (N.Y. 1989) (restricted stock agreements "define the scope of the relevant fiduciary duty and supply certainty of obligation to each side.  They should not be undone simply upon an allegation of unfairness."); *Evangelista v. Holland,* 537 N.E.2d 589, 592 (Mass. App. Ct. 1989)  ("[q]uestions of good faith and loyalty do not arise when all the stockholders in advance enter into an agreement for the purchase of stock of a withdrawing or deceased shareholder"); *Unigroup, Inc. v. O'Rourke Storage & Transfer,* 980 F.2d 1217, 1221 (8th Cir. 1992) (simply because directors are deemed fiduciaries, they do not owe a duty to pay anything other than **book value** which is articulated in the corporate repurchase by-law); *Renberg v. Zarrow,* 667 P.2d 465, 472 (Okla. 1983) (enforcement of a restricted stock agreement which resulted in a purchase for less than [the] actual value of the stock "does not subject the agreement to attack as a breach of the relation of trust and confidence"); *Estate of Meller v. Adolf Meller Co.,* 554 A.2d 648, 652 (R.I. 1989) (when a restricted stock agreement was fair when made, "there is no equitable duty on the part of the other shareholders to revise, update or change the redemption price in the absence of an agreement to do so").[58]

### 6. The Stock Restrictions In The JDS Articles Were Fair And Reasonable When Made.

The ownership and transfer restrictions, rights of repurchase, and price formula in the JDS Articles were fair and equitable when measured by the

---

[58] *Accord Nichols Const. Corp. v. St. Clair,* 708 F. Supp. 768, 770-72 (M.D. La. 1989), *aff'd,* 898 F.2d 150 (5th Cir. 1990) (a shareholders' agreement is the law between the parties, is enforceable in accordance with its terms, and is not a breach of fiduciary duty even though an accurate calculation of the price of the shares of a withdrawing shareholder under its terms (*i.e.,* **book value**) resulted in a price per share that was "unconscionably low" compared to the shares' true (unencumbered) market value); *Miller Waste Mills, Inc. v. MacKay,* 520 N.W.2d 490, 495 (Minn. Ct. App. 1994) ("price disparity, however, between current market value and record [book] value alone is not sufficient to make a transfer restriction invalid."); *Martin v. Graybar Elec. Co.,* 285 F.2d 619, 626 (7th Cir. 1961) (there was no breach of fiduciary duty by Graybar's officers and directors because the plaintiff gave his consent to every material step taken in the formation and carrying forth of the retirement plan and did not make an objection until after his retirement.").

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

circumstances prevailing in 1956 when the restrictions and price formula at issue were first created. At that time, Mr. Schneider first investigated and determined how the fair market value of JDS's common shares should be calculated. As noted above, in 1956, JDS was a family limited partnership and was incorporated by John Schneider specifically to provide a vehicle for employee ownership. In order to perpetuate family and employee ownership of JDS, Mr. Schneider at that time inserted into JDS's original by-laws essentially the very same ownership and transfer restrictions, JDS's repurchase rights, and the book value pricing mechanism which are now in JDS's Articles. Mr. Schneider was so wedded to these provisions that in 1972, in order to further highlight them, he directed Zwirner to transfer them from JDS's by-laws to its Articles of Incorporation so that they were a matter of public record.

Seventeen years after the transfer restrictions, rights of repurchase, and book value pricing system had been first made part of JDS's by-laws, and one year after they had been moved to its Articles, HolliShare was created. The ownership and transfer restrictions placed on JDS's shares, and JDS's rights of repurchase, had served their intended purpose of maintaining JDS as private and insuring its continued employee ownership. The book value method for calculating the fair market value of JDS's shares had, at that time, also been used for many years and had also served its intended purpose. It was considered by Mr. Schneider to be sound, simple, and fair. For numerous reasons, Mr. Schneider believed the use of the book value system was the best method available to value JDS's common shares.

These were the prevailing circumstances when this decision was made to expressly incorporate into the HolliShare trust instrument the ownership and transfer restrictions, JDS's rights of repurchase, and the book value system. These decisions were fair and equitable when made.

-94-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The court concludes that because the restrictions on the JDS shares are valid and fully enforceable, the book value of the JDS shares constitutes "adequate consideration" under ERISA § 408(e), and sufficient or fair market value under ERISA § 404(a)(1)(B) and § 404 (a)(1)(A).

I.   **Applicable Federal Estate Tax Provisions, Treasury Regulations, And Decisional Law Also Establish That The Book Value Of JDS Common Shares Is "Adequate Consideration" Under ERISA § 408(e) And Is Their Fair Market Value Under ERISA § 404(a).**

In determining the "fair market value" of shares in a closely held corporation for federal estate tax purposes, a book value price or any other reasonable price formula built into a restricted stock agreement has been held enforceable and binding by the I.R.S.  Again, this result obtains even if the shares, on an unrestricted basis, have a significantly higher "market value" calculated under other commonly accepted valuation methodologies.

Under applicable Treasury Regulations, I.R.S. Revenue Rulings, and other I.R.S. pronouncements, the fair market value of JDS's common shares is their book value.  These authorities should be given significant, if not controlling, weight here.

1.   **Background - The Applicable I.R.C. Provisions And Treasury Regulations ("Treas. Regs.")**

a.   **The Federal Estate Tax Is Based On The Fair Market Value Of All Property In A Decedent's Gross Estate.**

The federal estate tax provisions in the I.R.C. require that "the value of all property to the extent of the interest therein of the decedent at the time of his death" be included in his gross estate.  26 U.S.C. ("I.R.C.") § 2033.  Federal estate taxes are imposed on the transfer of the taxable estate of every citizen or resident of the United States.  I.R.C. § 2001 (a).  The taxable estate is defined as the gross estate less allowable deductions.  I.R.C. § 2051.  The gross estate is defined to include the value of all property owned by a decedent at the time of death.  I.R.C. § 2031.  In most instances, the value of the gross estate is the "fair market value" of the

-95-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

included property as of either the date of death or as of the alternate valuation date under I.R.C. § 2032 if elected by the executor.  Treas. Reg.  § 20.2031-1(b).  This includes property consisting of restricted stock such as the JDS common shares.

### b.  I.R.C. § 2031, Treas. Reg. § 20.2031-2(h), And Revenue Ruling 59-60

Section 2031(b) of the I.R.C. simply provides, in general terms, that the fair market value of stock, not listed on an exchange and the value of which cannot be determined with reference to bid and ask prices, is to be determined "in addition to all other factors," by considering "the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." The "other factors" are found in the Treas. Regs., which are far more comprehensive than the statute and furnish the specific requirements applied in the decisional law. As the applicable Treas. Regs. themselves make clear, the valuation of stock in a closely held business is, due to the absence of public trading or an established market, one of the more complex and inexact areas of estate valuation.

However, and critical here, the Treas. Regs. specifically provide that, under certain circumstances, a restricted stock agreement can establish the "fair market value" of stock in a closely held corporation provided that the agreement satisfies certain conditions.  In that regard, Treas. Reg. § 20.2031-2 (h) states:

> *Securities subject to an option or contract to purchase.*  Another person may hold an option or a contract to purchase securities owned by a decedent at the time of his death.  The effect, if any, that is given to the option or contract price in determining the value of the securities for estate tax purposes depends upon the circumstances of the particular case .... Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities *unless it is determined under the circumstances of the particular case that the agreement represents a bonafide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration or monies worth* [emphasis added].

//

-96-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The Treas. Regs. set forth in § 20.2031 were promulgated in 1958 pursuant to I.R.C. § 2031. In 1959, they were expanded through Revenue Ruling 59-60 ("Rev. Rul. 59-60"; 26 C.F.R. § 20.2031-2.) Significantly, § 8 of Rev. Rul. 59-60 pointedly addresses the impact of a restricted stock agreement upon "the fair market value" of closely held shares:

> Frequently, in the valuation of closely held stock for estate and gift tax purposes, it will be found that the stock is subject to an agreement restricting its sale or transfer. Where shares of stock were acquired by a decedent subject to an option reserved by the issuing corporation to repurchase at a certain price, *the option price is usually accepted as the fair market value for estate tax purposes* [emphasis added].

Treasury Reg. § 20.2031-2(h) and § 8 of Rev. Rul. 59-60 are directly applicable to the validity and enforceability of the book value pricing system set forth in the JDS Articles which is, in turn, incorporated into the Hollister trust instrument.[59] Their application, as interpreted by federal courts and other federal tax authorities, establishes beyond question that the fair market value of the JDS common shares is unquestionably their book value.

## 2. Interpretations And Applications Of § 8 Of Revenue Ruling 59-60 And Treas. Reg. § 20.2031-2(h) Are Controlling Here.

The strongest proponent of the application here of federal estate tax precedents is the D.O.L. itself. In the Preamble to the Regulations it proposed in

---

[59] In 1990, the I.R.C. was amended to add Chapter 14 which tightened the rules so as to preclude low evaluations as disguised testamentary devices. Among other things, the amendments set forth special valuation rules for estate and gift tax purposes. These rules only apply to restricted stock agreements executed after October 8, 1990 or any previously executed restricted stock agreement that was, after October 8, 1990, "substantially modified". Treas. Reg. § 25.2703-2. In 1992, the new Treasury Regulations (Treas. Reg. § 25.2703-1 *et. seq.*) were adopted to implement the 1990 I.R.C. amendments. Notwithstanding their amendments from time to time, the ownership and transfer restrictions, rights of repurchase, and the book value pricing formula in the JDS Articles have not been "substantially modified" within the meaning of the new 1992 Treas. Regs. because the "quality, value and timing" of the JDS restrictions remained unchanged. Treas. Regs. §§ 25.2703-1(c)(1)-(c)(2); *Estate of Blount v. Comm'r,* 428 F.3d 1338, 1344 (11th Cir. 2005); I.R.S. P.L.R. 9141043 (July 16, 1991); I.R.S. P.L.R. 9248026 (Sept. 1, 1992); I.R.S. P.L.R. 9432017 (May 16, 1994); I.R.S. P.L.R. 9620017 (Feb. 15, 1996).

-97-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

1988, the D.O.L. articulated, for purposes of ERISA, its proposed definition of "fair market value." In doing so, the D.O.L. relied upon the definition of "fair market value" as established by federal estate tax authorities:

> This proposed definition [of fair market value] essentially reflects the well-established meaning of this term in the area of asset valuation. *See, e.g.,* 26 CFR 20.2031-1 (estate tax regulations); Rev. Rul. 59-60, 1959-1 Cum. Bull. 237; *United States v. Cartwright,* 411 U.S. 546, 551 (1973); *Estate of Bright v. United States,* 658 F.2d 999, 1005 (5th Cir. 1981)....

53 Fed. Reg. 17632.

Later, the D.O.L. addressed the issue of a fair market valuation of corporate stock for which there is no generally recognized market. Again, the D.O.L. looked to federal estate tax authorities for direction, specifically Rev. Rul. 59-60:

> The Internal Revenue Service has had occasion to address the valuation problems posed by one type of such securities – securities issued by closely held corporations. Rev. Rul. 59-60, 1959-1, Cum. Bull. 237, lists a variety of factors to be considered when valuing securities of closely held corporations for tax purposes. *The Department's experience indicates that Rev. Rul. 59-60 is familiar to plan fiduciaries, plan sponsors, and the corporate community in general. The Department has, therefore, modeled this proposed special rule after Rev. Rul. 59-60 ..."* [emphasis added].

While the D.O.L.'s proposed Regulations never became law, their exclusive dependence upon federal estate tax rulings, regulations, and case authorities for instruction and guidance establishes the controlling weight to be accorded these very same authorities here in determining the "fair market value" of the shares of a closely held corporation, such as JDS, for which there is no established market.

The controlling weight to be accorded these authorities is also reinforced by the fact that ERISA nowhere defines "fair market value". However, ERISA defines "adequate consideration" for closely held shares (without an established market) as their "fair market value ... as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan ...." 29 U.S.C. § 1002(18). Under the I.R.C., the property in an estate is taxed on the basis of its "fair market value". The D.O.L., in its proposed Regulations, proposed an ERISA definition of "fair market

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

value" virtually identical to that used in the I.R.C.  While the D.O.L.'s proposed Regulations were never enacted, again, it is significant that the D.O.L. looked to the I.R.C. for guidance.  In addition, courts faced with legal issues under ERISA which were analogous to legal issues arising under I.R.C. have also looked to the I.R.C., Treas. Regs., and federal estate tax authorities as relevant precedents.[60]

Finally, even one of plaintiffs' own experts, Kevin Long, agrees that federal estate tax precedents are controlling here.  In his Report, he states:

> Many companies, in my experience, have article restrictions that apply to the stock in their ERISA retirement plans....  This is a long standing area of litigation between the Internal Revenue Service (IRS) and taxpayers when determining fair market value of an asset.  [Dkt. 410, p.5.]

* * *

> One of the primary guidelines the courts look to for definitional guidance in determining fair market value is Revenue Ruling 59-60.  Appraisal experts and the courts follow the standard of a fully informed hypothetical willing buyer and willing seller under no compulsion to buy or sell, as described in Revenue Ruling 59-60 as the fundamental standard for their methods of establishing fair market value for trustees in retirement plan transactions.  [Dkt. 410, p.7.]

* * *

---

[60]  *See, e.g., Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 564, 517-21 (1981) (Treas. Regs. and I.R.S. rulings are relevant in interpreting the anti-discrimination provisions in ERISA); *Tully v. Ethyl Corp.*, 861 F.2d 120, 125 (5th Cir. 1988) (Treas. Regs. relied upon in determining whether employer properly calculated pre-retirement benefits: "[W]e do defer to the Internal Revenue Service's interpretation of the statutory language, since the I.R.S. was originally lone of the agencies charged with administering ERISA..."); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 917-18 (2d Cir. 1987) (I.R.C. provisions and I.R.S. Revenue Rulings relied upon in deciding whether an ERISA Plan was a "governmental plan" within the meaning of ERISA: "Because the I.R.S. is one of the agencies charged with administering ERISA, its interpretations of the statute are entitled to great deference"); *Becker v. Weinberg Group Inc. Pension Trust*, 473 F. Supp. 2d 48, 64 (D.D.C. 2007) (I.R.S. Treas. Regs. applied to determine if ERISA was violated by Plan distributions to certain highly compensated individuals); *Goodin v. Innovative Technical Solutions, Inc.*, 489 F. Supp. 2d 1157, 1160 (D.C. Haw. 2007) (Treas. Reg. cited in determining whether defendants violated ERISA in determining the fair market value of employer's stock for purposes of an ESOP's put option); *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 332-33 (S.D.N.Y. 2006) ("There is significant statutory overlap between ERISA and the Internal Revenue Code on matters such as funding, vesting and benefit accrual"); *Eggert v. Merrimac Paper Co. Inc.*, 311 F. Supp. 2d 245, 257 (D.C. Mass. 2004) (I.R.S. Treas. Regs. applied to determine if fair market value of put options in an ERISA Plan was properly calculated).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Determining fair market value for the stock of a private company can be difficult. Historically this problem has arisen most frequently in the estate tax context and it is in that area that a large body of law and precedent dealing with the IRS is available to be followed. In fact, in numerous court cases, the IRS' estate tax regulations and administrative pronouncements are looked at to determine how to conduct this investigation of value. [Dkt. 410, p.8.][61]

For the foregoing reasons, the interpretations and applications by the Tax Court and by other federal courts of the provisions of the I.R.C. and Treas. Reg. § 20.2031-2(h) to determine, for federal estate tax purposes, the "fair market value" of shares of a closely held corporation for which there is no established market, are highly probative, if not controlling here. Their application establishes that JDS's common shares have been sold by HolliShare to JDS, or used to calculate plaintiffs' vested benefits, for "adequate consideration" under ERISA, and that their "fair market value" is their book value.

> **a.   Under I.R.C. § 2031, Treas. Reg. § 20.2031-2(h), And Applicable Decisional Law, The Restrictions In The JDS Articles Constitute A Bona Fide Business Arrangement, Were Made For A Legitimate Business Purpose, And Fix The Fair Market Value Of JDS's Common Shares As Their Book Value.**

Courts that have been called upon to interpret and apply Treas. Reg. § 20.2031-2(h) have uniformly held that a restricted stock agreement, such as the JDS Articles, establishes the fair market value of shares in a closely held corporation for federal estate tax purposes as long as the agreement:

> (1)   Specifies the price to be paid for the shares either by formula or by reference to a specific price; *Estate of Blount v. Comm'r*, 87 T.C.M. (CCH) 1303, 1309 (2004), *aff'd in part and rev'd in part on other grounds*, 428 F.3d 1338 (11th Cir. 2005); *Estate of Lauder v. Comm'r,* 64 T.C.M. (CCH) 1643, 1656 (1992); *Estate of Seltzer v.*

---

[61] Although Long is correct that estate tax regulations and decisions are relevant to ERISA, his analysis of the issues in this case is flawed. Moreover, Long offers only legal conclusions and opinions, and thus his opinions do not qualify as proper expert testimony.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Comm'r,* 50 T.C.M. (CCH) 1250, 1253 (1985); *Estate of Littick v. Comm'r,* 31 T.C.M. (CCH) 181, 186-87 (1958);

(2)    Precludes a transfer of the shares during the holder's life at a price higher than the price specified in the agreement; *Slocum v. United States,* 256 F. Supp. 753, 754 (S.D.N.Y. 1966); *Baltimore Nat'l Bank v. United States,* 136 F. Supp. 642, 654 (D. Md. 1955); *May v. McGowan,* 194 F.2d 396, 397 (2d Cir. 1952); *Wilson v. Bowers,* 57 F.2d 682, 683 (2d Cir. 1932); *Estate of Weil v. Comm'r,* 13 T.C.M. (CCH) 653, 654 (1954)*; Fiorito v. Comm'r,* 33 T.C. 440, 444 (1959);

(3)    Requires that the estate of the deceased shareholder sell the shares upon his death, at the specified price; *Estate of Godley v. Comm'r,* 80 T.C.M. (CCH) 158, 164 (2000); *Estate of Gloeckner v. Comm'r,* 152 F.3d 208, 212-14 (2d Cir. 1998); *St. Louis County Bank v. United States,* 674 F.2d 1207, 1210-11 (8th Cir. 1982); *Mathews v. United States,* 226 F. Supp. 1003, 1005-06 (E.D.N.Y. 1964); *United States v. Land,* 303 F.2d 170, 173-74 (5th Cir. 1962); *Baltimore Nat'l Bank v. United States,* 136 F. Supp. 642, 654-55 (D.C. Md. 1955); and

(4)    Fixes the price as a "*bona fide* business arrangement" and not a device to pass the decedent's shares to the natural objects of his bounty for less than adequate and full consideration. *Comm'r v. Bensel,* 100 F.2d 639, 639 (3d Cir. 1938).

Whether a restricted stock agreement satisfies the requirements of Treas. Reg. § 20.2031-2 depends upon the nature of the arrangement and the surrounding circumstances at the time the agreement was created, not at the time it is enforced. *Slocum,* 256 F. Supp. at 756.

The emphasis in the judicial decisions interpreting and applying the Treas. Reg. § 20.2031-2(h) is upon the *bona fides* of the arrangement – is it a real, legitimate business arrangement supported by adequate consideration or is it a tax avoidance substitute for a testamentary disposition?  Typically, the issue has arisen in family settings where the parties to the restricted stock agreement are related to each other, thereby creating natural inferences that the agreement is simply a device to pass the shares of a closely held corporation at a reduced price to the natural objects of a decedent's bounty.  That is not an issue here since, other than

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

his wife, Minnie, John Schneider had no heirs or any other relative or family member who benefitted from the transfer restrictions, the rights of repurchase, or the book value pricing formula in the JDS Articles.

Stated simply, if an agreement satisfies each of the requirements of Treas. Reg. § 20.2031-2(h), it establishes the fair market value of the shares of a close corporation for federal estate tax purposes.  The restrictions in the JDS Articles satisfy each of the requirements of Treas. Reg. § 20.2031.  The JDS Articles (1) specify the price to be paid for common shares by a formula – book value; (2) preclude transfers not only at a price higher than book value, but also prohibit "outsiders" from acquiring any JDS shares; 3) require any JDS shareholder to sell his, her or its shares, not only in the event of death but also on termination of employment; and (4) were promulgated for the *bona fide* business purposes of maintaining the independence of the company, its employee-owned character, and the privacy of its financial information.  Thus, the fair market value of JDS's common shares was and remains their book value.

> **b.    Judicial Decisions Which Have Applied Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) To Restricted Stock Agreements, Such As The JDS Articles, Establish That The Fair Market Value Of JDS Common Shares Is Their Book Value.**

Here, there is no issue as to whether the JDS Articles constitute a device to pass a decedent's shares to the "natural objects of his bounty" for less than adequate consideration.  Nor is there any issue as to whether the ownership and transfer restrictions, rights of repurchase, and repurchase price in the JDS Articles (incorporated into HolliShare) were binding "during the life and after the death of the shareholder" (here, by analogy, the Plan and/or the beneficial owners, the Plan participants).   Under Treas. Reg. § 20.2031-2(h) and decisions applying the Regulation, the ownership and transfer restrictions, rights of repurchase, and

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

repurchase price in the JDS Articles constitute "a *bona fide* business arrangement" and were for a legitimate business purpose.

Each of the numerous considerations which led to JDS's adoption of the ownership and transfer restrictions, rights of repurchase, and the book value pricing method in 1956, which were later adopted by HolliShare at its inception in 1973, has been held sufficient to support a restricted stock agreement as a "*bona fide* business arrangement" for federal estate tax purposes.

For example, the use of a restricted stock agreement to insure continued ownership (by employees, family, or current owners) has been consistently held to be a legitimate business purpose and to be a *bona fide* business arrangement. *Quan v. Computer Scis. Corp.,* 623 F.3d 870, 881 (9th Cir. 2010) (ERISA favors employee ownership); *Foltz v. U.S. News & World Report, Inc.,* 865 F.2d 364, 373 (D.C. 1989) ("ERISA specifically favors that pattern [long term employee ownership] by exempting Employee Stock Ownership Plans from ERISA's 10 percent cap on plans' holdings of 'employer securities.'"); *Estate of Seltzer v. Comm'r,* 50 T.C.M. (CCH) 1250, 1252 (1985) (convinced by the evidence that the purpose of a restricted stock agreement was to restrict ownership and control of the corporation, and that without the agreement these goals could not have been achieved, the court

-103-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

concluded "that the Agreement was entered into and has been adhered to as a *bona fide* business arrangement.").[62]

The decision in *Estate of Carpenter v. Comm'r*, 64 T.C.M. (CCH) 1274 (1992), is a leading case on this point. In *Carpenter*, the Tax Court upheld as *bona fide* a restricted buy-sell agreement which required a stockholder to sell his shares of a closely held corporation back to the corporation at "the **book value** of [his] common stock as shown upon the last annual statement of the corporation." *Id.* at 1275. The court held this formula established the fair market value of the decedent's stock because the agreement had been created for the valid purpose of allowing the surviving stockholder to continue the operation of the business and to prevent strangers from acquiring ownership.[63]  *Id.* at 1280. The court also held that the **book value** formula price was realistic, reasonable and fixed the fair market value of the deceased shareholder's stock:

> There is nothing else in the record to show what the actual fair market value of this stock might have been in 1981 [the date of the buy-sell agreement]. The Agreement provided for a yearly review of the price but *the parties never changed the price.* From the testimony in this record, we conclude that the weight of the evidence is that the book value price the

_____

[62]  Other cases to the same effect are: *Estate of Gloeckner v. Comm'r,* 152 F.3d 208, 214 (2d Cir. 1998) (restricted stock agreement represents a *bona fide* business arrangement: "this test is sufficiently satisfied when the purpose of a restricted agreement is to maintain current managerial control – whether by family or outsiders"); *Estate of Davis v. Comm'r,* 37 T.C.M. (CCH) 341, 347 (1978) (formula price which was lower than unrestricted value sustained in several restricted stock agreements because the parties intended: "to provide for the retention of control of the Bank by the survivor on a fair and equitable basis"); *Slocum,* 256 F. Supp. at 755-56; *Estate of Stone v. Comm'r,* 86 T.C.M. (CCH) 551, 579 (2003); *Estate of Hall v. Comm'r,* 92 T.C.M. (CCH) 312, 322-37 (1989); *Estate of Harrison v. Comm'r,* 52 T.C.M. (CCH) 1306, 1309 (1987); *St. Louis County Bank v. United States,* 674 F.2d 1207, 1210-11 (8th Cir. 1982); *Roth v. United States,* 511 F. Supp. 653, 655 (D.C. Mo. 1981); *Estate of Bischoff v. Comm'r,* 69 T.C.M. (CCH) 32, 39-41 (1977) (a lower formula price in a restricted partnership agreement sustained because its purpose was "to maintain continuity of management and control of Boar's Head and its sister corporations ..."); *Estate of Strangi v. Comm'r,* 293 F.3d 279, 282 (5th Cir. 2002).

[63]  Similar to the JDS Articles and HolliShare, the agreement also provided that the book value applicable to any repurchase by the corporation or by the other shareholder was to be determined as of the end of the fiscal year preceding the date of the transaction, and was to be determined by the accountant for the company "according to accepted accounting principles". *Carpenter*, 64 T.C.M. (CCH) at 1276.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

parties agreed to in 1981 was agreed to in an *arm's length negotiation* between the two of them and *for business reasons* and in that sense was a *realistic price.*

*Id.* (emphasis added).

Similarly, here there is no evidence of what the unrestricted fair market value of JDS's common shares might have been in 1956, and only limited evidence regarding their hypothetical unrestricted fair market value in 1973 when HolliShare was created. In addition, unlike the situation in *Carpenter,* annual re-calculations of the book value of the shares in question are made each and every year, thereby strengthening the ongoing use of book value as the appropriate determinant of the fair market value of JDS's common shares.

*Carpenter* relied upon the (then) 56-year-old decision of the United States Supreme Court in *Helvering v. Salvage,* 297 U.S. 106 (1936), which is also controlling here. In *Helvering,* the Supreme Court was called upon to determine the validity of a taxpayer's argument that the fair market value of certain corporate shares was not to be determined on an unencumbered basis (under which each share was worth $1,164.70), but rather was limited to the price ($100 per share) at which the corporation had an option to repurchase the same shares. *Id.* at 109. In ruling for the taxpayer, and capping the fair market value of the shares at issue at $100 per share, the Supreme Court stated: "Considering the [corporation's] option to repurchase at par, outstanding in 1922, there could be no proper finding of fair market value at that time in excess of $100 per share." *Id.* The *Helvering* decision, the only U.S. Supreme Court decision which has addressed this specific issue, has been often cited with approval and remains good law.

Another leading decision, also rendered under similar facts, is *Estate of Seltzer v. Comm'r,* 50 T.C.M. (CCH) 1250 (1985). In *Seltzer,* the tax court upheld a restricted stock agreement as a *bona fide* business arrangement and ruled that the stock of the closely held corporation was includable in a decedent's gross estate at the price fixed by a buy-sell agreement (*i.e.,* **book** value), and not at its higher

-105-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

unrestricted fair market value. *Id.* at 1252. In reaching this result, the court was impressed by the evidence that, on three prior occasions, three owners had left the corporation and their stock was, as provided in the restricted stock agreement, repurchased by the corporation for its **book value** and was not resold to any third party or redistributed among the remaining shareholders:

> Since the Agreement was entered into, three of the contracting parties have severed the "ownership required relationships" with the company. In each such case the stock was sold to the corporation at book value, pursuant to the Agreement. The purchased stock was neither sold to anyone outside the circle of original shareholders, nor redistributed among the remaining shareholders. Rather, it is being held as treasury stock. We think this is convincing evidence that the purpose of the Agreement was to restrict ownership and control of the corporation. Absent the Agreement, this restrictive ownership could not have been achieved. We are convinced that the Agreement was entered into and has been adhered to as a *bonafide* business arrangement.

*Id.* (emphasis added). That the book value was less than the unencumbered fair market value of the shares was held to be of no consequence. It still established the fair market value of the shares:

> The fact that the fair market value of the encumbered interest may have been higher than the price fixed by the Agreement does not require us to find to the contrary. [citations omitted]. Neither does the fact that the value of goodwill is excluded from the purchase price invalidate the Agreement. [citations omitted].

*Id.* at 1254.

This decision is strongly supportive of defendants' position here. The ownership, transfer, repurchase, and price restrictions at issue in *Seltzer* are virtually identical to those in the JDS Articles. As in *Seltzer,* JDS has uniformly exercised its option and repurchase rights and has always, without exception, repurchased all JDS common shares available to it for their book values. Indeed, JDS's track record in exercising its repurchase rights is far more impressive than the track record of the close corporation in *Seltzer,* where the restrictions had been enforced on only three prior occasions. Here, the restrictions have been enforced for 38 years in hundreds of transactions. As in *Seltzer,* this history is "convincing

-106-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

evidence" that the restrictions in the JDS Articles were created in order to continue employee ownership and to maintain adherence to the Policies and Principles of Mr. Schneider – unassailably, a *bona fide* and legitimate business arrangement.

Restricted stock agreements, virtually identical to that contained in the JDS Articles, have also been sustained where the purpose of the agreement was, as here, to promote the business decision of a close corporation to remain private. A leading decision on this point was that rendered in *Estate of Hall v. Comm'r,* 92 T.C. 312 (1989). Many of the operative facts in *Hall* closely parallel those present here.

In *Hall,* the decedent, Joyce Hall, founded Hallmark Cards, Inc. ("Hallmark") in 1910. *Id.* at 314. He died in 1982. When he died, the business of Hallmark had expanded exponentially – such that, by 1982, Hallmark and American Greetings Corp. controlled 68% of the entire greeting card market. *Id.* at 322. Hallmark had maintained a strong policy to remain a privately held company in order to avoid public disclosure of financial information, and to make long range decisions without worrying about short-term earnings and stock prices. *Id.* at 316-17. As a private corporation, Hallmark believed it had a greater ability to maintain the confidentiality of its operating information as well as to save the cost and management time that public companies must expend to satisfy regulatory and compliance requirements. This policy was embraced by Hall, by members of Hall's family, and by Hallmark's Board of Directors. Hall believed that only three groups should own shares of Hallmark: (1) members of Hall's family, (2) Hallmark employees, and (3) various charities. To implement its business policies, Hallmark adopted ownership and transfer restrictions in its Articles and other documents under which Hallmark shares could only be purchased or sold at their then existing **"adjusted book value"** which was determined by a detailed formula. *Id.* at 318-19.

At the time of Hall's death, the corporation had a first option to buy the decedent's common shares which it exercised at their adjusted book value. *Id.* at

-107-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

319-20.  The adjusted book value of Hallmark's shares at the time of the decedent's death was less than $2 per share, which was the fair market value listed on Hall estate's federal estate tax return.  *Id.* at 321.  The I.R.S. challenged that valuation and issued a Notice of Deficiency claiming that the value of Hall's Class C shares should be increased to over $4 per share.  *Id.* at 333-34.  This would have resulted in an increase in Hall's gross estate of over $167 million.

At trial, the parties provided extensive expert testimony.  The court rejected the expert testimony, upheld the restricted stock agreements, and concluded that the adjusted book value formula established by those agreements fixed the fair market value of the Class C common shares for federal estate tax purposes.[64]   *Id.* at 334-35.

In reaching this result, the court concluded that the various transfer restrictions set forth in the restricted stock agreements served a *bona fide* business purpose, namely, remaining private.  *Id.* at 335.  The court was also influenced by the number of repurchases – all of which were consummated at the shares' adjusted book value:

> All of the evidence supports the conclusion that Hallmark's owners intended to maintain the privately held status of the corporation.
>
> *          *          *
>
> Despite the existence of permitted transferees for over 50 years, there has never been a purchase or transfer of Hallmark stock at more than its adjusted book value.

*Id.* at 337, 342.

//

---

[64] "Each of the experts, appropriately, was purporting to determine the price at which the stock would have traded publicly if it were publicly held.  Those methods are necessarily imprecise and involve estimates and approximations which are generally less reliable than evidence of actual sales of the property to be valued.  *See Tripp v. Comm'r,* 337 F.2d 432, 434-35 (7th Cir. 1964)."  *Hall,* 92 T.C. at 338.

-108-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

There are many similarities between Hallmark's policy of staying private and limiting transferees to family members and employees and Mr. Schneider's Policies and Principles, in particular, Mr. Schneider's goal of keeping JDS independent and employee-owned. Equally parallel is the fact that for over 38 years the JDS restrictions have always been enforced by JDS. Moreover, in *Hall,* while permitted transferees "could" have purchased the shares at issue for more than the formula price, they never did so. Here, sellers of JDS common shares have no choice; they are required to sell JDS common shares to JDS for their book value and that is what they have done. The decision in *Hall* should be accorded great weight.

Restricted stock agreements with a price formula based on book value have also been sustained as consistently *bona fide* business arrangements on multiple other grounds similar to grounds present here. For example, they have been sustained on the basis that: (a) book value provides **certainty**, *Estate of Amlie v. Comm'r,* 91 T.C.M. (CCH) 1017, 1026 (2006); *Carpenter,* 64 T.C.M. (CCH) at 1278; (b) book value provides **"a means to assure future liquidity"**, *Amlie,* 91 T.C.M. (CCH) at 1025-26; *Carpenter,* 64 T.C.M at 1276; Committee on Finance Report, 136 Cong. Rec. at 30,539 (1990) (committee stated that a legitimate business reason which would validate a buy-sell agreement was one which was designed **"to allow owners to plan for future liquidity needs in advance"** and to **"avoid costly appraisals"**); (c) book value would produce a per share price that **"could not be manipulated"** and **created an affordable price**, *Carpenter,* 64 T.C.M at 1278; and (d) book value **would avoid costly litigation to remove the transfer restrictions**, *Hall,* 92 T.C.M. (CCH) at 330.

Under the foregoing decisions and Treas. Reg. § 20.2031-2(h), the repurchase and price restrictions in the JDS Articles fix the fair market value of JDS's common shares as their book value. Even the I.R.S. would agree.

//

-109-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

For example, in the situation presented in I.R.S. Revenue Ruling 54-76, 1954-1 CB 194, the decedent had bequeathed shares of a close corporation to a certain legatee.  The corporation had, as set forth in its articles of incorporation, an option to repurchase its shares at a specific price before any transfer could be made by any of its shareholders to others.  The state's Supreme Court (unidentified) affirmed the lower court's decision that the restrictions were binding on the decedent and his estate because: (1) they were included in the articles of incorporation and were, therefore, "in effect a part of the charter of the corporation," and (2) a contract existed between the decedent and the corporation which was valid and enforceable.  In its Ruling, the I.R.S. upheld the restriction as valid and enforceable and stated that the formula price locked in the fair market value of the shares:

> [W]here a stockholder acquires stock from the corporation subject to an option reserved to the corporation in the articles of organization to repurchase the stock at a specific price before any sale or transfer, including any transfer at the death of the stockholder, can be validly made to others, *the option price, in the absence of other material circumstances, will be accepted as the fair market value at the date of death, especially where the option is exercised by the corporation. See Estate of Albert L. Salt, et al. v. Commissioner,* 17 T.C., acquiescence, C.B. 1952-1, 4 [emphasis added].

An identical result was reached in I.R.S. P.L.R. 8541005 (1985).  There, a shareholder agreement was executed under which the founder and majority owner of a closely held corporation and all other shareholders agreed, in order to preserve the employment of the stockholder-employees who were indispensable to the operation of the business, that no shareholder could transfer or encumber his shares without the consent of the others unless he first offered to sell the shares to the corporation according to the terms stated in the agreement.  The agreement further provided that upon the death of a shareholder, the corporation would purchase the shareholder's stock.  All purchases under the agreement, either during a shareholder's lifetime or upon his death, were to be made at a price established by an (unspecified) formula.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The I.R.S. concluded that since the parties to the agreement were not related, and the objects of the agreement, *i.e.,* to assure the continued employment of the stockholders who were valued employees and to insure permanent ownership of the company by its existing shareholders, the agreement represented a *bonafide* business arrangement: "Accordingly, WE CONCLUDE that the price set in the Buy-Sell Agreement ... establishes the price of the stock for federal estate tax purposes." *Id.* at *3.

### c. Even If The Repurchase Price Or Formula In A Restricted Stock Agreement Results In A Price That Is Only A Fraction Of The Unrestricted Fair Market Value Of The Same Shares, The Formula Price Will Still Be Upheld And Enforced – Provided That The Repurchase Price Or Price Formula Was Fair When Created.

To be valid and enforceable as a *bona fide* business arrangement, the specified repurchase price or price formula in a restricted stock agreement must have been fair and reasonable *at the time it was created, not when it was enforced. See, e.g., Carpenter,* 64 T.C.M. (CCH) at 1280; *Fiorito,* 33 T.C. at 445; *Davis,* 37 T.C.M. (CCH) at 347; *Amlie,* 91 T.C.M. (CCH) at 1026; *Gloeckner,* 152 F.3d at 216; *Littick,* 31 T.C.M. (CCH) at 181; *Roth,* 511 F. Supp. at 654; *St. Louis County Bank,* 674 F.2d at 1210. Two noteworthy decisions applied this standard to factual situations not unlike the situation presented here.

*Rudolph v. United States,* 93-1 U.S.T.C. ¶60130 (S.D. Ind. 1993), held that a shareholders' agreement which locked in the fair market value of stock in the corporation for federal estate tax purposes was designed to provide continuity in management and to protect the closely held corporation's cash flow. In the agreement, each shareholder agreed that he could not transfer his stock during his lifetime, or after his death in any manner, other than by selling it back to the corporation at *$1,000 per share.* The price of $1,000 per share remained unchanged even though the shareholders' agreement was amended on several

-111-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

occasions.  When one of the shareholders died, his estate's federal tax return valued his 1,850 shares at *$1,000 per share*. The I.R.S. argued that the fair market value of the shares was actually $2,579.20 per share, over two and a half times the price specified in the shareholders' agreement.

The tax court concluded that the $1,000 per share agreement price fixed the fair market value of the decedent's shares for federal estate tax purposes:

> [T]he Court should evaluate the reasonableness of the stock purchase price as of the date the agreement was entered into.  To hold otherwise would be to effectively render buy/sell agreements invalid; in the majority of cases, such an agreement provides for a purchase price which is lower than the fair market value of the stocks, as determined by an expert, on the date of death.

*Id.* The court concluded that, based upon the circumstances that existed when the applicable restricted stock agreement was executed (*i.e.,* the economy, the corporation's financial condition, and the state of the industry), the per share price of $1,000 was fair and reasonable.  *Id.*

As the court noted in its Findings of Fact (see *supra* Part I), the decision of HolliShare to utilize a book value pricing formula was, at the time the decision was made in 1973, fair and reasonable under the circumstances.  Considering those circumstances, together with the fact that, unlike the situation in *Rudolph,* the book value of JDS's common shares is recalculated annually, the fair market value of JDS's common shares was and is unquestionably their "book value".

The growth of Hollister's business and its profitability since 1973 does not warrant a different conclusion.  In *Slocum v. United States,* 256 F. Supp. 753 (S.D.N.Y. 1966), the district court held that 1915 transfer and price restrictions in a close corporation's certificate of incorporation were binding and established the fair market value of the shares.  The court found that the restrictions had been adopted for "the purpose of keeping control of a business and its present management, which is recognized as a business purpose." *Id.* at 755.  The price restriction was upheld even though it fixed the price at $100.00 per share for shares owned by a

-112-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

shareholder who died *almost 50 years later*, and many years after the business purpose behind the restrictions (to preserve family control of the business) had been accomplished.  Rejecting the government's objection that the underlying purpose for the restrictions had "ceased to exist", the court stated:

> The government, in effect, would place an affirmative duty on the decedent and her husband as majority shareholders of Craig House to delete a provision of the certificate of incorporation when, as the government contends, its purpose ceased to exist on the ground that the provision might reduce the potential estate tax liability of the decedent (or her husband).  The government cites no authority for this novel proposition, and I find none.  I do not see how, as a matter of law or fact, events thirty years after the adoption of a provision in a certificate of incorporation can affect either the *bona fide* nature of such provision or the non-existence of a tax avoidance purpose *at its inception.*  To my mind, Article Tenth [in the Certificate of Incorporation] was a *bona fide* business arrangement and not a tax avoidance device and therefore meets the requirements of Treas. Reg.  § 20.2031-2(h).

*Id.* at 755-56 (emphasis added).

In its petition for rehearing, the government argued that the unrestricted true market value of the shares at issue was eleven times the specified repurchase price, and that the repurchase price of $100 per share was so low that it lacked "adequate and full consideration."  In language singularly applicable here, the court denied the government's petition and stated:

> The Regulation [Treas. Reg. § 20.2031-2(h)], however, does not specify what point in time is determinative.  *In my view, the facts at the inception of the agreement control.*  If no business purpose or a tax avoidance purpose exists at that time, the agreement is tainted from the start and nothing, except cancellation, can change that.  If a business purpose and no tax avoidance purpose exist at inception, the agreement, at least at that time, is controlling for estate tax purposes. [*citation omitted*] … *To alter that effect on the basis of circumstances many years after the adoption of the agreement is to taint the agreement retroactively and to read implications into the agreement which are not there.*

*Id.* at 756-57 (emphasis added).

Here, as in *Slocum,* the ownership and transfer restrictions, repurchase rights, and the repurchase price were also set forth in two organic corporate documents (initially in JDS's by-laws and later in its Articles) over 50 years ago.

-113-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Under the test enunciated in *Slocum,* the purpose of the JDS restrictions was for a *bona fide* business purpose, and the restrictions are supported by adequate and full consideration.  Most significantly, the restrictions are to be assessed and evaluated as of their inception – *i.e.,* the circumstances as they existed in 1973.  To grant the relief sought here by plaintiffs would, as in *Slocum,* "taint the agreement [the JDS Articles] retroactively, and read implications into the agreement [the JDS Articles] which are not there."  *Id.* at 757.

In the instant case, as in *Slocum,* there have been no intervening events which would warrant any reassessment of Mr. Schneider's initial decision in 1956, reconfirmed in 1973, to lock in the fair market value of the JDS common shares as their book value.  Thus, plaintiffs' core argument that defendants violated ERISA by their failure to have HolliShare comply with the D.O.L.'s Proposed Regulations, and in particular, by their failure to have arranged for an outside, independent appraisal of JDS's common shares each year, is of no consequence.[65]

Accordingly, even if they are given the force of law (which the court holds they are not), the D.O.L.'s Proposed Regulations have no application to transactions which preceded their publication in May 1988.  Thus, as of May 1988, HolliShare had experienced years of uninterrupted sales to JDS of JDS common shares at their book values.  There had been no complaints, and each participant had received precisely what he or she was entitled to receive under the Plan.  In addition, neither the I.R.S. nor the D.O.L. had raised any objections to the Plan, in particular to the book value method of valuing the JDS common shares.  As in *Slocum,* "the facts at the inception control" and events which occurred many years after the creation in 1974 of what was then a *bona fide* business arrangement cannot "taint the

---

[65]  For the first 15 years of HolliShare's existence under ERISA (1974-1988), there was no existing or even proposed requirement that an outside, independent appraisal be conducted to value JDS's common shares.  Moreover, by their very terms, the D.O.L.'s Proposed Regulations were not retroactive, only prospective.

-114-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

agreement retroactively" or "read implications into the agreement that are not there." In addition, the circumstances as they existed in 1988 did not give defendants any "reason to suspect" that continuing to apply the book value method in valuing JDS's common shares was "imprudent" or violative of ERISA. The defendants' judgment was reaffirmed thereafter when the I.R.S. and the D.O.L. examined, audited, and investigated HolliShare and raised no issue with respect its compliance with ERISA. (*See* DX 584-586; DX 596-97.)

### d. The Expert Testimony At Trial Supports The Court's Conclusion.

While the court need go no further to conclude that the fair market value of the JDS common shares is its book value, it is worth noting that this conclusion is bolstered by the testimony of several expert witnesses who testified on behalf of the defendants. Defendants called two expert witnesses who opined on this issue: (1) Roger Grabowski and (2) Robert Wallace.

Both witnesses were qualified as experts. Mr. Grabowski is a member of the American Society of Appraisers and has been designated as an Accredited Senior Appraiser. He has lectured and has been published extensively regarding business valuations, and has frequently been qualified to testify as an expert witness on valuation matters, including valuations of the stock of privately held corporations. Mr. Wallace also holds a Senior Accredited Appraiser designation from the American Society of Appraisers. In addition, he is a Certified Public Accountant who has been accredited in business valuation by the American Institute of Certified Public Accountants, and has been recognized as a Certified Business Appraiser by the Institute of Business Appraisers. Mr. Wallace previously served as Chairman of the Business Valuation Section Committee of the California Society of Certified Public Accountants.

//

-115-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Both testified that, in their opinion, the fair market value of the JDS common shares from 1974 through 2007 was the same as their book value calculated in accordance with GAAP. In their expert opinion, the eligibility restrictions as to whom can own JDS common shares, the transfer restrictions, repurchase rights of JDS, the GAAP book value, and the parties' established practice for JDS common shares establish and severely limit the market. No reasonable financial investor would pay more than book value for JDS common shares.

As did the HolliShare Trustees, Grabowski and Wallace took the JDS common shares as they found them in reaching their opinions. Grabowski considered: (a) that the JDS common shares are an encumbered, intangible asset, with a bundle of rights and restrictions; (b) that the formula GAAP book value price is a readily ascertainable specified measure of value; (c) that there was no reasonable expectation of dividends being paid during the holding period; (d) that JDS bought the JDS common shares at book value; (e) that the sales of the JDS common shares to JDS were not an attempt to avoid federal income tax or estate and gift taxes; and (f) that a return on investment has been provided to HolliShare that is more than comparable to the return on investment on the common shares at their hypothetical fair market value and to the return on investment one would have realized from investing stock in the guideline publicly-traded companies.

Both also considered the transfer restrictions and JDS's consistent and uniform exercise of its right of repurchase. Wallace opined that the HolliShare Trustees could not reasonably anticipate realizing any benefit in excess of book value and that book value was therefore the ceiling for the fair market value analysis.

In sum, Grabowski and Wallace considered the factors that Zwirner testified the HolliShare Trustees considered when conducting their investigation into the fair market value of the common shares. The court finds this evidence highly probative

-116-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

and further evidence that the HolliShare Trustees engaged in a good faith, thorough, and diligent investigation.

On the other hand, the testimony by plaintiffs' primary expert, Dr. Shannon Pratt, was, for several reasons, not persuasive. First, Pratt selected a completely irrelevant valuation date (December 31, 2006), which was not a date when any of the plaintiffs' HolliShare accounts were valued. Pratt's inexplicable failure to select a proper valuation date undermined his entire testimony. As he admitted at trial, selecting the right valuation date is critically important because circumstances can cause values to vary from one valuation date to another.

Second, Pratt's testimony was based on the expert report he and his company, Shannon Pratt Valuations, prepared in October 2008. Most of the work on the report was performed by his staff and not by Pratt. Rather, he admitted he only gave the report a "hasty" review the evening it was due.

Third, perhaps as a result of his rushed review, Pratt's report contained a number of significant errors. For example, his report concluded that the fair market value of a single JDS common share was $1,320.00. However, while preparing for his deposition six months later, Pratt discovered an error in calculating the per share value. It turned out that the fair market value of a single JDS common share was actually $10 less. Given that there were 787,000 outstanding JDS common shares, this error involved almost eight million dollars, not an insignificant amount.

Another troubling aspect of Pratt's testimony was the 15% discount he applied to the JDS common shares for their lack of marketability. This rate was substantially less than the discount rate he has applied in other cases in which he opined as an expert witness on the value of an equity interest in a closely held corporation. At trial, Pratt could not explain adequately why his discount rate in this case was so low compared to the discount rate he applied in other cases.

Two approaches Pratt used to determine the fair market value of the JDS

-117-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

common shares also contained significant flaws. For example, in his expert's report, Pratt's entire analysis under the discounted cash flow method was predicated on a long-term growth rate for Hollister of 6%. Yet, at trial, Pratt admitted that he was unaware of any company that had been able to sustain a 6% percent growth rate over an extended period of time. By contrast, Grabowski utilized a 2.5% growth rate, which is far more in line with industry standards. Without changing anything else in Pratt's report, the use of a 2.5% long term growth rate instead of a 6% rate would lower the fair market value of JDS common shares by 20%.

Pratt's use of a 6% growth rate becomes even more suspect in light of the relief being sought by plaintiffs. Pratt testified that he used a 6% growth rate, in part, because Hollister had a practice of retaining cash for product development and acquisitions. However, Hollister also used its cash reserves to pay for the common shares it redeemed from shareholders, including HolliShare. If plaintiffs prevail in this action, JDS will have to use substantially more of its cash to pay vested plan benefits. This would restrict its ability to use cash for product development and acquisitions, and would, in turn, seriously thwart its growth. Yet, Pratt's 6% long term growth rate into perpetuity does not give reasonable consideration to this possibility.

Other flaws were present in his discounted cash flow analysis. In the forecasted balance sheets created by Pratt, he projected an increase in cash available to Hollister that would result in a nearly fivefold increase in only nine years. At trial, Pratt could not identify any company that had even quadrupled its cash reserves over a ten year period.

Pratt's testimony under the guideline public company method was also defective. Hollister's primary competitor is Coloplast, a publicly traded company whose stock is traded on an international exchange. Despite the readily available

-118-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

public information on Coloplast, Pratt did not select it as a guideline company. Coloplast should have been used as a guideline company because it, Hollister, and Bristol Myers Squib control virtually the entire disposable ostomy product market. Pratt also excluded a number of other companies as guideline companies even though they produced plastic medical devices. These companies should have been included, particularly because Pratt excluded Coloplast as a guideline company.

Because of these significant flaws in his analysis, the court rejects Dr. Pratt's conclusion that the fair market value of a JDS common share was $1,310.00 on December 31, 2006.

John C. Korschot was plaintiffs' other valuation expert who testified at trial. He is presently employed by Stern Brothers Valuation Advisers. While he was qualified as an expert witness, Korschot's analysis suffered from many of the same defects as Pratt's. Korschot opined that the fair market value of a JDS common share was $425.00 on December 31, 2003. In his discounted cash flow analysis, Korschot used a smaller growth rate than Pratt, 5%, but one that was still unrealistically high. He also excluded Coloplast as a comparable in his guideline public company analysis. Finally, Korschot incorrectly applied the same 15% lack of marketability discount, which the court concludes is too low.

Korschot used valuation methods similar to those used by Pratt - the guideline public company method and the discounted cash flow method. While Korschot compared JDS to seven companies (Pratt selected only four), many of the companies he selected were poor comparables. Four have different product lines that account for a large share of their total revenues. Korschot also improperly excluded many companies that have product lines and revenues similar to JDS because their stock is traded on international exchanges.

Korschot's analysis under the discounted cash flow model fared no better. As stated above, Korschot's reliance on a 5% growth rate into perpetuity is wholly

-119-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

unrealistic. His analysis also included unrealistic amounts for capital expenditures and an excessive increase in gross margins.

Korschot's analysis undercut Pratt's testimony. Pratt concluded that the fair market value of a JDS common share was $1,310.00 as of December 31, 2006. Korschot concluded that the fair market value of a JDS common share was $425.00 on December 31, 2003. Thus, according to plaintiffs' own experts, the putative "fair market value" of JDS common shares tripled in only three years. However, at trial, none of the experts were able to plausibly explain how this could have occurred.

### J. Plaintiffs' Claims Based On Defendants' Alleged Breaches Of Their Fiduciary Duties Of Prudence And Loyalty Under ERISA Are Precluded On Numerous Other Grounds.

As noted above, the prohibited transaction provisions of ERISA can be violated only by a fiduciary act, here by a breach of fiduciary duty. *Lockheed Corp. v. Spink,* 517 U.S. 882, 888-92 (1996). Thus, if the individual defendant fiduciaries did not breach their fiduciary duties under ERISA, neither they nor any of the other defendants violated the prohibited transaction provisions of ERISA §§ 406(a) or 406(b). For the following reasons, the fiduciary defendants fully complied with their fiduciary duties under ERISA.

### 1. The Standards To Be Applied And The Factors To Be Considered

In determining whether a fiduciary duty has been breached under ERISA, the Supreme Court requires that courts give deference to judgments made by plan fiduciaries in discharging their fiduciary duties. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Jordan v. Northrup Grumman Welfare Benefit Plan,* 370 F.3d 869, 875 (9th Cir. 2004); *Herman v. Mercantile Bank,* 143 F.3d 419, 422 (8th Cir. 1998).

In assessing whether any defendant here has breached a fiduciary duty under ERISA, this court considers that the individual fiduciary defendants could properly

-120-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

rely on their ongoing knowledge and familiarity with the business of JDS and Hollister, and the circumstances pertaining to the market for or transactions in JDS common shares. The fiduciaries could also properly consider the long-term horizon of retirement investing and the favored status Congress has granted to employee stock plan investments in the employees' companies. The court also evaluates the discharge by the defendants of their fiduciary duties here in light of the character and aims of the HolliShare Plan which, among other things, was, and is, to reward employees for their service by providing stable and secure retirement benefits and to promote employee ownership of the company. The Plan was not designed to maximize benefits.

The court has already found that the defendant fiduciaries have conducted a good faith and prudent investigation and properly determined that the fair market value of JDS's common shares is their book value. However, it has been held that even if an ERISA fiduciary fails to make a good faith effort to determine the fair market value of closely-held stock, there is no liability if a hypothetical prudent fiduciary would have made the same decision. *Herman*, 143 F.3d at 421.

*Herman* was an action in which the D.O.L. alleged that a plan trustee (aided by others) paid more for an employer's (privately held) stock than that stock was worth. The Eighth Circuit affirmed a judgment for defendants even though the plan trustee had not conducted any investigation of the value of the company's stock, and even though plaintiff's expert had testified that the amount paid was 12% more than the stock's actual value. The *Herman* Court reasoned:

> Even if a trustee fails to make a good faith effort to determine the fair market value of the stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Roth v. Sawyer Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994). Thus, if a prudent trustee would have purchased the Lenco [company] stock for the price for which Mueller [defendant-trustee] purchased it, then Mueller did not violate ERISA, regardless of whether he made a good faith effort to determine the fair market value of the stock.

*Herman,* 143 F.3d at 421.

-121-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The *Herman* Court emphasized that the overriding issue was not whether the trustee had *in fact* overpaid, but rather what a prudent fiduciary acting under the same circumstances would have done if he *knew* he was overpaying. Singularly applicable here, the court stated:

> Determining the value of a company's stock is not an exact science. This is particularly true of the stock of a closely held corporation such as Lenco, because there is no continuously operating market for such stock. In order to hold that Mueller did not violate ERISA in conducting the buy-back, the District Court did not need to find that Mueller bought the stock for exactly, to the penny, its fair market value; the Court merely needed to find that a prudent fiduciary in Mueller's place would have paid what Mueller paid. That is what the District Court found. We conclude that the District Court did not clearly err in finding that the value of the Lenco stock was such that a prudent fiduciary in Mueller's place would have bought the stock for the price that Mueller paid. Accordingly, Mueller did not violate ERISA in conducting the buy-back.

*Id.* at 422. Here, the court must consider the ownership and transfer restrictions, repurchase rights, and the pricing formula set forth in the JDS Articles that mandate that JDS can purchase any JDS common shares offered for sale only at their book value. Plaintiffs have not proved, and the court does not find, that a hypothetically prudent trustee fiduciary would have, under similar circumstances, sold HolliShare's JDS common shares for any price other than for their book value.

Plaintiffs claim that a "prudent trustee" would have sold HolliShare's JDS common shares for more than their book value. No such assertion can credibly be made. It would violate ERISA and its fundamental purpose to accept plaintiffs' unsupported contention that defendants violated ERISA by selling HolliShare's JDS common shares for the only price available – rather than for some higher, speculative value created by experts hired by plaintiffs.

//

//

//

//

-122-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**2.     In Determining Whether They Breached Their Duties Under ERISA, The Defendant Fiduciaries Are Presumed To Have Acted Prudently And Diligently.     Plaintiffs Have Failed To Rebut This Presumption.**

Plan fiduciaries of an EIAP under ERISA enjoy a presumption – commonly referred to as the *Moench* presumption due to its recognition in *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995) – that they are acting prudently when they follow the terms of the ERISA plan.

In *Moench*, a former employee claimed that the committee that managed the company's ESOP had violated its statutory duty of prudence under ERISA § 404(a)(1)(B) because it continued to authorize the investment of plan assets in employer securities when the employer's business was deteriorating.  On appeal, the *Moench* Court first considered the overall impact of a strict standard of review when assessing whether a plan fiduciary of an ESOP has breached his/her or its statutory duty of prudence by continuing to invest in employer securities when the employer was falling deeper and deeper into serious financial straits:

> [B]y subjecting an ERISA fiduciary's decision to invest in employer stock to strict judicial scrutiny, we essentially would render meaningless the ERISA provision excepting ESOPs from the duty to diversify.  Moreover, we would risk transforming ESOPs into ordinary pension benefit plans, which then would frustrate Congress' desire to encourage employee ownership.  After all, why would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing?  Further still, basic principles of trust law require that the interpretation of the terms of the trust be controlled by the settlor's intent.  That principle is not well served in the long run by ignoring the general intent behind such plans in favor of giving beneficiaries the maximum opportunities to recover their losses.

*Id.* at 570.

The *Moench* Court then concluded that ERISA's goal and *that of Congress* in promoting employee ownership of their employer entitled the plan fiduciaries of an ESOP to a presumption of prudence:

> [I]n the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision.  However, the plaintiff may overcome that

-123-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

In attempting to rebut the presumption, the plaintiff may introduce evidence that "owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." Restatement (Second) § 227 cmt. g. As in all trust cases, in reviewing the fiduciary's actions, the court must be governed by the intent behind the trust -- in other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate. In determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive.

*Id.* at 571-572.

In September 2010, in *Quan v. Computer Scis. Corp.,* 623 F.3d 870 (9th Cir. 2010), the Ninth Circuit joined the Third, Fifth, Sixth and Seventh Circuits in embracing the *Moench* presumption and applying it to defined contribution plans which offer stock in the employer. *See Edgar v. Avaya*, 503 F.3d 340, 345-48 (3d Cir. 2007); *Kirshbaum v. Reliant Energy*, 526 F.3d 243, 254 (5th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Pugh v. Tribune Co.*, 521 F.3d 686, 701-02 (7th Cir. 2008); *Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003). No Court of Appeals has rejected the *Moench* presumption.

In *Quan*, the district court had granted summary judgment in favor of Computer Sciences Corp. ("CSC") in a class action brought by CSC employees who alleged CSC and plan fiduciaries had breached their ERISA duties by retaining company stock when it was no longer a prudent investment. The district court concluded that CSC employees failed to establish that the temporary drop in CSC's stock price during the class period sufficiently demonstrated that the plan fiduciaries had a duty under ERISA to remove it from the plan, and concluded that the plaintiffs had failed to establish or create a triable issue linking any losses suffered by them to the allegedly imprudent investment. *Quan,* 623 F.3d at 877. On cross-motions for summary judgment, the court granted defendants' motion.

-124-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

On appeal, the Ninth Circuit reviewed *de novo* the grant of summary judgment and affirmed. In a well-reasoned decision, the Ninth Circuit carefully analyzed and balanced the tension between various provisions in the ERISA statutory framework which had generated concern from the Ninth Circuit in two prior cases,[66] and concluded those concerns were illusory. It then adopted the *Moench* presumption:

> We therefore adopt the *Moench* presumption. The presumption is consistent with the statutory language of ERISA and the trust principles by which ERISA is interpreted, whether the plan is an ESOP or other EIAP. [citation omitted] At its core, our objection to adopting the *Moench* presumption in *Wright* was that it was *not sufficiently* deferential to or protective of fiduciaries, not that it placed too great a burden on those asserting breach-of-fiduciary-duty claims. We believe that if properly formulated, the *Moench* presumption can strike the appropriate balance between the employee ownership purpose of ESOPs and other EIAPs, and ERISA's goal of ensuring proper management of such plans.
>
> * * *
>
> We adopt the *Moench* presumption because it provides a substantial shield to fiduciaries when plan terms require or encourage the fiduciary to invest primarily in employer stock. Fiduciaries are not expected to predict the future of the company stock's performance; without the *Moench* presumption, a fiduciary "could be sued for not selling if he adhered to the plan [and the company stock dropped], but also sued for deviating from the plan [and selling] if the stock rebounded." [citation omitted]. Moreover, the "long-term horizon of retirement investing" requires protecting fiduciaries from pressure to divest when the company's stock drops. [citation omitted] [emphasis in original].

*Quan,* 623 F.3d at 881-882. The court also articulated the burden a plaintiff faced in rebutting the *Moench* presumption:

> To overcome the presumption of prudent investment, plaintiffs must therefore make allegations that "clearly implicate the company's viability as an ongoing concern" or show "a precipitous decline in the employer's stock … combined with the evidence that the company is on the brink of collapse or is undergoing serious mismanagement." [Citation omitted] It will not be enough for plaintiffs to prove that the company's stock was not a "prudent" investment or that defendants ignored a decline in stock price. Plan participants can only rebut the *Moench* presumption by showing publicly known facts that would trigger the kind of "careful and impartial

---

[66] *Wright,* 360 F.3d at 1097; *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1102 (9th Cir. 2008).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

investigation" by a reasonable fiduciary that the plan's fiduciary failed to perform.

*Id.* at 882. After noting that there is no bright-line rule defining what is required to rebut the *Moench* presumption, the *Quan* court candidly noted that: "In any event, however, the *Moench* presumption would be difficult to rebut."[67] *Id.* at 883. Finding that the plaintiffs failed to prevent evidence sufficient to rebut the *Moench* presumption of prudence, the district court's judgment was affirmed. *Id.* at 884.

Plaintiffs here have also failed to rebut the *Moench* presumption. Plaintiffs offered no evidence whatsoever that the fiduciary defendants should have reasonably concluded that continued adherence to the JDS restrictions, the book value pricing method, or the terms of the Plan itself were not "in keeping with the settlor's expectations of how a prudent trustee would operate." To the contrary, no reasonable and prudent fiduciary would have acted differently. The HolliShare fiduciaries have acted throughout in full and complete compliance with the settlor's intentions reflected in the terms of the Plan, the terms of the JDS Articles, and the

---

[67] For example, the *Moench* presumption was applied and held not sufficiently rebutted in numerous cases involving circumstances far more egregious than those present here. *See, e.g., In re UBS AG ERISA Litig.,* No. 08 Civ. 6696, 2011 WL 1344734, at *6-*9 (S.D.N.Y. Mar. 24, 2011) (*Moench* presumption applied to dismiss a class action rising out of the subprime mortgage crisis of 2007 – as a result of which UBS had to write down approximately $42 billion of its troubled assets and bought back $83 billion of auction rate securities, paid a $150 million fine and $780 million to the federal government following a Department of Justice investigation); *In re Wachovia Corp. ERISA Litig.,* No. 3:09cv262, 2010 WL 3081359, at *13-14 (W.D.N.C. August 6, 2010) (87% decrease in stock value combined with alleged improper business and accounting practices were insufficient to overcome presumption of prudence); *In re Lehman Bros. Secs. & ERISA Litig.,* 683 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (stock decline in $2.8 billion loss held insufficient to show fiduciary knew that Lehman "was about to fold"); *In re American Exp. Co. ERISA Litig.,* 762 F. Supp. 2d 614, 629 (S.D.N.Y. 2010) (fiduciary defendants failed to remove employer's stock as an option in its ERISA plan even though the employer was reported eligible for a $3.39 billion "bailout" funds from the United States Treasury and the employer's stock lost over 77% of its market value in one year); *In re Citigroup,* 2009 WL 2762708, at *18 (52% drop in stock price combined with allegations of a pattern of risky loan practices and losses of tens of billions of dollars held insufficient to overcome presumption of prudence); *Summers v. State St. Bank & Trust Co.,* 453 F.3d 404, 407-08 (7th Cir. 2006) (plan fiduciaries failed to diversify an ESOP even after the price of the company's stock had dropped by over 50% and its CEO acknowledged the "company is 'in a struggle just to survive …[and was] hemorrhaging money.'").

-126-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Schneider Policies and Principles. Indeed, any contrary decision would have the anomalous effect of holding defendants liable for their failure to change Plan provisions (including those requiring investment in JDS common shares and the valuation of those shares at book value), and/or the restrictions of the JDS Articles, which they were powerless to change. Courts have recognized that the imposition of ERISA liability under such circumstances is manifestly improper. *In re Bear Stearns Cos.*, 763 F. Supp. 2d 423, 566-67 (S.D.N.Y. 2008); *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *9 (S.D.N.Y. Aug. 31, 2009); *Pedroza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1273 (N.D. Ga. 2006); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1326 (N.D. Ga. 2006).

### 3. Analogous Decisions Under ERISA Support The Defendants' Compliance With Their Fiduciary Duties Of Prudence And Loyalty.

Defendants' compliance with their fiduciary duties under ERISA is validated by several cases decided on similar facts.

In *Krueger Int'l., Inc. v. Blank,* 225 F.3d 806 (7th Cir. 2000), employer stock held in an ERISA plan was, as here, subject to restrictions in a shareholders' agreement. The shareholders' agreement gave the employer ("KI") the option to repurchase an employee's stock, based on the stock's appraised value, upon the death of the employee. Following litigation regarding the identity of proper recipients of the deceased employee's plan benefits, the issue then presented was whether the stock was to be valued, as KI argued, as of the date of the employee's death (which was the date specified in the shareholder's agreement) or, as the decedent's beneficiaries argued, at its current value (which was four times the value as of the date of death). The beneficiaries claimed that defendants had violated their fiduciary duties and the prohibited transaction provisions of ERISA because, by redeeming the stock at its earlier value, the redemption had been effected for less than "adequate consideration". *Id.* at 813. KI countered that the value of the stock

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

had been fixed by the exercise of its repurchase option under the shareholders' agreement, and that the transaction was therefore being effected for "adequate consideration". Ruling for the beneficiaries, the trial court found that the shareholder agreement was a "collateral contract whose application was preempted by ERISA," and held that under the plan at issue and ERISA, KI was required to repurchase the shares at their current value. *Id.* at 810.

The Seventh Circuit reversed. In language applicable here, it held:

> Stock unencumbered by a repurchase option … is not the same thing as stock that is so encumbered. If … KI exercised its option when the share price was $258.70, then at that moment Robert's [deceased-employee's] stock became quite different from ordinary KI stock. From that time it would have been stock subject to an exercised call option. *Because the fair market value of stock that someone else has the right to purchase for $258.70 is just $258.70 (at least as long as the stock alone is worth more than that), there would be no violation of ERISA "adequate consideration" rules for KI to pay that amount per share* … All of this is to say simply that the beneficiaries are entitled only to what the plan provides; there can be no breach of fiduciary duty if that is what the plan gives them.

*Id.* at 813 (emphasis added).

The beneficiaries had also argued that the plan at issue purportedly required that valuations be made "using the most recent information." The Seventh Circuit rejected this contention, stating:

> Before the accounting rules of an ERISA plan can be applied, the basic terms of the asset to be accounted for must be determined. That is what the SA [shareholders' agreement] does – it defines the bundle of rights to which a KI shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled. Because KI has chosen to remain a privately held company, it has the prerogative to limit ownership in its shares to employees. It has chosen to do so, which makes it necessary to include a repurchase option in its shareholder agreement (so that when employees leave the firm, it gets the shares back). Accepting this repurchase option is an inseparable part of owning KI stock, which means that Robert and his successors in interest to the stock are bound to its terms.

*Id.* at 812.

-128-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Krueger* instructs that ERISA does not permit or require plan fiduciaries to disregard restrictions that are expressly required to be applied to the plan's purchases or sales of employer securities. In short, plan trustees must take the plan's assets as they find them. As in *Krueger,* to conduct an adequate and prudent investigation, ERISA plan fiduciaries must become aware of, and consider the impact that valid and enforceable restrictions have on the stock whose fair market value they are charged with determining. Just as the restrictions imposed by the shareholders' agreement in *Krueger* were held to be fundamental attributes of KI stock, here the ownership, transfer, and repurchase restrictions imposed on JDS common shares by the JDS Articles are also (in the words of the *Krueger* Court) an "inseparable part of owning" JDS common shares. The HolliShare Plan recognizes this fundamental reality; it (a) mandates a valuation of JDS common shares that conforms to the price available under the terms of the JDS Articles, and (b) requires that any sales of JDS common shares be effected in compliance with the JDS Articles.[68] By their familiarity with these various restrictions, and revisiting their status each year, the HolliShare fiduciaries have conducted a "prudent investigation" and have acted with loyalty within the purview of ERISA §§ 404(a)(1)(B) and 404(a)(1)(A). Based on their determination, HolliShare has sold its JDS common shares for "adequate consideration" within the meaning of ERISA §3(18) because the fair market value of the JDS common shares was their book value.

//

---

[68] The situation here presents a stronger case than does *Krueger* for deferring to transfer and repurchase restrictions attributable to employer stock that is bought and sold by an ERISA plan. The plan at issue in *Krueger* did not (so far as the Seventh Circuit opinion reflects) incorporate the provisions of the shareholders' agreement into the plan at issue there. Here, HolliShare has expressly incorporated the ownership and transfer restrictions and repurchase rights in the JDS Articles into the Plan itself, thereby making those restrictions an integral part of the Plan.

-129-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

As this court recognized when it denied plaintiffs' motion for summary judgment on their prohibited transaction claims, in assessing the adequacy of the investigation conducted by the defendant fiduciaries and in determining whether they acted in good faith, the decision in *Krueger* is directly on point. Decided as it was on very similar facts, *Krueger* is accorded significant weight. *DeFazio v. Hollister, Inc.,* 636 F.2d 1045, 1069 (E.D. Cal 2009).

In *Allen v. The Katz Agency Inc. Employee Stock Ownership Plan*, 677 F.2d 193, 194 (2d Cir. 1982), the Second Circuit relied on plan provisions similar to HolliShare which also equated "fair market value" with "book value" and denied an ERISA claim similar to those asserted here. In *Allen*, plan participants had the right to "put" their stock to the plan or the employer for their per share book value. After plaintiff exercised his "put" and was paid its per share book value by his employer, he later contended that ERISA required that he should have been paid the unrestricted fair market value for those shares. The Second Circuit rejected this contention and, in language controlling here, held:

> The fiduciary obligation to discharge duties "solely in the interest of the participants and beneficiaries," ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), surely did not obligate the trustees to pay Allen [plaintiff] more than the value to which the Plan entitled him. In addition, a fiduciary's duty hardly extends to a requirement to have a benefit plan amended by the board of directors in a manner that increases the value of benefits to employees.

*Id.* at 198-99.

*Allen* was cited with approval and followed in *Owens v. Soundview Fin. Group, Inc.,* 54 F. Supp. 2d 305 (S.D.N.Y. 1999). There, a former officer alleged that he should have been paid the unrestricted fair market value, rather than book value, for the stock of his employer which was held in an ERISA plan. Rejecting plaintiff's ERISA claim for breach of fiduciary duty, the *Owens* Court reasoned as follows:

> ERISA requires that plan trustees, as fiduciaries, act "solely in the interests" of plan participants and beneficiaries, 29 U.S.C. § 1104(a)(1). However, "[t]he fiduciary obligation to discharge duties 'solely in the interest of the participants and beneficiaries', surely [does] not obligate the

-130-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

trustees to pay [Owens] more than the value to which the Plan entitled him." *Allen v. Katz Agency, Inc. Employee Stock Ownership Plan,* 677 F.2d 193, 198 (2d Cir. 1982). The trustees must determine the "value" of a participant's benefits taking into account not only the interests of the particular participant receiving the benefit, but the interests of *all* plan participants and beneficiaries. [citation omitted] ... The use of the book value methodology to value the SoundView [employer] stock held by the Plan complied with that duty because it provided an objective and easily administrable method that could be, and was, applied uniformly to all participants whose Plan accounts held SoundView stock. Moreover, because all Plan participants acquired stock at adjusted book value, the Plan trustees reasonably determined that it was appropriate that participants also receive benefit distributions using the same methodology, ....

*Owens,* 54 F. Supp. 2d at 308.

Similarly, *Foltz v. U.S. News and World Report, Inc.,* 865 F.2d 364 (D.C. Cir. 1989), affirmed a judgment for plan fiduciary defendants who valued retirees' interests in a stock bonus plan on a "minority discount" basis, rather than on the basis of a "control premium". *Foltz* held that the trustees were legally required by the terms of the plan (and the company's Articles) to value the company's stock based on an appraisal conducted in accordance with applicable I.R.S. guidelines. The *Foltz* Court construed those guidelines as requiring a valuation of minority shares on a discounted basis because the stated purpose of the Articles was to maintain employee ownership of the company by making a sale of control highly unlikely. *Id.* at 373. Rejecting plaintiffs' claim that the plan fiduciaries had violated their fiduciary duty under ERISA § 404(a)(1)(A), the *Foltz* Court stated "Section 404 creates no exclusive duty of maximizing pecuniary benefits. Under ERISA, the fiduciaries' duties are found largely in the terms of the plan itself." Here, as in *Foltz,* both the HolliShare Plan and the JDS Articles have also been, literally for decades, specifically designed to preserve and protect the status of JDS (and derivatively, of Hollister) as employee-owned companies, and not to maximize "pecuniary benefits".

Plaintiffs essentially claim that defendants were required to extract the highest per share value for each sale by HolliShare of each JDS common share it

-131-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

held.   Plaintiffs' position flies in the face of well-developed ERISA decisional law. EIAPs, such as HolliShare, by definition, are not designed to maximize benefits, but rather to promote and encourage employee ownership.  *See Taylor v. United Techs. Corp.,* No. 06-cv-1494, 2009 WL 535779, at \*8-\*10 (D. Conn. Mar. 3, 2009), *aff'd*, 555 F.3d 1 (1st Cir. 2009).  Unlike traditional pension plans, the assets of an EIAP generally are invested in securities issued by the Plan's sponsoring company, and therefore "are not intended to guarantee retirement benefits..." *Martin v. Feilen,* 965 F.2d 660, 664 (8th Cir. 1992).   EIAPs are designed to encourage employee ownership of employer stock, which is "a goal in and of itself" for the purpose of "expanding the national capital base among employees – an effective merger of the roles of capitalist and worker." *Moench,* 62 F.3d at 568 (*citing Donovan v. Cunningham,* 716 F.2d 1455, 1458 (5th Cir. 1983)).   The Ninth Circuit recently recognized that "plans that tie employee compensation to the company's success are widely believed to be good for employee productivity and loyalty." *Quan,* 623 F.3d at 881.

Moreover, ERISA does not "create an exclusive duty to maximize pecuniary benefits." *Collins v. Pension & Ins. Comm. Of So. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns,* 144 F.3d 1279, 1282 (9th Cir. 1998).  Thus, where a fiduciary complies with a plan's lawful terms and provides the beneficiaries with the benefits they were due under the Plan, there is no violation of ERISA § 404(a)'s "exclusive purpose" requirement. *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1100 (9th Cir. 2004).

Plaintiffs here were paid precisely what they were promised.  ERISA requires nothing less, nothing more.

ERISA is flexible; it is designed to adjust to the real world.  The definitions of "current value" and "adequate consideration" recognize that plan fiduciaries must have latitude in valuing assets that are not publicly traded and must be permitted

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

to make reasonable valuation decisions in good faith and in accordance with "the circumstances then prevailing".  The focus is not on the outcome of the transaction but on the process employed by the plan fiduciaries to investigate and evaluate the proposed transaction.  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984); *Ulico Cas. Co. v. Clover Capital Mgmt.*, 217 F. Supp. 2d 311, 315 (S.D.N.Y. 2002).  The critical inquiry is whether the fiduciaries, at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits and structure of the transaction.  The court finds that here they did so.

### 4. Plaintiffs' Have Failed To Establish That They Suffered Any Damage Or Harm As A Result Of The Matters Complained Of.

Finally, even if plaintiffs had established a breach by defendants of their fiduciary duties under ERISA, they are not entitled to any recovery because they have failed to prove, as they are required to do, that they incurred any damage or harm as the result of the breaches of fiduciary duties of which they complain.  Specifically, they have not established (a) that the JDS common shares held by HolliShare could have been sold for more than their book value, or (b) what the "true" fair market value was of the JDS common shares either when their HolliShare accounts were valued or when any of the alleged prohibited transactions occurred.  For these additional reasons, they cannot recover on their breach of fiduciary duty claims under either ERISA §§ 404(a)(1)(B) or 404(a)(1)(A).

The Ninth Circuit's recent decision in *Quan* affirmed the grant of summary judgment in favor of defendants because (*inter alia*) plaintiffs had not shown that a drop in a company's stock price was caused by those factors which plaintiffs claimed should have led plan fiduciaries to conclude that the company's stock was not a prudent investment.  623 F.2d at 886.  As the Ninth Circuit emphasized in *Quan,* plaintiffs "must show a *causal link* between the failure to investigate … and

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

harm suffered by the plan." *Id.* at 885 (*quoting Wright,* 360 F.3d at 1099) (emphasis in the original).

Similarly, in *Nelson v. Hodowal,* 512 F.3d 347, 351 (7th Cir. 2008), the court held that plaintiffs had no viable ERISA breach of fiduciary duty claim based on the alleged non-disclosure of material facts to plan participants in connection with defendants' sales of company stock where they were unable to show that the sales had any adverse effect on the stock price. In *In re Calpine Corp. ERISA Litig.,* No. C-03-1685, 2005 WL 1431506 (N.D. Cal. Dec. 5, 2005), the court dismissed plaintiffs' breach of fiduciary duty claim, stating that "a fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable. [A] plaintiff must show [a] causal link between the failure to investigate and harm suffered by the Plan." *Id.* at *5 (*quoting Kuper v. Ivanko,* 66 F.3d 1447, 1449 (6th Cir. 1995)). Guesswork and speculation are not enough to establish loss causation under ERISA. *See Fink v. Nat'l Sav. & Trust Co.,* 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part); *Silverman v. Mut. Benefit Life Ins. Co.,* 138 F.3d 98, 104 (2d Cir. 1998) (ERISA "requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'result[ed] from' [defendant's] breach .... Specifically, [plaintiff] must show some causal link between the alleged breach of [defendant's] duties and the loss plaintiff seeks to recover." (citations omitted)); *Fox v. Herzog, Heine, Geduld, Inc.,* No. 01CV1827, 2005 WL 3542464, at *3 (D.N.J. Dec. 27, 2005) (in order to state a claim for monetary recovery for breach of fiduciary duty under ERISA, [p]laintiffs must demonstrate a "loss to the plan.") (*quoting Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140 (1985), *aff'd,* 2007 WL 1113802 (3d Cir. April 17, 2007)); *Smith v. Sydnor,* 2000 U.S. Dist. LEXIS 20074, at *59-*62 (E.D. Va. 2002) (collecting cases); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 279 (2d Cir. 1992) ("[s]peculative damages cannot support a cause of action for fraud [under ERISA] ... [P]roof of a causal

-134-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

connection ... is required between a breach of fiduciary duty and the loss alleged."); *In re Enron Corp. S.E.C. Derivative & "ERISA" Litig.,* 284 F. Supp. 2d 511, 519 (S.D. Tex. 2003) (plaintiffs have the burden of demonstrating causation); *Taylor v. KeyCorp,* No. 1:08-C-1927, 2010 WL 3702423, at *5 (N.D. Ohio Aug. 12, 2010) ("Ms. Taylor has suffered no injury and thus does not have standing to bring the [breach of fiduciary duty] claims at bar.") (collecting cases).

### 5. Plaintiffs' Legal Arguments Are Flawed And Their Authorities Are Distinguishable.

Plaintiffs' primary complaint is that the fiduciary defendants did not conduct a thorough investigation, arguing that the HolliShare Trustees failed to obtain regular appraisals of the fair market value of the JDS common shares.  For several reasons, plaintiffs' position is unsupported by the applicable law and the evidence adduced at trial.

First, ERISA does not require an appraisal as a prerequisite for a diligent investigation.  Yet, plaintiffs ask this court to adopt that as a bright-line rule and hold defendants liable for not satisfying this non-existent "requirement".  This the court will not do.

Second, such an appraisal or fairness opinion would have been nothing other than a meaningless academic exercise.  It would have resulted in a waste of time, money, and effort – particularly because HolliShare's JDS common shares could not have been sold for any price other than their book value.  Moreover, had the Trustees arranged for appraisals, they would have faced claims that they violated their fiduciary duties by causing the Plan to incur a needless and wasteful expense on a continuing basis.

Plaintiffs' claim that an appraisal of the fair market value of JDS common shares would have produced a value greater than book value is directly refuted by plaintiffs' own expert, Pratt.  Pratt admitted that restrictions on ownership and

-135-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

transferability can be conclusive, or at least highly persuasive, in establishing the fair market value of stock. Pratt testified (and has written) that if a stockholder is required pursuant to a restricted stock agreement to resell his shares of stock back to a company at book value, and the company has the financial capability to do so, it would be difficult to value the shares much above book value, even though they might be worth more if unrestricted.

Plaintiffs also contend that the investigation conducted by the HolliShare Trustees was inadequate because certain Trustees were aware of higher estimates of the fair market value of JDS common shares.  Plaintiffs rely upon: (1) a purported 1997 "analysis" performed by First Union Capital Markets ("First Union") that estimated the value of JDS to be 3.34 times its book value; (2) Winn's deposition testimony that he knew that JDS common shares had a value in the "outside world" higher than their book value; and (3) statements in a document generated by ABN-AMRO.  In each instance, plaintiffs' reliance is misplaced.

Zwirner testified that the First Union "analysis" was simply a hypothetical estimate based upon the *unrestricted* value of JDS common shares; it was prepared as part of a Capitalization Study conducted in 1997 and 1998 to determine whether JDS should adopt a valuation method for JDS's common shares other than book value.  One alternative being considered at that time was the formation of an employee stock ownership plan ("ESOP").  Under the applicable provisions of ERISA and D.O.L. regulations, an ESOP could be formed only on the basis of an "*appraised*" fair market value of the company stock on an *unrestricted basis*.

Ultimately, the ESOP alternative was rejected, because the formation of an ESOP would require JDS to incur unmanageable debt in order to fund repurchases of ESOP shares.  While there were several internal memoranda generated which referred to the First Union "analysis", because First Union was only considering the

-136-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

value of JDS common shares hypothetically on a *free and unrestricted basis*, those memoranda are of no moment.

Winn's statements at his deposition were taken out of context; as he testified at trial, he was also referring to the *unrestricted* fair market value of the JDS common shares, *i.e.,* the value of the shares absent the ownership and transfer restrictions and the repurchase rights of JDS as they appear in the JDS Articles. Winn has never questioned the validity of those ownership and transfer restrictions or rights of repurchase and never suggested that JDS common shares should be valued without their application.

Similarly, the hearsay statements of the document generated by ABN-AMRO also related to the value of the JDS common shares on a *free* and *unrestricted basis*.

Each of the cases relied upon by plaintiffs suffer from the same critical defect: the company stock in each case was *unrestricted and unencumbered.* Additionally, each also involved a plainly inadequate "investigation". For example, in *Howard v. Shay,* 100 F.3d 1484 (9th Cir. 1996), the administrative committee of an employee stock ownership plan ("ESOP") determined in advance that it would sell unencumbered company stock to the company's controlling shareholder at a price to be determined by an accounting firm (even though the valuation had not even been prepared). The shares had been acquired by the ESOP from the controlling shareholder fourteen years earlier. Later, they were sold back to the controlling shareholder at a price that provided the ESOP with a meager (2.2%) annual return, even though the company had benefited from a "parabolic" rise in Japanese real estate values while the ESOP had held the company's stock. The *Howard* Court found that the accounting firm's valuation was flawed and that defendants' blind reliance upon it was imprudent. *Id.* at 1490.

Similarly, in *Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002), an ESOP had paid $1 million more than the company's *unencumbered* stock was worth when

-137-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

the ESOP was created.  The purchase price was based on an appraisal, which valued the entire company and not the minority interest being acquired by the ESOP.  The appraiser acknowledged that if he knew that only a minority percentage of the company's stock was being purchased in order to form the ESOP, he would have only valued the minority interest being sold to the ESOP.  *Id.* at 430.

In *Eyler v. Comm'r,* 88 F.3d 445 (7th Cir. 1996), the founder of a company sold his *unrestricted and unencumbered* shares to an ESOP for a price based upon valuations previously conducted by various investment banking firms for the purpose of a contemplated initial public offering ("IPO").  Due to lack of interest, the IPO was abandoned.  Thereafter, the ESOP purchased the company's stock based on the earlier IPO valuations.  Since the IPO valuations were outdated and had not considered additional debt the company had incurred in forming the ESOP, the court had no difficulty determining that the ESOP overpaid for the company shares and the defendants had breached ERISA.  *Id.* at 456.  No similar facts are present here.

Similarly, in *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), an ESOP had, on two occasions, bought *unencumbered* stock from the company's Chairman and CEO at inflated prices.  Although the purchase prices were based on a prior appraisal by an investment banking firm, that appraisal was long outdated when the purchases occurred.  By then, it had also become apparent that the revenue projections upon which the prior appraisal had been based had not materialized.  By not questioning the reliability of the prior appraisal, and by proceeding with the transactions based on the outdated appraisal, the ESOP fiduciaries clearly violated ERISA by failing to conduct a prudent investigation.  *Id.* at 1473-74.

In each case, unlike here, the defendant fiduciaries were dealing with *unrestricted shares*, failed to conduct any reasonable investigation of their true

-138-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

value, and failed to adequately scrutinize the flawed appraisals that they blindly relied upon.  Nothing similar is present here.  Here, the HolliShare Trustees were not required to obtain any appraisal, and, because they did not do so, they did not, as did the defendants in *Howard, Donovan, Chao,* and *Eyler,* rely upon an unreliable one.  Conversely, in the (impossible) event that they obtained an accurate appraisal which valued the JDS common shares at a value higher than their book value and found a willing buyer (among the limited classes of persons who are permitted to own JDS shares), JDS could have and would have exercised its right of first refusal and would have repurchased those shares at their book value.

Liability under ERISA turns on the realities of the situations faced by plan fiduciaries as of the time of their challenged decisions. Given the undisputed nature of "circumstances then prevailing" here, to impose ERISA liability upon defendants for their failure to obtain appraisals or to take any actions beyond what they did would require them to engage in meaningless and futile actions that would only deplete the assets of the Plan by incurring unnecessary expenses.

Indeed, read properly, defendants' position is actually supported by the decision in *Donovan.*  The *Donovan* Court stressed that "the prudent man rule as codified in ERISA is a flexible standard: the adequacy of a fiduciary's investigation is to be evaluated in light of the 'character and aims' of the particular type of plan he serves."  716 F.2d at 1467.  Accordingly, the Fifth Circuit concluded that ERISA plan fiduciaries "will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation *in the circumstances then prevailing.*"  *Id.* at 1467-68 (emphasis added).  The *Donovan* Court also stressed that:

> Appraisal of closely-held stock is a very inexact science; given the level of uncertainty inherent in the process and the variety of potential fact patterns, we do not think a court should require fiduciaries to follow a specific valuation approach as a matter of law under [ERISA] Section 3(18).  The standard they must follow remains one of prudence.  If more

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

specific rules are needed, the better – and fairer – approach is to inform fiduciaries of them beforehand by regulation.

*Id.* at 1473.

Here, "the particular type of plan" is a profit sharing plan that, since its inception 38 years ago, was designed to invest in shares that are subject to ownership and transfer restrictions, and the repurchase rights of JDS to repurchase them at their book value. This is the "circumstance then prevailing" within the meaning of *Donovan.* The above quoted language makes clear that the failure to obtain an appraisal or fairness opinion is not a *per se* ERISA violation. Instead, if shares are subject to ownership and transfer restrictions, rights of repurchase, and a price formula, and the plan fiduciaries are fully aware of them and have no reason whatsoever to believe those provisions are not valid and fully enforceable, they cannot be held liable for complying with them. Under the undisputed circumstances present here, defendants' position is bolstered by the decision in *Donovan.*

### K. Defendants Did Not Violate The Prohibited Transaction Provisions Of ERISA § 406 Or Their Fiduciary Duties Under ERISA § 404(a) By Entering Into The Mid-1980s Agreement.

#### 1. Plaintiffs' Claims

Plaintiffs' contend that the defendant fiduciaries violated the prohibited transaction provisions of ERISA §§ 406(a) and (b) and their fiduciary duties under ERISA § 404(a) by entering into, and implementing the Mid-1980s Agreement.[69] Under that agreement, the Plan valued and sold JDS common shares to pay vested benefits to those participants who were terminating their Hollister employment based upon the book value established at the end of the preceding fiscal year, and not at the end of the month when the repurchase actually occurred. Tacitly

---

[69] The terms of the mid-1980s Agreement have been summarized *supra* at pp. 20 to 29 and need not be repeated here.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

recognizing that HolliShare's sales of JDS common shares for book value are not prohibited transactions, plaintiffs now try a different tack, claiming that defendants sold JDS common shares for the wrong book value.  Since 1986, HolliShare's sales of JDS common shares have been made for the audited book value per share as of December 31, rather than for the per share book value as of the end of the month in which sales occurred (the "current month end book value").  The current month end book value is the price paid to individual shareholders by JDS when it repurchases their shares under Article Five, Paragraphs II.D.1 or II.D.2 of the JDS Articles. Because the book value of JDS often (but not necessarily always) increases between the end of a year and when during the ensuing year HolliShare effected its sales, plaintiffs presumably claim that (a) HolliShare did not receive adequate consideration (and as a result, the sales were not exempt from ERISA's prohibited transactions provision), and (b) the defendant fiduciaries breached their fiduciary duties under ERISA § 404(a).  (Dkt. 613, ¶¶90-110.)

## 2.    Defendants' Position

Defendants justify the Mid-1980s Agreement as having been authorized by Article Five, Section II.D.7.a of the JDS Articles.  (DX 531.)  Beginning in the mid-1980s, HolliShare's sales of its common shares to JDS were made under what the Hollister Trustees and JDS believed were "exceptional circumstances" within the meaning of that provision.  (DX 531, H02160-H02161.)  These circumstances were: (a) the sales by HolliShare to JDS to fund the payment of plan benefits had become by far the largest share repurchases made by JDS; (b) the number of retiring participants and the amount of vested benefits to be paid to them had been growing dramatically; (c) HolliShare could not comply with the payment provisions of Article Five, Section II.D.3 of the JDS Articles (by accepting cash and providing a promissory note) without violating the prohibited transaction provisions of ERISA; (d) Hollister's annual cash contributions to HolliShare were regularly being exceeded

-141-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

by the amounts of vested benefits HolliShare was being required to pay the growing number of retiring participants which created a cash flow and liquidity concern for Hollister; and (e) Hollister's cash flow concerns were exacerbated by (i) its ongoing involvement in an arbitration proceeding with Abbott Laboratories, (ii) Hollister's ongoing global expansion, including the substantial expenses it was incurring in establishing a wider distribution system in Europe, and (iii) the dramatic, unpredictable fluctuations in the exchange rates of foreign currencies. The confluence of these factors operated to create a "perfect storm" which threatened Hollister's liquidity and the continued survival of HolliShare.

Faced with these challenges, JDS and the HolliShare Trustees exercised their discretion and determined that these constituted "exceptional circumstances" under Article Five, Section II.D.7.a of the JDS Articles, and that the parties were therefore authorized to enter into the Mid-1980s Agreement.

Defendants also maintain, and the evidence establishes, that the Mid-1980s Agreement has provided significant benefits to HolliShare. For example, the evidence established that the December 31 book value was the most reliable and accurate book value available to the HolliShare Trustees. JDS's fiscal year ends on December 31, and its year-end financial statements were audited by Deloitte & Touche, an internationally recognized public accounting and auditing firm. The year-end book value was computed from JDS's year-end audited financial statements. In contrast, JDS's interim month-end financial statements did not include, in any comprehensive manner, adjustments and accruals that are generally made as of December 31 immediately prior to the annual year end audit under the JDS Articles, the audited book value were "conclusive"; book value based on month-end, interim financial statements were not.

Further, under the Mid-1980s Agreement, HolliShare (unlike other JDS common shareholders) received cash payments from JDS rather than a combination

-142-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

of a low percentage of cash and a long-term subordinated promissory note. This was beneficial to HolliShare's participants. Even if HolliShare could legally accept a promissory note from JDS (which it could not), HolliShare required cash in order to pay vested Plan benefits, and the economic value of cash is greater than that of a subordinated note. HolliShare's Trustees reasonably believed that a long-term subordinated note could be converted into cash only at a substantial discount from its principal amount.

With the passage of time, the Mid-1980s Agreement generated additional benefits for the Plan. It has provided HolliShare with certainty and predictability as those cash needs became more volatile. In 1998, the Plan received additional assurance that its fluctuating cash needs would be satisfied in full by JDS when it received a three-year rolling commitment from JDS that it would repurchase from HolliShare the number of JDS common shares requested by HolliShare in order to meet HolliShare's vested benefit payment obligations.

The court denies plaintiffs' claims that the Mid-1980s Agreement violated the prohibited transaction provisions of ERISA. For the same reasons articulated above, the sales by HolliShare to JDS of the JDS common shares held by HolliShare at their book value were sales made for adequate consideration because the book value of those shares were their fair market value determined by the HolliShare Trustees in good faith and in accordance with the terms of the Plan instrument. Judgment on these claims is entered in favor of defendants.

Similarly, judgment is also entered for defendants on plaintiffs' claims that, by entering into and implementing the 1980s Agreement, defendants violated their fiduciary duties under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A). Defendants' decision to enter into and perform under the Mid-1980s Agreement was within their discretion, and, as noted above, they are presumed to have acted prudently and reasonably. Plaintiffs have not produced any evidence to rebut this presumption.

-143-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The court's conclusion is also supported by (1) the extraordinarily broad discretion given to the defendant fiduciaries, which plaintiffs have failed to prove the fiduciaries have exercised arbitrarily or capriciously, and (2) plaintiffs' failure to prove they suffered any damages or harm.

### 3. The Defendant Fiduciaries Were Given Broad Discretion Which Authorized Them To Enter Into And Implement The Mid-1980s Agreement.

In evaluating the prudence of the defendants' decision to enter into and implement the Mid-1980s Agreement, the court is called upon to evaluate the defendants' interpretation of the Plan instrument, and by reference, the appropriate sections of the JDS Articles. Here, the Plan instrument referred the HolliShare Trustees to Article Five, Section II.D.7.a of the JDS Articles, and they interpreted the "exceptional circumstances" provision in hose Articles to authorize JDS and HolliShare's decision to enter into and implement the Mid-1980s Agreement.

Federal courts defer to a plan fiduciary's interpretation of the terms of a plan instrument provided the interpretation is not arbitrary and capricious. This is particularly true where fiduciaries are, as here, given broad discretion under the Plan. In that regard, the terms of the HolliShare trust instrument cloaks the HolliShare Trustees with extraordinarily broad discretion. Article XI, 11.01(4) provides that the Trustees may:

> exercise every power, election and discretion, give every notice, make every demand and do every act in respect to any shares of stock, bonds, notes, debentures or other obligations or securities held in the Trust Fund which the Trustees could or might do if they were the absolute owners thereof.

(DX 501, H01402.) Article XI, 11.01(7)(d) provides that the Trustees may

> protect in any way the interests of the Trust and the Trust Fund, either before or after default with respect to any such contract, claim or right.

(DX 501, H01404.) Article XI, 11.01(8) provides that the Trustees may

-144-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

enter into all contracts and agreements and execute any and all documents which they deem necessary or advisable in exercising the authorities and powers herein granted.

(DX 501, H01404.)  Article XI, 11.01(9) provides that the Trustees may

do or cause to be done any and all other acts which they deem necessary or advisable for the advantageous effectuation, management, investment and distribution of the Trust and the Trust Fund.

(DX 501, H01405.)

Finally, the Trustees are expressly given discretion and authority to interpret the provisions of the Plan itself, including the discretionary provisions quoted above. Article XI, 13.04 provides that:

Except as otherwise provided in this Trust, the Trustees shall have authority to interpret all provisions of this Trust and to decide all questions arising in its administration.  All such determinations shall be binding on all Participants, Former Participants, Alternate Payees, Beneficiaries and all other persons or entities having or claiming any interest through or against them.

(DX 501, H01413.)   Each of these provisions were in effect in the mid-1980s and have remained in effect through the present.

A determination of the "fair market value" of closely-held shares has been held to be a matter that is subject to judgment and discretion.  *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 422 (8th Cir. 1998).  Courts give deference to reasoned decisions made by ERISA fiduciaries where the plan at issue confers discretion on the plan fiduciaries, as does the Plan here.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Jordan v. Northrup Grumman Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004).  Where, as here, an ERISA plan gives its fiduciaries discretion to construe and interpret the plan's terms, determinations by plan fiduciaries are assessed under a deferential abuse of discretion standard.  *Burke v.*

-145-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*Pitney Bowes Inc. Long-Term Disability Plan,* 544 F.3d 1016, 1023-24 (9th Cir. 2008); *Abattie v. Alta Health Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006).[70]

Far from being arbitrary and capricious, the decision of HolliShare and JDS to enter into and implement the Mid-1980s Agreement was prudent and reasonable. As the Seventh Circuit recently stated in *Green v. UPS Health, Welf, Package for RET. Employees,* 595 F.3d 734, 737-38 (7th Cir. 2010):

> The parties agree that, because the dispute involves Plan interpretation and the Plan grants UPS discretion to interpret its terms, the district court properly applied the deferential arbitrary and capricious standard. [citation omitted]  A plan administrator's interpretation is not arbitrary and capricious if it falls within the range of reasonable interpretations. *See Carr v. Gates Health Care Plan,* 195 F.3d 292, 294 (7th Cir. 1999); *Exbom v. Central States Se. & Sw. Areas Health & Welfare Fund,* 900 F.2d 1138, 1142-43 (7th Cir. 1990).

The decision of the defendant fiduciaries to enter into and implement the Mid-1980s Agreement was within the bounds of their authority to interpret and apply the provisions of the HolliShare Plan so that all sales of JDS common shares conformed to the provisions of the JDS Articles.  On this point, *Darvell v. Life Ins. Co. of N. Am.,* 597 F.3d 929, 934-35 (8th Cir. 2010), is instructive.  The *Darvell* Court identified the following factors to be considered when assessing the propriety an ERISA plan fiduciary's interpretation of the operative plan:

> (1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation. [*Finley v. Special Agents Mut. Benefit Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir. 1992)].  However, '[t]he dispositive principle remains … that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own – and therefore cannot

_____

[70] Under that standard, an ERISA fiduciary abuses his, her, or its discretion if he, she, or it: (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact.  *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan,* 410 F.3d 1173, 1178 (9th Cir. 2005) (*citing Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 944 (9th Cir. 1999)).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

disturb as an 'abuse of discretion' the challenged benefits determination.' [*King v. Hartford Life & Accident Ins. Co.,* 414 F.3d 994, 999 (8th Cir. 2005)].

*Darvell,* 597 F.2d at 929.   *Darvell* also stressed that courts are to defer to the fiduciary's interpretation of the plan so long as it is reasonable, even if the court would adopt a different interpretation as an original matter.   *Id.* (*citing King,* 414 F.3d at 998-99) (*en banc*).

Application of the factors identified in *Darvell* establishes that the HolliShare Trustees did not act arbitrarily or capriciously in entering into the Mid-1980s Agreement.  In that regard: (1) the HolliShare Plan *required* that any disposition of JDS common shares be in accordance with the JDS Articles; (2) the Mid-1980s Agreement was reached (in part) in order to avoid engaging in prohibited transactions violative of ERISA; (3) the Mid-1980s Agreement was clearly consistent with both the terms of the Plan and the JDS Articles, including the decision of HolliShare and JDS to use the most precise and accurate book value - - *i.e.,* the value obtained from the audited December 31 year-end financial statements; (4) the agreement was reached in order to ensure that HolliShare would have sufficient cash to pay vested plan benefits; and (5) the terms of the agreement have been consistently followed since its adoption in the mid-1980's.

Because it involved the deference to be given an ERISA fiduciary's exercise of discretion and claims (as here) that an employer's securities were undervalued due to the use of a year old valuation date, the decision in *McCabe v. Capital Mercury Apparel,* 752 F. Supp. 2d 396 (S.D.N.Y. 2010), is particularly apposite here.

In *McCabe*, a class action was brought by participants in an ERISA plan (an ESOP) which invested in the employer's securities.  According to the terms of the plan, upon their termination, the amount of plaintiffs' vested benefits would be determined by the plan fiduciary, the Administrative Committee, based on the "fair market value" of the employer's stock "as of the allocation date."   The "allocation

-147-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

date" was defined as "June 30 of each year (the last day of each Plan Year)" preceding the date of distribution. The plan also required an outside independent appraiser to annually appraise the employer's stock; the appraisal was provided to the Administrative Committee which then determined the shares' fair market value as of the preceding allocation date. This determination was made typically 6 to 7 months after the allocation date. When participants were terminated or retired, the shares in their account were distributed to them and then immediately repurchased by the employer in cash at their fair market value. *Id.* at 398.

Beginning in 2001, the employer suffered business reversals and operational difficulties, and the price of the company's shares declined; over the next few years, the company's future was becoming increasingly perilous. While preparing its valuation for the allocation date, as of June 30, 2008, the appraiser was advised by the company's management that there was an 80% chance that the company would be liquidated during the next fiscal year. *Id.* at 400. Using a methodology of adjusted book value, the appraiser determined that the fair market value of the company's stock was, as of the allocation date of June 30, 2008, $0.015 per share. In the latter part of 2008 and in early 2009, the company was forced to sell most of its assets, including its inventory and good will, to a third party. *Id.* at 401. After the sale, the company focused upon liquidating what few assets were left, and assisting its employees in finding new jobs.

In March 2009, the plaintiff-employees were terminated and the Administrative Committee decided to use June 30, 2008 as the allocation date for purposes of calculating the amount of vested benefits to be distributed to plaintiffs. Those distributions were made in June 2009, a few weeks prior to June 30. Several months later, in August 2009, the Administrative Committee determined that the fair market value of the company stock was $0.13 per share as of the allocation date of June 30, 2009 – over 8 times its fair market value as of June 30, 2008.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

In their suit, the plaintiffs argued that an independent appraisal of the fair market value should have been performed as of the allocation date of June 30, 2009, and that the prior valuation, as of June 30, 2008 had undervalued the company stock when their benefits were calculated in June 2009. Plaintiffs alleged that by applying a year old valuation date in calculating the amount of their vested benefits, the defendants had violated ERISA by not following the terms of the plan, and had breached their fiduciary duties of prudence and loyalty under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A). *Id.* at 404-05.

On cross-motions for summary judgment, the court entered judgment for the defendants. The court first concluded that defendants had acted in conformity with the terms of the plan. Ironically, the court rejected plaintiffs' argument that defendants should have conducted a new valuation prior to calculating their benefits because "extraordinary circumstances" existed which required defendants to depart from the literal terms of the plan which only applied to "ordinary circumstances". The court noted that, unlike the case here, "The distinction between ordinary and extraordinary circumstances does not appear anywhere in the Plan or the SPD…." *Id.* at 407. The court then concluded that the Administrative Committee acted within the broad discretion given it in the plan to interpret and apply the plan's terms:

> Plaintiff's claim is belied by the very terms he chooses to emphasize. Plaintiff argues that defendants were required to undertake a new valuation, but the Plan – and the cited provision – is unequivocal in its commitment of interpretive and administrative discretion to the Committee. It vests the Committee with the "sole and exclusive authority to construe, interpret, and apply the terms of the plan," and underscores that "[t]he Committee shall be given the greatest possible deference permitted by law in the exercise of such discretionary authority." … Thus, plaintiff's claim that defendants did not comply with the terms of the Plan is entirely unavailing.

*Id.* at 409.

The court then entered judgment against plaintiffs on their breach of fiduciary duty claims under ERISA § 404(a) based upon its analysis of the circumstances

-149-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

prevailing at the time the defendants made their decision to use the June 30, 2008 allocation date:

> Under these circumstances, it was prudent to use the June 30, 2008 valuation to distribute Class members' interests in the Plan. Plaintiff argues that "the prudent course of conduct would have been to wait for the independent appraisal required by the Plan (in June 30, 2009)." However, any number of reasons can justify defendants' decision to use the earlier valuation – an interest in ensuring that Inactive Employees received their benefits before the Company was no longer able to provide any benefits; the reasonable possibility that the cost of a new valuation would have devastated the Company; an attempt to ease the administrative burden by eliminating the large volume of small accounts; the impractibility of obtaining a timely new valuation before the next Allocation Date; and the sincere belief that the Plan terms required use of the June 30, 2008 valuation. Because defendants' decisions were objectively appropriate in light of the then-prevailing circumstances, subjective disagreement or speculation regarding their motivations does not render their actions imprudent or unreasonable.

*Id.* at 412.

Circumstances similar to those prevailing in *McCabe* were also prevailing here when defendants decided to enter into and implement the Mid-1980s Agreement. Absent that agreement, HolliShare would also have faced "administrative burdens" which were steadily growing, HolliShare would not have survived, and would not have been able to continue to pay vested benefits. HolliShare would have also faced the "impracticability" of providing accurate book values at the end of each month each time a vested benefit became payable. As in *McCabe,* defendants' decision to enter into and implement the Mid-1980s Agreement was "objectively appropriate in light of then-prevailing circumstances," and "speculation regarding their motivation does not render their actions imprudent or unreasonable." *See id.* at 412.

It is also significant that the Mid-1980s Agreement was intended to provide the liquidity needed by HolliShare to meet its benefit obligations. The Second Circuit recently recognized that maintaining adequate liquidity in an ERISA plan was a legitimate consideration in the discharge of plan fiduciaries' duties even if the result was to reduce the benefits received by plan participants. *Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2009 WL 535779, at *9 (D. Conn. Mar. 3, 2009), *aff'd,*

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

354 F. Appx. 525 (2d Cir. 2009). Summary judgment for defendant-fiduciaries was affirmed despite plaintiffs' presentation of evidence that the plan's retention of cash caused the participants to lose $69 million worth of gains that would have been obtained by investing the cash. Nevertheless, the *Taylor* Court concluded that the defendants had properly evaluated and monitored the amount of cash necessary "to provide transactional liquidity," and "[t]he fact that plaintiffs may have been able to enjoy a greater Fund performance without the cash retention is not sufficient to support a claim of fiduciary breach where a defendant has engaged in prudent analysis of its decision." 2009 WL 535779, at *9; *see also Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (ERISA does not impose a "duty to take any particular course of action if another approach seems preferable"); *George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992, 1011-12 (N.D. Ill. 2010) (if ERISA fiduciaries engage in reasoned decision-making, they will not be liable even if the "choice resulting from that process" is not "one that all will agree was the optimal one").

Plaintiffs question the very existence of the Mid-1980s Agreement because it was not formally reduced to writing. However, such documentation was not required by ERISA, the JDS Articles, or the terms of the Plan. In addition, substantial documentation of it implementation was produced. Zwirner and Winn also credibly testified that the agreement was made and has been implemented continuously and regularly for 25 years. In *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 862 (N.D. Ill. 2009), the fiduciaries of an ERISA plan were held not to have breached their fiduciary duties by failing to have conducted formal meetings or by failing to document their conversations regarding a key decision affecting an ERISA plan. Instead, the *Brieger* Court specifically determined that the informal and undocumented day-to-day communications among defendants, who were members of the plan sponsor's upper management, were sufficient to establish that the decision at issue had been thoroughly vetted and had been made prudently. *Id.*;

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

*see also Foltz,* 865 F.2d at 374-75 ("while it is true here that the Plan fiduciaries here [*sic*] never recorded any deliberations and appear to have pursued the minority-basis valuation more on the basis of inertia than explicit decision making, that is no basis for overturning a decision that is entirely consistent with the Plan document and with ERISA's substantive requirements.")[71]   Thus, plaintiffs' assertion that the lack of formal documentation of the Mid-1980s Agreement does not establish that the Agreement was non-existent, imprudent, or a breach of fiduciary duty.

### L.   Plaintiffs Have Failed To Prove They Suffered Any Harm Or Damages Due To The Mid 1980s Agreement.

Finally, there is no evidence that the use of the audited December 31 book value of the preceding year as the price for HolliShare's sales of JDS common shares harmed the plaintiffs, particularly in light of ERISA's primary purpose of ensuring that plan participants receive the benefits that they *have been promised.   See* discussion and cases cited, *supra,* at p. 64.

Even if it is assumed that the use of the December 31 book value somehow diminished plaintiffs' benefits – despite the lack of any evidence supporting such an assumption – Hollister's contributions to HolliShare have exceeded the minimum amount required by the terms of the HolliShare Plan since at least 1990.  HolliShare participants, including the plaintiffs, had an expectation of receiving only a level of benefits commensurate with the minimum required contribution amount.  However, defendants presented evidence establishing that since 1990, Hollister's contributions to HolliShare exceeded the required minimum by more than $33 million.  This excess contribution to HolliShare more than offsets the $8.8 million

---

[71]   *See also Nelson v. IPALCO Enters., Inc.,* 480 F. Supp. 2d 1061, 1099 (S.D. Ind. 2007), *aff'd sub non. Nelson v. Hodowal,* 512 F.3d 347, 351 (7th Cir. 2008) (fiduciaries did not breach duty of prudence although they never formally considered divestiture of company stock or sought independent analysis).

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

which plaintiffs claim (but did not prove) that HolliShare purportedly "lost" by selling shares at the audited December 31 book value rather than for the current month end book value.

Second, and more importantly, plaintiffs' calculation of any ostensible shortfall due to sales at the audited December 31 book value is overly simplistic and deeply flawed. HolliShare's sales of JDS common shares were made in order to generate cash needed to pay vested benefits. If the sales were made at a per share price higher than the December 31 audited per share book value, HolliShare would not have sold the same number of shares for the higher per share price (as plaintiffs incorrectly posit in ¶¶94 through 104 of their Proposed Findings, Dkt. 613). Instead, as plaintiffs apparently recognize elsewhere (Dkt. 613, ¶106), HolliShare would have sold fewer shares to generate the same amount of cash proceeds.

Before the HolliShare Trustees sold any of the Plan's JDS common shares, they first took into consideration the amount of the cash available to pay vested benefits as a result of Hollister's annual contribution to HolliShare. Because substantially more than the minimum required contribution had consistently been made, the excess cash contributed by Hollister served to reduce greatly the number of shares that HolliShare needed to sell in order to pay benefits, thereby allowing more shares to be retained as HolliShare assets. Nevertheless, plaintiffs' analysis completely ignores the facts that: (1) sales at a comparatively higher price would have resulted in the sale of less shares (rather than the sale of the same number of shares at a higher per share price), and (2) the reduction in the number of shares sold by HolliShare was reduced due to Hollister's excess contributions.

Additionally, since sales at the current month-end book value would have resulted in HolliShare selling fewer shares, the Plan would have wound up holding a greater number of shares at each year-end valuation date, but with each share having a lower book value per share. As such, even though HolliShare may have

-153-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

had comparatively more JDS shares as of each year-end valuation date, because each share would have a lower book value per share, the aggregate year-end value of HolliShare's holdings of JDS common shares may have been comparatively greater, lower, or unchanged.  Due to the numerous variables that would have to be considered in assessing accurately whether or not HolliShare would have been better off selling its shares for the current month-end book value rather than the for the audited December 31 book value, HolliShare's Trustees certainly made a "good faith" determination of "fair market value" in selling shares for the audited December 31 book value – particularly in view of the deference that is to be afforded to their determination.  What is clear, however, is that HolliShare has benefited more from Hollister's practice of making contributions substantially in excess of the minimum and HolliShare's practice of selling JDS common shares at the December 31 book value than if it had only made the minimum contributions and had sales by HolliShare been effected at the current month-end book value.  Having failed to prove they were damaged or suffered any loss as a result of the Mid-1980s Agreement, plaintiffs' claims for breach of fiduciary duty based on that Agreement are barred.  *See* cases cited, *supra*, at pp. 131-133.

The court denies plaintiffs' claim that the Mid-1980s Agreement violated the prohibited transaction provisions of ERISA.  For the same reasons articulated above, the sales by HolliShare under the Mid-1980s Agreement to JDS of the JDS common shares held by HolliShare at their book value were sales made for adequate consideration, as the book value of those share was their fair market value determined by the HolliShare Trustees in good faith and in accordance with the terms of the Plan instrument.  In addition to the grounds noted above, judgment on plaintiffs' prohibited transaction claims is entered in favor of defendants.

Similarly, judgment is also entered for defendants on plaintiffs' claim that by entering into and implementing the 1980s Agreement, defendants violated their

-154-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

fiduciary duties under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A). Defendants' decision to enter into and perform under the Mid-1980s Agreement was within their discretion, and, as noted above, they are presumed to have acted prudently and reasonably. Plaintiffs have not produced any evidence to rebut this presumption.

### M. Defendants Are Entitled To Judgment On Plaintiffs' Other ERISA Claims.

#### 1. Defendants Did Not Violate 29 U.S.C. §§ 1103(a) and (c)(1) ("ERISA §§ 403(a) and 403(c)(1)").

The first counts in both the HAC and the FAC are brought under ERISA §§ 403(a) and 403(c)(1). (Dkt. 368, HAC; Dkt. 314, FAC; Dkt. 588, SPTS, p. 5.) ERISA § 403(a) requires that plan assets be held in trust, and that the trustees be either named in the trust instrument or be appointed by named fiduciaries. ERISA § 403(c)(1) provides, in pertinent part:

> (c)    Assets of plan not to inure to benefit of employer; allowable purposes of holding plan assets
>
> (1) ... [t]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

In the HAC, plaintiffs allege defendants breached ERISA §§ 403(a) and (c)(1) by: (1) undervaluing Plan assets when selling the JDS common shares to JDS at their book value; (2) acquiring JDS common shares by assuming and paying certain 6% promissory notes to JDS; (3) incorrectly determining retirement benefits under the Plan; (4) maintaining the Plan's investment in JDS common stock; (5) voting the Plan's shares of common stock in favor of certain amendments to the JDS Articles; and (6) concealing JDS's ability to manipulate the value of Plan assets. (Dkt. 368, Count I.) The FAC alleges the same breaches, except for those relating to the promissory notes and voting the Plan's shares of JDS common stock in favor of the amendments to the JDS Articles.

-155-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

As with most of plaintiffs' ERISA claims, defendants' alleged violations of ERISA §§ 403(a) and 403(c)(1) are rooted in plaintiffs' contention that HolliShare's annual sales of JDS's common shares at their book value were for less than the shares' fair market value and were therefore not sold for adequate consideration. Plaintiffs, other than Ellis, Dimaro, Humphries, and Seay, also claim that those defendants who served as HolliShare Trustees violated these sections of ERISA by participating in HolliShare's valuation of its holdings of JDS common shares at their book value.[72] Accordingly, if the HolliShare Trustees determined in good faith and in accordance with the terms of the Plan that the book value of the JDS common shares sold by HolliShare is their fair market value, then plaintiffs' claims under ERISA § 403 are fatally defective.[73]

For the reasons detailed above, the fair market value of JDS common shares has always been, and remains, their book value and the sales of JDS common shares to JDS were made for adequate consideration within the meaning of ERISA § 3(18). Plaintiffs have also failed to prove that any of the other acts of which they complain constituted a breach of fiduciary duty under ERISA. Thus, plaintiffs have failed to prove an underlying violation of ERISA, an essential element of their claims under ERISA §§ 403(a) and 403(c)(1). Judgment is therefore entered for defendants on plaintiffs' claims brought under ERISA § 403 (Dkt. 386, HAC, Count I; Dkt. 314, FAC, Count I; Dkt. 588, SPTS, p. 5).

Moreover, plaintiffs offered no evidence that established how any Plan asset "inured" to the benefit of JDS. JDS buys JDS common shares from HolliShare when HolliShare recommends that it do so. Grabowski testified that when a

_____

[72] This court has already held that the valuation claims of Ellis, Dimaro, Humphrey, and Shea, other than their ERISA § 405 "co-fiduciary liability" claims, were barred by the statute of limitations. *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045, 1060 (E.D. Cal. 2009).

[73] The other bases alleged by plaintiffs to support their claims under ERISA §§ 403(a)(c)(1) are each dealt with elsewhere herein where the court found them to be without merit.

-156-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

company buys its own stock, the effect is to reduce the total number of outstanding shares. Even if the stock is bought at a discount to its market price, the company does not make a "profit" or receive a "benefit". If the company pays cash for its own shares, its assets decrease (by the amount of the cash used for the purchase), its liabilities remain unchanged, and its net worth decreases.[74] Plaintiffs counter that because JDS stock is sold by HolliShare to JDS at its book value rather than at its fair market value, the difference between book and fair market value reverts back to JDS, and that Plan assets therefore revert to parties other than Plan participants.

The reality of the situation is that JDS's purchases of JDS common shares from HolliShare were solely for the benefit of the Plan and its participants. The undisputed evidence at trial established that JDS's annual purchases provided HolliShare with the funds it needed to pay Plan benefits. Though JDS and Hollister may have received the indirect benefit of an incentive being provided to the employees of Hollister to perform their jobs more productively by giving them a stake in the company's success, such an indirect benefit does not violate ERISA § 403(c). *Saylor v. Parker Seal Co.*, 975 F.2d 252, 256 (6th Cir. 1992) (the issue under § 403(c)(1) is not whether defendant has received a benefit, but "whether Plan assets are being used to benefit [defendant] rather than Plan participants"); *Holliday v. Xerox Corp.,* 732 F.2d 548, 551 (6th Cir. 1984) (ERISA § 403(c)(1) does not prohibit incidental benefits that inure to an employer when the overall purpose of the underlying plan was to benefit the employees); *Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272, 284 (D.R.I. 2003), *aff'd in part, rev'd in part on other grounds*, 369 F.3d 1 (1st Cir. 2004) ("§ 403(c)(1) does not prevent an employer from enjoying indirect benefits associated with plan investment decisions"); *Aldridge v. Lily-Tulip, Inc.,* 953

---

[74] Because the transaction also decreases the number of outstanding shares, JDS's decreased net worth is divided by fewer shares, thereby resulting in little or no impact on the per share book value.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

F.2d 587, 592 (11th Cir. 1992) (§ 403(c)(1) claim could not be predicated on an unjust enrichment theory). Moreover, improved employee productivity, motivation, and longevity increase JDS's profits, thus increasing the book value of JDS common shares and hence, the benefits received by HolliShare participants.

Finally, the record is devoid of any evidence that the HolliShare Trustees allowed Plan assets to inure to the benefit of JDS, the JDS or the Hollister Boards of Directors, or the 1977 or 1999 Preferred Share Trust. To the contrary, the evidence established that the Plan Trustees held plan assets for the exclusive purpose of providing benefits to HolliShare participants and beneficiaries. Even assuming *arguendo* that any sales of JDS common shares were effected for less than fair market value, the sales were made for the purpose of generating the cash which has been used by HolliShare to pay, without exception, the full amount of the promised benefits to each and every former Plan participant. Accordingly, even if the sales were made for less than fair market value, they still did not constitute violations of ERISA § 403.

### 2. Plaintiffs' Claims Under 29 U.S.C. § 1104(a)(1)(C) ("ERISA § 404(a)(1)(c)") Are Not Tenable.

ERISA § 404(a)(1)(c) provides:

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and - ...

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; ...

//

//

-158-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Plaintiffs contend that defendants breached their fiduciary duty under ERISA by failing to diversify the Plan's investments when it was clearly prudent to do so.[75] (Dkt. 386, HAC, Count IV; SPTS, p. 8.)   Although ERISA § 404(a)(1)(C) generally requires diversification of Plan assets, ERISA § 404(a)(2) expressly exempts from the diversification requirement an EIAP that invests in "qualifying employer securities." *See Quan v. Computer Scis. Corp.,* 623 F.3d 870, 878 (9th Cir. 2010); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (commenting that because ERISA § 407(b) exempts EIAPs from the requirement of diversification, a plan fiduciary should not be subjected to ERISA claims based on allegations that it was imprudent to invest all of the plan's assets in employer stock).   As an EIAP, HolliShare is exempt from ERISA's diversification requirement.   *See In re Suntrust Bank Inc. ERISA Litig.,* 749 F. Supp. 2d 1365, 1372-75 (N.D. Ga. 2010).   Thus, the HolliShare Trustees were not required to diversify plan investments and judgment is entered against plaintiffs on their claims under ERISA § 404(a)(1)(c).   (Dkt. 386, HAC, Count IV; SPTS, p.8.)

//

//

//

//

//

//

---

[75]   Given the steady appreciation of the book value of JDS common shares over the last three decades and its outperformance of all other market indices, a decision by the HolliShare Trustees to divest the Plan of its JDS holdings would probably have resulted in the assertion against them of breach of fiduciary duty claims by disgruntled participants for not following the terms of the Plan and acting imprudently. *See, e.g., Evans v. Akers,* 534 F.3d 65 (1st Cir. 2008) (suit brought against plan fiduciaries for following the terms of the ERISA plan and not divesting employer stock held in the plan); *Bunch v. W.R. Grace & Co.,* 556 F.3d 1 (1st Cir. 2009) (suit brought against the very same plan fiduciaries sued in *Evans* for divesting the very same employer stock in the very same ERISA plan at issue in *Evans*).

-159-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 3. Brilliant And Kelleher Cannot Properly Be Held Liable For Their Predecessor Trustees' Votes In Favor Of The 1999 Amendments To The JDS Articles.

#### a. The Votes At Issue Were Prudent And Thus Did Not Violate ERISA.

Plaintiffs allege that defendants breached ERISA §§ 404 and 410 (29 U.S.C. § 1110) by voting HolliShare's JDS common shares in favor of several amendments made to the JDS Articles in 1999. (Dkt. 368, HAC, Count X; Dkt. 314, FAC, Count IX; Dkt. 588, SPTS, p. 14.)[76]  In its June 29, 2009 Order, the court found that plaintiffs' direct claims against the defendants arising from these votes were barred by the applicable statute of limitations. *DeFazio,* 636 F. Supp. 2d at 1058. However, the court also found that plaintiffs' co-fiduciary liability claims under ERISA § 405 were not barred by the statute of limitations because the limitations period for those claims did not begin to run until 2002. *Id.* at 1059.  In view of this ruling, the defendants who served as HolliShare Trustees before or at the time of the 1999 votes cannot be held liable with respect to this claim; the only defendants who may have potential liability are Brilliant and Kelleher.[77]

#### b. The January 28, 1999 Amendments

If the HolliShare Trustees in 1999 did not breach their duties in voting for the amendments at issue, then later "co-fiduciaries" cannot be held liable under ERISA § 405. *See Harris v. Amgen, Inc.*, No. 07-CV-5442, 2010 WL 744123, at *14 (C.D. Cal. Mar. 2, 2010); *In re Calpine Corp. ERISA Litig.,* No. 03-1685, 2005 WL 1431506, at *8 (N.D. Cal. Mar. 31, 2005).  That is the case with respect to all four of the amendments at issue.

One of the January 28, 1999 amendments slightly expanded the

---

[76]  ERISA § 410 provides "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."

[77]  Brilliant and Kelleher became HolliShare Trustees in 2000 and 2004, respectively.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

indemnification of JDS officers and directors. (DX 535, Article Six.) This court has already rejected plaintiffs' position that this amendment violates ERISA § 410. In addressing plaintiffs' request for partial summary judgment on that point, this court held:

> By their terms, these provisions are expressly limited in scope to a director's liability "as a director" to the corporation or shareholders. They do not purport to limit the liability of the directors as ERISA fiduciaries to an ERISA plan, beneficiaries or participants. While these provisions might limit a suit by HolliShare as a shareholder against Hollister or JDS directors, they do not limit such suits to the extent they are based on breaches of ERISA duties. Accordingly, 29 U.S.C. § 1110(a) does not render these provisions void as against public policy.

*DeFazio*, 636 F. Supp. 2d at 1080.

Nor did approval of this amendment violate the defendants' obligation to act prudently because it enhanced JDS's ability to attract qualified directors, which, in turn, would inure to the benefit of HolliShare as JDS's largest common shareholder.

The other amendment approved on January 28, 1999 increased the cash paid by JDS to sellers of JDS common shares from $5,000 to the greater of $250,000 or 10% of the transaction amount, increased the interest rates payable on promissory notes for the balance of the purchase price, and shortened (in most cases) the term of those promissory notes. (DX 535, Article Five, § II.D.4.a.) The vote in favor of this amendment was prudent because, among other things, it was intended to (and did) result in a considerable savings by JDS of interest expense (primarily due to the shorter term of the notes). Plaintiffs claim the amendment was imprudent in that it reduced the cash available to JDS and thus increased the risk that JDS would not be able to buy JDS common shares from HolliShare. However, there is no evidence that JDS's ability to buy Plan shares was realistically jeopardized by this amendment – especially in view of the fact that the JDS Board agreed, shortly thereafter, to provide HolliShare with a rolling three-year commitment to buy its JDS common shares and to maintain the liquidity to do so. During the 12 years

-161-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

since the adoption of this amendment, JDS has always maintained sufficient funds to purchase the HolliShare's JDS common shares and has done so every year.

### c.      The April 30, 1999 Amendments

Plaintiffs also complain of two amendments to JDS's Articles approved on April 30, 1999.  The first restricted any individual from owning more than 10% of the outstanding JDS common shares.  (DX 536, Article Five, § II.D.8.)  This amendment has had no impact whatsoever on the rights of HolliShare participants.  Plaintiffs maintain that this amendment could be detrimental to HolliShare because it restricts an outside buyer from purchasing JDS common shares but there is no evidence that any outside buyer would or could purchase JDS common shares.  No buyer could purchase JDS common shares unless the buyer was an eligible to own JDS shares under Article Five, Paragraph II.C of the JDS Articles.  (DX 536.)  In addition, the amendment was intended to keep any single individual from asserting too much control over Hollister – an objective that the HolliShare Trustees legitimately viewed as being in the best interests of HolliShare.

The final amendment at issue eliminated the exception to the transfer restrictions and repurchase rights for John Schneider, Minnie Schneider, and trusts established by them or established for their benefit.  (DX 536, Article Five, § II.E.)  This exemption was, as of April 30, 1999, moot, and its deletion from the JDS Articles merely eliminated meaningless surplusage.  As such, the HolliShare Trustees' vote for that amendment did not violate any fiduciary duty to HolliShare, or its participants.

### d.      Co-Fiduciary Liability For The 1999 Amendments

As noted, plaintiffs' sole remaining claims with respect to the 1999 amendments are predicated on 29 U.S.C. § 1105(a)(1)-(3) ("ERISA §§ 405(a)(1)-(3)"); (Dkt. 368, HAC, Counts IV-VIII (6-8); Dkt. 314, FAC, Counts V-VII (5-7); Dkt. 588, SPTS, p. 10.)  While the three subparts of ERISA § 405 impose co-fiduciary liability

-162-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

for different acts, they all require proof of (1) an underlying breach of fiduciary duty by a fiduciary and (2) a causal connection between the breach and damages which a plaintiffs seek to recover.  In *Silverman v. Mut. Benefit Life Ins. Co.,* the Second Circuit held that ERISA §§ 405(a)(1)-(3) requires a plaintiff to "show some causal link between the alleged breach of [the fiduciary's] duties and the loss plaintiff seeks to recover."  138 F.3d 98, 104 (2d Cir. 1998); *accord Brandt v. Grounds,* 502 F. Supp. 598, 599 (N.D. Ill. 1980), *aff'd,* 687 F.2d 895 (7th Cir. 1992); *Pension Fund-Mid Jersey Trucking Industry - Local 701 v. Omni Funding Group,* 731 F. Supp. 161, 176 (D.N.J. 1990).  The burden is on a plaintiff to establish the requisite causal nexus between the co-fiduciary's acts or omissions and a resulting loss.  *Silverman,* 138 F.3d at 106 (concurring opinion).  As discussed above, none of the amendments harmed HolliShare and thus plaintiffs have not established any violation of ERISA § 405(a).  *See Brock v. Robbins,* 830 F.2d 640, 647 (7th Cir. 1987) ("[M]onetarily penalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA...."); *Brandt,* 687 F.2d at 898.

In addition, ERISA § 405(a)(1) and § 405(a)(3) require proof that a defendant *knowingly* participated in or *knowingly* facilitated a breach by the other defendants. *See Silverman,* 138 F.3d at 104; *Stein v. Smith,* 270 F. Supp. 2d 157, 175 (D. Mass. 2003); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* 284 F. Supp. 2d 511, 519, 581 (S.D. Tex. 2003).  Plaintiffs introduced no evidence whatsoever that either Brilliant or Kelleher had any reason to suspect that, in 1999, votes for the 1999 amendments were a breach of fiduciary duty by the HolliShare Trustees.  Similarly, ERISA § 405(a)(2) only imposes liability on a fiduciary who, through the failure to discharge his, her, or its fiduciary responsibilities, enables another fiduciary to commit a breach of his, her, or its fiduciary duty.  Since Brilliant and Kelleher were

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

not Trustees until 2000 and 2004, respectively, they could not possibly have "enabled" the vote in favor of the 1999 amendments.[78]

### 4. Defendants Did Not Conceal The Existence Of Other Potential Markets For JDS Common Shares.

Plaintiffs also claim that the fiduciary defendants violated their fiduciary duties under ERISA by concealing the existence of other potential markets for the sale by HolliShare of its JDS common shares. (Dkt. 368, HAC, Count III; Dkt. 314, FAC, Count III; Dkt. 588, SPTS, p. 7.)

Prior to 1999, the JDS Articles contained a provision which *excepted* from the ownership and transfer restrictions, repurchase rights, and book value pricing, any transfer of JDS shares "by, to or for the use of John D. Schneider, Minnie R. Schneider or any trustee designated in writing by either or both of them." (DX 531, Article Five, § II.E.) Plaintiffs argue that this provision created potential markets where JDS common shares could be bought and sold free of the transfer restrictions and JDS's repurchase rights. This exception was contained in the JDS Articles that were on file with the office of the Illinois Secretary of State and were therefore a matter of public record. Thus, as a threshold matter, any claim by plaintiffs that defendants concealed these provisions cannot be, and has not been sustained.

---

[78] The considerations discussed with respect to the ERISA §§ 405(a)(1) and 405(a)(3) claims against Brilliant and Kelleher apply with equal force to plaintiffs' allegations of co-fiduciary liability against all of the various defendants for other defendants' conduct. In Count IX of the HAC and Count VIII of the FAC, plaintiffs also seek to impose co-fiduciary liability on all defendants under ERISA § 405(b). However, by its express terms, ERISA § 405(b) is applicable only to persons who served as plan trustees. Thus, the non-trustee defendants could not possibly be liable for violations of ERISA § 405(b).

As to the trustee defendants, plaintiffs' claims under ERISA § 405(b) can be sustained only if an underlying breach of fiduciary duty is proven. Since plaintiffs have failed to meet their burden to prove such a breach, the HolliShare Trustees are also entitled to judgment in their favor on this count. Plaintiffs' claims under ERISA § 405(b) also fail because the record is devoid of any evidence that the HolliShare Trustees failed to use reasonable care to prevent any other trustee from breaching any of their fiduciary duties. *Enron Corp.*, 284 F. Supp. 2d at 580. Judgment should therefore be entered in favor of all defendants on Count IX of the HAC and on Count VIII of the FAC.

-164-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

At trial, plaintiffs attempted to prove that two individuals and three trusts had the potential right to buy and sell JDS common shares free of the transfer restrictions, JDS's repurchase rights, and the book value pricing formula in the JDS Articles. The two individuals were Mr. Schneider and his wife, Minnie. The three trusts were the 1957 Schneider Trust, the John D. and Minnie R. Schneider Charitable Trust ("Charitable Trust"), and the 1977 Preferred Share Trust.

### a.   The Schneider And The 1957 Schneider Trust

As Zwirner testified, while performing legal services as personal counsel to Mr. Schneider, he became aware that Mr. Schneider had established a trust in 1957. At no time did any trustee of that trust ever attempt to buy JDS common shares from HolliShare. Mr. Schneider died in 1985. Minnie R. Schneider died in 1993. At no time during their respective lifetimes did either of them ever express any desire to purchase any JDS common shares from HolliShare.

Thus, while they had the potential right to buy and sell JDS common shares without any encumbrances, not once did either of them ever exercise that right. Because Mr. Schneider wanted JDS's common shares to be available for the benefit of the employees, through HolliShare and otherwise, it is clear that neither John nor Minnie Schneider ever intended to buy or sell any JDS common shares.

### b.   The Charitable Trust

Nor was the Charitable Trust a potential market for HolliShare's JDS common shares. The Charitable Trust was at all relevant times subject to the transfer restrictions, the repurchase rights of JDS, and book value pricing. The Charitable Trust instrument itself establishes that Hollister – not Mr. or Mrs. Schneider – was the settlor of that trust. (DX 642.) Thus, the Charitable Trust was not established "by, to, or for the use of John D. Schneider, [or] Minnie R. Schneider," it was not administered by "any trustee designated in writing by either or both of them," and it does not fall within the exception created by Article Five, II.E of the JDS Articles.

-165-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

(DX 531.)  Any transaction by the Charitable Trust involving JDS common shares was therefore subject to the ownership and transfer restrictions, JDS's repurchase rights, and book value pricing as set forth in the JDS Articles.

### c.   The 1977 Preferred Share Trust

The 1977 Preferred Share Trust may have been excepted from the transfer restrictions, repurchase rights of JDS, and book value formula as set forth in the JDS Articles.  However, no evidence was presented by plaintiffs at trial that the 1977 Trust was a potential "market" purchaser of JDS common shares from HolliShare at any price in excess of their per share book values.  The 1977 Preferred Share Trust already controlled JDS through its ownership of all of its outstanding preferred shares.  No evidence was presented that, at any time during the 24 year existence of the 1977 Preferred Share Trust, its trustees ever had any interest in purchasing any JDS common shares even though funds were available for it to do so.  To the contrary, Zwirner, a Trustee of the 1977 Preferred Share Trust, testified that the Trustees of the 1977 Preferred Share Trust had no interest whatsoever in purchasing JDS common shares, much less at any price greater than the shares' book value.  Zwirner also testified that Mr. Schneider believed the JDS common shares should be the vehicle through which the company employees could, either directly or indirectly through HolliShare, acquire an equity interest in JDS.  Thus, it would have been inconsistent with the intent of Schneider, the settlor of the 1977 Preferred Share Trust, for that Trust to have diluted employees' equity ownership of JDS through purchases of common shares by the 1977 Preferred Share Trust.  This serves as direct evidence that the 1977 Preferred Share Trust never possessed any intent to purchase JDS common shares.

Moreover, the 1977 Preferred Share Trust no longer exists.  As noted above, it was, by its terms, scheduled to terminate on April 21, 2001.  In 1999, there was a restructuring of the control of JDS under which the Trustees of the 1977 Preferred

-166-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Share Trust – with the consent of the Trust beneficiaries – transferred the trust corpus (consisting of JDS preferred shares) into a new trust, the 1999 Preferred Share Trust.  Since the 1999 Preferred Share Trust is not administered by "any trustee designated in writing" by either the late John D. Schneider or Minnie R. Schneider within the meaning of Article Five, Section II.E. of the JDS Articles (DX 531), it was never eligible to purchase JDS common shares from HolliShare free of the restrictions applicable to all other JDS shareholders.

Finally, because there is no longer anyone who is exempt from the stock ownership and transfer restrictions, repurchase rights of JDS, and book value pricing contained in the JDS Articles, there simply never was any ERISA violation to be "remedied".  John and Minnie Schneider are dead, the Charitable Trust was never exempt from JDS's stock restrictions, and the 1977 Preferred Share Trust is no longer in existence.  Aside from JDS, no other markets existed for the sale of HolliShare's JDS common shares.  Accordingly, defendants did not conceal the existence of any other potential market for HolliShare's JDS common shares.

### d.    <u>Defendants Made No Misrepresentations.</u>

There is also no evidence that any defendant affirmatively misrepresented the existence of any potential market for JDS common shares.  Plaintiffs failed to offer evidence of any actual reliance on any statement made in HolliShare's Form 5500 filings, its summary plan descriptions, and/or *HolliShare Highlights*, the documents they cite as containing alleged misrepresentations.  This lack of reliance is fatal to their claims.  *See, e.g., Bell v. Pfizer, Inc. Stock & Incentive Plan*, 626 F.3d 66, 74, 77 (2d Cir. 2010); *Harris v. Amgen, Inc.,* No. 07-CV-5442, 2010 WL 744123, at *13 (C.D. Cal. Mar. 2, 2010); *Wilson v. Venture Fin. Group, Inc.*, No. 09-5768, 2010 WL 2028088, at *10 (W.D. Wash. May 18, 2010).

Moreover, the statement that "as a practical matter" HolliShare could only sell its common shares to JDS was truthful, accurate, and did not mislead anyone.

-167-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Indeed, it would have been materially misleading for HolliShare Trustees to have represented to the HolliShare participants otherwise.[79]

### 5.    Defendants Did Not Discriminate Against Ellis And DeFazio In Violation Of 29 U.S.C. § 1140 ("ERISA § 510").

DeFazio and Ellis also claim that defendants violated ERISA § 510 by "discriminating against DeFazio for the purpose of interfering with his right to which he may become entitled under the Plan" by filing the January 2008 Motion in the Ellis/DeFazio divorce proceeding. (Dkt. 368, HAC, Count XIII; Dkt 588, SPTS, pp. 15-16.)

On January 18, 2008, Hollister, as HolliShare's Plan Administrator, filed the January 2008 Motion to relieve itself of any obligation under the then existing DROs entered in the Ellis/DeFazio divorce proceedings. Among other things, the January 2008 Motion requested that: (1) the Superior Court issue a new DRO distributing DeFazio's alternate payee account into an escrow account; (2) DeFazio and Ellis post a bond to indemnify Hollister and HolliShare from liabilities they may face in this action regarding ERISA violations related to the DROs; and (3) Ellis and DeFazio be sanctioned for any attorneys' fees incurred by Hollister in determining the qualified status of the DROs. DeFazio alleged that all defendants (except HolliShare) violated ERISA § 510 because the January 2008 Motion sought to "fine, discipline, and discriminate against a participant (Ellis) and beneficiary (DeFazio) who exercised their rights under ERISA and the Plan." (Dkt. 368, HAC, Count XIII.)

Defendants initially moved to dismiss this claim, arguing that Hollister has a constitutional right to petition the court for legal redress. The court denied defendants' motion on the ground that the motion required consideration of matters

---

[79]    The court also notes that regardless of whether the alleged statements were misrepresentations, plaintiffs did not present any evidence whatsoever that they incurred any damage as a result.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

outside the complaint. *DeFazio v. Hollister, Inc.*, No. CV-04-1358, 2008 WL 4979940, at *2 (E.D. Cal. Nov. 18, 2008). Having now proceeded through trial, and having heard and considered the evidence, the court finds that the filing of the January 2008 Motion was a proper and protected exercise of Hollister's constitutional rights, and that defendants are therefore entitled to judgment in their favor on Count XIII of the HAC.

The United States Supreme Court has recognized the right to petition as one of "the most precious of the liberties safeguarded by the Bill of Rights," *Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967), and has held that the right is implied by "[t]he very idea of a government, republican in form," *United States v. Cruikshank*, 92 U.S. 542, 552 (1876). On numerous occasions, the United States Supreme Court has reiterated these principles. *See, e.g., BE&K Construction Co. v. NLRB*, 536 U.S. 516, 524-25 (2002); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 611 (1972); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).

In *Empress LLC v. City & County of San Francisco*, 227 F.3d 1052 (9th Cir. 2005), the Ninth Circuit summarized the Supreme Court precedents and what had become known as the *Noerr-Pennington* doctrine as follows:

> The [United States] Supreme Court has described the right to petition as 'among the most precious of the liberties safeguarded by the Bill of Rights' and 'intimately connected, both in origin and in purpose, with other First Amendment rights of free speech and free press.' *White v. Lee,* 227 F.3d 1214, 1231 (9th Cir. 2000) (*quoting United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed. 2d 426 (1967)). Under the Noerr-Pennington doctrine, those who petition all departments of the government for redress are generally immune from liability. *Manistee Town Ctr. v. City of Glendale,* 227 F.3d 1090, 1092 (9th Cir. 2000).... 'Noerr-Pennington is a label for a form of First Amendment protection; to say that one does not have Noerr-Pennington immunity is to

//

//

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

conclude that one's petitioning activity is unprotected by the First Amendment.' *White,* 227 F.3d at 1231 (footnote omitted).

*Empress LLC,* 419 F.3d at 1056.[80]

As the Supreme Court recognized in *BE&K,* as long as a lawsuit has some reasonable basis, even if unsuccessful, it cannot support a violation of a federal statute. 536 U.S. at 531-533. To determine whether a lawsuit has a reasonable basis, federal courts apply the *Noerr-Pennington* doctrine. Under the *Noerr-Pennington* doctrine, the right to petition is entitled to constitutional protection unless (a) the petition is a "sham" that is both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (b) the petition is subjectively designed to use "the governmental *process* -- as opposed to the *outcome* of that process -- as ... [a] weapon." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993). Accordingly, the Supreme Court held in *BE&K* that "[a]s long as a plaintiff's *purpose* is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively." 536 U.S. at 534 (emphasis in original).

The court concludes that Hollister's January 2008 Motion was a not a sham, and under the *Noerr-Pennington* doctrine was constitutionally protected. Hollister filed the January 2008 Motion for the legitimate purpose of ending Ellis's and DeFazio's use of Superior Court DROs as a mechanism to satisfy DeFazio's obligations to Ellis while simultaneously claiming in this court that Hollister violated ERISA each time it complied with each of those Orders.

Moreover, the January 2008 Motion was anything but baseless; it was, in fact, successful. Judge McBrien of the Superior Court granted (over DeFazio's and Ellis's objections) that part of the January 2008 Motion which authorized Hollister to

---

[80] *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136 (1961) ; *Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965).

-170-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

distribute to DeFazio the funds in his HolliShare alternate payee account. Judge McBrien stated in open court that he was "disgusted" by the conduct of Ellis and DeFazio in agreeing to use the DROs, on the one hand (in the Superior Court), to pay DeFazio's obligations to Ellis, while simultaneously contending, on the other hand (in this court), that Hollister was violating ERISA by treating those very same orders as QDROs. (*See* Dkt. 349, ¶¶3, 8, Declaration of Nancy Perkovich.)

Under the *Noerr-Pennington* doctrine, the January 2008 Motion is entitled to the full protection of the First Amendment to the United States Constitution. Defendants did not violate ERISA § 510 (29 U.S.C. § 1140).

### 6. JDS's Board Of Directors Is Not A Fiduciary Under ERISA, And Its Purchases Of The Plan's JDS Common Shares Were Not Fiduciary Acts.

JDS, who is not a named fiduciary, is not a *de facto* HolliShare "fiduciary" within the meaning of ERISA. "Fiduciary" is a defined term under ERISA. ERISA § 3(21)(A) (29 U.S.C. § 1102(21)(A)) specifies that:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan....

The hallmark of fiduciary status under ERISA is discretionary control over the administration and management of an ERISA plan, or over the management of its assets. *See, e.g., Pegram v. Herdrich,* 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty … the threshold question is not whether the actions … adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaints."); *Stein v. Smith,* 270 F. Supp. 2d 157, 165 (D. Mass. 2003); *Assoc. in Adolescent Psychiatry v. Home Life Ins. Co.,* 941 F.2d 561,

-171-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

570 (7th Cir. 1991) ("[T]he power *to act for the plan* is essential to status as a fiduciary under ERISA") (emphasis added); *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989) (fiduciary status requires "the authority *to exercise control unilaterally* over a portion of a plan's assets ...") (emphasis added).

At trial, plaintiffs' submitted no evidence that JDS falls within any of the categories enumerated in the statutory definition of "fiduciary". JDS purchases its common shares from HolliShare, but those purchases are not initiated by JDS. Instead, the purchases are made in response to requests received by the JDS Board from the HolliShare Trustees. JDS does not decide (a) whether HolliShare should sell any of HolliShare's JDS common shares or, (b) if it does, how many JDS common shares HolliShare needs or wants to sell. Instead, those decisions are made solely by the HolliShare Trustees. The evidence at trial established that the role of JDS (acting through its Board of Directors) with respect to HolliShare's sales of JDS common shares was limited to accepting requests made by the HolliShare Trustees that JDS purchase a specific number of shares that HolliShare desired to sell. JDS never suggested that it purchase any definitive number of shares or that it pay any price for the JDS common shares other than their book value. Consequently, JDS did not "act for the plan" in buying JDS common shares from HolliShare and it could not and did not exercise *unlimited* or *unilateral* discretion or control over the management or administration of any Plan asset.

In this regard, the issue has arisen as to whether the Mid-1980s Agreement is binding on JDS or whether it is free to act unilaterally (*i.e.,* as a fiduciary) with respect to the JDS shares held by HolliShare. For approximately 25 years, the terms of the Mid-1980s Agreement have been scrupulously adhered to by HolliShare and JDS. In addition, for the past 12 years, JDS has honored its three-year rolling commitment to purchase each year the number of JDS common shares that

-172-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

HolliShare requested that it purchase. Moreover, HolliShare has reasonably relied, and continues to reasonably rely on JDS's three-year rolling commitment. Under these circumstances, given the established custom and practice between the parties, the Mid-1980s Agreement is a legally binding and enforceable agreement which requires JDS to continue to honor its three-year rolling commitment. *See Carl Haas Automobile Imports, Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381, 1388-89 (N.D. Ill. 1996) (part performance of an oral agreement is good evidence of the existence of a binding contract); *B & B Land Acquisition, Inc. v. Mandell*, 714 N.E.2d 58, 62 (Ill. App. Ct. 1999) (performance and reliance on an oral agreement render an agreement enforceable); *Gaffney v. McCarron*, 360 N.E.2d 508, 509 (Ill. App. Ct. 1977) (existence of an oral contract may be established by circumstances showing the general course of dealing between the parties).[81] Because JDS's dealings with HolliShare under the Mid-1980s Agreement have been performed pursuant to a legally binding bi-lateral agreement between those parties, JDS did not and could not exercise any discretionary control over the administration or management of HolliShare or its assets. For all the foregoing reasons, JDS is not a HolliShare fiduciary and, consequently, is not liable as such under ERISA. *See Harris v. Amgen, Inc.,* No. 07-CV-5442, 2010 WL 744123, at *5 (C.D. Cal. Mar. 2, 2010) ("only fiduciaries can be held liable for breach of fiduciary duty under ERISA" (*citing Wright*, 360 F.3d at 1101)).

Moreover, in buying JDS common shares pursuant to the Mid-1980s Agreement from HolliShare, JDS made a business decision and was acting in its

---

[81] California law is to the same effect. *See, e.g., Sutton v. Warner*, 12 Cal. App. 4th 415, 421-22 (1st Dist. 1993) (enforceable oral contract established by partial performance); *So. Cal. Thrift & Loan v. Sylvania Elec. Products, Inc.*, 56 Cal. Rptr. 706, 708-09 (Cal. App. Ct. 1967) (oral agreement enforced based on past business practice and past performance); *Goble v. Dotson*, 203 Cal. App. 2d 272, 279 (1st Dist. 1962) (binding, enforceable oral agreement exists "[w]here a party accepts the benefits of an oral contract which he has agreed to perform ..."); *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007).

-173-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

corporate capacity rather than as an ERISA fiduciary. As such, it is not subject to ERISA liability for those decisions. *See Pegram,* 530 U.S. at 225-26;*Verity Corp.,* 516 U.S. 489, 498 (1996); *Henderson v. UPMC,* 640 F.3d 524, 527 (3d Cir. 2011); *DeLuca v. Blue Cross of Michigan,* 628 F.3d 743, 746-47 (6th Cir. 2010) ("a party is subject to fiduciary duty under ERISA only when the party 'was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint"); *In re Lehman Bros. Sec. & ERISA Litig.,* 683 F. Supp. 2d 294, 299 (S.D.N.Y. 2010).

### 7.     The Hollister Board Of Directors Did Not Breach Its Limited Liability Fiduciary Duties Under The Plan.

The Hollister Board is a "named fiduciary" for certain purposes under the HolliShare Plan.    However, fiduciary status under ERISA is not an "all or nothing concept". *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 18 (1st Cir. 1998); *Custer v. Sweeney,* 89 F.3d 1156, 1162 (4th Cir. 1996) (*quoting Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 61 (4th Cir. 1992)); *Walker v. Nat'l City Bank of Minneapolis,* 18 F.3d 630, 634 (8th Cir. 1994).  Instead, the scope and extent of a person's fiduciary duties under ERISA are limited to those duties and responsibilities assigned to that person by the plan at issue. *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir. 1985); *Johnson v. Georgia-Pacific Corp.,* 19 F.3d 1184, 1188 (7th Cir. 1994) (under the statutory definition, a "person is a fiduciary 'to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others").

The only duty imposed on the Hollister directors by the Plan is the appointment of the HolliShare Trustees.  The parties do not dispute, and the record is devoid of any evidence to the contrary, that the Hollister Board appointed competent people as HolliShare Trustees.  Even assuming that the power to appoint

-174-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

plan trustees carries with it the duty to exercise reasonable prudence in monitoring their actions,[82] there was no evidence adduced at trial that, based upon their monitoring of the trustees, the Hollister directors believed that the HolliShare Trustees were not fulfilling their fiduciary duties, or that they had any reason to believe the HolliShare Trustees were acting imprudently or unreasonably. *See In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 902-03 (S.D. Tex. 2004) (claims against board of directors for not monitoring plan committees it had appointed were dismissed where there were no "red flags" that placed the board "on notice of possible misadventure by their appointees," and plaintiffs' failed to allege the appointees were incompetent or subject to replacement for cause); *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (directors do not breach their duty to monitor absent knowledge of "possible misadventure by their appointees").

Moreover, the duty to monitor does not carry with it the duty to oversee and approve every decision made. In *Howell v. Motorola, Inc.*, 633 F.3d 552, 555-56 and 571 (7th Cir. 2011), the price of Motorola's stock fell 20% after the public disclosure of a bad loan for $1.7 billion to $2 billion to a Turkish company. Claims for breach of fiduciary duty under ERISA were brought against Motorola's employer stock fund, alleging imprudence in offering Motorola stock as an investment option for the

---

[82] There is conflicting Ninth Circuit authority regarding whether the persons who appoint fiduciaries of an ERISA plan have a fiduciary duty to monitor reasonably the actions of their appointees. *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (person whose sole duty was to appoint the plan administrators was only liable with regard to their appointment of those administrators); *Henry v. Frontier Indus., Inc.*, 863 F.2d 886 (9th Cir. 1988) (unpublished) (board member had the duty to monitor the performance of another plan fiduciary the board member had appointed). Various courts have held that inferring a duty to monitor the actions of appointed fiduciaries is inconsistent with the language and structure of ERISA. *See In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d 1328, 1338-39 (N.D. Okla. 2003) and unpublished October 27, 2003 Order at 2, n. 1 (imposing a general duty to monitor would make the appointing fiduciaries "a guarantor for any and all actions by those [appointed] fiduciaries"); *In re American Express Co. ERISA Litig.*, 762 F. Supp. 2d 614, 626 (S.D.N.Y. 2010) (a plan fiduciary charged only with appointing a investment committee has no fiduciary duty extending beyond its appointment duty, citing *Gelardi* with approval).

-175-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

company's 401(k) plan participants.  Plaintiffs claimed, *inter alia,* that Motorola's Board of Directors breached its fiduciary duty under ERISA by failing to monitor the activities of the plan trustees (Plan Administrators) it had appointed.  In offering the entry of summary judgment for all defendants, the Seventh Circuit concluded that, based on the Board's review of periodic reports it received and audit reports from an outside auditor, it had adequately performed its duty to monitor.  The court stated:

> Plaintiffs essentially ask us to recognize a duty to monitor that would require every appointing Board member to review all business decisions of Plan administrators.  As the district court rightly pointed out, that standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place.

*Id.* at 573.  Indeed, the D.O.L. has acknowledged that the appointing fiduciaries "are not … generally obligated to assume direct responsibility for duties properly allocated to other fiduciaries *or to vouchsafe every decision they make.*"  D.O.L. *Amicus* Brief in *In re Worldcom, Inc. ERISA Litig.*, No. 02-Civ-4816 (DLC) (S.D.N.Y. Jan. 16, 2002), *available at:* http://www.dol.gov/sol/media/briefs/worldcom-1-16-04.htm (emphasis added).

The court finds that the Hollister Board exercised reasonable prudence in monitoring the activities of the HolliShare Trustees.  Among other things, the Hollister Board interacted with the HolliShare Trustees in determining the amount of Hollister's annual contribution to HolliShare.  The Hollister Board received a report, at least annually, from Hollister's Corporate Deferred Benefits Committee, whose individual members also served as Trustees of HolliShare.  The report also provided the Hollister Board with information concerning the current size of the HolliShare Trust Fund, the number of JDS common shares sold by HolliShare to JDS in the prior year, their price per share based on their book value, and the proceeds realized by HolliShare as a result of each sale.

The Hollister Board also monitored closely the returns being generated by HolliShare's investments.  Zwirner testified that the Hollister Board paid careful

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

attention to the year-end increases in the book value of HolliShare's JDS common shares.  Based on the annual increases in the book value of JDS common shares, which have, almost every year, exceeded the increases in the S&P 500 index and representative indices of mid-cap and small cap stocks, the Board reasonably concluded that the Plan was being operated prudently and properly.  The steady appreciation drove the account balances of HolliShare's participants to increase, and ultimately, the amount of vested benefits that they received increased, including the benefits received by the plaintiffs.  Members of the Hollister Board also interacted often with HolliShare participants at company functions where they consistently received positive feedback regarding HolliShare.  Hollister's General Counsel, Zwirner, also kept the Hollister Board up to date regarding: (a) the D.O.L.'s acceptance each year, without objection, of HolliShare's Form 5500 (which calculated the "current value" of HolliShare's holdings of JDS common shares at their year-end book value), (b) the lack of any questions being raised by the D.O.L. following its 1998 audit of HolliShare, and (c) the numerous Determination Letters HolliShare received from the I.R.S.  The Hollister Board was also intimately involved, in the late 1990s, in the Capitalization Study, which considered a number of alternatives to the continued use of book value to determine the fair market value of JDS common shares.  The Board eventually agreed with the Capitalization Study Team that retention of the book value system was in the best interests of JDS and Hollister.

The court previously held in this case that (1) Hollister's Board should have been aware that JDS's repurchases of JDS common shares fell (unless exempted) within ERISA's prohibited transaction provisions, and (2) that the HolliShare Trustees (*i.e.,* Zwirner) had, because of their positions with Hollister and JDS, potential conflicts of interest.  *DeFazio v. Hollister Inc.*, 636 F. Supp. 2d 1045, 1068 (E.D. Cal. 2009).  Based on the evidence at trial, none of these potential conflicts

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

ever evolved into an actual conflict. As a result, the mere existence of these potential conflicts does not render the Hollister Board members liable to plaintiffs. *In re Syncor ERISA Litig.*, 351 F. Supp. 2d 970, 987-988 (C.D. Cal. 2004), *rev'd on other gds.*, 516 F.3d 1095 (9th Cir. 2008) (court rejected plaintiff's theory that potential conflicts of interests, in of themselves, violate ERISA, because "Under this theory corporate defendants would always have a conflict of interest); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 756 F. Supp. 2d 330, 355 (S.D.N.Y. 2010) (merely hypothetical or potential conflicts of interest are not actionable; "This is because the purported conflict would exist for all corporate insiders who are charged with managing the affairs of the corporation; it would deprive the plan of services of the most knowledgeable individuals"); *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005) ("No case of which the court is aware has held that ERISA fiduciaries breach their duty of loyalty simply by 'placing themselves in a position' where they might act disloyally.")

Indeed, the text of ERISA itself makes it clear that the existence of a relationship which creates a potential conflict does not result in ERISA liability. *See* §408(c)(3) (29 U.S.C. §1108(c)(3)) ("Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from … serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest."). Thus, as was recognized in *In re Huntington Bancshares ERISA Litig.*, 620 F. Supp. 2d 842, 849, n. 6 (S.D. Ohio 2009), if potential conflicts were actionable, "ERISA's statutory scheme allowing company officers and directors … to serve as fiduciaries would be contradictory" (citing ERISA §408(c)(3)). Accordingly, there is no liability for a fiduciary breach based on a purported conflict of interest where the ostensible conflict has not caused any adverse consequences to the plan or its participants. *In re Bear Stearns Cos.*, 763 F. Supp. 2d at 579-580.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The U.S. Supreme Court has also recognized that potential conflicts arising from the dual role of a plan fiduciary and a corporate manager does not result in ERISA liability.   In *Pegram*, the Court distinguished ERISA fiduciaries from common-law trustees as follows:

> [t]he trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats.

> Speaking of the traditional trustee, Professor Scott's treatise admonishes that the trustee "is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries." 2A Scott § 170, at 311.   Under ERISA, however, a fiduciary may have financial interests adverse to beneficiaries. Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (*e. g.,* firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (*e. g.,* modifying the terms of a plan as allowed by ERISA to provide less generous benefits).   Nor is there any apparent reason in the ERISA provisions to conclude … that this tension is permissible only for the employer or plan sponsor, to the exclusion of persons who provide services to an ERISA plan.

530 U.S. at 225.

Here, the evidence established that all decisions made by the HolliShare Trustees were made prudently and in good faith to further the best interests of Hollister, JDS, and HolliShare's participants and beneficiaries.   Further, Zwirner's multiple roles actually served to advance the interests of Hollister's Board.   For example, as a HolliShare Trustee, he was fully knowledgeable about the actions taken by HolliShare every year to determine the fair market value of HolliShare's assets (primarily of JDS's common shares), and regularly communicated what those actions were to the other members of Hollister's Board.

Based on the monitoring of HolliShare and its Trustees by the Hollister Board, the Hollister Board prudently and reasonably concluded that HolliShare was a properly-functioning, stable plan that was being conducted according to law and that it provided significant benefits to its participants and beneficiaries.   Under such circumstances, the members of the Hollister Board are not liable to plaintiffs for any

-179-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

failure to monitor the activities of the HolliShare Trustees. *See Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (rejecting breach of fiduciary duty claim against employer whose role was simply the selection of the plan administrator); *In re Calpine Corp. ERISA Litig.*, No. C-03-1685, 2005 WL 1431506, at *4 (N.D. Cal. Mar. 31, 2005); *In re RCN Litig.*, No. 04-5068, 2006 WL 753149, at *7-*8 (D.N.J. Mar. 21, 2006). In addition, even if the Hollister Board had a duty to monitor the HolliShare Trustees, since those Trustees did not breach their fiduciary duty, plaintiffs' claims against the Hollister Board are precluded. *See In re Bank of Am. Corp.*, 756 F. Supp. 2d. at 358 (ERISA claim based on a duty to monitor fails if the underlying fiduciary breach claim fails.)

Accordingly, judgment will be entered in favor of the members of the Hollister Board as to all claims based on their alleged failure to monitor the HolliShare Trustees.

> **8.     Defendants Did Not Violate 29 U.S.C. §§ 1056(d)(3) Or 1105(a) ("ERISA §§ 206(d)(3) And 405(a)") Because The March 29, 2002 DRO And The Subsequent DROs Are QDROs Under ERISA.**

> **a.     ERISA's QDRO Provisions**

DeFazio and Ellis claim that defendant Hollister, as Plan Administrator, violated ERISA by treating various DROs entered by the Sacramento Superior Court in the DeFazio/Ellis divorce proceedings, particularly the order entered on March 29, 2002, as QDROs under ERISA. DeFazio and Ellis also seek to impose liability on those fiduciary defendants who knowingly participated, enabled, or with knowledge, failed to remedy Hollister's breach. (Dkt. 368, HAC, Counts VI-VIII; Dkt. 314, FAC, Counts V-VII (5-7), XI; Dkt. 588, SPTS, pp. 3-4, 10.) By complying with those orders, according to DeFazio and Ellis, the HolliShare fiduciaries also violated their duties under 29 U.S.C. § 1104(a)(1)(b) ("ERISA § 404(a)(1)(D)") to administer the Plan in compliance with the terms of the Plan Instrument.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The benefits of an ERISA plan may not, in general, be assigned or alienated. However, ERISA authorizes certain state court-ordered assignments of plan benefits to former spouses or dependents. ERISA § 206(d)(1). ERISA provides that pension plans "shall provide for the payment of benefits in accordance with the applicable requirements of any [QDRO]." ERISA § 206(d)(3)(A). An order is a QDRO if: (a) it relates "to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent of a plan participant... made pursuant to a State domestic relations law" (ERISA § 206(d)(3)(B)(ii)(I)) and if (b) it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan" (ERISA § 206(d)(3)(D)(i)).

In addition, to qualify as a QDRO, a DRO may not (1) require the plan to provide any type of benefit not otherwise provided, (2) require the plan to provide increased benefits, or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO. ERISA § 206(d)(3)(D)(i)(ii)(iii). These QDRO provisions are designed to provide simple and certain rules for plan administrators to follow. *Carmona v. Carmona*, 544 F.3d 988, 999 (9th Cir. 2008) (noting that the QDRO requirements "allow a plan administrator to more easily administer the plan and reduce the risk of making improper payments").

### b. The March 29, 2002 Order Recognized DeFazio's Status As An Alternate Payee In Accordance With ERISA § 206(d)(3)(D)(i).

The DRO entered in the DeFazio and Ellis divorce proceedings on March 29, 2002 assigned to DeFazio the right to receive a portion of Ellis's HolliShare account in accordance with ERISA § 206(d)(3)(D)(i). (Dkt. 559, pp. 63-64.) As this court has already noted, the March 29, 2002 DRO "provided that HolliShare was to segregate DeFazio's community property share of Ellis's HolliShare account". *Id.* The March

-181-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

29, 2002 DRO also determined that DeFazio was entitled to one-half of Ellis's HolliShare account as his community property. (Dkt. 524, Ex. G, ¶7, Request for Judicial Notice.) Section 7 of the March 29, 2002 DRO expressly provided that "[H]usband shall be entitled to request a distribution of the balance of Husband's Share in excess of One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00), at any time." *Id.* The first paragraph of Section 7 of the March 29, 2002 DRO placed a restraint against the first $1,500,000 of the amount potentially awardable to DeFazio "pending resolution of child support and property settlement issues between [DeFazio] and [Ellis]." *Id.* Accordingly, the court concludes that the March 29, 2002 DRO was compliant with ERISA § 206(d)(3)(D)(i) and was properly treated by Hollister as a QDRO under ERISA.

### c. The Subsequent DROs Entered By The Superior Court Recognized DeFazio's Right As An Alternate Payee To Receive A Portion Of Ellis's HolliShare Account And Thus Were QDROs.

DeFazio and Ellis contend that the subsequent DROs violated ERISA in several respects. Their contentions are without merit.

The subsequent DROs entered by the Superior Court also recognized DeFazio's right to a portion of Ellis's HolliShare account. Again, a DRO is a QDRO if it recognizes the existence of an alternate payee's right to "receive all or part of the benefits payable with respect to a participant under an ERISA plan." ERISA § 206(d)(3)(D)(i). The subsequent DROs at issue all recognized and even adjusted the division of Ellis's HolliShare account between Ellis and DeFazio. *DeFazio,* 636 F. Supp. 2d at 1078; Dkt. No. 559, pp. 66-67. Therefore, the subsequent DROs did not violate ERISA § 206(d)(3)(D)(i).

//

//

//

-182-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### d.    The DROs At Issue Did Not Require HolliShare To Provide Any Type Of Benefit Not Otherwise Provided.

Neither the March 29, 2002 DRO nor any of the subsequent DROs required HolliShare to provide any type of benefit not otherwise provided under the Plan.  The March 29, 2002 DRO provided that HolliShare was to segregate DeFazio's community property share of Ellis's HolliShare account, and further specified that Ellis would have a lien and security interest for unpaid child support.  *DeFazio,* 636 F. Supp. 2d at 1078.  The Superior Court also retained jurisdiction over DeFazio's share and ordered the HolliShare Administrator to retain possession of $1,500,000 of DeFazio's HolliShare account pending further order of the Superior Court.  *Id.*

DeFazio (and presumably Ellis) argues that this order violated ERISA § 206(d)(3)(D)(i) because it did not provide for the immediate distribution of the balance of DeFazio's alternate payee account to him in accordance with the terms of the HolliShare trust instrument.  (Dkt. 474, 3:7-16.)  However, as the court previously noted, the March 29, 2002 DRO did not violate ERISA § 206(d)(3)(D)(i) because that provision provides that a DRO meets the requirements of a QDRO if it "does not require a plan to provide any type or form of benefit … not otherwise provided under the plan."  *DeFazio,* 636 F. Supp. 2d at 1078.  The plain language of ERISA § 206(d)(3)(D)(i) only prohibits a QDRO from requiring a plan to provide a type or form of benefit not established under that plan.  The March 29, 2002 DRO simply delayed the timing of DeFazio's distribution described in the trust instrument.  It did not require Hollister, as Plan Administrator, to provide DeFazio with any benefit which he was not entitled to receive.  *Id.* at 1079.  The failure of the March 29, 2002 DRO or of any of the subsequent DROs to provide for the immediate distribution to DeFazio of his alternate payee account did not violate ERISA § 206(d)(3)(D)(i).

-183-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### e. The DROs Did Not Require HolliShare To Provide Increased Benefits.

A QDRO may not require the plan to provide increased benefits. ERISA § 206(d)(3)(D)(ii). Neither the March 29, 2002 DRO nor the subsequent DROs provided increased benefits to DeFazio. Accordingly, the DROs complied with ERISA § 206(d)(3)(D)(ii).

### f. The DROs Did Not Require Benefits To Be Paid To An Alternate Payee Which Were Required To Be Paid To Another Alternate Payee.

The March 29, 2002 DRO and the subsequent DROs that were entered did not require the payment of benefits to a different alternate payee. ERISA § 206(d)(3)(D)(iii) states that a DRO only qualifies as a QDRO if it "does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order." The March 29, 2002 DRO and the subsequent DROs ordered HolliShare to make payments directly to Ellis and not to DeFazio's children. While the payments were made to satisfy DeFazio's child support obligations, they were not paid to the children as alternate payees, and thus did not violate ERISA § 206(d)(3)(D)(iii). *DeFazio,* 636 F. Supp. 2d at 1079.

In conclusion, the March 2002 DRO and the subsequent DROs did not violate ERISA § 206(d)(3)(D)(iii) and are, in fact, QDROs under ERISA. Judgment will therefore be entered against DeFazio and Ellis, and in favor of Hollister and the fiduciary defendants who are alleged to have participated, enabled, or, with knowledge, failed to remedy Hollister's breach of ERISA §§ 206(d)(3) and 405(a).

//
//
//
//

-184-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

**g.      DeFazio's And Ellis's QDRO Claims Are Also Barred On Numerous Other Grounds.**

The Superior Court's QDROs were entered by a court of competent jurisdiction in a case in which Ellis and DeFazio were represented by competent counsel.  Each of those QDROs has now become final and each is binding upon DeFazio and Ellis.  Although presented with a full opportunity to do so, DeFazio failed to object in the divorce proceeding to the entry of almost all of the QDROs of which he now complains, and Ellis affirmatively petitioned for entry of the very orders she now claims were illegal.  DeFazio's and Ellis's QDRO claims are therefore barred by application of the doctrines of *Rooker-Feldman,* collateral estoppel, judicial estoppel, and *Colorado River.*

**1)      Under The *Rooker-Feldman* Doctrine, This Court Lacks Subject Matter Jurisdiction Over DeFazio's And Ellis's QDRO Claims.**

Under the *Rooker-Feldman* doctrine, a federal court lacks subject matter jurisdiction to review the final determinations of a state court.  *Doe & Assocs. Law Office v. Napolitano,* 252 F.3d 1026, 1029 (9th Cir. 2001) (*citing Branson v. Nott,* 62 F.3d 287, 291 (9th Cir.1995)); *D.C. Ct. of App. v. Feldman,* 460 U.S. 462, 476 (1983); *Ignacio v. Judges of the U.S. Court of App., Ninth Circuit,* 453 F.3d 1160, 1165 (9th Cir. 2006).  Stated simply, this court lacks authority to review what are now final orders of the Superior Court.  As the Ninth Circuit stated in *Carmona v. Carmona,* 603 F.3d 1031, 1054 (9th Cir. 2010), the *Rooker-Feldman* doctrine stands for the relatively straightforward principle that "federal district courts do not have jurisdiction to hear *de facto* appeals from state court judgments."  However, that is precisely what DeFazio is asking this court to do.

The Superior Court had jurisdiction to decide the very issue that lies at the heart of DeFazio's and Ellis's ERISA QDRO claims in this consolidated action – whether its domestic relations orders were QDROs under ERISA.  It is now well

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

established that federal and state courts have concurrent jurisdiction to decide whether a particular order in a divorce case is or is not a QDRO under ERISA. *See, e.g., Mack v. Kuckenmeister,* 619 F.3d 1010, 1018 (9th Cir. 2010); *Carmona,* 603 F.3d at 1051-52; *In re Marriage of Zamos,* No. D038380, 2002 WL 31358971, at *1 n.5 (Cal. Ct. App. Oct. 21, 2002); *In re Marriage of Oddino,* 16 Cal. 4th 67, 71 (Cal. 1997); *In re Marriage of Levingston,* 16 Cal. Rptr. 2d 100, 102 (Cal. Ct. App. 1993); *In Re Marriage of Padgett,* 172 Cal. App. 4th 830, 850-51 (Cal. Ct. App. 2009).

In *Carmona,* the Ninth Circuit applied the *Rooker-Feldman* doctrine to dismiss a federal action involving the validity of a QDRO that had already been decided by a state court. 603 F.3d at 1050. *Carmona* involved a contest between two ex-wives of a participant in two ERISA plans who had died. The dispute centered on whether a DRO entered by a Nevada family court was a QDRO under ERISA. The issue had been extensively litigated in the Nevada state courts, resulting in a final decision by the Nevada Supreme Court. The Ninth Circuit, relying on the *Rooker-Feldman* doctrine, upheld the concurrent jurisdiction of the Nevada state courts, and affirmed the lower court's dismissal of the federal suit. *Id.*

Accordingly, under *Carmona* and the foregoing authorities, the Sacramento County Superior Court had concurrent jurisdiction to determine whether or not the DROs presented to it by Ellis and DeFazio were QDROs. Having failed to remove the QDRO proceedings to federal court, DeFazio and Ellis subjected themselves to the final determinations of the Superior Court that the DROs presented to it were, as a matter of law, QDROs under ERISA. Appeal of the Superior Court's Orders by Ellis or DeFazio was required to have been taken within 60 days after each order was filed. *Cal. Rules of Court,* Rule 8.104(a) and (d)(3); *In re Marriage of Parker,* No. H023121, 2002 WL 31031645, at *4 (Cal. Ct. App. Sept. 11, 2002). Since neither DeFazio nor Ellis appealed any of the Superior Court's orders at issue, those orders

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

are now final, and DeFazio's and Ellis' QDRO claims are barred by application of the *Rooker-Feldman* doctrine.

In addition, since six of the nine QDROs entered by the Superior Court were stipulated to by Ellis and DeFazio (including the critical March 29, 2002 QDRO), Ellis and DeFazio are now, on this separate ground, barred from challenging these orders as a matter of law. *Klinker v. Klinker,* 132 Cal. App. 2d 687, 694-95 (Cal. Ct. App. 1955); 14 Cal. Jur. 878, § 13.

In short, in pursuing their QDRO claims before this court, DeFazio and Ellis have been *de facto* appealing from the Superior Court's orders on the ground they are void and unenforceable because they are not QDROs under ERISA. This they cannot do.

### 2)    DeFazio's And Ellis's QDRO Claims Are Also Precluded By Collateral Estoppel.

DeFazio's claims are also barred by the doctrine of collateral estoppel. Collateral estoppel prevents the relitigation of an issue in a second action that was litigated and determined in a prior proceeding. In determining the collateral estoppel effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel. *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 81 (1984); *Bugna v. McArthur,* 33 F.3d 1054, 1057 (9th Cir. 1994). Under California law, collateral estoppel bars the relitigation of an issue when: (1) the issue decided in the prior action is identical to the issue presented in the second action; (2) a final judgment on the merits was rendered in the prior action; and (3) the party against whom collateral estoppel is asserted was a party to the prior adjudication. *Garrett v. City & County of San Francisco,* 818 F.2d 1515, 1520 (9th Cir. 1987). Each of those elements is present here.

DeFazio and Ellis were both parties to the Superior Court proceeding. As established above, the Superior Court orders were appealable orders. No appeals were taken from any of those orders, and therefore each is now a final order.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Finally, the issue decided in the divorce proceedings by the Superior Court is identical to the issue which comprise the very core of DeFazio's QDRO claims here – namely, were the Superior Court orders at issue valid QDROs under ERISA?  The Superior Court has already addressed this issue and answered, time after time, affirmatively.

DeFazio and Ellis are collaterally estopped from challenging in this action the Superior Court determinations that the orders at issue are QDROs.  They are thus judicially estopped from claiming Hollister violated ERISA's QDRO provisions.

### 3) DeFazio's And Ellis's QDRO Claims Are Also Barred By The Doctrine Of Judicial Estoppel.

DeFazio's and Ellis's QDRO claims are also barred by the doctrine of judicial estoppel.  DeFazio and Ellis are judicially estopped from challenging the QDROs to which they stipulated or agreed in the Superior Court.  *Swain v. Swain,* 58 Cal. Rptr. 83, 88 (Cal. 1967) ("We concede the rule of judicial estoppel by agreement, *i.e.,* that when two spouses have stipulated to a fact upon the basis of which the court acts, the other party may not invoke the jurisdiction of the court to deny the agreement" (*citing Rich v. Silver,* 37 Cal. Rptr. 749, 749-53 (Cal. Ct. App. 1964)). The doctrine of judicial estoppel applies when:

> (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (*i.e.,* the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.  The doctrine of judicial estoppel is "especially appropriate where [as here] a party has taken inconsistent positions in separate proceedings."

*Jackson v. City of Los Angeles,* 70 Cal. Rptr. 2d 96, 103 (Cal. Ct. App. 1997) (*citing Risetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 605 (9th Cir. 1996)); *Astor Chauffeured Limousine v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547-48 (7th Cir. 1990).  DeFazio and Ellis have taken polar opposite positions in the divorce proceedings and in this court.

-188-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

### 4) Under The *Colorado River* Doctrine, This Court Also Declines To Adjudicate DeFazio's And Ellis's QDRO Claims.

In *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976), the United States Supreme Court recognized that, under certain circumstances, it is appropriate for a federal court to refrain from exercising its jurisdiction in the interests of wise judicial administration. According to the *Colorado River* Court, in determining whether abstention is appropriate, a federal court should consider the following factors:

(1) The relative progress of the state and federal proceedings;

(2) Whether staying or dismissing the federal action will avoid piecemeal litigation;

(3) Whether the controversy involves a *res* over which one of the courts has assumed jurisdiction;

(4) The order in which the actions were filed;

(5) The presence or absence of concurrent state and federal court jurisdiction; and

(6) Whether the state court action is adequate to protect the plaintiff's federal rights.

*Id.* at 818 (identifying the first four factors); *see also Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 23 (1983) (identifying the remaining two factors). No factor is, by itself, determinative of the issue presented. Instead, a court should exercise a carefully considered judgment weighing these factors on a case by case basis. *Colorado River,* 424 U.S. at 818-819 ("the Colorado River doctrine").

When faced with parallel lawsuits in a federal and in a state court, the Ninth Circuit has, under analogous circumstances, applied the *Colorado River* doctrine and abstained from exercising federal jurisdiction. *See, e.g., Fireman's Fund Ins. Co. v. Quackenbush,* 87 F.3d 290, 297-98 (9th Cir. 1996); *Akins v. Rodriguez,* 15 F.3d 883, 887 (9th Cir. 1994); *MJT Inc. v. Adcom Exp., Inc.,* 39 F.3d 1187, *2-*3 (9th Cir.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

1994); *40235 Washington St. Corp. v. Lusardi,* 976 F.2d 587, 589 (9th Cir. 1992); *Nakash v. Marciano,* 882 F.2d 1411, 1415-17 (9th Cir.  1989).

The circumstances present here satisfy each of the factors delineated in *Colorado River* and the court declines to exercise jurisdiction over this matter. Counts VI-VII of the HAC and Counts V-VII and XI of the FAC are therefore dismissed with prejudice.

### 9.    Defendants Did Not Violate ERISA By Crediting DeFazio's HolliShare Alternate Payee Account With A Short-Term Rate of Interest.

Finally, DeFazio claims defendants violated ERISA because his alternate payee account was not credited with the difference in interest between the interest paid to him in his alternate payee account, and the interest HolliShare received on the funds in DeFazio's alternate payee account which remained part of the HolliShare Trust Fund.  (Dkt. 368, HAC, Count XIII; Dkt. 588, SPTS, p. 10.); *DeFazio,* 636 F. Supp. 2d at 1065.  The court concludes that DeFazio is not entitled to any additional interest and enters judgment in favor of defendants on this claim.

This is yet another example of DeFazio trying to obtain more benefits than the Plan entitled him to receive.  The Plan provides that alternate payee accounts are to be credited with a "short term rate of interest".  (DX 501, § 7.02(4).)  The evidence at trial established that the HolliShare Trustees did credit DeFazio's alternate payee account with a short-term rate of interest.  DeFazio therefore received all the benefits due him under the Plan.

DeFazio's interest claim is also foreclosed by the Ninth Circuit's decision in *Wright,* where it held that "ERISA does no more than protect the benefits which are due an employee under a plan." *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1100 (9th Cir. 2004) (*quoting Bennett v. Conrail Matched Saving Plan Admin. Comm.,* 168 F.3d 671, 677 (3d Cir. 1999)).  Since the defendants in *Wright* provided plaintiffs with everything they were *entitled* to receive under the plan at issue there,

-190-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

plaintiffs had no actionable ERISA claim.  *See Allen v. The Katz Agency Inc. Employee Stock Ownership Plan*, 677 F.2d 193, 194 (2d Cir. 1982) (ERISA's fiduciary duty requirements "surely did not obligate the trustees to pay Allen [plaintiff] more than the value to which the Plan entitled him.").  DeFazio's claim that he is entitled to more than his entitlement under the HolliShare Plan is without merit and judgment is entered in favor of defendants on HAC, Count XIII.[83]

### N.    Defendants Are Entitled To An Award Of Attorneys' Fees.

The United States Supreme Court has recently held that a fee claimant need not be a "prevailing party" to be eligible for an award of attorneys' fees under 29 U.S.C. § 1132(g)(1) ("ERISA § 502(g)(1)").  *Hardt v. Reliance Standard Life Ins. Co.,* 130 S.Ct. 2149, 2152 (2010).  In *Hardt,* the Supreme Court held that a court may, in its discretion, award fees and costs to either party as long as the fee claimant "has achieved some degree of success on the merits."  *Id.* at 2152.  The *Hardt* Court stated:

> A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquiry into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'"

*Id.* at 2158 (*citing Ruckelshaus v. Sierra Club,* 463 U.S. 680, 688 (1983)).

Prior to *Hardt*, the Ninth Circuit had established a five-factor test, which still remains applicable, for awarding attorneys' fees in an ERISA case.  *See Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980); *Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 388 (9th Cir. 1994); *Draper v. Baker Hughes Inc.,* 892 F.

---

[83]  DeFazio's claim could also be interpreted as one seeking to recover the difference between the short term interest rate he did receive and the appreciation of the book value of the JDS common shares held by HolliShare in which the funds in his alternate payee account were invested.  It doesn't matter.  The funds in his alternate payee account were not invested in JDS shares, and DeFazio received exactly what he was entitled to receive under the Plan.

-191-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Supp. 1287, 1300 (E.D. Cal. 1995).  The five factors are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.  *Id.*

The district court in *Hardt* applied the same five-factor test.  The Supreme Court noted that the five factor test was consistent with the broad, discretionary language in ERISA § 502(g)(1), and held that a court may apply the five-factor test after it determines that a party is entitled to fees.  This court determines that defendants are entitled to an award of fees under the standard enunciated in *Hardt.* The next step in the analysis is to apply the five-factor test in order to determine the amount of attorneys' fees to be awarded.

The first factor, culpability or bad faith, militates strongly in favor of defendants. Throughout the course of this litigation, plaintiffs' have made scurrilous, vilifying, and but for the litigation privilege, defamatory allegations about the individual defendants, particularly Zwirner.  These allegations impugned defendants' integrity and assassinated their character without any basis.  For example, plaintiffs have unsuccessfully moved the court twice to remove Plan Trustees alleging that "[t]he record presently before the Court is rife with fraud, concealment and theft." (Dkt. 190, pp. 12-15.)  The plaintiffs also went so far as to request an order enjoining Zwirner "from providing any further services to ERISA plans" (Dkt. 224, p. 52, DeFazio/Dimaro plaintiffs' Third Amended Complaint), essentially requesting that this court limit Zwirner's ability to practice law.  The court properly struck this request for relief.  (Dkt. 291, p. 29.)  Despite the remarkable benefits it generated, Ellis characterized the Plan as a "heist." (Dkt.

-192-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

314, p. 21.)[84]  In a particularly hyperbolic moment, plaintiffs claimed that various defendants used the Plan as a "billion dollar piggy-bank" and "lied to their employees and retirees, stole ultimate ownership of JDS away from the Plan, kept the value of plan assets artificially low, eliminated the market for plan assets, and placed the Plan in financial jeopardy through self-dealing (insider) transactions – all for their personal benefit." (Dkt. 368, HAC, ¶31; Dkt. 314, FAC, ¶21.)  In ¶28 of her FAC, Ellis pontificated that the 1999 transaction was an instance where "[a]bsolute power tends to corrupt absolutely." (Dkt. 314.)

Even though each plaintiff received a full payout of his or her vested benefits, each alleged that the plan's investment in JDS common shares was "worthless". (Dkt. 368, HAC, ¶4; Dkt. 314, FAC, ¶7.)  As what can only be understood as bombastic over-statement, in the worst of bad faith, the DeFazio/Dimaro plaintiffs alleged, "Candidly, HolliShare would have been better served investing in Monopoly™ money rather than JDS common stock.  At least Monopoly™ money can be sold on the open market." (Dkt. 368, HAC, ¶120.)  In the plaintiffs' own words, when filing this case, they alleged that they would attempt to show that: "[T]he defendants breached their fiduciary duty through a carefully orchestrated scheme to undervalue plan assets and retirement benefits; steal ultimate ownership of a billion dollar company (i.e., Hollister) away from the Plan; use the Plan as an impenetrable piggybank for JDS common stock; and a billion dollar tax shelter for their sole benefit." (Dkt. 368, HAC, ¶138; Dkt. 314, FAC, ¶72.)  It is now clear that those allegations were and are baseless, and plaintiffs had no evidence of any intentional wrongdoing or of any personal benefit gained by any of the defendants during the 38 year operation of the Plan.

---

[84]  (Dkt. 314, FAC, ¶21.)

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Also, many of plaintiffs' claims were asserted after the expiration of the statute of limitations. *See Ellis v. Hollister, Inc. et al.,* No. S-05-559, 2006 WL 1132377, at *9 (E.D. Cal. Apr. 14, 2006); *DeFazio*, 636 F. Supp. 2d at 1080-81. The Ninth Circuit has found bad faith and awarded attorneys' fees where a party filed a claim after the applicable statute of limitations had expired. *Beaudry Motor Co. v. ABKO Props., Inc.*, 780 F.2d 751, 756 (9th Cir. 1986).

The court also finds that by asserting in this court the very same "QDRO" arguments rejected by Judge Mize in his order of May 4, 2004 – which could have been but was not appealed – DeFazio and Ellis have acted in bad faith. DeFazio's conduct is particularly egregious since he agreed in the divorce proceeding that DROs were QDROs to avoid being jailed for contempt, but then reversed his position and alleged in this court that Hollister violated ERISA by complying with them.

The court concludes that substantial legal fees were incurred by HolliShare in defending against unfounded and baseless allegations. Permitting plaintiffs' condut to go unabated would contravene the primary purpose of ERISA – protecting plan benefits.

With regard to the second factor, plaintiffs knew or should have known of the possibility of being required to pay defendants' attorneys' fees. At their depositions, several of the plaintiffs (Dimaro, McNair and Seay) expressly acknowledged being aware of the possibility that the court could enter an award assessing defendants' fees' against them, and McNair even went so far to put aside some of his savings to prepare for this possibility. (Dkt. 610, pp. 79, 211, 293.) Plaintiffs nevertheless pressed ahead with this suit.

With regard to the third factor, an award of attorneys' fees is particularly appropriate in this case to prevent and/or deter others from filing similarly frivolous lawsuits in the future. ERISA lawsuits are very expensive to defend – even baseless ones. They are fact intensive and invariably involve extensive discovery, numerous

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

pre-trial motions, and the filing of numerous legal memoranda. The attorneys' fees incurred by a plan sponsor, a plan administrator, and/or plan fiduciaries in defending themselves is significant and operate to deplete plan assets. This, in turn, works to the detriment of all plan participants and their beneficiaries. Thus, deterring prospective plaintiffs, and their lawyers, from filing similarly frivolous and baseless ERISA suits serves the best interests of ERISA, plan participants, and their beneficiaries.

The fourth factor also supports an award to defendants of their attorneys' fees. By successfully defending themselves, defendants have preserved the integrity and continued viability of HolliShare, an ERISA plan that for almost four decades, has provided significant financial benefits to its participants. Defendants' success has benefited all HolliShare participants in that HolliShare will continue operating as it has in the past, and will continue to provide financial benefits to Hollister's employees and their beneficiaries.

In that regard, as most are acutely aware, the 2008 financial crisis paralyzed banks and undercut consumer confidence. Among its many victims were balances in 401(k) plans.[85] Indeed, in 2008, the average 401(k) account balance fell by more than twenty-five percent.[86] The effect was pervasive – at the time around sixty million American workers were active participants invested in a 401(k) plan.[87] As a result, those American workers watched their 401(k) account balances rapidly decline by around $800 billion dollars in one year.[88] Ninety-four percent of American employers that participated in 401(k) plans in 2008 did not offer their

---

[85]   Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Private Pension Plan Bulletin: Abstract of 2008 Form 5500 Annual Reports* (Version 1.0, December 2010), at 1, *available at* http://www.dol.gov/ebsa/PDF/2008pensionplanbulletin.PDF.

[86]   *Id.* ("Assets invested in 401(k) plans decreased 25.2 percent to $2.2 trillion from a high of about $3 trillion in 2007." ).

[87]   *Id.* at 44.

[88]   *Id.* at 1.

-195-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

employees any other type of employer sponsored retirement plan.[89]   Free-falling balances in 401(k) plans seriously jeopardized the retirement security of participants in such plans.

Historically, retirees have depended on three sources of retirement income: (1) Social Security, (2) personal savings, and (3) private pension plans.[90]   The Social Security fund has encountered huge budget shortfalls.[91]   Also, Americans have saved increasingly smaller percentages of their income over the past 20 years.[92]   As a result, private plans have assumed a more significant role in retirement financial security.   In the current environment of plummeting 401(k) balances and the budgetary crisis facing our federal government, it is more critical than ever that courts protect stable, profitable ERISA plans (such as HolliShare) from frivolous and baseless lawsuits (such as the present actions) which only operate to deplete plan assets.   This consideration militates strongly in favor of awarding attorneys' fees to defendants.

Considering the fifth factor, the relative merits of the parties' positions, the court notes that plaintiffs have failed to prove a single ERISA violation.   Judgment will be entered against them on 24 separate counts with multiple claims often

---

[89] *Id.* at 45.

[90] Social Security Admin., Historian's Office, Research Note #1: *Origins of the Three-Legged Stool Metaphor for Social Security* (1996), *available at* http://www.ssa.gov/history/stool.html.

[91] Social Security Admin., Summary of Performance and Financial Information Fiscal Year 2010, at 8 ("[T]he combined OASI and DI Trust Funds [that fund social security benefits] are deemed adequately financed for the short term...[however] [F]inancing of the DI Trust Fund is inadequate and, without remedial action, the fund is expected to be exhausted by 2018.").

[92] U.S. Dep't of Commerce, Bureau of Econ. Analysis, *Personal Income and Outlays, available at* http://www.bea.gov/newsreleases/release_archive.htm.   These statistics show the average American's personal savings.   Over the last five years there were many months where a negative personal savings was concluded.   This means that the average American's personal outlays (i.e. personal interest payments and personal consumption expenditures) exceeded their personal disposable income and, therefore, they were unable to save anything.

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

included within single counts.  Plaintiffs have not only failed to prevail on a single claim, but they prosecuted, through trial, numerous claims that were not only groundless but were claims for which they knew they had (a) no supporting evidence, and (b) no provable damage or loss.

Defendants propose that the court conclude that plaintiffs' counsel be required to pay the majority of defendants' reasonable attorneys' fees and costs.  It is well settled that an award of attorneys' fees and costs under ERISA may, in the court's discretion, be assessed against a party's attorneys.  *Childers v. Medstar Health*, 289 F. Supp. 2d 714, 718 (D. Mass. 2003); *Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 496 (D. Del. 1998) (*citing Monkelis v. Mobay Chem.*, 827 F.2d 935, 937 (3d Cir. 1987)); *Cowden v. Montgomery County Soc'y For Cancer Control*, 653 F. Supp. 1072, 1079 (S.D. Ohio 1986).

For example, in *Baker v. Greater Kansas City Laborers Welfare Fund*, 716 F. Supp. 1229 (W.D. Mo. 1989), the district court assessed attorney's fees against a plaintiff and his counsel for continuing to pursue an ERISA claim after discovery had closed and after it had become apparent that the claim was frivolous.  The district court apportioned three-fourths of defendant's attorneys' fees to plaintiff's counsel because the court determined that it was plaintiff's counsel who continued to litigate the frivolous claim when it should have been dismissed.  The court reasoned:

> I do not expect a lay person to appreciate the difference between a federal statutory violation and plaintiff's perception of unfair treatment.  However, the difference should have been readily discerned by counsel and communicated to plaintiff.
>
> * * *
>
> Attorneys, by training and experience, are in the best position to understand the problems presented by a frivolous case and to advise [a] plaintiff not to pursue the case or to withdraw.

*Id.* at 1231.

-197-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

The court's reasoning in *Baker* is particularly applicable here. Plaintiffs' counsel were in the best position to know that their clients were pursuing many baseless claims under ERISA. Yet, rather than dismiss their claims, plaintiffs' counsel embarked upon a scorched earth strategy by filing numerous and novelistic amended complaints, groundless motions for summary judgment and other extraordinary relief, and other unnecessary pleadings. The evidence at trial demonstrated that many of these pleadings and motions had no factual or legal support. The court therefore holds plaintiffs' counsel responsible for 75% of defendants' reasonable attorneys' fees and costs. The court assesses 20% of defendants' reasonable attorneys' fees and costs against Ellis and DeFazio, with the remaining 5% being assessed against the other plaintiffs.[93]

### III.   Conclusion

For all of the reasons addressed above, judgment is entered in favor of all defendants on all of plaintiffs' claims. In addition, defendants are granted leave to file a petition for attorneys' fees and costs on a date to be set by the court, followed by briefing and a hearing pursuant to a schedule which will also be set by the court.

DATED: July 27, 2011                    SCHUYLER, ROCHE & CRISHAM, P.C.

By: _____/s/ Michael B. Roche_____
                    MICHAEL B. ROCHE
                    Attorneys for Defendants

HOLLISTER INCORPORATED, THE FIRM
OF JOHN DICKINSON SCHNEIDER,
INC., ALAN F. HERBERT and RICHARD I.
FREMGEN

---

[93] Other courts have also assessed attorneys' fees and costs against counsel in ERISA cases. *See Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 496 (D. Del. 1998); *Childers v. Medstar Health*, 289 F. Supp. 2d 714, 718-19 (D. Mass. 2003) (district court imposed sanctions on plaintiff's attorney even though the attorney had not pursued the case after it had been dismissed on motion).

-198-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

SCHUYLER, ROCHE & CRISHAM, P.C.
MICHAEL B. ROCHE (admitted *pro hac vice*)
L. ANDREW BREHM (admitted *pro hac vice*)
Suite 3800, One Prudential Plaza
130 East Randolph Street
Chicago, Illinois 60601
Tel:   (312) 565-2400
Fax:   (312) 565-8300

Attorneys for defendants THE FIRM OF JOHN DICKINSON SCHNEIDER, INC. HOLLISTER INCORPORATED, ALAN F. HERBERT and RICHARD I. FREMGEN

ADDUCCI, DORF, LEHNER, MITCHELL & BLANKENSHIP, P.C.

By:   /s/ James D. Adducci
JAMES D. ADDUCCI
Attorney for Defendants
SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER

ADDUCCI, DORF, LEHNER, MITCHELL & BLANKENSHIP, P.C.
JAMES D. ADDUCCI (admitted *pro hac vice*)
MARSHALL L. BLANKENSHIP (admitted *pro hac vice*)
150 North Michigan Avenue, Suite 2130
Chicago, Illinois 60601-7524
Tel:   (312) 781-2800
Fax:   (312) 781-2811

Attorneys for defendants SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER

SIDLEY AUSTIN LLP

By:   /s/ James W. Ducayet
JAMES W. DUCAYET
Attorneys for Defendants
MICHAEL C. WINN and LORETTA L. STEMPINSKI

SIDLEY AUSTIN LLP
WILLIAM F. CONLON (admitted pro hac vice)
JAMES W. DUCAYET (admitted pro hac vice)
One North Dearborn Street
Chicago, Illinois 60603
Tel:   (312) 853-7000
Fax:   (312) 853-7036

Attorneys for Defendants MICHAEL C. WINN and LORETTA L. STEMPINSKI

-199-

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**

Co-counsel:

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
WILLIAM A. GOULD (SBN 035446)
DANIEL L. BAXTER (SBN 203862)
400 Capitol Mall, Twenty-Second Floor
Sacramento, CA  95814
Telephone:   (916) 441-2430
Facsimile:    (916) 442-6664

Attorneys for Defendants THE FIRM OF JOHN DICKINSON SCHNEIDER, INC., HOLLISTER INCORPORATED, SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER

**Defendant's Proposed Findings Of Fact And Conclusions Of Law**