WILKE, FLEURY, HOFFELT, GOULD & BIRNEY
WILLIAM A. GOULD (SBN 035446)
DANIEL L. BAXTER (SBN 203862)
400 Capitol Mall, Twenty-Second Floor
Sacramento, California 95814
Tel: (916) 441-2430
Fax: (316) 442-6664

Attorneys for Defendants, THE FIRM OF JOHN
DICKINSON SCHNEIDER, INC., HOLLISTER
INCORPORATED, SAMUEL P. BRILLIANT, RICHARD
I. FREMGEN, DONALD K. GRONEBERG, ALAN F.
HERBERT, JAMES A. KARLOVSKY, LORI J.
KELLEHER, JAMES J. MCCORMACK, CHARLES C.
SCHELLENTRAGER, LORETTA L. STEMPINSKI,
MICHAEL C. WINN and RICHARD T. ZWIRNER

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES P. DE FAZIO, et al.,

        Plaintiffs,

        v.

HOLLISTER INCORPORATED, et al.

        Defendants.

_____

And Related Cases.

_____

Case No. 04-1358 WBS GGH

**DEFENDANTS' POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Table of Contents**

I. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        2.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Background Regarding JDS, Hollister And The
Growth Of Hollister's Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    Schneider's Creation Of A System To Share JDS's
And Hollister's Business Success With Their Employees. . . . . . . . . . . . . . . . . 4

    D.    Since JDS's Incorporation In 1956, Its Shares Have
Been Subject To The Same Ownership And Transfer
Restrictions, Rights of Repurchase And Pricing Formula. . . . . . . . . . . . . . . . . 7

        1.    Restriction of Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.    Restrictions on Transferability. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.    Payment Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        4.    The "Exceptional Circumstances" Provision. . . . . . . . . . . . . . . . . . 9

    E.    Direct Ownership of JDS Shares. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    F.    The 1977 Preferred Share Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    G.    Transfer Of The JDS Preferred Shares In The 1977
Trust To The 1999 Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    H.    HolliShare, Its Trustees And Its Operations. . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    HolliShare's Sale of JDS's Common Shares. . . . . . . . . . . . . . . . . . . . . . . . . . 17

    J.    The Investigation Conducted By The HolliShare Trustees
Annually To Determine The Fair Market Value Of The
JDS Common Shares Sold To JDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    K.    The Mid-1980s Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    L.    Scrutiny Of The Book Value System By
HolliShare's Governmental Regulators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

|  | 1. | DOL Determinations. | 29 |
|  | 2. | IRS Scrutiny. | 33 |
| M. | | Zwirner's Multiple Roles. | 33 |
| N. | | The HolliShare Trustees' Investment In JDS Stock | 36 |
| O. | | Disclosure of HolliShare's Practices Regarding The Valuation Of JDS Common Shares To The Plan Participants. | 37 |
| P. | | The 1999 Amendments To The JDS Articles. | 38 |
| Q. | | The Monitoring Of HolliShare And Its Trustees By Hollister's Board Of Directors. | 42 |
| R. | | JDS Role. | 44 |
| S. | | The Plaintiffs Have Prospered In Their HolliShare Accounts. | 45 |

II. Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

| A. | | Overview Of Plaintiffs' Claims. | 45 |
| B. | | This Court Lacks Subject Matter Jurisdiction Over This Action Because Plaintiffs Are Not Plan Participants And Thus Lack Standing Under ERISA | 47 |
| C. | | The Claims Asserted In This Action Are Not Authorized Under ERISA. | 53 |
| D. | | Plaintiffs' Primary Claims And The Applicable Legal Standards. | 56 |
|  | 1. | Plaintiffs' Claims Under ERISA §§ 406(a) and 406(b). | 56 |
|  | 2. | Plaintiffs' Claims That Defendants Violated The Prudent Man Standard Of Care Under ERISA § 404(a)(1)(B). | 56 |
|  | 3. | Plaintiffs' Claims That Defendants Breached Their Duty Of Loyalty Under ERISA § 404(a)(1)(A). | 56 |
|  | 4. | Plaintiffs' Burden of Proof. | 57 |
|  | 5. | Plaintiffs' Claims Predicated Upon The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA Are Barred By The Settlor Doctrine. | 58 |
|  | 6. | Defendant Fiduciaries Are Presumed To Have Acted Prudently And Diligently. | 62 |

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

E.    The Ownership And Transfer Restrictions, JDS's Rights of Repurchase, And The Pricing Formula In The JDS Articles Are Valid And Fully Enforceable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    1.    JDS's Inclusion Of Ownership And Transfer Restrictions, Rights Of Repurchase And A Pricing Formula In Its Articles Is Expressly Authorized Under Illinois Law And Has Been Uniformly Enforced By Illinois Courts. . . . . . . . . . . . . . . . . . . . 66

    2.    Courts In Other Jurisdictions Have Also Consistently Upheld And Enforced Similar Stock Restrictions And Repurchase Prices Based On Book Value. . . . . . . . . . . . . . . . . . . 67

    3.    Repurchase Prices Fixed By Stock Restrictions Are Upheld Even If They Are Significantly Less Than The Shares' Unrestricted Fair Market Value. . . . . . . . . . . . . . . . . . . . 68

    4.    Enforcement Of Valid Stock Restrictions, Including A Pricing Formula, Does Not Constitute A Breach Of Fiduciary Duty. . . . . . . . . . . . . 70

    5.    The Stock Restrictions In The JDS Articles Were Fair And Reasonable When Made.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

F.    Defendants Are Entitled To Judgment On Plaintiffs' Claims That HolliShare Sold JDS Shares For Less Than Adequate Consideration.. . . . . . . . . . . 72

    1.    The Goals Of ERISA, "Prohibited Transactions" Under ERISA, And The Statutory Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . 72

    2.    The Exemption For Sales Of Employer Stock By Eligible Individual Account Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    3.    The Fiduciary Defendants Conducted A Reasonable and Thorough Investigation Of The Fair Market Value Of JDS's Common Shares. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

        a.    The Circumstances Prevailing In 1973. . . . . . . . . . . . . . . . . . . . 76

        b.    The Circumstances Prevailing After 1973. . . . . . . . . . . . . . . . . . . 78

    4.    Well-Founded Decisional Law Supports The Defendants' Compliance With Their Fiduciary Duties Of Prudence And Loyalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    5.    Defendants Acted As Prudent Fiduciaries.. . . . . . . . . . . . . . . . . . . . . . . . 86

6.   Defendants Did Not Violate The Prohibited Transaction Provisions Or Their Fiduciary Duty By Selling At The Prior December 31 Book Value Pursuant To the Mid-1980s Agreement, Rather Than At The Month-End Book Value Of The Month Of Sale. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

a.   Sales Pursuant To The Mid-1980s Agreement Were Not Prohibited Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

b.   Given Their Broad Discretion, Defendants Did Not Breach Their Fiduciary Duties By Entering Into And Implementing The Mid-1980s Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

7.   Applicable Federal Estate Tax Provisions, Treasury Regulations, And Decisional Law Also Establish That The Book Value Of JDS Common Shares Is "Adequate Consideration" Under ERISA § 408(e) And Is Their Fair Market Value Under ERISA § 404(a). . . . . . . . . . 103

a.   The Federal Estate Tax Is Based On The Fair Market Value Of All Property In A Decedent's Gross Estate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

b.   IRC § 2031, Treas. Reg. § 20.2031-2(h), And Revenue Ruling 59-60. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

c.   Interpretations And Applications Of § 8 Of Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) Are Controlling Here.. . . . . . 105

d.   Under IRC § 2031, Treas. Reg. § 20.2031-2(h), And Applicable Decisional Law, The Restrictions In The JDS Articles Constitute A Bona Fide Business Arrangement, Were Made For A Legitimate Business Purpose, And Fix The Fair Market Value Of JDS's Common Shares As Their Book Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

e.   Judicial Decisions Which Have Applied Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) To Restricted Stock Agreements, Such As The JDS Articles, Establish That The Fair Market Value Of JDS Common Shares Is Their Book Value. . . . . . . . . . . . . . . . . 110

f.   Even If The Repurchase Price Or Formula In A Restricted Stock Agreement Results In A Price That Is Only A Fraction Of The Unrestricted Fair Market Value Of The Same Shares, The Formula Price Will Still Be Upheld And Enforced If The Repurchase Price Or Price Formula Was Fair When Created. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

8. The Good Faith And Prudent Investigation Conducted By The Defendant Fiduciaries Has Been Effectively Ratified By HolliShare's Two Regulators.............................................. 116

9. The Expert Testimony At Trial Supports The Court's Conclusion.. ........ 116

G. Defendants Are Entitled To Judgment On Plaintiffs' Claim That HolliShare Improperly Valued JDS Shares In Determining Participants' Benefits............. 122

H. Plaintiffs Failed To Present Competent Evidence Supporting The Relief They Sought – For The First Time – In Their Post-Trial Submissions....... 124

1. As Former HolliShare Participants, Plaintiffs Have No Standing To Seek Reformation Of The Plan ..................................... 125

2. Although Now Requested by Defendants, Plaintiffs Improperly Failed To Disclose Their "Surcharge" Calculations In Discovery And At Trial.............................................. 125

3. Plaintiffs Have Waived Their Claim For A Surcharge.................. 127

4. Plaintiffs Improperly Claim The Same Surcharge Against All Defendants Regardless Of Whether Or When Each Defendant Was A Plan Fiduciary ......................................... 128

5. Plaintiffs Have Failed To Establish Harm.. ......................... 128

I. Plaintiffs' Legal Arguments Are Flawed And Their Authorities Are Distinguishable. ...................................................... 130

J. Even If The Plaintiffs Had Viable Claims (Which They Do Not), Their Claims Are Barred (In Whole Or Part) By The Statute Of Limitations.. .......... 134

K. Defendants Are Entitled To Judgment On Plaintiffs' Other ERISA Claims. ..................................................... 137

1. Defendants Did Not Violate ERISA §403............................ 137

2. Plaintiffs' Claims That Defendants Violated ERISA §§404(a)(1)(C) By Failing To Diversify HolliShare's Assets Are Untenable.......................................... 139

3. Brilliant And Kelleher Cannot Are Not Liable For Their Predecessor Trustees' Votes In Favor Of The 1999 Amendments To The JDS Articles............................ 141

a. The Votes At Issue Were Prudent And Thus Did Not Violate ERISA............................... 141

(1) The January 28, 1999 Amendments..................... 141

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

(2)    The April 30, 1999 Amendments.. . . . . . . . . . . . . . . . . . . . . 142

b.    Even If The Votes Were Imprudent,
Brilliant And Kelleher Are Not Subject
To Co-Fiduciary Liability Based On The
1999 Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

4.    Defendants Made No Misrepresentations.. . . . . . . . . . . . . . . . . . . . . . . 144

5.    JDS's Board Of Directors Is Not A Fiduciary Under
ERISA, And Its Purchases Of The Plan's JDS Common
Shares Were Not Fiduciary Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

6.    The Hollister Board Of Directors Did Not Breach
Its Limited Liability Fiduciary Duties Under The Plan. . . . . . . . . . . . . . . . 148

7.    Ellis's And DeFazio's QDRO Claims Lack Merit.. . . . . . . . . . . . . . . . . . 153

8.    Defendants Did Not Violate ERISA By Crediting
DeFazio's HolliShare Alternate Payee Account With
A Short-Term Rate of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

L.    Defendants Are Entitled To An Award Of Attorneys' Fees.. . . . . . . . . . . . . . . . . 156

III.  Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

**Points and Authorities**

**Cases**

*Abattie v. Alta Health Life Ins. Co.*,   458 F.3d 955 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Adamson v. Armco, Inc.*, 44 F.3d 650 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Aldridge v. Lily-Tulip, Inc.*, 953 F.2d 587 (11th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 564 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Allen v. The Katz Agency Inc. Employee Stock Ownership Plan*,

        677 F.2d 193 (2d Cir. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 155

*Amalgamated Clothing v. Murdock*, 861 F.2d 1406 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . 50

*American Rubber & Plastics Corp. v. First Nat'l Bank*, 277 N.E.2d 840 (Ill. 1971). . . . . . . . . . . . . 66

*Amschwand v. Spherion Corp.*, 505 F.3d 342 (5th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Arentsen v. Sherman Towel Service Corp.*, 185 N.E. 822 (Ill. 1933). . . . . . . . . . . . . . . . . . . . . . . . 67

*Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . 90

*Associates in Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir. 1991).. . . . . . . . 146

*B & B Land Acquisition, Inc. v. Mandell*, 714 N.E.2d 58 (Ill. App. Ct. 1999). . . . . . . . . . . . . . . . . 147

*Baker v. Greater Kansas City Laborers Welfare Fund*, 716 F. Supp. 1229 (W.D. Mo. 1989). . . . . . . 161

*Baltimore Nat'l Bank v. United States*, 136 F. Supp. 642 (D. Md. 1955). . . . . . . . . . . . . . . . . . . . . 108

*Barker v. American Mobil Power Corp.*, 64 F.3d 1397 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . 134, 135

*Beaudry Motor Co. v. ABKO Props., Inc.*, 780 F.2d 751 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . 158

*Beck v. Pace International Union,* 551 U.S. 96 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 122

*Becker v. Mack Trucks, Inc.*, 281 F.3d 372 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Becker v. Weinberg Group Inc. Pension Trust*, 473 F. Supp. 2d 48 (D.D.C. 2007). . . . . . . . . . . . . . 106

*Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 148

*Bell v. Pfizer, Inc. Stock & Incentive Plan*, 626 F.3d 66 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 144

*Bendaoud v. Hodgson*, 578 F. Supp. 2d 257 (D. Mass. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Bennett v. Conrail Matched Saving Plan Admin. Comm.*, 168 F.3d 671 (3d Cir. 1999)............ 155

*Bins v. Exxon Co.*, 220 F.3d 1042 (9th Cir. 2000)..................................... 59, 122

*Blank v. Chelmsford Ob/Gyn, P.C.*, 649 N.E.2d 1102 (Mass. 1995)........................ 70

*Board of Trustees CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139

    (2d Cir. 1997)..................................................... 145

*Brandt v. Grounds*, 502 F. Supp. 598 (N.D. Ill. 1980), aff'd 687 F.2d 895

    (7th Cir. 1992). .............................................. 143, 144

*Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848 (N.D. Ill. 2009). ........................... 103

*Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987). .................................... 144

*Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016 (9th Cir. 2008). .......... 98

*Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620 (3d Cir. 1984)............................ 134

*Carl Haas Automobile Imports, Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381 (N.D. Ill. 1996). ...... 147

*Carr v. Gates Health Care Plan*, 195 F.3d 292 (7th Cir. 1999). ........................... 98

*Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002). ..................... 57, 102, 131, 132

*Childers v. Medstar Health*, 289 F. Supp. 2d 714 (D. Mass. 2003). ........................ 160

*CIGNA Corp. v. Amara*, 563 U.S. ___, Case No. 09-804, slip op. at 22 (S. Ct. May 16, 2011)..... 128

*Claire v. Wigdor*, 266 N.Y.S.2d 6 (N.Y. App. Div. 1965). ............................... 67

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992)......................... 148

*Collins v. Pension & Ins. Comm. Of So. Cal. Rock Prods. & Ready Mixed*

    *Concrete Ass'ns*, 144 F.3d 1279 (9th Cir. 1998)............................... 73, 85

*Comm'r v. Bensel*, 100 F.2d 639 (3d Cir. 1938). .................................... 108

*Cook v. Campbell*, 482 F. Supp. 2d 1341 (M.D. Ala. 2007) . ............................ 55

*Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050 (D. Ariz. 1995). .......................... 75

*Crawford v. Lamantia*, 34 F.3d 28 (1st Cir. 1994). ................................... 52

*Custer v. Sweeney*, 89 F.3d 1156 (4th Cir. 1996). ................................... 148

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Cutter Labs., Inc. v. Twining*, 221 Cal. App. 2d 302 (1st Dist. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Darvell v. Life Ins. Co. of North America*, 597 F.3d 929 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 98

*Estate of Davis v. Comm'r*, 37 T.C.M. (CCH) 341, 347 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085

      (E.D. Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 72

*DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045 (E.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*DeFazio v. Hollister, Inc.*, Dkt. 430, 2008 WL 5113654 (E.D. Cal. 2008). . . . . . . . . . . . . . . . . . . . . . 57

*DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670 (E.D. Cal.

      Nov. 1, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 58, 59, 75

*DeLuca v. Blue Cross of Michigan*, 628 F.3d 743 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 147

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . 129

*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Draper v. Baker Hughes Inc.*, 892 F. Supp. 1287 (E.D. Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . 75, 156

*Eckelkamp v. Beste*, 315 F.3d 863 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 132

*Edgar v. Avaya*, 503 F.3d 340 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Eggert v. Merrimac Paper Co. Inc.*, 311 F. Supp. 2d 245 (D.C. Mass. 2004). . . . . . . . . . . . . . . . . 107

*Ellis v. Hollister, Inc.*, 2006 WL 1132377 (E.D. Cal. Apr. 14, 2006). . . . . . . . . . . . . . . . . . . . . . . . 158

*Estate of Amlie v. Comm'r*, 91 T.C.M. (CCH) 1017 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 114

*Estate of Blount v. Comm'r*, 87 T.C.M. (CCH) 1303 (2004),

      aff'd in part and rev'd in part on other gds, 428 F.3d 1338 (11th Cir. 2005). . . . . . . . . . . . . 107

*Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Estate of Carpenter v. Comm'r*, 64 T.C.M. (CCH) 1274 (1992). . . . . . . . . . . . . . . . . . 111, 113, 114

*Estate of Cohen v. Booth Computers*, 22 A.2d 991 (N.J. App. July 13, 2011). . . . . . . . . . . . . . . . . . 69

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Estate of Gloeckner v. Comm'r*, 152 F.3d 208 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 108, 111, 114

*Estate of Hall v. Comm'r*, 92 T.C.M. (CCH) 312 (1989). . . . . . . . . . . . . . . . . . . . . . 113, 114, 117

*Estate of Lauder v. Comm'r*, 64 T.C.M. (CCH) 1643 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*Estate of Meller v. Adolf Meller Co.*, 554 A.2d 648 (R.I. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Estate of Seltzer v. Comm'r*, 50 T.C.M. (CCH) 1250 (1985). . . . . . . . . . . . . . . . . 107, 110, 112, 113

*Estate of Weil v. Comm'r*, 13 T.C.M. (CCH) 653 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Evangelista v. Holland*, 537 N.E.2d 589 (Mass. App. Ct. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Exbom v. Central States Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138

    (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Eyler v. Comm'r*, 88 F.3d 445 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 154, 155

*Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288 (7th Cir. 1989). . . . . . . . . . . . . . 146

*Felix v. Lucent Technologies, Inc.*, 387 F.3d 1146 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 49

*Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . 74, 128

*Fiorito v. Comm'r*, 33 T.C. 440 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 114

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). . . . . . . . . . . . . . . . . . . . . . 48, 49, 97

*First Nat'l Bank of Montclaire v. Coldwell*, 145 N.Y.S.2d 674 (N.Y. App. Div. 1955). . . . . . . . . . . 67

*First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611 (1983). . . . . . . . 66

*Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . *passim*

*Fox v. Herzog, Heine, Geduld, Inc.*, 2005 WL 3542464 (D.N.J. Dec. 27, 2005). . . . . . . . . . . . . . . 129

*Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1

    (1983), amended by 234 F.3d 428 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Gaffney v. McCarron*, 360 N.E.2d 508 (Ill. App. Ct. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

*Gallagher v. Lambert*, 549 N.E.2d 136 (N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Gannon v. NYSA-ILA Pension Trust Fund & Plan*, 2011 WL 868713 (S.D.N.Y. Mar. 11, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323 (9th Cir. 1985). . . . . . . . . . . . . . . . . 148, 149, 153

*George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992 (N.D. Ill. 2010). . . . . . . . . . . . . . . . . . . 102

*Godley v. Comm'r*, 80 T.C.M. (CCH) 158 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Goodin v. Innovative Technical Solutions, Inc.*, 489 F. Supp. 2d 1157 (D.C. Haw. 2007). . . . . . . . . 107

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). . . . . . . . . . . . . . . . . . . . . . 54

*Green v. UPS Health, Welf, Package for Ret. Employees*, 595 F.3d 734 (7th Cir. 2010). . . . . . . . . . . 98

*Hanover Bank v. Comm'r*, 369 U.S. 672 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. ___, 130 S.Ct. 2149 (2010). . . . . . . . . . . . 156, 157

*Harris v. Amgen, Inc.*, 2010 WL 744123 (C.D. Cal. Mar. 2, 2010). . . . . . . . . . . . . . . . . 141, 144, 147

*Harris v. Amgen, Inc.*, 573 F.3d 728 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Harris v. Koenig*, 2011 WL 4542973 (D. D.C. Oct. 3, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 55

*Helvering v. Salvage*, 297 U.S. 106 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Henderson v. UPMC*, 640 F.3d 524 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

*Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 76

*Henry v. Frontier Indus., Inc.*, 863 F.2d 886 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Herman v. Mercantile Bank, N.A.*, 143 F.3d 519 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 86, 87, 97

*Holliday v. Xerox Corp.*, 732 F.2d 548 (6th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Hollister v. Fiedler*, 92 A.2d 52 (N.J. Super. Ct. App. Div. 1952). . . . . . . . . . . . . . . . . . . . . . . . . 68

*Hooven v. Exxon Mobil Corp.*, 465 F.3d 566 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 58, 75, 131, 132

*Howell v. Motorola*, 633 F.3d 552 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 149

*Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432 (1999). . . . . . . . . . . . . . . . . . . . . . . . 58-61, 122

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

xi

*Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*In re American Express Co. ERISA Litigation*, 762 F. Supp. 2d 614

    (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 114, 149

*In re Bank of America Corp. Sec., Derivative & ERISA Litigation*, 756 F. Supp. 2d

    330 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 153

*In re Bear Stearns Cos.*, 763 F. Supp. 2d 423 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . 123, 151

*In re Calpine Corp. ERISA Litigation*, No. 03-1685, 2005 WL 1431506

    (N.D. Cal. Mar. 31, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141, 153

*In re Citigroup ERISA Litigation*, 662 F.3d 128 (2d Cir. Oct. 19, 2011) . . . . . . . . . . . . . . . . . . *passim*

*In re Dynegy, Inc. ERISA Litigation*, 309 F. Supp. 2d 861 (S.D. Tex. 2004). . . . . . . . . . . . . 60, 61, 149

*In re Enron Corp. S.E.C. Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511
    (S.D. Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 129, 144

*In re Huntington Bancshares ERISA Litigation*, 620 F. Supp. 2d 842 (S.D. Ohio 2009). . . . . . . . . . 151

*In re Lehman Bros. Securities & ERISA Litigation*, 683 F. Supp. 2d 294

    (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*In re McKesson HBOC, Inc. ERISA Litigation*, 391 F. Supp. 2d 812 (N.D. Cal. 2005). . . . . . . . . . 150

*In re RCN Litigation*, 2006 WL 753149 (D.N.J. Mar. 21, 2006). . . . . . . . . . . . . . . . . . . . . . . . 153

*In re Suntrust Bank Inc. ERISA Litigation*, 749 F. Supp. 2d 1365 (N.D. Ga. 2010). . . . . . . . . . . . . 140

*In re Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*In re Syncor ERISA Litigation*, 351 F. Supp. 2d 970 (C.D. Cal. 2004), rev'd

    on other gds. 516 F.3d 1095 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*In re Textron, Inc. ERISA Litigation*, 1:09-cv-00383-PJB-LDA, 2011 WL 39127922

    (D.R.I. Sept. 6, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 152

*In re UBS AG ERISA Litigation*, 2011 WL 1344734 (S.D.N.Y. Mar. 24, 2011). . . . . . . . . . . . . . . 65

*In re Unisys Sav. Plan Litigation*, 74 F.3d 420 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 57

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*In re Wachovia Corp. ERISA Litigation*, 2010 WL 3081359 (W.D.N.C.

    August 6, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d 1328 (N.D. Okla. 2003. . . . . . . . . . . . . . 148

*In re Worldcom, Inc. ERISA Litigation*, No. 02-Civ-4816 (DLC) (S.D.N.Y. Jan. 16, 2002). . . . . . . 150

*J Geils Band Employee Benefits Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245

    (1st Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Jones v. Harris*, 388 P.2d 539 (Wash. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*Jordan v. Northrup Grumman Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004). . . . . . . . . . . . . . 97

*Joseph v. New Orleans Elec. Pension & Ret. Plan*, 754 F.2d 628 (5th Cir. 1985). . . . . . . . . . . . . . . 52

*Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 55

*King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 98

*Kirshbaum v. Reliant Energy*, 526 F.3d 243 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Krueger Int'l, Inc. v. Blank*, 225 F.3d 806 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 73, 78, 81-83

*Kuntz v. Reese*, 758 F.2d 1410 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 63

*Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544 (3d. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431 (Mo. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272 (D.R.I. 2003), aff'd in part, rev'd in

    part on other gds., 369 F.3d 1 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 134, 135

*LaRue v. DeWolff, Boberg & Associates, Inc. et al.*, 552 U.S. 248 (2008). . . . . . . . . . . . . . . . . . 51, 52

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58-61, 122

*Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480 (D. Del. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 160

*Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134

    (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 54, 127, 129, 145

*Mathews v. United States*, 226 F. Supp. 1003 (E.D.N.Y. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . 108

*May v. McGowan*, 194 F.2d 396 (2d Cir. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396 (S.D.N.Y. 2010). . . . . . . . . . . . . . . 99, 101

*McCreery v. R.S.A. Mgmt., Inc.*, 287 S.E.2d 203 (Ga. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*McDonald v. Provident Indemnity Life Ins. Co.*, 60 F.3d 234 (5th Cir. 1995). . . . . . . . . . . . . . . . 57

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 62-66, 121, 123

*Monkelis v. Mobay Chem.*, 827 F.2d 935 (3d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Nachman Corp. v. PBGC*, 446 U.S. 359 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 52, 55

*Newton v. Van Otterloo*, 756 F. Supp. 1121 (N.D. Ind. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Owens v. Soundview Fin. Group, Inc.*, 54 F. Supp. 2d 305 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . 84

*Pedroza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262 (N.D. Ga. 2006). . . . . . . . . . . . . . . . . . . . . . . 123

*Pegram v. Herdrich*, 530 U.S. 211 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 146, 147, 151

*Pension Fund-Mid Jersey Trucking Industry - Local 701 v. Omni Funding Group*,

    731 F. Supp. 161 (D.N.J. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Quan v. Computer Sciences Corp.*, 623 F.3d 870 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ranke v. Sanofi-Synthelabo Inc.,* 436 F.3d 197 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 134, 135

*Raymond v. Mobil Oil Co.*, 983 F.2d 1528 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Register v. Cameron & Barkley Co.*, 481 F. Supp. 2d 471 (D.S.C. 2007)........................ 52

*Rego v. Westvaco Corp.*, 319 F.3d 140 (4th Cir. 2003)............................... 55

*Renberg v. Zarrow*, 667 P.2d 465 (Okla. 1983)................................. 71

*Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910 (2d Cir. 1987). ................ 106

*Rosiny v. Schmidt*, 587 N.Y.S.2d 929 (N.Y. App. Div. 1992)......................... 70

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994). .............. 57,  87,  90, 114

*Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983)............................... 156

*Rudolph v. United States*, 93-1 U.S.T.C. 60130 (S.D. Ind. 1993)................. 114 , 115

*Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382 (9th Cir. 1994)................... 156

*Saylor v. Parker Seal Co.*, 975 F.2d 252 (6th Cir. 1992)........................ 139

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)............................... 72

*Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98(2d Cir. 1998). ........... 57, 128, 143, 144

*Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1023 (9th Cir. 2000)................... 48

*Siskind v. Sperry Ret. Program*, UNISYS, 47 F.3d 498 (2d Cir. 1995). ................... 61

*Slocum v. United States*, 256 F. Supp. 753 (S.D.N.Y. 1966)................... 108, 115

*Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310 (N.D. Ga. 2006)................... 123

*Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154 (Utah 2003). ................... 68

*Smith v. Sydnor*, 2000 U.S. Dist. LEXIS 20074 (E.D. Va. 2002)................... 129

*Snyder's Estate v. United States*, 285 F.2d 857 (4th Cir. 1961)...................... 67

*St. Louis County Bank v. United States*, 674 F.2d 1207 (8th Cir. 1982)................ 108, 114

*Stein v. Smith*, 270 F. Supp. 2d 157 (D. Mass. 2003). ................... 144, 146

*Steinman v. Hicks*, 352 F.3d 1101 (7th Cir. 2003)........................ 57, 63

*Stern v. Birnbaum*, 615 N.Y.S.2d 62 (N.Y. App. Div. 1994). ................... 68

*Summers v. State Street Bank & Trust Co.*, 453 F.3d 404 (7th Cir. 2006). ................... 65

*Taylor v. KeyCorp*, 2010 WL 3702423 (N.D. Ohio Aug. 12, 2010) . ................... 129

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2009 WL 535779

    (D. Conn. Mar. 3, 2009), aff'd 555 F.3d 1 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 73, 85, 102

*Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947 (6th Cir. 1990). . . . . . . . . . . . . . 52

*Tripp v. Comm'r*, 337 F.2d 432 (7th Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Tully v. Ethyl Corp.*, 861 F.2d 120 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*Ulico Casualty Co. v. Clover Capital Mgmt.*, 217 F. Supp. 2d 311 (S.D.N.Y. 2002). . . . . . . . . . . . . 86

*Unigroup, Inc. v. O'Rourke Storage & Transfer*, 980 F.2d 1217 (8th Cir. 1992). . . . . . . . . . . . . . . . 70

*United States v. Cartwright*, 411 U.S. 546 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313 (2011). . . . . . . . . . . . . . . . . . . . . . . . . 145

*United States v. Land*, 303 F.2d 170 (5th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Vartanian v. Monsanto Co.*, 880 F. Supp. 63 (D. Mass. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 51

*Vogel v. Melish*, 203 N.E. 2d 411 (Ill. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Walker v. Nat'l City Bank of Minneapolis*, 18 F.3d 630 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 148

*Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 55

*Wells Fargo & Co. & Subsidiaries v. Comm'r*, 224 F.3d 874 (8th Cir. 2000). . . . . . . . . . . . . . . . . . 116

*Wilson v. Bowers*, 57 F.2d 682 (2d Cir. 1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Wilson v. Venture Fin. Group, Inc.*, 2010 WL 2028088 (W.D. Wash.

    May 18, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . *passim*

*Yancy v. American Petrofina, Inc.*, 768 F.2d 707 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Yeng Sue Chow v. Levy Strauss & Co.*, 49 Cal.App. 4th 315 (1st Dist. 1975). . . . . . . . . . . . . . . . . . 69

**Statutes**

26 U.S.C. § 2033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

26 U.S.C. § 401(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

ERISA, 29 U.S.C. § 1001 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1002(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

29 U.S.C. § 1002(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48, 52

29 U.S.C. § 1002(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

29 U.S.C. § 1002(14)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

29 U.S.C. § 1002(18). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1002(26). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

29 U.S.C. § 1056(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

29 U.S.C. § 1102(21)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

29 U.S.C. § 1103(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 137, 138

29 U.S.C. § 1104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1104(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1104(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1104(a)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

29 U.S.C. § 1106(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

29 U.S.C. § 1106(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58, 60, 74

29 U.S.C. § 1107(d)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

29 U.S.C. § 1108(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1109. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 127, 128

29 U.S.C. § 1110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141, 142

29 U.S.C. § 1110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

29 U.S.C. § 1132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 1132(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 51, 52, 127, 128

29 U.S.C. § 1140. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

29 U.S.C. §§ 1103(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137, 138, 139

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

805 Ill. Comp. Stat. 5/6.66 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

I.R.C. § 2001 (a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

I.R.C. § 2031. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 105, 107

I.R.C. § 2051. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

## **Other**

*Committee on Finance Report*, 136 Cong. Rec. at 30,539 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 113

Revenue Ruling 59-60. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Treasury Regulation § 20.2031-2(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

## I. Findings of Fact

This consolidated case was tried in a bench trial commencing on August 16, 2011, with the presentation of evidence concluded on September 9, 2011. The court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. To the extent any findings of fact are deemed conclusions of law, they shall be considered conclusions of law, and *vice versa*.

### A. The Parties

#### 1. Plaintiffs

Each plaintiff, other than plaintiff James DeFazio, is a former employee of Hollister Incorporated ("Hollister") and a former participant in the Hollister Employee Share Ownership Trust ("HolliShare" or "the Plan"). With the exception of DeFazio, each plaintiff's employment with Hollister terminated before he or she commenced or joined this action and each received a lump sum distribution of the full amount of the benefits to which he or she was entitled under the terms of the Plan.[1]

DeFazio is the former spouse of plaintiff Kathleen Ellis (a former Hollister employee) for whom an alternate payee account was created in 2002.[2]

None of the plaintiffs testified at trial.

#### 2. Defendants

There are two corporate defendants – The Firm of John Dickinson Schneider Inc. ("JDS") and Hollister. JDS is an Illinois close corporation.[3] JDS is a holding company that owns 100% of the capital

---

[1]   Stipulation of Facts, Dkt. 630, ¶¶ 1-10; Complaint, Dkt. 1 in case 2:05-CV-01726-GEB-JFM; Second Amended Complaint, Dkt. 183 in case 04-1358-WMB-GGH.

[2]   Stipulation of Facts, ¶ 11.

[3]   Zwirner Tr. 2236:7-18.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-1-

stock of Hollister; Hollister is a wholly-owned subsidiary of JDS.[4] Hollister is an Illinois corporation.[5] Hollister develops, manufactures, markets and sells a relatively narrow line of externally applied medical devices in the fields of ostomy, continence care and wound care.[6]

The remaining defendants are all individuals[7] who were affiliated with JDS, Hollister, and/or HolliShare as follows:

- Samuel P. Brilliant was Hollister's Vice President of Finance and Treasurer from October 1998 to July 2000; he has been Chief Financial Officer and a Vice President of Hollister, and a HolliShare Trustee since July 2000.[8]

- Richard I. Fremgen was a Director of Hollister from 1999 until 2010.[9]

- Alan F. Herbert was Hollister's President and Chief Operating Officer from 1997 to 2001, President (which included the duties of Chairman, Chief Executive Officer and Chief Operating Officer) from 2001 to 2007, and Chairman and Chief Executive Officer from 2007 until May 2011. Herbert also served as a Director of JDS and Hollister between 1998

---

[4]    Zwirner Tr. 1988:21-1989:8; McCormack Tr. 1141:18-20.

[5]    Zwirner Tr. 2236:7-18.

[6]    Zwirner Tr. 2226:13-20.

[7]    In its Memorandum Opinion and Order of June 29, 2009, *DeFazio v. Hollister, Inc.*, 636 F. Supp. 2d 1045, 1049 (E.D. Cal. 2009), the court identified HolliShare as a defendant. The operative complaints are unclear as to whether plaintiffs intended to name HolliShare as a defendant. Dkt. 368, ¶21; Dkt. 314, ¶11. In any event, HolliShare is a common law trust and can only be represented by its trustees.

Additionally, plaintiffs have named Donald K. Groneberg and Charles C. Schellentrager as defendants, and the plaintiffs other than Ellis have named Loretta L. Stempinski as a defendant. However, plaintiffs adduced no evidence at trial regarding these individuals and plaintiffs do not propose any findings with respect to these individuals. Accordingly, the court enters judgment in favor of defendants Groneberg, Schellentrager and Stempinski on all claims made against them. Similarly, plaintiffs have proposed no findings with respect to defendant Richard Fremgen, no evidence was adduced at trial with respect to Fremgen, and therefore the court also enters judgment in his favor on all claims made against him.

[8]    Stipulation of Facts, ¶ 14; Brilliant Tr. 1264:22-1265:25, 1268:7-14.

[9]    PX 6, H02278.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-2-

and May 2011.[10]

- James A. Karlovsky was Hollister's Vice President of Human Resources from 1989 to 2003, Executive Assistant to the President from 2003 to July 2004, and a HolliShare Trustee from 1990 to July 2004.[11]

- Lori J. Kelleher was a HolliShare Trustee from 2004 to 2011.[12]

- James J. McCormack was Hollister's Vice President of Finance, Treasurer and Chief Financial Officer from May 1981 to approximately 1993; Senior Vice President, Chief Financial Officer and Treasurer from approximately 1993 to June 2000; and a HolliShare Trustee from 1989 to June 2000.[13]

- Loretta A. Stempinski was a Hollister employee from 1961 to 1980 (lastly in the position of Manager of Customer Service), a Director of JDS and Hollister from 1980 to 2001, and a HolliShare Trustee from 1974 to 1980.[14]

- Michael C. Winn was Hollister's Vice President of Legal Affiars from 1974 to 1977, President from 1977 to May 2001, Chairman and CEO from 1981 until May 2001, and a Director of JDS and Hollister from 1979 to May 2001.[15]

- Richard T. Zwirner has performed legal work for Hollister and JDS since 1969, was Corporate Secretary of JDS from 1974 to 1981, has been a Director of JDS and Hollister since 1978, was Hollister's Vice President of Marketing and Sales from 1991 to 1994, has provided consulting services to Hollister since the late 1970s, has served as General Counsel of Hollister since 1977, and has been a Hollishare Trustee since 1976.[16]

---

[10]    Herbert Tr. 1494:19-1496:9, 1497:10-16.

[11]    Stipulation of Facts, ¶ 15; Karlovsky Tr. 337:17-338:1, 338:14-22, 507:17-508:7.

[12]    Stipulation of Facts, ¶ 17.

[13]    Stipulation of Facts, ¶ 16; McCormack Tr. 722:2-723:10.

[14]    Stipulation of Facts, ¶ 19; PX 6, H02278, H02300.

[15]    Winn Tr. 36:21-38:2, 636:5-7.

[16]    Stipulation of Facts, ¶ 18; Zwirner Tr. 2072:14-17, 2223:20-23, 2224:16-18, 2227:25-2228:16.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

**B.      Background Regarding JDS, Hollister And The Growth Of Hollister's Business**

John D. Schneider was a printer with a high school education.[17]  In 1921 he started an offset printing business.[18]  The business was a closely-held family business for many years until it was incorporated as JDS in 1956.[19]

In the early 1940s, Schneider printed decorative birth certificates for Franklin C. Hollister.[20]  In the late 1940s, JDS purchased the Franklin C. Hollister Company and began to manufacture and sell hospital products.  This business prospered and was ultimately incorporated under the name Hollister Incorporated, an Illinois corporation, in 1959.  Hollister is and always has been a wholly-owned subsidiary of JDS.[21]

In 1964, Hollister began selling ostomy products.[22]  The ostomy business did very well and, as a result, Hollister grew remarkably in the late 1960s and early and mid-1970s.[23]  In 1973, JDS sold its printing business to certain of its employees who were working in JDS's printing operations.[24]

**C.      Schneider's Creation Of A System To Share JDS's And Hollister's Business Success With Their Employees**

While he was alive, Schneider consistently expressed his intentions to keep JDS and Hollister

---

[17]    Zwirner Tr. 2234:1-18.

[18]    *Id.*

[19]    DX 635B, H02220; DX 527, H22150-22154; Zwirner Tr. 2235:8-10.

[20]    Zwirner Tr. 2234:1-18.

[21]    DX 635B, H02220-H02221; Zwirner Tr. 2235:1-15.

[22]    Zwirner Tr. 2235:16-17.

[23]    DX 635B, H02221.

[24]    DX 635B, H02221; Zwirner Tr. 2235:18-2236:10.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-4-

independent, employee-owned, and private.[25]  In fact, JDS and Hollister have always been guided by Schneider's six policies and principles ("Schneider's Policies and Principles") pursuant to which JDS and Hollister would: (1) remain independent and employee owned; (2) adhere to conservative financial and investment policies; (3) develop product lines which are natural outgrowths of existing products and existing markets; (4) make investments abroad on a conservative basis; (5) introduce new products and make acquisitions that are logically related to Hollister's existing products and markets; and (6) emphasize "quality," which Hollister sometimes summarizes as quality products, quality service and quality employees.[26]

In 1956, Schneider incorporated JDS because he wanted to make shares in the company available to his employees.[27]  Indeed, it was one of Schneider's fundamental goals to provide deserving employees of JDS and Hollister with an ownership interest in JDS.  To that end, Schneider sold and later caused JDS to sell shares of JDS to employees of JDS and later of Hollister.  He did so to reward those employees who contributed most to the success of the business by providing them with JDS common shares at their current book value with the hope that the employees would realize substantial gains at retirement if the business, through their efforts, was successful.[28]

To preserve and perpetuate his goal of independence and employee ownership, Schneider devised

---

[25]    Winn Tr. 138:2-10, 640:7-18; Herbert Tr. 1595:9-25; Zwirner Tr. 2266:2-2267:12.

[26]    Zwirner Tr. 2266:15-2269:4; DX 635B, H02230-2235.

[27]    Zwirner Tr. 2237:25-2238:14.  Originally, there was only one class of JDS shares – common. Zwirner Tr. 2238:15-18; DX 527, H22152A.  In 1966, a second class of shares – preferred – was created. Zwirner Tr. 2242:23-2243:13; DX 528, H22147.  The JDS Articles then were restated to eliminate ownership of the preferred shares by employees and a capitalization program was instituted through which the preferred shares previously owned by employees were repurchased by the company and  redeemed. DX 529, H01645; Zwirner Tr. 2250:6-24.

[28]    DX 635GB, H02222.  Book value is the company's total assets minus its liabilities.  Korschot Tr. 1642:5-9.  Per share book value is the total shareholders' equity in the company, less the value of the preferred shares, divided by the total number of outstanding shares.  McCormack Tr. 1104:5-11.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-5-

a system based upon transfer restrictions and repurchase provisions (see next section) which required that each shareholder of JDS who terminated his employment with JDS or Hollister resell his shares to JDS at their then current book value.[29] Under this system, if an employee worked for Hollister and contributed significantly to its success, he or she would have the benefit of stable employment with fair compensation while employed, and then upon retirement would reap the benefit of the increase in the book value of the JDS common shares he or she owned.[30]

Schneider strongly believed that he was both rewarding and incentivizing Hollister's employees by permitting them to share in the profitability of the business as part owners through this stock ownership system, and he repeatedly shared his belief with Zwirner.[31] Schneider told both Winn and Zwirner that he believed that book value was the best method for valuing JDS shares and that he had always used and wanted to continue to use book value because: (1) the use of book value enabled Schneider to share the profits of the company with the employees; (2) the use of book value helped protect the liquidity of JDS and Hollister by permitting them to project their cash needs and cash flow; (3) the use of book value avoided the expense and cost of outside appraisals which neither JDS nor Hollister could afford in their early years, as well as the effect of outside factors that would need to be taken into account; (4) the use of book value was fair to both the company and to the employee-shareholders, for whom it acted as an incentive and reward; and (5) the book value system had been used successfully from 1956 to 1971, when Zwirner met Schneider, and he thought it worked well.[32] Zwirner agreed with Schneider's reasons for

---

[29]   DX 635B, H02222.

[30]   DX 635B, H02223.

[31]   Zwirner Tr. 2251:9-22.

[32]   Zwirner Tr. 2251:14-2253:21; Winn Tr. 639:18-640:18; Herbert Tr. 1616:7-11. Zwirner testified that Schneider had several experiences with appraisers and was mortified over the variance and range of difference in appraised values for real estate. Zwirner Tr. 2253:5-16.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-6-

supporting the use of book value in repurchasing JDS shares.[33]

### D. Since JDS's Incorporation In 1956, Its Shares Have Been Subject To The Same Ownership And Transfer Restrictions, Rights of Repurchase And Pricing Formula

As noted above, in order to preserve and perpetuate the benefits of employee ownership, since JDS's incorporation in 1956 and at Schneider's direction, ownership and transfer restrictions and rights of repurchase have been set forth in JDS's corporate by-laws and then in its publicly-filed Articles of Incorporation. Essentially, JDS shares could only be owned by Schneider's family and employees of JDS and, later, Hollister; the shares could not be transferred unless they were first offered to JDS for repurchase; and JDS had an option to repurchase the shares at their book value.[34] The Articles were amended and restated from time to time over the years, and each version contained, with minor refinements, the same transfer restrictions, rights of repurchase and pricing formula.[35]

### 1. Restriction of Ownership

The JDS Articles have always severely restricted the persons who may own JDS shares. Article Five, Paragraph II.C of the JDS Articles provides:

C. Restriction of Classes of Persons Entitled to Hold Shares

The following are the only classes of persons entitled to be holders of shares of any class: directors and officers of the Corporation [JDS] or of Hollister Incorporated who (in the opinion of the corporation's Board of Directors) have performed substantial and continuing services for the Corporation or Hollister Incorporated; employees of the Corporation, of Hollister Incorporated or of any other corporation controlled by one or more of such corporations; any deferred benefit plan maintained for the exclusive benefit of such directors, officers or employees; and The Firm of John Dickinson Schneider, Inc. Preferred Share Trust April 21, 1999.[36]

---

[33] Zwirner Tr. 2253:22-24.

[34] Zwirner Tr. 2239:20-2240:17, 2242:14-2244:24; DX 523, H22655-58; DX 528, H22147-48.

[35] DX 529, H01639-H01639-1650; DX 530, H02125-2136; DX 531, H02137-2162; DX 536, p. 44 of 57.

[36] DX 536, p. 51 of 57. See also, DX 531, H01244; DX 533, H02200.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

## 2.    Restrictions on Transferability

Article Five, Paragraph II.D of the JDS Articles sets forth the transfer restrictions and repurchase rights to which JDS shares, both common and preferred, are subject. The introductory provision of paragraph D provides that JDS shares cannot be transferred unless they are transferred to permissible shareholders under the Articles (as described above) and are purchased subject to the repurchase provisions set forth in the Articles:

> Except as provided in this paragraph D and subject to the restrictions set forth in paragraph C above, shares of the Corporation shall not be transferred, directly or indirectly, to any person, firm, corporation, trust, entity or other holder, whether by cash sale, contract, deed, gift, operation of law, sale pursuant to lien, pledge, security agreement or judicial process, or otherwise. No transfer or attempted transfer of any one or more shares of the Corporation, or of any interest, legal or equitable, or claimed interest in such shares, shall be effective unless and until the following conditions shall have been satisfied...[37]

Paragraph II.D then describes two scenarios pursuant to which JDS shares can be transferred. First, the Articles provide JDS with the right to repurchase shares in the event of termination of the shareholder's employment or affiliation with JDS or Hollister "by death or for any other reason..."[38] Second, the Articles provide that before any JDS shareholder can transfer his shares, he is required to offer those shares to JDS:

> If any owner, person, personal representative, firm, corporation, trust, entity or other holder desires or intends to transfer any one or more shares of the Corporation, or to create any interest, legal or equitable, in such shares, such holder shall first offer in writing, at least 30 days prior to such transfer or creation of an interest, to sell to the Corporation all shares of the Corporation which such holder desires or intends to transfer, or in which such holder desires or intends to create an interest, at the price and in the manner set forth in [subsequent provisions of the JDS Articles].[39]

## 3.    Payment Terms

The Articles further provide that JDS common shares can only be sold at their book value. Article

---

[37]    DX 533, H02200; see also, DX 523, H22655-22656; DX 531, H02144; DX 530, H02132; DX 529, H01643.

[38]    DX 531, H02144; DX 533, H02200. See also, DX 523, H22656; DX 528, H22148; DX 529, H01644; DX 530, H02132.

[39]    DX 531, H02145.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-8-

Five, Section II.D.3.b of the JDS Articles currently provides:

> The price of each common share shall be its book value as of the end of the calendar month in which the Repurchase Date occurs, plus the amount of any dividends declared but not paid prior to the Repurchase Date. The book value of each common share shall be the book value as reflected on the books of the Corporation and a report by an independent certified public accountant retained by the Corporation stating such book value shall be conclusive proof thereof, regardless of whether the accountant's opinion is qualified.[40]

Moreover, the price to be paid by JDS for the repurchase of its shares is to be paid by a combination of cash and long-term subordinated promissory note. While the specific combination has varied slightly over the years[41], since 1999 the Articles have provided that the "greater of the first $250,000 or 10% of the aggregate price shall be paid in cash and the balance shall be paid in the form of a promissory note...." For amounts over $135,000, the term of the note is ten years.[42]

### 4.     The "Exceptional Circumstances" Provision

Since 1974, The Articles have provided:

> Under exceptional circumstances and in the discretion of the Corporation's Board of Directors, shares may be repurchased by the Corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner or holder of such shares may from time to time agree.[43]

The right of JDS to repurchase the JDS shares of a shareholder employee who dies or terminates his or her employment, the "right of first refusal" and the "exceptional circumstances" provisions are the only

---

[40]    DX 533, H02202.  See also, DX 523, H22655-22658; DX 529, H01645; DX 530, H02133; DX 531, H02147.

[41]    Schneider originally provided that payment would be entirely in the form of a promissory note so that the repurchase of shares would not require at the time of repurchase JDS  and Hollister to divert any cash from their businesses.  DX 635B, H02222-02223.  As the companies prospered, a cash component was added and, as noted above, increased in amount in 1999.

[42]    DX 523, H22657; DX 529, H01646; DX 530, H02133-2134; DX 531, H02147-2148; DX 535, p. 44 of 57.

[43]    DX 530, H02135; DX 78, H02150.  Prior versions of the Articles and Bylaws granted JDS greater discretion to negotiate the terms of its repurchase with a shareholder.  DX 523, H22656; DX 529, H01644.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

methods set forth in the JDS Articles for the transfer of JDS common shares.

### E.   Direct Ownership of JDS Shares

JDS common stock was and is offered annually to Hollister employees who in the opinion of the JDS Board of Directors perform valuable services and are worthy of being given the opportunity to buy JDS common stock.[44]   Eligibility is based on years of service and performance evaluations and recommendations, but JDS's Board makes the final decision as to whom is offered shares.[45]   Employees who have been given the opportunity to buy JDS common stock include management personnel, various technical, professional and scientific personnel, members of the field sales force, and marketing research and development personnel.[46]   In excess of two hundred employees currently own JDS common shares.[47]

Employees who are invited to purchase JDS common shares are given an offer letter and offering circular that summarizes the specific repurchase provisions in the Articles.[48]   They sign a written purchase agreement in which they acknowledge the repurchase system and that they are going to receive month-end book value and a long-term subordinated promissory note when they sell their common shares back to JDS.[49]

Direct shareholders pay for their common shares using their own cash.[50]   The common shares that are sold to the direct shareholders are shares from JDS's treasury, and are not repurchased from other JDS

---

[44]   DX 635B, H02231; McCormack Tr. 725:15-726:5.

[45]   Karlovsky Tr. 339:22-340:15, 383:14-23; DX 635B, H02231.

[46]   DX 635B, H02231; McCormack Tr. 725:15-726:5.

[47]   Herbert Tr. 1850:2-4.

[48]   Zwirner Tr. 2382:11-25; Karlovsky Tr. 558:3-13.

[49]   Zwirner Tr. 2382:11:25.

[50]   Zwirner Tr. 2437:13-24; Herbert Tr. 1592:23-25.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

shareholders; when shares are repurchased by JDS, they are returned to the treasury.[51]   When direct shareholders sell their JDS shares back to JDS, they receive a combination of cash and promissory note.[52]

As Hollister grew, it was not practical to include all of Hollister's employees in the direct ownership program because: (1) it was too difficult to assess the performance of larger numbers of employees; and (2) broadening the number of persons invited to purchase JDS common shares could trigger registration requirements under the Securities Act of 1933 and the Securities Exchange Act of 1934, which would make public JDS's detailed, confidential financial information.[53]   Accordingly, Schneider devised a method whereby all U.S. employees could participate indirectly in common share ownership: HolliShare.[54]

### F.        The 1977 Preferred Share Trust

On April 21, 1977, Schneider established the John D. Schneider Preferred Share Trust ("the 1977 Trust").[55]   This was done in order to memorialize and implement his Policies and Principles, to promote the benefits of employee ownership, and to preserve the book value pricing system.[56]   At that time, Schneider owned the vast majority of the outstanding JDS preferred shares, which represented control of JDS.[57]   Schneider's objectives in creating the 1977 Trust were that: (a) he wanted the Hollister business to continue beyond the time that he could manage it; and (b) he had been allowing Hollister employees to have an ownership interest in JDS for a number of years and wanted the employees who had helped make

---

[51]     Herbert Tr. 1901:16-1902:7.

[52]     Winn Tr. 98:1-5; Karlovsky Tr. 469:15-20.

[53]     Zwirner Tr. 2341:5-22, 2369:9-2370:12; McCormack Tr. 726:6-22.

[54]     DX 635B, H02232.

[55]     DX 635B, H02219.

[56]     DX 635B, H02220-2227.

[57]     *Id.*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

the company successful to be able to continue to share in its success.[58]   Accordingly, the 1977 Trust obligated its trustees to elect JDS directors who were committed to Schneider's Policies and Principles, which were expressly set forth in the 1977 Trust instrument.[59]

To this end, Schneider placed all of his outstanding JDS preferred shares in the 1977 Trust.  Those preferred shares represented control over JDS and, by the Trust's terms, were to be held in the Trust for 24 years.  Schneider was the sole initial trustee of that trust.[60]

### G.   Transfer Of The JDS Preferred Shares In The 1977 Trust To The 1999 Trust

In 1981, Schneider became incapable of managing his own affairs and, pursuant to the terms of the 1977 Trust, Winn, Stempinski and Zwirner, as successor trustees, became trustees of the trust.[61]   By its terms, the 1977 Trust was to expire on April 21, 2001.[62]   Accordingly, in 1999 a new trust was created to receive the JDS preferred shares then held by the 1977 Trust when the 1977 Trust expired ("1999 Trust").[63]   On April 21, 2001, all of JDS's preferred shares were transferred from the 1977 Trust to the 1999 Trust, where they remain today.[64]

### H.   HolliShare, Its Trustees And Its Operations

HolliShare is a non-contributory, tax qualified, defined contribution profit sharing plan designed to provide retirement benefits to Hollister's U.S. non-union employees.  It was created in 1972 as a profit

---

[58]   *Id.*

[59]   DX 635B, H02236-2237.

[60]   DX 635B, H02237.

[61]   Zwirner Tr. 2002:22-25; DX 635B, H02237.

[62]   DX 635B, H02237.

[63]   DX 641, H10946-11002; Stipulation of Facts, ¶ 22.

[64]   Stipulation of Facts, ¶ 22.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

sharing plan and it became operational in 1973.[65] ERISA was enacted on September 2, 1974. Once ERISA became effective, the Plan was modified to be ERISA compliant.[66] The Plan is an Eligible Individual Account Plan under ERISA.[67]

The origins of HolliShare can be traced to Arnold Rivin, then a Vice President of Hollister, who, with Schneider's full support, wanted to expand employee ownership through a retirement plan.[68] In early 1974, before ERISA was enacted, HolliShare received 11,950 common shares of JDS from JDS. In exchange for those shares, HolliShare assumed the obligation to pay the promissory notes issued to the former shareholders (all former Hollister employees) from whom JDS had repurchased those shares.[69] HolliShare has not purchased any JDS shares since it acquired those shares.[70] However, the number of JDS common shares held by HolliShare has increased due to stock splits and a stock dividend.[71]

Since HolliShare's inception, all Hollister employees in the United States, except those who are members of the collective bargaining unit for union workers at Hollister's Kirksville, Missouri plant, have been eligible to participate in the Plan.[72] An eligible employee is enrolled as a HolliShare participant on either January 1 or July 1, following the completion by that employee of one year of service at Hollister.[73]

---

[65]    Stipulation of Facts, ¶ 25; Zwirner Tr. 2022:19-20.

[66]    Zwirner Tr. 2296:19-2297:11.

[67]    Stipulation of Facts, ¶¶ 26-27.

[68]    Zwirner Tr. 2288:23-2289:9.

[69]    Zwirner Tr. 1991:1-15; 2078:1-20.

[70]    Zwirner Tr. 1992:5-6; 2306:6-8.

[71]    Zwirner Tr. 2287:8-2288:15, 2302:19-2303:22.

[72]    DX 501, H01368, H01371, H01373.

[73]    DX 501, H01373.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

HolliShare currently has approximately 1,100 participants.[74]

HolliShare is funded solely through cash contributions by Hollister made each year from its profits. HolliShare participants are neither required nor permitted to contribute to HolliShare.[75]   Hollister has always contributed more than the five percent minimum contribution mandated by the HolliShare trust document.[76]   In recent years, Hollister's contribution to HolliShare has ranged from 7.5% to 8.5% of the aggregate participants' eligible compensation.[77]   Indeed, since 1990, Hollister has contributed approximately $33 million more than the specified minimum to HolliShare.[78]

HolliShare has three Trustees ("the HolliShare Trustees"), each of whom is appointed by Hollister's Board of Directors.[79]   The management of HolliShare involves financial, legal and personnel matters. Accordingly, Hollister's Board of Directors has typically appointed Hollister's Chief Financial Officer, its General Counsel, and its Head of Human Resources as HolliShare's Trustees.[80]

Since HolliShare's creation in 1973, Hollister has served as the Plan's Sponsor and Plan Administrator.  Since that time, the Hollister Board of Directors has appointed the HolliShare Trustees and monitored their performance; along with Hollister, the Trustees are also "named fiduciaries" of the Plan.[81]

---

[74]   Zwirner Tr. 1994:21-22.

[75]   DX 501, H01375; Zwirner Tr. 2347:23-2348:8.

[76]   DX 501, H01375; Zwirner Tr.  2383:11-18.

[77]   DX 501, H01375; DX 776, H22780A-22781A.  Hollister is not required to contribute anything to HolliShare if JDS's consolidated net operating profits for the year are less than $10,000,000 after deducting the contribution to HolliShare.  DX 501, H01375.  This requirement has never prevented Hollister from making a contribution.  DX 759.

[78]   Zwirner Tr. 2383:19-22.

[79]   DX 501, H01406-1407.

[80]   Herbert Tr. 1827:21-1828:6.

[81]   Stipulation of Facts, ¶¶ 12, 13.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

At HolliShare's inception, the HolliShare Trustees were Arnold A. Rivin, Loretta L. Stempinski and L. Victor Dickinson.[82]  The individual HolliShare Trustees who are defendants in this action and their terms of service are:  Samuel P. Brilliant, 2000 to the present; James A. Karlovsky, 1990 to 2004; Lori J. Kelleher, 2004 to 2011; James J. McCormack, 1980 to 2000; Loretta L. Stempinski, 1974 to 1980; and Richard T. Zwirner, 1974, and 1976 to the present.[83]

An individual account in the Plan is maintained for each HolliShare participant.[84]  The balance in each participant's account is generally based on the participant's *pro rata* percentage of the value of the entire HolliShare Trust Fund.[85]  The value of HolliShare's assets and the balance of each participant's HolliShare account are determined once a year, as of December 31.[86]  Upon the termination of a HolliShare participant's employment with Hollister, that person becomes entitled to a distribution of an amount equal to the vested portion of his or her HolliShare account balance as of December 31 of the prior year, *i.e.*, the year preceding the employee's termination of employment, plus interest until paid.[87]

The Plan has been amended and restated on numerous occasions.[88]  As required under ERISA, each amended or restated version of the Plan has been submitted to the Internal Revenue Service ("IRS") for determination, and has always been approved by the IRS, thereby maintaining the Plan's continued

---

[82]     Zwirner Tr. 1994:13-17; DX 502, H03115.

[83]     Stipulation of Facts, ¶¶ 14-19.

[84]     Zwirner Tr. 2348:24-2349-1.

[85]     Zwirner Tr. 2350:4-2351:12; DX 501, H01376-1378.

[86]     DX 501, H01376, H01380-1381.

[87]     DX 501, H01410-1411.  Participants begin to vest in the Plan after they have been participants for one year.  After seven years, they are fully vested.  DX 501, H0183-1385.

[88]     Zwirner Tr. 2296:19-2300:9; DX 501-505.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-15-

tax-qualified status.[89]

HolliShare's principal asset is JDS common shares.[90]   The HolliShare Plan mandates that "under normal circumstances and to the maximum extent practicable, the [HolliShare] Trustees are to ... invest the Trust Fund in Common Shares of JDS Inc...."[91] Consistent with this mandate, HolliShare's investment in JDS common shares typically comprises in excess of 95% of the value of the HolliShare Trust Fund.[92]  The JDS common shares held by HolliShare are owned by HolliShare.  HolliShare participants have no legal or equitable ownership interest in any of the HolliShare assets, including (without limitation) the JDS common shares owned by HolliShare.[93]

The JDS common shares in the HolliShare Trust Fund are valued at their fair market value, which the trust instrument states to be their book value as of their valuation date.[94]   Because HolliShare invests primarily in JDS common shares, the principal factor that determines the change in value of each HolliShare participant's account is the annual appreciation (or decline) in the book value of JDS's common shares.  According to the terms of the Plan, the value of a HolliShare participant's account is also affected by:  (a) Hollister's cash contributions to the Plan; (b) gains or losses on the comparatively small amount of the HolliShare Trust Fund that is invested in assets other than JDS common shares; (c) the allocation of forfeitures of the unvested portions of the account balances of former HolliShare participants; and (d) any expenses incurred by HolliShare (essentially none, as all are paid by Hollister).  The factor that most significantly affects the value of the HolliShare participants' individual account balances is the book value

[89]     Zwirner Tr. 2300:2-9; DX 513-520.

[90]     Winn Tr. 126:12-17.

[91]     DX 501, H01401.

[92]     Winn Tr. 126:12-17; Karlovsky Tr. 484:14-21.

[93]     DX 501, H01405.

[94]     DX 501, H01380-1381.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-16-

of the JDS common shares held by HolliShare as of their valuation date.[95]

## I.    HolliShare's Sale of JDS's Common Shares

During the first few years of the operation of HolliShare, the annual cash contributions from Hollister were sufficient to pay the benefits of retirees.[96]   In 1978, the Department of Labor ("DOL") audited the Plan and required a change in the Plan's operation.  Specifically, it required that payments that previously were to be made over a long period of years, with interest, all be put into a segregated account immediately.[97]   The Plan did not have sufficient cash to do this and it had to sell portions of its JDS common shares to JDS to obtain sufficient funds to segregate the amounts needed immediately.[98]   This led to the system of HolliShare selling JDS shares back to JDS for cash to help fund the payments to retirees which system is still in place today.[99]

Periodically, HolliShare sells some of its JDS common shares to JDS.[100]   These sales are made so that HolliShare has sufficient cash available to pay benefits to departing participants.[101]   HolliShare is required to sell its JDS common shares in accordance with the JDS Articles.[102]

In the early 1980s, sales of JDS common shares by HolliShare to JDS took place at irregular

---

[95]    Zwirner Tr. 2349:2-2350:7.

[96]    Zwirner Tr. 2335:11-16.

[97]    Zwirner Tr. 2335:11-2336:4.

[98]    Zwirner Tr. 2336:5-11; DX 770.

[99]    *Id.*

[100]    *Id.*

[101]    *Id.*

[102]    DX 501, H01401-1402.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-17-

times.[103]    Prior to 1986, there were six sales of JDS stock by HolliShare to JDS.[104]    Four of them were done at interim month-end book values and two at prior year-end book values.[105]    To avoid violating ERISA, in the early years of the Plan, the practice developed whereby HolliShare sold its JDS common shares to JDS for cash.[106]  Since the mid-1980s, HolliShare typically sells JDS common shares to JDS once a year, and only sells the number of shares necessary to generate cash proceeds sufficient to cover the HolliShare Trustees's detailed projection of the Plan's vested benefit payment obligations for the next year.[107]

**J.    The Investigation Conducted By The HolliShare Trustees Annually To Determine The Fair Market Value Of The JDS Common Shares Sold To JDS**

The Hollishare Trustees sell JDS common shares to JDS at their fair market value.[108]  To determine their fair market value, the HolliShare Trustees annually calculate, in good faith, the price of the shares in accordance with the terms of the Plan.  As noted above, the Plan document states that the fair market value of JDS shares is their book value at the valuation date, the preceding December 31.[109]  However, the trustees also undertake an investigation to verify that this is the fair market value of the shares.  In doing so, they take into consideration all of the circumstances that may be relevant to the sale, including, but not limited to: (a) the impact of the ownership and transfer restrictions and the repurchase rights of JDS on the

[103]    Zwirner Tr. 2373:22-2374-13; 2376:20-2377:20; DX 770.

[104]    *Id.*

[105]    *Id.*

[106]    Zwirner Tr. 2236:5-11, 2072:22-2073:1.

[107]    DX 775; Zwirner Tr. 2056:14-2058:11, 2390:22-2392:20. In one instance, at the end of 1995, the number of shares sold covered two years of HolliShare's needs.  Zwirner Tr. 2071:9-12; PX 253.35, MIN02861.

[108]    Zwirner Tr. 2358:9-14; Karlovsky Tr. 344:15-23; Brilliant Tr. 1370:7-17.

[109]    DX 501, H01380-1381.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

price attainable by HolliShare for its JDS common shares; (b) the value that HolliShare could otherwise obtain for the JDS common shares; (c) the business prospects for Hollister, including a review of its financial statements, balance sheet and general business conditions; (d) HolliShare's cash needs for the forthcoming year; (e) the provisions of the HolliShare trust instrument; (f) potential buyers; (g) the rate of return to the participants that is being generated by the sale; (h) the book value of JDS common shares as reflected by JDS's audited financial statements; (i) whether there have been any changes in the law, particularly in ERISA, that would affect the Plan; (j) the historical returns generated by investments in JDS common shares; (k) the lack of any objection from the DOL following its multiple audits of the Plan; (l) the issuances of multiple Internal Revenue Service ("IRS") determination letters essentially reaffirming that the Plan complies with Internal Revenue Code and ERISA regulations; (m) knowledge that the federal estate tax returns of Minnie Schneider and Frank Walker, showing their JDS stock valued at book value, were accepted by the IRS; and (n) any other changes that would warrant a change in their conclusion.[110] After considering each of these factors, the HolliShare Trustees have consistently concluded that book value is the fair market value of the JDS common shares because it is the only price obtainable for the JDS common shares held by the Plan.[111]

Although HolliShare continues to sell shares of JDS stock to JDS and does not purchase additional shares, it has never and will never run out of JDS common shares.[112]  This is because the value of HolliShare is almost entirely based on the value of JDS common shares which represent the value of the assets of JDS.[113]  If the value of JDS common stock declined, the value of the common shares held by

---

[110]    Zwirner Tr. 2358:15-2363:7; McCormack Tr. 1164:16-1167:22; Karlovsky Tr. 366:13-368:8; Brilliant Tr. 1365:24-1366:15.

[111]    Zwirner Tr. 2363:2-7; McCormack Tr. 1164:6-1165:1.

[112]    Zwirner Tr. 2357:6-2358:3.

[113]    Zwirner Tr. 2346:14-2347:22.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-19-

HolliShare would also decline and the account balances of the participants would also decline.[114] When the book value of JDS common shares has risen in value to around $1,000 per share, they are split 100 for one.[115] This is done for economic reasons.[116] As long as there are participants in HolliShare with positive account balances, there will always be common shares to support those balances.[117]

### K.      The Mid-1980s Agreement

As noted above, the initial sales of JDS stock by HolliShare in the early 1980s were caused by the DOL's mandate that payments of vested benefits that were to be made to former HolliShare participants over a long period of years, with interest, all be put into a segregated account immediately.[118] Thus, the initial sale transactions were done at irregular intervals and with requests from the HolliShare Trustees on short notice to JDS for the repurchase of JDS shares.[119] In addition, in the early 1980s, the number of retirees was increasing and the amounts of their retirement benefits also were increasing dramatically.[120] HolliShare's aggregate sales of JDS common shares in each of 1980, 1981 and 1982 were for less than a million dollars and then suddenly, in the mid-1980s, the Plan needed $12 million in one year and $10 million in the next. No one had anticipated this and, in those days, given Hollister's smaller size and volatile business situation (see next paragraph), those sums were significant.[121] At that time, HolliShare did not have any obligation to give the JDS Board any advance notice of when it wanted to sell its JDS

---

[114]     *Id.*

[115]     Zwirner Tr. 2357:8-14.

[116]     *Id.*

[117]     Zwirner Tr. 2357:25-2358:2.

[118]     Zwirner Tr. 2335:17-2336:11.

[119]     Zwirner Tr. 2375:8-12; Winn Tr. 656:24-657:16.

[120]     Zwirner Tr. 2375:8-2376:2.

[121]     *Id.*; DX 770.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-20-

common shares back to JDS to raise funds to pay retirement benefits.[122]

In addition, in the early 1980s, Hollister became involved in a major arbitration with its international distributor, Abbott Laboratories ("Abbott"), that put severe financial strains on the company.[123]  That arbitration was initially expected to be completed in two years but ended up taking six years to complete.[124]   A dispute arose regarding Abbott's distribution of new and older Hollister products.[125]  The arbitration encompassed the entire agreement between Abbott and Hollister and all the countries where Hollister distributed its products through Abbott, which excluded only the United States and Canada.[126]  As a result, Hollister had to suddenly create an entirely new structure for the distribution of its products throughout Europe, which was critical to Hollister.  Since the situation threatened Hollister's business future, executives felt compelled to spend substantial time abroad.[127]  The arbitration was also very expensive in terms of legal fees and other expenses.[128]  Thus, the Abbott arbitration created another drain on Hollister's cash flow.

At the same time, in the early 1980s, Hollister began to engage in a more formal and rigorous planning process to make sure it had enough cash to fund JDS's repurchases of JDS common shares from HolliShare.[129]  Hollister needed a plan under which it would have some level of confidence that it could

---

[122]     Winn Tr. 656:24-657:4.

[123]     Zwirner Tr. 2376:3-19.

[124]     Winn Tr. 646:2-8.

[125]     Winn Tr. 644:11-645:21.

[126]     Winn Tr. 645:22-646:1.

[127]     Winn Tr. 646:20-650:8; Zwirner Tr. 2376:3-19.

[128]     Winn Tr. 651:18-652:14.

[129]     Winn Tr. 657:17-658:6; Zwirner Tr. 2379:3-20.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-21-

reasonably project its cash needs going forward.[130]

Under these circumstances, Winn became concerned about Hollister's and JDS's ability to project and satisfy their future liquidity needs.[131]  In Hollister, a competition developed between funding JDS's repurchase of its common shares from HolliShare to provide the cash HolliShare needed to pay retirement benefits and having enough cash for its own business investments and operations.[132]  The large amounts of cash suddenly needed to pay benefits in the mid-1980s created great concern among officers and managers of the corporation and the HolliShare Trustees about whether there would be adequate cash to fund both the Plan and Hollister's business operations.[133]  The HolliShare Trustees knew that if JDS was not able to repurchase common shares from the Plan, the Plan would not be able to pay the growing amounts of vested benefits to the growing number of retirees.[134]

The interaction between ERISA and the JDS Articles further exacerbated the cash flow concerns. As noted above, the JDS Articles gave JDS the right to pay for its repurchases of JDS common shares through a combination of a comparatively small cash payment and a long-term subordinated promissory note for the balance.[135]

For a $1 million repurchase in the mid-1980s, JDS could pay $5,000 cash and $995,000 in a subordinated promissory note payable over decades. If JDS were to repurchase HolliShare's shares on that basis, the limited amount of cash it received would still leave HolliShare without the funds it needed to meet its growing benefit payment obligations.  In addition, HolliShare could not enter into such a

---

[130]   Winn Tr.  658:7-17.

[131]   Winn Tr. 656:13-19.

[132]   Zwirner Tr. 2377:21-2378:2.

[133]   Zwirner Tr. 2377:21-2378:18.

[134]   *Id.*

[135]   DX 531, H02147-2148.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

transaction because to do so would be a "prohibited transaction" under ERISA, 29 U.S.C. § 1106(a) ("§ 406(a)"). Zwirner testified that HolliShare would not have been able to continue to operate without the mid-1980s Agreement (which included the right for HolliShare to be paid entirely in cash).[136]

The only other provision in the JDS Articles under which JDS common shares could be sold by HolliShare and repurchased by JDS is Article Five, Section II.D.7.a, which provides that:

> Under exceptional circumstances and in the discretion of the Corporation's [JDS's] Board of Directors, shares may be repurchased by the corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner or holder of such shares may from time to time agree.[137]

JDS determined that HolliShare's sales of its common shares to JDS presented "exceptional circumstances" in that: (a) they were by far the largest share repurchases made by JDS; and (b) if made in strict adherence with the JDS Articles, they would violate the prohibited transaction provisions of ERISA.[138] The HolliShare Trustees and the JDS Board members relied on legal advice from Zwirner and his law firm that, under all of the circumstances then prevailing, the transactions for the sale of Hollishare's JDS common shares under the exceptional circumstances provision at year-end book value for cash were permissible and within their discretion, and were proper under the JDS Articles.[139] The HolliShare trust

---

[136] Zwirner Tr. 2394:9-14. After 1999, the cash component was $250,000. DX 535, p. 4. The Court finds the Plaintiffs' contention that HolliShare could have circumvented this requirement by making hundreds of separate tenders of stock to JDS to be preposterous. Given JDS's expressed desire to engage in only one transaction with HolliShare per year, there is no reason to believe JDS would have played along with this suberterfuge.

[137] DX 531, H02150.

[138] Zwirner Tr. 2034:21-2035:17.

[139] Winn Tr. 698:23-699:7; McCormack Tr. 819:13-24. Plaintiffs cite, out of context, two reply memoranda filed by defendants several years ago when this case was in its early stages wherein defendants disclaimed that the exceptional circumstances provision of the JDS Articles was used for sales of HolliShare's JDS shares to JDS. Defendants should not be bound by offhand comments made in legal memoranda directed at pleadings at a time before their counsel had interviewed them about the facts

(continued...)

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-23-

instrument gives the trustees broad discretion to administer the Plan.[140]   JDS and HolliShare did not, however, believe it authorized a departure from the use of book value to determine the price to be paid by JDS in repurchasing JDS common shares.[141]

The concerns created by these circumstances led to the Mid-1980s Agreement. That agreement was entered into by Winn and Zwirner after multiple discussions over an extended period of time.[142]   The agreement had several components. First, JDS would pay for all repurchases from the Plan entirely in cash.[143]   Second, there would be one transaction per year with advance notice from HolliShare to JDS of the projections of the amount of cash needed.[144] Third, the Plan's JDS common shares would be repurchased at the prior December 31, audited book value.[145]   And, finally, JDS would repurchase whatever number of JDS common shares the trustees felt they needed to sell annually to generate the funds necessary to pay the retirement benefits then coming due.[146]

JDS requested that the December 31 book value be used.[147]   That number was used because it is

---

[139](...continued)
underlying this case. Moreover, a fair reading of the referenced statements in context shows that the real point defendants' counsel were making was that the exceptional circumstances provision did not allow the HolliShare Trustees to use any value other than book value in pricing the JDS shares it sold to JDS. That point was and remains valid. See Docket No. 148, pp. 10-11; Docket No. 282, pp. 10-12.

[140]   Zwirner Tr. 2386:15-2387:18; DX 501, H01402, H014041, and H01413.

[141]   Zwirner Tr. 2258:11-24.

[142]   Winn Tr. 47:17-48:1; Zwirner Tr. 2059:17-24, 2374:20-2375:7.

[143]   Zwirner Tr. 2056:14-22.

[144]   Zwirner Tr. 2056:14-19.

[145]   Zwirner Tr. 2056:14-22.

[146]   Zwirner Tr. 2056:14-2058:2.

[147]   Zwirner Tr. 2059:25-2060:7.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-24-

the only audited number and, at the time of the Mid-1980s Agreement, it was the most accurate number.[148] Use of the year-end value was advantageous to both JDS and the Plan because it was the most reliable, figure.[149]  In addition, the Plan itself expressly states that the fair market value of the JDS common shares is their book value as of their valuation date, *i.e.*, December 31 of each year.  Thus, that price constitutes the fair market value of the JDS common shares owned by HolliShare and sold by it to JDS during any given year – regardless of when during the year the shares were sold.  Finally, under the JDS Articles, the audited year-end book value is "conclusive" and thus not subject to challenge or dispute.[150]

In the mid-1980s, the month-end numbers had many imperfections.[151]  These existed particularly in the areas of: (1) accruals for doubtful accounts receivables; (2) unsalable inventory; (3) tax reserves which were then done only once a year; (4) accruals for pensions; and (5) the effect of the fluctuations in foreign exchange rates and translations back into United States dollars, which were becoming increasingly important to Hollister at that time.[152]

Beginning in 1999, JDS went further and made a three-year commitment to run its business in such a way that it would be in a cash position to purchase whatever number of common shares of JDS stock HolliShare wanted to sell.[153]  This three-year commitment has been a rolling one which, without exception, has been renewed every year.[154]

The Plan benefitted from the Mid-1980s Agreement because JDS committed to buy whatever

---

[148]    Zwirner Tr. 2380:14-2381:7.

[149]    Herbert Tr. 1511:23-1512:1; Zwirner Tr. 2380:14-2381:7.

[150]    DX 533, H02202.

[151]    Zwirner Tr. 2380:14-2381:4; Winn Tr. 662:3-11.

[152]    Zwirner Tr. 2380:14-2381:4.

[153]    Zwirner Tr. 2058:3-11, 2346:18-2347:12; DX 643, MIN02874.

[154]    *Id.*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

number of JDS common shares the trustees felt they needed to sell once a year, for cash.[155]    JDS did not have that obligation prior to the Mid-1980s Agreement.[156]    And while JDS had been paying cash in the past, the amount of cash needed was growing exponentially.[157]

The Mid-1980s Agreement ensured that JDS would have the cash it needed to allow HolliShare to meet its benefit payment obligations.[158]    The Mid-1980s Agreement provided the Plan with cash based on the sale of its JDS common shares at their fair market value which was calculated in accordance with the terms of the Plan.  The fair market value was a year-end audited value that would be the per share price that would be paid for the shares sold during the year regardless of when during the year they were sold and regardless of whether the book value in the subsequent year went up or down.[159]    To the extent the subsequent month-end book value might go down, this was a benefit to the Plan.[160]    A decline in the book value of JDS's common shares was perceived as a real possibility at that time.[161]    The fact that HolliShare would be paid totally in cash as opposed to being paid with a small amount of cash and a large, long-term subordinated promissory note was also a major benefit to HolliShare.[162]    The HolliShare Trustees were legally obligated to sell JDS shares to JDS for cash.[163]    In addition, even if HolliShare could legally accept a small amount of cash and a subordinated note from JDS (which it could not), HolliShare required cash

---

[155]    Zwirner Tr. 2070:1-2071:3.

[156]    Zwirner Tr. 2074:19-2075:12

[157]    Zwirner Tr. 2071:15-22.

[158]    Winn Tr. 658:12-17.

[159]    Winn Tr. 659:11-22.

[160]    *Id.*

[161]    Winn Tr. 182:5-16.

[162]    Winn Tr. 663:1-19.

[163]    Zwirner Tr. 2071:23-2072:2.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

in order to pay Plan benefits.[164]   Moreover, since a note could be converted into cash only at a substantial discount from its principal amount, HolliShare's Trustees reasonably believed that the economic value of a payment entirely in cash far exceeded that of a small cash payment coupled with a long-term subordinated note.[165]

Several witnesses testified that, over time, the use of the audited year-end book value figure rather than a subsequent month-end book value figure would not have any adverse impact on the value of the individual accounts of the HolliShare participants.[166]   Karlovsky conducted multiple simulations to determine whether selling HolliShare's shares for their prior year-end audited book values had any material impact on the Plan.  He concluded that there was no material effect irrespective of which price was used.[167] Karlovsky described this at the "self-correcting" nature of the Plan; McCormack described it as the "counterintuitive" effect.[168]   The court analogized it to a pitcher's earned run average in baseball and the ripple effect of an error upon a pitcher's earned run average if a subsequent hitter (who would not have batted but for the error) scored.[169]   No testimony to the contrary was provided by plaintiffs.

Although the Mid-1980s Agreement was not reduced to writing, its terms were reflected in numerous documents implementing it.  For example, the summary plan description, which goes to all

---

[164]   DX 501, H01386-1390.

[165]   As both Zwirner and Winn testified, at some point in the 1980s, Winn requested that JDS repurchase some of his JDS common shares so that Winn could make a charitable donation. JDS did so, purchasing the shares with $5,000 in cash and the balance with a promissory note. Since Winn wished to make his contribution in cash, he sold his note to a bank that was familiar with Hollister, its business operations and its financial condition. Nonetheless, Winn was disappointed to learn that the bank paid him cash which was only between 88% and 90% of the note's principal amount. Winn Tr. 663:10-664:2; Zwirner Tr. 2393:20-2394:8.

[166]   McCormack Tr. 767:25-769:20; Karlovsky Tr. 352:1-355:19; Zwirner Tr. 2383:23-2386:6.

[167]   Karlovsky, Tr. 360:17-361:20.

[168]   McCormack Tr. 768:1-769:20.

[169]   McCormack Tr. 1077:14-1078:2

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-27-

HolliShare participants, disclosed that the JDS shares held by HolliShare are valued as of December 31 each year based on JDS's financial statements as audited by independent public accountants. It further states that this process is normally completed in April of each year.[170] December 31 is the only valuation date mentioned in that document.[171] More significantly, documents are also generated each year in connection with the sale of JDS common shares to JDS by HolliShare.[172] This only occurs once a year. The first page of DX 775 is a memorandum from the HolliShare Trustees to the JDS Board recommending that JDS repurchase a specific number of HolliShare's JDS common shares in 2010. It states that the prior year-end book value is being used for the sale and it states that payment for the shares will be all in cash.[173] Subsequent pages in that exhibit contain projections showing how the repurchase price was calculated and the JDS board of directors minutes authorizing the repurchase. The minutes also contain the dollar amount, the December 31, 2009 valuation date and the number of shares being purchased.[174] DX 775, taken as a whole, reflects all of the elements of the Mid-80s Agreement.[175] Similar documents are generated every year. With the passage of time, the agreement has enabled the Plan to satisfy its continually expanding and still volatile cash needs. From the mid-1980s to the present, JDS has purchased a total of approximately $340 million worth of its stock from HolliShare to enable HolliShare to pay all retirement benefits.[176]

---

[170]   DX 512, H03694; Zwirner Tr. 2389:6-2390:13.

[171]   *Id.*

[172]   DX 775, H22716-22720.

[173]   *Id.*; Zwirner Tr. 2391:1-15.

[174]   DX 775; Zwirner Tr. 2391:21-2392:20.

[175]   Zwirner Tr. 2391:16-20; McCormack Tr. 885:19-886:14.

[176]   Zwirner Tr. 2379:23-2380:1; DX 770.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

**L.      Scrutiny Of The Book Value System By HolliShare's Governmental Regulators**

**1.      DOL Determinations**

The financial statements of JDS and HolliShare have been audited annually, as of December 31 of each year, by the prominent, internationally-recognized accounting firm, Deloitte and Touche ("Deloitte").[177]   In 1991, Deloitte issued a qualified opinion in connection with its audit of HolliShare, based upon its concerns over the use of book value for valuing the JDS common shares held by the Plan. This qualified opinion initially resulted in the rejection by the DOL of the Plan's 1991 Annual Report on HolliShare's Form 5500.[178]

In its Notice of Rejection,[179] relying upon the qualified opinion of Deloitte, the DOL determined that HolliShare's investment in JDS common shares "was not properly presented at fair value," and violated the DOL's Regulation which required employee benefit plans to list the "net assets available to

---

[177]    Zwirner Tr. 2356:20-2357:3; DX 577.

[178]    McCormack Tr. 1173:8-1174:25; DX 59; DX 592.  The Form 5500 is an annual report submitted on behalf of an employee benefit plan regarding its financial condition, investments and operations. *See Form 5500 Series*, available at http;//www.dol.gov/EBSA/ 5500MAIN.html.  The Form 5500 is required to be filed under Sections 104 and 4065 of ERISA and Sections 6039D, 6057(b), and 6058(a) of the I.R.C. The Form 5500 is part of ERISA's overall reporting and disclosure requirements.  These requirements are intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided with, or have access to sufficient information to protect the rights and benefits of participants. *Id.*

Attached every year to the Form 5500 is an independent auditors' report (performed by Deloitte for most of the relevant years for HolliShare).  The end of term audit report is required by DOL's Regulation 29 CFR Section 25.20.103-1(b).

[179]    Even though Form 5500 has been filed for HolliShare for years,  this was the first time the Form 5500 had been rejected by the DOL.  The DOL had also reviewed the Plan on two prior occasions, in the late 1970s and in the early 1980s.  Both times, the DOL noted issues (unrelated to the book value system or any other matters at issue in this case) and the Plan immediately brought its procedures into compliance with the DOL's direction. McCormack Tr. 1170:1-1171:24.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

plan benefits at 'current value.'"[180]  In rejecting HolliShare's listing of its holdings of JDS common shares at their "current value," the DOL had, in effect, determined that HolliShare's use of book value in determining the value of its JDS common share holdings was not supported by "adequate consideration."[181]

On May 26, 1993, Deloitte amended its report, stating:

> [I]t has been determined that the fair value of the Trust's investment in the common shares of JDS equals the book value of such shares because of the restrictions on the sale of such shares under the terms of the JDS Articles, and because the terms of the Trust Agreement require the Trustees to comply with those restrictions.[182]

Deloitte also withdrew its "qualified" opinion and instead issued an "unqualified" opinion.[183]

HolliShare's administrator sent a letter on June 10, 1993 to the DOL attaching Deloitte's unqualified opinion and amended Form 5500s for the calendar years 1990 and 1991.[184]  On June 15, 1993, the DOL issued to HolliShare its "Withdrawal of Notice of Rejection of the HESOT (92-DAS-361)."[185]  The DOL then accepted HolliShare's amended Form 5500 filings which utilized a book-value methodology in reporting the fair market value of the JDS common shares.  The DOL's Notice of Withdrawal effectively determined that HolliShare's book value methodology accurately listed its JDS common shares at their "current value."  By determining that the book value of JDS's common shares was their "current value," given the virtually identical definitions of "current value" and "adequate consideration," the DOL

---

[180]    McCormack Tr. 1173:13-25; DX 592, H22296.

[181]    The term "current value" is defined in ERISA in terms virtually identical to ERISA's definition of "adequate consideration."  ERISA defines "current value" as follows: "The term 'current value' means fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary ... pursuant to the terms of the plan and in accordance with regulations of the Secretary, assuming an orderly liquidation at the time of such determination ...."  29 U.S.C. § 1002(26).

[182]    McCormack Tr. 1174:16-1176:9; DX 594, H22225; DX 595, H22236.

[183]    DX 594; DX 595.

[184]    McCormack Tr. 1174:8-15; DX 596.

[185]    DX 597.

effectively determined that the book value price of JDS's common shares constituted "adequate consideration."[186]

HolliShare's annual Form 5500s have always indicated that the JDS stock held by HolliShare was valued at its book value.[187]   Since at least 1999, the Form 5500s have also specifically stated that HolliShare held assets "whose current value was neither readily determinable on an established market nor set by an independent third-party appraiser."[188]

In 1998, Hollister received a letter from the DOL requesting an appointment to review the HolliShare Plan documents.[189]   The request was prompted by a complaint by plaintiff DeFazio and the issue raised in the investigation was the use of book value in determining the fair market value of the employer stock (*i.e.*, the JDS common shares ) held by HolliShare.[190]

On May 12, 1998, the DOL's investigator, Jean Bracken, reviewed HolliShare documents at Hollister's office.   Hollister made twenty-six categories of documents available for DOL's inspection, including the following:

- Signed originals of the Plan Documents, including the Trust agreement and all amendments;

- Summary Plan Descriptions;

- JDS's Articles of Incorporation;

- Summary Annual Reports;

- Documentation identifying the dates of all stock purchases by JDS since inception including, but not limited to, the number of shares purchased, price per share and

---

[186]   McCormack Tr. 1177:3-1179:9.  The documentation related to these series of events is set forth in DX 596 and 597.

[187]   PX 200-213; Handorf Tr. 1482:5-7.

[188]   PX 206, PG-000020; Handorf Tr. 1484:8-17.

[189]   McCormack Tr. 1179:21-1880:7; DX 584.

[190]   DX 585, p. 1; McCormack Tr. 1182:5-1183:24.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-31-

the aggregate amount paid;

- The latest IRS determination letters; and

- Form 5500s and the accompanying Deloitte Reports.[191]

Although the DOL requested "documentation related to any appraisal of the employer stock which was performed prior to each purchase if the stock is not publicly trade…," no appraisals were produced because none existed.[192] Bracken spoke with McCormack and others in his department and conducted an extensive investigation, reviewing all the extensive documentation produced by HolliShare.[193]

Thus, as of 1998 at the latest, the DOL knew that HolliShare was selling JDS common stock at its book value as determined as of December 31 of the prior year, and not at some appraised value, as well as the actual date of sale.[194] In June 2001, Hollister was notified by the DOL that its investigation was closed and that it did not intend to take any action.[195] While there was no formal approval rendered by the DOL of the book value methodology utilized by HolliShare, clearly, the methodology was reviewed by Bracken when she spoke to McCormack and conducted her onsite review of HolliShare documents, particularly the Deloitte reports attached to the Form 5500s. The decision by the DOL not to take any action under these circumstances constituted an implied approval by the DOL of the book value methodology. From this, the HolliShare trustees reasonably concluded that the DOL had accepted the use of book value, determined as of December 31 of each year, as a proper determinant of the fair market value of the JDS common shares sold by HolliShare to JDS.[196]

---

[191]    McCormack Tr. 1179:21-1181:23; DX 584.

[192]    DX 584; Handorf Tr. 1468:15-1469:7.

[193]    McCormack Tr. 1196:9-1199:21.

[194]    See, *e.g.*, DX 788.

[195]    DX 586.

[196]    Over objection, the Court admitted into evidence PX 54, which purports to be a redacted version
(continued...)

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-32-

### 2. IRS Scrutiny

The IRS has also scrutinized HolliShare and the book value system. A favorable Determination Letter: (1) is issued by the IRS in response to a request by a Plan Sponsor seeking a determination that its retirement plan is qualified under 26 U.S.C.A. § 401(a); (2) expresses the IRS's opinion regarding the form of the Plan; (3) is issued based on the applicable Cumulative List at the time the application is received; and (4) applies only to the employer and the Plan participants on whose behalf the determination letter was issued.[197] From December 20, 1973 (before ERISA was enacted) through October 28, 2002, HolliShare has received nine favorable Determination Letters from various district directors of the IRS.[198]

In addition, on two other occasions, the IRS has effectively agreed that the book value of JDS's common shares is their fair market value. The estates of two JDS common shareholders, each of whom died while owning JDS common shares, reported the fair market value of those shares on their federal estate tax returns at their book value. In each instance, the IRS accepted those valuations.[199]

### M. Zwirner's Multiple Roles

As noted above, Zwirner has held multiple positions with JDS, Hollister and HolliShare. Regarding this, the 1977 Trust states as follows:

> The Trustee or any successor Trustee may act as a director, officer or counsel of JDS Inc

---

[196](...continued)
of a DOL report of interview relating to its 1998 investigation of HolliShare. The last page of that exhibit (PG-0070) is a document referring to sales of JDS shares by HolliShare on January 1, 1995, 1996, 1997 and 1998. There is no foundation as to who prepared this document or what it purports to represent. The DOL report of its investigation (DX 585, p. 2) refers to the value of JDS stock as of the dates noted above, but not to transactions. Given the lack of evidence of its provenance and the ambiguity of its content, the Court ascribes no weight to this document.

[197] See, *e.g.*, Internal Revenue Service, Determination Letters (June 24, 2008), *available at* http://www.irs.gov/retirement/article/0,,id=128037,00. html. All documents related to the Internal Revenue Service's Determination Letters and its onsite audit are included in DX 513-521.

[198] Zwirner Tr. 2395:20-2398:3; DX 513-521.

[199] Zwirner Tr. 2398:4-2401:17; DX 629-632.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

or Hollister or both and he or any firm of which he may be a member, or any corporation of which he may be a shareholder, director or officer, may contract with JDS Inc or Hollister or both, or be financially interested in any transaction to which JDS Inc or Hollister may be a party, or in which either such corporation may be in any way interested, as fully as though he were not a Trustee or successor Trustee.[200]

The 1999 Trust has a similar provision.[201]    This provision was put into the 1977 Trust because Schneider wanted the management and direction of JDS and Hollister to be conducted by a small group of people with knowledge of the business that he trusted and he thought had good judgment.  He wanted to make sure that they would have multiple roles and multiple positions, which he considered an asset and strength in the management of his business.[202]

Throughout his affiliation with Hollister and JDS, Zwirner has considered whether there is any conflict of interest created by his roles as a HolliShare Trustee, the company's General Counsel and as a Director of both JDS and Hollister.[203]   He has always been aware that there are potential conflicts and he was always sensitive to whether any of those potential conflicts might ripen into an actual conflict.[204]   He kept his law firm advised on this.[205]    In addition to his own law firm, Zwirner obtained advice on the subject of his potential conflicts from Arnold & Porter in Washington, Skadden, Arps, Slate, Meagher & Flom in New York, and Barnes & Thornburg in Indianapolis.[206]   There were one or two formal evaluations of whether a conflict existed which were performed by Schuyler, Roche & Zwirner and Arnold & Porter

---

[200]    DX 635B, H02238.

[201]    DX 641, H10978.

[202]    Zwirner Tr. 2269:7-24.

[203]    Zwirner Tr. 2292:17-2293:13.

[204]    Zwirner Tr. 2293:4-13.

[205]    *Id.*

[206]    *Id.*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-34-

prior to the establishment of the 1999 Trust.[207]   When Zwirner has been up for election as a JDS director, he has abstained from voting on this as a HolliShare Trustee.[208]   He has never been advised by any lawyer, nor has he concluded himself, that any of his potential conflicts of interest ever evolved into an actual conflict of interest.[209]

There were advantages to HolliShare to Zwirner's multiple positions.  Because of his familiarity with both the operations of Hollister's business and of the Plan, he was able to provide valuable information to the Plan and to serve as a liaison between the company and the Plan.[210]   Zwirner discussed his multiple roles with Schneider many times and Schneider consistently encouraged Zwirner to fulfill his multiple roles.[211]

John Schneider reposed great trust and confidence in Zwirner.  Among other positions, Schneider: (1) named Zwirner General Counsel of Hollister and JDS; (2) placed him on the Boards of both JDS and Hollister; (3) named him as a successor trustee of the 1977 Trust; and (4) named him as a HolliShare Trustee.[212]

By 1983, Zwirner was spending more time on business problems and projects for Hollister than on legal matters.  Winn and Stempinski decided that Zwirner should be given the opportunity to acquire JDS stock because his activities went beyond even those of an employee.  He was dedicated not just in the area of law, but he was also dedicated in serving the company in various business capacities.  This was at the

---

[207]    Zwirner Tr. 2293:23-2294:6.

[208]    Zwirner Tr. 2294:20-24.

[209]    Zwirner Tr. 2294:25-2295:6.

[210]    Zwirner Tr. 2295:7-18.

[211]    Zwirner Tr. 2295:19-2296:1.

[212]    Zwirner Tr. 2227:10-2228:16.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-35-

time when the company was encountering serious difficulties because of the Abbott arbitration.[213] Zwirner was acting more in the capacity of a businessman and an executive in the company than that of an outside lawyer.[214] The legal work he and his firm were performing was compensated through billing in the ordinary course; it was the other commitments and services the company required of him that, in the view of Winn and Stempinski, justified giving him additional compensation.[215] So the JDS Articles were amended to allow him to purchase stock in JDS.[216]

## N.    The HolliShare Trustees' Investment In JDS Stock

The HolliShare trust instrument requires that "under normal circumstances and to the maximum extent practicable and advisable," the trustees are to "invest the Trust Fund in Common Shares of JDS, Inc."[217] Not only is such maximum investment mandated by the trust instrument, but it is extremely prudent and has proven to be highly advantageous to the Plan participants.

The percentage annual increases in the book value of JDS common shares have, in the vast majority of years, exceeded the increases in the S&P 500 index and other commonly accepted indices of mid-cap and small cap stocks.[218] For the years 1977 through 2010, the mean of the above percentages was 26.79% for JDS common shares, as contrasted with (a) 8.88% for the S&P 500 Index, (b) 14.09% for the Mid-Cap Index, and (c) 15.24% for the Small Cap Index. Because the mean can be affected by unusually large or small values, the medians of the figures reflected above were also considered by the court. During the entire 34 year period covered by DX 754, the medians were 22.12% for JDS common shares, 12.35% for

---

[213]    Winn Tr. 65:1-13.

[214]    Winn Tr. 66:2-5.

[215]    Winn Tr. 66:6-13.

[216]    Winn Tr. 65:20-22.

[217]    DX 501, H01401; Zwirner Tr. 2306:9-25.

[218]    DX 754.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-36-

the S&P 500, 13.32% for the Mid-Cap Index, and 20.56% for the Small Cap Index.[219]

It could be argued that extraordinarily high returns on JDS shares for the years prior to 1989 were aberrational because of the Abbott arbitration (discussed above).[220]  If only the period from 1989 to 2010 is considered, JDS common shares still outperformed the stock indexes, as follows: (a) JDS common shares, mean of 18.43% and median of 17.63%; (b) S&P 500 index, mean of 8.88% and median of 10.89%; (c) Mid-Cap Index, mean of 12.55% and median of 14.25%; and (d) Small Cap Index, mean of 12.09% and median of 12.85%.[221]

The increase in the book value of JDS common shares is the primary factor contributing to the steady increases in the account balances of HolliShare's participants, and, ultimately, the vested benefits that they have received.[222]

### O.      Disclosure of HolliShare's Practices Regarding The Valuation Of JDS Common Shares To The Plan Participants

Since 1984, each HolliShare participant has been provided annually with a booklet entitled HolliShare Highlights.[223]  While the title of the booklet varied, a substantively identical booklet was also provided during the period 1977 to 1983.  It was titled Summary Annual Report in 1977 and 1978,[224] HolliShare Highlights in 1979, 1980 and 1981,[225] and Annual Report in 1982 and 1983.[226]  The HolliShare Highlights booklets were distributed to all HolliShare participants and provided a summary of the financial

---

[219]    *Id.*

[220]    Zwirner Tr. 2343:1-24.

[221]    DX 754.

[222]    Zwirner Tr. 2350:4-7.

[223]    DX 656-681; Zwirner Tr. 2092:19-2093:3.

[224]    DX 649-650.

[225]    DX 651-653.

[226]    DX 654-655.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-37-

results of the HolliShare Trust Fund for the prior year.[227]

The HolliShare Highlights booklets describe the nature of JDS's common shares and HolliShare's valuation of those shares as follows:

> **Closely Held Nature of JDS Stock**
>
> JDS common shares, which are valued at their book value, are not publicly traded. They are for all practical purposes not transferable to any person or entity other than JDS itself. They are subject to severe transfer restrictions which require that the Trust [HolliShare] first offer them to JDS at their book value.
>
> To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with needed cash. Both the Trustees and JDS expect to continue in this manner, in order to maintain the necessary liquidity and financial integrity of HolliShare.[228]

Furthermore, HolliShare's practice of selling its common shares to JDS at their per share December 31 book value has been disclosed to HolliShare participants since at least 1990, when each participant received a Summary Plan Description which disclosed this practice.[229]

## P.    The 1999 Amendments To The JDS Articles

In order to implement the terms of the 1999 Trust, it was necessary for the JDS shareholders to approve certain amendments to the JDS Articles. An amendment to the JDS Articles that affected the permitted holders of JDS stock required a two-thirds vote by each class of shares, voting as a class.[230] Given the number of common shares owned by HolliShare, the amendments to the JDS Articles required

---

[227]    DX 649-681.

[228]    DX 680, H22196. Plaintiffs have pointed to PX 176, a November 1997 letter to Plaintiff DeFazio from Dian Thelitz, then Secretary to the Trustees of HolliShare, in an attempt to argue that it is a misstatement to say that HolliShare's JDS shares were sold to JDS pursuant to JDS's right of first refusal. In his testimony, Zwirner made clear that "right of first refusal" was used as a generic term "to describe the transfer restrictions and repurchase provisions in total and in general in a number of documents and letters because its [sic] considered to be readily understood by laymen." Zwirner Tr. 2031:21-2032 :l. The court finds this testimony to be credible.

[229]    DX 512, H03694.

[230]    DX 531, H02162.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-38-

its approval.[231]

Under the HolliShare trust instrument, the HolliShare Trustees were solely responsible for determining how HolliShare would vote its shares.[232]   At the time these amendments were proposed, and throughout 1999, the HolliShare Trustees were McCormack, Karlovsky and Zwirner.[233]

The following amendments were approved at a special meeting of the JDS shareholders held on January 28, 1999:

> a.    An amendment which (I) increased the amount of cash paid by JDS to individual common shareholders from whom JDS redeems its common shares from $5,000.00 to the greater of $250,000 or 10% of the amount of the transaction; and (ii) increased the interest rate payable on subordinated promissory notes provided in connection with such redemptions from a range of 6% to 9% to a range of 8% to 12%.

> b.    An amendment which added a new Article Six to the JDS Articles, and provided as follows:

> No director of the Corporation shall be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, (3) under Section 8.65 of the Business Corporation Act, or (4) for any transaction from which the director derived an improper personal benefit.  If, after adoption by the shareholders of this ARTICLE SIX, the Business Corporation Act is amended to permit the further elimination or limitation of the personal liability of directors, then the liability of directors of the Corporation shall be eliminated or limited to the fullest extent permitted by the Business Corporation Act as so amended. This ARTICLE SIX shall not eliminate or limit the liability of a director of the Corporation for any breach of fiduciary duty occurring before March 19, 1999.  The right set forth in this ARTICLE SIX is in addition to: any indemnification or other right eliminating or limiting the personal liability of directors to which a director may be entitled by any by-law, agreement, vote of shareholders or disinterested directors, or otherwise…[234]

The amendments were filed with the Illinois Secretary of State on March 19, 1999, and have been a matter

---

[231]   Zwirner Tr. 2308:5-12.

[232]   DX 501, H01402.

[233]   Stipulation of Facts, ¶¶ 15, 16, 18.

[234]   DX 535, p. 45 of 57.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

of public record since that time.[235]

The HolliShare Trustees voted in favor of the January 1999 amendments because they believed that these amendments were in the best interests of HolliShare.[236]  First, the Trustees believed that the amendment which changed the term and interest rate of the promissory notes issued to direct shareholders and increased the amount of cash paid to direct shareholders upon redemption of their shares made JDS share ownership more attractive.  As a result, the improved terms of direct share ownership would allow Hollister to recruit and retain higher quality personnel.  The Trustees believed that this, in turn, was beneficial to HolliShare in that attracting more skilled managers would logically enhance Hollister's profits, thereby increasing the book value of JDS common shares.  HolliShare, as the largest JDS common shareholder, would be the principal beneficiary of those increased profits.  Although the amendment increased the rate of interest paid on the notes provided to direct shareholders upon redemption of their shares, the shortened duration of the notes was forecasted to result in an overall reduction of the amount of interest expense incurred by JDS (again, leading to enhanced profits and, consequently, a greater book value of HolliShare's JDS common shares).[237]

Second, the Trustees voted HolliShare's shares in favor of an amendment which limited the personal liability of JDS directors in the manner specifically authorized by the Illinois Business Corporation Law. The trustees believed that this amendment removed a competitive disadvantage to JDS's ability to attract well-qualified directors.[238]  Again, the Trustees believed that this amendment – which contrary to plaintiffs' erroneous claims had no impact on the liability of HolliShare Trustees – benefitted HolliShare by allowing JDS to attract persons with the skill and competency to maintain, and ideally

---

[235]   DX 535, pp. 41-57.

[236]   Zwirner Tr. 2279:13-2280:7, 2282:5-11, 2284:4-10, 2287:5-7; Karlovsky Tr. 534:15-539:12; McCormack Tr. 1168:16-1169:10.

[237]   Zwirner Tr. 2280:10-14.

[238]   *Id.*, 2280:15-2281:4.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-40-

enhance, the financial performance of Hollister and derivatively, the value of HolliShare's JDS common shares.[239]

The foregoing amendments were unanimously approved by the JDS shareholders at the January 28, 1999 shareholders' meeting. The fact that all of the common shareholders in addition to HolliShare considered the amendments beneficial negates any suggestion that HolliShare's vote in favor of them involved a breach of the HolliShare Trustees' duty of prudence.

At the April 30, 1999 JDS shareholders' meeting, the JDS shareholders (including HolliShare) unanimously voted in favor of an amendment to the JDS Articles that permitted the 1999 Trust to own JDS shares.[240] At that meeting, the JDS shareholders also approved an amendment to the JDS Articles which provided that no natural person would be permitted to own more than 10% of the outstanding JDS common shares at any year end. An amendment that deleted Article Five, Paragraph II.E (an exemption from the otherwise applicable transfer restrictions and repurchase rights in the JDS Articles for John Schneider, Minnie Schneider, and trustees designated in writing by either or both of them) was also approved because there was no one left to whom this exemption applied.[241] The amendments approved at the April 30, 1999 meeting were filed with the Illinois Secretary of State on June 14, 1999. They have been a matter of public record since that time.[242]

Plaintiffs claim these amendments limited the available purchasers of JDS common shares. They

---

[239] Plaintiffs' claim that Zwirner, as a JDS director, was in a conflict situation in causing HolliShare's JDS common shares to be voted in favor of an amendment to the JDS Articles that limited his personal liability as a director. However, the evidence established that Karlovsky and McCormack favored the amendment, so any position taken by Zwirner regarding this amendment was irrelevant to the ultimate determination whether HolliShare's shares would be voted for or against the amendment.

[240] DX 646.

[241] See DX 531, Article Five, II.E for this "Schneider exception", and DX 536 for the 1999 amendment eliminating that exception.

[242] DX 646.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-41-

did not do so.  No single JDS common shareholder was a realistic purchaser of JDS common shares.  The Trustees voted in favor of 10% limitation because they believed it benefitted HolliShare by ensuring that no individual could accumulate shares to an extent that would have undercut the voting power possessed by HolliShare. [243]

With respect to the elimination of the Schneider exception, by 1999 the Schneiders were dead, the 1977 trust was the only trust falling within the exception being eliminated, and that trust was due to expire within two years, in April 2001.  More importantly, neither the Schneiders during their lifetime nor any of their trusts were potential purchasers of HolliShare's JDS common shares.[244]  Accordingly, the Trustees voted in favor of the amendment striking the Schneider exception from the JDS Articles because the amendment did nothing more than eliminate an obsolete provision.

**Q.    The Monitoring Of HolliShare And Its Trustees By Hollister's Board Of Directors**

Since HolliShare became effective on January 1, 1973, as required by the Plan, the Hollister Board of Directors has appointed and monitored the activities of the HolliShare Trustees.[245]  The Hollister Board monitors the activities of HolliShare in several ways.  First, there is an annual, formal, written report from the Deferred Benefits Committee whose members are currently also the HolliShare Trustees.  This report has sections on each of the Hollister deferred benefit plans including HolliShare.[246]  This report contains all the basic information about HolliShare's activities in the prior year.[247]  Included in the report is information concerning the current size of the HolliShare trust fund and the number and value of JDS

---

[243]    Zwirner Tr. 2283:12-2284:15.

[244]    Zwirner Tr. 2285:2-2287:4.

[245]    Zwirner Tr. 2406:24-2407:4.

[246]    Zwirner Tr. 2407:11-17.

[247]    Zwirner Tr. 2409:12-21; DX 683-688.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-42-

common shares sold by HolliShare to JDS in the prior year.[248]   In addition, the Hollister Board engaged in the following informal activities to monitor the performance of HolliShare:

- Reporting on HolliShare by Zwirner and Brilliant at Hollister board meetings;

- Review by the board of directors of the results of an employee satisfaction survey which is conducted every two years by an outside professional organization and which has specific questions on HolliShare;

- Consideration by the board of increases in the book value of the common shares and of the growth in the participants' accounts in HolliShare;

- Herbert, Zwirner and George Maliekel, the current President of Hollister, review the HolliShare Highlights booklet each year before it is published;

- Two of the directors attend meetings of the Compensation Committee where the profit sharing plan or various aspects of it are on the agenda and are discussed from time to time;

- One of the directors is the Chair of the Audit Committee, and the Plan is on the agenda and discussed at committee meetings;

- Herbert and now Maliekel supervise generally all the trustees in their normal work activities and consider questions that may arise regarding the Plan from time to time;

- There are communications meetings with employees at which, from time to time, questions are solicited, received and answered about the Plan;

- There are managers and sales meetings that Zwirner and one other director attend, and where, in small groups, Zwirner asks attendees whether they are satisfied with the information they receive and disclosures made and if they are satisfied or have any questions about the HolliShare Trustees' functions;

- There is also a program called "Breakfast with George and Sam" where employees sign up in groups of 10 or 12, attend breakfast with Maliekel and Brilliant and ask whatever questions they want including questions about the Plan.[249]

The Hollister Board also monitors the investigation by the HolliShare Trustees to determine whether book value continues to be the fair market value of JDS common shares held by the Plan.  Brilliant or Zwirner state, when HolliShare makes a request to the Board for the repurchase by JDS of its shares, that the

---

[248]   DX 683-688.

[249]   Zwirner Tr. 2407:11-2409:11.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-43-

investigation has been completed by the HolliShare Trustees and that they are satisfied that continuing to follow the Mid-1980s Agreement provides adequate consideration.[250]

Herbert also testified to other specific activities taken to monitor Hollishare. He personally had an hour-long interview with everyone who retired from the 500-person home office staff as well as the sales force when he was in the field. HolliShare came up in those interviews and it was very favorably reviewed.[251] In addition, Herbert reviewed the results of written organization surveys (which included questions about HolliShare) and aside from this litigation, he has never seen a complaint about HolliShare.[252]

No employee has ever complained to Zwirner about the amount of his or her final distribution from HolliShare.[253] Based on its monitoring as described above, the Hollister Board has concluded that the Plan is implemented in accordance with the Plan document and in compliance with all applicable laws and that the HolliShare trustees are properly discharging their fiduciary functions.[254]

**R.     JDS Role**

The only role JDS performs in connection with Hollishare is that it: (1) receives the requests of the HolliShare Trustees to sell back to JDS a certain number of JDS common shares at the prior December 31 book value for cash in accordance with the Mid-1980s Agreement; (2) it accepts and approves those requests; (3) then executes the transactions, by repurchasing the shares and providing HolliShare with the

---

[250]   Zwirner Tr. 2409:22-2410:6.

[251]   Herbert Tr. 1829:6-25, 1832:20-1833:13.

[252]   Herbert Tr. 1833:20-1834:15.

[253]   Zwirner Tr. 2410:7-10.

[254]   Zwirner Tr. 2410:11-15.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

required cash.[255]   JDS does this in its corporate capacity, as the issuer of the capital stock.[256]   JDS plays no role in determining whether HolliShare should sell shares of JDS stock and, if so, how many shares it should sell; only the HolliShare Trustees make those decisions.[257]   Accordingly, JDS exercises no discretion or control over its repurchases of JDS shares from HolliShare.

### S.   The Plaintiffs Have Prospered In Their HolliShare Accounts

The account balances of plaintiffs' HolliShare accounts increased consistently and dramatically.[258] For example, during her Hollister employment, Ellis's HolliShare account increased annually by an average of $100,000.[259] This exceeded the highest amount of annual compensation (salary and bonus) that Ellis received from Hollister.[260] All the other plaintiffs realized similar rates of increase in their HolliShare accounts.[261]

## II.  Conclusions of Law

### A.   Overview Of Plaintiffs' Claims

In this action, plaintiffs have asserted a melange of claims under ERISA.[262]   Prior to trial, the gist of plaintiffs' claims was that defendants improperly undervalued HolliShare's holdings of JDS common

---

[255]   Zwirner Tr. 2404:17-2405-1.

[256]   Zwirner Tr. 2405:2-7.

[257]   Zwirner Tr. 2405:8-13.

[258]   DX 750A; Zwirner Tr. 2352:11-20.

[259]   Zwirner Tr. 2353:10-13.

[260]   Zwirner Tr. 2353:14-17.

[261]   DX 762-769.

[262]   The trial involved the allegations made in the Fifth Amended Complaint ("HAC") in which all plaintiffs joined except Ellis  (Dkt. 368) and Ellis's Fourth Amended Complaint ("FAC") (Dkt. 314). Collectively, the HAC and the FAC embody twenty-four different counts, all of which are brought under ERISA.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-45-

shares by using the per share book value of JDS common shares to calculate: (a) the amount of vested benefits paid to participants individually upon termination of their employment at Hollister; and (b) the per share price paid by JDS to HolliShare in HolliShare's annual sales to JDS of JDS common shares to fund benefit payments to HolliShare participants.  At trial, plaintiffs focused principally on the latter, complaining about the sale price based on book value and also that the shares were sold at prior " year-end" book value rather than the book value at the end of the month in which the shares were sold.

Plaintiffs contend defendants violated the "prohibited transactions" provisions of ERISA § 406(a), 29 U.S.C. § 1106(a).[263]  Plaintiffs also assert that defendants violated the statutory duty of an ERISA plan fiduciary under ERISA §404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), to act with the care, skill, prudence, and diligence under the circumstances then prevailing with which a prudent man would act, and the statutory duty of an ERISA plan fiduciary under ERISA §404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), to act for the exclusive purpose of providing benefits to the plan participants and their beneficiaries.

Other ERISA violations were also alleged.  While some of the claims in the HAC and the FAC are duplicative, many are not.  In addition, many of the counts in each of the two amended complaints are brought against different defendants.  As a result, on October 23, 2009, the court directed plaintiffs' counsel to submit a "Supplemental Pre-Trial Statement" ("SPTS") that would identify each of the counts being asserted, their statutory or common law basis, their requisite elements of proof, and the defendants against whom each count was being asserted.

Plaintiffs' SPTS failed to provide clarity with respect to the claims that plaintiffs would pursue at trial. It also violated the Final Pre-Trial Order in that it did not specify which claims were asserted against which defendants.  Further, it did not delineate in any way the relief sought on each claim.  As the court observed at trial, further clarity was not sought because the court thought it would only lead to further

---

[263]   Dkt. 368, HAC, Count XI-XII; Dkt. 314, FAC, Count X.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-46-

confusion.[264] Nevertheless, the SPTS and plaintiffs' post-trial filings will be used as a guide to the claims that need to be addressed.

**B.     This Court Lacks Subject Matter Jurisdiction Over This Action Because Plaintiffs Are Not Plan Participants And Thus Lack Standing Under ERISA.**

Defendants have challenged the court's jurisdiction over this action on the basis that plaintiffs lack statutory standing to sue because they are not "participants."  See 29 U.S.C. §§ 1002(7) ("§ 3(7)") and 1132(a)(2) ("§ 502(a)(2)").    The court finds that plaintiffs do not have standing to assert the claims at issue.

The "civil enforcement" provisions of ERISA restrict the persons who may bring suit for alleged ERISA violations, and specify the types of suits that may be brought.  Section 502 provides in pertinent part that:

> A civil action may be brought -
>
> (1)     by a participant or beneficiary -
>
> > (A)     for the relief provided for in subsection (c) of this section, or
> >
> > (B)     to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2)     by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;[ ]
>
> (3)     by a participant, beneficiary, or fiduciary
>
> > (A)     to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
> >
> > (B)     to obtain other appropriate equitable relief
> >
> > > (I)     to redress such violations or
> > >
> > > (ii)    to enforce any provisions of this subchapter or the terms of the plan; … [emphasis added].

29 U.S.C. § 1132 ("ERISA § 502").

---

[264]    Tr. 814:22-815:13.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-47-

Thus, by its terms, ERISA standing is limited to participants, beneficiaries, and fiduciaries. "Participant" and "beneficiary" are defined terms under ERISA.

> The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

ERISA § 3(7), 29 U.S.C. § 1002(7).  A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." ERISA § 3(8), 29 U.S.C. § 1002(8).

As the Ninth Circuit has noted, "[t]he Supreme Court has construed Section 502 narrowly to permit only the parties enumerated therein to sue directly for relief." *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1023, 1081 (9th Cir. 2000) (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27 (1983)), amended by 234 F.3d 428 (9th Cir. 2000).  Here, no plaintiff claims to be a HolliShare "fiduciary" and no plaintiff other than DeFazio could or does claim to be a "beneficiary." Thus, the standing of the plaintiffs other than DeFazio to sue under ERISA depends solely upon whether they may properly be deemed to be Plan "participants."[265]   For the reasons that follow, no plaintiff is a "participant" under ERISA, and therefore all plaintiffs lack standing to bring this action.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court set forth the pertinent test for determining who is a "participant" under ERISA.  Under the *Firestone* test, participants include only: (1) employees in, or reasonably expected to be in, currently covered employment; (2) former employees who have a reasonable expectation of returning to covered employment; or (3) former

---

[265]   Although DeFazio may have statutory standing to sue under ERISA, the point is moot because this court has held that his fiduciary breach and prohibited transaction claims are barred by the applicable statute of limitations. *DeFazio v. Hollister, Inc.,* 636 F. Supp. 2d 1045, 1058; *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1092 (E.D. Cal. 2005).  Moreover, the amount of his alternate payee account was not affected by the purported ERISA violations alleged by the other plaintiffs.  As such, based on the principles articulated in the court's ruling pertaining to the parties' summary judgment motions, *DeFazio*, 636 F. Supp. 2d at 1072, DeFazio lacks constitutional standing under ERISA.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-48-

employees who have a colorable claim to vested benefits. *Id.* at 117.

The parties stipulated that no plaintiff is in currently covered employment (*i.e.*, currently employed by Hollister).[266] Also, no plaintiff has any reasonable expectation of returning to his or her Hollister employment. Thus, plaintiffs' ostensible status as "participants" under *Firestone* turns on whether they have a colorable claim for a vested benefit.

To qualify as a person who has a colorable claim for a vested benefit, the *Firestone* court determined that a claimant must have a colorable claim upon which he or she will prevail in a suit for vested benefits. *Id.* at 117-18. Plaintiffs lack a colorable claim for any vested benefit because the evidence demonstrated that all plaintiffs have received every vested benefit to which they were entitled to under the Plan. First, plaintiffs were not deprived of any vested benefit because HolliShare's sales of JDS common shares for the December 31 book value rather than some appraised value or a "current month-end" book value did not diminish the value of their HolliShare accounts. See Section II.H.5, below. Second, plaintiffs are not entitled to the difference between the value of their accounts when HolliShare's holdings of JDS stock were valued based on based on book value and a valuation based on "fair market value" because none exists. See Section II.6, below.

Even if sale at the prior December 31 book value affected the value of plaintiffs' HolliShare accounts, or if there was some difference between the fair market value and book value of the JDS common shares, plaintiffs did not prove that the amounts they seek to recover are vested benefits promised to them by the terms of the Plan. As stated in *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 575 (3d Cir. 2006):

> Where the plan provides that an employee is irrevocably entitled to a certain benefit, and where all the conditions precedent to the employee's receipt of that benefit have been satisfied, "that benefit is said to have accrued (or 'vested'or 'ripened') and cannot be taken away by plan amendment or termination." ABA Section of Labor & Employment Law, Employee Benefits Law 1052 (2d ed. 2000).

See also *Felix v. Lucent Technologies, Inc.*, 387 F.3d 1146, 1162 (10th Cir. 2004) (plaintiffs had no claim

---

[266] Stipulation of Facts, ¶¶ 1-10.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-49-

for vested benefits "as they do not claim that they are entitled to benefits under the terms of their plan as it existed at the time of their retirement" (emphasis added)); *Becker v. Mack Trucks, Inc.*, 281 F.3d 372, 378-79 (3d Cir. 2002) ("contingent benefits do not establish a colorable claim to vested benefits under the Firestone standard").

Plaintiffs received all vested benefits to which they were entitled under HolliShare. The additional benefits which plaintiffs argue might hypothetically have accrued if HolliShare had been able to sell its JDS common shares for a higher price, or if a valuation methodology other than that specified by the Plan had been adopted, are not "vested" but are instead purely speculative. *Yancy v. American Petrofina, Inc.*, 768 F.2d 707, 708-09 (5th Cir. 1985) (finding that "participant" encompasses only those former employees who are owed vested benefits and that alleged additional benefits that may have accrued were speculative and not vested benefits).

As noted in the court's Order dated November 1, 2007 (Dkt. 291), the Ninth Circuit has held that retirees who have been paid their full account balances in lump-sum payments, as have the plaintiffs here, are no longer "participants" and lack standing to sue for damages. *DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670 at *3 (E.D. Cal. Nov. 1, 2007) (citing *Kuntz v. Reese*, 758 F.2d 1410, 1411 (9th Cir. 1986)).[267] Indeed, in *Kuntz*, the nexus between the money sought by the plaintiffs and a vested benefit under the plan was far closer than is the case here. There, plaintiffs claimed that the defendant-fiduciaries had misled them concerning the amount of the retirement benefits they would receive by participating in the plan at issue. Here, plaintiffs do not and cannot allege that they were deprived of any vested benefit to which they were entitled under the terms of the HolliShare Plan since the Plan expressly mandates that HolliShare's JDS common shares are to be valued at their per share book value. Thus, unlike the plaintiffs

---

[267]   The court then pointed out that a subsequent Ninth Circuit decision carved out an exception to the *Kuntz* rule when allegations are made that plan fiduciaries have personally profited through the misuse of Plan assets. *DeFazio*, 2007 WL 32316770 at *3 (citing *Amalgamated Clothing v. Murdock*, 861 F.2d 1406, 1418 (9th Cir. 1988)). Plaintiffs did not prove that the Plan fiduciaries personally profited and thus they do not fall under this exception.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

in *Kuntz*, plaintiffs are not seeking any benefit which they were entitled to receive by virtue of their participation in the Plan.

*Kuntz* is dispositive of plaintiffs' claims. In *Kuntz*, the Ninth Circuit squarely held that:

> We are now persuaded that the Kuntz plaintiffs are not participants because, as former employees whose vested benefits under the plan have already been distributed in a lump sum, the Kuntz plaintiffs were not eligible to receive a benefit, and were not likely to become eligible to receive a benefit, at the time that they filed the suit. Because, if successful, the plaintiffs' claim would result in a damage award, not in an increase in vested benefits, they are not plan participants.

758 F.2d at 1411.[268]

Here, any recovery by plaintiffs would not qualify as a vested benefit from the Plan, but instead would be a simple damage award. In other words, if a judgment is entered in favor of plaintiffs under which they receive the incremental difference between the benefits already paid to them by HolliShare and a larger amount based upon some theoretical fair market value of JDS common shares or assumed prices at which HolliShare might have sold its JDS common shares, that judgment would merely constitute a classic, traditional money judgment, not the payment of a vested plan benefit. If such a judgment were entered, plaintiffs would also receive nothing as a Plan participant because no plaintiff currently has a HolliShare account.

In *LaRue v. DeWolff, Boberg & Associates, Inc. et al.*, 552 U.S. 248 (2008), which plaintiffs cite, the Supreme Court did not overrule either this widely-accepted tenet of ERISA law or the holding in *Kuntz*.

---

[268] In *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1023-25 (9th Cir. 2009) and *Harris v. Amgen, Inc.*, 573 F.3d 728, 733 (9th Cir. 2009), the Ninth Circuit held that a former employee has standing to sue as a "participant" under ERISA where it is alleged that he or she "did not receive everything that was due to him under the [defined contribution] Plan..." *Harris*, 573 F.3d at 733 (*quoting Vaughn*, 567 F.3d at 1023). Here, unlike the situation extant in *Vaughn* and *Harris*, plaintiffs received everything to which they were entitled under the HolliShare Plan as it was written. Thus, plaintiffs are not seeking amounts due *under the Plan*, but rather money damages based on their position that a methodology other than that specified by the Plan should have been used and/or that HolliShare's share sales should have been made at some different price. As such, plaintiffs here are not seeking any vested benefits that they would have received under the Plan. Moreover, in *Harris*, the plaintiff-former employee was held to have standing under ERISA § 502(a)(2) because he was, unlike the plaintiffs here, seeking benefits he claimed were miscalculated under the plan *as written*.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*LaRue* simply expanded the relief available under ERISA § 502(a)(2). As such, *LaRue* is inapposite here. §502(a)(2) permits a participant to bring a claim only on behalf of the plan "for appropriate relief under [ERISA] section [409] 1109 of this title." See *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985) (also cite by plaintiffs). No claim under §409 was referred to in the SPTS, so plaintiffs also have no claim under §502(a)(2).

The *LaRue* court recognized that defined contribution plans had become more prevalent and thus recovery can now be had under § 502(a)(2) when a participant demonstrates fiduciary misconduct that affected his or her individual account. 552 U.S. at 256; see also *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 1060-07 (N.D. Cal. 2008). Neither the *LaRue* Court nor the *Russell* Court addressed whether the respective plaintiffs were, in fact, "participants" as defined by ERISA § 3(7). Moreover, the *LaRue* Court specifically excluded from its holding situations where, as here, plaintiffs lacked standing because they had already received all of the vested benefits which they were contractually entitled to receive. 552 U.S. at 254 (citing *Russell*, 473 U.S. at 136-37).

Numerous other federal appellate courts have also held that former plan participants who have already received all of the vested benefits promised them by ERISA plans lacked standing to sue under ERISA. See *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100-01 (2d Cir. 2005); *Raymond v. Mobil Oil Co.*, 983 F.2d 1528, 1535 (10th Cir. 1993); *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 952 (6th Cir. 1990); *Joseph v. New Orleans Elec. Pension & Ret. Plan*, 754 F.2d 628, 630 (5th Cir. 1985); *Crawford v. Lamantia*, 34 F.3d 28, 32-33 (1st Cir. 1994); *Adamson v. Armco, Inc.*, 44 F.3d 650, 655 (8th Cir. 1995).

The decision in *Register v. Cameron & Barkley Co.*, 481 F. Supp. 2d 471 (D.S.C. 2007), reconsideration denied, 481 F. Supp. 2d 479 (D.S.C. 2007), is particularly compelling and on all fours with the case at bar. In *Register*, the plaintiffs – like plaintiffs here – alleged a breach of fiduciary duty in connection with the valuation of the employer's stock held in an ERISA plan. The *Register* court concluded that the plaintiffs were not seeking vested benefits but rather speculative damages, stating,

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-52-

"[e]ven if plaintiffs can definitively prove the correct valuation of the CSI stock at the time of the spin-off, the court can only speculate as to what the value of the assets following the spin-off would have been but for the incorrect valuation." 481 F. Supp. 2d at 477.

As here, plaintiffs in *Register* did not allege that their distributions had been improperly computed. Rather, they only alleged that they would have received a greater distribution if a valuation other than that specified by the Plan had been used to calculate their vested benefits. The *Register* court determined that the "difference between what plaintiffs' accounts might have been worth had the CSI stock been properly valued during the spin-off and what the accounts actually were worth at the time of distribution is not a benefit that is promised under the terms of the ESOP [plan]." *Id.* at 478. As a result, plaintiffs were held to lack standing to sue under ERISA, and the same result applies in this case.

For all the reasons stated, the court finds that plaintiffs lack standing to bring this case. The court will nonetheless address the merits of those claims below.

**C.      The Claims Asserted In This Action Are Not Authorized Under ERISA.**

Assuming *arguendo* that plaintiffs had standing to sue under ERISA, their claims are nevertheless not permitted by ERISA. The causes of action that may be brought by an ERISA participant are exclusively listed in ERISA § 502(a). The only provision of §502(a) upon which plaintiffs rely here is §502(a)(3), which permits a participant, beneficiary or fiduciary to bring an action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan….

Section 502(a)(3) does not authorize a suit for money damages, yet plaintiffs' claims are nothing more that an impermissible attempt to recover money damages.

Recognizing that § 502(a) does not allow an award of money damages, plaintiffs couch their action as a request that this court, presumably pursuant to its inherent equitable power, compel HolliShare to: (1) correct all prohibited transactions and disgorge all profits; (2) revalue the JDS common shares held by the Plan; (3) revalue all retired participants' accounts as of the date of distribution and distribute the remaining

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-53-

balances; and (4) recover any tax loss incurred. (Dkt. 368, HAC, p. 66, 7-10; Dkt. 314; FAC, p. 41, 7-10.) Plaintiffs' attempts to circumvent the limitations of § 502(a)(3) fail.

Specifically, § 502(a)(3) authorizes a plan beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). The Supreme Court has construed this provision narrowly and has excluded claims for money damages "since that statute's [ERISA's] carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Associates*, 508 U.S. 248, 254 (1993) (quoting *Massachusetts Mutual Life Insurance Co. v. Russell, supra*, 473 U.S. at 146-47. The Supreme Court has limited the equitable relief available under this provision to "categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens*, 508 U.S. at 256 (emphasis in original); see also *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

No matter how plaintiffs attempt to disguise their claims, they effectively seek compensatory damages. They claim that they want to be "made whole" through a retroactive "sur-charge" based upon a revaluation of their previously-existing plan account -- one that would be based upon a judicial adjudication, not upon the terms of the Plan. (Dkt. 368, HAC, p. 66, 7-10; Dkt. 314; FAC, p. 41, 7-10.) However, it is clear that Plaintiffs simply seek funds in addition to the lump sum cash payments they have already received - *i.e.*, money damages.

Individual claims for money damages are not cognizable under ERISA. As the Supreme Court stated in *Great-West Life*:

> Almost invariably … suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty. And money damages are, of course, the classic form of legal relief.

534 U.S. at 210; see also *Mertens*, 508 U.S. at 255 (the term "appropriate equitable relief" as used in §

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

502(a)(3) does not encompass claims, however characterized, that are in reality requests for money damages); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005) (where plaintiff was not seeking recovery from any separate, segregated fund, plaintiff's claim was one for money damages, not one for equitable relief cognizable under ERISA).

Courts have consistently held that such "make whole" relief is not cognizable under § 502(a)(3). *Rego v. Westvaco Corp.*, 319 F.3d 140, 143-44 (4th Cir. 2003) (§ 502(a)(3) only authorizes "those categories of relief that were typically available in equity (such as injunction, mandamus and restitution), but not compensatory damages;" thus, plaintiff lacked standing under § 502(a)(3) to pursue his claim against defendants for not distributing his holdings in a savings plan in a timely manner); accord *Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 480 (6th Cir. 2001) (plaintiff not entitled to recover money damages under § 502(a)(3) when he sued for the amount he would have earned had the plan administrator followed his investment instructions at the appropriate time); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir. 1999) (plaintiff not entitled to recover difference between the return that he could have earned on funds during the time the plan administrator wrongfully withheld payment and the return that the plan earned during that period); *Amschwand v. Spherion Corp.*, 505 F.3d 342, 348 (5th Cir. 2007) (plaintiff's request for "a form of make-whole damages" was outside the scope of § 502(a)(3)); *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1359-60 (M.D. Ala. 2007) (§ 502(a)(3) did not afford plaintiffs relief for equitable estoppel claims because the remedy sought was really a legal remedy); *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527-28 (9th Cir. 1993).

Clearly, plaintiffs do not seek "typical" or "traditional" equitable relief. There is no evidence that any specific, identifiable funds have been set aside for the purpose of paying plaintiffs the difference between the book value of their JDS common shares and their purported higher "fair market value." Plaintiffs are simply seeking money damages from the commingled assets in Hollister's and JDS's general coffers.

Therefore, the relief sought by plaintiffs is not cognizable under ERISA § 502(a)(3), and the claims

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

asserted in this action are precluded under ERISA.

### D.   Plaintiffs' Primary Claims And The Applicable Legal Standards

#### 1.   Plaintiffs' Claims Under ERISA §§ 406(a) and 406(b)

Plaintiffs allege that defendants engaged in prohibited transactions in violation of § 406(a)(1)(A) based upon: (1) HolliShare's annual sales of JDS common shares to JDS purportedly for less than adequate consideration (as defined by ERISA § 3(18), 29 U.S.C. § 1002(18)); and (2) HolliShare's assumption in 1974 of certain promissory notes payable by JDS to former Hollister employees/JDS common shareholders. (Dkt. 368, HAC, Count XI; Dkt. 314, FAC, Count X; Dkt. 588, SPTS, p. 12.)   Plaintiffs also claim that defendants violated the prohibited transaction provisions of § 406(b)(2) by calculating the amount of their vested benefits under the Plan based upon the book value of the JDS common shares which was used to calculate their HolliShare account balances. (Dkt. 588, SPTS, p. 13.)

#### 2.   Plaintiffs' Claims That Defendants Violated The Prudent Man Standard Of Care Under ERISA § 404(a)(1)(B)

ERISA § 404(a)(1)(B) requires that an ERISA plan fiduciary act

> solely in the interest of the [plan] participants and beneficiaries and ... with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Defendants are alleged to have violated their fiduciary duties under § 404(a)(1)(B) primarily by: (1) valuing the JDS common shares held by the Plan at book value; (2) engaging in prohibited transactions by directing the Plan to sell its JDS common shares to JDS at a price equal to their book value; and (3) selling JDS common shares to JDS at their book value calculated on the basis of the prior December 31 book value and not the book value calculated at the end of the month of each repurchase transaction.

#### 3.   Plaintiffs' Claims That Defendants Breached Their Duty Of Loyalty Under ERISA § 404(a)(1)(A)

ERISA § 404(a)(1)(A) requires that an ERISA fiduciary act "for the exclusive purpose of … providing benefits to participants and their beneficiaries…" Plaintiffs allege that defendants breached their fiduciary duty to them individually under § 404(a)(1)(A) by valuing their individual HolliShare accounts

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

based on the book value of JDS's common shares in calculating their vested benefits.  Dkt. 368, HAC, Counts I, XII; Dkt. 314, FAC, Counts I, X; Dkt. 588, SPTS, p. 6.

Plaintiffs' claims under both §§ 404(a)(1)(B) and 404(a)(1)(A) are based on defendants' failure to maximize the vested benefits of the Plan participants and plaintiffs' own vested benefits by not calculating those benefits at a per share value for JDS's common shares higher than their book value.  For the numerous reasons detailed below, these claims have not been sustained.

### 4.     Plaintiffs' Burden of Proof

To establish a breach of fiduciary duty claim under ERISA, the burden is on a plaintiff to prove (1) a breach of a fiduciary duty and (2) loss or damage to the Plan resulting from the breach.  *Howell v. Motorola*, 633 F.3d 552, 565 (7th Cir. 2011); *Eckelkamp v. Beste*, 315 F.3d 863, 867 (8th Cir. 2002); *Chao v. Hall Holding Co.*, 285 F.3d 415, 430-38 (6th Cir. 2002); *Kuper v. Iovenko*, 66 F.3d 1447, 1459-60 (6th Cir. 1995); *McDonald v. Provident Indemnity Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); see also *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003); *In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 433 (3d Cir. 1996); *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 105-06 (2d Cir. 1998); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994).  As Judge Hollows noted in his December 1, 2008 Order, plaintiffs bear the burden of proof with respect to their ERISA breach of fiduciary duty claims. *DeFazio v. Hollister, Inc.*, Dkt. 430, 2008 WL 5113654 at *5 (E.D. Cal. 2008). Contrary to plaintiffs' position, the burden shifts to defendants if, and only if, plaintiffs meet their initial burden.  Then, defendants must establish that no loss or damage was caused by the particular breach of fiduciary duty. *Eckelkamp*, 315 F.3d at 867; *Roth*, 16 F.3d at 917.

Cases such as this, which involve decisions by ERISA fiduciaries to invest in employer securities, require an analysis of whether the fiduciaries acted "in good faith" to exempt their conduct under ERISA § 408(e) from violations of §§ 406 (a) and (b), and whether they complied with the "prudent man" and "loyalty" standards of §§ 404(a)(1)(B) and 404(a)(1)(A).  While couched in different terms, the test to be applied to prohibited transaction and breach of fiduciary duty claims is essentially the same and calls for

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

a two-step analysis: (a) did the fiduciaries act in good faith (under § 408(e)) and prudently and loyally (under § 404(a)); (b) by conducting a reasonable, thorough, and prudent investigation of the use of the prior December 31 book value that resulted in a good faith determination that book value was the fair market value of JDS common shares. *DeFazio v. Hollister, Inc.*, 636 F. Supp. 2d 1045, 1068 (n. 23) (E.D. Cal. 2009); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Donovan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir. 1983).

Based on the evidence introduced at trial, the court concludes that: (1) defendants acted "in good faith," prudently and loyally as required by §§ 408(e) and 404(a); and (2) HolliShare's receipt of millions of dollars, paid entirely in cash, upon its sales of the highly restricted, illiquid JDS common shares, resulted in the receipt by HolliShare (and ultimately its participants) of adequate consideration and the fair market value of those common shares.

As noted above, the prohibited transaction provisions of ERISA can be violated only by a fiduciary act, here by a breach of fiduciary duty. *Lockheed Corp. v. Spink*, 517 U.S. 882, 888-92 (1996). Thus, if the individual defendant fiduciaries did not breach their fiduciary duties under ERISA, neither they nor any of the other defendants violated the prohibited transaction provisions of §§ 406(a) or 406(b). For the following reasons, the fiduciary defendants fully complied with their fiduciary duties under ERISA.

**5.    Plaintiffs' Claims Predicated Upon The Prohibited Transaction And Fiduciary Duty Provisions Of ERISA Are Barred By The Settlor Doctrine.**

The terms of the Plan do not violate ERISA. As a result, application of the settlor doctrine bars all of plaintiffs' claims for violations of the prohibited transaction provisions of ERISA §§ 406(a) and (b) and for breach of any fiduciary duty under § 404(a).

Under the settlor doctrine, decisions concerning the design and structure of an ERISA plan are not fiduciary acts. Instead, an employer acts as a plan settlor in making such decisions. *E.g., Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 444 (1999). Consequently, defendants cannot be held liable under ERISA's prohibited transaction or fiduciary duty provisions for design decisions when the fiduciary is acting in his

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

or her settlor capacity.  See *DeFazio v. Hollister, Inc.*, 2007 WL 3231670, at \*4 (E.D. Cal. Nov. 1, 2007) (citing *Hughes*, 525 U.S. at 444; *Lockheed Corp. v. Spink*, 517 U.S. 882, 890-91 (1996)); *Bins v. Exxon Co.*, 220 F.3d 1042, 1047 (9th Cir. 2000)).  Indeed, ERISA neither requires employers to provide retirement plans nor dictates the retirement benefits to be provided:

> Congress sought to encourage employers to set up plans voluntarily by offering tax incentives, methods to limit fiduciary liability, means to contain administrative costs, and giving employers flexibility and control over matters such as whether or when to design a plan, how to amend a plan, when to terminate a plan, all of which are generally viewed as business decisions of a settlor, not of a fiduciary, and thus not subject to fiduciary obligations.

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511, 551 (S.D. Tex. 2003) (citing *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).  Accord, *In re Citigroup ERISA Litigation*, 662 F.3d 128, 145 (2d Cir. Oct. 19, 2011) ("Congress' intent was 'to create a system that is [not] so complex that administrative costs, or litigation expenses unduly discourage employers from offering [ERISA] plans in the first place.'").

In its November 1, 2007 Order, this court held that the settlor doctrine does not insulate defendants from liability for following the terms of the HolliShare trust instrument if those terms violate ERISA. *DeFazio v. Hollister, Inc.*, 2007 WL 3231670, at \*4 (E.D. Cal. Nov. 1, 2007).  The evidence at trial failed to establish that any terms of HolliShare violate ERISA.  As a result, the settlor doctrine is applicable and insulates defendants from any liability for any allegedly fiduciary acts under ERISA which arose from their adherence to the "design" (*i.e.*, the terms) of the Plan.

The settlor doctrine has been long recognized as applicable both to alleged violations of the prohibited transaction provisions of § 406 and those involving alleged breaches of fiduciary duty under § 404(a).  In *Lockheed Corp.*, *supra*, for example, the Supreme Court specifically addressed the applicability of the settlor doctrine to § 406 prohibited transaction claims, emphasizing that a fiduciary can only be liable for a prohibited transaction if it engages in the allegedly prohibited transaction while acting in a fiduciary capacity.  517 U.S. at 888-92.  There, an employee brought an action against his employer and several officers and directors, alleging that an amendment to the employer's retirement plan requiring

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

a waiver of claims against the employer as a condition to receiving early retirement benefits violated, among other provisions, ERISA's fiduciary duty and prohibited transaction provisions, §§ 404(a) and 406(a) and (b). *Id.* at 885-86. In determining whether the employer and the officers and directors acted as ERISA fiduciaries when they adopted the amendment at issue, the court explained that "plan design," including the act of amending the terms of a plan, are settlor functions. It thus concluded that the employer acted not as a fiduciary but as a settlor when it amended the terms of the plan. *Id.* at 890-91. Because "the only transactions rendered impermissible by § 406(a) are transactions caused by fiduciaries," the court found that this requirement of § 406(a) was not met because there were no fiduciary acts (as opposed to settlor acts) that violated the prohibited transaction provisions of ERISA. *Id.* at 889-91.[269]

Similarly, in *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101-02 (9th Cir. 2004), the Ninth Circuit applied the settlor doctrine in assessing liability for violations of ERISA's prohibited transaction and fiduciary duty provisions. At issue in *Wright* was a stock bonus plan, under which each participant's plan account was credited with a proportionate share of the securities held by that plan. Under the terms of the plan, participants were precluded from selling 15% of the amount of employer stock credited to their accounts. When a merger resulted in an increase in the value of the employer's stock, certain participants requested that the plan fiduciaries authorize participants to sell the remaining 15%, but the fiduciaries refused. Those participants then brought ERISA claims against the plan fiduciaries' claiming that their refusal to modify the limitation on the sale of employer stock violated ERISA's fiduciary duty and prohibited transaction provisions. In affirming the dismissal of these claims, the *Wright* Court held that "plan design" is a "settlor," not a fiduciary, function under ERISA and that, as a result, no claim under ERISA for a violation of its prohibited transaction or breach of its fiduciary duty provisions was actionable. *Id.* (citing *Lockheed*, 517 U.S. at 893; *Hughes*, 525 U.S. at 444).

*In re Dynegy, Inc. ERISA Litigation*, 309 F. Supp. 2d 861 (S.D. Tex. 2004), also entailed settlor issues similar to those present here. There, the court dismissed an ERISA claim which alleged that plan

---

[269] The prohibitions in §§ 406(a)(1) and 406(b) are limited, on their face, to actions by "a fiduciary."

fiduciaries "may not blindly follow the plan document if doing so leads to an imprudent result." *Id.* at 891. In *Dynegy*, the ERISA plan at issue provided that the employer's contributions to the plan were to be made in the form of stock in the employer. That stock had declined precipitously in value after accounting improprieties by the employer had been uncovered and disclosed. One count of plaintiff's complaint alleged that the committee that administered the plan had violated its fiduciary duties by continuing to accept employer contributions in the form of employer stock, the value of which had been shown to have been artificially inflated. Nonetheless, the *Dynegy* court still rejected this claim, holding that the design of the plan was a settlor function that did not implicate fiduciary duties imposed by ERISA. Consequently, the court held the plan committee had neither the responsibility nor the ability to depart from the mandates of the plan design, and dismissed that count of the complaint based on the committee's failure to do so. *Id.* at 890-92.

In this case, the "plan design" of HolliShare requires that the HolliShare Trustees invest virtually all of the Plan assets in JDS common shares, and specifies that those shares are to be valued at their per share book value. The decision to value JDS common shares at their book value was a "design" decision made when the Plan was created 38 years ago. The use of book value has been an integral component of the Plan's design from its inception. To encourage the formation of a retirement plan, ERISA affords an employer flexibility in designing a benefit plan. The settlor doctrine is a recognition of this principle. Thus, designing a plan (as opposed to administrating it) simply does not invoke ERISA fiduciary duties or obligations. See, e.g., *Beck v. Pace Int'l Union*, 551 U.S. 96, 101-02 (2007); *Lockheed*, 517 U.S. at 893; *Hughes*, 525 U.S. at 444; *Wright*, 360 F.3d at 1102; *Siskind v. Sperry Ret. Program, UNISYS*, 47 F.3d 498, 507 (2d Cir. 1995).

Moreover, given that the "plan design" of HolliShare mandates the investment to be made and the valuation procedures to be followed by Plan Trustees, any decision to override those terms would, in effect, constitute amending the Plan as it concerns the composition and design of the Plan itself. The settlor doctrine case law also establishes that the act of amending, or failing to amend, a plan is not a fiduciary

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-61-

act but instead a settlor act under ERISA. See, *e.g.*, *Hughes*, 525 U.S. at 444; *Lockheed*, 517 U.S. at 890-91; *Wright*, 360 F.3d at 1101-02; *Gannon v. NYSA-ILA Pension Trust Fund & Plan*, 2011 WL 868713 at *13-16 (S.D.N.Y. Mar. 11, 2011) (granting defendants' motion to dismiss a claim of breach of fiduciary duty under ERISA for failure to amend an employee welfare benefit plan, concluding that the act of amending, or failing to amend, is a settlor function free from ERISA's fiduciary obligations). As such, any decision to amend the Plan or not to amend the Plan constitutes a design decision, not a fiduciary act, and cannot support a claim for a violation of the prohibited transaction provisions of § 406 or a violation of the fiduciary duty provisions of § 404(a).

Under the clear and explicit holdings of the foregoing cases, coupled with the requirement of § 404(a)(1)(D) that plans be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]…," the settlor doctrine bars plaintiffs' claims for violations of the prohibited transaction provisions and breach of fiduciary duty provisions of ERISA.

### 6. Defendant Fiduciaries Are Presumed To Have Acted Prudently And Diligently.

Plan fiduciaries of an EIAP under ERISA enjoy a presumption – commonly referred to as the *Moench* presumption due to its recognition in *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995) – that they are acting prudently when they follow the terms of the ERISA plan. In *Moench*, a former employee claimed that the committee that managed the company's ESOP had violated its statutory duty of prudence under § 404(a)(1)(B) because it continued to authorize the investment of plan assets in employer securities when the employer's business was deteriorating. On appeal, the *Moench* court first considered the overall impact of a strict standard of review when assessing whether a plan fiduciary of an ESOP has breached his/her or its statutory duty of prudence by continuing to invest in employer securities when the employer was falling deeper and deeper into serious financial straits:

> [B]y subjecting an ERISA fiduciary's decision to invest in employer stock to strict judicial scrutiny, we essentially would render meaningless the ERISA provision excepting ESOPs from the duty to diversify. Moreover, we would risk

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

transforming ESOPs into ordinary pension benefit plans, which then would frustrate Congress' desire to encourage employee ownership. After all, why would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing? Further still, basic principles of trust law require that the interpretation of the terms of the trust be controlled by the settlor's intent. That principle is not well served in the long run by ignoring the general intent behind such plans in favor of giving beneficiaries the maximum opportunities to recover their losses.

62 F.3d at 570.

The *Moench* court then concluded that ERISA's goal and that of Congress in promoting employee ownership of their employer entitled the plan fiduciaries of an ESOP to a presumption of prudence:

[I]n the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

In attempting to rebut the presumption, the plaintiff may introduce evidence that "owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." Restatement (Second) § 227 cmt. g. As in all trust cases, in reviewing the fiduciary's actions, the court must be governed by the intent behind the trust -- in other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate. In determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive.

62 F.3d at 571-572.

In September 2010, in *Quan v. Computer Sciences Corp.*, 623 F.3d 870 (9th Cir. 2010), the Ninth Circuit joined the Third, Fifth, Sixth and Seventh Circuits in embracing the *Moench* presumption and applying it to defined contribution plans which offer stock in the employer. See *Edgar v. Avaya*, 503 F.3d 340, 345-48 (3d Cir. 2007); *Kirshbaum v. Reliant Energy*, 526 F.3d 243, 254 (5th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Pugh v. Tribune Co.*, 521 F.3d 686, 701-02 (7th Cir. 2008);

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003).[270]   No Court of Appeals has rejected the *Moench* presumption.

In *Quan*, the district court had granted summary judgment in favor of Computer Sciences Corp. ("CSC") in a class action brought by CSC employees who alleged CSC and plan fiduciaries had breached their ERISA duties by retaining company stock when it was no longer a prudent investment.  The district court concluded that CSC employees failed to establish that the temporary drop in CSC's stock price during the class period sufficiently demonstrated that the plan fiduciaries had a duty under ERISA to remove it from the plan, and concluded that the plaintiffs had failed to establish or create a triable issue linking any losses suffered by them to the allegedly imprudent investment.  *Quan*, 623 F.3d at 877.  On cross-motions for summary judgment, the court granted defendants' motion.

On appeal, the Ninth Circuit reviewed *de novo* the grant of summary judgment and affirmed.  In a well-reasoned decision, the Ninth Circuit carefully analyzed and balanced the tension between various provisions in the ERISA statutory framework which had generated concern from the Ninth Circuit in two prior cases,[271]  and concluded those concerns were illusory.  It then adopted the *Moench* presumption, stating:

> The presumption is consistent with the statutory language of ERISA and the trust principles by which ERISA is interpreted, whether the plan is an ESOP or other EIAP. [citation omitted]  At its core, our objection to adopting the *Moench* presumption in *Wright* was that it was not sufficiently deferential to or protective of fiduciaries, not that it placed too great a burden on those asserting breach-of-fiduciary-duty claims.  We believe that if properly formulated, the *Moench* presumption can strike the appropriate balance between the employee ownership purpose of ESOPs and other EIAPs, and ERISA's goal of ensuring proper management of such plans.
>
> * * *
>
> We adopt the *Moench* presumption because it provides a substantial shield to

---

[270]     After the trial, the Second Circuit became the latest circuit to adopt the *Moench* presumption. *In re Citigroup ERISA Litigation, supra*, 662 F.3d at 137-138.

[271]     *Wright, supra*, 360 F.3d at 1097; *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir. 2008).

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-64-

fiduciaries when plan terms require or encourage the fiduciary to invest primarily in employer stock.  Fiduciaries are not expected to predict the future of the company stock's performance; without the *Moench* presumption, a fiduciary "could be sued for not selling if he adhered to the plan [and the company stock dropped], but also sued for deviating from the plan [and selling] if the stock rebounded." Moreover, the "long-term horizon of retirement investing" requires protecting fiduciaries from pressure to divest when the company's stock drops.

*Quan*, 623 F.3d at 881-882 (citations omitted).  The court also articulated the burden a plaintiff faced in rebutting the *Moench* presumption:

To overcome the presumption of prudent investment, plaintiffs must therefore make allegations that "clearly implicate []the company's viability as an ongoing concern" or show "a precipitous decline in the employer's stock … combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." ... It will not be enough for plaintiffs to prove that the company's stock was not a "prudent" investment or that defendants ignored a decline in stock price.  Plan participants can only rebut the *Moench* presumption by showing publicly known facts that would trigger the kind of "careful and impartial investigation" by a reasonable fiduciary that the plan's fiduciary failed to perform.

623 F.3d at 882 (citation omitted).[272]    Finding that the plaintiffs failed to prevent evidence sufficient to

---

[272]    The *Moench* presumption was applied and held not sufficiently rebutted in numerous cases involving circumstances far more egregious than those present here. *See, e.g.*, *In re UBS AG ERISA Litigation*, 2011 WL 1344734, at *6-9 (S.D.N.Y. Mar. 24, 2011) (*Moench* presumption applied to dismiss a class action rising out of the subprime mortgage crisis of 2007 - as a result of which UBS had to write down approximately $42 billion of its troubled assets and bought back $83 billion of auction rate securities, paid a $150 million fine and $780 million to the federal government following a Department of Justice investigation); *In re Wachovia Corp. ERISA Litigation*, 2010 WL 3081359, at *13-14 (W.D.N.C. August 6, 2010) (87% decrease in stock value combined with alleged improper business and accounting practices were insufficient to overcome presumption of prudence); *In re Lehman Bros. Securities & ERISA Litigation*, 683 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (stock decline in $2.8 billion loss held insufficient to show fiduciary knew that Lehman "was about to fold"); *In re American Express Co. ERISA Litigation*, 762 F. Supp. 2d 614, 629 (S.D.N.Y. 2010) (fiduciary defendants failed to remove employer's stock as an option in its ERISA plan even though the employer was reported eligible for a $3.39 billion "bailout" funds from the United States Treasury and the employer's stock lost over 77% of its market value in one year); *In re Citigroup*, 2009 WL 2762708 at *18 (52% drop in stock price combined with allegations of a pattern of risky loan practices and losses of tens of billions of dollars held insufficient to overcome presumption of prudence); *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 407-08 (7th Cir. 2006) (plan fiduciaries failed to diversify an ESOP even after the price of the company's stock had dropped by over 50% and its CEO acknowledged the "company is 'in a struggle just to survive …[and was] hemorrhaging money.'").

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-65-

rebut the *Moench* presumption of prudence, the district court's judgment was affirmed. *Id.* at 884.

As explained more fully below, plaintiffs here failed to overcome the *Moench* presumption here.

**E.      The Ownership And Transfer Restrictions, JDS's Rights of Repurchase, And The Pricing Formula In The JDS Articles Are Valid And Fully Enforceable.**

As discussed below, in determining that the prior December 31 book value was the fair market value of JDS common shares, the HolliShare Trustees gave substantial weight to the impact of the transfer restrictions and repurchase rights of the JDS Articles on the amount that could be realized for the Plan's JDS common shares. Ownership and transfer restrictions, repurchase rights, or price formulae in the corporate charters, by-laws, articles of incorporation, or shareholder or buy/sell agreements of close corporations have been and are common, time honored, and have been historically held to be valid and enforceable. The validity and enforceability of transfer restrictions, rights of repurchase, and price formulae regarding the stock of a corporation are determined under the law of the state of incorporation, which in this case is Illinois. *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621 (1983) (application of the law of the state of incorporation achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation).

**1.      JDS's Inclusion Of Ownership And Transfer Restrictions, Rights Of Repurchase And A Pricing Formula In Its Articles Is Expressly Authorized Under Illinois Law And Has Been Uniformly Enforced By Illinois Courts.**

The Illinois Business Corporation Act ("BCA") expressly authorizes the inclusion of stock restrictions in corporate charters, by-laws, and shareholder agreements. 805 ILCS 5/6.66 (2010). In 1978, JDS elected to become a "Close Corporation" under the BCA. Once JDS elected to become a "Close Corporation," any transfer restrictions previously applicable to JDS's stock under § 6.55 of the BCA remained valid and in full force and effect.

Given their express statutory authorization, Illinois courts have consistently enforced ownership and stock transfer restrictions and/or price formulae similar or identical to those present here. Often, the

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-66-

price formula is, as here, based on book value. *See, e.g.*: *American Rubber & Plastics Corp. v. First Nat'l Bank*, 277 N.E.2d 840, 842 (Ill. 1971)  (corporation's right of first refusal to buy corporate stock in a closely held corporation held binding upon all subsequent distributees, including third person purchasers); *Vogel v. Melish*, 203 N.E. 2d 411, 413 (Ill. 1964) (shareholder agreement which gave shareholders in a closely held corporation a right of first refusal to buy others' shares based upon a maximum price not to exceed 115% of the shares' book value held valid and fully enforceable); *Arentsen v. Sherman Towel Service Corp.*, 185 N.E. 822, 826-27 (Ill. 1933) (provisions in a corporation's articles of incorporation authorizing the corporation to repurchase stock from an employee at book value, held valid and specifically enforceable in Illinois).

The Illinois legislature and Illinois courts have consistently authorized, upheld, and sustained the validity and enforceability of transfer restrictions, rights of repurchase, and purchase or repurchase prices similar to those contained in the JDS Articles.   The court has already held that the ownership and transfer restrictions and repurchase rights are not pre-empted by ERISA. *DeFazio, supra*, 636 F. Supp. 2d at 1071 (E.D. Cal. 2009).

### 2.   Courts In Other Jurisdictions Have Also Consistently Upheld And Enforced Similar Stock Restrictions And Repurchase Prices Based On Book Value.

While there is no universally accepted method to determine the fair market value of closely held corporate stock,[273] a method commonly used in a restricted stock agreement has been to tie the fair market value to the shares' book value. *Claire v. Wigdor*, 266 N.Y.S.2d 6, 8-9 (N.Y. App. Div. 1965) (when accepted accounting principles are used, "a book value for closely-held stock was objectively ascertainable and thus sufficiently provided a standard for the granting of equitable relief."); *First Nat'l Bank of Montclaire v. Coldwell*, 145 N.Y.S.2d 674, 678-79 (N.Y. App. Div. 1955) (close corporation's right upheld

[273]   The valuation of closely held corporate stock for purposes of a buyout or repurchase pursuant to a transfer restriction is not an exact science, and does not lend itself to any specific formula or textbook calculation. *Snyder's Estate v. United States*, 285 F.2d 857, 861 (4th Cir. 1961).

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

to enforce voting trust agreement which gave it the right to repurchase its shares at their book value as determined by the corporation's directors).

Furthermore, where the repurchase price of closely held shares is to be determined by their book value, it is also common for a by-law, or shareholders' agreement, etc., to provide that the book value is to be determined, as here, according to "generally accepted accounting principles" or a similar provision. Such provisions have uniformly been upheld. *See, e.g.*, *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1160 (Utah 2003) (book value standard for valuing closely held shares to be calculated "according to generally accepted accounting principles" sustained, noting: "(B)y selecting compliance with GAAP as the valuation methodology, Mr. Smith and Grand Canyon substantially narrowed the role of any implied legal or factual elements in defining their shared expectations."); *Jones v. Harris*, 388 P.2d 539, 542-43 (Wash. 1964) (the term "book value" has a "generally accepted meaning," and is enforceable as a determinant of the repurchase price of shares in a closely held corporation: "'Book value' normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities."); *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 436 (Mo. App. 1996) ("book value" restriction on a corporation's stock determined by "general accounting principles consistently applied in accounting for the corporation's operations" was supported by sufficient consideration, was unambiguous and would be enforced); *Stern v. Birnbaum*, 615 N.Y.S.2d 62, 63 (N.Y. App. Div. 1994) (repurchase price of closely held shares based upon their "book value" was "not an ambiguous term;" application of book value in accordance with accepted accounting practices held final and binding upon the parties); *Hollister v. Fiedler*, 92 A.2d 52, 57 (N.J. Super. Ct. App. Div. 1952) (the use of "book value" to value the price of the shares in a closely held corporation "is not an arbitrary value that may be entered upon the books of a corporation but is predicated on the market value of the assets of a corporation after deducting its liabilities" [citation omitted]).

### 3. Repurchase Prices Fixed By Stock Restrictions Are Upheld Even If They Are Significantly Less Than The Shares' Unrestricted Fair Market Value.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

Courts in Illinois and elsewhere have consistently enforced stock restrictions and repurchase price formulae, even if enforcement results in a valuation and a sale of the restricted shares at a price significantly less than the shares' unrestricted fair market value - provided that the formula price per share was fair at the time the restriction was created.

For example, in *Yeng Sue Chow v. Levy Strauss & Co.*, 49 Cal.App.4th 315 (1st Dist. 1975), the corporation's right to repurchase shares at book value was upheld despite the fact that the value of the shares tripled 10 months later when the corporation went public. The court so held because the shares were in a close corporation and thus the book value price was fair and justified. *Id.* at 322-324. See also *Cutter Labs., Inc. v. Twining*, 221 Cal. App. 2d 302 (1st Dist. 1963) (stock buy-back provision enforced even though the corporation repurchased its stock for $36,000 when its unrestricted market value was $800,000).

More recently, in *Estate of Cohen v. Booth Computers*, 22 A.2d 991 (N.J. App. July 13, 2011), a partnership asserted its right under a partnership agreement to repurchase a deceased partner's stock for its book value of $177,808.50. The decedent's estate claimed that the actual "fair market value" of the stock was $11,526,162, and contended that the substantial disparity between book value and an appraised fair market value rendered the partnership agreement unconscionable. Rejecting this contention, the *Estate of Cohen* court held that:

> Disparity in price between book value and fair market value, where a buyout provision is clear, is not sufficient to "shock the judicial conscience" and to warrant application of the doctrine of unconscionability. This view is consistent with the basic principle that where the terms of the contract are clear, it is not the court's function to make a better contract for either of the parties.

22 A.3d at 1006.

Even though a significant disparity may exist between the actual or "fair market" value of the stock and the formula price when the restrictions are applied, the price restrictions will be sustained provided that the restrictions were fair at the time they were made. Thus, in *Jones v. Harris*, 388 P.2d at 563, the Washington Supreme Court enforced a restricted stock agreement which required minority shareholders to sell their stock back to the majority shareholders at book value, even though the book value of the shares

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

was $91,000 and their unrestricted fair market value, established by experts at trial, was $2.5 million; the court noted that the agreement was fair and equitable when made by the parties. And in *Rosiny v. Schmidt*, 587 N.Y.S.2d 929, 932 (N.Y. App. Div. 1992), a stock restriction which required the estate of two deceased shareholders in a close corporation to sell their shares to the surviving shareholders at book value even though the book value of the shares was $200 per share and the unrestricted fair market value was $4,225 per share was upheld because it was fair when made. In *McCreery v. R.S.A. Mgmt., Inc.*, 287 S.E.2d 203, 205 (Ga. 1982), a book value pricing formula was enforced even though the book value was zero.

In sum, a restricted stock agreement, which requires the owner of stock in a closely held corporation to give the corporation or the other stockholders an option to purchase his stock under certain circumstances at a specified price, which often is its existing book value, is valid, reasonable, and fully enforceable provided that the agreement was fair and reasonable when made.

### 4. Enforcement Of Valid Stock Restrictions, Including A Pricing Formula, Does Not Constitute A Breach Of Fiduciary Duty.

It is also well established that enforcement of a restricted stock agreement does not constitute a breach of the fiduciary duty of loyalty or good faith by the enforcing party, even when the agreed-upon repurchase or buyout price for the corporation's shares is substantially less than their unrestricted fair market value. *Blank v. Chelmsford Ob/Gyn, P.C.*, 649 N.E.2d 1102, 1106 (Mass. 1995) (questions of good faith and loyalty do not arise when all the stockholders in advance enter into agreements concerning the purchase of stock of a withdrawing or a deceased stockholder because the stockholders receive all that they had bargained for which in this instance was the stock's book value); *Gallagher v. Lambert*, 549 N.E.2d 136, 137-38 (N.Y. 1989) (restricted stock agreements "define the scope of the relevant fiduciary duty and supply certainty of obligation to each side. They should not be undone simply upon an allegation of unfairness."); *Evangelista v. Holland*, 537 N.E.2d 589, 592 (Mass. App. Ct. 1989) ("[q]uestions of good faith and loyalty do not arise when all the stockholders in advance enter into an agreement for the purchase of stock of a withdrawing or deceased shareholder"); *Unigroup, Inc. v. O'Rourke Storage & Transfer*, 980

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-70-

F.2d 1217, 1221 (8th Cir. 1992) (simply because directors are deemed fiduciaries, they do not owe a duty to pay anything other than book value which is articulated in the corporate repurchase by-law); *Renberg v. Zarrow*, 667 P.2d 465, 472 (Okla. 1983) (enforcement of a restricted stock agreement which resulted in a purchase for less than [the] actual value of the stock "does not subject the agreement to attack as a breach of the relation of trust and confidence"); *Estate of Meller v. Adolf Meller Co.*, 554 A.2d 648, 652 (R.I. 1989) (when a restricted stock agreement was fair when made, "there is no equitable duty on the part of the other shareholders to revise, update or change the redemption price in the absence of an agreement to do so").

### 5. The Stock Restrictions In The JDS Articles Were Fair And Reasonable When Made.

As noted above, the reasonableness of stock restrictions is to be measured at the time they were first made. The ownership and transfer restrictions, rights of repurchase, and price formula in the JDS Articles were fair and equitable when measured by the circumstances prevailing in 1956 when the restrictions and price formula at issue were first created. At that time, Schneider first investigated and determined how the fair market value of JDS's common shares should be calculated. As noted above, JDS was a closely-held family business until it was incorporated in 1956.[274] It was incorporated specifically to provide a vehicle for employee ownership.[275] In order to perpetuate family and employee ownership of JDS, Schneider at that time inserted into JDS's original by-laws essentially the very same ownership and transfer restrictions, JDS's repurchase rights, and the book value pricing mechanism that are now in JDS's Articles.[276] Schneider was so wedded to these provisions that in 1972, in order to further highlight them, they were transferred from JDS's by-laws to its Articles of Incorporation so that they were a matter of public

---

[274]    DX 635B, H02220; DX 527, H22150-22154; Zwirner Tr. 2235:8-10.

[275]    Zwirner Tr. 2238:11-15.

[276]    DX 635B, H02222; Zwirner Tr. 2251:9-2252-7.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-71-

record.[277]

Seventeen years after the transfer restrictions, rights of repurchase, and book value pricing system had been first made part of JDS's by-laws, and one year after they had been moved to its Articles, HolliShare was created.[278] The ownership and transfer restrictions placed on JDS's shares, and JDS's rights of repurchase, had served their intended purpose of maintaining JDS as private and insuring its continued employee ownership. The book value method for calculating the fair market value of JDS's shares had, at that time, also been used for many years and had also served its intended purpose. For numerous reasons, Schneider believed the use of the book value system was the best method available to value JDS's common shares.[279]

These were the prevailing circumstances when this decision was made to expressly incorporate into the HolliShare trust instrument the ownership and transfer restrictions, JDS's rights of repurchase, and the book value system. These decisions were fair and equitable when made.

**F.    Defendants Are Entitled To Judgment On Plaintiffs' Claims That HolliShare Sold JDS Shares For Less Than Adequate Consideration.**

With the above facts in mind, the court will now address plaintiffs' claim that HolliShare sold JDS shares for less than adequate consideration.

**1.    The Goals Of ERISA, "Prohibited Transactions" Under ERISA, And The Statutory Scheme**

ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1091-92 (E.D. Cal. 2005) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)); *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980). In that regard, ERISA encourages the creation of

---

[277]    Dx 529; Zwirner Tr. 2246:10-2247:7.

[278]    DX 502.

[279]    Zwirner Tr. 2251:9-2253:21.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-72-

retirement plans that, like HolliShare, give employees a financial stake in the success of their employers. *Quan v. Computer Sciences Corp.*, 623 F.3d 870, 879 (9th Cir. 2010); *Wright*, 360 F.3d at 1097; *In re Citigroup ERISA Litigation, supra*, 2011 WL 4950368 at *10 ("Congress has expressed concern that its goal of encouraging employee ownership could 'be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans'").[280]

However, ERISA serves only to protect and preserve employees' rights to their promised retirement benefits; it does not mandate that employees be provided with any minimum level of benefits, or for that matter, any benefits at all. *Wright*, 360 F.3d at 1100 (quoting *Collins v. Pension & Ins. Comm'n of S. Cal. Rock Products & Ready Mixed Concrete Ass'n*, 144 F.3d 1279, 1282 (9th Cir. 1998)); *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 370-71, 374 (D.C. Cir. 1989); *Krueger Int'l, Inc. v. Blank*, 225 F.3d 806, 812 (7th Cir. 2000). Nor does ERISA impose upon plan trustees any duty to maximize financial benefits. *Id.* See also *Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2009 WL 535779, at *8-10 (D. Conn. Mar. 3, 2009), aff'd 555 F.3d 1 (1st Cir. 2009).

ERISA Section 406, 29 U.S.C. § 1106, does, however, establish a blanket prohibition on certain transactions, including the sale or exchange of property between an ERISA plan and a "party in interest,"

---

[280] The *Citigroup* court quoted from the statement of Congressional purpose set forth in the Tax Reform Act of 1976, which provides:

INTENT OF CONGRESS CONCERNING EMPLOYEE STOCK OWNERSHIP PLANS

The Congress, in a series of laws... has made clear its interest in encouraging employee stock ownership plans [ESOPs] as a bold and innovative method of strengthening the free private enterprise system which will solve the dual problems of securing capital funds for necessary capital growth and of bringing about stock ownership by all corporate employees. The Congress is deeply concerned that the objectives sought by this series of laws will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans, which reduce the freedom of the employee trust and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans ....

P.L. 94-455, October 4, 1976, 90 Stat. 1520.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-73-

because such transactions "entail a high potential for abuse." *Donovan v. Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983). Specifically – and subject to the exception discussed below – § 406(a)(1)(A) precludes a plan fiduciary from causing the plan to engage in a transaction that "constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest." As the parent corporation of Hollister, JDS is a "party in interest" under ERISA § 3(14)(E), 29 U.S.C. § 1002 (14)(E). ERISA § 406(b)(2) provides that an ERISA fiduciary shall not "in his individual, or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries…."

### 2. The Exemption For Sales Of Employer Stock By Eligible Individual Account Plans

ERISA Section 408(e), 29 U.S.C. § 1108(e), creates an exemption for transactions in employer securities that essentially swallows the "prohibited transaction" rule. Section 408(e) provides:

> Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities ...
>
> (1)   if such acquisition, sale, or lease is for adequate consideration ...
>
> (2)   if no commission is charged with respect thereto,[ ] and
>
> (3)   if -
>
>       (A)   the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title),…

HolliShare is an "eligible individual account plan" ("EIAP") under ERISA.[281]

EIAPs enjoy a favored status under ERISA. For example, in *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 956 (D.C. Cir. 1985)), the Ninth Circuit observed that "EIAPs are exempt from certain ERISA provisions because of the strong policy and preference in favor of investment in employer stock." Consequently, the *Wright* Court held that defendants did not violate their fiduciary duties under ERISA by refusing to permit

---

[281]   Stipulation of Facts, ¶¶ 26-27.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

the liquidation of an employer's stock in an EIAP even though the liquidation would have allowed the plan and its participants to benefit from an appreciation in the stock's value as a result of a recent acquisition.

Defendants rely upon the exemption of § 408(e) as a defense to plaintiffs' prohibited transaction claims. Thus, the key question is whether, under the circumstances, the sales by HolliShare of JDS common shares to JDS, at their book value, were for "adequate consideration."

Under ERISA, when a security has no generally recognized market (as is the case here) the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." ERISA § 3(18); see also 29 C.F.R. § 2550.408e (cross-referencing 29 U.S.C. § 1002(18) in defining "adequate consideration" for purposes of § 1108(e)). No regulations have yet been promulgated by the Secretary of Labor.[282] Whether a particular transaction with an interested party is exempted under § 408(e) depends upon the conduct of the fiduciaries at the time of the challenged transaction. *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir. 1983)); *Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050, 1064 (D. Ariz. 1995) ("Good faith requires that the trustees of the Plan have used a prudent method of determining value."), *aff'd* 107 F.3d 877 (9th Cir. 1997).

### 3. The Fiduciary Defendants Conducted A Reasonable and Thorough Investigation Of The Fair Market Value Of JDS's Common Shares.

The required scope and nature of the trustees' investigation to determine fair market value depends upon the circumstances that existed at the time of the challenged transaction. *Keach v. U.S. Trust Co.*, 419

---

[282] Plaintiffs rely heavily upon the Department of Labor's "Proposed Regulation Relating to the Definition of Adequate Consideration", 53 Fed. Reg. 17632 (May 17, 1988). As the court previously held, however, courts "decline to take cognizance of the proposed regulations . . . because a proposed regulation does not represent an agency's considered interpretation of its statute." *DeFazio v. Hollister, Inc.*, No. 04-1358, 2007 WL 3231670, at *10 (E.D. Cal. Nov. 1, 2007); *see Draper v. Baker Hughes Inc.*, 892 F. Supp. 1287, 1293 (E.D. Cal. 1995) (the court disregarded a proposed regulation issued by the Department of the Treasury relating to the COBRA statute, noting that "almost a decade has passed since COBRA's Enactment, and the promised regulatory guidelines have not materialized.").

F.3d 626, 637 (7th Cir. 2005) (the sufficiency of the fiduciary's investigation should be evaluated "within the context of the totality of the circumstances"); *Donovan*, 716 F.2d at 1467-68 (noting that fiduciaries must determine fair market value based upon "a prudent investigation in the circumstances then prevailing"); *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 619 (2d Cir. 2006) ("whether a fiduciary has made a proper determination of fair market value depends on whether the parties are well-informed about the asset and the market for that asset." (internal quotation marks omitted)).

### a.    The Circumstances Prevailing In 1973

When HolliShare was established in 1973, Schneider had been utilizing the book value system with success for 17 years. Zwirner testified that, as of 1973, Schneider wanted to continue to use the book value system because: (1) the use of book value enabled Schneider to share the profits of the company with the employees; (2) the use of book value helped protect the liquidity of JDS and Hollister by permitting them to project their cash needs and cash flow; (3) the use of book value avoided the expense and cost of outside appraisals which neither JDS nor Hollister could afford at that time, as well as the effect of outside factors that would need to be taken into account; (4) the use of book value was fair to both the company and to the employee-shareholders, for whom it acted as an incentive and reward, and (5) the book value system had been used successfully from 1956 to 1971, when Zwirner met Schneider, and he thought it worked well.[283] With respect to appraisals, Schneider had adverse experiences with varying valuations determined by real estate appraisers in transactions that were not particularly large.[284]

In 1973, Hollister was not the global company it is today. At that time, Hollister was a small company and was just beginning to grow.[285] However, Schneider was familiar with the huge increase in

---

[283]    Zwirner Tr. 2251:14-2253:21; Winn Tr. 639:18-640:18; Herbert Tr. 1616:7-11.

[284]    Zwirner Tr. 2253:5-16.

[285]    DX 761; Zwirner Tr. 2225:3-16.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

the profitability of JDS between 1956 and 1973.[286]  He knew the future business prospects for Hollister depended on the efforts of its employees and he wanted to reward and incentivize deserving employees.[287] Strongly committed to the belief that if the employees were given an ownership interest in the company they would become more dedicated and should therefore be entitled to reap the benefits of their efforts, he selected JDS common shares as the principal investment for HolliShare.[288]  History has proven he was prudent to do so.

The court concludes that under the circumstances prevailing in 1973, Schneider's investigation into the determination of the fair market value of the JDS common shares was prudent, adequate, reasonable, and thorough.  Zwirner learned from Schneider the considerations, discussed above, that led to the use of the book value system at JDS.[289]   He concurred with Mr. Schneider's views.[290]  His familiarity with the book value system was considered by him in connection with HolliShare's subsequent sales of its JDS common shares.[291]

Similarly, the ownership and transfer restrictions, rights of repurchase, and the book value pricing requirement, are valid, enforceable, and severely limited the market for JDS common shares. (See __, *infra*.)  In 1973, these provisions had been in place for 17 years and had also served JDS, Hollister, and their employees well.  The restricted nature of JDS common shares, HolliShare's primary asset, was carefully considered by Schneider when he conducted his 1973 investigation into the fair market value of JDS's common shares. See *DeFazio*, 636 F. Supp. 2d at 1069 ("Before the accounting rules of an ERISA

---

[286]   DX 635B, H02221.

[287]   *Id.*, H02222-H02223.

[288]   DX 502, H03097.

[289]   Zwirner Tr. 2251:9-2253:16.

[290]   Zwirner Tr. 2253:22-24.

[291]   Zwirner Tr. 2358:24-2362:16.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-77-

plan can be applied, the basic terms of the asset to be accounted for must be determined.  That is what the [shareholder agreement] does - it defines the bundle of rights to which a shareholder (whether a direct shareholder or a shareholder through an ERISA plan) is entitled", quoting *Krueger Int'l, Inc. v. Blank*, 225 F.3d 806, 812 (7th Cir. 2000)); see also *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 370-71, 374 (D.C. Cir. 1989) (upholding a plan's valuation of closely-held stock based upon the valuation method specified in the corporation's certificate of incorporation).

The court concludes that the investigation conducted in 1973 by Schneider and the HolliShare Trustees to determine the fair market value of JDS common shares was conducted in good faith in compliance with ERISA § 408(e) and with the care, skill, prudence, and loyalty required by ERISA §§ 404(a)(1)(B) and 404(a)(1)(A).

### b.        The Circumstances Prevailing After 1973

After 1973, after HolliShare became effective, every year the HolliShare Trustees have undertaken an investigation to verify that book value is the fair market value of the shares.  In doing so, they take into consideration all of the circumstances that may be relevant to the sale, including, but not limited to: (a) the impact of the ownership and transfer restrictions and the repurchase rights of JDS on the price attainable by HolliShare for its JDS common shares; (b) the value that HolliShare could otherwise obtain for the JDS common shares; (c) the business prospects for Hollister, including a review of its financial statements, balance sheet and general business conditions; (d) HolliShare's cash needs for the forthcoming year; (e) the provisions of the HolliShare trust instrument; (f) potential buyers; (g) the rate of return to the participants that is being generated by the sale; (h) the book value of JDS common shares as reflected by JDS's audited financial statements; (i) whether there have been any changes in the law, particularly in ERISA, that would affect the Plan; (j) the historical returns generated by investments in JDS common shares; (k) the lack of any objection from the DOL. following its multiple audits of the Plan; (l) the issuances of multiple Internal Revenue Service ("IRS") determination letters essentially reaffirming that the Plan complies with Internal Revenue Code and ERISA regulations; (m) knowledge that the federal

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

estate tax returns of Minnie Schneider and Frank Walker, showing their JDS stock valued at book value, were accepted by the IRS; and (n) any other changes that would warrant a change in their conclusion.[292]

After considering each of these factors, the HolliShare Trustees have consistently concluded that book value is the fair market value of the JDS common shares because it is the only price obtainable for the JDS common shares held by the Plan.[293] Their careful consideration of these factors establishes that the HolliShare Trustees conducted a prudent, diligent, and loyal investigation of the fair market value of JDS's common shares.[294]

By virtue of their respective corporate positions, these HolliShare Trustees have been conversant with the business of Hollister including (without limitation) the ownership and transfer restrictions, JDS's repurchase rights, and the book value formula in the JDS Articles. As long-term, high-ranking Hollister managers, they also knew that JDS's historical practice was to always exercise its right to pay book value for any JDS common shares offered for sale. The Trustees were also aware of JDS's consistent, historical practice of redeeming any JDS common shares that were offered for sale for the book value of those shares. They also knew that since HolliShare's inception, every purchase and sale of a JDS common share had, over decades, complied with the various restrictions in the JDS Articles. They knew that each and every vested benefit payable by HolliShare had, since 1973, been paid in full. They also believed that compliance with the JDS ownership, transfer, and repurchase restrictions, and the book value pricing system were consistent with the Schneider Policies and Principles, and that continued adherence to those

[292]    Zwirner Tr. 2358:15-2363:7; McCormack Tr. 1164:16-1167:22; Karlovsky Tr. 366:13-368:8; Brilliant Tr. 1365:24-1366:15.

[293]    Zwirner Tr. 2363:2-7; McCormack Tr. 1164:6-1165:1.

[294]    Consistent with their propensity to mischaracterize the record evidence, plaintiffs seize on Brilliant's testimony that he had not read the JDS Articles before his deposition was taken. Brilliant Tr. 1226:18-1277:10. However, Brilliant also testified that he was aware of the transfer restrictions and repurchase rights because he had personally purchased JDS common shares before he became a HolliShare Trustee, and those restrictions and rights were described by the Offering Circular provided to prospective direct purchasers of JDS common shares. Brilliant Tr. 1277:23-1278:20.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-79-

Policies and Principles had been and would continue to be vital to Hollister's finances and its business success.[295]

The HolliShare Trustees also considered, as discussed below, the lack of regulatory action by the DOL after conducting multiple audits of HolliShare, and the issuance by the IRS of determination letters pertaining to HolliShare. Zwirner had personal knowledge of the acceptance by the IRS of estate tax returns in which the decedent's holdings of JDS common shares were valued at the book value.[296]

Under these prevailing circumstances, the HolliShare Trustees have, each year, in good faith and in compliance with § 408(e), conducted a reasonable, adequate, and prudent investigation and they have done so with the care, skill, prudence, and loyalty required by §§ 404(a)(1)(B) and 404(a)(1)(A).

Plaintiffs did not offer any evidence that: (a) JDS had ever stopped or ever intended to stop exercising its repurchase rights; (b) JDS had ever waived those rights (or would do so in the future); (c) any book value computation by JDS was ever in compliance with GAAP; or (d) the HolliShare Trustees realistically could have sold JDS common shares entirely for cash at any price other than the prior December 31 book value of JDS common shares.[297] Plaintiffs have also failed to prove how or why any "investigation" by the HolliShare Trustees of the value of JDS common shares could have reasonably led to the conclusion that those shares could be sold for more than their prior December 31 book value - even

---

[295]    DX 635B, H02230-H02235; DX 641, H10969.

[296]    Zwirner Tr. 2398:10-2404:3.

[297]    "Fair market value" is defined as a value measured in cash or cash equivalents. Grabowski Tr. 2538:24-2539:25. Throughout the trial, plaintiffs referred to the receipt by direct shareholders of the current month end book value, and contended that HolliShare's sales for the comparative lower, prior year-end book value therefore resulted in HolliShare's receipt of less than fair market value (and hence, that the sales were for less than adequate consideration). The fact that direct shareholders were paid through a combination of cash and a long-term subordinated promissory note means, by definition, that the current month end book value was *not* the fair market value of JDS common shares. Korschot, Ellis's valuation expert, admitted that his ostensible appraised "fair market value" of JDS common shares owned by HolliShare as of December 31, 2003 would not be the "fair market value" of the common shares owned by the direct shareholders. Korschot Tr. 1701-1703.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

if some hypothetical, ostensible "fair market" valuation of those shares exceeded their book value.

To the contrary, the evidence established that an analysis was conducted at Hollister regarding whether some other valuation methodology would be superior to the established book value system (particularly consideration of the possible formation of an ESOP during a 1997-1998 "Capitalization Study"), but Hollister affirmatively determined that the continued use of book value provided the best prospects for favorable returns to all JDS shareholders and best met Hollister's business needs.[298] During the Capitalization Study and at various other times, JDS and Hollister internal documents referred to JDS common shares as potentially having values several times book value (see Winn Tr.: 101:18-25), but the evidence made it crystal clear that these references were to the value the share might have *absent the restrictions on the shares*.[299] The restrictions do, in fact, exist. Thus, in the real world, the actual fair market value of JDS common shares was dictated by those restrictions. Any valuation of JDS common shares greater than book value was therefore purely theoretical and unattainable, and thus was not the fair market value of JDS common shares.

Accordingly, the court concludes that under the totality of the circumstances which existed from 1973 to the present, the HolliShare Trustees and the other defendant fiduciaries conducted a reasonable and thorough investigation of the fair market value of the common shares of JDS, and acted in good faith, prudently, and loyally in deciding that their fair market value was equal to their book value.

### 4. Well-Founded Decisional Law Supports The Defendants' Compliance With Their Fiduciary Duties Of Prudence And Loyalty.

Defendants' compliance with their fiduciary duties under ERISA is validated by several well-reasoned cases decided on similar facts.

In *Krueger Int'l., Inc. v. Blank*, 225 F.3d 806 (7th Cir. 2000), employer stock held in an ERISA plan was, as here, subject to restrictions in a shareholders' agreement. The shareholders' agreement gave

---

[298] McCormack Tr. 1133:16-22.

[299] Winn Tr. 101;18-25; McCormack Tr. 1245:6-13.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-81-

the employer ("KI") the option to repurchase an employee's stock, based on the stock's appraised value, upon the death of the employee. Following litigation regarding the identity of proper recipients of the deceased employee's plan benefits, the issue then presented was whether the stock was to be valued, as KI argued, as of the date of the employee's death (which was the date specified in the shareholder's agreement) or, as the decedent's beneficiaries argued, at its current value (which was four times the value as of the date of death).

The beneficiaries claimed that defendants had violated their fiduciary duties and the prohibited transaction provisions of ERISA because, by redeeming the stock at its earlier value, the redemption had been effected for less than "adequate consideration." 225 F.3d at 813. KI countered that the value of the stock had been fixed by the exercise of its repurchase option under the shareholders' agreement, and that the transaction was therefore being effected for "adequate consideration." Ruling for the beneficiaries, the trial court found that the shareholder agreement was a "collateral contract whose application was preempted by ERISA," and held that under the plan at issue and ERISA, KI was required to repurchase the shares at their current value. 225 F.3d at 810.

The Seventh Circuit reversed. In language applicable here, it held:

> *Stock unencumbered by a repurchase option … is not the same thing as stock that is so encumbered.* If … KI exercised its option when the share price was $258.70, then at that moment Robert's [deceased-employee's] stock became quite different from ordinary KI stock. From that time it would have been stock subject to an exercised call option. *Because the fair market value of stock that someone else has the right to purchase for $258.70 is just $258.70* (at least as long as the stock alone is worth more than that), *there would be no violation of ERISA "adequate consideration" rules for KI to pay that amount per share* … All of this is to say simply that the beneficiaries are entitled only to what the plan provides; there can be no breach of fiduciary duty if that is what the plan gives them.

225 F.3d at 813 (emphasis added).

The beneficiaries had also argued that the plan at issue purportedly required that valuations be made "using the most recent information." The Seventh Circuit rejected this contention, stating:

> Before the accounting rules of an ERISA plan can be applied, the basic terms of the asset to be accounted for must be determined. That is what the SA [shareholders' agreement] does - it defines the bundle of rights to which a KI shareholder (whether

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

a direct shareholder or a shareholder through an ERISA plan) is entitled.  Because KI has chosen to remain a privately held company, it has the prerogative to limit ownership in its shares to employees.  It has chosen to do so, which makes it necessary to include a repurchase option in its shareholder agreement (so that when employees leave the firm, it gets the shares back).  Accepting this repurchase option is an inseparable part of owning KI stock, which means that Robert and his successors in interest to the stock are bound to its terms.

225 F.3d at 812.

*Krueger* holds that ERISA does not permit or require plan fiduciaries to disregard restrictions that are expressly required to be applied to the plan's purchases or sales of employer securities.  In short, plan trustees must take the plan's assets as they find them.  As in *Krueger*, to conduct an adequate and prudent investigation, ERISA plan fiduciaries must become aware of, and consider the impact that valid and enforceable restrictions have on the stock whose fair market value they are charged with determining.  Just as the restrictions imposed by the shareholders' agreement in *Krueger* were held to be fundamental attributes of KI stock, here the ownership, transfer, and repurchase restrictions imposed on JDS common shares by the JDS Articles are also (in the words of the *Krueger* court) an "inseparable part of owning" JDS common shares.  The HolliShare Plan recognizes this fundamental reality; it (a) mandates a valuation of JDS common shares that conforms to the formula (book value) specified by the JDS Articles, and (b) requires that any sales of JDS common shares be effected in compliance with the JDS Articles.[300]  By their familiarity with these various restrictions, and revisiting their status each year, the HolliShare fiduciaries have conducted a "prudent investigation" and have acted with loyalty within the purview of ERISA §§ 404(a)(1)(B) and 404(a)(1)(A).  Based on their determination, HolliShare has sold its JDS common shares for "adequate consideration" within the meaning of ERISA §3(18) because the fair market value of the JDS common shares was their prior December 31 audited book value.

---

[300]    The situation here presents a stronger case than does *Krueger* for deferring to transfer and repurchase restrictions attributable to employer stock that is bought and sold by an ERISA plan. The plan at issue in *Krueger* did not (so far as the Seventh Circuit opinion reflects) incorporate the provisions of the shareholders' agreement into the plan at issue there. Here, HolliShare has expressly incorporated the ownership and transfer restrictions and repurchase rights in the JDS Articles into the Plan itself, thereby making those restrictions an integral part of the Plan.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

As this court recognized when it denied plaintiffs' motion for summary judgment on their prohibited transaction claims, in assessing the adequacy of the investigation conducted by the defendant fiduciaries and in determining whether they acted in good faith, the decision in *Krueger* is directly on point. *DeFazio, supra*, 636 F.2d at 1069.

In *Allen v. The Katz Agency Inc. Employee Stock Ownership Plan*, 677 F.2d 193, 194 (2d Cir. 1982), the Second Circuit relied on plan provisions similar to those in the HolliShare Plan which also equated "fair market value" with "book value" and denied an ERISA claim similar to those asserted here. In *Allen*, plan participants had the right to "put" their stock to the plan or the employer for their per share book value. After plaintiff exercised his "put" and was paid its per share book value by his employer, he later contended that ERISA required that he should have been paid the unrestricted fair market value for those shares. The Second Circuit rejected this contention and, in language controlling here, held:

> The fiduciary obligation to discharge duties "solely in the interest of the participants and beneficiaries," ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), surely did not obligate the trustees to pay Allen [plaintiff] more than the value to which the Plan entitled him. In addition, a fiduciary's duty hardly extends to a requirement to have a benefit plan amended by the board of directors in a manner that increases the value of benefits to employees.

677 F.2d at 198-99.

*Allen* was cited with approval and followed in *Owens v. Soundview Fin. Group, Inc.*, 54 F. Supp. 2d 305 (S.D.N.Y. 1999). There, a former officer alleged that he should have been paid the unrestricted fair market value, rather than book value, for the stock of his employer which was held in an ERISA plan. Rejecting plaintiff's ERISA claim for breach of fiduciary duty, the *Owens* court reasoned as follows:

> ERISA requires that plan trustees, as fiduciaries, act "solely in the interests" of plan participants and beneficiaries, 29 U.S.C. § 1104(a)(1). However, "[t]he fiduciary obligation to discharge duties 'solely in the interest of the participants and beneficiaries,' surely [does] not obligate the trustees to pay [Owens] more than the value to which the Plan entitled him." *Allen v. Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193, 198 (2d Cir. 1982). The trustees must determine the "value" of a participant's benefits taking into account not only the interests of the particular participant receiving the benefit, but the interests of all plan participants and beneficiaries. [citation omitted] ... The use of the book value methodology to value the SoundView [employer] stock held by the Plan complied with that duty because it provided an objective and easily administrable method that could be, and was, applied uniformly to all participants whose Plan accounts held SoundView

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-84-

stock.  Moreover, because all Plan participants acquired stock at adjusted book value, the Plan trustees reasonably determined that it was appropriate that participants also receive benefit distributions using the same methodology ....

54 F. Supp. 2d at 308.

Similarly, *Foltz v. U.S. News and World Report, Inc.*, 865 F.2d 364 (D.C. Cir. 1989), affirmed a judgment for plan fiduciary defendants who valued retirees' interests in a stock bonus plan on a "minority discount" basis, rather than on the basis of a "control premium." *Foltz* held that the trustees were legally required by the terms of the plan (and the company's Articles) to value the company's stock based on an appraisal conducted in accordance with applicable IRS guidelines.  The *Foltz* court construed those guidelines as requiring a valuation of minority shares on a discounted basis because the stated purpose of the Articles was to maintain employee ownership of the company by making a sale of control highly unlikely.  *Id.* at 373.  Rejecting plaintiffs' claim that the plan fiduciaries had violated their fiduciary duty under ERISA § 404(a)(1)(A), the *Foltz* court stated, "Section 404 creates no exclusive duty of maximizing pecuniary benefits.  Under ERISA, the fiduciaries' duties are found largely in the terms of the plan itself." *Id.*  Here, as in *Foltz*, both the HolliShare Plan and the JDS Articles have also been, literally for decades, specifically designed to preserve and protect the status of JDS (and derivatively, of Hollister) as employee-owned companies, and not to maximize "pecuniary benefits."

Plaintiffs essentially claim that defendants were required to extract the highest per share value for each sale by HolliShare of each JDS common share it held.  Plaintiffs' position flies in the face of well-developed ERISA decisional law.  EIAPs, such as HolliShare, by definition, are not designed to maximize benefits, but rather to promote and encourage employee ownership. *Taylor v. United Techs. Corp., supra*, 2009 WL 535779 at *8-*10.  Unlike traditional pension plans, the assets of an EIAP generally are invested in securities issued by the Plan's sponsoring company, and therefore "are not intended to guarantee retirement benefits..." *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992).[301]

Moreover, ERISA does not "create an exclusive duty to maximize pecuniary benefits." *Collins v.*

---

[301] See also the decisions cited above regarding the favored status of EIAPs under ERISA.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Pension & Ins. Comm. Of So. Cal. Rock Prods. & Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998).  Thus, where a fiduciary complies with a plan's lawful terms and provides the beneficiaries with the benefits they were due under the Plan, there is no violation of ERISA § 404(a)'s "exclusive purpose" requirement.  *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004). Plaintiffs here were paid precisely what they were promised.  ERISA requires nothing less, nothing more.

ERISA is designed to adjust to the real world.  The definitions of "current value" and "adequate consideration" recognize that plan fiduciaries must have latitude in valuing assets that are not publicly traded and must be permitted to make reasonable valuation decisions in good faith and in accordance with "the circumstances then prevailing."  The focus is not on the outcome of the transaction but on the process employed by the plan fiduciaries to investigate and evaluate the proposed transaction.  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984); *Ulico Casualty Co. v. Clover Capital Mgmt.*, 217 F. Supp. 2d 311, 315 (S.D.N.Y. 2002).  The critical inquiry is whether the fiduciaries, at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits and structure of the transaction. The court finds that here they did so.

### 5.    Defendants Acted As Prudent Fiduciaries.

The court has already found that the defendant fiduciaries have conducted a good faith and prudent investigation and properly determined that the fair market value of JDS's common shares is their book value.  However, it has been held that even if an ERISA fiduciary fails to make a good faith effort to determine the fair market value of closely-held stock, there is no liability if a hypothetical prudent fiduciary would have made the same decision.  *Herman v. Merchantile Bank*, 143 F.3d 419, 421 (8th Cir. 1998).

In assessing whether any defendant here has breached a fiduciary duty under ERISA, this court considers that the individual fiduciary defendants could properly rely on their ongoing knowledge and familiarity with the business of JDS and Hollister, and the circumstances pertaining to the market for or transactions in JDS common shares.  The fiduciaries could also properly consider the long-term horizon of retirement investing and the favored status Congress has granted to employee stock plan investments

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

in the employees' companies.  The court also evaluates the discharge by the defendants of their fiduciary duties here in light of the character and aims of the HolliShare Plan which, among other things, was, and is, to reward employees for their service by providing stable and secure retirement benefits and to promote employee ownership of the company.  The Plan was not designed to maximize benefits.

*Herman* was an action in which the DOL alleged that a plan trustee (aided by others) paid more for an employer's (privately held) stock than that stock was worth.  The Eighth Circuit affirmed a judgment for defendants even though the plan trustee had not conducted any investigation of the value of the company's stock, and even though plaintiff's expert had testified that the amount paid was 12% more than the stock's actual value.  The *Herman* court reasoned:

> Even if a trustee fails to make a good faith effort to determine the fair market value of the stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Roth v. Sawyer Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).  Thus, if a prudent trustee would have purchased the Lenco [company] stock for the price for which Mueller [defendant-trustee] purchased it, then Mueller did not violate ERISA, regardless of whether he made a good faith effort to determine the fair market value of the stock.

143 F.3d at 421.

The *Herman* court emphasized that the overriding issue was not whether the trustee had in fact overpaid, but rather what a prudent fiduciary acting under the same circumstances would have done.  Singularly applicable here, the court stated:

> Determining the value of a company's stock is not an exact science.  This is particularly true of the stock of a closely held corporation such as Lenco, because there is no continuously operating market for such stock.  In order to hold that Mueller did not violate ERISA in conducting the buy-back, the District Court did not need to find that Mueller bought the stock for exactly, to the penny, its fair market value; the Court merely needed to find that a prudent fiduciary in Mueller's place would have paid what Mueller paid.  That is what the District Court found.  We conclude that the District Court did not clearly err in finding that the value of the Lenco stock was such that a prudent fiduciary in Mueller's place would have bought the stock for the price that Mueller paid.  Accordingly, Mueller did not violate ERISA in conducting the buy-back.

*Id.* at 422.

Similarly here, in assessing the conduct of the HolliShare Trustees, the court must consider the

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-87-

ownership and transfer restrictions, repurchase rights, and the pricing formula set forth in the JDS Articles that mandate that JDS can purchase any JDS common shares offered for sale only at their book value. The court must also necessarily consider that HolliShare needed to convert its illiquid JDS common shares into cash, and in order to do so, HolliShare's Trustees sought and obtained an agreement that JDS not only would pay HolliShare the audited book value of the shares that HolliShare needed to sell, but also that JDS would operate its business to maintain cash reserves sufficient to allow JDS to make the purchases.[302] A reasonable and prudent fiduciary acting under the same circumstances as those confronted by the HolliShare Trustees would readily have sold HolliShare's JDS common shares for cash at their prior December 31 audited book value.

Zwirner testified that the HolliShare Trustees (who were high-ranking corporate managers intimately familiar with JDS's policies and practices) considered whether JDS would pay more but concluded that JDS would not do so.[303] This testimony was not impeached or contradicted. Plaintiffs offered no evidence suggestion that a better price was reasonably or realistically obtainable for HolliShare's JDS common shares.

In short, no assertion that a "prudent trustee" would have sold HolliShare's JDS common shares for more than their prior December 31 audited book value can credibly be made. It would violate ERISA and its fundamental purpose to accept plaintiffs' unsupported contention that defendants violated ERISA by selling HolliShare's JDS common shares for the only price available.

---

[302]    Plaintiffs cite occasions in 1982 and 1993 on which they claim that HolliShare sold shares even though the sales were not necessary to pay then-current benefit obligations. To the extent that plaintiffs have any claims predicated on ostensibly unnecessary sales of shares, the sales at issue occurred more than six years before the filing of any claim, and thus are barred by the statute of limitations. Also, plaintiffs failed to present any evidence that the sales were imprudent at the time they were made that would warrant second-guessing by the court of the HolliShare Trustees' exercise of their discretion, which is entitled to substantial deference.

[303]    Zwirner Tr. 2373:6-20.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

**6.      Defendants Did Not Violate The Prohibited Transaction Provisions Or Their Fiduciary Duty By Selling At The Prior December 31 Book Value Pursuant To the Mid-1980s Agreement, Rather Than At The Month-End Book Value Of The Month Of Sale.**

**a.      Sales Pursuant To The Mid-1980s Agreement Were Not Prohibited Transactions.**

Up to the time of the trial, plaintiffs devoted most of their attack to the contention that the defendant fiduciaries violated the prohibited transaction provisions §§ 406(a) and (b) and their fiduciary duties under § 404(a) by selling HolliShare's JDS common shares for less than some hypothetical appraised "fair market value." At trial, the focus of plaintiff's efforts shifted dramatically, centering on the practice of selling JDS common shares for the prior December 31 book value pursuant to the Mid-1980s Agreement. In essence, at trial, plaintiffs' primary contention was that HolliShare sold its shares for the wrong book value. Because the use of the prior December 31 book value was based on the Mid-1980s Agreement, plaintiffs are, in essence, arguing that the HolliShare Trustees breached their ERISA fiduciary duties and caused HolliShare to engage in prohibited transactions by entering into and implementing the Mid-1980s Agreement.

Since 1986, HolliShare's sales of JDS common shares have been made for the audited book value per share as of December 31, rather than for the per share book value as of the end of the month in which sales occurred (the "current month-end book value"). The current month-end book value is the price paid to individual shareholders by JDS when it repurchases their shares under Article Five, Paragraphs II.D.1 or II.D.2 of the JDS Articles. Because the book value of JDS generally increased between the prior year end and the time when HolliShare sold its JDS common shares to JDS, plaintiffs argue that (a) HolliShare did not receive adequate consideration (and as a result, the sales were not exempt from ERISA's prohibited transactions provision), and (b) the defendant fiduciaries breached their fiduciary duties under § 404(a). (Dkt. 613, 90-110.)

Of course, when the Mid-1980s Agreement was made, HolliShare's Trustees could not possibly have known that the book value of JDS common shares would increase steadily. Indeed, Hollister was

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

facing considerable challenges at that time, and one of the principal considerations leading to the Mid-1980s Agreement was the concern that, in view of the considerable challenges the company might not be capable of generating cash sufficient to continue to pay Plan benefits and to meet its existing business needs.[304] Had the book value of JDS common shares declined between the prior year end and the date of the sale, then HolliShare would then have been paid the comparatively higher prior December 31 year-end book value.[305]

In assessing the prudence of the HolliShare Trustees' entry into, and continued implementation of, the Mid-1980s Agreement, it must be recognized that, "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight...." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007). The "test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994). In addition, prudence "involves a balancing of competing interests under conditions of uncertainty." *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006). No one factor is controlling in measuring the conduct of a fiduciary under ERISA (rather, in assessing a fiduciary's conduct, a court must "examine the totality of the circumstances, including, but not limited to: the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment and company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability." *DiFelice v. U.S. Airways, Inc., supra*, 497 F.3d at 418. Accord, *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009).

As noted above, the initial sales of JDS stock by HolliShare in the early 1980s were caused by the DOL's mandate that payments of vested benefits that were to be made to former HolliShare participants

---

[304]    Winn Tr. 656:13-19; Zwirner Tr. 2377:21-2378-6.

[305]    Winn Tr. 659:11-22.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-90-

over a long period of years, with interest, all be put into a segregated account immediately.[306]   Thus, the initial sale transactions were done at irregular intervals and with requests from the HolliShare Trustees on short notice to JDS for the repurchase of JDS shares.[307]   In addition, in the early 1980s, the number of retirees was increasing and the amounts of their retirement benefits also were increasing dramatically.[308]  HolliShare's aggregate sales of JDS common shares in each of 1980, 1981 and 1982 were for less than a million dollars and then suddenly, in the mid-1980s, the Plan needed $12 million in one year and $10 million in the next.  No one had anticipated this and, in those days, given Hollister's smaller size and volatile business situation (see next paragraph), those sums were significant.[309]   At that time, HolliShare did not have any obligation to give the JDS Board any advance notice of when it wanted to sell its JDS common shares back to JDS to raise funds to pay retirement benefits.[310]

        In addition, in the early 1980s, Hollister became involved in a major arbitration with its international distributor, Abbott Laboratories ("Abbott"), that put severe financial strains on the company.[311]   That arbitration was initially expected to be completed in two years but ended up taking six years to complete.[312]    A dispute arose regarding Abbott's distribution of new and older Hollister products.[313]   The arbitration encompassed the entire agreement between Abbott and Hollister and all the countries where Hollister distributed its products through Abbott, which excluded only the United States

---

[306]     Zwirner Tr. 2335:17-2336:11.

[307]     Zwirner Tr. 2375:8-12; Winn Tr. 656:24-657:16.

[308]     Zwirner Tr. 2375:8-2376:2.

[309]     *Id.*; DX 770.

[310]     Winn Tr. 656:24-657:4.

[311]     Zwirner Tr. 2376:3-19.

[312]     Winn Tr. 646:2-8.

[313]     Winn Tr. 644:11-645:21.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

and Canada.[314]  As a result, Hollister had to suddenly create an entirely new structure for the distribution of its products throughout Europe; this was critical to Hollister.  Since the situation threatened Hollister's business future, executives felt compelled to spend substantial time abroad.[315]  The arbitration was also very expensive in terms of legal fees and other expenses.[316]  The Abbott arbitration created another drain on Hollister's cash flow.

At the same time, in the early 1980s, Hollister began to engage in a more formal and rigorous planning process to make sure it had enough cash to fund JDS's repurchases of JDS common shares from HolliShare.[317]  Hollister needed a plan under which it would have some level of confidence that it could reasonably project its cash needs going forward.[318]

Under these circumstances, Winn became concerned about Hollister's and JDS's ability to project and satisfy their future liquidity needs.[319]  In Hollister, a competition developed between funding JDS's ability to buy back its common shares from HolliShare to provide the cash HolliShare needed to pay retirement benefits and having enough cash for its own business investments and operations.[320]  The large amounts of cash suddenly needed to pay benefits in the mid-1980s created great concern among officers and managers of the corporation and HolliShare Trustees about whether there would be adequate cash to

---

[314]   Winn Tr. 645:22-646:1.

[315]   Winn Tr. 646:20-650:8; Zwirner Tr. 2376:3-19.

[316]   Winn Tr. 651:18-652:14.

[317]   Winn Tr. 657:17-658:6; Zwirner Tr. 2379:3-20.

[318]   Winn Tr.  658:7-17.

[319]   Winn Tr. 656:13-19.

[320]   Zwirner Tr. 2377:21-2378:2.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-92-

fund both the Plan and Hollister's business operations.[321]   The HolliShare Trustees knew that if JDS was not able to repurchase common shares from the Plan, the Plan would not be able to pay the growing amounts of vested benefits to the growing number of retirees.[322]

Faced with these challenges, JDS and the HolliShare Trustees exercised their discretion and determined that these circumstances required regularity with respect to HolliShare's share sales to JDS. JDS and Hollister needed advance notice of the anticipated amount of the sales so that it could plan its cash needs to facilitate Hollister's continued growth and expansion. In turn, Hollister's growth and expansion was vital to HolliShare, in view of the Plan's mandate that the HolliShare trust fund was to be invested predominantly in JDS common shares. The HolliShare Trustees also needed to know that when the Plan needed cash, JDS would have the capability to purchase HolliShare's JDS common shares in order to provide HolliShare with the cash that was required.

The Plan benefitted from the Mid-1980s Agreement because JDS committed to buy whatever number of JDS common shares, that the trustees felt they needed to sell, once a year, for cash.[323]   JDS did not have that obligation prior to the Mid-1980s Agreement.[324]   And while JDS had been paying cash in the past, the amount of cash needed was growing exponentially.[325]

The Mid-1980s Agreement ensured that JDS would have the cash it needed to allow HolliShare to meet its benefit payment obligations.[326]   The Mid-1980s Agreement provided the Plan with cash based on the sale of its JDS common shares at their fair market value which was calculated in accordance with

---

[321]     Zwirner Tr. 2377:21-2378:18.

[322]     *Id.*

[323]     Zwirner Tr. 2070:1-2071:3.

[324]     Zwirner Tr. 2074:19-2075:12

[325]     Zwirner Tr. 2071:15-22.

[326]     Winn Tr. 658:12-17.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

the terms of the Plan. The fair market value was a year-end audited value that would be the per share price that would be paid for the shares sold during the year regardless of when during the year they were sold and regardless of whether the book value in the subsequent year went up or down.[327]   To the extent the subsequent month-end book value might go down, this was a benefit to the Plan.[328] A decline in the book value of JDS's common shares was perceived as a real possibility at that time.[329]   The fact that HolliShare would be paid all in cash as opposed to being paid with a small amount of cash and a large, long-term subordinated promissory note was also a major benefit to HolliShare.[330]   The HolliShare Trustees were legally obligated to sell JDS shares to JDS for cash.[331]   In addition, even if HolliShare legally could accept a small amount of cash and a subordinated note from JDS (which it could not), HolliShare required cash in order to pay Plan benefits.[332]   Moreover, since a note could be converted into cash only at a substantial discount from its principal amount, HolliShare's Trustees reasonably believed that the economic value of a payment entirely in cash far exceeded that of a small cash payment coupled with a long-term subordinated note.[333]

JDS had paid HolliShare cash for its shares in the sales that were made prior to the Mid-1980s

---

[327]   Winn Tr. 659:11-22.

[328]   *Id.*

[329]   Winn Tr. 182:5-16.

[330]   Winn Tr. 663:1-19.

[331]   Zwirner Tr. 2071:23-2072:2.

[332]   DX 501, H01386-1390.

[333]   As both Zwirner and Winn testified, at some point in the 1980s, Winn requested that JDS repurchase some of his JDS common shares so that Winn could make a charitable donation. JDS did so, purchasing the shares with $5,000 in cash and the balance with a promissory note. Since Winn wished to make his contribution in cash, he sold his note to a bank that was familiar with Hollister, its business operations and its financial condition. Nonetheless, Winn was disappointed to learn that the bank paid him cash which was only between 88% and 90% of the note's principal amount. Winn Tr. 663:10-664:2; Zwirner Tr. 2393:20-2394:8.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-94-

Agreement. Plaintiffs therefore claim that the term of the Mid-1980s Agreement requiring payment for HolliShare's shares in cash was nothing new, and provided no benefit to the Plan. However, the size of the transactions from 1986 on dwarf those which were made earlier. In view of the strain on JDS's cash reserves created by the spike in HolliShare benefits, it would have been imprudent for the HolliShare Trustees to have blithely assumed that JDS would continue to be willing to continue to pay cash for HolliShare's shares in the future. Moreover, even if JDS had the willingness to continue that practice, the HolliShare Trustees were legitimately concerned whether JDS would conduct its affairs so as to have the ability to do so. Consequently, the HolliShare Trustees entered into an agreement that benefited HolliShare by eliminating these substantial concerns, and that benefitted Hollister and JDS by allowing them to plan their cash and liquidity requirements, both by having advance notice of HolliShare's anticipated cash requirements and through the consistent use of a price that was fixed as of defined date and that was also based on the reliable, audited financial statements.

With the passage of time, the Mid-1980s Agreement provided HolliShare with certainty and predictability as those cash needs became more volatile. In 1999, the Plan received additional assurance that its fluctuating cash needs would be satisfied in full by JDS when it received a three-year rolling commitment from JDS that it would repurchase from HolliShare the number of JDS common shares requested by HolliShare in order to meet HolliShare's vested benefit payment obligations.[334]

The court denies plaintiffs' claims that HolliShare's sale of its JDS common shares for the price specified by the Mid-1980s Agreement violated ERISA's prohibited transactions provisions. The sales by HolliShare to JDS of the JDS common shares held by HolliShare at their book value were sales made for adequate consideration because under the totality of the circumstances the December 31 book value of those shares was their fair market value determined by the HolliShare Trustees in good faith and in accordance with the terms of the Plan instrument. Judgment on these claims is entered in favor of defendants.

---

[334]    Herbert Tr. 1820:25-1821-25; Zwirner Tr. 2058:3-11, 2346:18-2347:12; DX 643.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

###### b.    Given Their Broad Discretion, Defendants Did Not Breach Their Fiduciary Duties By Entering Into And Implementing The Mid-1980s Agreement.

Similarly, judgment is also entered for defendants on plaintiffs' claims that, by entering into and implementing the Mid-1980s Agreement, defendants violated their fiduciary duties under ERISA §§ 404(a)(1)(B) and 404(a)(1)(A). Defendants' decision to enter into and perform under the Mid-1980s Agreement was within their discretion.

Plan fiduciaries are entitled under circumstances such as those present here to a presumption that they have acted prudently and reasonably, especially where (again, as here), the plan provides the Trustees with significant discretion. Plaintiffs have not produced any evidence to rebut this presumption, and certainly have failed to establish that the defendant fiduciaries exercised their discretion arbitrarily or capriciously.

In evaluating the prudence of the defendants' decision to enter into and implement the Mid-1980s Agreement, the court is called upon to evaluate the defendants' interpretation of the Plan instrument, and by reference, the appropriate sections of the JDS Articles. Here, the Plan instrument referred the HolliShare Trustees to Article Five, Section II.D.7.a of the JDS Articles, and they interpreted the "exceptional circumstances" provision in those Articles to authorize JDS and HolliShare's decision to enter into and implement the Mid-1980s Agreement.

Federal courts defer to a plan fiduciary's interpretation of the terms of a plan instrument provided the interpretation is not arbitrary and capricious. This is particularly true where fiduciaries are, as here, given broad discretion under the Plan. In that regard, the following terms of the HolliShare trust instrument provide the HolliShare Trustees with extraordinarily broad discretion to:

- exercise every power, election and discretion, give every notice, make every demand and do every act in respect to any shares of stock, bonds, notes, debentures or other obligations or securities held in the Trust Fund which the Trustees could

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-96-

or might do if they were the absolute owners thereof;[335]

- [p]rotect in any way the interests of the Trust and the Trust Fund, either before or after default with respect to any such contract, claim or right;[336]

- enter into all contracts and agreements and execute any and all documents which they deem necessary or advisable in exercising the authorities and powers herein granted;[337]

- [d]o or cause to be done any and all other acts which they deem necessary or advisable for the advantageous effectuation, management, investment and distribution of the Trust and the Trust Fund.[338]

Finally, the Trustees are expressly given discretion and authority to interpret the provisions of the Plan itself, including the discretionary provisions quoted above.  Article XI, 13.04 provides that:

> Except as otherwise provided in this Trust, the Trustees shall have authority to interpret all provisions of this Trust and to decide all questions arising in its administration.  All such determinations shall be binding on all Participants, Former Participants, Alternate Payees, Beneficiaries and all other persons or entities having or claiming any interest through or against them.[339]

Each of these provisions was in effect in the mid-1980s and have remained in effect through the present.

A determination of the "fair market value" of closely-held shares has been held to be a matter that is subject to judgment and discretion. *Herman v. Mercantile Bank, N.A.*, 143 F.3d at 422.  Courts give deference to reasoned decisions made by ERISA fiduciaries where the plan at issue confers discretion on the plan fiduciaries, as does the Plan here. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Jordan v. Northrup Grumman Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004).  Where, as here, an ERISA plan gives its fiduciaries discretion to construe and interpret the plan's terms, determinations by plan fiduciaries are assessed under a deferential abuse of discretion standard.  *In re*

---

[335]    DX-501, H01402.

[336]    DX-501, H01404.

[337]    DX 501, H01404.

[338]    DX 501, H01405.

[339]    DX 501, H01413.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

*Citigroup*, 662 F.3d at 138, 140 (decisions by plan fiduciaries "should be reviewed for an abuse of discretion…"); *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th Cir. 2008); *Abattie v. Alta Health Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

Far from being arbitrary and capricious, the decision of HolliShare and JDS to enter into and implement the Mid-1980s Agreement was prudent and reasonable. As the Seventh Circuit recently stated in *Green v. UPS Health, Welf, Package for Ret. Employees*, 595 F.3d 734, 737-38 (7th Cir. 2010):

> The parties agree that, because the dispute involves Plan interpretation and the Plan grants UPS discretion to interpret its terms, the district court properly applied the deferential arbitrary and capricious standard. [citation omitted]   A plan administrator's interpretation is not arbitrary and capricious if it falls within the range of reasonable interpretations. See *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999); *Exbom v. Central States Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990).

The decision of the defendant fiduciaries to enter into and implement the Mid-1980s Agreement was within the bounds of their authority to interpret and apply the provisions of the HolliShare Plan so that all sales of JDS common shares conformed to the provisions of the JDS Articles. On this point, *Darvell v. Life Ins. Co. of North America*, 597 F.3d 929, 934-35 (8th Cir. 2010), is instructive. The *Darvell* Court identified the following factors to be considered when assessing the propriety an ERISA plan fiduciary's interpretation of the operative plan:

> (1)  whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.... However, '[t]he dispositive principle remains ... that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own - and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination."

597 F.2d at 929. *Darvell* also stressed that courts are to defer to the fiduciary's interpretation of the plan so long as it is reasonable, even if the court would adopt a different interpretation as an original matter. *Id.* (citing *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (*en banc*).

Application of the factors identified in *Darvell* further establishes that the HolliShare Trustees did

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-98-

not act arbitrarily or capriciously in entering into the Mid-1980s Agreement.  In that regard: (1) the HolliShare Plan required that any disposition of JDS common shares be in accordance with the JDS Articles; (2) the Mid-1980s Agreement was reached (in part) in order to avoid engaging in prohibited transactions violative of ERISA; (3) the Mid-1980s Agreement was clearly consistent with both the terms of the Plan and the JDS Articles, including the decision of HolliShare and JDS to use the most precise and accurate book value – i.e., the value obtained from the audited December 31 year-end financial statements; (4) the agreement was reached in order to ensure that HolliShare would have sufficient cash to pay vested plan benefits; and (5) the terms of the agreement have been consistently followed since its adoption in the mid-1980s.

Because it involved the deference to be given an ERISA fiduciary's exercise of discretion and claims (as here) that an employer's securities were undervalued due to the use of a year old valuation date, the decision in *McCabe v. Capital Mercury Apparel*, 752 F. Supp. 2d 396 (S.D.N.Y. 2010), is particularly apposite here.  In *McCabe*, a class action was brought by participants in an ERISA plan (an ESOP) which invested in the employer's securities.  According to the terms of the plan, upon their termination, the amount of plaintiffs' vested benefits would be determined by the plan fiduciary, the Administrative Committee, based on the "fair market value" of the employer's stock "as of the allocation date."   The "allocation date" was defined as "June 30 of each year (the last day of each Plan Year)" preceding the date of distribution.  The plan also required an outside independent appraiser to annually appraise the employer's stock; the appraisal was provided to the Administrative Committee which then determined the shares' fair market value as of the preceding allocation date.  This determination was made typically six to seven months after the allocation date.  When participants were terminated or retired, the shares in their account were distributed to them and then immediately repurchased by the employer in cash at their fair market value. *Id.* at 398.

Beginning in 2001, the employer suffered business reversals and operational difficulties, and the price of the company's shares declined; over the next few years, the company's future was becoming

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-99-

increasingly perilous. While preparing its valuation for the allocation date, as of June 30, 2008, the appraiser was advised by the company's management that there was an 80% chance that the company would be liquidated during the next fiscal year. *Id.* at 400. Using a methodology of adjusted book value, the appraiser determined that the fair market value of the company's stock was, as of the allocation date of June 30, 2008, $0.015 per share. In the latter part of 2008 and in early 2009, the company was forced to sell most of its assets, including its inventory and good will, to a third party. *Id.* at 401. After the sale, the company focused upon liquidating what few assets were left, and assisting its employees in finding new jobs.

In March 2009, the plaintiff-employees were terminated and the Administrative Committee decided to use June 30, 2008 as the allocation date for purposes of calculating the amount of vested benefits to be distributed to plaintiffs. Those distributions were made in June 2009, a few weeks prior to June 30. Several months later, in August 2009, the Administrative Committee determined that the fair market value of the company stock was $0.13 per share as of the allocation date of June 30, 2009 - over 8 times its fair market value as of June 30, 2008.

In their suit, the plaintiffs argued that an independent appraisal of the fair market value should have been performed as of the allocation date of June 30, 2009, and that the prior valuation, as of June 30, 2008 had undervalued the company stock when their benefits were calculated in June 2009. Plaintiffs alleged that by applying a year old valuation date in calculating the amount of their vested benefits, the defendants had violated ERISA by not following the terms of the plan, and had breached their fiduciary duties of prudence and loyalty under §§ 404(a)(1)(B) and 404(a)(1)(A). *Id.* at 404-05.

On cross-motions for summary judgment, the court entered judgment for the defendants. The court first concluded that defendants had acted in conformity with the terms of the plan. Ironically, the court rejected plaintiffs' argument that defendants should have conducted a new valuation prior to calculating their benefits because "extraordinary circumstances" existed which required defendants to depart from the literal terms of the plan which only applied to "ordinary circumstances." The court noted that, unlike the

case here, "The distinction between ordinary and extraordinary circumstances does not appear anywhere in the Plan or the SPD…." *Id.* at 407. The court then concluded that the Administrative Committee acted within the broad discretion given it in the plan to interpret and apply the plan's terms:

> Plaintiff's claim is belied by the very terms he chooses to emphasize. Plaintiff argues that defendants were required to undertake a new valuation, but the Plan - and the cited provision - is unequivocal in its commitment of interpretive and administrative discretion to the Committee. It vests the Committee with the "sole and exclusive authority to construe, interpret, and apply the terms of the plan," and underscores that "[t]he Committee shall be given the greatest possible deference permitted by law in the exercise of such discretionary authority." … Thus, plaintiff's claim that defendants did not comply with the terms of the Plan is entirely unavailing.

*Id.* at 409.

The court then entered judgment against plaintiffs on their breach of fiduciary duty claims under § 404(a) based upon its analysis of the circumstances prevailing at the time the defendants made their decision to use the June 30, 2008 allocation date:

> Under these circumstances, it was prudent to use the June 30, 2008 valuation to distribute Class members' interests in the Plan. Plaintiff argues that "the prudent course of conduct would have been to wait for the independent appraisal required by the Plan (in June 30, 2009)." However, any number of reasons can justify defendants' decision to use the earlier valuation - an interest in ensuring that Inactive Employees received their benefits before the Company was no longer able to provide any benefits; the reasonable possibility that the cost of a new valuation would have devastated the Company; an attempt to ease the administrative burden by eliminating the large volume of small accounts; the impractibility of obtaining a timely new valuation before the next Allocation Date; and the sincere belief that the Plan terms required use of the June 30, 2008 valuation. Because defendants' decisions were objectively appropriate in light of the then-prevailing circumstances, subjective disagreement or speculation regarding their motivations does not render their actions imprudent or unreasonable.

*Id.* at 412.

Circumstances similar to those prevailing in *McCabe* were also prevailing here when defendants decided to enter into and implement the Mid-1980s Agreement. Absent that agreement, HolliShare might also have faced "administrative burdens" which were steadily growing; HolliShare would not have survived, and if so, would not have been able to continue to pay vested benefits. As in *McCabe*, defendants' decision to enter into and implement the Mid-1980s Agreement was "objectively appropriate

in light of then-prevailing circumstances," and "speculation regarding their motivation does not render their actions imprudent or unreasonable." *See Id.* at 412.

It is also significant that the Mid-1980s Agreement was intended to provide the liquidity needed by HolliShare to meet its benefit obligations. The Second Circuit recently recognized that maintaining adequate liquidity in an ERISA plan was a legitimate consideration in the discharge of plan fiduciaries' duties even if the result was to reduce the benefits received by plan participants. *Taylor v. United Techs. Corp.*, 2009 WL 535779 at *9 (D. Conn. Mar. 3, 2009), aff'd 354 F. Appx. 525 (2d Cir. 2009). Summary judgment for defendant-fiduciaries was affirmed despite plaintiffs' presentation of evidence that the plan's retention of cash caused the participants to lose $69 million worth of gains that would have been obtained by investing the cash. Nevertheless, the *Taylor* court concluded that the defendants had properly evaluated and monitored the amount of cash necessary "to provide transactional liquidity," and "[t]he fact that plaintiffs may have been able to enjoy a greater Fund performance without the cash retention is not sufficient to support a claim of fiduciary breach where a defendant has engaged in prudent analysis of its decision." 2009 WL 535779, at *9; see also *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (ERISA does not impose a "duty to take any particular course of action if another approach seems preferable"); *George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992, 1011-12 (N.D. Ill. 2010) (if ERISA fiduciaries engage in reasoned decision-making, they will not be liable even if the "choice resulting from that process" is not "one that all will agree was the optimal one").

Plaintiffs question the very existence of the Mid-1980s Agreement because it was not formally reduced to writing. However, such documentation was not required by ERISA, the JDS Articles, or the terms of the Plan. In addition, substantial documentation of its implementation was produced.[340] Zwirner and Winn also credibly testified that the agreement was made and has been implemented continuously and

---

[340]   *E.g.*, DX 775.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-102-

regularly for 25 years.[341]  In *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 862 (N.D. Ill. 2009), the fiduciaries of an ERISA plan were held not to have breached their fiduciary duties by failing to have conducted formal meetings or by failing to document their conversations regarding a key decision affecting an ERISA plan.  Instead, the *Brieger* court specifically determined that the informal and undocumented day-to-day communications among defendants, who were members of the plan sponsor's upper management, were sufficient to establish that the decision at issue had been thoroughly vetted and had been made prudently.  *Id.*; see also *Foltz*, 865 F.2d at 374-75 ("while it is true here that the Plan fiduciaries here [sic] never recorded any deliberations and appear to have pursued the minority-basis valuation more on the basis of inertia than explicit decision making, that is no basis for overturning a decision that is entirely consistent with the Plan document and with ERISA's substantive requirements.").  The same circumstances existed at Hollister.  Thus, plaintiffs' assertion that there is no formal documentation of the Mid-1980s Agreement does not establish that the Agreement was non-existent, imprudent, or a breach of fiduciary duty.

**7.    Applicable Federal Estate Tax Provisions, Treasury Regulations, And Decisional Law Also Establish That The Book Value Of JDS Common Shares Is "Adequate Consideration" Under ERISA § 408(e) And Is Their Fair Market Value Under ERISA § 404(a).**

As demonstrated above, persuasive case law has long held that book value can be the fair market value of stock in a closely held corporation for ERISA purposes.  This is further buttressed by well-established law establishing that in determining the "fair market value" of shares in a closely held corporation for federal estate tax purposes, a book value price or any other reasonable price formula built into a restricted stock agreement has been held enforceable and binding by the IRS.  Again, this result obtains even if the shares, on an unrestricted basis, have a significantly higher "market value" calculated under other commonly accepted valuation methodologies.

Under applicable Treasury Regulations, IRS Revenue Rulings, and other IRS pronouncements, the

---

[341]    Zwirner Tr. 2056:16-2058:11; Winn Tr. 157:6-25.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-103-

fair market value of JDS's common shares is their book value. These authorities should be given significant weight here.

### a. The Federal Estate Tax Is Based On The Fair Market Value Of All Property In A Decedent's Gross Estate.

The federal estate tax provisions in the Internal Revenue Code, 26 U.S.C. § 2001, *et seq.* ("IRC")[342] require that "the value of all property to the extent of the interest therein of the decedent at the time of his death" be included in his gross estate. IRC § 2033. Federal estate taxes are imposed on the transfer of the taxable estate of every citizen or resident of the United States. IRC § 2001(a). The taxable estate is defined as the gross estate less allowable deductions. IRC § 2051. The gross estate is defined to include the value of all property owned by a decedent at the time of death. IRC § 2031. In most instances, the value of the gross estate is the "fair market value" of the included property as of either the date of death or as of the alternate valuation date under IRC § 2032 if elected by the executor. Treasury Regulation § 20.2031-1(b) ("Treas. Reg. § 20.2031-1(b)"). This includes property consisting of restricted stock such as JDS common shares.

### b. IRC § 2031, Treas. Reg. § 20.2031-2(h), And Revenue Ruling 59-60

Section 2031(b) of the IRC simply provides, in general terms, that the fair market value of stock not listed on an exchange which cannot be determined with reference to bid and ask prices is to be determined through consideration of all relevant factors. However, and critical here, the Treasury Regulations specifically provide that a restricted stock agreement can establish the "fair market value" of stock in a closely held corporation provided that the agreement satisfies certain conditions. In that regard, Treas. Reg. § 20.2031-2 (h) states:

> *Securities subject to an option or contract to purchase.* Another person may hold an option or a contract to purchase securities owned by a decedent at the time of his death. The effect, if any, that is given to the option or contract price in determining

[342]    Henceforth, all IRC citations will be to the applicable IRC sections, omitting the reference to 26 U.S.C.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-104-

the value of the securities for estate tax purposes depends upon the circumstances of the particular case ....  Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bonafide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration or monies worth [emphasis added].

(Italics in original.)

The Treasury Regulations set forth in § 20.2031 were promulgated in 1958 pursuant to IRC § 2031. In 1959, they were expanded through Revenue Ruling 59-60, 26 C.F.R. § 20.2031-2 ("Rev. Rul. 59-60"). Significantly, § 8 of Rev. Rul. 59-60 pointedly addresses the impact of a restricted stock agreement upon "the fair market value" of closely held shares:

Frequently, in the valuation of closely held stock for estate and gift tax purposes, it will be found that the stock is subject to an agreement restricting its sale or transfer.  Where shares of stock were acquired by a decedent subject to an option reserved by the issuing corporation to repurchase at a certain price, the option price is usually accepted as the fair market value for estate tax purposes.

Treas. Reg. § 20.2031-2(h) and § 8 of Rev. Rul. 59-60 are directly applicable to the validity and enforceability of the book value pricing system set forth in the JDS Articles which is, in turn, incorporated into the HolliShare trust instrument.  Their application, as interpreted by federal courts and other federal tax authorities, establishes beyond question that the fair market value of the JDS common shares is their book value.

### c.    Interpretations And Applications Of § 8 Of Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) Are Controlling Here.

The strongest proponent of the application here of federal estate tax precedents is the DOL itself. In the Preamble to the Regulations it proposed in 1988, the DOL articulated, for purposes of ERISA, its proposed definition of "fair market value."  In doing so, the DOL relied upon the definition of "fair market value" as established by federal estate tax authorities:

This proposed definition [of fair market value] essentially reflects the well-established meaning of this term in the area of asset valuation.  See, e.g., 26 CFR 20.2031-1 (estate tax regulations); Rev. Rul. 59-60, 1959-1 Cum. Bull. 237; *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Estate of Bright v. United*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-105-

*States*, 658 F.2d 999, 1005 (5th Cir. 1981)….

53 Fed. Reg. 17632.

Later, the DOL addressed the issue of a fair market valuation of corporate stock for which there is no generally recognized market.  Again, the DOL looked to federal estate tax authorities for direction, specifically Rev. Rul. 59-60:

> The Internal Revenue Service has had occasion to address the valuation problems posed by one type of such securities - securities issued by closely held corporations. Rev. Rul. 59-60, 1959-1, Cum. Bull. 237, lists a variety of factors to be considered when valuing securities of closely held corporations for tax purposes.  The Department's experience indicates that Rev. Rul. 59-60 is familiar to plan fiduciaries, plan sponsors, and the corporate community in general.  The Department has, therefore, modeled this proposed special rule after Rev. Rul. 59-60
> ...

Notably, ERISA nowhere defines "fair market value."  However, ERISA defines "adequate consideration" for closely held shares (without an established market) as their "fair market value ... as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan ...." 29 U.S.C. § 1002(18).  Under the IRC, the property in an estate is taxed on the basis of its "fair market value."  The DOL, in its proposed Regulations, proposed an ERISA definition of "fair market value" virtually identical to that used in the IRC.  While the DOL's proposed Regulations were never enacted, again, it is significant that the DOL looked to the IRC for guidance.  In addition, courts faced with legal issues under ERISA which were analogous to legal issues arising under IRC have also looked to the IRC, Treasury Regulations and federal estate tax authorities as relevant precedents.[343]

---

[343]   *See, e.g., Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 564, 517-21 (1981) (Treasury Regulations and IRS rulings are relevant in interpreting the anti-discrimination provisions in ERISA); *Tully v. Ethyl Corp.*, 861 F.2d 120, 125 (5th Cir. 1988) (Treasury Regulations relied upon in determining whether employer properly calculated pre-retirement benefits: "[W]e do defer to the Internal Revenue Service's interpretation of the statutory language, since the IRS was originally lone of the agencies charged with administering ERISA…"); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 917-18 (2d Cir. 1987) (IRC provisions and IRS Revenue Rulings relied upon in deciding whether an ERISA Plan was a "governmental plan" within the meaning of ERISA: "Because the IRS is one of the agencies charged with administering ERISA, its interpretations of the statute are entitled to great deference"); *Becker v. Weinberg*
(continued...)

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

For the foregoing reasons, the interpretations and applications by the Tax Court and by other federal courts of the provisions of the IRC and Treas. Reg. § 20.2031-2(h) to determine, for federal estate tax purposes, the "fair market value" of shares of a closely held corporation for which there is no established market are highly probative, if not controlling, here. Their application establishes that JDS's common shares have been sold by HolliShare to JDS, or used to calculate plaintiffs' vested benefits, for "adequate consideration" under ERISA, and that their "fair market value" is their book value.

**d.     Under IRC § 2031, Treas. Reg. § 20.2031-2(h), And Applicable Decisional Law, The Restrictions In The JDS Articles Constitute A *Bona Fide* Business Arrangement, Were Made For A Legitimate Business Purpose, And Fix The Fair Market Value Of JDS's Common Shares As Their Book Value.**

Courts that have been called upon to interpret and apply Treas. Reg. § 20.2031-2(h) have uniformly held that a restricted stock agreement, such as the JDS Articles, establishes the fair market value of shares in a closely held corporation for federal estate tax purposes as long as the agreement:

(1)     specifies the price to be paid for the shares either by formula or by reference to a specific price; *Estate of Blount v. Comm'r*, 87 T.C.M. (CCH) 1303, 1309 (2004), aff'd in part and rev'd in part on other gds, 428 F.3d 1338 (11th Cir. 2005); *Estate of Lauder v. Comm'r*, 64 T.C.M. (CCH) 1643, 1656 (1992); *Estate of Seltzer v. Comm'r*, 50 T.C.M. (CCH) 1250, 1253 (1985); *Estate of Littick v. Comm'r*, 31 T.C.M. (CCH) 181, 186-87 (1958);

---

[343](...continued)

*Group Inc. Pension Trust*, 473 F. Supp. 2d 48, 64 (D.D.C. 2007) (Treasury Regulations applied to determine if ERISA was violated by Plan distributions to certain highly compensated individuals); *Goodin v. Innovative Technical Solutions, Inc.*, 489 F. Supp. 2d 1157, 1160 (D.C. Haw. 2007) (Treasury Regulations cited in determining whether defendants violated ERISA in determining the fair market value of employer's stock for purposes of an ESOP's put option); *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 332-33 (S.D.N.Y. 2006) ("There is significant statutory overlap between ERISA and the Internal Revenue Code on matters such as funding, vesting and benefit accrual"); *Eggert v. Merrimac Paper Co. Inc.*, 311 F. Supp. 2d 245, 257 (D.C. Mass. 2004) (IRS Treasury. Regulations applied to determine if fair market value of put options in an ERISA Plan was properly calculated).

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

(2)    precludes a transfer of the shares during the holder's life at a price higher than the price specified in the agreement; *Slocum v. United States*, 256 F. Supp. 753, 754 (S.D.N.Y. 1966); *Baltimore Nat'l Bank v. United States*, 136 F. Supp. 642, 654 (D. Md. 1955); *May v. McGowan*, 194 F.2d 396, 397 (2d Cir. 1952); *Wilson v. Bowers*, 57 F.2d 682, 683 (2d Cir. 1932); *Estate of Weil v. Comm'r*, 13 T.C.M. (CCH) 653, 654 (1954); *Fiorito v. Comm'r*, 33 T.C. 440, 444 (1959);

(3)    requires that the estate of the deceased shareholder sell the shares upon his death, at the specified price; *Estate of Godley v. Comm'r*, 80 T.C.M. (CCH) 158, 164 (2000); *Estate of Gloeckner v. Comm'r*, 152 F.3d 208, 212-14 (2d Cir. 1998); *St. Louis County Bank v. United States*, 674 F.2d 1207, 1210-11 (8th Cir. 1982); *Mathews v. United States*, 226 F. Supp. 1003, 1005-06 (E.D.N.Y. 1964); *United States v. Land*, 303 F.2d 170, 173-74 (5th Cir. 1962); *Baltimore Nat'l Bank v. United States*, 136 F. Supp. 642, 654-55 (D.C. Md. 1955); and

(4)    fixes the price as a "bona fide business arrangement" and not a device to pass the decedent's shares to the natural objects of his bounty for less than adequate and full consideration. *Comm'r v. Bensel*, 100 F.2d 639, 639 (3d Cir. 1938).

Whether a restricted stock agreement satisfies the requirements of Treas. Reg. § 20.2031-2 depends upon the nature of the arrangement and the surrounding circumstances at the time the agreement was created, not at the time it is enforced. *Slocum*, 256 F. Supp. at 756.

The emphasis in the judicial decisions interpreting and applying the Treas. Reg. § 20.2031-2(h) is upon the *bona fides* of the arrangement – is it a real, legitimate business arrangement supported by adequate consideration or is it a tax avoidance substitute for a testamentary disposition? Typically, the issue has arisen in family settings where the parties to the restricted stock agreement are related to each other, thereby creating natural inferences that the agreement is simply a device to pass the shares of a closely held corporation at a reduced price to the natural objects of a decedent's bounty. That is not an issue here since John Schneider had no heirs, relatives or family members to whom he sought to pass JDS common shares upon his death. Indeed, John Schneider owned no JDS shares when he died. The preferred

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-108-

shares that he previously owned were placed in a Trust in 1977. Due to Schneider's incapacity during the last few years of his life, he was not even a Trustee of that 1977 Trust at the time of his death.[344]

As discussed below, Minnie Schneider (Schneider's wife) owned some JDS common shares, but her shareholdings were an insignificant portion of the outstanding JDS common shares.[345] Those shares were not transferred to any heirs of Mrs. Schneider based on some below-market valuation of the shares designed to avoid estate taxes; instead, pursuant to the JDS Articles, her shares were redeemed by JDS on the same terms generally applicable to JDS common shareholders.[346] The evidence thus established beyond peradventure that: (a) the transfer restrictions and repurchase rights were formulated to perpetuate John Schneider's fundamental principle that JDS and Hollister would remain independent and employee owned; and (b) legitimate business considerations, not tax avoidance, led to the choice of book value as the basis for valuing JDS common shares.

Where, as here, a restrictive agreement satisfies each of the requirements of Treas. Reg. § 20.2031-2(h), it establishes the fair market value of the shares of a close corporation for federal estate tax purposes. The restrictions in the JDS Articles satisfy each of the requirements of Treas. Reg. § 20.2031. The JDS Articles: (a) specify the price to be paid for common shares by a formula - book value; (b) preclude transfers not only at a price higher than book value, but also prohibit "outsiders" from acquiring any JDS shares; (c) require any JDS shareholder to sell his, her or its shares, not only in the event of death but also on termination of employment; and (d) were promulgated for the *bona fide* business purposes of maintaining the independence of the company, its employee-owned character, and the privacy of its financial information. Thus, the fair market value of JDS's common shares was and remains their book

---

[344]    DX 635B, H02219, H02248; Zwirner Tr. 2002:22-25.

[345]    As reflected by Minnie Schneider's estate tax return, she owned 27,700 JDS common shares when she died in 1993. DX 632, RZ07316. At the end of 1993, there were 305,165 outstanding JDS common shares. DX 538.

[346]    Zwirner Tr. 2458:12-19.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

value.

###### e. Judicial Decisions Which Have Applied Rev. Rul. 59-60 And Treas. Reg. § 20.2031-2(h) To Restricted Stock Agreements, Such As The JDS Articles, Establish That The Fair Market Value Of JDS Common Shares Is Their Book Value.

Here, there is no issue as to whether the JDS Articles constitute a device to pass a decedent's shares to the "natural objects of his bounty" for less than adequate consideration. Nor is there any issue as to whether the ownership and transfer restrictions, rights of repurchase, and repurchase price in the JDS Articles (incorporated into HolliShare) were binding "during the life and after the death of the shareholder" (here, by analogy, the Plan and its participants). Under Treas. Reg. § 20.2031-2(h) and decisions applying that Regulation, the ownership and transfer restrictions, rights of repurchase, and repurchase price in the JDS Articles constitute "a bona fide business arrangement" established for a legitimate business purpose.

Each of the numerous considerations which led to JDS's adoption of the ownership and transfer restrictions, rights of repurchase, and the book value pricing method in 1956, which were later adopted by HolliShare at its inception in 1973, has been held sufficient to support a restricted stock agreement as a "*bona fide* business arrangement" for federal estate tax purposes.

For example, the use of a restricted stock agreement to insure continued ownership (by employees, family, or current owners) has consistently been held to be a legitimate business purpose and to be a bona fide business arrangement. *Quan v. Computer Sciences Corp.*, 623 F.3d 870, 881 (9th Cir. 2010) (ERISA favors employee ownership); *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 373 (D.C. 1989) ("ERISA specifically favors that pattern [long term employee ownership] by exempting Employee Stock Ownership Plans from ERISA's 10 percent cap on plans' holdings of 'employer securities.'"); *Estate of Seltzer v. Comm'r*, 50 T.C.M. (CCH) 1250, 1252 (1985) (because the purpose of a restricted stock agreement was to restrict ownership and control of the corporation, and that these goals could not have been achieved absent the agreement, the court concluded "that the Agreement was entered into and has

been adhered to as a *bona fide* business arrangement.").[347]

The decision in *Estate of Carpenter v. Comm'r*, 64 T.C.M. (CCH) 1274 (1992), is a leading case on this point. In *Carpenter*, the Tax Court upheld as *bona fide* a restricted buy-sell agreement which required a stockholder to sell his shares of a closely held corporation back to the corporation at "the book value of [his] common stock as shown upon the last annual statement of the corporation." *Id.* at 1275. The court held this formula established the fair market value of the decedent's stock because the agreement had been created for the valid purpose of allowing the surviving stockholder to continue the operation of the business and to prevent strangers from acquiring ownership. *Id.* at 1280. The court also held that the book value formula price was realistic, reasonable and fixed the fair market value of the deceased shareholder's stock, stating:

> There is nothing else in the record to show what the actual fair market value of this stock might have been in 1981 [the date of the buy-sell agreement]. The Agreement provided for a yearly review of the price but the parties never changed the price. From the testimony in this record, we conclude that the weight of the evidence is that the book value price the parties agreed to in 1981 was agreed to in an arm's length negotiation between the two of them and for business reasons and in that sense was a realistic price.

*Id.*

Similarly, here there is no evidence of what the unrestricted fair market value of JDS's common shares might have been in 1956 when JDS was incorporated or when HolliShare was created in 1973. In addition, unlike the situation in *Carpenter*, re-calculations of the book value of the shares in question are made annually, thereby strengthening the ongoing use of book value as the appropriate determinant of the fair market value of JDS's common shares.

*Carpenter* relied upon the (then) 56-year-old decision of the U.S. Supreme Court in *Helvering v. Salvage*, 297 U.S. 106 (1936), which is also controlling here. In *Helvering*, the Supreme Court was called

[347] See also *Estate of Gloeckner v. Comm'r*, 152 F.3d 208, 214 (2d Cir. 1998) (restricted stock agreement represents a *bona fide* business arrangement: "this test is sufficiently satisfied when the purpose of a restricted agreement is to maintain current managerial control – whether by family or outsiders").

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-111-

upon to determine the validity of a taxpayer's argument that the fair market value of certain corporate shares was not to be determined on an unencumbered basis (under which each share was worth $1,164.70), but rather was limited to the $100 per share price at which the corporation had an option to repurchase the same shares. *Id.* at 109. In ruling for the taxpayer, and capping the shares' fair market value at $100 per share, the Supreme Court stated: "Considering the [corporation's] option to repurchase at par, outstanding in 1922, there could be no proper finding of fair market value at that time in excess of $100 per share." *Id.* The *Helvering* decision, the only U.S. Supreme Court decision which has addressed this specific issue, has been often cited with approval and remains good law.

Another leading decision, also rendered under similar facts, is *Estate of Seltzer v. Comm'r*, 50 T.C.M. (CCH) 1250 (1985). In *Seltzer*, the tax court upheld a restricted stock agreement as a *bona fide* business arrangement and ruled that the stock of the closely held corporation was includable in a decedent's gross estate at the price fixed by a buy-sell agreement (*i.e.*, book value), and not at its higher unrestricted fair market value. *Id.* at 1252. In reaching this result, the court was impressed by the evidence that:

> Since the Agreement was entered into, three of the contracting parties have severed the "ownership required relationships" with the company. In each such case the stock was sold to the corporation at book value, pursuant to the Agreement. The purchased stock was neither sold to anyone outside the circle of original shareholders, nor redistributed among the remaining shareholders. Rather, it is being held as treasury stock. We think this is convincing evidence that the purpose of the Agreement was to restrict ownership and control of the corporation. Absent the Agreement, this restrictive ownership could not have been achieved. We are convinced that the Agreement was entered into and has been adhered to as a bonafide business arrangement.

*Id.* Continuing, the *Seltzer* court observed that it was of no consequence that the book value was less than the unencumbered fair market value of the shares. The restrictive agreement was held to establish the shares' fair market value because:

> The fact that the fair market value of the encumbered interest may have been higher than the price fixed by the Agreement does not require us to find to the contrary. [citations omitted]. Neither does the fact that the value of goodwill is excluded from the purchase price invalidate the Agreement. [citations omitted].

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-112-

*Id.* at 1254.

*Seltzer* is strongly supportive of defendants' position here. The ownership, transfer, repurchase, and price restrictions at issue in *Seltzer* are virtually identical to those in the JDS Articles. As in *Seltzer*, JDS has uniformly exercised its repurchase rights and has always, without exception, repurchased for book value all JDS common shares from any and all common shareholders. Indeed, JDS's track record in exercising its repurchase rights is far more impressive than the track record of the close corporation in *Seltzer*, where the restrictions had been enforced on only three prior occasions. Here, the restrictions have been enforced for 38 years in hundreds of transactions.[348] As in *Seltzer*, this history is "convincing evidence" that the restrictions in the JDS Articles were created in order to continue employee ownership and to maintain adherence to the Policies and Principles of John Schneider - unassailably, a *bona fide* and legitimate business arrangement.

Stock agreements, with restrictions virtually identical to those contained in the JDS Articles, have also been sustained where the purpose of the agreement was, as here, to promote the business decision of a close corporation to remain private. See, *e.g.*, *Estate of Hall v. Comm'r*, 92 T.C. 312 (1989) (transfer restrictions fixed fair market value of stock at adjusted book value). Restricted stock agreements with a price formula based on book value have been consistently sustained as *bona fide* business arrangements based on multiple grounds which are present here. For example, in upholding formulas mandating the use of book value, courts have relied on the following considerations: (a) book value provides certainty, *Estate of Amlie v. Comm'r*, 91 T.C.M. (CCH) 1017, 1026 (2006); *Carpenter*, 64 T.C.M. (CCH) at 1278; (b) book value provides "a means to assure future liquidity," *Amlie*, 91 T.C.M. (CCH) at 1025-26; *Carpenter*, 64 T.C.M at 1276; *Committee on Finance Report*, 136 Cong. Rec. at 30,539 (1990) (stating that legitimate business reasons validating buy-sell agreements include "allow[ing] owners to plan for future liquidity needs in advance" and to "avoid costly appraisals"); (c) book value produces a per share price that "could not be manipulated" and which is an affordable price, *Carpenter*, 64 T.C.M at 1278; and (d) book value

---

[348]    Zwirner Tr. 2258:21-24, 2373:6-20.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-113-

would avoid costly litigation to remove the transfer restrictions, *Hall*, 92 T.C.M. (CCH) at 330.

Under the foregoing decisions and Treas. Reg. § 20.2031-2(h), the repurchase and price restrictions in the JDS Articles fix the fair market value of JDS's common shares as their book value.

**f.    Even If The Repurchase Price Or Formula In A Restricted Stock Agreement Results In A Price That Is Only A Fraction Of The Unrestricted Fair Market Value Of The Same Shares, The Formula Price Will Still Be Upheld And Enforced If The Repurchase Price Or Price Formula Was Fair When Created.**

To be valid and enforceable as a *bona fide* business arrangement, the specified repurchase price or price formula in a restricted stock agreement must have been fair and reasonable at the time it was created, not when it was enforced. See, *e.g.*, *Carpenter*, 64 T.C.M. (CCH) at 1280; *Fiorito*, 33 T.C. at 445; *Estate of Davis v. Comm'r*, 37 T.C.M. (CCH) 341, 347 (1978); *Amlie*, 91 T.C.M. (CCH) at 1026; *Gloeckner*, 152 F.3d at 216; *Littick*, 31 T.C.M. (CCH) at 181; *Roth*, 511 F. Supp. at 654; *St. Louis County Bank*, 674 F.2d at 1210. Two noteworthy decisions applied this standard to factual situations similar to that presented here.

*Rudolph v. United States*, 93-1 U.S.T.C. 60130 (S.D. Ind. 1993), held that a shareholders' agreement which locked in the fair market value of stock in the corporation for federal estate tax purposes was designed to provide continuity in management and to protect the closely held corporation's cash flow. In the agreement, each shareholder agreed that he could not transfer his stock during his lifetime, or after his death, other than by selling it back to the corporation at $1,000 per share. The price of $1,000 per share remained unchanged even though the shareholders' agreement was amended on several occasions. When one of the shareholders died, his estate's federal tax return valued his 1,850 shares at $1,000 per share, while the IRS argued that the fair market value of the shares was actually $2,579.20 per share (over two and a half times the formula price). The tax court concluded that the $1,000 per share agreement price fixed the fair market value of the decedent's shares for federal estate tax purposes based upon the circumstances that existed when the applicable restricted stock agreement was executed. *Id.*

The decision of HolliShare to utilize a book value pricing formula was, at the time the decision was

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-114-

made in 1973, fair and reasonable under the circumstances.  Those circumstances, together with the fact that, unlike the situation in *Rudolph*, the book value of JDS's common shares is recalculated annually to reflect the company's financial performance, compel the conclusion that the fair market value of JDS's common shares was and is their "book value."

The growth of Hollister's business and its profitability since 1973 does not warrant a different conclusion.  In *Slocum v. United States*, 256 F. Supp. 753 (S.D.N.Y. 1966), the district court held that transfer and price restrictions from 1915 in a close corporation's certificate of incorporation were binding and established the fair market value of the shares more than fifty years later.  The court found that the restrictions had been adopted for "the purpose of keeping control of a business and its present management, which is recognized as a business purpose."  *Id.* at 755.  The price restriction was upheld even though it fixed the price at $100 per share for shares owned by a shareholder who died almost 50 years later, and many years after the business purpose behind the restrictions (to preserve family control of the business) had been accomplished. *Id.* at 755-56.  The government argued that the unrestricted true market value of the shares at issue was eleven times the specified repurchase price, and that the repurchase price of $100 per share was so low that it lacked "adequate and full consideration."  The court rejected this argument and found that the facts at the inception of the agreement controlled.  *Id.* at 756-57.

Here, as in *Slocum*, the ownership and transfer restrictions, repurchase rights, and the repurchase price were also set forth in two organic corporate documents (initially in JDS's by-laws and later in its Articles) over 50 years ago.[349]  Under the test enunciated in *Slocum*, the JDS restrictions were for a *bona fide* business purpose, and the restrictions are supported by adequate and full consideration.  Most significantly, the restrictions are to be assessed and evaluated as of their inception - *i.e.*, the circumstances as they existed in 1973.

As demonstrated above, under applicable ERISA decisions, the HolliShare trustees properly determined that book value was the fair market value of the JDS stock which the Plan sold.  This

---

[349]   DX 523; DX 528; Zwirner Tr. 2239:20-2240:17, 2242:14-2244:24.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-115-

conclusion is further buttressed by the estate tax law decisions.

**8.      The Good Faith And Prudent Investigation Conducted By The Defendant Fiduciaries Has Been Effectively Ratified By HolliShare's Two Regulators.**

As discussed above (in Findings of Fact Section L), the HolliShare Trustees relied upon determinations by the DOL and IRS in conducting their good faith investigation of the fair market value of JDS stock. The IRS's Determination Letters are entitled to consideration because they "reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." *Wells Fargo & Co. & Subsidiaries v. Comm'r*, 224 F.3d 874, 886 (8th Cir. 2000) (citing *Hanover Bank v. Comm'r*, 369 U.S. 672, 686 (1962) (unpublished rulings that were not even rendered against a party may nevertheless be used to demonstrate the IRS's interpretation of the IRC)).  Moreover, on two other occasions, the IRS has effectively agreed that the book value of JDS's common shares is their fair market value.  The federal estate tax returns of those shareholders reported the fair market value of the decedents' JDS common shares at their book value.  In each instance, the IRS accepted those valuations by issuing Closing Letters accepting those valuations.

The DOL and IRS determinations that HolliShare complied with all applicable requirements of the IRC necessary to maintain its tax qualified status reinforces the court's conclusion that defendants acted in "good faith" and prudently in continuing to believe that the Plan was in full compliance with all regulatory requirements – under both ERISA and the IRC.

**9.      The Expert Testimony At Trial Supports The Court's Conclusion.**

While the court need go no further to conclude that the fair market value of the JDS common shares is its book value, it is worth noting that this conclusion is bolstered by the testimony of defendants' expert witness, Roger Grabowski.

Grabowski was exceedingly well-qualified.  He is a member of the American Society of Appraisers

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-116-

and has been designated as an Accredited Senior Appraiser.[350]  He has been published extensively regarding business valuations, and has frequently been qualified to testify as an expert witness on valuation matters, including valuations of the stock of privately held corporations.[351]

Based on an extensive analysis of JDS and Hollister, including interviews with Hollister management, Grabowski opined that:

> It is our opinion that the fair market value in this case is determined by and is equal to generally accepted accounting principles, GAAP, book value of the subject shares pursuant to the stipulated formula pricing in place and corroborated by the historical price....  Formula, practice and the right of first refusal at book value establish and limit the market. No reasonable financial investor would pay more. It is our opinion that the fair market value of the subject shares from '74 to 2007 is equal to their book value.[352]

Consistent with this opinion, Grabowski sensibly testified that no reasonable investor would pay more than book value when, due to applicable restrictions, a stock can only be sold for book value.[353]

Grabowski also testified that his opinion was predicated on the existence of a "market" in JDS common shares in which actual transactions were effected at book value.[354]  As a result, he did not need to use the methodologies typically relied upon by valuation experts to determine the fair market value of unrestricted shares.[355]

Grabowski also presented a persuasive analysis that the ultimate value of the HolliShare trust fund

---

[350]   Grabowski Tr. 2518:15-17.

[351]   Grabowski Tr. 2512:6-17, 2517:9-22, 2518:25-2521:23.

[352]   Grabowski Tr. 2528:6-2529:8.

[353]   Grabowski Tr. 2623:16-2624:4.

[354]   Grabowski Tr. 2546:12-2548:11.

[355]   In this respect, Grabowski's testimony brings to mind the observation of the Tax Court in *Hall*, *supra*, that methods which are intended to determine the value of the stock of a closely held corporation by comparison with publicly traded securities "are necessarily imprecise and involve estimates and approximations which are generally less reliable than evidence of actual sales of the property to be valued. See *Tripp v. Comm'r*, 337 F.2d 432, 434-35 (7th Cir. 1964)."  92 T.C. at 338.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-117-

would be the same over time regardless of whether HolliShare's JDS common shares were valued at book value or for some ostensible "fair market value" (which Grabowski, for illustration purposes, hypothesized was two or three times the book value). Regardless of the initial valuation, an investment of a fixed amount in JDS common shares would, assuming a constant rate of growth over time, result in the same ultimate return regardless of whether the investment was made at book value, two times book value or three times book value.[356] This illustration demonstrated, as Grabowski explained, that what really drives the incremental changes in the actual benefits and cash that HolliShare participants receive is the amount of the incremental change in the value of the JDS common shares from one year-end to the next, irrespective of the valuation method that is used.[357]

Grabowski's testimony confirmed that using plaintiffs' hypothesized (but in reality, unrealizable) "fair market value" would not necessarily result in greater benefits for plan participants, because book value can be more stable than market value.[358]

Also, Grabowski presented an analysis which made clear that when HolliShare was established, the point-to-point return on JDS common shares based on the book value of such shares equaled or exceeded the return that would have been generated based on some hypothetical fair market value of such shares.[359] This testimony further established that book value was a reasonable method of valuation as of the time of the formation of the HolliShare Plan.

On the other hand, the testimony by plaintiffs' valuation expert, John Korschot, was not persuasive. Korschot's opinion was based on an assumption, which he acknowledged was "critical" to his analysis, that JDS should have redeem its common shares for some appraised "fair market value" rather than book

---

[356] Grabowski Tr. 2551:23-2557:1.

[357] Grabowski Tr. 2557:2-2258:20.

[358] Grabowski Tr. 2258:12-20.

[359] Grabowski Tr. 2549:25-2551:22.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-118-

value.[360]  Specifically, Korschot testified:

> Q.   So you assumed away the provision in the Articles of Incorporation that said it would pay book value and only book value; right?
>
> A.   Yes.
>
> Q.   That's the critical assumption?
>
> A.   It's a critical assumption, no question about that.[361]

This assumption was utterly unfounded and was, in essence, based on a legal conclusion, beyond the scope of Korschot's expertise, that ERISA purportedly required an *appraised* fair market value to be used.[362]  Korschot also admitted that he was thus assuming the existence of a ready market for JDS common shares in which transactions would occur at a price different from the prices at which transactions actually did occur – *i.e.*, that JDS would not only provide a market for the sale of JDS common shares, but that it would provide a market at fair market value.[363]  This assumption is completely antithetical not only to the manner in which JDS has in fact redeemed its shares since it was incorporated in 1957 – more than a half-century ago – but is also inconsistent with the mandate of the 1999 Trust that JDS is to maintain the book value system.  Korschot's reliance on a wholly unfounded assumption is, standing alone, sufficient to render his opinion unreliable.

Korschot's opinion was also defective in numerous other respects.  In assessing the putative fair market value of JDS common shares based on a comparison of JDS's financial performance to purportedly comparable publicly-traded "guideline" companies, Korschot failed to include Coloplast, one of Hollister's principal competitors, as a guideline company even though it was the publicly-traded entity that was most

---

[360]   Korschot Tr. 1729:6-1730:22, 1795:2-6.

[361]   Korschot Tr. 1795:7-12.

[362]   Korschot Tr. 1794:12-20.

[363]   Korschot Tr. 1730:23-1731:4.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-119-

comparable to JDS and Hollister.[364]

Even though he assumed that JDS would repurchase JDS common shares at some "fair market value" in excess of book value, Korschot based his valuation on forward-looking projections which assumed that JDS's share redemptions would be made for book value.[365]   Obviously, if JDS was instead required to redeem shares for more than book value, its future cash flow would be negatively affected, which in turn would lower the valuation of an ostensible "fair market value" of JDS shares.  Korschot, however, ignored this consideration.  He also relied uncritically on Hollister's projections even though Hollister had not been able to achieve various strategic goals that it had set years before.[366]

Korschot utilized a definition of "fair market value" that purported to be based on the estate tax regulations discussed above.  Nevertheless, in describing in his report the various factors specified by Rev. Rul. 59-60 that are relevant considerations in assessing the value of an interest in a closely-held corporation, Korschot conspicuously omitted the provisions of Section 8 of that rule, which teach that the value of the interest is typically dictated by restrictions to which the interest is subject.[367]  Korschot was also unaware that, as discussed below, at least two shareholders died owning JDS common shares and the IRS accepted the book value of their shares as their "fair market value."[368]

In some respects, Korschot's testimony actually supported defendants' position.  Korschot concurred with various statements made in a leading work on valuation of interests in closely-held corporations – Pratt and Niculita, *Valuing a Business, the Analysis and Appraisal of Closely Held*

---

[364]   Korschot Tr. 1767:24-1769:8.

[365]   Korschot Tr. 1769:9-1777:14.

[366]   Korschot Tr. 1761:5-1767:17.

[367]   Korschot Tr. 1781:20-1785:14.

[368]   Korschot Tr. 1785:17-1787:23.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-120-

*Corporations* (McGraw Hill, 5th Ed. 2008) (hereinafter, "Pratt")[369] – that:

> [r]estrictions in shareholder agreements, partnership agreements, and limited liability company agreements often severely affect the transferability of ownership interests.... Others... determine the price at which, and the circumstances under which, the shares are to be voluntarily or involuntarily transferred, put and call provisions, and who may be entitled to a right of first refusal on transactions.... The presence of practically any type of restrictive agreement tends to reduce the estimated market value of a closely held business ownership interests.[370]

Korschot's testimony also supported the choice of book value as a valuation methodology that would provide HolliShare participants with benefits based on Hollister's profitability. He acknowledged that the market value of public companies is affected by numerous macro-economic factors unrelated specifically to the company's financial performance.[371] In contrast, Korschot admitted that book value is a valuation method in which incremental year to year changes in value would be the result of the company's own financial performance.[372] Thus, Korschot's testimony supports the conclusion that the use of book value is consistent with the Congressional public policy decision to afford favored status to ERISA plans that give employees a financial stake in the success or failure of the company for which they work. In that regard, EIAPs are designed to encourage employee ownership of employer stock, which is "a goal in and of itself" for the purpose of "expanding the national capital base among employees - an effective merger of the roles of capitalist and worker." *Moench*, 62 F.3d at 568 (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir. 1983)). The Ninth Circuit recently recognized that "plans that tie employee compensation to the company's success are widely believed to be good for employee productivity and loyalty." *Quan*, 623 F.3d at 881.

Korschot's testimony also brought into sharp focus the abject failure of plaintiffs to provide

---

[369] Korschot acknowledged that the Pratt and Nicoleta book is authoritative in the field of valuation of business interests. Korschot Tr. 1736:19-1737:4.

[370] Korschot Tr. 1737:21-1738:21.

[371] Korschot Tr. 1778:15-1779:12.

[372] Korschot Tr. 1780:1-9.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-121-

competent evidence of the damages or other relief they seek (a point discussed in detail below). Korschot only determined the ostensible fair market value of HolliShare's JDS common shares as of a single date, December 31, 2003, which was the date of the final valuation of Ellis's HolliShare account.[373] However, he did not perform any calculations to determine, and thus had no opinion regarding, what the final balance Ellis's HolliShare account, and hence the benefit paid to her, would have been if some appraised fair market value had been used consistently as the valuation methodology throughout the time that Ellis was a HolliShare participant.[374]

### G.    Defendants Are Entitled To Judgment On Plaintiffs' Claim That HolliShare Improperly Valued JDS Shares In Determining Participants' Benefits.

Plaintiffs' second main claim is that Defendants wrongly valued their participant accounts when plaintiffs left Hollister's employment because those values were largely based on the book value of the Plan's JDS stock as of the preceding December 31. The trial evidence established that the valuation of HolliShare's JDS common shares at their December 31 audited book value was required by §7.03 of the Plan.[375] In challenging that valuation methodology, plaintiffs are effectively arguing that the design of the Plan violates ERISA.

Plaintiffs' position is therefore precluded by the "settlor" doctrine discussed at length above in Section II.D.5. The act of designing an ERISA plan and formulating its provisions has consistently been held to be a "settlor" function to which the fiduciary duties of ERISA §§404(a)(1)(A) and 404(a)(1)(B) simply do not apply. *Beck v. Pace International Union,* 551 U.S. 96 (2007); *Hughes Aircraft*, *supra*, 525 U.S. at 444; *Lockheed Corp. v. Spink*, 517 U.S. 882, 890-891 (1996); *Wright v. Oregon Metallurgical Corp., supra*, 360 F.3d at 1102; *Bins v. Exxon Co.*, 220 F.3d 1042, 1047 (9th Cir. 2000).

The Ninth Circuit's decision in *Wright* illustrates this point. There, as a result of a merger, company

---

[373]    Korschot Tr. 1792:14-18.

[374]    Korschot Tr. 1792:21-1793:18.

[375]    DX 501, H01380-1381.

stock held in an ERISA plan had appreciated in value, and plan participants alleged that the plan fiduciaries breached their fiduciary duties by enforcing the limits specified by the plan on the amount of company stock that could be held. Affirming the dismissal of that claim, the *Wright* court held, *inter alia*, that "plan design" is a "settlor," not a fiduciary, function under ERISA. As a result, the plaintiffs – like plaintiffs here – had no claim for a breach ERISA fiduciary duties.

Moreover, plaintiffs have failed to overcome the *Moench* presumption (see discussion above at Section II.D.6) that the ERISA fiduciaries acted prudently when following §7.03 of the Plan. While Plaintiffs have steadfastly maintained that HolliShare's JDS common shares should have been valued at their ostensible "fair market value" rather than at their book value, they have not explained how or under what circumstances those shares could have a "fair market value" other than book value in light of the transfer restrictions and repurchase rights that are inseparable ownership components of JDS common shares. Plaintiffs offered no evidence whatsoever that the fiduciary defendants should have reasonably concluded that continued adherence to the JDS restrictions, the book value pricing method, or the terms of the Plan itself were not in keeping with the settlor's expectations of how a prudent trustee would operate.

To the contrary, no reasonable and prudent fiduciary would have acted differently. The HolliShare fiduciaries have acted throughout in full and complete compliance with the settlor's intentions reflected in the terms of the Plan, the terms of the JDS Articles, and the Schneider Policies and Principles. Indeed, any contrary decision would have the anomalous effect of holding defendants liable for their failure to change Plan provisions (including those requiring investment in JDS common shares and the valuation of those shares at book value), and/or the restrictions of the JDS Articles, which they were powerless to change. Courts have recognized that the imposition of ERISA liability under such circumstances is manifestly improper. *In re Bear Stearns Cos.*, 763 F. Supp. 2d 423, 566-67 (S.D.N.Y. 2008); *In re Citigroup ERISA Litigation*, 2009 WL 2762708 at *9 (S.D.N.Y. Aug. 31, 2009); *Pedroza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1273 (N.D. Ga. 2006); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310,

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-123-

1326 (N.D. Ga. 2006).

The trial evidence affirmatively established that HolliShare's Trustees acted prudently and loyally in applying the book value system to the Plan. The book value methodology has also accounted for the incredible phenomenon that HolliShare participants have never experienced a decline in the value of their HolliShare accounts from one year to the next. They have thus avoided the fate experienced by many American employees who have suffered declines in the value of their retirement accounts in recent years. Under an unrestricted "fair market value" system, the same financial performance of a company in one year might have a lower value placed on it by the marketplace in the next year. The book value system, however, measures Hollister's performance solely based upon the company's financial performance and condition. This factor has successfully insulated HolliShare's participants from the volatility of the public securities markets.

### H.   Plaintiffs Failed To Present Competent Evidence Supporting The Relief They Sought – For The First Time – In Their Post-Trial Submissions.

Although the court has determined that defendants have not violated ERISA, the Court will now address the claims for relief that plaintiffs have asserted for the first time in their post-trial submissions. In that regard, the court notes that at trial plaintiffs failed even to articulate what relief they were seeking, other than to assert vaguely that they were requesting "reformation" of the Plan and/or the imposition of a monetary "surcharge." Even then, plaintiffs offered no testimony, expert or otherwise, as to how the HolliShare trust instrument should be reformed, and no evidence as to the amount or calculation of the surcharge they seek.

Nevertheless, in their post-trial submissions, both sets of plaintiffs (*i.e.*, Ellis, on the one hand, and all the other plaintiffs (the "DeFazio plaintiffs") on the other), for the first time, offer heretofore undisclosed computations of their claimed damages. Plaintiffs' claims for relief are denied because: (1) they have no standing to seek reformation of the Plan; (2) plaintiffs' surcharge computations were not properly disclosed in discovery (or at trial); (3) plaintiffs have waived their claim for a surcharge by not properly identifying that claim in response to the court's Final Pretrial Order; (4) plaintiffs improperly seek

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-124-

to impose the surcharge against all defendants regardless of when that defendant served as a Plan fiduciary; and (5) plaintiffs' surcharge claims are inherently flawed and are negated by uncontroverted testimony regarding the self-correcting nature of the Plan which nullifies any adverse effect of selling JDS shares at year-end book values instead of month-end book value over time.

### 1.    As Former HolliShare Participants, Plaintiffs Have No Standing To Seek Reformation Of The Plan.

While plaintiffs vaguely indicated at trial that they sought "reformation" of the Plan, that request is not made in their post-trial submissions.[376]  In any event, as this court his recognized,  because all plaintiffs are former participants or beneficiaries, they have no standing to seek any prospective injunctive or equitable relief. *DeFazio v. Hollister Incorporated*, 636 F. Supp. 2d 1045, 1076 (E.D. Cal. 2009) (citing *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 267-268 (D. Mass. 2008)).

### 2.    Although Now Requested by Defendants, Plaintiffs Improperly Failed To Disclose Their "Surcharge" Calculations In Discovery And At Trial.

For the first time in her Closing Argument, Ellis has put forth various damage figures and devoted 22 pages to explaining how those divergent figures were calculated.  The DeFazio plaintiffs devoted 11 pages and incomprehensible spreadsheets to support their damage claims.  Although requested in pre-trial discovery, none of this was disclosed by any plaintiffs in their discovery responses or at trial.

During discovery, defendants specifically asked DeFazio to "[d]escribe in detail the manner in which any defendant incorrectly determine[d] retirement benefits under Section 7.03 [of the Plan]," the "amounts by which those retirement benefits were incorrectly determined," and "the extent of loss or

---

[376]    At the close of the trial, the court specifically directed plaintiffs to file with their initial post-trial submissions "the [proposed] order that you want me to sign." Tr. 2657. The DeFazio plaintiffs submitted no proposed order in direct violation of this court's directive. Ellis also failed to submit the order she is seeking to have the court sign. Instead, she filed four *alternative* proposed Orders, all of which called for the appointment of an independent fiduciary whose activities apparently would need to be supervised on an ongoing basis by the court - exactly what the court told plaintiffs it was not going to do.  Tr. 2658 (statement by the court that "I'm not going to step in, roll up my sleeves and decide how to run this company or this ERISA plan.").

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-125-

damage to DeFazio that resulted from each of the incorrect determinations of retirement benefits." DeFazio Defendants' Interrogatories to DeFazio, No. 22.[377] DeFazio responded by "incorporating" his "expert witness report *(i.e.*, Pratt), the DROs themselves, and the facts alleged in the Fifth Amended Complaint." Defendants' Interrogatory to DeFazio No. 22 and DeFazio's answer thereto. None of those materials shed any light on the amount of any putative undervaluation of DeFazio's HolliShare "alternate payee" account; nor did they provide any computation or any methodology by which such an amount could be computed. DeFazio's response did not disclose the calculations which DeFazio has now put forth in his Closing Brief.

The other plaintiffs were similarly evasive. Defendants served all plaintiffs except DeFazio with this interrogatory:

> State whether [plaintiff] contends that she [or he] was damaged by the acts or omission complained of in the Fourth Amended Complaint, or whether any of those acts or omissions caused a diminution in the value of her [or his] HolliShare account, and if so, describe in details the damages or diminution in value that [plaintiff] claims she [or he] sustained and how such damages or the diminution in account value was calculated.

Defendants' Interrogatories to Plaintiffs, No. 21. Other than Ellis, all plaintiffs to whom this interrogatory was directed provided the identical response: "Plaintiff is not seeking damages, and will disclose her [or his] restitution calculation (if any) in accordance with the scheduling order." Plaintiffs' Responses to Interrogatories, No. 21. However, nothing was "disclosed" by any of these plaintiffs, *even through the end of the trial*. Only in the DeFazio plaintiffs' post-trial submissions did they provide, for the first time, any quantification of the amounts they now claim in damages.

For her part, Ellis responded merely by "incorporating" the expert reports of Kevin Long and John Korschot "and the treatises cited therein." Ellis's Response to Interrogatory No. 21. Other than providing an ostensible "fair market value" of JDS shares as of December 31, 2003, the date of the final valuation of Ellis's account, Korschot's report provided no explanation how this single valuation could conceivably

---

[377] The discovery requests and responses were discussed at trial. Tr. 16:9-17:10, 1086:19-22, 1385:17-1386:4.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-126-

translate into the sum of money that Ellis now claims as a surcharge. Indeed, Korschot's opinion is hardly mentioned in Ellis's post-trial filings.

As the court itself discerned at trial, Long's report pertained to legal issues and thus shed no light on the amount of any "surcharge" claimed by Ellis. On a subject which is uniquely suited to expert testimony, Ellis never disclosed any such testimony, expert or otherwise, during discovery, nor any other materials which set forth the surcharge she is now claiming.

In her post-trial filings, Ellis asserts that the number of shares oversold by HolliShare is either 243,366, 310,999 or 318,695, with the requested surcharge being $30,674,599.56, $65,449,826.25 or $70,028,626.25. None of these figures, or the basis upon which they have been calculated, was provided to defendants during discovery and now, even after trial, it is still unclear what amount Ellis is seeking. The DeFazio plaintiffs have offered still another set of numbers that do not match those requested by Ellis and that were also not disclosed to defendants.

The Court finds that defendants have been severely prejudiced by plaintiffs' failure to disclose their damage calculations until after trial. Had they been properly disclosed during discovery, defendants would have had the opportunity to introduce expert and other testimony, and possibly spreadsheets or written analyses, to dispute those calculations. Accordingly, the Court denies plaintiffs claims for a "surcharge" because those claims were not properly disclosed by plaintiffs in discovery or at trial.

### 3.    Plaintiffs Have Waived Their Claim For A Surcharge.

Plaintiffs are seeking to "surcharge" defendants in part for amounts based on sales of JDS common shares made by HolliShare *after* the final valuation of any of their respective accounts. Such a surcharge is a claim based on ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), under which any claim is deemed to be brought on behalf of the plan. *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134 (1984). Section 502(a)(2) provides that a participant may bring a claim "for appropriate relief under section 1109 of this title [ERISA §409]." In its Final Pre-Trial Order, the court directed plaintiffs to file "… an amended statement of the remaining claims that identifies, for each claim, 1) the statutory or common law

basis for the claim…" Dkt. 583, Section V, 3.  In the SPTS filed by plaintiffs in response to this Order, plaintiffs did not refer to any claim based on §409. Thus, plaintiffs have waived any ostensible claim on behalf of the Plan under §§409 and 502(a)(2), and thus have no right to seek any "surcharge" attributable to any event after December 31, 2005.

### 4.   Plaintiffs Improperly Claim The Same Surcharge Against All Defendants Regardless Of Whether Or When Each Defendant Was A Plan Fiduciary.

The Final Pre-Trial Order also directed plaintiffs to specify for each claim identified in their SPTS "the defendant or defendants that the claim is asserted against." Dkt. 583.  Despite this directive – and even after the completion of the trial – the plaintiffs have continued to improperly group all defendants together, acting as if all of the defendants served as ERISA fiduciaries for the entire history of the Plan (from 1982 to 2011), when they did not.  As a result, plaintiffs improperly seek to have the same surcharge levied against each individual defendant irrespective of the time each served as a HolliShare fiduciary.  There is no basis for holding particular defendants liable for actions which occurred before or after their tenure as trustees, and therefore plaintiffs' claim for a surcharge is denied because plaintiffs have failed to differentiate among defendants.

### 5.   Plaintiffs Have Failed To Establish Harm.

At any rate, "just as a court of equity would not surcharge a trustee for a nonexistent harm, … a fiduciary can be surcharged under §502(a)(3) only upon a showing of actual harm…" *CIGNA Corp. v. Amara*, 563 U.S. ___, Case No. 09-804, slip op. at 22 (S. Ct. May 16, 2011).  Moreover, as the Ninth Circuit emphasized in *Quan*, *supra*, plaintiffs "must show a causal link between the failure to investigate … and harm suffered by the plan."  623 F.2d at 885 (quoting *Wright*, 360 F.3d at 1099) (emphasis in the original).  See also *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part); *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998) (ERISA "requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'result[ed] from' [defendant's] breach .... Specifically, [plaintiff] must show some causal link

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-128-

between the alleged breach of [defendant's] duties and the loss plaintiff seeks to recover." (citations omitted)); *Fox v. Herzog, Heine, Geduld, Inc.*, 2005 WL 3542464 at *3 (D.N.J. Dec. 27, 2005) (in order to state a claim for monetary recovery for breach of fiduciary duty under ERISA, [p]laintiffs must demonstrate a "loss to the plan.") (quoting *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985), aff'd 2007 WL 1113802 (3d Cir. April 17, 2007)); *Smith v. Sydnor*, 2000 U.S. Dist. LEXIS 20074 at *59-*62 (E.D. Va. 2002) (collecting cases); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 279 (2d Cir. 1992) ("[s]peculative damages cannot support a cause of action for fraud [under ERISA] … [P]roof of a causal connection ... is required between a breach of fiduciary duty and the loss alleged."); *In re Enron Corp. S.E.C. Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511, 519 (S.D. Tex. 2003) (plaintiffs have the burden of demonstrating causation); *Taylor v. KeyCorp*, 2010 WL 3702423 at *5 (N.D. Ohio Aug. 12, 2010) ("Ms. Taylor has suffered no injury and thus does not have standing to bring the [breach of fiduciary duty] claims at bar.") (collecting cases).

Here, plaintiffs have not provided competent evidence of any diminution in the value of their HolliShare accounts, or those of other HolliShare participants, that was caused by any practice of which they complain. Indeed, while Defendants were effectively deprived of the opportunity to address Plaintiffs' surcharge claim at trial because the specifics of that claim were never disclosed, there is nonetheless sufficient unrebutted evidence in the record to show the fallacy of those claims.

Most importantly, plaintiffs are not entitled to a surcharge because they did not rebut the evidence that established that they were not harmed by the use of the prior audited year-end book value rather than the "current month-end" book value. The premise underlying plaintiffs' theory is that if HolliShare sold JDS common shares for their comparatively higher "current month-end" book value rather than the lower book value as of the end of the prior year, fewer shares would have been sold each year, resulting in more shares remaining in the plan at the following year-end and a correspondingly higher value for the plan. When one considers the lack of long-term effect that selling shares for "current month-end" book value rather than their prior year-end book value would have, any ostensible benefit to the Plan and its

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

participants postulated by plaintiffs disappears.

At trial, Karlovsky, McCormack, and Zwirner each testified – without contradiction – that over time, any short-term adverse impact on the HolliShare participant account balances resulting from sales at the prior year-end book value would be offset by countervailing impacts in later years.[378] Each testified that, in the long run, the price at which the shares were sold would not have a material impact on participant account balances.[379] Plaintiffs' simplistic view of the Plan ignores the "self-correcting" and "counter-intuitive" nature of the Plan over the long term.

## I.    Plaintiffs' Legal Arguments Are Flawed And Their Authorities Are Distinguishable.

For the reasons discussed at length above, the HolliShare Trustees conducted the requisite investigation to determine, in good faith, the fair market value of the JDS common shares sold by HolliShare. Plaintiffs' complaint regarding the adequacy of that investigation is that the HolliShare Trustees failed to obtain regular appraisals of the fair market value of the JDS common shares. For several reasons, plaintiffs' position is not supported by the applicable law and the evidence adduced at trial.

First, ERISA does not require an appraisal as a prerequisite for a diligent investigation. Yet, plaintiffs ask this court to adopt that as a bright-line rule and hold defendants liable for not satisfying this non-existent "requirement." In particular, plaintiffs' witness, Karen Handorf, took this position. The court finds that Ms. Handorf's opinion is without foundation.

Second, such an appraisal or fairness opinion would have been nothing other than a meaningless academic exercise. It would have resulted in a waste of time, money, and effort because HolliShare's JDS common shares could not have been sold for any price other than their book value. Moreover, had the Trustees arranged for appraisals, they would have faced claims that they violated their fiduciary duties by causing the Plan to incur a needless and wasteful expense on a continuing basis.

---

[378]   McCormack Tr. 767:25-769:20; Karlovsky Tr. 352:2-355:19; Zwirner Tr. 2383:23-2386:6.

[379]   *Id.*

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-130-

Each of the cases relied upon by plaintiffs as support for their challenge to the sufficiency of the investigation made by the HolliShare Trustees is distinguishable from the circumstances here for the same reason: in each case, the stock purchased or sold was unrestricted and unencumbered. Additionally, each also involved an "investigation" that was plainly inadequate. For example, in *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996), the administrative committee of an employee stock ownership plan ("ESOP") determined in advance that it would sell unencumbered company stock to the company's controlling shareholder at a price to be determined by an accounting firm (even though the valuation had not even been prepared). The shares had been acquired by the ESOP from the controlling shareholder fourteen years earlier. Later, they were sold back to the controlling shareholder at a price that provided the ESOP with a meager (2.2%) annual return, despite the "parabolic" rise in the value of Japanese real estate owned by the company while the ESOP held the company's stock. The *Howard* court found that the accounting firm's valuation was flawed and that defendants' blind reliance upon it was imprudent. *Id.* at 1490.

Similarly, in *Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002), an ESOP had paid $1 million more than the company's unencumbered stock was worth when the ESOP was created. The purchase price was based on an appraisal which valued the entire company rather than the minority interest being acquired by the ESOP. The appraiser acknowledged that if he knew that only a minority percentage of the company's stock was being purchased in order to form the ESOP, he would have only valued the minority interest being sold to the ESOP. *Id.* at 430.

In *Eyler v. Comm'r*, 88 F.3d 445 (7th Cir. 1996), the founder of a company sold his unrestricted and unencumbered shares to an ESOP for a price based upon valuations previously conducted by various investment banking firms for the purpose of a contemplated initial public offering ("IPO"). Due to lack of interest, the IPO was abandoned. Thereafter, the ESOP purchased the company's stock based on the earlier IPO valuations. The IPO valuations were outdated and were obviously unrealistic in view of the lack of interest on the part of investors in acquiring the company's share at the proposed IPO price. In addition, the valuation failed to consider additional debt the company had incurred in forming the ESOP.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-131-

In view of these facts, the *Eyler* court had no difficulty determining that the ESOP overpaid for the company shares and the defendants had breached their ERISA fiduciary duties. *Id.* at 456. No similar facts are present here.

Similarly, in *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), an ESOP had, on two occasions, bought unencumbered stock from the company's Chairman and CEO at inflated prices. Although the purchase prices were based on a prior appraisal by an investment banking firm, that appraisal was long outdated when the purchases occurred. By then, it had also become apparent that the revenue projections upon which the prior appraisal had been based had not materialized. By not questioning the reliability of the prior appraisal, and by proceeding with the transactions based on the outdated appraisal, the ESOP fiduciaries clearly violated ERISA by failing to conduct a prudent investigation. *Id.* at 1473-74.

In each case, unlike here, the defendant fiduciaries were dealing with unrestricted shares, failed to conduct any reasonable investigation of their true value, and failed to adequately scrutinize the flawed appraisals that they blindly relied upon. Nothing similar is present here. Here, the HolliShare Trustees were not required to obtain any appraisal, and, because they did not do so, they did not, as did the defendants in *Howard*, *Donovan*, *Chao*, and *Eyler*, rely upon an unreliable one. Conversely, in the (impossible) event that they obtained an appraisal which valued the JDS common shares at a value higher than their book value and found a willing buyer (among the limited classes of persons who are permitted to own JDS shares), JDS could have and would have exercised its right of first refusal and would have repurchased those shares at their book value. Even Korschot, plaintiffs' own expert, admitted that if JDS did not buy HolliShare's JDS common shares, then HolliShare would not have the money needed to pay benefits to it participants.[380]

Liability under ERISA turns on the realities of the situations faced by plan fiduciaries as of the time of their challenged decisions. Given the undisputed nature of "circumstances then prevailing" here, to impose ERISA liability upon defendants for their failure to obtain appraisals or to take any actions beyond

---

[380]    Korschot Tr. 1754:25-1755:4.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-132-

what they did would require them to engage in meaningless and futile actions that would only deplete the assets of the Plan by incurring unnecessary expenses.

Indeed, read properly, defendants' position is actually supported by the decision in *Donovan*. The *Donovan* court stressed that "the prudent man rule as codified in ERISA is a flexible standard: the adequacy of a fiduciary's investigation is to be evaluated in light of the 'character and aims' of the particular type of plan he serves." 716 F.2d at 1467. Accordingly, the Fifth Circuit concluded that ERISA plan fiduciaries "will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." 716 F.2d at 1467-68, emphasis added. The *Donovan* court also stressed that:

> Appraisal of closely-held stock is a very inexact science; given the level of uncertainty inherent in the process and the variety of potential fact patterns, we do not think a court should require fiduciaries to follow a specific valuation approach as a matter of law under [ERISA] Section 3(18). The standard they must follow remains one of prudence. If more specific rules are needed, the better - and fairer - approach is to inform fiduciaries of them beforehand by regulation.

716 F.2d 1473.

Here, "the particular type of plan" is a profit sharing plan that, since its inception 38 years ago, was designed to invest in shares that are subject to ownership and transfer restrictions, and the repurchase rights of JDS to repurchase them at their book value. This is the "circumstance then prevailing" within the meaning of *Donovan*. The above-quoted language makes clear that the failure to obtain an appraisal or fairness opinion is not a *per se* ERISA violation. Instead, if shares are subject to ownership and transfer restrictions, rights of repurchase, and a price formula, and the plan fiduciaries are fully aware of them and have no reason whatsoever to believe those provisions are not valid and fully enforceable, they cannot be held liable for complying with them. Under the undisputed circumstances present here, defendants' position is bolstered by the decision in *Donovan*.

Plaintiffs also suggested at various points during the trial that the HolliShare Trustees, and certain of the other individual defendants, purportedly knew that JDS common shares had a value in excess of book value. This contention is based on various Hollister internal documents referring to the value of JDS

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-133-

common shares in terms of multiples of book value. However, the evidence was clear that these references were to hypothetical values of the shares if the transfer restrictions and repurchase rights to which they were subject did not exist.[381] Such restrictions do, in fact, exist, and the evidence furnished no basis whatsoever to believe that they would be abandoned. To the contrary, the restrictions and the book value system are so ingrained at JDS and Hollister that the 1999 Trust (the owner of preferred shares having voting control of JDS) provides explicitly for the continuation and enforcement of them.[382]

## J.   Even If The Plaintiffs Had Viable Claims (Which They Do Not), Their Claims Are Barred (In Whole Or Part) By The Statute Of Limitations.

In claiming damages stemming from transactions that occurred as long ago as 1974 (see 181-182 of the DeFazio plaintiffs' post-trial Proposed Findings of Fact and Conclusions of Law), plaintiffs are seeking to assert claims that are barred in whole or part by the ERISA statute of limitations, ERISA §413, 29 U.S.C. §1113. The normally applicable limitations period is six years after the alleged violation, which is shortened to three years in cases where the plaintiff had actual knowledge of the essential facts of the violation.

Section 413 also provides that claims may be brought within six years after discovery of the violation in cases of "fraud or concealment. As this Court previously held (see Dkt. 333, April 8, 2008 Order), the "fraud or concealment" provision is a codification of federal "fraudulent concealment" doctrine and requires some affirmative act on the part of a defendant to, in effect, "cover up" the ERISA violation – separate and independent of the violation itself. Dkt. No. 333 at 13-14; see *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1402 (9th Cir. 1995); *Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544, 1552 (3d. Cir. 1996); *Ranke v. Sanofi-Synthelabo Inc.,* 436 F.3d 197, 204 (3d Cir. 2006); *J Geils Band Employee Benefits Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173 (D.C. Cir. 1994); *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir.

---

[381]   Winn Tr. 101:18-25.

[382]   DX 641, H10969; Zwirner Tr. 1614:19-1616:2.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-134-

1984).

Plaintiffs bear the burden of establishing fraudulent concealment. *Larson v. Northrop Corp., supra*, 21 F.3d at 1172-73; *Foltz v. U.S. News and World Report, Inc.*, 663 F. Supp. 1494, 1537 (D. D.C. 1987), *aff'd* 865 F.2d 364 (D.C. Cir. 1989); *Harris v. Koenig*, 2011 WL 4542973 (D. D.C. Oct. 3, 2011). To invoke the "fraudulent concealment" exception, plaintiffs must prove specific affirmative, intentional conduct that is distinct from the underlying fiduciary breach, and that this conduct was taken by the defendant against whom the doctrine is sought to be applied for the express purpose of preventing or hindering a party from discovering the facts underlying the alleged breach. See *Barker,* 64 F.3d at 1402 ("Under [the fraudulent concealment] doctrine, a statute of limitations may be tolled only if the plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." (internal quotations omitted)); see also *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006) ("[A]n ERISA fiduciary ... [must] have taken affirmative steps to hide an alleged breach of fiduciary duty from a beneficiary in order for the 'fraud or concealment' exception to apply.").

Here, plaintiffs have not proven that defendants have misled anyone concerning the price at which HolliShare was selling its common shares to JDS or how the participants' accounts are valued. There is no evidence that any defendant engaged in any affirmative concealment of any act or practice pertaining to HolliShare.

More pointedly, there is no evidence that plaintiffs were unable in the exercise of reasonable diligence to uncover the alleged violations because there was no testimony by any plaintiff about anything. The failure of all plaintiffs to testify precludes them from invoking the "fraud or concealment" provision of § 413 because plaintiffs have not shown that they exercised the required due diligence to discover their claim within the normally-applicable six year limitations period. See *Larson v. Northrop Corporation, supra*, 21 F.3d at 1172 (fraud or concealment exception requires the plaintiffs show they lacked actual or constructive notice of the claim despite their exercise of diligence).

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-135-

Ellis filed her claim in March 2005. To the extent that she claims sales by HolliShare of its JDS common shares for the prior December 31 book value were prohibited transactions, any recovery by her would be limited to harm to her HolliShare account stemming from the sales made on May 27, 1999, June 30, 2000, June 29, 2001, June 21, 2002 and June 23, 2003.

Plaintiffs Dimaro and Lavick filed their claims on August 25, 2005. Consequently, any claim by them would have to be based on an act or omission occurring on or after August 25, 1999. As a result, any "prohibited transaction" claim by Dimaro, whose Hollister employment terminated in 1999 and whose final HolliShare account balance was fixed as of December 31, 1998, is time-barred in its entirety. Lavick left Hollister in 2000, so her account balance was fixed as of December 31, 1999. The last sale by HolliShare which could have affected her account occurred on May 27, 1999, so her "prohibited transaction" claim is also completely barred by the statute of limitations.

As to the other plaintiffs:

- McNair filed his Complaint on July 10, 2006, and his account balance was fixed as of December 31, 2001. Accordingly his claims are barred except to the extent they are based on HolliShare's sale of JDS stock on June 29, 2001.

- Humphries and Seay filed their complaints on April 19, 2008, and their account balances were fixed as of December 31, 1997, and December 31, 1998, respectively. Accordingly, their claims are barred in their entirety.

- Stanton filed her complaint on April 19, 2007, and her account balance was fixed as fo December 31, 2001. Accordingly her claims are barred except to the extent they are based on HolliShare's sale of JDS stock on June 29, 2001.

- Pace filed her complaint on April 19, 2007, and her account balance was fixed as fo December 31, 2002. Accordingly her claims are barred except to the extent they are based on HolliShare's sales of JDS stock on June 29, 2001 and June 21, 2002.

- Beetham and Wirth their complaints on April 19, 2007, and their account balances was fixed as of December 31, 2005. Accordingly their claims are barred except to the extent they are based on HolliShare's sales of JDS stock on June 29, 2001, June 21, 2002, June 27, 2003, June 25, 2004, and July 1, 2005.

Of course, because there was no evidence that any plaintiff's HolliShare account was adversely affected by any of the JDS share sales made by HolliShare, determinations by the court regarding which transactions do or do not fall within the six-year limitations period serves only to demonstrate the extent

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-136-

to which plaintiffs are overreaching by seeking damages (or, to use their term, a "surcharge") for all of HolliShare's sales of its JDS sales of JDS common shares that occurred during their respective periods of employment with Hollister.

### K.   Defendants Are Entitled To Judgment On Plaintiffs' Other ERISA Claims.

#### 1.   Defendants Did Not Violate ERISA §403

The first counts in both the HAC and the FAC purport to be brought under ERISA §§ 403(a) and 403(c)(1), 29 U.S.C. §§1103(a) and 1103(c)(1).  Dkt. 368, HAC; Dkt. 314, FAC; Dkt. 588, SPTS, p. 5. Section 403(a) requires that plan assets be held in trust, and that the trustees be either named in the trust instrument or be appointed by named fiduciaries.  ERISA § 403(c)(1) provides, in pertinent part:

> (c)   Assets of plan not to inure to benefit of employer; allowable purposes of holding plan assets
>
> (1)   [t]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

In the HAC, plaintiffs allege that defendants breached §§ 403(a) and (c)(1) by: (1) undervaluing Plan assets when selling the JDS common shares to JDS at their book value; (2) acquiring JDS common shares by assuming and paying certain 6% promissory notes to JDS; (3) incorrectly determining retirement benefits under the Plan; (4) maintaining the Plan's investment in JDS common stock; (5) voting the Plan's shares of common stock in favor of certain amendments to the JDS Articles; and (6) concealing JDS's ability to manipulate the value of Plan assets.  (Dkt. 368, Count I.)  The FAC alleges the same breaches, except for those relating to the promissory notes and voting the Plan's shares of JDS common stock in favor of the amendments to the JDS Articles.

As with most of plaintiffs' ERISA claims, defendants' alleged violations of §§ 403(a) and 403(c)(1) are rooted in plaintiffs' contention that HolliShare's annual sales of JDS's common shares at their book value were for less than the shares' fair market value and were therefore not sold for adequate consideration.  Plaintiffs, other than Ellis, Dimaro, Humphries, and Seay, also claim that those defendants

who served as HolliShare Trustees violated these sections of ERISA by participating in HolliShare's valuation of its holdings of JDS common shares at their book value.   Accordingly, if the HolliShare Trustees determined in good faith and in accordance with the terms of the Plan that the book value of the JDS common shares sold by HolliShare is their fair market value, then plaintiffs' claims § 403 are fatally defective.

For the reasons detailed above, the fair market value of JDS common shares has always been, and remains, their book value and the sales of JDS common shares to JDS were made for adequate consideration.  Plaintiffs have also failed to prove that any of the other acts of which they complain constituted a breach of fiduciary duty under ERISA.  Thus, plaintiffs have failed to prove an underlying violation of ERISA, an essential element of their claims under §§ 403(a) and 403(c)(1).  Judgment is therefore entered for defendants on plaintiffs' claims brought under § 403 (Dkt. 386, HAC, Count I; Dkt. 314, FAC, Count I; Dkt. 588, SPTS, p. 5).

Moreover, plaintiffs offered no evidence that established how any Plan asset "inured" to the benefit of JDS. JDS buys JDS common shares from HolliShare when HolliShare recommends that it do so.  Even if the stock is bought at a discount to its market price, the company does not make a "profit" or receive a "benefit."  If the company pays cash for its own shares, its assets decrease (by the amount of the cash used for the purchase), its liabilities remain unchanged, and its net worth decreases (although that reduced total net worth is shared by fewer shareholders).[383]    Plaintiffs counter that because JDS stock is sold by HolliShare to JDS at its book value rather than at its fair market value, the difference between book and fair market value reverts back to JDS, and that Plan assets therefore revert to parties other than Plan participants.

---

[383]    For example, if a company has a net worth of $1,000,000 and is owned by 10 shareholders, each of whom holds 1,000 shares, each share is worth $1,000 and each shareholder's stake is worth $100,000.  If the corporation redeems the shares of one shareholder (1,000 shares) for $1,000 per share, then the corporation's net worth declines to $900,000.  However, each of the 9,000 shares that then would remain outstanding are still worth $1,000 per share, so the nine remaining shareholders each continue to hold a $100,000 interest in corporation.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-138-

The reality of the situation is that JDS's purchases of JDS common shares from HolliShare were solely for the benefit of the Plan and its participants. The undisputed evidence at trial established that JDS's annual purchases provided HolliShare with the funds it needed to pay Plan benefits. Though JDS and Hollister may have received the indirect benefit of an incentive being provided to the employees of Hollister to perform their jobs more productively by giving them a stake in the company's success, such an indirect benefit does not violate § 403(c). *Saylor v. Parker Seal Co.*, 975 F.2d 252, 256 (6th Cir. 1992) (the issue under § 403(c)(1) is not whether defendant has received a benefit, but "whether Plan assets are being used to benefit [defendant] rather than Plan participants"); *Holliday v. Xerox Corp.*, 732 F.2d 548, 551 (6th Cir. 1984) (§ 403(c)(1) does not prohibit incidental benefits that inure to an employer when the overall purpose of the underlying plan was to benefit the employees); *Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272, 284 (D.R.I. 2003), aff'd in part, rev'd in part on other gds., 369 F.3d 1 (1st Cir. 2004) ("§ 403(c)(1) does not prevent an employer from enjoying indirect benefits associated with plan investment decisions"); *Aldridge v. Lily-Tulip, Inc.*, 953 F.2d 587, 592 (11th Cir. 1992) (§ 403(c)(1) claim could not be predicated on an unjust enrichment theory). Moreover, improved employee productivity, motivation, and longevity increase JDS's profits, thus increasing the book value of JDS common shares and hence, the benefits received by HolliShare participants.

Finally, the record is devoid of any evidence that the HolliShare Trustees allowed Plan assets to inure to the benefit of JDS, the JDS or the Hollister Boards of Directors, or the 1977 or 1999 Preferred Share Trust. To the contrary, the evidence established that the Plan Trustees held plan assets for the exclusive purpose of providing benefits to HolliShare participants and beneficiaries.

> **2.      Plaintiffs' Claims That Defendants Violated ERISA §§404(a)(1)(C) By Failing To Diversify HolliShare's Assets Are Untenable.**

ERISA § 404(a)(1)(c) (29 U.S.C. §1104(a)(1)(c)) provides:

>     (a)      Prudent man standard of care
>
>         (1)      Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

the interest of the participants and beneficiaries and - ...

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; ...

Plaintiffs have alleged that defendants breached their fiduciary duty under ERISA by failing to diversify the Plan's investments when it was clearly prudent to do so. Dkt. 386, HAC, Count IV; SPTS, p. 8. However, plaintiffs did not support that theory with evidence at trial. Had they done so, their efforts to predicate an ERISA claim on this ground would have been unavailing.

Although § 404(a)(1)(C) generally requires diversification of Plan assets, ERISA § 404(a)(2) expressly exempts from the diversification requirement an EIAP that invests in "qualifying employer securities." See *Quan v. Computer Sciences Corp., supra*, 623 F.3d at 878; *Wright v. Oregon Metallurgical Corp., supra*, 360 F.3d at 1097 (commenting that because § 407(b) exempts EIAPs from the requirement of diversification, a plan fiduciary should not be subjected to ERISA claims based on allegations that it was imprudent to invest all of the plan's assets in employer stock). As an EIAP, HolliShare is exempt from ERISA's diversification requirement. See *In re Suntrust Bank Inc. ERISA Litigation*, 749 F. Supp. 2d 1365, 1372-75 (N.D. Ga. 2010). Thus, the HolliShare Trustees were not required to diversify plan investments and judgment is entered against plaintiffs on their claims under § 404(a)(1)(c) as a matter of law. As a matter of fact, in view of the above-market returns that HolliShare's concentrated investment in JDS common shares has generated for Plan participants,[384] any contention that it was imprudent for the HolliShare Trustees to have invested HolliShare's assets principally in JDS common shares is frivolous.

---

[384]    See DX 754, which compares the year-to-year appreciation in the value of JDS common shares with various market indexes.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-140-

### 3. Brilliant And Kelleher Cannot Are Not Liable For Their Predecessor Trustees' Votes In Favor Of The 1999 Amendments To The JDS Articles.

#### a. The Votes At Issue Were Prudent And Thus Did Not Violate ERISA.

Plaintiffs allege that defendants breached ERISA §§ 404 and 410 (29 U.S.C. §§ 1104 and 1110) by voting HolliShare's JDS common shares in favor of several amendments made to the JDS Articles in 1999. Dkt. 368, HAC, Count X; Dkt. 314, FAC, Count IX; Dkt. 588, SPTS, p. 14. In its June 29, 2009 Order, the court found that plaintiffs' direct claims against the defendants arising from these votes were barred by the applicable statute of limitations. *DeFazio*, 636 F. Supp. 2d at 1058. However, the court also found that plaintiffs' co-fiduciary liability claims under § 405 were not barred by the statute of limitations because the limitations period for those claims did not begin to run until 2002. *Id.* at 1059. In view of this ruling, the defendants who served as HolliShare Trustees before or at the time of the 1999 votes cannot be held liable with respect to this claim; the only defendants who may have potential liability are Brilliant and Kelleher.

#### (1) The January 28, 1999 Amendments

If the HolliShare Trustees in 1999 did not breach their duties in voting for the amendments at issue, then later "co-fiduciaries" cannot be held liable under ERISA § 405. See *Harris v. Amgen, Inc.*, 2010 WL 744123 at *14 (C.D. Cal. Mar. 2, 2010); *In re Calpine Corp. ERISA Litigation*, No. 03-1685, 2005 WL 1431506 at *8 (N.D. Cal. Mar. 31, 2005). That is the case with respect to all four of the amendments at issue.

One of the January 28, 1999 amendments slightly limited the potential liability of JDS directors.[385] This court has already rejected plaintiffs' position that this amendment violates § 410. In addressing plaintiffs' request for partial summary judgment on that point, this court held:

> By their terms, these provisions are expressly limited in scope to a director's liability "as a director" to the corporation or shareholders. They do not purport to

---

[385] DX 535, Article Six.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-141-

limit the liability of the directors as ERISA fiduciaries to an ERISA plan, beneficiaries or participants.  While these provisions might limit a suit by HolliShare as a shareholder against Hollister or JDS directors, they do not limit such suits to the extent they are based on breaches of ERISA duties. Accordingly, 29 U.S.C. § 1110(a) does not render these provisions void as against public policy.

*DeFazio*, 636 F. Supp. 2d at 1080.  Nor did approval of this amendment violate the defendants' obligation to act prudently because it enhanced JDS's ability to attract qualified directors, which, in turn, would inure to the benefit of HolliShare as JDS's largest common shareholder.[386]

The other amendment approved on January 28, 1999 (a) increased the cash paid by JDS to sellers of JDS common shares from $5,000 to the greater of $250,000 or 10% of the transaction amount; (b) increased the interest rates payable on promissory notes for the balance of the purchase price; and (c) shortened (in most cases) the term of those promissory notes.[387]  The vote in favor of this amendment was prudent because, among other things, it was intended to (and did) result in a more reasonable "down payment" on the note given the size of the balances and to enhance the quality of the benefit, which helped to attract qualified personnel to Hollister.[388]  Plaintiffs alleged in their complaints that the amendment was imprudent in that it reduced the cash available to JDS and thus increased the risk that JDS would not be able to buy JDS common shares from HolliShare.  However, there is no evidence that JDS's ability to buy Plan shares was realistically jeopardized by this amendment.

### (2)    The April 30, 1999 Amendments

Plaintiffs also complain of two amendments to JDS's Articles approved on April 30, 1999.  The first restricted any individual from owning more than 10% of the outstanding JDS common shares.[389]  The amendment was intended to keep any single individual from asserting too much control over Hollister –

---

[386]    Karlovsky Tr. 536:7-21; McCormack Tr. 1168:6-1169:10; Zwirner Tr. 2280:17-2282:11.

[387]    DX 535, Article Five, § II.D.4.a.

[388]    Karlovsky Tr. 534:21-536:3; McCormack Tr. 1040:1-1041:18; Zwirner Tr. 2278:16-2280:7.

[389]    DX 536, Article Five, § II.D.8.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-142-

an objective that the HolliShare Trustees legitimately viewed as being in the best interests of HolliShare.[390] This amendment has had no impact whatsoever on the rights of HolliShare participants. Plaintiffs maintain that this amendment could be detrimental to HolliShare because it restricts an individual buyer from purchasing JDS common shares, but there is no evidence that any individual buyer, qualified to own JDS shares under the JDS Articles, would or could purchase JDS common shares in the quantities HolliShare needs.

The final amendment at issue eliminated the exception to the transfer restrictions and repurchase rights for John Schneider, Minnie Schneider, and trusts established by them or established for their benefit.[391] This exemption was moot, as of April 30, 1999, and its deletion from the JDS Articles merely eliminated meaningless surplusage.[392] As such, the HolliShare Trustees' vote for that amendment did not violate any fiduciary duty to HolliShare, or its participants.

### b. Even If The Votes Were Imprudent, Brilliant And Kelleher Are Not Subject To Co-Fiduciary Liability Based On The 1999 Amendments.

Not only were the votes of the HolliShare Trustees in favor of the 1999 Amendments prudent, Brilliant and Kelleher would still not be subject to ERISA co-fiduciary liability even if the votes had been imprudent. Each of the three subparts of § 405 requires proof of a causal connection between the breach and damages which a plaintiffs seek to recover. In *Silverman v. Mutual Benefit Life Ins. Co.*, the Second Circuit held that §§ 405(a)(1)-(3) require a plaintiff to "show some causal link between the alleged breach of [the fiduciary's] duties and the loss plaintiff seeks to recover." 138 F.3d 98, 104 (2d Cir. 1998). Accord, *Brandt v. Grounds*, 502 F. Supp. 598, 599 (N.D. Ill. 1980), aff'd 687 F.2d 895 (7th Cir. 1992); *Pension Fund-Mid Jersey Trucking Industry - Local 701 v. Omni Funding Group*, 731 F. Supp. 161, 176

---

[390]    Karlovsky Tr. 537:1-538:9; McCormack Tr. 1042:9-1053:9; Zwirner Tr. 2283:3-2284:10.

[391]    DX 536, Article Five, § II.E.

[392]    Karlovsky Tr. 538:10-539:3; McCormack Tr. 1169:11-25; Zwirner Tr. 2285:2-11.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-143-

(D.N.J. 1990).  The burden is on a plaintiff to establish the requisite causal nexus between the co-fiduciary's acts or omissions and a resulting loss.  *Silverman*, 138 F.3d at 106 (concurring opinion).

In their post-trial submissions, plaintiffs do not allude to any actual harm purportedly caused by the votes in favor of the 1999 Amendments. Thus, plaintiffs have not established any violation of ERISA § 405(a).  See *Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987) ("[M]onetarily penalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA...."); *Brandt*, 687 F.2d at 898.

In addition, § 405(a)(1) and § 405(a)(3) require proof that a defendant knowingly participated in or knowingly facilitated a breach by the other defendants.  See *Silverman*, 138 F.3d at 104; *Stein v. Smith*, 270 F. Supp. 2d 157, 175 (D. Mass. 2003); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 284 F. Supp. 2d 511, 519, 581 (S.D. Tex. 2003).  Plaintiffs introduced no evidence whatsoever that either Brilliant or Kelleher had any reason to suspect that, in 1999, votes for the 1999 amendments were a breach of fiduciary duty by the HolliShare Trustees.[393]  Similarly, § 405(a)(2) only imposes liability on a fiduciary who, through the failure to discharge his, her, or its fiduciary responsibilities, enables another fiduciary to commit a breach of his, her, or its fiduciary duty.  Since Brilliant and Kelleher were not Trustees until 2000 and 2004, respectively, they could not possibly have "enabled" the vote in favor of the 1999 amendments.

### 4.    Defendants Made No Misrepresentations.

Defendants are not liable for having made any misrepresentations in violation of ERISA.  As a threshold matter, because no plaintiff testified at trial, plaintiffs necessarily failed to offer evidence of any actual reliance on any statement they now contend was a misrepresentation.  Their failure to prove actual reliance on any putative misrepresentations is fatal to their claims.  See, *e.g.*, *Bell v. Pfizer, Inc. Stock & Incentive Plan*, 626 F.3d 66, 74, 77 (2d Cir. 2010); *Harris v. Amgen, Inc.*, 2010 WL 744123 at *13 (C.D. Cal. Mar. 2, 2010); *Wilson v. Venture Fin. Group, Inc.*, 2010 WL 2028088 at *10 (W.D. Wash. May 18,

---

[393]    Brilliant testified that he knew nothing about the 1999 amendments to the JDS Articles.  Brilliant Tr. 1370:22-1371:3.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-144-

2010).

The evidence also failed to show that the defendants made any actionable misrepresentation. Indeed, plaintiffs' "misrepresentation" claims ultimately come down to an alleged failure on the part of the defendants to disclose expressly that HolliShare sold its JDS common shares at the prior December 31 audited book value. However, ERISA does not impose an overarching disclosure obligation on fiduciaries to communicate all facts concerning the administration of an ERISA plan. See *In re Citigroup ERISA Litigation, supra*, 663 F.3d at 142-143; *Board of Trustees CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997) ("We think it inappropriate to infer an unlimited disclosure obligation [under ERISA] on the basis of general provisions that say nothing about disclosure."). See also *United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313, 2330 (2011) ("When Congress provides specific statutory obligations, we will not read a 'catch all' provision to impose general obligations that would include those specifically enumerated," citing *Massachusetts Mutual Life Ins. Co. v. Russell, supra*, 473 U.S. at 141-142). In view of these authorities, defendants had no obligation to disclose the price at which HolliShare sold its JDS common shares, especially since (as discussed above) the evidence was that over the long term, sales of shares for the prior December 31 audited book value did not have a material effect on HolliShare participant account balances. See *In re Citigroup ERISA Litigation, supra*, 662 F.3d at 143-144 (misstatements are actionable under ERISA only if they are "intentionally connected" to Plan benefits).

**5.    JDS's Board Of Directors Is Not A Fiduciary Under ERISA, And Its Purchases Of The Plan's JDS Common Shares Were Not Fiduciary Acts.**

JDS, who is not a named fiduciary, is not a *de facto* HolliShare "fiduciary" within the meaning of ERISA. "Fiduciary" is a defined term under ERISA. ERISA § 3(21)(A), 29 U.S.C. § 1102(21)(A), specifies that:

> [A] person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-145-

discretionary responsibility in the administration of such plan….

The hallmark of fiduciary status under ERISA is discretionary control over the administration and management of an ERISA plan, or over the management of its assets. *See, e.g., Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty … the threshold question is not whether the actions … adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaints."); *Stein v. Smith*, 270 F. Supp. 2d 157, 165 (D. Mass. 2003); *Associates in Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir. 1991) ("[T]he power to act for the plan is essential to status as a fiduciary under ERISA") (emphasis added); *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989) (fiduciary status requires "the authority to exercise control unilaterally over a portion of a plan's assets …") (emphasis added).

At trial, plaintiffs submitted no evidence that JDS falls within any of the categories enumerated in the statutory definition of "fiduciary." JDS purchases its common shares from HolliShare, but those purchases are not initiated by JDS. The only role JDS performs in connection with HolliShare is that it: (1) receives the requests of the HolliShare Trustees to sell back to JDS a certain number of JDS common shares at the prior December 31 book value fro cash in accordance with the Mid-80s Agreement; (2) accepts and approves those requests; (3) then executes the transactions, by repurchasing the shares and providing HolliShare with the required cash.[394] JDS does this in its corporate capacity, as the issuer of the capital stock.[395] JDS plays no role in determining whether HolliShare should sell shares of JDS stock and, if so, how many shares it should sell; only the Plan Trustees make those decisions.[396] Accordingly, JDS exercises no discretion or control over its repurchases of JDS shares from HolliShare.

---

[394]    Zwirner Tr. 2404:17-2405-1.

[395]    Zwirner Tr. 2405:2-7.

[396]    Zwirner Tr. 2405:8-13.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-146-

In this regard, the issue has arisen as to whether the Mid-1980s Agreement is binding on JDS or whether it is free to act unilaterally (*i.e.*, as a fiduciary) with respect to the JDS shares held by HolliShare. For approximately 25 years, the terms of the Mid-1980s Agreement have been scrupulously adhered to by HolliShare and JDS. In addition, for the past 12 years, JDS has honored its three-year rolling commitment to purchase each year the number of JDS common shares that HolliShare requested that it purchase. Moreover, HolliShare has reasonably relied, and continues to reasonably rely on JDS's three-year rolling commitment. Under these circumstances, given the established custom and practice between the parties, the Mid-1980s Agreement is a legally binding and enforceable agreement which requires JDS to continue to honor its three-year rolling commitment. See *Carl Haas Automobile Imports, Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381, 1388-89 (N.D. Ill. 1996) (part performance of an oral agreement is good evidence of the existence of a binding contract); *B & B Land Acquisition, Inc. v. Mandell*, 714 N.E.2d 58, 62 (Ill. App. Ct. 1999) (performance and reliance on an oral agreement render an agreement enforceable); *Gaffney v. McCarron*, 360 N.E.2d 508, 509 (Ill. App. Ct. 1977) (existence of an oral contract may be established by circumstances showing the general course of dealing between the parties). Because JDS's dealings with HolliShare under the Mid-1980s Agreement have been performed pursuant to a legally binding bilateral agreement between those parties, JDS did not and could not exercise any discretionary control over the administration or management of HolliShare or its assets. For all the foregoing reasons, JDS is not a HolliShare fiduciary and, consequently, is not liable as such under ERISA. See *Harris v. Amgen, Inc.*, 2010 WL 744123, at *5 (C.D. Cal. Mar. 2, 2010) ("only fiduciaries can be held liable for breach of fiduciary duty under ERISA," citing Wright, 360 F.3d at 1101)).

Moreover, in buying JDS common shares pursuant to the Mid-1980s Agreement from HolliShare, JDS made a business decision and was acting in its corporate capacity rather than as an ERISA fiduciary. As such, it is not subject to ERISA liability for those decisions. See *Pegram, supra*, 530 U.S. at 225-26; *Verity Corp., supra*, 516 U.S. 489, 498 (1996); *Henderson v. UPMC*, 640 F.3d 524, 527 (3d Cir. 2011); *DeLuca v. Blue Cross of Michigan*, 628 F.3d 743, 746-47 (6th Cir. 2010) ("a party is subject to fiduciary

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-147-

duty under ERISA only when the party 'was acting as a fiduciary' (that is, was performing a fiduciary function) when taking the action subject to complaint"); *In re Lehman Bros. Sec. & ERISA Litigation*, 683 F. Supp. 2d 294, 299 (S.D.N.Y. 2010).

### 6.   The Hollister Board Of Directors Did Not Breach Its Limited Liability Fiduciary Duties Under The Plan.

The Hollister Board is a "named fiduciary" for certain purposes under the HolliShare Plan. However, fiduciary status under ERISA is not an "all or nothing concept." *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998); *Custer v. Sweeney*, 89 F.3d 1156, 1162 (4th Cir. 1996) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992)); *Walker v. Nat'l City Bank of Minneapolis*, 18 F.3d 630, 634 (8th Cir. 1994). Instead, the scope and extent of a person's fiduciary duties under ERISA are limited to those duties and responsibilities assigned to that person by the plan at issue. *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994) (under the statutory definition, a "person is a fiduciary 'to the extent that' he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others").

The only duty imposed on the Hollister directors by the Plan is the appointment of the HolliShare Trustees. The parties do not dispute, and the record is devoid of any evidence to the contrary, that the Hollister Board appointed competent people as HolliShare Trustees. Even assuming that the power to appoint plan trustees carries with it the duty to exercise reasonable prudence in monitoring their actions,[397]

_____

[397] There is conflicting Ninth Circuit authority regarding whether the persons who appoint fiduciaries of an ERISA plan have a fiduciary duty to monitor reasonably the actions of their appointees. *Gelardi v. Pertec Computer Corp.*, *supra*, 761 F.2d at 1325 (person whose sole duty was to appoint the plan administrators was only liable with regard to their appointment of those administrators); *Henry v. Frontier Indus., Inc.*, 863 F.2d 886 (9th Cir. 1988) (unpublished) (board member had the duty to monitor the performance of another plan fiduciary the board member had appointed). Various courts have held that inferring a duty to monitor the actions of appointed fiduciaries is inconsistent with the language and structure of ERISA. *See In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d 1328, 1338-39 (N.D. Okla. 2003 and unpublished October 27, 2003 Order at 2, n. 1 (imposing a general duty to monitor would
(continued...)

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

there was no evidence adduced at trial that, based upon their monitoring of the trustees, the Hollister directors believed that the HolliShare Trustees were not fulfilling their fiduciary duties, or that they had any reason to believe the HolliShare Trustees were acting imprudently or unreasonably. See *In re Dynegy, Inc. ERISA Litigation*, 309 F. Supp. 2d 861, 902-03 (S.D. Tex. 2004) (claims against board of directors for not monitoring plan committees it had appointed were dismissed where there were no "red flags" that placed the board "on notice of possible misadventure by their appointees," and plaintiffs' failed to allege the appointees were incompetent or subject to replacement for cause); *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991) (directors do not breach their duty to monitor absent knowledge of "possible misadventure by their appointees").

Moreover, the duty to monitor does not carry with it the duty to oversee and approve every decision made. In *Howell v. Motorola, Inc.*, 633 F.3d 552, 555-56 and 571 (7th Cir. 2011), the price of Motorola's stock fell 20% after the public disclosure of a bad loan for $1.7 billion to $2 billion to a Turkish company. Claims for breach of fiduciary duty under ERISA were brought against Motorola's employer stock fund, alleging imprudence in offering Motorola stock as an investment option for the company's 401(k) plan participants. Plaintiffs claimed, *inter alia*, that Motorola's Board of Directors breached its fiduciary duty under ERISA by failing to monitor the activities of the plan trustees (Plan Administrators) it had appointed. In offering the entry of summary judgment for all defendants, the Seventh Circuit concluded that, based on the Board's review of periodic reports it received and audit reports from an outside auditor, it had adequately performed its duty to monitor. The court stated:

> Plaintiffs essentially ask us to recognize a duty to monitor that would require every appointing Board member to review all business decisions of Plan administrators. As the district court rightly pointed out, that standard would defeat the purpose of having trustees appointed to run a benefits plan in the first place.

---

[397](...continued)
make the appointing fiduciaries "a guarantor for any and all actions by those [appointed] fiduciaries"); *In re American Express Co. ERISA Litigation*, 762 F. Supp. 2d 614, 626 (S.D.N.Y. 2010) (a plan fiduciary charged only with appointing a investment committee has no fiduciary duty extending beyond its appointment duty, citing *Gelardi* with approval).

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-149-

633 F.3d at 573.  Indeed, the DOL has acknowledged that the appointing fiduciaries "are not … generally obligated to assume direct responsibility for duties properly allocated to other fiduciaries or to vouchsafe every decision they make."   DOL Amicus Brief in *In re Worldcom, Inc. ERISA Litigation*, No. 02-Civ-4816 (DLC) (S.D.N.Y. Jan. 16, 2002), available at: http://www.dol.gov/sol/media/briefs/worldcom-1-16-04.htm.  The court finds that the Hollister Board exercised reasonable prudence in monitoring the activities of the HolliShare Trustees.  See above at II.K.5.

The court previously held in this case that:  (1) Hollister's Board should have been aware that JDS's repurchases of JDS common shares fell (unless exempted) within ERISA's prohibited transaction provisions; and (2) that the HolliShare Trustees (*i.e.*, Zwirner) had, because of their positions with Hollister and JDS, potential conflicts of interest.  *DeFazio*, *supra*, 636 F. Supp. 2d at 1068.  Based on the evidence at trial, none of these potential conflicts ever evolved into an actual conflict.  As a result, the mere existence of these potential conflicts does not render the Hollister Board members liable to plaintiffs.  *In re Syncor ERISA Litigation*, 351 F. Supp. 2d 970, 987-988 (C.D. Cal. 2004), *rev'd on other gds.* 516 F.3d 1095 (9th Cir. 2008) (court rejected plaintiff's theory that potential conflicts of interests, in of themselves, violate ERISA, because "[u]nder this theory corporate defendants would always have a conflict of interest"); *In re Bank of America Corp. Sec., Derivative & ERISA Litigation*, 756 F. Supp. 2d 330, 355 (S.D.N.Y. 2010) (merely hypothetical or potential conflicts of interest are not actionable; "This is because the purported conflict would exist for all corporate insiders who are charged with managing the affairs of the corporation; it would deprive the plan of services of the most knowledgeable individuals"); *In re McKesson HBOC, Inc. ERISA Litigation*, 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005) ("No case of which the court is aware has held that ERISA fiduciaries breach their duty of loyalty simply by 'placing themselves in a position' where they might act disloyally.").

Indeed, the text of ERISA itself makes it clear that the existence of a relationship which creates a potential conflict does not result in ERISA liability.  See §408(c)(3), 29 U.S.C. §1108(c)(3) ("Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from … serving as a fiduciary in

addition to being an officer, employee, agent, or other representative of a party in interest."). Thus, as was recognized in *In re Huntington Bancshares ERISA Litigation*, 620 F. Supp. 2d 842, 849, n. 6 (S.D. Ohio 2009), if potential conflicts were actionable, "ERISA's statutory scheme allowing company officers and directors … to serve as fiduciaries would be contradictory" (citing ERISA §408(c)(3)). Accordingly, there is no liability for a fiduciary breach based on a purported conflict of interest where the ostensible conflict has not caused any adverse consequences to the plan or its participants. *In re Bear Stearns Cos.,* 763 F. Supp. 2d at 579-580.

The U.S. Supreme Court has also recognized that potential conflicts arising from the dual role of a plan fiduciary and a corporate manager does not result in ERISA liability. In *Pegram*, the Court distinguished ERISA fiduciaries from common-law trustees as follows:

> [t]he trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats.
>
> Speaking of the traditional trustee, Professor Scott's treatise admonishes that the trustee "is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries." 2A Scott § 170, at 311. Under ERISA, however, a fiduciary may have financial interests adverse to beneficiaries. Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e. g., modifying the terms of a plan as allowed by ERISA to provide less generous benefits). Nor is there any apparent reason in the ERISA provisions to conclude … that this tension is permissible only for the employer or plan sponsor, to the exclusion of persons who provide services to an ERISA plan.

530 U.S. at 225.

In a decision rendered during the course of the trial of these consolidated actions, the court in *In re Textron, Inc. ERISA Litigation*, 1:09-cv-00383-PJB-LDA, 2011 WL 39127922 (D.R.I. Sept. 6, 2011), dismissed breach of fiduciary duty claims against the members of a committee that oversaw the administration of the plan involved in that case. The *Textron* court did so because the actions of which plaintiffs complained (various statements which allegedly affected the value of company stock available as an investment option to plan participants) were made by those defendants as corporate managers, and

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

not as plan fiduciaries. Quoting from *Vartanian v. Monsanto Co.*, 880 F. Supp. 63, 70 (D. Mass. 1995), the *Textron* court stated:

> Under ERISA, a corporation and its Board members are allowed to wear two hats: that of corporate employer and that of an ERISA fiduciary. ERISA liability can only arise from actions taken in a performance of ERISA fiduciary obligations. … As a result, 'the threshold determination in making out an ERISA claim of misrepresentation is whether the decision taken was a business corporate management decision or whether it was an action falling within the fiduciary functions delineated by ERISA, …"

2011 WL 39127922 at *5. The *Textron* court then concluded that the defendants:

> [w]ere acting in a corporate capacity pursuant to their obligations under federal securities law when they made the statements at issue. … The fact that the filings were made available to plan participants does not transform them into fiduciary communications."

*Id.* at *6.

In their post-trial submissions, plaintiffs conjure up another putative conflict, claiming that the individual defendants, as direct shareholders, had interests that conflicted with those of HolliShare and its participants. This contentions is negated by *In re Citigroup ERISA Litigation, supra*, in which the Second Circuit recently held, in an analogous situation, that a conflict of interest claim cannot be based on a connection between a fiduciary's compensation and the company's stock performance. 662 F.3d at 146. Here, the individual defendants' interests as direct shareholders were aligned – rather than in conflict – with the interests of HolliShare, because both HolliShare and the direct shareholders benefitted from appreciations in the value of JDS common shares.

The trial evidence established that all decisions made by the HolliShare Trustees were made prudently and in good faith to further the best interests of Hollister, JDS, and HolliShare's participants and beneficiaries. Further, Zwirner's multiple roles actually served to advance the interests of Hollister's Board. For example, as a HolliShare Trustee, Zwirner was fully knowledgeable about the actions taken by HolliShare every year to determine the fair market value of HolliShare's assets (primarily of JDS's common shares), and regularly communicated what those actions were to the other members of Hollister's Board. As a Board member, Zwirner was in a position to keep his fellow HolliShare Trustees informed

of matters addressed and decided at the Board level which may have had an impact on HolliShare.

Based on the monitoring of HolliShare and its Trustees by the Hollister Board, the Hollister Board prudently and reasonably concluded that HolliShare was a properly-functioning, stable plan that was being conducted according to law and that it provided significant benefits to its participants and beneficiaries. Under such circumstances, the members of the Hollister Board are not liable to plaintiffs for any failure to monitor the activities of the HolliShare Trustees. *See Gelardi v. Pertec Computer Corp., supra*, 761 F.2d at 1325 (rejecting breach of fiduciary duty claim against employer whose role was simply the selection of the plan administrator); *In re Calpine Corp. ERISA Litigation*, 2005 WL 1431506 at *4 (N.D. Cal. Mar. 31, 2005); *In re RCN Litigation*, 2006 WL 753149 at *7-8 (D.N.J. Mar. 21, 2006). In addition, even if the Hollister Board had a duty to monitor the HolliShare Trustees, since those Trustees did not breach their fiduciary duty, plaintiffs' claims against the Hollister Board are precluded. See *In re Bank of America Corp.*, 756 F. Supp. 2d at 358 (ERISA claim based on a duty to monitor fails if the underlying fiduciary breach claim fails.)

Accordingly, judgment will be entered in favor of the members of the Hollister Board as to all claims based on their alleged failure to monitor the HolliShare Trustees.

### 7.    Ellis's And DeFazio's QDRO Claims Lack Merit.

DeFazio and Ellis claim that defendant Hollister, as Plan Administrator, violated ERISA by treating various domestic relations orders entered by the Sacramento Superior Court in the DeFazio/Ellis divorce proceedings (particularly the order entered on March 29, 2002) as "qualified domestic relations orders" ("QDROs") under ERISA. *See* ERISA §206(d)(B)(3), 29 U.S.C. §1056(d)(B)(3). For the reasons stated in the court's prior summary judgment opinion, the challenges made by DeFazio and Ellis to the QDROs lack merit. *DeFazio*, *supra,* 636 F. Supp. 2d at 1077-1079. Judgment is therefore entered against Ellis and DeFazio and in favor of Hollister (the only defendant with potential liability) on Ellis's and DeFazio's QDRO claims.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-153-

**8.    Defendants Did Not Violate ERISA By Crediting
DeFazio's HolliShare Alternate Payee Account With
A Short-Term Rate of Interest.**

DeFazio claims that defendants violated ERISA because his alternate payee account was not credited with the difference in interest between the interest paid to him in his alternate payee account and the interest HolliShare received on the funds in DeFazio's alternate payee account which remained part of the HolliShare Trust Fund. Dkt. 368, HAC, Count XIII; Dkt. 588, SPTS, p. 10; *DeFazio*, 636 F. Supp. 2d at 1065. The court concludes that DeFazio is not entitled to any additional interest and enters judgment in favor of defendants on this claim.

The Plan provides that alternate payee accounts are to be credited with a "short term rate of interest."[398] The evidence at trial established that the HolliShare Trustees did credit DeFazio's alternate payee account with interest.[399] DeFazio therefore received all the benefits due him under the Plan.

Pertinent here is the Second Circuit's recent decision in *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011). In *Faber*, certain Plan beneficiaries brought a class action against the Plan administrator. The Plans at issue provided life insurance benefits funded by group life insurance policies issued by the claims administrators. If the life insurance proceeds exceeded a certain amount, the Plan administrator established a "Total Control Account" ("TCA") in the name of the beneficiary, credited the TCA with the full amount of the benefits due, and issued to the beneficiary a "checkbook" that the beneficiary was free to use at any time to draw on the TCA – for some and even all of the balance due and owing to him/her. When a TCA was established, the Plan administrator sent the beneficiary a Customer Agreement which spelled out the terms of the TCA relationship. The Customer Agreement, among other things, provided that the Plan administrator would pay interest on the funds remaining in the TCA at an interest rate based upon the performance of certain identified money market indices. While any TCA remained open, the Plan administrator retained the TCA funds in its general account and invested those

---

[398]    DX 501, H01380.

[399]    Zwirner Tr. 2481:14-18.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-154-

funds, thus profiting on the spread between its return on investment and the interest paid on the TCAs.

Plaintiffs had established TCAs and did not dispute that they received the entire amount of their life insurance proceeds and interest guaranteed to them under the Plans. However, they brought a class action alleging that they (and the Plans) were entitled to the profits earned by the Plan administrators on the TCA funds. They charged the Plan administrators with having breached their fiduciary duties under ERISA and the prohibited transaction provisions of ERISA by self-dealing in Plan assets.

In affirming the lower court's dismissal of plaintiff's claims, the Second Circuit concluded in *Faber* that the Plan administrators had fully discharged their fiduciary duties to the plaintiffs and that plaintiffs had no right to any profits generated by the defendants' investment of the funds set aside for the TCAs, holding that:

> Nothing in the SPDs [summary plan descriptions], or in the complaint, provides any indication that after the TCAs were established either Plaintiffs or MetLife contemplated an indefinite fiduciary relationship. As the district court recognized once the TCAs were set up and credited, MetLife had provided all of the benefits promised by the Plans, in the manner contemplated by the Plans.

648 F.3d at 105.

Similarly, here, nothing in the HolliShare Plan gave DeFazio, or any other alternate payee, any entitlement to any profit earned by the funds set aside for DeFazio's benefit in his alternate payee account, nor was DeFazio or any other alternate payee entitled to any augmentation of an alternate payee account based on the appreciation in the value of HolliShare's JDS common shares. DeFazio received the short term interest rate that he was promised and, under Faber, the defendants fully discharged their fiduciary duty to him.

In that regard, *Faber* is consistent with the Ninth Circuit's decision in *Wright*, where it held that "ERISA does no more than protect the benefits which are due an employee under a plan." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (quoting *Bennett v. Conrail Matched Saving Plan Admin. Comm.*, 168 F.3d 671, 677 (3d Cir. 1999)); *see also Allen v. The Katz Agency Inc. Employee Stock Ownership Plan, supra*, 677 F.2d at 194 (ERISA's fiduciary duty requirements "surely

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-155-

did not obligate the trustees to pay Allen [plaintiff] more than the value to which the Plan entitled him."). DeFazio's claim that he is entitled to more than his entitlement under the HolliShare Plan is without merit and judgment is entered in favor of defendants on HAC, Count XIII.[400]

**L.    Defendants Are Entitled To An Award Of Attorneys' Fees.**

The United States Supreme Court has recently held that a fee claimant need not be a "prevailing party" to be eligible for an award of attorneys' fees under 29 U.S.C. § 1132(g)(1) ("ERISA § 502(g)(1)"). *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. ___, 130 S.Ct. 2149, 2152 (2010).  In *Hardt*, the Supreme Court held that a court may, in its discretion, award fees and costs to either party as long as the fee claimant "has achieved some degree of success on the merits." *Id.* at 2152.  The *Hardt* Court stated:

> A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquiry into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'"

130 S.Ct. at 2158, citing *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 (1983).

Prior to *Hardt*, the Ninth Circuit had established a five-factor test, which still remains applicable, for awarding attorneys' fees in an ERISA case.  See *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir. 1980); *Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 388 (9th Cir. 1994); *Draper v. Baker Hughes Inc.*, 892 F. Supp. 1287, 1300 (E.D. Cal. 1995).  The five factors are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits

---

[400]    DeFazio and Ellis also claim that defendants violated ERISA §510, 29 U.S.C. §1140, by "discriminating against DeFazio for the purpose of interfering with his right to which he may become entitled under the Plan."  Dkt. 368, HAC, Count XIII; Dkt 588, SPTS, pp. 15-16.  This claim was predicated on Hollister's filing in January 2008 of a Motion in the Ellis/DeFazio divorce proceeding.  No evidence was presented by plaintiffs to support this claim, so Hollister is entitled to judgment on it.

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-156-

of the parties' positions. *Id.*

The district court in *Hardt* applied the same five-factor test. The Supreme Court noted that the five factor test was consistent with the broad, discretionary language in ERISA § 502(g)(1), and held that a court may apply the five-factor test after it determines that a party is entitled to fees. This court determines that defendants are entitled to an award of fees under the standard enunciated in *Hardt*.

The first factor, culpability or bad faith, militates strongly in favor of defendants. Throughout the course of this litigation, plaintiffs have made scurrilous, vilifying, and but for the litigation privilege, defamatory allegations about the individual defendants. Those *ad hominum* attacks have continued through and including plaintiffs' post-trial submissions, in which they accuse the individual defendants of having concocted a scheme to benefit themselves and the other direct shareholders at the expense of HolliShare. These allegations impugned defendants' integrity and assassinated their character without any basis. For example, plaintiffs have unsuccessfully moved the court twice to remove Plan Trustees, alleging that "[t]he record presently before the Court is rife with fraud, concealment and theft." Dkt. 190, pp. 12-15. The plaintiffs also went so far as to request an order enjoining Zwirner "from providing any further services to ERISA plans" (Dkt. 224, p. 52, DeFazio/Dimaro plaintiffs' Third Amended Complaint), essentially requesting that this court limit Zwirner's ability to practice law. The court properly struck this request for relief. Dkt. 291, p. 29. Despite the remarkable benefits it generated for her, Ellis characterized the Plan as a "heist." Dkt. 314, p. 21. In a particularly hyperbolic moment, plaintiffs claimed that various defendants used the Plan as a "billion dollar piggy-bank" and "lied to their employees and retirees, stole ultimate ownership of JDS away from the Plan, kept the value of plan assets artificially low, eliminated the market for plan assets, and placed the Plan in financial jeopardy through self-dealing (insider) transactions - all for their personal benefit." Dkt. 368, HAC, 31; Dkt. 314, FAC, 21. In paragraph 28 of her FAC, Ellis pontificated that the 1999 transaction was an instance where "[a]bsolute power tends to corrupt absolutely." Dkt. 314.

Even though each plaintiff received a full payout of his or her vested benefits, each alleged that the

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-157-

plan's investment in JDS common shares was "worthless." Dkt. 368, HAC, 4; Dkt. 314, FAC, 7. As what can only be understood as bombastic over-statement, in the worst of bad faith, the DeFazio/Dimaro plaintiffs alleged, "Candidly, HolliShare would have been better served investing in Monopoly™ money rather than JDS common stock. At least Monopoly™ money can be sold on the open market." Dkt. 368, HAC, 120. In the plaintiffs' own words, when filing this case, they alleged that they would attempt to show that: "[T]he defendants breached their fiduciary duty through a carefully orchestrated scheme to undervalue plan assets and retirement benefits; steal ultimate ownership of a billion dollar company (i.e., Hollister) away from the Plan; use the Plan as an impenetrable piggybank for JDS common stock; and a billion dollar tax shelter for their sole benefit." Dkt. 368, HAC, 138; Dkt. 314, FAC, 72. It is now clear that those allegations were and are baseless, and plaintiffs had no evidence of any intentional wrongdoing or of any personal benefit gained by any of the defendants during the 38 year operation of the Plan.

Also, many of plaintiffs' claims were asserted after the expiration of the statute of limitations. See *Ellis v. Hollister, Inc.*, 2006 WL 1132377, at *9 (E.D. Cal. Apr. 14, 2006); *DeFazio*, 636 F. Supp. 2d at 1080-81. The Ninth Circuit has found bad faith and awarded attorneys' fees where a party filed a claim after the applicable statute of limitations had expired. *Beaudry Motor Co. v. ABKO Props., Inc.*, 780 F.2d 751, 756 (9th Cir. 1986).

The court also finds that by asserting in this court the very same "QDRO" arguments rejected by Judge Mize in his order of May 4, 2004 - which could have been but was not appealed - DeFazio and Ellis have acted in bad faith.

The court concludes that substantial legal fees were incurred by defendants in defending against unfounded and baseless allegations. Permitting plaintiffs' conduct to go unabated would contravene the primary purpose of ERISA, *i.e.*, protecting plan benefits.

With regard to the second factor, plaintiffs knew or should have known of the possibility of being required to pay defendants' attorneys' fees. At their depositions, several of the plaintiffs (Dimaro, McNair and Seay) expressly acknowledged being aware of the possibility that the court could enter an award

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-158-

assessing defendants' fees' against them, and McNair even went so far to put aside some of his savings to prepare for this possibility. Dkt. 610, pp. 79, 211, 293. Plaintiffs nevertheless pressed ahead with this suit.

With regard to the third factor, an award of attorneys' fees is particularly appropriate in this case to prevent and/or deter others from filing similarly frivolous lawsuits in the future. ERISA lawsuits are very expensive to defend - even baseless ones. They are fact intensive and invariably involve extensive discovery, numerous pre-trial motions, and the filing of numerous legal memoranda. The attorneys' fees incurred by a plan sponsor, a plan administrator, and/or plan fiduciaries in defending themselves is significant and operate to deplete plan assets. This, in turn, works to the detriment of all plan participants and their beneficiaries. Thus, deterring prospective plaintiffs, and their lawyers, from filing similarly frivolous and baseless ERISA suits serves the best interests of ERISA plans, their participants and their beneficiaries.

The fourth factor also supports an award to defendants of their attorneys' fees. By successfully defending themselves, defendants have preserved the integrity and continued viability of HolliShare, an ERISA plan that for almost four decades, has provided significant financial benefits to its participants. Defendants' success has benefited all HolliShare participants in that HolliShare will continue operating as it has in the past, and will continue to provide financial benefits to Hollister's employees and their beneficiaries.

In that regard, the 2008 financial crisis paralyzed banks and undercut consumer confidence. Among its many victims were balances in 401(k) plans.[401] Indeed, in 2008, the average 401(k) account balance fell by more than 25%.[402] The effect was pervasive - at the time around sixty million American workers

---

[401] Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Private Pension Plan Bulletin: Abstract of 2008 Form 5500 Annual Reports* (Version 1.0, December 2010), at 1, *available at* http://www.dol.gov/ebsa/PDF/2008pensionplanbulletin.PDF.

[402] *Id.* ("Assets invested in 401(k) plans decreased 25.2 percent to $2.2 trillion from a high of about
(continued...)

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

were active participants invested in a 401(k) plan.[403]   As a result, those American workers watched their 401(k) account balances rapidly decline by around $800 billion dollars in one year.[404]   Ninety-four percent of American employers that participated in 401(k) plans in 2008 did not offer their employees any other type of employer sponsored retirement plan.[405]   Free-falling balances in 401(k) plans seriously jeopardized the retirement security of participants in such plans.   In the current environment of plummeting 401(k) balances and the budgetary crisis facing our federal government, it is more critical than ever that courts protect stable, profitable ERISA plans (such as HolliShare) from frivolous and baseless lawsuits (such as the present actions) which only operate to deplete plan assets.   This consideration militates strongly in favor of awarding attorneys' fees to defendants.

Considering the fifth factor, the relative merits of the parties' positions, the court notes that plaintiffs have failed to prove a single ERISA violation.   Judgment will be entered against them on 24 separate counts with multiple claims often included within single counts.   Plaintiffs have not only failed to prevail on a single claim, but they prosecuted, through trial, numerous claims that were not only groundless but were claims for which they knew they had (a) no supporting evidence, and (b) no provable damage or loss.

Defendants propose that the court conclude that plaintiffs' counsel be required to pay the majority of defendants' reasonable attorneys' fees and costs. It is well settled that an award of attorneys' fees and costs under ERISA may, in the court's discretion, be assessed against a party's attorneys. *Childers v. Medstar Health*, 289 F. Supp. 2d 714, 718 (D. Mass. 2003); *Loving v. Pirelli Cable Corp.*, 11 F. Supp. 2d 480, 496 (D. Del. 1998) (citing *Monkelis v. Mobay Chem.*, 827 F.2d 935, 937 (3d Cir. 1987)); *Cowden v.*

---

[402](...continued)
$3 trillion in 2007.").

[403]     *Id.* at 44.

[404]     *Id.* at 1.

[405]     *Id.* at 45.

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-160-

*Montgomery County Soc'y For Cancer Control*, 653 F. Supp. 1072, 1079 (S.D. Ohio 1986).

For example, in *Baker v. Greater Kansas City Laborers Welfare Fund*, 716 F. Supp. 1229 (W.D. Mo. 1989), the district court assessed attorney's fees against a plaintiff and his counsel for continuing to pursue an ERISA claim after discovery had closed and after it had become apparent that the claim was frivolous. The district court apportioned three-fourths of defendant's attorneys' fees to plaintiff's counsel because the court determined that it was plaintiff's counsel who continued to litigate the frivolous claim when it should have been dismissed. The court reasoned:

> I do not expect a lay person to appreciate the difference between a federal statutory violation and plaintiff's perception of unfair treatment. However, the difference should have been readily discerned by counsel and communicated to plaintiff.
>
> * * *
>
> Attorneys, by training and experience, are in the best position to understand the problems presented by a frivolous case and to advise [a] plaintiff not to pursue the case or to withdraw.

716 F. Supp. at 1231.

The court's reasoning in *Baker* is particularly applicable here. Plaintiffs' counsel were in the best position to know that their clients were pursuing many baseless claims under ERISA. Yet, rather than dismiss their claims, plaintiffs' counsel embarked upon a scorched earth strategy by filing numerous and novelistic amended complaints, groundless motions for summary judgment and other extraordinary relief, and other unnecessary pleadings. The evidence at trial demonstrated that many of these pleadings and motions had no factual or legal support. The court therefore holds plaintiffs' counsel responsible for 75% of defendants' reasonable attorneys' fees and costs. The court assesses 20% of defendants' reasonable attorneys' fees and costs against Ellis and DeFazio, with the remaining 5% being assessed against the other plaintiffs.

### III. Conclusion

For all of the reasons addressed above, judgment is entered in favor of all defendants on all of plaintiffs' claims. In addition, defendants are granted leave to file a petition for attorneys' fees and costs

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

on a date to be set by the court, followed by briefing and a hearing pursuant to a schedule which will also be set by the court.

DATED:  January 17, 2012                    SCHUYLER, ROCHE & CRISHAM, P.C.


                                            By:  /s/ Michael B. Roche
                                                 MICHAEL B. ROCHE

Attorneys for Defendants HOLLISTER INCORPORATED, THE FIRM OF JOHN DICKINSON SCHNEIDER, INC., ALAN F. HERBERT and RICHARD I. FREMGEN

SCHUYLER, ROCHE & CRISHAM, P.C.
MICHAEL B. ROCHE (admitted pro hac vice)
L. ANDREW BREHM (admitted pro hac vice)
Suite 3800, One Prudential Plaza
130 East Randolph Street
Chicago, Illinois 60601
Tel:    (312) 565-2400
Fax:    (312) 565-8300

Attorneys for defendants THE FIRM OF JOHN DICKINSON SCHNEIDER, INC. HOLLISTER INCORPORATED, ALAN F. HERBERT and RICHARD I. FREMGEN

                                            ADDUCCI,   DORF,   LEHNER,   MITCHELL   &
                                            BLANKENSHIP, P.C.


                                            By:  /s/ James D. Adducci
                                                 JAMES D. ADDUCCI

Attorney for Defendants SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER

ADDUCCI, DORF, LEHNER, MITCHELL & BLANKENSHIP, P.C.
JAMES D. ADDUCCI (admitted pro hac vice)
MARSHALL L. BLANKENSHIP (admitted pro hac vice)
150 North Michigan Avenue, Suite 2130
Chicago, Illinois 60601-7524
Tel:    (312) 781-2800
Fax:    (312) 781-2811

Attorneys for defendants SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER

---

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**

-162-

SIDLEY AUSTIN LLP


By:  /s/ James W. Ducayet
JAMES W. DUCAYET

Attorneys for Defendants MICHAEL C. WINN and LORETTA L. STEMPINSKI

SIDLEY AUSTIN LLP
WILLIAM F. CONLON (admitted pro hac vice)
JAMES W. DUCAYET (admitted pro hac vice)
One North Dearborn Street
Chicago, Illinois 60603
Tel:    (312) 853-7000
Fax:    (312) 853-7036

Attorneys for Defendants MICHAEL C. WINN and LORETTA L. STEMPINSKI

Co-counsel:

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
WILLIAM A. GOULD (SBN 035446)
DANIEL L. BAXTER (SBN 203862)
400 Capitol Mall, Twenty-Second Floor
Sacramento, CA  95814
Telephone:    (916) 441-2430
Facsimile:    (916) 442-6664

Attorneys for Defendants THE FIRM OF JOHN DICKINSON SCHNEIDER, INC., HOLLISTER INCORPORATED, ALAN F. HERBERT, RICHARD I. FREMGEN, SAMUEL P. BRILLIANT, DONALD K. GRONEBERG, JAMES A. KARLOVSKY, LORI J. KELLEHER, JAMES J. MCCORMACK, CHARLES C. SCHELLENTRAGER and RICHARD T. ZWIRNER, MICHAEL C. WINN AND LORETTA L. STEMPINSKI

**Defendants' Post-Trial Findings of Fact and Conclusions of Law**