UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JAMES P. DEFAZIO, et al.,

       Plaintiffs,

          v.

HOLLISTER, INC., et al.,

       Defendants.

_____/

NOS. CIV. 2:04-1358 WBS GGH
      2:05-0559 WBS GGH
      2:05-1726 WBS GGH
CONSOLIDATED

MEMORANDUM OF DECISION

----oo0oo----

      After conducting a fifteen-day bench trial and providing the parties with extended time to submit post-trial briefing, the court finds in favor of all defendants on all of plaintiffs' claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461.  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

1

I.   Factual and Procedural Background

Defendant Hollister, Inc. ("Hollister") is a privately-held Illinois corporation that develops, manufactures, and markets medical devices in the fields of ostomy, continence care, and wound care.  Hollister is the wholly-owned and operating subsidiary of defendant The Firm of John Dickinson Schneider ("JDS").  JDS is an Illinois close corporation that holds all of Hollister's capital stock.

John D. Schneider, who only had a high school education and initially began a printing business, founded JDS and developed Hollister into a prosperous company.  Schneider desired for JDS and Hollister to remain independent and employee-owned companies and wanted his employees to share in their success. Schneider accomplished these goals through a direct shareholder program and the Hollister Employee Share Ownership Trust ("HolliShare" or "Plan").

HolliShare is a non-contributory, tax qualified defined contribution profit sharing plan designed to provide retirement benefits to Hollister's non-union employees in the United States. It is governed by a written instrument, the HolliShare Employee Share Ownership Trust ("Plan Instrument").  HolliShare's predominant asset, which totals approximately 95% of its total value, is its JDS common shares.  The Plan Instrument mandates that HolliShare's assets be invested in JDS shares to the maximum extent practicable.  When initially funded in 1974, HolliShare received 11,950 common shares of JDS that were purchased from shareholders.  In exchange, HolliShare assumed the obligation to pay the long-term promissory notes issued to the shareholders to

2

purchase the shares.  In late 1974, the Plan transferred 4,007 shares back to JDS along with the related promissory note obligations, leaving the Plan with 7,943 shares.  HolliShare has not purchased JDS shares since 1975, but the number of its total shares has increased due to two 100-for-1 stock splits and a 9-for-1 stock dividend.

HolliShare's ownership of JDS shares has proved to be an extraordinary investment, and the annual increases in value of JDS shares according to JDS's valuations exceeded most publicly-traded investments.  For example, from 1977 through 2010, the mean average increase in JDS's share price was 26.79% each year, whereas the mean average increase for the Standard & Poors 500 index was 8.8% per year, the mean average increase for the Mid-Cap Index was 14.09% per year, and the mean average increase for the Small-Cap Index was 15.24% per year.

HolliShare participants are neither required nor permitted to contribute to HolliShare.  HolliShare primarily raised the liquidity to pay benefits to participants through annual cash contributions from Hollister and cash paid by JDS for the repurchase of the Plan's stock.  Hollister is required to contribute 5% of the aggregate compensation of participants to HolliShare each year, but, in recent years, Hollister has contributed between 7.5% to 8.5% of the aggregate compensation, totaling approximately $33 million in contributions since 1990.  Because HolliShare invests primarily in JDS common shares, the principal factor that determines the change in value of each HolliShare participant's account is the annual decline or appreciation in the value of the Plan's JDS common shares, and

the balance in each participant's account is generally based on
the participant's pro-rata percentage of the value of HolliShare.
Participants in HolliShare learned about the Plan and its
financial condition in annual reports, which were referred to by
the parties as and often bore the title of "HolliShare
Highlights."

JDS has two classes of shares, preferred[1] and common,
neither of which has a generally recognized public market.  The
JDS Articles of Incorporation[2] ("JDS Articles") provide several
restrictions on JDS shares relevant to this case.  First, under
Article Five, only certain persons and entities are entitled to
own JDS shares, including holders of shares as of May 5, 1978,
select directors and officers of JDS or Hollister, select JDS or
Hollister employees, and any deferred benefit plan maintained by

---

[1]     HolliShare does not own any preferred shares and all of
the preferred shares, which have the controlling interest, were
originally owned by Schneider.  Schneider placed all of his
outstanding preferred shares in the 1977 Preferred Share Trust,
which was set to expire in 2001.  Upon its expiration, the 1977
Preferred Share Trust provided for the shares to be distributed
to the Hollister employees who owned common shares and agreed in
writing to abide by Schneider's principles.  Instead of allowing
the shares to be distributed, a new trust, the 1999 Preferred
Share Trust, was created and, with the consent of the employees
who would have received preferred shares upon expiration of the
1977 Preferred Share Trust, the JDS preferred shares were
transferred to the 1999 Preferred Share Trust.
Although plaintiffs asserted claims based on these trust
transactions, the court entered summary judgment in favor of
defendants on these claims prior to trial in its June 26, 2009
Order ("June 2009 Order").  See DeFazio v. Hollister, Inc., 636
F. Supp. 2d 1045, 1052-54, 1072-77 (E.D. Cal. 2009).

[2]     The JDS Articles were amended multiple times between
1978 and 1999.  (See Exs. 531-36.)  Unless otherwise noted, the
cited paragraphs of JDS Articles are common to all of the
versions.

4

1   JDS and/or Hollister.[3]  (Ex. 533, Art. V, ¶ II.C.)

2          Second, Article Five restricts the manner in which

3   holders of JDS stock may transfer ownership.  Specifically,

4   subparagraph II.D.2.a gives JDS a right of first refusal by

5   requiring that any holder of JDS stock who intends to transfer

6   one or more shares must first offer to sell those shares to JDS.

7   Subparagraph II.D.3.b further provides that the price paid for

8   any common share purchased by JDS under its right of first

9   refusal "shall be its book value as of the end of the calendar

10  month in which the Repurchase Date occurs . . . computed in

11  accordance with generally accepted accounting principles."[4]  (Ex.

12  531, Art. V, ¶ II.D.3.b.)

13         The JDS Articles also provide that when JDS repurchases

14  shares pursuant to its right of first refusal, it is obligated to

15  pay only a minimal amount in cash (set originally at $5,000 and

16  then increased to $250,000 in 1999) and can pay the remainder

17  with a promissory note.  Not only did HolliShare's cash needs

18  always exceeded the $5,000 and $250,000 minimums, it could not

19

20         [3]  Subparagraph II.C was amended in 1984 to allow a non-
21  employee director or officer of JDS or Hollister, such as
    defendant Richard T. Zwirner, to own stock if the individual had
22  "performed substantial and continuing services" for JDS or
    Hollister.  The JDS Articles were amended again in 1999 to allow
23  The 1999 Preferred Share Trust to hold shares.

24         [4]  As noted in an earlier Order, "book value" refers to a
    method used to value corporate stock, but the term has no
25  generally accepted definition.  DeFazio v. Hollister Emp. Share
    Ownership Trust, 406 F. Supp. 2d 1085, 1087 n.2 (E.D. Cal. 2005)
26  (Karlton, J.) (citing 51 A.L.R. 2d 606 § 2).  "[T]he term
    contemplates a theoretical value resulting from depreciation or
27  appreciation as computed upon an originally determined base."
    Id.  Albeit a simplified explanation, book value is generally
28  calculated by subtracting a company's liabilities from its
    assets.

5

1 receive a promissory note for its sale of JDS stock because ERISA
2 prohibited it from accepting a promissory note as payment from an
3 employer.  See 29 U.S.C. § 1106(a)(1)(B).

4       In addition to the right of first refusal, subparagraph
5 II.D.7.a provides for the sale of JDS shares under "exceptional
6 circumstances":

> Under exceptional circumstances and in the discretion of
> the Corporation's Board of Directors, shares may be
> repurchased by the Corporation at such other times, upon
> such other terms, in such other manners, over such other
> periods of time, or on such other conditions as the
> Corporation and the owner or holder of such shares may
> from time to time agree.

11 (Ex. 531, Art. V, ¶ II.D.7.a.)

12       The Plan Instrument permits the sale of the Plan's JDS
13 stock and does not set the price for such sales but requires that
14 the sales be conducted in accordance with the JDS Articles.  (Ex.
15 9-9.14, § 11.01(2).)  Defendants testified at trial that, since
16 the mid-1980s, HolliShare has sold its holdings of JDS common
17 shares to JDS pursuant to the "exceptional circumstances"
18 provision of subparagraph II.D.7.a, not the right of first
19 refusal embodied in subparagraph II.D.2.a.  Defendants testified
20 that HolliShare and JDS entered into an agreement in the mid-
21 1980s ("mid-80s agreement")[5] that has since governed JDS's
22 repurchases of common shares from HolliShare.  Neither the mid-
23 80s agreement nor its terms were memorialized in writing.
24 Defendants testified that the terms of the agreement were that
25 HolliShare would provide advance projections of the Plan's cash

27       [5]    As this litigation progressed, counsel referred to this
28 agreement as the "mid-80s agreement," (Tr. 862:16-21), and the
court will refer to it as such in this Order as well.

needs, HolliShare would sell shares back to JDS once a year, the purchase price would be the audited book value from December 31 of the prior year, JDS would purchase all of the shares HolliShare sought to sell, and JDS would pay all cash for the shares.

Although the theories underlying plaintiffs' claims have evolved as this case has progressed, the heart of plaintiffs' case at trial was that the price JDS paid for HolliShare's sales of its JDS stock should have been 1) the current month-end book value from the month in which the sale took place ("month-end book value"); or 2) a price determined to be the fair market value of the shares.  Plaintiffs contend that, by selling at the December 31 book value from the year prior to the sale ("December 31 book value") instead of the month-end book value or the fair market value, the HolliShare fiduciaries breached their duties under ERISA and caused the Plan to suffer extraordinary losses.

The parties have stipulated as to a variety of details concerning the challenged transactions, including the sale date, the December 31 book value that was used for the sale price, the number of shares sold, and, for almost all of the sales, the month-end book value for the month in which the challenged transactions occurred.  (See Docket No. 630 ("Stipulation of Facts").)  Between 1981 and 2007, HolliShare sold its shares to JDS on nineteen occasions.  The years in which sales took place, the number of shares sold, and the cash proceeds generated were as follows: 1981 (69,300 shares for $997,227.00); 1982 (38,000 shares for $723,140.00); 1985 (20,000 shares for $1,368,400.00);

1  1986 (180,000 shares for $12,619,800.00); 1987 (100,000 shares
2  for $9,756,000.00); 1993 (75,000 shares for $25,830,000.00); 1995
3  (30,000 shares for $14,697,300.00); 1996 (166,973 shares for
4  $10,000,012.97); 1997 (135,000 shares for $9,863,100.00); 1998
5  (250,000 shares for $21,262,500.00); 1999 (200,000 shares for
6  $21,332,000.00); 2000 (150,000 shares for $18,679,500.00); 2001
7  (220,000 shares for $29,590,000.00); 2002 (46,250 shares for
8  $7,174,300.00); 2003 (44,750 shares for $8,490,417.50); 2004
9  (50,000 shares for $11,908,000.00); 2005 (22,000 shares for
10 $6,335,120.00); 2006 (26,500 shares for $8,717,400.00); and 2007
11 (85,500 shares for $34,006,770.00).  (Id. ¶¶ 28-46.)

12     A.  The Parties

13         1.  Plaintiffs

14         With the exception of plaintiff James P. DeFazio, all
15 of the plaintiffs in this case are former employees of Hollister
16 and former participants in HolliShare.  The former HolliShare
17 participant plaintiffs and the years in which they ended their
18 Hollister employment and received the distribution of their
19 HolliShare accounts include: DeLane Humphries (1998); Brenda
20 Dimaro (1999); Judy Seay (1999); Hallie Lavick (2000); Michael
21 McNair (2002); Nancy Russell Stanton (2002); Sonya Pace (2003);
22 Kathleen Ellis (2004); Theresa Beetham (2006); and Cindy Worth
23 (2006).  All of these plaintiffs had terminated their employment
24 and received lump sum distributions of their HolliShare accounts
25 before commencing or joining this action.  James P. DeFazio is
26 Ellis's former husband and is an alternate payee on an account
27 created with funds from Ellis's HolliShare distribution.

28         In a fourteen-month period between 2004 and 2005, three

8

1  subsets of the current plaintiffs independently filed complaints

2  against Hollister, JDS, the HolliShare Trustees, and various

3  members of the boards of directors of both companies.[6]  The cases

4  were consolidated by court order on May 25, 2006.  (Docket No.

5  87.)  All of the plaintiffs except Ellis ("DeFazio/Dimaro

6  plaintiffs") are represented by the same counsel and filed their

7  Fifth Amended Complaint on July 22, 2008.  (Docket No. 368.)

8  Ellis, the only plaintiff represented by separate counsel, filed

9  her Fourth Amended Complaint on January 23, 2008.[7]  (Docket No.

10  314.)  The allegations asserted against defendants are

11  substantially similar in both operative complaints, and counsel

12  for the DeFazio/Dimaro plaintiffs and Ellis tried the case

13  together, with Ellis's counsel taking the lead at trial and in

14  the post-trial briefing.

15          2.  Defendants

16              a.  HolliShare Trustee Defendants

17          Defendant Richard T. Zwirner has performed legal work

18  for Hollister and JDS since 1969, and he has been a HolliShare

19  Trustee since 1976.  He has also provided consulting services to

20  Hollister since the late 1970s and served as the Corporate

21

22      [6]   This case was not brought as a class action on behalf
   of all past or current members of HolliShare.  The DeFazio/Dimaro
23  plaintiffs included class allegations in their Fourth and Fifth
   Amended Complaints, but then filed a statement of non-opposition
24  to defendants' motion to strike those allegations, (Docket No.
   533), and thus the court granted defendants' motion to strike the
   class allegations.  DeFazio, 636 F. Supp. 2d at 1055-56.
25      Plaintiffs also named HolliShare as a defendant, but
26  have never treated it as a defendant and did not propose findings
   of fact or conclusions of law addressing its liability.  Thus the
   court will enter judgment in favor of HolliShare.
27

28      [7]   As used in this Order, the term "plaintiffs" refers
   collectively to all eleven plaintiffs unless otherwise noted.

Secretary of JDS from 1974 to 1981, a Director of JDS and Hollister since 1978, Hollister's Vice President of Marketing and Sales from 1991 to 1994, and General Counsel to Hollister since 1977.

Hollister's chief financial officers also served as HolliShare Trustees, which, in succession, were defendants Charles H. Gunderson,[8] James J. McCormack, and Samuel P. Brilliant.  McCormack served as a HolliShare Trustee from 1989 to June 2000 and was also Hollister's Treasurer and Chief Financial Officer from 1981 to 2000, Vice President of Finance from 1981 to 1993, and a Senior Vice President from 1993 to 2000.  Brilliant became a HolliShare Trustee in July of 2000 and was still a Trustee at the time of trial.  Brilliant also served as Hollister's Vice President of Finance and Treasurer from October 1998 to July 2000 and became its Chief Financial Officer and a Vice President of Hollister in 2000.

Hollister's heads of the human resources department also served as HolliShare Trustees, which, in succession, were defendants Charles C. Schellentrager, James A. Karlovsky, and Lori Kelleher.  Although it is unclear from the testimony at trial when Schellentrager became a Trustee, his term ended in 1990 at the latest when Karlovsky succeeded him.  Karlovsky served as a Trustee from 1990 to July 2004 and also served as

---

[8]     Although plaintiffs indicate in their proposed findings of fact that Gunderson was a Trustee before McCormack (Docket No. 647 at 13:20-21), the only testimony at trial was that Gunderson was the "vice president and treasurer of the corporation" prior to his termination.  (Tr. 245:5-8.)  More importantly, the court dismissed Gunderson as a defendant in this action in the June 2009 Order.  See DeFazio, 636 F. Supp. 2d at 1059, 1080.

Hollister's Vice President of Human Resources from 1989 to 2003 and Executive Assistant to the President from 2003 to 2004. Kelleher succeeded Karlovsky as a Trustee in 2004 and continued to serve as a Trustee until 2011.

Defendant Loretta A. Stempinski also served as a HolliShare Trustee from 1980 to 2001, held various positions in Hollister from 1961 to 1980, and served as a Director of JDS and Hollister from 1980 to 2001.[9]  Ellis has not asserted claims against Stempinski.

b.   <u>Non-Trustee Defendants</u>

Defendant Michael C. Winn served as a Director of JDS and Hollister from 1979 to May 2001 and as Hollister's Vice President of Legal Affairs from 1974 to 1977, President from 1977 to 2001, and Chairman and CEO from 1981 until 2001.  Ellis has not asserted claims against Winn.  Defendant Alan F. Herbert served on the Boards of Directors of Hollister and JDS from 1998 to May 2011 and also served as Hollister's President and Chief Operating Officer from 1997 to 2001, President from 2001 to 2007, and Chairman and CEO from 2007 until 2011.

Plaintiffs also named Donald J. Groneberg, Richard I. Fremgen, and Donna J. Matson as defendants.  The only testimony about Groneberg at trial was that he was a member of the finance department at Hollister.  (Tr. 2153:21-2154:2, 2374:24-2375:1.) Plaintiffs did not offer evidence at trial establishing that Groneberg owed fiduciary duties to the HolliShare beneficiaries

_____

[9]   Defendants contend that plaintiffs did not adduce any evidence at trial with respect to Stempinski.  However, Winn testified that she was a HolliShare Trustee and a Hollister and JDS board member.  (Tr. 46:4-11, 62:11-14, 117:7-11.)

11

1  and have not proposed findings of fact or conclusions of law

2  addressing his liability.  Similarly, while there was limited

3  testimony about Fremgen being on the Hollister Board of Directors

4  (Tr. 315:14-316:5, 1546:25-1547:4) and defendants have indicated

5  that he was on the board from 1999 until 2010, there was no

6  testimony about his conduct at trial and plaintiffs did not

7  propose any findings of fact or conclusions of law with respect

8  to claims against him.  Lastly, based on two passing references

9  to her at trial, it appears Matson may have been a HolliShare

10 Trustee.  (See Tr. 306, 1913.)  While the clerk's office has not

11 terminated her as a defendant in this action, it appears she was

12 dismissed in an early order in this case and neither party

13 appears to believe claims are still pending against her.  The

14 court will therefore enter judgment in favor of Groneberg,

15 Fremgen, and Matson.

16      B.   Plaintiffs' Claims

17           Because plaintiffs failed to sufficiently identify

18 their claims remaining for trial in their pretrial statement, the

19 Final Pretrial Order required plaintiffs to file "an amended

20 statement of the remaining claims that identifies, for each

21 claim, 1) the statutory or common law basis for the claim; 2) the

22 elements plaintiff must prove in order to prevail on the claim;

23 3) the plaintiff or plaintiffs asserting the claim; and 4) the

24 defendant or defendants that the claim is asserted against."

25 (Docket No. 583 at 3:23-28.)  In their amended statement,

26 plaintiffs identified twelve ERISA claims under various

27 subsections of 29 U.S.C. §§ 1103-1106, 1110, 1140, and 1056.

28 (Docket No. 588.)

12

1  II.  Analysis

2      A.  Statutory Standing

3          ERISA provides for a civil action to be brought only by

4  the Secretary of Labor, a participant, a beneficiary,[10] or a

5  fiduciary.  29 U.S.C. § 1132.  In the context of ERISA, a

6  "participant" means "any employee or former employee of an

7  employer . . . who is or may become eligible to receive a

8  benefit of any type from an employee benefit plan which covers

9  employees of such employer."  Id. § 1002(7).  "The Supreme Court

10 has interpreted this section as conferring standing on former

11 employees who 'have a reasonable expectation of returning to

12 covered employment or . . . a colorable claim to vested

13 benefits.'"  Vaughn v. Bay Envtl. Mgmt., Inc., 567 F.3d 1021,

14 1025 (9th Cir. 2009) (quoting Firestone Tire & Rubber Co. v.

15 Bruch, 489 U.S. 101, 117 (1989)).

16         Relying on Kuntz v. Reese, 785 F.2d 1410, 1411 (9th

17 Cir. 1986), defendants have repeatedly argued during the course

18 of this litigation that plaintiffs lack statutory standing under

19 ERISA because, as retirees who have withdrawn their full account

20 balances, they no longer have a colorable claim to vested

21 benefits and thus are not "participants."  In 2006, however,

22 Judge Karlton rejected defendants' argument, concluding that the

23 Ninth Circuit has "allowed suit even when plaintiffs have

24 received their vested benefits if they allege that fiduciaries

25 'personally profited' from a breach of their duty of loyalty to

26

27     [10]  Defendants concede that, as an "alternate payee,"
   DeFazio is deemed to be a "beneficiary" under 29 U.S.C. §
28 1056(d)(3)(J).  (Docket No. 658 at 20 n.8.)

13

1  the plan." <u>Ellis v. Hollister, Inc.</u>, Civ. 05-559 LKK GGH, 2006
2  WL 988529, at *4 (E.D. Cal. Apr. 14, 2006) (citing <u>Amalgamated</u>
3  <u>Clothing & Textile Workers Union, AFL-CIO v. Murdock</u>, 861 F.2d
4  1406, 1418 (9th Cir. 1988)).  Defendants requested this court to
5  reconsider Judge Karlton's ruling in 2007, and the court declined
6  to do so because the ruling was not clearly erroneous.  <u>See</u>
7  <u>DeFazio v. Hollister, Inc.</u>, Civ. No. 04-1358 WBS GGH, 2007 WL
8  3231670, at *3-4 (E.D. Cal. Nov. 1, 2007).  The court again
9  declines defendants' suggestion that the court should depart from
10 Judge Karlton's 2006 decision.

11        Moreover, the Ninth Circuit has more recently
12 distinguished <u>Kuntz</u> and held that a "former employee who has
13 received a full distribution of his or her account balance under
14 a defined contribution pension plan has standing as a plan
15 participant to file suit under [ERISA] to recover losses
16 occasioned by a breach of fiduciary duty that allegedly reduced
17 the amount of his or her benefits." <u>Vaughn</u>, 567 F.3d at 1023,
18 1025-26; <u>accord</u> <u>Harris v. Amgen, Inc.</u>, 573 F.3d 728, 733 (9th
19 Cir. 2009).  In <u>Vaughn</u>, the Ninth Circuit did not require that
20 the trustees had personally profited from their breaches in order
21 for the participants to have standing, which Judge Karlton had
22 previously found would be required under the pre-<u>Vaughn</u>
23 precedent.[11]

24 _____

25        [11]    Whether the Trustees personally profited as a result of
26 their breaches would be relevant if plaintiffs were seeking a
   constructive trust on any ill-gotten profits.  <u>See</u> <u>Amalgamated</u>
   <u>Clothing & Textile Workers Union, AFL-CIO</u>, 861 F.2d at 1414
27 ("[T]he imposition of a constructive trust on a fiduciary's
   ill-gotten profits in favor of all plan participants and
28 beneficiaries is an important, appropriate, and available form of

1      B.   <u>Statute of Limitations</u>

2           1.   <u>"Fraud or Concealment" Exception</u>

3           ERISA's statute of limitations provides:

4      No action may be commenced under this subchapter with
       respect to a fiduciary's breach of any responsibility,
5      duty, or obligation under this part, or with respect to
       a violation of this part, after the earlier of--
6
       (1) six years after (A) the date of the last action which
7      constituted a part of the breach or violation, or (B) in
       the case of an omission the latest date on which the
8      fiduciary could have cured the breach or violation, or
       (2) three years after the earliest date on which the
9      plaintiff had actual knowledge of the breach or
       violation;
10
       <u>except that in the case of fraud or concealment</u>, such
11     action may be commenced not later than six years after
       the <u>date of discovery of such breach or violation</u>.
12

13     29 U.S.C. § 1113 (emphasis added).  While § 1113 requires a

14     plaintiff to file a claim within six years of the date of the

15     last act constituting a part of the alleged violation, regardless

16     of when the plaintiff actually learned of the violation, the

17     "'fraud or concealment' exception tolls the running of the

18     limitations period for six years from the date of discovery."

19     <u>Barker v. Am. Mobil Power Corp.</u>, 64 F.3d 1397, 1401 (9th Cir.

20     1995).  "Plaintiffs bear the burden of proving 'fraud or

21     concealment' under 29 U.S.C. § 1113."  <u>Harris v. Koenig</u>, --- F.

22     Supp. 2d ----, ----, No. 02-618, 2011 WL 4542973, at *5 (D.D.C.

23     2011); <u>accord</u> <u>Barker</u>, 64 F.3d at 1401 (finding the "fraud or

24     concealment" exception inapplicable "because the plaintiffs have

25     not produced specific evidence of fraudulent activity or

26     concealment" by defendants).

27     _____

28     relief under ERISA § 409(a).")  Plaintiffs have not, however,
       sought such a remedy.  (<u>See</u> Docket Nos. 650-53, 662.)

15

1          Here, plaintiffs rely on the "fraud or concealment"

2    exception to assert claims based on defendants' alleged breaches

3    of fiduciary duties beginning in 1982.  The "fraud or

4    concealment" exception applies only when an ERISA fiduciary

5    either "made knowingly false misrepresentations with the intent

6    to defraud the plaintiffs" or took "affirmative steps . . . to

7    conceal any alleged fiduciary breaches."  <u>Barker</u>, 64 F.3d at

8    1401; <u>accord</u> <u>Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.</u>, 919

9    F.2d 1216, 1220 (7th Cir. 1990) ("An ERISA fiduciary can delay a

10   wronged beneficiary's discovery of his claim [meriting

11   application of the 'fraud or concealment' exception] either by

12   misrepresenting the significance of facts the beneficiary is

13   aware of (fraud) or by hiding facts so that the beneficiary never

14   becomes aware of them (concealment).").

15         Courts have recognized that the "fraud or concealment"

16   exception to § 1113 incorporates the common law doctrine of

17   fraudulent concealment.  <u>Barker</u>, 64 F.3d at 1402.  Under that

18   common law doctrine, passive concealment alone may toll the

19   statute of limitations if the defendant has a duty to disclose

20   material information.  <u>Thorman v. Am. Seafoods Co.</u>, 421 F.3d

21   1090, 1092 (9th Cir. 2005).  Courts that have considered the

22   issue, however, have held that the doctrine of passive

23   concealment does not apply to § 1113.  <u>See, e.g.</u>, <u>Ranke v.</u>

24   <u>Sanofi-Synthelabo Inc.</u>, 436 F .3d 197, 204 (3d Cir. 2006)

25   (stating that an ERISA fiduciary must "have taken affirmative

26   steps to hide an alleged breach of fiduciary duty from a

27   beneficiary in order for the 'fraud or concealment' exception to

28   apply"); <u>Larson v. Northrop Corp.</u>, 21 F.3d 1164, 1174 (D.C. Cir.

16

1  1994) ("While a fiduciary's mere silence could, in some

2  circumstances, amount to fraud, it would still fall short of the

3  fraudulent concealment that courts have required for purposes of

4  § 1113."); Schafer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491 (8th

5  Cir. 1988) (holding that active concealment under § 1113 requires

6  "more than merely a failure to disclose").

7       The Ninth Circuit in Barker implicitly found passive

8  concealment insufficient to toll the statute of limitations.

9  There, the Ninth Circuit recognized that an ERISA fiduciary

10 generally has a duty to disclose "complete and  accurate

11 information material to the beneficiary's circumstances," but

12 focused only on whether the defendants had affirmatively

13 concealed their breach when holding that the defendants did not

14 engage in "fraud or concealment" under § 1113.  See Barker, 64

15 F.3d at 1401, 1403.  An ERISA fiduciary's mere failure to

16 disclose material information thus does not merit tolling under §

17 1113.

18      The "fraud or concealment" exception tolls the statute

19 of limitations only "until the plaintiff in the exercise of

20 reasonable diligence discovered or should have discovered the

21 alleged fraud or concealment."  J. Geils Band Emp. Ben. Plan v.

22 Smith Barney Shearson, Inc., 76 F.3d 1245, 1252 (1st Cir. 1996)

23 (citing Larson, 21 F.3d at 1172-74).[12]  Defendants first argue

24 that plaintiffs cannot rely on the "fraud or concealment"

25

26      [12]   In cases of active concealment, some courts have held
   that a plaintiff can rely on the "fraud or concealment" exception
27 even in the absence of diligence by the plaintiff.  See J. Geils
   Band Emp. Ben. Plan, 76 F.3d at 1254 n.10; Martin v. Consultants
28 & Adm'rs, Inc., 966 F.2d 1078, 1096 n.19 (7th Cir. 1992).

1  exception because none of the plaintiffs testified at trial or
2  submitted evidence establishing that they exercised reasonable
3  diligence.

4       When addressing a similar tolling provision in the
5  statute of limitations for federal securities fraud claims (28
6  U.S.C. § 1658(b)), however, the Supreme Court held that "the
7  limitations period does not begin to run until the plaintiff
8  thereafter discovers or a reasonably diligent plaintiff would
9  have discovered 'the facts constituting the violation,' . . .
10 <u>irrespective of whether the actual plaintiff undertook a</u>
11 <u>reasonably diligent investigation</u>."  <u>Merck & Co., Inc. v.</u>
12 <u>Reynolds</u>, --- U.S. ----, ----, 130 S. Ct. 1784, 1798 (2010)
13 (emphasis added).  The Court's holding applies equally to § 1113,
14 especially because the Court's analysis in <u>Merek</u> is centered
15 around concepts embodied in the general "discovery rule."  <u>See</u>
16 <u>id.</u> at 1793-98.  Holding otherwise could fault plaintiffs for
17 failing to exercise reasonable diligence even when the exercise
18 of reasonable diligence would not have alerted them to their
19 claims because the defendants had concealed their misconduct.
20 Therefore, assuming plaintiffs in this case were not reasonably
21 diligent, they would be precluded from relying on the "fraud or
22 concealment" exception only if a reasonably diligent plaintiff
23 would have discovered the misconduct.[13]

24 _____

25    [13]   When addressing tolling in the context of federal
26 securities fraud claims, the Supreme Court "held that the
   ultimate burden is on the defendant to demonstrate that a
27 reasonably diligent plaintiff would have discovered the facts
   constituting the violation."  <u>Strategic Diversity, Inc. v.</u>
28 <u>Alchemix Corp.</u>, 666 F.3d 1197, 1206 (9th Cir. 2012) (discussing
   <u>Merck & Co.</u>, 130 S. Ct. at 1798).  In contrast, the First Circuit

1              2.   HolliShare Highlights

2         Plaintiffs contend that defendants concealed the sales

3    price of HolliShare's JDS shares in the HolliShare Highlights,

4    which were the annual reports distributed to participants to

5    inform them about HolliShare's funding and financial condition.[14]

6    In the June 2009 Order, this court held that, based on language

7    in the HolliShare Highlights, a participant could have reasonably

8    believed that HolliShare's shares of JDS stock were sold to JDS

9

10   held that, for tolling under § 1113, the plaintiff has the burden
     of showing reasonable diligence unless the plaintiff alleges that
     the statute is tolled based on the defendant's self-concealing
11   wrong.  J. Geils Band Emp. Ben. Plan, 76 F.3d at 1259; see also
     Truck Drivers & Helpers Union, Local No. 170 v. N.L.R.B., 993
12   F.2d 990, 996 (1st Cir. 1993) ("[A] plaintiff may establish a
     self-concealing wrong by demonstrating that the defendant
13   'engage[d] in some misleading, deceptive or otherwise contrived
     action or scheme, in the course of committing the wrong, that is
14   designed to mask the existence of a cause of action.'" (quoting
     Hobson v. Wilson, 737 F.2d 1, 34-35 (D.C. Cir. 1984) (alteration
15   in original)).
          The parties have not addressed which party has the
16   burden to establish either the existence or absence of reasonable
     diligence.  Nonetheless, because the court finds that the
17   exercise of diligence would not have uncovered the alleged
     breaches, the court's conclusion about reasonable diligence would
18   be the same regardless of which party had the burden on that
     issue.
19

20        [14]   The Ninth Circuit has held that the "fraud or
     concealment" exception applies "only when the defendant himself
21   has taken steps to hide his breach of fiduciary duty."  Barker,
     64 F.3d at 1402.  As a result, "[p]laintiffs may not generally
22   use the fraudulent concealment by one defendant as a means to
     toll the statute of limitations against other defendants."  Id.
23   (quoting Griffin v. McNiff, 744 F. Supp. 1237, 1256 n.20
     (S.D.N.Y. 1990), aff'd, 996 F.2d 303 (2d Cir. 1993)) (internal
24   quotation marks omitted).  The testimony from at least some of
     the Trustees in this case was that they read and reviewed the
25   HolliShare Highlights before they were distributed to the
     participants.  (See Tr. 371:14-16, 372:9-12 (Karlovsky), 2452:16-
26   23 (Zwirner).)  From this testimony--and in light of the fact
     that defendants have not argued that any of the Trustees did not
27   read or review the HolliShare Highlights--the court finds that
     each Trustee approved the HolliShare Highlights and is
28   responsible for the information provided to the beneficiaries in
     them.

                                 19

at the month-end book value from the month in which a sale

occurred.  DeFazio, 636 F. Supp. 2d at 1061.  Specifically, from

1993 to 2000, the HolliShare Highlights informed participants of

the following:

> JDS common shares, which are valued at their book
> value, are not publicly traded.  They are for all
> practical purposes not transferable to any person or
> entity other than JDS itself.  They are subject to severe
> transfer restrictions which require that the Trust first
> offer them to JDS, the parent company of Hollister
> Incorporated, at their book value.
> To date, JDS has repurchased common shares from the
> Trust at their book value to provide the plan with the
> needed cash.

(Exs. 4-4.18 at 7, 4-4.19 at 7, 4-4.20 at 7, 4-4.21 at 7, 4-4.22

at 7, 4-4.23 at 7, 4-4.24 at 7, 4-4.25 at 7.)[15]  Based on this

information, a reasonable participant could have believed that

HolliShare sold its holdings of JDS common shares pursuant to the

sale price specified for sales made pursuant to the "right of

first refusal" in subparagraph II.D.2.a of Article 5 of the JDS

Articles.

Specifically, subparagraph II.D.2.a provides:

> If any . . . trust . . . desires or intends to transfer
> any one or more shares of the Corporation, . . . such
> holder shall first offer in writing, . . . to sell to the
> Corporation all shares of the Corporation which such
> holder desires or intends to transfer . . . at the price
> and in the manner set forth in subparagraphs 3 and 4 of
> this paragraph D.

(Ex. 531, Art. V, ¶ II.D.2.a.)  Subparagraph II.D.3.b of Article

---

[15]   Beginning in 1998 and continuing through 2000, the
following underscored language was omitted: "They are subject to
severe transfer restrictions which require that the Trust first
offer them to JDS, the parent company of Hollister Incorporated,
at their book value."  (See Exs. 4.4-23 at 7, 4.4-24 at 7, 4-4.25
at 7 (emphasis added).)  This omission does not affect the
court's analysis.

Five then mandates that, for sales pursuant to the right of first refusal, "[t]he price of each common share shall be its book value as of the end of the calendar month in which the Repurchase Date occurs . . . ." (Id. Art. V, ¶ II.D.3.b.)  When the explanation in the HolliShare Highlights that the transfer restrictions on its JDS shares "require that the Trust first offer them to JDS . . . at their book value" is read in conjunction with the right of first refusal in the JDS Articles, a participant could reasonably conclude that the shares were sold at the month-end book value dictated in subparagraph II.D.3.b.

Defendants argue, however, that a reasonable beneficiary would not draw this conclusion because the JDS Articles also provide for JDS to pay the purchase price for sales pursuant to the right of first refusal with a limited amount of cash and the remainder in a subordinated promissory note. (See id. Art. 5, ¶ II.D.4.a.)  In contrast to this provision, they point out that HolliShare always received payment for its shares from JDS in cash, suggesting that the sales were not conducted under the terms of the right of first refusal.  In the HolliShare Highlights, however, beneficiaries were told that "JDS has repurchased common shares from the Trust at their book value to provide the plan with the needed cash."  Although this suggests that payments may have been in cash, it does not preclude the possibility that HolliShare received a promissory note, especially because a promissory note could have been sold to a bank to obtain cash. (See Tr. 663:10-664:2.)  That HolliShare's receipt of cash only payments for its JDS stock is inconsistent with the terms of payment for a sale conducted pursuant to the

1 right of first refusal would therefore not prevent a reasonable

2 participant from concluding that HolliShare's sales were

3 conducted under the terms and at the price provided for in the

4 right of first refusal provision.

5       Before 1993, however, the HolliShare Highlights did not

6 contain similar language suggesting that HolliShare's sales of

7 its JDS stock were pursuant to and according to the terms of the

8 right of first refusal.  Specifically, from 1983 to 1992, the

9 HolliShare Highlights stated:

> JDS common shares, which are valued at their book
> value, are not publicly traded.  They are subject to
> severe transfer restrictions and can only be sold to JDS,
> the parent company of Hollister Incorporated.
>       To date, JDS has repurchased common shares from the
> Trust at their book value to provide the plan with needed
> cash.

14 (Exs. 4-4.8 at 9, 4-4.9 at 10, 4-4.10 at 10, 4-4.11 at 6, 4-4.12

15 at 6, 4-4.13 at 7, 4-4.14 at 7, 4-4.15 at 7, 4-4.16 at 7, 4-4.17

16 at 7.).[16]  Similarly, the 1982 HolliShare Highlights explained:

> In evaluating these comparisons, it must be
> recognized that JDS common shares, which are valued at
> their book value, are not publicly traded and are subject
> to very severe transfer restrictions.  As a practical
> matter, they can only be sold to JDS, the parent company
> of Hollister Incorporated.
>       To date, JDS has repurchased common shares from the
> Trust at their book value in order to provide the Trust
> with needed cash.

22 (Ex. 4-4.7 at 7.)

23       The explanations from 1982 to 1992 are silent with

24

---

25       [16]    From 1983 to 1987, the first sentence of the
26 explanation varied slightly.  (See Exs. 4-4.8 at 9, 4-4.9 at 10,
   4-4.10 at 10 ("As you evaluate these comparisons, remember that
   JDS common shares, which are valued at their book value, are not
27 publicly traded."); Exs. 4-4.11 at 6, 4-4.12 at 6 ("Remember that
   JDS common shares, which are valued at their book value, are not
28 publicly traded.").)

respect to whether "book value" refers to the December 31 book value or month-end book value and lack any language suggesting one or the other.  Based on the explanations, it is equally plausible that HolliShare sold its shares under the exceptional circumstances provision.  At most, the HolliShare Highlights from 1982 to 1992 omit arguably material information, which is insufficient to trigger the "fraud or concealment" exception.  Plaintiffs have not satisfied the court that defendants committed any other affirmative acts of concealment during that ten-year period that would have led a reasonable participant to believe that HolliShare's sales of its JDS stock were at the month-end book value.

Accordingly, because plaintiffs are unable to rely on the "fraud or concealment" exception for any alleged misconduct between 1982 to 1992, their claims based on HolliShare's sale of JDS stock from 1982 to 1992 are time barred and the court will enter judgment in favor of defendants on those claims.[17] Further, because Schellentrager's tenure as trustee ended when Karlovsky replaced him in 1990, (Tr. 345:1-5), the entirety of plaintiffs' claims against him are untimely and the court will enter judgment in his favor.

Returning to plaintiffs' claims based on HolliShare's sale of JDS stock beginning in 1993, defendants further contend that the following language in the Plan Instrument disclosed the

---

[17]   If the court's finding that plaintiffs' claims based on defendants' conduct from 1982 to 1992 is reversed for any reason, the remainder of the court's analysis in this Order of plaintiffs' post-1992 claims would apply equally to their time-barred claims.

1   use of the December 31 book value:

2           The assets in the Trust Fund shall be valued by the
        Trustees at their respective fair market values as of
3       each December 31st.  The fair market value of Common
        Shares of JDS Inc. held in the Trust Fund shall, subject
4       to the provisions of the remainder of this Section 7.03,
        be their book value as of the valuation date as reflected
5       on the books of JDS Inc.  The Trustees shall accept such
        book value as the fair market value if such book value is
6       computed in accordance with generally accepted accounting
        principles.

7

8   (Ex. 501 § 7.03.)[18]  Article VII of the Plan Instrument, which

9   this explanation is a part of, however, is titled "Accounts and

10  Allocations of Funds" and addresses valuing each participant's

11  account in detail, not valuing JDS stock for the purpose of a

12  sale.

13          Because the first sentence addresses the "assets in the

14  Trust Fund" more broadly, the reference to the December 31 value

15  in that sentence could be interpreted as referring to the

16  valuation of all assets in the trust for purposes of determining

17  the value of each participant's account.  This is consistent with

18  the use of December 31 as the date of evaluation for

19  participant's accounts regardless of when they retire in the

20  following year.  On the other hand, the second sentence, which

21  specifically refers to the "fair market value of Common Shares of

22  JDS Inc.," omits any reference to December 31 and states that the

23  value shall be "their book value as of the <u>valuation date</u>."

24  Based on the use of "valuation date" in that sentence, a

25  _____

26      [18]    The explanation was also included in the letter sent to
    DeFazio, which is discussed below.  (Ex. 176.)  Although
27  defendants have not relied on this evidence, all of the
    HolliShare Highlights before the court also included
28  substantially similar language in the endnotes following the
    breakdown of HolliShare's financial information.

                                    24

participant could reasonably conclude that the book value of JDS stock would vary depending on when the valuation and sale occurred and thus would not remain stagnant for the entire year at the December 31 book value.  Although the correct interpretation of this explanation is not clear, a reasonable participant could still believe that HolliShare's sales of JDS stock were set at the right of first refusal price of month-end book value and that only the accounts were valued annually as of December 31.

Plaintiffs have thus persuaded the court that the potential inconsistency between HolliShare's receipt of cash payments and the provision for a promissory note in the right of first refusal and the disclosure setting the valuation date for HolliShare accounts at December 31 did not amount to "storm warnings" putting the plaintiffs on notice about defendants' alleged breaches.  Even assuming these inconsistencies would have alerted a reasonably diligent participant to defendants' alleged breaches, the most a reasonable participant could be expected to do in receipt of potentially conflicting information would be to inquire further about the terms of the sales.  While the court doubts that a reasonably diligent participant would have done more than review the annual HolliShare Highlights, the court finds that even additional efforts would not have led a participant to discover the alleged misconduct.

For example, a reasonably diligent participant might have inquired about the details pertaining to the Plan's sale of JDS stock.  In this case, however, DeFazio made such an inquiry. In a letter dated November 3, 1997, he was told that, since 1973,

1  "every transfer by JDS Inc[.] has been at book value; and JDS
2  Inc[.] has always exercised its right of first refusal and
3  repurchased such shares at book value." (Ex. 176 at 3.)  As
4  previously discussed, the express reference to the "right of
5  first refusal" in this letter when read in conjunction with the
6  JDS Articles indicates that the price for the JDS stock would
7  have been the "book value as of the end of the calendar month in
8  which the Repurchase Date occurs." (Ex. 531.)

9      Additionally, if plaintiffs had pursued an
10 investigation beyond inquiring from Hollister or HolliShare, the
11 evidence suggests they would not have discovered the precise
12 terms of HolliShare's sales of JDS stock.  In response to a
13 Department of Labor investigator's request for documents
14 evidencing HolliShare's sales of its shares to JDS, (Ex. 54 at
15 8), HolliShare indicated sales prices for sales from 1994 to 1998
16 that were the December 31 book value, but also indicated that
17 each of the sales took place on January 1, (id. at 10).  From the
18 information provided to the Department of Labor and available to
19 the participants, it would be unlikely that a reasonably diligent
20 participant would have known that the sales in 1994 to 1998
21 actually took place in March of each year, with a sales price
22 that is allegedly three months, not one day, "old."

23     The court also doubts that additional efforts or
24 inquiries by plaintiffs could have unveiled the dynamics and
25 purported terms of the Plan's sales of JDS stock because even
26 defendants' counsel seemed unaware of the terms of such sales for
27 at least the first three years of this litigation.  In a
28 memorandum in support of their motion to dismiss plaintiffs'

26

1   First Amended Complaint filed in October 2006, counsel for seven

2   of the defendants stated, "It cannot seriously be argued that a

3   routine and commonplace sale by HolliShare of JDS common shares

4   involves any 'extraordinary circumstances.'"  (Docket No. 148 at

5   11:15-17.)  A year later, the same counsel again explained that

6   sales could not have been pursuant to the "exceptional

7   circumstances" provision.  (See Docket No. 282 at 12:3-6

8   ("Plaintiffs do not suggest what 'exceptional circumstances'

9   exist that would – or even may – justify a decision by the JDS

10  Board to treat HolliShare's periodic offers to sell some of its

11  JDS common shares differently from offers to sell made by all

12  other JDS shareholders.").)  If it was unclear to at least some

13  of defendants' counsel that the sales were pursuant to the

14  exceptional circumstances provision, it would be unreasonable to

15  conclude that a reasonably diligent participant would have

16  discovered that fact about HolliShare's sales of JDS stock.

17          Accordingly, the court finds that a reasonably diligent

18  participant would not have discovered the alleged misconduct at

19  issue in this case before the plaintiffs in this case did and

20  therefore any lack of diligence or inquiry by plaintiffs does not

21  preclude them from relying on the "fraud or concealment"

22  exception.  Because § 1113 tolls the statute of limitations to

23  six years after the discovery date and the true sales prices and

24  terms were not revealed until after this case was filed,

25  plaintiffs' ERISA claims beginning in 1993 and continuing through

26  2011 are timely.

27          C.   Sales of JDS Shares at December 31 Book Value

28              1.   Breach of Fiduciary Duties

27

a.   Prohibited Transactions under ERISA

ERISA establishes a blanket prohibition on certain transactions that "entail a high potential for abuse," including the sale or exchange of property between an ERISA plan and a "party in interest."  Donovan v. Cunningham, 716 F.2d 1455, 1465 (5th Cir. 1983) (discussing 29 U.S.C. § 1106(a)(1)).  As used in § 1106(a)(1), a "party in interest" includes the employer of the employees covered by the ERISA plan in question.  29 U.S.C. § 1002(14).

Nevertheless, ERISA provides an exemption for prohibited transactions that meet certain requirements, and § 1108(e) allows the sale or acquisition by a plan of employer stock if three criteria are met:

> (1) if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title), (2) if no commission is charged with respect thereto, and (3) if-- (A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title) . . . .

Id. § 1108(e).  The parties stipulated that HolliShare is an eligible individual account plan under ERISA, (Stipulation of Facts ¶ 26), and plaintiffs have not alleged that a commission was charged.  Therefore, the only dispute at trial to determine whether HolliShare's sales of JDS stock to JDS came within the exception in § 1108(e) was whether the sales were for "adequate consideration."

When a security has no generally recognized market, the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance

28

1  with regulations promulgated by the Secretary [of Labor]."  29

2  U.S.C. § 1002(18); see also 29 C.F.R. § 2550.408e (cross-

3  referencing § 1002(18) in defining "adequate consideration" for

4  purposes of § 1108(e)).  The Secretary of Labor has yet to

5  promulgate regulations guiding a trustee's determination of fair

6  market value.[19]

7  ───────────────

8      [19]   In 1988, the Department of Labor proposed a regulation
   that elaborated on the definition of "adequate consideration."
9  It states:

10         First, the value assigned to an asset must reflect its
           fair market value . . . . Second, the value assigned to
11         an asset must be the product of a determination made by
           the fiduciary in good faith . . . . The Department will
12         consider that a fiduciary has determined adequate
           consideration in accordance with section 3(18)(B) of the
13         Act . . . only if both of these requirements are
           satisfied.
14
   53 Fed. Reg. 17632 (May 17, 1988).  "Although proposed
15 regulations have no legal effect, numerous circuit courts have
   adopted the DOL's proposed definition of adequate consideration."
16 Henry v. Champlain Enters., Inc., 445 F.3d 610, 619 (2d Cir.
   2006).  Relying on language in Howard v. Shay, 100 F.3d 1484 (9th
17 Cir. 1996), that is similar to the proposed regulation, the
   Second Circuit has indicated that the Ninth Circuit adopted the
18 proposed regulation.  See Henry, 445 F.3d. at 619 ("To enforce
   [ERISA fiduciary rules], the court focuses not only on the merits
19 of the transaction, but also on the thoroughness of the
   investigation into the merits of the transaction." (quoting
20 Howard, 100 F.3d at 1488 (internal quotation marks omitted))).
   Although the Ninth Circuit applies a standard similar to the
21 proposed regulation, it has not expressly adopted the proposed
   regulation.
22      As this court previously explained, courts "decline to
   take cognizance of the proposed regulations . . . because a
23 proposed regulation does not represent an agency's considered
   interpretation of its statute."  DeFazio, 2007 WL 3231670, at
24 *10; see Draper v. Baker Hughes Inc., 892 F. Supp. 1287, 1293
   (E.D. Cal. 1995) (disregarding a proposed regulation issued by
25 the Department of the Treasury relating to the COBRA statute,
   noting that "almost a decade has passed since COBRA's Enactment,
26 and the promised regulatory guidelines have not materialized").
   The court will therefore rely on Ninth Circuit precedent, not the
27 Department of Labor's proposed regulation that has not, for some
   reason or no reason at all, been adopted since its proposal over
28 twenty years ago.

1        In addition to prohibiting certain transactions, ERISA
2   also imposes on fiduciaries the "highest" duties known to law.
3   Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996).
4   Specifically, § 1104(a)(1) requires an ERISA fiduciary to "act
5   for the exclusive benefit of plan beneficiaries" and §
6   1104(a)(1)(B) requires the fiduciary to act "with the care,
7   skill, prudence, and diligence under the circumstances then
8   prevailing that a prudent man acting in like capacity and
9   familiar with such matters would use in the conduct of an
10  enterprise of a like character and with like aims." Id. (quoting
11  § 1104(a)(1)(B)) (internal quotation marks omitted).  When an
12  ERISA plan transacts in employer securities, its fiduciaries thus
13  bear the "heavy" burden of showing that the transaction satisfies
14  the requirements of § 1108(e) and that the fiduciaries fulfilled
15  their duties of loyalty and care under § 1104(a)(1) and
16  (a)(1)(B).  See id.

17       Whether a particular transaction with an interested
18  party complies with §§ 1104(a)(1), (a)(1)(B), and 1108(e) depends
19  upon the conduct of the fiduciaries.  See id. (citing Cunningham,
20  716 F.2d at 1467-68).  Fiduciaries "are obliged at a minimum to
21  engage in an intensive and scrupulous independent investigation
22  of their options." Id. at 1488-89; see Cosgrove v. Circle K
23  Corp., 915 F. Supp. 1050, 1064 (D. Ariz. 1995) ("Good faith
24  requires that the trustees of the Plan have used a prudent method
25  of determining value."), aff'd, 107 F.3d 877 (9th Cir. 1997).
26  The precise scope and nature of the required investigation
27  depends upon the circumstances surrounding the transaction and
28  the asset.  See Keach v. U.S. Trust Co., 419 F.3d 626, 637 (7th

30

1  Cir. 2005) (evaluating the sufficiency of the fiduciary's

2  investigation "within the context of the totality of the

3  circumstances"); Cunningham, 716 F.2d at 1467-68 (noting that

4  fiduciaries may satisfy their burden by showing they determined

5  fair market value based upon "a prudent investigation in the

6  circumstances then prevailing"); see also Henry v. Champlain

7  Enters., Inc., 445 F.3d 610, 619 (2d Cir. 2006) ("Whether a

8  fiduciary has made a proper determination of fair market value

9  depends on whether the parties are 'well-informed about the asset

10 and the market for that asset.'" (quoting Cunningham, 716 F.2d at

11 1467)).  Failure to "investigate suspicions that one has with

12 respect to the funding and maintenance of the plan constitutes a

13 breach of" the duty to act in the best interests of the plan

14 participants.  Barker, 64 F.3d at 1403.

15              b.   *Firestone* and the *Moench* Presumption

16              Relying on Firestone, 489 U.S. 101, defendants argue

17 that the Trustees' decision to enter into and perform under the

18 terms of the mid-80s agreement--including the purported setting

19 of "fair market value" of JDS common stock in the mid-80s

20 agreement--is entitled to a presumption that the Trustees acted

21 prudently and reasonably because the Plan Instrument vested the

22 Trustees with broad discretion.  In Firestone, the Supreme Court

23 held that "a denial of benefits challenged under § 1132(a)(1)(B)

24 is to be reviewed under a de novo standard unless the benefit

25 plan gives the administrator or fiduciary discretionary authority

26 to determine eligibility for benefits or to construe the terms of

27 the plan."  Id. at 115; accord Burke v. Pitney Bowes Inc.

28 Long-Term Disability Plan, 544 F.3d 1016, 1023-24 (9th Cir. 2008)

31

1   (recognizing the holding from Firestone and explaining that,

2   "[w]hen a plan unambiguously gives the plan administrator

3   discretion to determine eligibility or construe the plan's terms,

4   a deferential abuse of discretion standard is applicable" to a

5   denial of benefit claim).

6            Section 1132, however, lays out several claims for

7   relief and plaintiffs' claims are brought under subsections

8   (a)(2) and (a)(3), not subsection (a)(1)(B).[20]  Not only was

9   Firestone's holding limited to claims under § 1132(a)(1)(B), the

10  Court explicitly indicated that its discussion was "limited to

11  the appropriate standard of review in § 1132(a)(1)(B) actions

12  challenging denials of benefits based on plan interpretations"

13  and that it "express[ed] no view as to the appropriate standard

14  of review for actions under other remedial provisions of ERISA."

15  Firestone, 489 U.S. at 108.  Accordingly, Firestone does not

16  govern the conduct at issue in this case because plaintiffs are

17  not seeking relief for a denial of their benefits under §

18  

19      [20]    Section 1132(a) provides:

20      Persons empowered to bring a civil action.  A civil
        action may be brought--
21          (1) by a participant or beneficiary-- . . .
                (B) to recover benefits due to him under the
22      terms of his plan, to enforce his rights under the terms
        of the plan, or to clarify his rights to future benefits
        under the terms of the plan;
23          (2)  by  the  Secretary,  or  by  a  participant,
        beneficiary or fiduciary for appropriate relief under
24      section 1109 of this title;
            (3) by a participant, beneficiary, or fiduciary (A)
25      to  enjoin  any  act  or  practice  which  violates  any
        provision of this subchapter or the terms of the plan, or
26      (B) to obtain other appropriate equitable relief (I) to
        redress such violations or (ii) to enforce any provisions
27      of this subchapter or the terms of the plan . . . .

28  29 U.S.C. § 1132(a).

1132(a)(1)(B).   See John Blair Commc'ns, Inc. Profit Sharing Plan
v. Telemundo Grp., Inc. Profit Sharing Plan, 26 F.3d 360, 369 (2d
Cir. 1994) ("[W]e decline to apply the arbitrary and capricious
standard [from Firestone] to the fiduciary conduct at issue here
because this case does not involve a simple denial of benefits,
over which the plan administrators have discretion. . . .
[D]ecisions that improperly disregard the valid interests of
beneficiaries in favor of third parties remain subject to the
strict prudent person standard articulated in § 404 of ERISA.").

        Nonetheless, courts have extended application of the
deferential review applied in Firestone to claims other than
those for a denial of benefits under § 1132(a)(1)(B).   In Moench
v. Robertson, 62 F.3d 553 (3d Cir. 1995), the plaintiffs sought
relief under § 1132(a)(2), alleging that the fiduciaries of their
employee stock option plan ("ESOP") breached their duties when
they invested solely in employer common stock even though the
employer was deteriorating financially.   Recognizing that "the
arbitrary and capricious standard of review allowed in Firestone
should not be applied mechanically to all ERISA claims," the
Third Circuit reasoned that "the Court's mode of analysis is
certainly relevant to determine the standard of review pertaining
to all claims filed under ERISA challenging a fiduciary's
performance."   Moench, 62 F.3d at 565.   Developing what has been
coined as the "Moench presumption," the Third Circuit held:

> [A]n ESOP fiduciary who invests the assets in employer
> stock is entitled to a presumption that it acted
> consistently with ERISA by virtue of that decision.
> However, the plaintiff may overcome that presumption by
> establishing that the fiduciary abused its discretion by
> investing in employer securities.

1  Id. at 571.

2         Consistent with every circuit that has evaluated the
3  Moench presumption, the Ninth Circuit recently adopted the
4  presumption in Quan v. Computer Scis. Corp., 623 F.3d 870 (9th
5  Cir. 2010).  Similar to Moench, the plaintiffs in Quan asserted
6  claims under § 1132(a)(2), alleging that the fiduciaries of their
7  eligible individual account plan ("EIAP") made imprudent
8  investments in their employer's common stock.

9         The Third Circuit's development of the Moench
10 presumption, and the Ninth Circuit's adoption of it in Quan,
11 centered around the fact that the plaintiffs challenged the
12 fiduciaries' decisions to invest in employer stock even though
13 the plans in both cases required or encouraged the fiduciaries to
14 invest in employer stock and ERISA exempted the fiduciaries of
15 the plans from the general duty to diversify plan investments.
16 See 29 U.S.C. § 1104(a)(2) ("In the case of an eligible
17 individual account plan (as defined in section 1107(d)(3) of this
18 title), the diversification requirement of paragraph (1)(C) and
19 the prudence requirement (only to the extent that it requires
20 diversification) of paragraph (1)(B) is not violated by
21 acquisition or holding of qualifying employer real property or
22 qualifying employer securities."); Quan, 623 F.3d at 881
23 ("Congress has granted favored status to ESOPs and other EIAPs by
24 exempting them from certain ERISA requirements. . . . We adopt
25 the Moench presumption because it provides a substantial shield
26 to fiduciaries when plan terms require or encourage the fiduciary
27 to invest primarily in employer stock.").  In Moench and Quan,
28 the plaintiffs did not allege that the conduct at issue

                              34

1  constituted prohibited transactions under ERISA or that adequate

2  consideration was not paid for the employer stock.

3        Unlike the plans and claims at issue in Moench and

4  Quan, plaintiffs' claims do not conflict with ERISA, the terms of

5  the Plan Instrument, or the Congressional policy in favor of

6  plans that "tie employee compensation to the company's

7  success."[21]  Quan, 623 F.3d at 881.  Section 1106(a)(1)

8  unequivocally prohibits the sale of HolliShare's JDS stock to JDS

9  unless the sale was for adequate consideration.  29 U.S.C. §§

10 1106(a)(1), 1108(e).  ERISA then defines "adequate consideration"

11 as "the fair market value of the asset as determined in good

12 faith by the trustee or named fiduciary pursuant to the terms of

13 the plan and in accordance with regulations promulgated by the

14 Secretary [of Labor]."  Id. § 1002(18) (emphasis added).  As the

15 Ninth Circuit has explained, this places a heavy burden on the

16 fiduciaries "to engage in an intensive and scrupulous independent

17 investigation of their options to insure that they act in the

18 best interests of the plan beneficiaries."  Howard, 100 F.3d at

19 1488-89.

20        Not only have defendants failed to cite a single case

21 in which plaintiffs challenged a transaction as prohibited under

22 ERISA and the court applied the more deferential standard of

23 review, applying the more lenient standard would be inconsistent

24 with ERISA's explicit requirement of a good faith determination

25 and courts' application of the more exacting standard.  For

26

27        [21]   Understandably in light of Hollister and JDS's
28 exceptional performance, plaintiffs do not attack the Trustees'
   decision to primarily invest the Plan assets in JDS common stock.

35

1   example, when evaluating whether a plan received adequate

2   consideration under § 1002(18) in <u>Howard</u>, the Ninth Circuit

3   stated that a fiduciary had "the burden of proving that he

4   fulfilled his duties of care and loyalty" and discussed the

5   various inquiries the fiduciary must have undergone to fulfill

6   his burden.  <u>Id.</u> at 1488-89.  The court ultimately found in favor

7   of plaintiffs because, even though the fiduciaries obtained an

8   independent assessment from a financial advisor, the fiduciaries

9   failed to "meaningfully review, discuss, or question the

10  valuation" or assumptions used.  <u>Id.</u> at 1489-90.  The Ninth

11  Circuit neither considered nor applied a more deferential

12  standard, and the breaches at issue in <u>Howard</u> are similar to the

13  alleged breaches in this case.

14          It could still be argued that, because § 1002(18)

15  contemplates adherence to the ERISA plan in determining fair

16  market value, if a plan vests the fiduciary with discretion in

17  arriving at the fair market value, the fiduciary's valuation

18  would be subject to the less stringent abuse of discretion

19  review.  <u>See</u> 29 U.S.C. § 1002(18) ("[T]he fair market value of

20  the asset as determined in good faith by the trustee or named

21  fiduciary <u>pursuant to the terms of the plan</u> and in accordance

22  with regulations promulgated by the Secretary [of Labor]."

23  (emphasis added)).  As the Second Circuit explained, however,

24  reviewing "decisions that improperly disregard the valid

25  interests of beneficiaries in favor of third parties" under a

26  standard less stringent than the "the strict prudent person

27  standard articulated in § 404 . . . would allow plan

28  administrators to grant themselves broad discretion over all

36

1  matters concerning plan administration, thereby eviscerating
2  ERISA's statutory command that fiduciary decisions be held to a
3  strict standard."  John Blair Commc'ns, Inc. Profit Sharing Plan,
4  26 F.3d at 369; cf. 29 U.S.C. § 1104(a)(1)(D) (requiring a
5  fiduciary to discharge his duties "in accordance with the
6  documents and instruments governing the plan insofar as such
7  documents and instruments are consistent with the provisions of
8  [ERISA]").

9           Lastly, even assuming the Plan Instrument vested the
10  Trustees with discretion to determine the fair market value and
11  that, under the reasoning of Firestone, their determination
12  should be reviewed only for an abuse of that discretion,
13  defendants' conduct in this case would still not be reviewed
14  under the less stringent standard of review.  As the Moench Court
15  recognized in response to the argument that the plan gave the
16  trustees the discretion to interpret the plan, "the deferential
17  standard of review of a plan interpretation 'is appropriate only
18  when the trust instrument allows the trustee to interpret the
19  instrument and when the trustee has in fact interpreted the
20  instrument.'"  Moench, 62 F.3d at 567 (quoting Trustees of Cent.
21  States, Se. & Sw. Areas Health & Welfare Fund v. State Farm Mut.
22  Auto Ins. Co., 17 F.3d 1081, 1083 (7th Cir. 1994)); see also
23  Moench, 62 F.3d at 567-68 ("[T]his is not a case implicating the
24  arbitrary and capricious standard of review.  The Committee
25  points to nothing in the record indicating that it--the
26  Committee--actually deliberated, discussed or interpreted the
27  plan in any formal manner. . . . 'Thus, if the trustee without
28  knowledge of or inquiry into the relevant circumstances and

37

1  merely as a result of his arbitrary decision or whim exercises or

2  fails to exercise a power, the court will interpose.'" (quoting

3  Restatement (Second) of Trusts § 187, comment (h))).

4          As discussed in greater detail below, however, there

5  was no testimony that the Trustees used the December 31 book

6  value because they determined that it reflected the "fair market

7  value" of the JDS stock.  Without having exercised the discretion

8  presumably afforded the Trustees in the Plan Instrument, any

9  argument that the determination is subject to review only for an

10  abuse of that discretion must fail.

11              c.  <u>Trustees' Lack of Investigation</u>

12          The court must therefore determine whether, at trial,

13  the fiduciaries carried their burden of proving that they

14  fulfilled their duties under §§ 1104(a)(1), (a)(1)(B), and

15  1108(e), which required them "at a minimum to engage in an

16  intensive and scrupulous independent investigation of their

17  options to insure that they act in the best interests of the plan

18  beneficiaries."  <u>Howard</u>, 100 F.3d at 1488-89 (quoting <u>Leigh v.</u>

19  <u>Engle</u>, 727 F.2d 113, 125-26 (7th Cir. 1984)) (internal quotation

20  marks omitted).  At trial, plaintiffs' central focus was that the

21  Trustees breached their duties when they sold HolliShare's JDS

22  shares to JDS at the December 31 book value from the prior year

23  without determining that the sale price was for "adequate

24  consideration" and, consequently, sold the Plan's JDS stock to

25  JDS for less than "adequate consideration."

26          The consistent testimony from the Trustees who

27  testified at trial was that, after the mid-80s agreement, the

28  Trustees used the December 31 book value as the sale price for

1   HolliShare's JDS stock.  At trial, Winn and Zwirner testified at
2   length about the arguably "exceptional" circumstances that led to
3   the mid-80s agreement, including Hollister's six-year arbitration
4   with its international distributor that put severe financial
5   strains on the company, (Tr. 644-46, 2376), uncertainty in
6   predicting HolliShare's liquidity needs in upcoming years, and
7   concerns about whether JDS could satisfy HolliShare's increasing
8   cash needs, (Tr. 656-58, 2071:15-22).  Because the controlling
9   inquiry examines "how the fiduciary acted viewed from the
10  perspective of the time of the [challenged] decision rather than
11  from the vantage point of hindsight," Roth v. Sawyer-Cleator
12  Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994) (alteration in
13  original) (internal quotation marks omitted), the circumstances
14  in the mid-80s may very well have merited use of the agreement
15  JDS and HolliShare reached.  The agreement, however, neither
16  demonstrates that the Trustees sought to determine the fair
17  market value of the JDS shares nor justifies the Trustees'
18  unquestioning adherence to its terms.

19          Although the Trustees relied on the December 31 book
20  value to set the sales price of HolliShare's JDS shares, the
21  evidence at trial established that they never attempted to
22  determine whether the December 31 book value was the fair market
23  value for the Plan's stock.  Specifically, Karlovsky testified
24  that it was his understanding that the fair market value in the
25  month of sale was the December 31 book value regardless of when
26  the sale took place.  (Tr. 406:22-407:5.)  He explained that his
27  "recollection is that [the Trustees] accepted the audited year
28  end valuation according to the plan as the book value and [] used

39

1  it." (Tr. 471:12-18.) Karlovsky also testified that he "didn't
2  have the ability or skills or the basis to determine" the fair
3  market value of JDS stock in the month of the sale because he
4  lacked "access to understanding and the ingredients to do our
5  book value valuation," which was done by the finance department.
6  (Tr. 406:9-16.) He testified that he "did not attempt to
7  calculate any other valuation" and is not aware that any of the
8  other Trustees did either. (Tr. 471:12-18.) As Judge
9  O'Scannlain has explained, "[i]f [fiduciaries] do not have all of
10 the knowledge and expertise necessary to make a prudent decision,
11 they have a duty to obtain independent advice." Howard, 100 F.3d
12 at 1490 (O'Scannlain, J., dissenting on other grounds).

13          In addition to never attempting to determine the "fair
14 market value" of HolliShare's JDS shares, the Trustees never
15 requested or obtained an independent valuation of the stock by an
16 outside auditor. Zwirner, who has been a Trustee since 1976,
17 recognized that it was within the prerogative of the Trustees to
18 obtain an outside appraisal, but did not recall a single time
19 that the Trustees obtained an independent appraisal to value the
20 Plan's JDS stock. (Tr. 1889:10-17, 2101:3-8; accord Tr.
21 393:21-23 (Karlovsky testifying that he never asked for or
22 requested an appraisal of the JDS stock).) It appears that the
23 first outside appraisal performed of HolliShare's JDS stock in
24 the history of HolliShare was done at the request of defense
25 counsel after this litigation commenced, and Zwirner, who is
26 still a HolliShare Trustee and was aware of the appraisal, did
27 not even request to review it. (Tr. 2495:14-25.)

28          Although § 1108(e) and caselaw interpreting it have

1   never required trustees to obtain an independent audit, the Ninth

2   Circuit has recognized that "securing an independent assessment

3   from a financial advisor or legal counsel is evidence of a

4   thorough investigation."  Howard, 100 F.3d at 1489 (citing Martin

5   v. Feilen, 965 F.2d 660, 670-71 (8th Cir. 1992)); see also

6   Katsaros v. Cody, 744 F.2d 270, 275 (2d Cir. 1984) (finding that

7   fiduciaries breached their duties when "[t]hey lacked any

8   expertise in such important matters as capital adequacy, quality

9   of assets, liquidity, the value of the bank's stock, and the

10  like" and "[n]o effort was made to obtain independent

11  professional assistance or analysis of the financial data

12  presented to them").  In explaining that obtaining an independent

13  assessment is "not a complete defense to a charge of imprudence,"

14  the Ninth Circuit has also held that a trustee must "(1)

15  investigate the expert's qualifications, (2) provide the expert

16  with complete and accurate information, and (3) make certain that

17  reliance on the expert's advice is reasonably justified under the

18  circumstances."  Howard, 100 F.3d at 1489 (internal citations

19  omitted).  In light of the Howard court's criticism of the

20  trustees' failure to "meaningfully review, discuss, or question

21  the valuation" they obtained, it would go against reason for the

22  court to conclude that trustees who did not even obtain an

23  independent audit or perform a sufficiently similar inquiry had

24  fulfilled their duties.

25          In assessing the thoroughness of trustees'

26  investigation of an asset's fair market value, the Ninth Circuit

27  has also found fault when the trustees "completed the transaction

28  without negotiation."  Id. at 1484; accord Chao v. Hall Holding

41

1   Co., Inc., 285 F.3d 415, 432, 434 (6th Cir. 2002) (holding that
2   plan fiduciaries failed to prove that they had made a good faith
3   inquiry into fair market value when they, inter alia, did not
4   engage in a negotiation to set the price of the stock).  The
5   evidence at trial in this case confirmed that, after the mid-80s
6   agreement, the Trustees never attempted to negotiate a different
7   price with JDS for the sale of its stock.  (See Tr. 898:12-899:1
8   (McCormack testifying that he never attempted to negotiate the
9   price); Tr. 1299:22-1300:2 (Brilliant testifying that he never
10  suggested negotiating the price).)  In fact, Zwirner testified
11  that, "a few times over [his] 30 some years as trustee,"
12  HolliShare considered the possibility of selling JDS shares at a
13  price higher than book value, but the Trustees always concluded
14  that "JDS Inc. always repurchases at book and would not – just
15  would not entertain that."  (Tr. 2373:6-20.)  Although Zwirner's
16  conclusion could have ultimately been correct,[22] the Trustees
17  never attempted to determine whether § 1108(e) demanded a higher
18  price or, assuming it did, present information to JDS in an
19  effort to negotiate.

20      The Trustees also seemed to accept the terms of the
21  mid-80s agreement without question or a consistent understanding
22  of its terms or justifications for them.  At its inception, the
23  mid-80s agreement did not appear to come about as a result of
24  meaningful negotiations between JDS and HolliShare.  With respect
25  to the price, the testimony was that JDS suggested the use of the
26
27      [22]    The parties never addressed the implications under
    ERISA and for HolliShare if JDS refused to repurchase
28  HolliShare's shares at the fair market value or even at the
    December 31 book value.

December 31 book value from the prior year, (Tr. 2059:25-2060:7),
and Zwirner testified that, when sales were pursuant to the
"exceptional circumstances" provision, the practice was that JDS
set the terms of the sale and there was no room for negotiation.
(See Tr. 2114:20-22, 2115:4-7 ("When JDS's board uses its
discretion and uses the exceptional circumstances clause to
deviate, there's not necessarily a negotiation. . . . JDS can
determine they'll permit the exceptional circumstances under
conditions they specify, and then the person wanting the
exception either says yes or no.  That's the way it worked in
practice." ).)  Karlovsky also testified that he did not know how
the mid-80s agreement came about and that Zwirner had simply told
him it was the existing practice without explanation.  (Tr.
370:23-371:2.)

          Not only were the Trustees unable to produce a single
document memorializing the terms of the mid-80s agreement or even
pinpointing the year it was consummated, but the Trustees also
lacked a consistent understanding of it.  For example, defendants
suggested that if the month-end book value in the month of a sale
was actually lower than the December 31 book value from the prior
year, HolliShare would have received the benefit of the higher
value and been able to sell at the December 31 book value.
Winn, on the other hand, testified that it was not his
understanding that JDS would have paid the higher price if the
book value in the month of sale had fallen below the December 31
book value.  (Tr. 659:19-22.)  Additionally, although one of the
"terms" of the mid-80s agreement was that JDS would purchase all
of the shares HolliShare offered, the Trustees felt the need to

43

1   obtain a commitment from JDS that it would continue to purchase
2   shares in 1999.  (See Ex. 41 at 68.)  After discussing the fact
3   that the commitment would not be binding on JDS, the JDS Board
4   agreed to make a commitment to HolliShare that included a
5   "restatement of the historic commitment of the company to
6   repurchase its stock and . . . a new, three-year commitment that
7   is subject to renewal annually."  (Id.)  The Trustees'
8   unquestioning acceptance of an amorphous verbal agreement that
9   set the price of the Plan's most valuable asset underscores their
10  failure to perform a thorough investigation.

11          The Trustees also accepted the use of the December 31
12  book value without question even though they knew that the month-
13  end book value during the month of each sale was almost always
14  greater than the December 31 book value.  Not only did Zwirner
15  and Stempkinski receive monthly financial statements that
16  included the current month-end book value for JDS because of
17  their roles as Hollister and JDS board members, (Tr. 1107:5-11),
18  Zwirner, McCormack, Karlovsky, and Brilliant all testified that
19  they knew the December 31 book value was less than the month-end
20  book value, (Tr. 2016:6-9 (Zwirner), 767:17-19, 1034:6-9
21  (McCormack), 404:13-23 (Karlovsky), 1325:2-10 (Brilliant)).
22  Brilliant also testified that he did not recall having
23  discussions with anyone about whether selling for less than
24  month-end book value was reducing the value of HolliShare.  (Tr.
25  1344:7-14.)  In Cunningham, the Fifth Circuit held that
26  fiduciaries did not fulfill their duties when, similar to
27  HolliShare's use of an out-dated book value, the fiduciaries
28  relied on an appraisal that was "out of date" at the time of the

44

1  transaction because "the factual assumptions upon which it was
2  based were no longer valid."  Cunningham, 716 F.2d at 1469.

3       The evidence at trial also revealed that at least
4  Zwirner knew that an outside appraisal of JDS had been conducted
5  as part of a capitalization study in anticipation of the
6  termination of the 1977 Preferred Share Trust and that the
7  outside appraisal suggested that the market value of JDS stock
8  without any ownership or transfer restrictions was at least 3.4
9  times book value.  (Tr. 102:14-18, 122:24-123:22.)  Of course, a
10  valuation of JDS stock without ownership restrictions was
11  entirely hypothetical because the shares of JDS stock could not
12  be sold on the public market.  In receipt of such information,
13  however, a prudent fiduciary would at least inquire whether an
14  outside appraiser would value JDS stock above book value even
15  with the restrictions.

16       Not only did ERISA require the Trustees to ensure they
17  were receiving adequate consideration to sell HolliShare's shares
18  to JDS, the use of the December 31 book value should have
19  prompted a thorough inquiry by the Trustees because, when the
20  Plan sold its shares to JDS at the December 31 book value, the
21  evidence suggests the Trustees may have personally benefitted as
22  individual shareholders.  Zwirner acknowledged that, when
23  HolliShare sold below month-end book value and JDS retired the
24  purchased shares, the current book value for each outstanding
25  share increased and, as an owner of outstanding shares, the value
26  of his shares also increased.  (Tr. 2050:6-14.)  At a minimum, a
27  prudent fiduciary would have questioned and assessed the
28  justifications for this "transfer of value" that occurred when

45

1  HolliShare sold its shares for less than the month-end book

2  value.

3          It appears the only Trustee who ever questioned the use

4  of the December 31 book value was Karlovsky.  When he first

5  became Trustee, he wondered whether the use of the December 31

6  book value affected the Plan and "went back and [] used [his]

7  mathematical modeling capabilities and [] work experience in

8  benefits to do some simulation and sensitivity analysis to see if

9  [the use of the December 31 book value] had a significant impact

10  on the plan."  (Tr. 354:9-13.)  Based on the results of his

11  simulation, Karlovsky concluded that it did not.  Tellingly,

12  however, Karlovsky's concern was whether use of the December 31

13  book value from the prior year had made "a significant difference

14  to the overall operation of the plan," (Tr. 352:6-7), not whether

15  the price constituted the "fair market value" of the Plan's JDS

16  stock.  Even assuming Karlovsky's simulation was accurate,

17  determining that a price does not have a long-term detrimental

18  effect on the plan does not fulfill the trustee's duty to ensure

19  that the plan receives adequate consideration under § 1108(e) for

20  each sale.

21          All of the Trustees were also individual shareholders

22  under the direct shareholder program and thus knew that they

23  received month-end book value when they sold their shares to JDS

24  under the right of first refusal provision.  The court's overall

25  impression from the testimony was that the Trustees never

26  meaningfully questioned the disparity in price between

27  HolliShare's sales and individual shareholders' sales that

28  occurred in the same month.  As an explanation for the use of the

46

1   December 31 book value from the prior year for the sale of
2   HolliShare's shares and the month-end book value for the sales of
3   the individual shareholders' shares, defendants explain that
4   HolliShare received the lower price because the December 31 book
5   value was the only audited number and HolliShare received all
6   cash.  The court recognizes that a prudent trustee would
7   generally prefer to use an audited value.  Here, however, nothing
8   precluded the Trustees from obtaining an audit of a month-end
9   book value and, because a sale generally occurred only once a
10  year, the burden of obtaining a single updated valuation based on
11  the annual audited valuation would not have been unbearably
12  burdensome.  Moreover, the Trustees' justification for using the
13  December 31 book value because it was audited was not entirely
14  convincing in light of Zwirner's testimony that he could not
15  recall a single month in his tenure as Trustee when the audited
16  December 31 book value differed from the December 31 book value
17  JDS calculated and submitted to the auditors.[23]  (Tr. 2144:8-13.)
18  JDS also tracked its monthly book value and McCormack testified
19  that, in his over ten years with Hollister, he does not recall a
20  single month when JDS determined its calculation of a month-end
21  book value had to be adjusted or was calculated incorrectly.
22  (Tr. 1105:7, 1106:7-13.)
23
24      [23]    It appears that the book value for 1983 was adjusted
    because the 1984 HolliShare Highlights state, "A change in
25  Financial Accounting Standards Board requirements, implemented in
    JDS' 1983 financial statements audited by Arthur Andersen & Co.,
26  resulted in an increase in the book value of JDS common shares
    from $39.21 to $41.08 per share as of December 31, 1983."  (Ex.
27  4-4.9.)  Zwirner testified that he has "no recollection of this
    discrepancy between the company's books and the audited figure."
28  (Tr. 2456:7-9.)

1    With respect to the fact that HolliShare required cash
2    payments for JDS's purchases of its shares and the JDS Articles
3    provided for the individual shareholders to receive a promissory
4    note for sales over a certain sum, the court agrees with
5    defendants that the cash payment could detrimentally affect the
6    value of HolliShare's shares and that the Trustees would be
7    required to consider this factor in determining the fair market
8    value of the Plan's shares.  Nonetheless, while a prudent trustee
9    may have determined that the significant cash need decreased the
10   fair market value of HolliShare's stock, the evidence shows that
11   the Trustees never attempted to quantify how HolliShare's cash
12   needs affected the value of its stock.  Depending on the year and
13   the month of a sale, the difference between the December 31 book
14   value and month-end book value inevitably varied.  Defendants
15   have not satisfied the court that the Trustees determined that
16   the difference between the December 31 book value and the month-
17   end book value of each sale had any correlation to the decrease
18   in value of HolliShare's stock because of their need for cash
19   payments.

20              d.  Transfer and Ownership Restrictions

21        The Trustees emphasize that they were familiar with the
22   JDS Articles and transfer and ownership restrictions on JDS stock
23   and considered these restrictions when they sold for the December
24   31 book value.[24]  With the exception of Brilliant, who had not

25

26        [24]  Judge Karlton originally rejected defendants' argument
     that the settlor doctrine bars plaintiffs' claims, Ellis, 2006 WL
27   988529, at *5-6, and the undersigned declined to reconsider it a
     year later.  See DeFazio, 2007 WL 3231670, at *4.  As has been
28   previously discussed in two prior orders in this case, the

48

1  even read the JDS Articles before this litigation commenced, (Tr.
2  1276-78, 1295:14-1296:1, 1280:22-24), the other Trustees were
3  generally familiar with the JDS Articles and the transfer and
4  ownership restrictions on JDS stock.  Although nothing in the
5  HolliShare Trust or JDS Articles required the Trustees to sell
6  HolliShare's shares at the December 31 book value, defendants
7  contend that the ownership and transfer restrictions in the JDS
8  Articles limited the value of JDS stock.

9          It is without question that the fair market value of
10 JDS stock was affected by the restrictions in the JDS Articles
11 that limited ownership to HolliShare, select employees, and the
12 preferred share trusts and the transfer restrictions that gave
13 JDS the right of first refusal.  As the <u>Cunningham</u> court
14 explained, "[a]ppraisal of closely-held stock is a very inexact
15 science" that has a "level of uncertainty inherent in the process
16 and [a] variety of potential fact patterns." <u>Cunningham</u>, 716
17 F.2d at 1473; <u>accord</u> <u>Rhodes v. Amoco Oil Co.</u>, 143 F.3d 1369, 1372
18 (10th Cir. 1998) ("[T]here is no universally infallible index of
19 fair market value." (quoting <u>Amerada Hess Corp. v. Comm'r</u>, 517
20 F.2d 75, 83 (3d Cir. 1975) (alteration in original) (internal
21 quotation marks omitted)).

22         Defendants rely heavily on <u>Krueger International, Inc.</u>
23 <u>v. Blank</u>, 225 F.3d 806 (7th Cir. 2000), to argue that defendants
24 complied with their fiduciary duties.  In <u>Krueger</u>, an employee at
25 a privately held company had stock as part of the company's

26 ─────────────────────────────────────────────
27 settlor doctrine does not preclude plaintiffs' claims.  Moreover,
   even assuming the design of the HolliShare Plan dictated the use
   of book value, it did not dictate the use of December 31 book
28 value.

1  Salaried Employees Retirement Plan.  Krueger, 225 F.3d at 808.

2  The company's Stockholders Agreement provided for the company to

3  have the "option to redeem all" of its stock when an employee

4  died and set the purchase price for redeemed stock at "the

5  proportionate value of the Appraised Value of all shares [of its

6  stock] as of the last day of the fiscal period . . . ending on or

7  immediately proceeding the date of notice of exercise of the

8  option."  Id. (quoting subsections 4.4 and 6.1 of the

9  Shareholders Agreement) (internal quotation marks omitted).  When

10 one of the company's employees died in 1996, a dispute arose

11 between the potential beneficiaries, and the company notified the

12 beneficiaries that it intended to redeem all of the employee's

13 shares, but would not disburse any proceeds until the appropriate

14 beneficiaries were determined.  Id. at 808-09.  When the state

15 supreme court resolved the entitlement disputes between the

16 beneficiaries four years later, the price of the company's stock

17 had increased substantially.  Id. at 809.  The beneficiaries and

18 company therefore disputed whether the "fair market value" of the

19 stock should be set at the 1996 price when the company exercised

20 its option or the 2000 price when the transaction was completed

21 and the benefits were paid.

22     The Seventh Circuit explained that the "repurchase

23 option is an inseparable part of owning" the company stock and

24 that, because the stock was encumbered by a purchase option at

25 the time of the employee's death, if the company exercised that

26 option, then, under the Shareholders Agreement, the purchase

27 price was set in 1996.  Id. at 812-13.  It explained, "[b]ecause

28 the fair market value of stock that someone else has the right to

50

1   purchase for $258.70 is just $258.70 (at least as long as the

2   stock alone is worth more than that), there would be no violation

3   of the ERISA 'adequate consideration' rules for [the company] to

4   pay that amount per share (plus the interest, of course) to the

5   beneficiaries."   Id. at 813.

6          Although the reasoning from Krueger that the

7   restrictions in a Shareholders Agreement--or here, the JDS

8   Articles--affects the price of the stock, the case is

9   distinguishable.  In Krueger, the parties disputed whether

10  adequate consideration was determined at the time the call was

11  exercised or at the time the transaction was completed.  The

12  parties did not dispute the valuation method used to determine

13  the price of each share in 1996 or 2000.  Krueger therefore did

14  not engage in the inquiry that is dispositive to plaintiffs'

15  claims under § 1108(e)--whether the Trustees engaged in a

16  sufficient investigation to determine the fair market value of

17  the Plan's JDS stock.  In Krueger, because the appraised value of

18  the stock was not at issue, the Shareholders Agreement set the

19  purchase price of the stock at the time of the call.  In this

20  case, while the JDS Articles undeniably affect the fair market

21  value of JDS Stock, they never set it at the December 31 book

22  value.

23         As the Second Circuit has explained, "[t]he court's

24  task is to inquire whether the individual trustees, at the time

25  they engaged in the challenged transactions, employed the

26  appropriate methods to investigate the merits of the investment

27  and to structure the investment."  Henry, 445 F.3d at 618

28  (quoting Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)

51

(alteration in original) (internal quotation marks omitted)).
Here, the Trustees never attempted to quantify the amount by
which the transfer and ownership restrictions affected the value
of the Plan's JDS stock.  Even assuming that use of the book
value system was appropriate to value JDS,[25] an inquiry into and
correlation between the use of the December 31 book value versus
the month-end book value never occurred.

### e.  Hypothetical Prudent Fiduciary

Lastly, defendants argue that the court should follow
the Eighth Circuit's holding in Roth, 16 F.3d 915.  In Roth, the
Eighth Circuit held that, "[e]ven if a trustee failed to conduct
an investigation before making a decision, he is insulated from
liability if a hypothetical prudent fiduciary would have made the
same decision anyway."  16 F.3d at 919; accord Bussian v. RJR
Nabisco, Inc., 223 F.3d 286 (5th Cir. 2000); Herman v. Mercantile
Bank, N.A., 143 F.3d 419, 421 (8th Cir. 1998).  The Eighth
Circuit reasoned that such an exception was justified because, if
the Trustees actually sold assets for fair market value even in
the absence of an investigation to determine fair market value,
"there was no causal connection between their allegedly deficient
conduct and a loss to the ESOP."  Roth, 16 F.3d at 919.

---

[25]   The court is not suggesting that the use of book value
was per se imprudent or violated ERISA.  In a closed-corporation,
it may very well be that book value is the most reliable and
accurate method to assess the fair market value.  In this case,
use of book value was also consistent with the JDS Articles,
Schneider's principles, and the 1999 Preferred Share Trust.
Here, however, the fiduciaries never investigated whether the use
of book value was appropriate and ERISA unquestionably required
them to do so.  Putting aside the Trustees' failure to use the
month-end book value, they failed to investigate whether
discounts or increases had to be made to the book value in order
to arrive at the fair market value of the closely held stock.

1    When it first introduced the "hypothetical prudent
2    fiduciary" standard, the Eighth Circuit relied on a concurring
3    opinion from then-Judge Scalia in Fink v. National Savings and
4    Trust Co., 772 F.2d 951 (D.C. Cir. 1985).  Specifically, in Fink,
5    Judge Scalia commented that he did not know of a "case in which a
6    trustee who has happened--through prayer, astrology or just blind
7    luck--to make (or hold) objectively prudent investments (e.g., an
8    investment in a highly regarded 'blue chip' stock) has been held
9    liable for losses from those investments because of his failure
10   to investigate and evaluate beforehand."  Id. at 962.  Judge
11   Scalia explained that "[i]t is the imprudent investment rather
12   than the failure to investigate and evaluate that is the basis of
13   suit."  Id.

14   While reasoning that a fiduciary who happens to make a
15   prudent investment despite his lack of investigation is not
16   liable in "an action for damages arising from losing
17   investments," Judge Scalia nonetheless recognized that such a
18   "[b]reach of the fiduciary duty to investigate and evaluate would
19   sustain an action to enjoin or remove the trustee or perhaps even
20   to recover trustee fees paid for the investigative and evaluative
21   services that went unperformed."  Id. (citation omitted).  While
22   the "hypothetical prudent fiduciary" inquiry may therefore limit
23   an award of damages against a fiduciary who fails to investigate
24   but nonetheless makes a prudent investment, Judge Scalia's
25   concurring opinion in Fink does not support the conclusion that
26   the fiduciary is absolved from all liability under ERISA.

27   The Seventh Circuit similarly concluded that a plan was
28   not entitled to damages based on a fiduciary's "imprudent but

53

harmless conduct," but could nonetheless seek appropriate
equitable relief, such as an injunction. Brock v. Robbins, 830
F.2d 640, 647 (7th Cir. 1987); see also id. at 647 ("[N]o court
has held trustees liable in money damages for imprudent conduct
which resulted in no loss or damages to the ERISA plan and no
benefit or gain to the trustees and did not put the assets of the
plan at risk." (emphasis added) (internal quotation marks
omitted)); cf. Donovan v. Bierwirth, 754 F.2d 1049, 1052 n.3 (2d
Cir. 1985) ("[T]here can be a breach of duty without any 'loss'
to a plan."). Consistent with numerous other circuits, the Ninth
Circuit has also emphasized that the inquiry under §§ 1108(e) and
1104(a)(1)(B) is focused on the defendants' conduct, not the
result. See Howard, 100 F.3d at 1488; see also Cunningham, 716
F.2d at 1467 ("[I]t is especially significant that the adequate
consideration test, like the prudent man rule, is expressly
focused upon the conduct of the fiduciaries.") (emphasis added);
Henry, 445 F.3d at 619 ("[I]n practice, the 'fair market value'
inquiry overlaps considerably with the 'good faith' inquiry; both
are 'expressly focused upon the conduct of the fiduciaries.'"
(quoting Cunningham, 716 F.2d at 1467)); Eyler v. Comm'r of
Internal Revenue, 88 F.3d 445, 455 (7th Cir. 1996) ("ESOP
fiduciaries will carry the burden of proving that adequate
consideration was paid 'by showing that they arrived at their
determination of fair market value by way of a prudent
investigation in the circumstances then prevailing.' Thus, the
adequate consideration test focuses on the conduct of the
fiduciaries in determining the price, not the price itself."
(quoting Cunningham, 716 F.2d at 1467 (citation omitted)).

54

1    Accordingly, while determining whether the Trustees'
2    failure to investigate the fair market value of JDS stock caused
3    monetary loss to plaintiffs and HolliShare would affect an award
4    of <u>damages</u>, financial loss is not required to prove a breach of a
5    fiduciary duty under §§ 1108(e) and 1104(a)(1)(B) and the court
6    will not apply the "hypothetical prudent investor" exception to
7    absolve defendants from <u>liability</u>. <u>Chao</u>, 285 F.3d at 436
8    (rejecting application of the "hypothetical reasonable fiduciary"
9    standard because doing so would "ignore" the second part of the
10   "adequate consideration" definition, which requires that the fair
11   market value is "determined in good faith by the trustee").

12          2.   <u>Claims Against Hollister Board Members & JDS</u>

13          To qualify as an ERISA fiduciary, an individual or
14   entity may either be named as a fiduciary under the terms of an
15   ERISA plan, <u>see</u> 29 U.S.C. § 1102(a), or act as a functional or <u>de</u>
16   <u>facto</u> fiduciary by exercising discretionary control over the
17   management or administration of the plan or its assets, <u>see</u> <u>id.</u> §
18   1002(21)(A).  When an individual or entity is a named fiduciary,
19   that fiduciary's liability may be limited pursuant to provisions
20   of a plan instrument that allocates responsibility among named
21   fiduciaries.  <u>See</u> <u>Walker v. Nat'l City Bank of Minneapolis</u>, 18
22   F.3d 630, 633 (8th Cir. 1994) ("[U]nless ERISA mandates
23   otherwise, division of authority in the plan determines the
24   duties of the various fiduciaries."); 29 C.F.R. § 2509.75-8(D-4)
25   (noting that a plan instrument may allocate responsibility among
26   named fiduciaries).

27          Here, the Trust Instrument specifies Hollister, the
28   HolliShare Trustees, and the Hollister Board as named

55

1  fiduciaries.  (Ex. 9-9.14, § 11.11.)  Hollister is responsible

2  for administration of the Plan, (id.),[26] the Trustees are

3  responsible for management of the Plan's assets, (id. §§ 11.01,

4  11.02), and the Hollister Board has the authority to appoint and

5  remove the Trustees, (id. §§ 11.05-11.07).  The Board also has

6  the authority to inspect and audit HolliShare's records and

7  receive reports from the Trustees.  (Id. § 11.04.)

8              a.  Hollister Board Members

9          The Trustee defendants who also served on the Hollister

10  Board are Zwirner and Stempinski and the non-trustee defendants

11  who served on the Hollister Board are Winn and Herbert.

12  Plaintiffs do not dispute that the Hollister Board appointed

13  competent individuals to serve as the HolliShare Trustees, but

14  alleges that the Board breached its duty to monitor the Trustees

15  it appointed.  The Hollister Board's potential liability

16  therefore arises only from its fiduciary duty to appoint and

17  monitor[27] the HolliShare Trustees.  See 29 C.F.R. § 2509.75-8

18

19      [26]   Plaintiffs neither presented evidence at trial nor
20  submitted proposed findings of fact and conclusions of law with
    respect to any claims against Hollister as the plan
21  administrator.  Although Ellis requested the court appoint a new
    plan administrator, the DeFazio/Dimaro plaintiffs' proposed order
22  would have Hollister remain as the plan administrator.  (Docket
    Nos. 650-53, 662.)  The court will therefore enter judgment in
23  favor of Hollister.

24      [27]   After trial, defendants argued in a footnote that there
    "is conflicting Ninth Circuit authority regarding whether the
25  persons who appoint fiduciaries of an ERISA plan have a fiduciary
    duty to monitor reasonably the actions of their appointees" and
26  that various courts have rejected imposition of a duty to monitor
    appointed fiduciaries.  (See Defs.' Proposed Findings &
27  Conclusions at 167 n.397.)  This position is the exact opposite
    of the position defendants argued in their motion for summary
28  judgment: "Moreover, while the power to appoint plan trustees
    carries with it the duty to monitor the trustees' activities, the

1  (FR-17) ("[T]rustees and other fiduciaries should be reviewed by

2  the appointing fiduciary in such manner as may be reasonably

3  expected to ensure that their performance has been in compliance

4  with the terms of the plan and statutory standards . . . ."); In

5  re Calpine Corp., No. 03-1685, 2005 WL 1431506, at *3 (N.D. Cal.

6  Mar. 31, 2005) (noting that the "power of appointment gives rise

7  to a limited duty to monitor").

8          Here, the vast majority of HolliShare's holdings

9  consisted of JDS common shares, meaning that almost all of the

10 Plan's transactions fell explicitly within ERISA's prohibited

11 transaction provision.  ERISA unequivocally required the Trustees

12 to conduct a good faith investigation to determine the fair

13 market value of the Plan's shares of JDS stock and sell those

14 shares at that value.  The evidence at trial established that the

15 Hollister Board knew that HolliShare had been selling its shares

16 at the December 31 book value since at least the mid-80s and that

17 the December 31 book value was less than the month-end book

18

19

20

_____

21 Hollister Board did so as a matter of undisputed fact."  (Docket
   No. 484 at 3:24-25.)
22          The court recognizes that there is authority suggesting
   that the limited duty to appoint trustees might not give rise to
23 a duty to monitor those trustees.  See Gelardi v. Pertec Computer
   Corp., 761 F.2d 1323, 1325 (9th Cir. 1985) (per curiam) (holding
24 that an employer who appointed the plan administrator was only a
   fiduciary and liable as such with respect to the selection of the
25 administrator).  The court, however, previously adhered to the
   position both parties advanced and will not hold otherwise when
26 there has not been a change in the controlling law.  Moreover, in
   addition to the duty to appoint trustees, the Hollister Board
27 also has the authority to inspect and audit HolliShare's records
   and receive reports from the Trustees.  These powers are
28 consistent with an oversight and monitoring role.

1  value.[28]  Not only did the Trustees fail to perform an adequate

2  investigation to determine the fair market value, the Hollister

3  board members understood that the December 31 book value was

4  always used and had no reason to conclude that an investigation

5  to determine the fair market value of the JDS shares led to that

6  price.  (See Tr. 1881:11-1883:22.)  The continual use of a preset

7  sales price and lack of any document or discussion suggesting

8  that the Trustees had performed an investigation to determine the

9  fair market value of the Plan's shares should have served as a

10  red flag to the Hollister board members that the Trustees were

11  not fulfilling their duties under ERISA.  The court thus finds

12  that the Hollister board members breached their duty to

13  adequately monitor the HolliShare Trustees.  Cf. Leigh, 727 F.2d

14  at 135-36 (holding that appointing fiduciaries who were aware of

15  the plan trustees' conflicting loyalties in certain transactions

16  were obliged to take extra measures to monitor the trustees'

17  actions).

18              b.  JDS

19              Unlike the Hollister Board, the Trust Instrument does

20  not name JDS as a fiduciary.  Plaintiffs contend, however, that

21  JDS was a de facto, or functional, fiduciary of HolliShare based

22  on the discretionary control and authority it exercised over the

23  management of HolliShare's main asset.  Plaintiffs rely on the

24  evidence at trial establishing that JDS, through the mid-80s

25

26          [28]   Winn also testified that he knew that JDS "had a value
    in the outside world higher than book value."  (Tr. 140:18-20.)
27  He gained this knowledge as a result of the capitalization study,
    but never shared the information with Karlovsky, one of the
28  Trustees.  (Tr. 391:22-393:23.)

1  agreement, proposed and established the practice of HolliShare
2  selling its shares to JDS once per year at the December 31 book
3  value.  At least one HolliShare Trustee testified that he did not
4  feel HolliShare could negotiate for a higher price because JDS
5  had always paid the December 31 book value and he did not feel
6  that the price was open to negotiation.  (Tr. 2114:20-22, 2115:4-
7  7.)

8       When determining whether a person is a <u>de facto</u>
9  fiduciary, "the threshold question is not whether the actions of
10 some person . . . adversely affected a plan beneficiary's
11 interest, but whether that person was acting as a fiduciary (that
12 is, was performing a fiduciary function) when taking the action
13 subject to complaint."  <u>Pegram v. Herdrich</u>, 530 U.S. 211, 226
14 (2000).  "An individual or entity performs a 'fiduciary' function
15 with respect to a pension plan when 'exercis[ing] any
16 discretionary authority or discretionary control respecting
17 management of such plan or exercis[ing] any authority or control
18 respecting management or disposition of its assets' under ERISA."
19 <u>Wright v. Or. Metallurgical Corp.</u>, 360 F.3d 1090, 1101 (9th Cir.
20 2004) (quoting 29 U.S.C. § 1002(21)(A)).

21      The strongest theory suggesting that JDS had
22 discretionary control over HolliShare's shares of JDS stock is
23 that JDS was--at least in practice--the only buyer for
24 HolliShare's shares and therefore could render HolliShare unable
25 to meet its cash needs by refusing to purchase its shares.  This
26 dynamic, however, is part in parcel of the design of the
27 HolliShare plan as a profit-sharing plan and JDS as a closely
28 held corporation with severe ownership restrictions.  While JDS

59

may have proposed the price and been reluctant to negotiate for a higher price, it was acting as a corporation making business decisions in doing so, not a fiduciary to HolliShare.  Assuming the mid-80s agreement was a binding agreement between JDS and HolliShare, it was the Trustees who had the power to negotiate the terms and agree to them on behalf of the beneficiaries.  It was the Trustees who had the power and obligation to ensure that the sales were for fair market value and to negotiate on behalf of the beneficiaries.  It was also the Trustees who had the power to assess their cash needs for the year and decide how many shares to sell.

        Judge Karlton previously held in this case that JDS would be an ERISA fiduciary only if it "in fact exercised any discretionary authority over plan assets." Ellis, 2006 WL 988529, at *7.  The court is not convinced from the evidence at trial that JDS had discretion or authority to make HolliShare sell shares at a given time or that it sought to exercise authority to limit the number of shares HolliShare sold.  See Assocs. In Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 570 (7th Cir. 1991) ("[T]he power to act for the plan is essential to status as a fiduciary under ERISA."); Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co., 884 F.2d 288, 292 (7th Cir. 1989) ("[C]ases which hold that the person or firm was a fiduciary have a common theme conspicuously absent here, viz., the authority to exercise control unilaterally over a portion of a plan's assets, not merely to propose investments.").  The evidence at trial was that the Trustees calculated how many shares they wanted to sell and

1 JDS bought the shares on every occasion and has provided

2 commitments to continue to do so.  (See Ex. 41 at 68.)  The

3 weight of the evidence does not persuade the court that JDS ever

4 attempted to exercise control over HolliShare's sales.

5 Accordingly, because the court is not convinced that JDS

6 exercised discretionary control over the Plan's assets sufficient

7 to render it a de facto fiduciary, the court will enter judgment

8 in favor of JDS.

9          3.  Co-Fiduciary Liability for Breaches under § 1104

10          Section 1105(a) provides for liability of a fiduciary

11 based on a breach of duty by a co-fiduciary:

12          In addition to any liability which he may have under any
           other provisions of this part, a fiduciary with respect
13          to a plan shall be liable for a breach of fiduciary
           responsibility of another fiduciary with respect to the
14          same plan in the following circumstances:

15          (1)  if he participates knowingly in, or knowingly
           undertakes to conceal, an act or omission of such other
16          fiduciary, knowing such act or omission is a breach;

17          (2)  if, by his failure to comply with section 1104(a)(1)
           of this title in the administration of his specific
18          responsibilities which give rise to his status as a
           fiduciary, he has enabled such other fiduciary to commit
19          a breach; or

20          (3)  if he has knowledge of a breach by such other
           fiduciary, unless he makes reasonable efforts under the
21          circumstances to remedy the breach.

22 29 U.S.C. § 1105(a).  Section 1105(a) "effectively imposes on

23 every ERISA fiduciary an affirmative duty to prevent other

24 fiduciaries from breaching their duties for which they are

25 jointly and severally liable."  Stewart v. Thorpe Holding Co.

26 Profit Sharing Plan, 207 F.3d 1143, 1157 (9th Cir. 2000).

27          Plaintiffs appear to rely on § 1105(a)(2) and seek to

28 hold defendants jointly liable as co-fiduciaries for losses

61

1    caused by the fiduciaries' breaches of the duty of loyalty under

2    § 1104(a)(1) and duty of prudence under § 1104(a)(1)(B).  Given

3    the court's findings that the fiduciary defendants breached their

4    duties under § 1104(a)(1) and (a)(1)(B), it follows that their

5    conduct enabled their co-fiduciaries to breach the same duties.

6    See Springate v. Weighmasters Murphy, Inc. Money Purchase Pension

7    Plan, 217 F. Supp. 2d 1007, 1025 (C.D. Cal. 2002) (holding that,

8    because "each Defendant failed to comply with Section 1104(a)(1),

9    and in doing so, each Defendant enabled the other fiduciaries to

10   commit a breach," each Defendant is liable for the breaches of a

11   co-fiduciary under § 1105(a)).

12        Nonetheless, because § 1105(a) requires that the

13   fiduciary's breach "enabled such other fiduciary to commit a

14   breach," a fiduciary's liability for any losses caused by a

15   breach would be limited to the time in which that defendant

16   served as a fiduciary.  ERISA clearly limits liability to the

17   time in which a defendant served as a fiduciary, stating, "No

18   fiduciary shall be liable with respect to a breach of fiduciary

19   duty under this subchapter if such breach was committed before he

20   became a fiduciary or after he ceased to be a fiduciary."  29

21   U.S.C. § 1109(b).  Plaintiffs thus cannot simply group all the

22   fiduciaries together when they each served different terms, and

23   any award of damages would need to be broken down by the years in

24   which the various defendants served as fiduciaries.

25        D.   Requested Relief

26        Plaintiffs brought their claims under subsections

27   (a)(2) and (a)(3) of § 1132.  Subsection 1132(a)(2) provides for

28   a participant to bring a civil action "for appropriate relief"

                                  62

1   under § 1109, which provides:

2          Any person who is a fiduciary with respect to a plan who
          breaches any of the responsibilities, obligations, or
3          duties imposed upon fiduciaries by this subchapter shall
          be personally liable to make good to such plan any losses
4          to the plan resulting from each such breach, and to
          restore to such plan any profits of such fiduciary which
5          have been made through use of assets of the plan by the
          fiduciary, and shall be subject to such other equitable
6          or remedial relief as the court may deem appropriate,
          including removal of such fiduciary.  A fiduciary may
7          also be removed for a violation of section 1111 of this
          title.

8

9   29 U.S.C. § 1109(a).  "Under 29 U.S.C. §§ 1109(a) and 1132(a)(2),

10  ERISA beneficiaries may bring an action against fiduciaries who

11  breach their duties to the plan, and may recover both damages and

12  equitable relief from them."  Landwehr v. DuPree, 72 F.3d 726,

13  733 (9th Cir. 1995).  "The Supreme Court has held that recovery

14  for a violation of 29 U.S.C. § 1109 for breach of fiduciary duty

15  inures to the benefit of the plan as a whole, and not to an

16  individual beneficiary."  Paulsen v. CNF Inc., 559 F.3d 1061,

17  1073 (9th Cir. 2009); see also LaRue v. DeWolff, Boberg &

18  Assocs., Inc., 552 U.S. 248, 256 (2008) ("[A]lthough § 502(a)(2)

19  does not provide a remedy for individual injuries distinct from

20  plan injuries, that provision does authorize recovery for

21  fiduciary breaches that impair the value of plan assets in a

22  participant's individual account.").

23          "Neither section 409(a) [of ERISA, 29 U.S.C. § 1109(a)]

24  nor any other section of ERISA discloses the methods which are to

25  be used in measuring the 'losses' for which breaching fiduciaries

26  are to be held liable."  Kim v. Fujikawa, 871 F.2d 1427, 1430

27  (9th Cir. 1989).  "The reports of the various committees

28  concerning this section of ERISA make it clear that Congress

                                  63

1   intended to provide the courts with broad remedies for redressing
2   the interests of participants and beneficiaries when they have
3   been adversely affected by breaches of a fiduciary duty."  Eaves
4   v. Penn, 587 F.2d 453, 462 (10th Cir. 1978); see also id. at 462-
5   63 ("Among the factors which the court may consider in selecting
6   a remedy are: (1) the purposes of the trust; (2) the relative
7   pecuniary advantages to the trust estate of the various remedies;
8   (3) the nature of the interest of each beneficiary; (4) the
9   practical availability of the various remedies; and (5) the
10  extent of the deviation from the terms of the trust required by
11  the adoption of each of the remedies.").

12        Subsection 1132(a)(3) provides for a participant to
13  bring a civil action "(A) to enjoin any act or practice which
14  violates any provision of this subchapter or the terms of the
15  plan, or (B) to obtain other appropriate equitable relief (I) to
16  redress such violations or (ii) to enforce any provisions of this
17  subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).
18  The Supreme Court has "interpreted the term 'appropriate
19  equitable relief' in § 502(a)(3) [of ERISA, 29 U.S.C. §
20  1132(a)(3),] as referring to those categories of relief that,
21  traditionally speaking (i.e., prior to the merger of law and
22  equity) were typically available in equity."  CIGNA Corp. v.
23  Amara, --- U.S. ----, ----, 131 S. Ct. 1866, 1878 (2011) (quoting
24  Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 361 (2006))
25  (internal quotation marks omitted).  Because § 1132(a)(3) is
26  limited to equitable relief, compensatory damages are not
27  available under this subsection.  Mertens v. Hewitt Assocs., 508
28  U.S. 248, 255-56 (1993).

1        In Cigna Corp., however, the Supreme Court discussed,
2   in dicta, the ability to award equitable relief under §
3   1132(a)(3) that would require a plan administrator to award
4   monetary compensation to already retired beneficiaries "for a
5   loss resulting from a trustee's breach of duty, or to prevent the
6   trustee's unjust enrichment." Cigna Corp., 131 S. Ct. at 1880.[29]
7   The court referred to this as an equitable "surcharge remedy" and
8   recognized that "[t]he relevant substantive provisions of ERISA
9   do not set forth any particular standard for determining harm."
10  Id. at 1880-81.

11       As the final week of trial came to a close in this
12  case, plaintiffs could not articulate the remedy they were
13  seeking, and suggested that the court could simply fashion
14  appropriate equitable relief.  The court is not in the business
15  of divining appropriate relief absent a request from plaintiffs.
16  In five different proposed orders submitted with their post-trial
17  briefing,[30] (see Docket Nos. 650-53, 662), plaintiffs have, for
18  the first time, identified the relief they are seeking, which
19  includes:

20       1.  **Removing Existing Trustees and Appointing a New Trustee**:
21  Plaintiffs request the court to issue a preliminary and permanent
22  injunction removing the HolliShare Trustees and barring them from

23
24       [29]    In Cigna Corp., the Court was addressing violations of
    §§ 1022(a) and 1024(b) and the surcharge that might be awarded
25  based on the district court's reformation of the plan documents.
    Cigna Corp., 131 S. Ct. at 1880-81.  Nothing in the Court's
26  opinion suggests that its discussion would not apply equally to
    the breaches at issue in this case.

27       [30]    In their five proposed orders, plaintiffs do not
    request damages based on any profits the fiduciaries allegedly
28  received as a result of their breaches.

65

1  serving as Plan Trustees in the future.  Plaintiffs then request

2  the court to appoint an independent trustee "to carry out the

3  orders of the Court to calculate the losses of the Plan and to

4  correct the fiduciary breaches and prohibited transactions."

5      2.  **Damages**: Plaintiffs request an award of damages against

6  the fiduciaries individually for restitution or a surcharge from

7  1992 through the present.[31]  Plaintiffs' calculations are based

8  on the difference between the actual price paid by JDS in each

9  prohibited transaction (December 31 book value from the year

10  prior to the sale) and (a) the month-end book value in the month

11  the transaction took place **or** (b) the fair market value of the

12  shares in the month the sale occurred as determined by an

13  independent appraiser retained by the court-appointed trustee.

14  If the month-end book value is used, Ellis calculates the amount

15  of damages at $30,674,599.56, plus interest.[32]  (Docket No. 650.)

16  The DeFazio/Dimaro plaintiffs used a "slightly different damage

17  calculation" than Ellis, and are requesting an award of

---

21  [31]  Although fiduciaries can be jointly and severally
22  liable for harms resulting from their breaches, see Stewart, 207
   F.3d at 1157, plaintiffs erroneously seek to hold all of
   HolliShare's fiduciaries liable for all losses regardless of when
23  each defendant served as a fiduciary.  See 29 U.S.C. § 1109(b)
   ("No fiduciary shall be liable with respect to a breach of
24  fiduciary duty under this subchapter if such breach was committed
   before he became a fiduciary or after he ceased to be a
25  fiduciary.").  Assuming the breaches caused loss to the Plan,
   damages would have been broken down by year and only the defendants
26  who breached fiduciary duties in a particular year could be
   liable for losses caused that year.

28  [32]  Of the $30,674,599.56, plaintiffs claim that Ellis is
   entitled to $108,917.87.  (Docket No. 650.)

$244,382,485.00.[33]  (Docket No. 654.)

    3.  **Recovery of Excess Shares**: As an alternative to an award of damages, plaintiffs seek an order against the fiduciaries individually requiring them to recover the excess shares redeemed by JDS in the transactions from 1992 to the present and restore the shares to HolliShare, with the value of the excess shares distributed to each participant's account for each of the years. The excess shares would be calculated based upon the difference between the actual shares sold in each prohibited transaction and (a) the number of shares that would have been sold in each prohibited transaction if the shares were valued at the month-end book value **or** (b) the number of shares that would have been sold in each prohibited transaction if the shares were valued at the fair market value as determined by an independent appraiser retained by the court-appointed trustee.  The DeFazio/Dimaro plaintiffs have calculated what they believe was the loss to the Plan as the result of selling an excessive number of shares due to the use of the December 31 book value.  They have calculated this loss to the Plan at $729,912,295.00.  (Docket No. 654 at 4.)

    The court now addresses each of the remedies plaintiffs seek.

          1.   Removal of Existing Trustees and Appointment of a
               New Trustee

    _____

    [33]   Of the $244,382,485.00, plaintiffs claim that Beetham is entitled to $78,032.68; DiMaro is entitled to $10,430.00; Humphries is entitled to $41,537.00; Lavick is entitled to $4,212.00; McNair is entitled to $980.00; Pace is entitled to $100,345.00; Seay is entitled to $882,055.00; Stanton is entitled to $110,803.00; Wirth is entitled to $23,414.00; and DeFazio and Ellis are entitled to $5,634,083.00.  (Docket No. 654 at 4.)  The remainder would be awarded to the Plan.

1    At the close of trial during discussions with counsel
2  about post-trial briefing, the court unequivocally raised its
3  concerns with plaintiffs' counsel about the court's ability to
4  grant any prospective injunctive relief, stating:

5       [Y]ou better be able to explain to me why any of the
        plaintiffs, any one [] of them is entitled to any
6       equitable relief when they no longer have an interest in
        the plan.  I referenced that in my ruling on the motion
7       for summary judgment, and I still fail to see how any
        modifications to the plan or putting money in the plan or
8       changing how the plan is administered or changing the
        articles or anything else is going to inure to the
9       benefit of any plaintiff in this case.  I fail to see an
        Article III context how they even have standing to ask
10      for that kind of relief when they no longer have an
        interest in the fund.

11

12 (Tr. 2658:7-17; see also DeFazio, 636 F. Supp. 2d at 1076-77
13 (citing Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 267-68 (D.
14 Mass. 2008), for the holding that a plaintiff who was no longer a
15 participant in a defined contribution plan had no standing to
16 seek purely prospective relief); see generally Cent. States Se. &
17 Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,
18 L.L.C., 433 F.3d 181, 199-203 (2d Cir. 2005) (discussing Article
19 III standing in the context of ERISA claims).  Every single
20 plaintiff that was a HolliShare participant had terminated his or
21 her employment with Hollister and received a full lump sum
22 distribution of his or her HolliShare account before commencing
23 or joining this action.

24    Although plaintiffs' proposed orders request
25 prospective injunctive relief, their over 350 pages of post-trial
26 submissions are devoid of any substantive discussion addressing
27 the court's concerns about their ability to seek such relief.
28 When defendants pointed out the deficiency in plaintiffs' briefs

1   on this issue, plaintiffs still failed to address the issue in
2   their reply brief.  In the face of the court's clear and direct
3   request for  authority supporting any request for injunctive
4   relief, the court can only construe plaintiffs' silence on this
5   issue as an admission that their requests for injunctive relief
6   are not "warranted by existing law or by a nonfrivolous argument
7   for extending, modifying, or reversing existing law or for
8   establishing new law."  Fed. R. Civ. P. 11(b)(2).

9        Not only would it be inappropriate in this case to
10  order removal of the existing Trustees and appoint a new trustee,
11  the court is quite certain that appointing a new trustee as
12  plaintiffs request would only prolong what has already been a
13  painfully protracted case.  The court has every reason to believe
14  that an independent trustee will be unable to render decisions
15  that both sides will believe are acceptable, thus requiring the
16  parties to return to court in the same position they are in
17  today, only several years later.  As the court explained at
18  trial, it is neither its role nor its desire to "step in, roll up
19  [its] sleeves and decide how to run this company or this ERISA
20  plan."  (Tr. 2658:24-25.)

21       Moreover, plaintiffs do not merely request the court to
22  appoint an independent trustee, plaintiffs also request the court
23  to order the trustee "to calculate the losses of the Plan and to
24  correct the fiduciary breaches and prohibited transactions."
25  (Docket Nos. 650-53.)  The purpose of the trial was for
26  plaintiffs to put on evidence that would allow the court to
27  "calculate the losses of the Plan and to correct the fiduciary
28  breaches and prohibited transactions."  Plaintiffs are

69

1  essentially asking for a second chance to do what they should
2  have done at trial.

3         This case has been pending in this court since 2004 and
4  the various judges assigned to it have issued over thirty
5  substantive orders.  Plaintiffs have had more than ample time and
6  opportunity to prove their case and could have retained experts
7  to testify at trial about the exact calculations they are asking
8  a court-appointed trustee to calculate.  Accordingly, the court
9  will deny plaintiffs' request for an injunction removing the
10 existing Trustees and appointing a new trustee.

11        2.   Damages

12        To seek damages under § 1132(a)(2) and (a)(3),
13 plaintiffs generally have the burden of proving the harm caused
14 by defendants' breaches of their fiduciary duties by a
15 preponderance of the evidence.  See Cigna Corp., 131 S. Ct. at
16 1881 ("[A] fiduciary can be surcharged under § 502(a)(3) only
17 upon a showing of actual harm—proved (under the default rule for
18 civil cases) by a preponderance of the evidence.").  However,
19 "once the ERISA plaintiff has proved a breach of fiduciary duty
20 and a prima facie case of loss to the plan or ill-gotten profit
21 to the fiduciary, the burden of persuasion shifts to the
22 fiduciary to prove that the loss was not caused by, or his profit
23 was not attributable to, the breach of duty."  Martin v. Feilen,
24 965 F.2d 660, 671 (8th Cir. 1992); accord Roth, 61 F.3d at 602.
25 "In determining the amount that a breaching fiduciary must
26 restore to the [ERISA plan] as a result of a prohibited
27 transaction, the court 'should resolve doubts in favor of the
28 plaintiffs.'"  Kim, 871 F.2d at 1430-31; accord Sec'y of U.S.

70

1  Dep't of Labor v. Gilley, 290 F.3d 827, 830 (6th Cir. 2002)

2  ("[T]o the extent that there is any ambiguity in determining the

3  amount of loss in an ERISA action, the uncertainty should be

4  resolved against the breaching fiduciary."); Patelco Credit Union

5  v. Sahni, 262 F.3d 897, 912 (9th Cir. 2001).[34]

6          In finding that defendants breached their duties under

7  §§ 1104(a)(1), (a)(1)(B), and 1108(e) by failing to perform an

8  investigation to determine the fair market value of HolliShare's

9  JDS stock, the court did not have to find--and did not find--that

10 the fair market value of the JDS shares at the time of each

11 prohibited transaction could not have been the December 31 book

12 value.  Surprisingly, after four weeks of trial, the court did

13 not hear a single expert witness estimate the value of the JDS

14 stock at the time of each prohibited transaction.  While

15 plaintiffs have suggested that the fair market value could be the

16 month-end book value, which was the valuation used for individual

17 shareholders when they sold their shares, they have alternatively

18 suggested that the court-appointed trustee could appoint an

19 appraiser to determine the fair market value of HolliShare's JDS

20 shares at the time of each prohibited sale.[35]  Even plaintiffs

21

22      [34]    In Vaughn, 567 F.3d 1021, the Ninth Circuit explained
    that it has "never required that [an ERISA] claim be for an
23  'ascertainable amount,'" but declined to determine whether it
    "should apply such a requirement, because in [the case], the
24  amount sought is ascertainable, despite the fact that it is not
    readily apparent on the face of the First Amended Complaint."
25  Id. at 1026-27.

26      [35]    For the same reasons that the court declines to appoint
    a trustee, the court declines to invite a second trial in this
27  case so that an expert can value the JDS stock at the time of
    each prohibited transaction to determine the fair market value.
28  Any evidence the outside appraiser would consider could have been

1  are unsure what value should have been used to ensure HolliShare

2  received adequate consideration.

3          Not only did the parties present insufficient evidence

4  to establish the fair market value of the JDS shares for each

5  prohibited transaction, the weight of the evidence presented at

6  trial does not persuade the court that the fair market value

7  exceeded the December 31 book value.  Most significantly, the JDS

8  Articles severely restricted who could purchase JDS shares and

9  thus the only market for HolliShare's sales was JDS or one of the

10 select individuals authorized to purchase shares under the direct

11 shareholder program.  (See Ex. 531-36 Art. 5, ¶ II.C.)  Each

12 year, offering circulars were distributed to the eligible direct

13 shareholders in the second or third quarter that provided them

14 with options to purchase JDS stock at the audited December 31

15 book value from the prior year.  (Tr. 558:6-559:1, 725:3-731:4,

16 1272:20-1273:14, 1710:5-7; see also Tr. 557:22-559:5 (Karlovsky

17 explaining that the ability to purchase JDS shares at the

18 December 31 book value even when sales were made during the

19 following year "was considered to be one of the benefits of the

20 direct share program").)[36]  It would therefore be unreasonable to

21

22 presented at trial and used to guide the court in its
23 determination.

24    [36]   The Trustees never investigated whether any individuals
   eligible to purchase JDS shares were interested in purchasing
25 shares from HolliShare.  Brilliant testified that his "best
   logic" was that there was not an eligible buyer who had
26 sufficient funds to purchase the amount of JDS stock HolliShare
   sold each year, but recognized that nothing precluded the
27 Trustees from selling smaller quantities of its JDS stock to
   multiple buyers.  (Tr. 1304:20-1305:19.)  The court agrees with
28 plaintiffs that a prudent trustee would have at least explored
   the option of selling shares to individual shareholders,

conclude that the direct shareholders would have been willing to purchase stock from HolliShare at a price that exceeded the December 31 book value.  When the only other "market" for JDS shares was set at the December 31 book value, it is at least possible that the fair market value of those shares was the December 31 book value.  Cf. Krueger Int'l, Inc., 225 F.3d at 812-13.

Furthermore, the fact that individual shareholders who were part of the direct shareholder program were able to sell their shares at the month-end book value does not invariably lead to the conclusion that the fair market value of HolliShare's shares was also the month-end book value.  The direct shareholders sold their shares pursuant to the right of first refusal provision in the JDS Articles, which set the sales price at the month-end book value, but also required the seller to receive most of the payment in the form of a promissory note.  In contrast to the individual shareholders who sold their shares under the right of first refusal, HolliShare received payment in all cash.  Winn testified about an occasion in the 1980s when he sold shares to JDS and received $5,000 in cash and the balance in a promissory note.  (Tr. 663:11-14.)  Because he needed all cash to satisfy an obligation, he sold the promissory note to a bank that was familiar with Hollister.  (Tr. 663:20-25.)  The bank,

---

especially because nothing precluded HolliShare from selling smaller quantities of shares to multiple buyers.  Nonetheless, because eligible employees were offered options to purchase shares at the December 31 book value around the same time HolliShare sold its shares, the court finds it unlikely that an eligible employee would have paid more than the December 31 book value for HolliShare's shares.

nonetheless, only paid Winn around 90% of the note's principal amount, thus illustrating that the receipt of all cash gave a significant benefit to HolliShare that direct shareholders did not receive.[37]   (Tr. 663:15-664:2, 2393:20-2394:8.)   Defendants' expert, Roger Grabowski, also testified at trial that the value the direct shareholders received would have to be discounted to its cash equivalent in order to compare it to the price HolliShare received.   (Tr. 2537:9-23, 2543:8-15.)

Moreover, the only testimony at trial valuing JDS stock during the time-period at issue came from defendants' expert, Grabowski.   Grabowski is an accredited senior appraiser with the American Society of Appraisers who has been performing business appraisals for about thirty-five years and is currently a managing director at a valuation and financial consulting firm. (Tr. 2510:1-7, 2512:6-11, 2518:15-17.)   Grabowski had also been a finance professor at a university and has authored five books pertaining to valuation, including one about valuation of closely held entities that was used in a course he taught for continuing education for certified public accountants.   (Tr. 2517:9-22, 2518:25-2519:4.)

Grabowski was asked to "render an opinion of the fair

[37]   It is worth noting that the increase in the book value of JDS stock from the December 31 book value to the month-end book value in the month of each prohibited transaction between 1993 to 2007 was almost always under ten percent.   Specifically, for the years in which the parties stipulated to the month-end book value in the month HolliShare sold shares, the book value of JDS stock had increased by the following percentages from December 31 to the month-end at the time of the sale: 1993 (1.2% increase); 1996 (7.88% increase); 1998 (4.16% increase); 1999 (5.34% increase); 2000 (3.6% increase); 2001 (3.24% increase); 2002 (9.7% increase); 2003 (9.45% increase); 2005 (7.21% increase); 2006 (8.33% increase); and 2007 (11.55% increase).

market value of the common shares of JDS that were held by the HolliShare plan for the period '74 through 2007." (Tr. 2527:19-25.)  He concluded that the fair market value was the "formula price, which was book value," explaining:

> It is our opinion that the fair market value in this case is determined by and is equal to generally accepted accounting principles, GAAP, book value of the subject shares pursuant to the stipulated formula pricing in place and corroborated by the historical practice. . . . Formula, practice and right of first refusal at book value establish and limit the market.  No reasonable financial investor [] would pay more.  It is our opinion that the fair market value of the subject shares from '74 through 2007 is equal to their book value.

(Tr. 2528:18-2529:8 (reading from the "Summary of Conclusions" in Grabowski's expert report).)[38]

The only expert testimony plaintiffs offered about the fair market value of HolliShare's shares of JDS stock came from their expert, John Calvin Korschot.  Korschot's appraisal, however, was limited to the fair market value of JDS stock as of December 31, 2003.  To appraise the JDS stock, Korschot relied on the market and income approaches to come up with an initial value and then discounted that value by fifteen percent to account for the lack of marketability of JDS stock.  The resulting value, however, relied on two "critical" assumptions.  (Tr. 1975:11-12.)

---

[38]   Grabowski's valuation does not distinguish between the December 31 book value or the month-end book value because, at the time defendants requested his opinion, plaintiffs' theory did not distinguish between the two book values.  His explanation about favors affecting his valuation are nonetheless relevant.
   Grabowski also testified about a "hypothetical fair market value" of JDS shares from 1997 to 2007, which he estimated exceeded the book value by 1.1 to 1.8 times depending on the year.  This valuation is not relevant because Grabowski calculated this "hypothetical fair market value" as if the restrictions in the JDS Articles did not exist and there could be "freely open trading" of the stock.  (Tr. 2572:7-10.)

First, Korschot assumed the use of book value for HolliShare's sales of JDS shares would not be required, but would still be used for sales from individual shareholders under the right of first refusal. (<u>See</u> Tr. 1701-1706, 1729:6-10, 1795:7-12.) Second, Korschot assumed that JDS would continue its practice of buying back shares on a regular basis from the Plan at the determined "fair market value." (Tr. 1692:10-12, 1730:19-1731:4.) Not only did Korschot appraise HolliShare stock as of a single date,[39] but the court also finds his assumptions to be flawed and is not persuaded that an evaluation of JDS stock could vary so drastically for sales by HolliShare at his estimated "fair market value" and sales by direct shareholders set at the book value.

Plaintiffs recognize that, "[t]he testimony of the experts does not provide a complete analysis of the difference between the previous December 31 book value and the properly appraised fair market value on the dates of the transactions from years 1982 through the present." (Pls.' Proposed Findings &

---

[39]   Even if the court found Korschot's testimony and appraisal credible, his evaluation of the fair market value of JDS stock on December 31, 2003 is barely relevant to calculating damages because, in 2003, HolliShare sold shares to JDS in June, not December. (<u>See</u> Stipulation of Facts ¶ 42.) At most, Korschot's testimony established that the fair market value of JDS stock as of December 31, 2003 exceeded the audited book value for that month, which could support the inference that the "fair market value" of JDS stock exceeded the book value during other months.
    An additional flaw is that a persuasive explanation was not offered about how JDS's purchase of shares from HolliShare at the increased fair market value Korschot calculated would have affected the fair market value of JDS shares in subsequent years. Simple math reveals that even the book value of JDS would have decreased if it was paying a significantly higher price for its shares.

Conclusions 57:24-58:1.)  With both parties' experts, the insufficiency of the evidence stemmed not from a lack of qualifications, but from the counsels' failure to request opinions on the relevant issues and ensure that the experts did not rely on assumptions that rendered their opinions irrelevant. Although the court must resolve any ambiguities in favor of plaintiffs, the inadequacy of the evidence on this issue resulted not from ambiguities or difficulty in computations but from the parties' failure to ask their experts the appropriate questions.[40]

        With these considerations in mind, the court is not persuaded from the evidence at trial that the fair market value of HolliShare's JDS shares at the time of each prohibited transaction was anything more than the preceding December 31 book value.  Moreover, even if the court were to assume that the fair market value of HolliShare's sales at the time of each prohibited transaction exceeded the December 31 book value, the court still finds that the sales at the December 31 book value did not cause harm to the Plan.  The court is persuaded that the use of the December 31 book value did not have a detrimental effect on HolliShare when evaluated over an extended duration of time.  As discussed in more detail below, four defendants and one expert credibly and consistently testified that, based on the dynamics

---

[40]    The fact that this issue was not appropriately addressed with the experts stems from the fact that plaintiffs' theory in this case has changed over the course of this litigation.
        Along this same vein, because the court ultimately finds in favor of defendants on damages, defendants' argument that plaintiffs failed to timely disclose their surcharge theory or damages calculations is moot.

1  of the HolliShare Plan, the closely held nature of JDS, and the

2  fact that JDS retired shares it purchased, HolliShare's sale of

3  its JDS stock at the December 31 book value did not cause a

4  material loss to HolliShare.

5         As a threshold matter, the court agrees with defendants

6  that any loss to the Plan must be assessed on a long-term basis,

7  not isolated annual inquiries that ignore the dynamics of the

8  Plan and various factors affecting its growth.  When determining

9  whether trustees' purchase of employer stock in an attempt to

10 prevent a tender offer by another company caused a loss to a

11 plan, the Second Circuit held that the appropriate measure of

12 loss compared what the plan earned on the challenged investment

13 and what it would have earned if the funds had been available for

14 other purposes.  Donovan v. Bierwirth, 754 F.2d 1049, 1056-57 (2d

15 Cir. 1985).  In performing this inquiry, the Second Circuit

16 explained that the comparisons of the respective investments must

17 be considered over an extended period of time and not limited to

18 the date of the challenged transaction.  Id.  "Donovan thus

19 stands squarely for the proposition that loss must be determined

20 by examining the assets of the plan as a whole, not at an instant

21 . . . , but over a period of time."  Roth, 61 F.3d at 604; see

22 also id. at 602-03 (rejecting the district court's "snapshot"

23 assessment of loss and explaining that it "failed to consider the

24 time frame component of the loss calculation, and so doing

25 implicitly focused upon too narrow a time frame").

26        Turning to the evidence presented at trial, Karlovsky

27 first testified about the simulation he performed to determine

28 whether the use of the December 31 book value had an impact on

78

1   the Plan.  Karlovsky has a Bachelor of Arts in systems

2   engineering and a Master's degree in industrial engineering

3   management, had previously worked as a strategic planning

4   analyst, and had performed extensive research dealing with

5   employee relations and compensation.  (Tr. 336:1-337:25.)  He

6   explained:

7           So when I joined the company and was evaluating the
        plan, I went back and used, for my own satisfaction, I
8       went back and I used my mathematical modeling
        capabilities and my work experience in benefits to do
9       some simulation and sensitivity analysis to see if it had
        a significant impact on the plan. . . .

10          [T]he plan has a plan design that's almost -- first
        of all, it's very elegantly simple.  You're taking the
11      profits of the company and spreading it across the
        ownership shares.  It's reciprocating, in that if you
12      were to sell [] too many shares, for example, we would
        have cash left over at the end of the year.  The price
13      would be affected for the following year if we [sold] too
        much shares because the profits of the coming year would
14      be spread over fewer shares.  So the price within the
        plan goes up for the next year.

15          And if we had [sold] too many shares, as we estimate
        the next year, we would have cash in the plan and we
16      would have a higher price for it and we would be selling
        fewer shares -- we would be asking to sell fewer shares
17      the following year.

18          If you simulate that over time and you look at the
        decisions that may be affected by the associates as well
19      because there's behavioral impact in the dynamics of the
        plan, you find that when you're looking at a retirement
20      plan, that isn't a one year event. You're looking at
        someone working 15, 20, 25 years to receive a benefit.

21          The plan will moderate itself so that the
        individuals are receiving a just benefit over time, and
22      materially it doesn't have a significant impact. . . .
        In my simulation that I had done, . . . what would happen
23      if we sold fewer shares in the middle of the year or the
        converse was what I did, I said we sold more shares, that
24      would affect succeeding years in terms of the number of
        shares we would be buying back.

25          You can't just add them independently year after
        year.  One year has an impact on the others. They
26      reciprocate for each other because the price has gone up
        and we need fewer shares at a higher price the following
        year.

27          It's kind of a self-correcting model over time where
        one year makes an adjustment for the prior year, and the
28      simulation process is what you would have to do.  You

                                 79

1    cannot just do an additive of one year on top of the
2    other on top of the other without involving the dynamics.

3  (Tr. 354:8-355:13, 361:1-14.)  Karlovsky ultimately concluded

4  that use of the December 31 book value did not cause a "material

5  difference" to the Plan.  (Tr. 357:15-16, 435:2-4, 438:1-8.)

6        McCormack, who has a Bachelor of Arts in social studies

7  with a focus in economics and a Masters in Business

8  Administration with an emphasis in finance, explained that, based

9  on the closely held nature of JDS and the fact that JDS was not

10 reissuing new shares, the financial effect of selling more shares

11 one year (because the December 31 book value was used) evened out

12 over time because there would be fewer outstanding shares the

13 following year:

14
15        [I]n public companies we have a dilution of
          shareholder interest or a shareholder stock value,
16        because in public companies, the shares are -- you have
          an initial public offering and then you issue new shares,
          and that happens.
17        And then what happens, it dilutes the share
          ownership interest and the value of stock over time,
18        everything else being equal.
          At Hollister it was a very unique situation. We had
19        the reverse dilution effect that we were always, as we
          have discussed, sir, retiring the shares over time. So
20        therefore, the more shares that we sold, the more shares
          that we retired. You add the impact of earnings of the
21        corporation plus the number of shares being reduced and
          you've got a higher value.
22        However, at Hollister, there was what we call the
          counterintuitive reverse dilution effect, and if I can
23        attempt to explain that. The people in the plan would
          plan their account, would have a target, if you will, for
24        the account balance they wanted to retire at. That
          retirement balance would be such that they would make a
25        decision each year on whether or not they would leave,
          leave early or when they wanted to do.
26        On the other hand, if we sold the shares at June
          30th [month-end book value for a sale in June], we
27        have to sell them at a higher price, and the consequence would
          be that they would receive a lesser benefit over time.
28        What we discovered through various analysis in

                                80

1   discussion with my treasury department, that this
2   counterintuitive effect based upon the number of shares
    outstanding -- and this also took into consideration the
    direct share ownerships also -- over time, this would
3   balance out.
        So I understand where you're coming from because
4   you're coming from a public company knowledge.  But the
    uniqueness of Hollister and the HolliShare plan and the
5   direct ownership plan makes your conclusion [that selling
    at the December 31 book value harmed the plan], I think,
6   erroneous.

7   (Tr. 768:9-769:20.)

8           Brilliant, who has a Bachelor of Arts in industrial

9   management and a Masters in Business Administration from the

10  Wharton Business School and had been a certified public

11  accountant since 1975, (Tr. 1264:3-7, 1356:11-12), reached the

12  same conclusion as McCormack, explaining:

13
14          By selling shares at the December 31st book value,
    as has been stated several times, versus the current book
    value, there are more shares that the plan is selling.
15  At the end of the subsequent year, the next December
    31st, there will be -- by selling more shares back to the
16  company, there will be less outstanding -- there would be
    less outstanding common shares as of 12/31.
17          And when those outstanding shares are then divided
    into the shareholders' equity, which was unchanged
18  because the dollar amount had already been subtracted
    under any share -- at any share price or book value
19  price, mathematically it would have the book value per
    share going up as of 12/31 because you'd have less shares
20  in the denominator.  So all common shareholders, both
    direct and the plan, would have a higher book value than
21  they would have otherwise had if they had sold -- if they
    had sold less shares.
22          And the plan participation account, the account
    balances from year to year, the dollar amount of a
23  participant's account balance is increased by the change
    in the value, the total value of the company.  The
24  predominant portion of that is the -- of the change in
    the assets of the plan, and the predominant asset is the
25  JDS -- their ownership of the stock.
            So if the book value increases 18 percent, and that
26  same calculation at a different share value would have
    been 17 and a half percent, the participants, at the end
27  of the following year, their individual account balance
    in that example would go up by 18 percent instead of
28  going up by 17 percent.

                                81

(Tr. 1367:19-1368:22.)

Zwirner who has a Bachelor of Arts in economics and a Juris Doctorate, (Tr. 1982:20-23), echoed McCormack and Brilliant's conclusion:

> [I]f you were to use the month end value, in the first year you would be selling back fewer shares, and at the end of that calendar year the plan would own more shares, which means it would own a larger percentage of the net equity of the company, which means the plan would be worth more and the account balances would be worth more.
> What starts to happen in the second and subsequent years, however, is that when those -- with those larger account balances, when people retire, the amounts required to pay out benefits are higher, which would then require HolliShare to sell back more shares than they do today, and that would have the opposite effect of reducing their ownership interest.
> Also, to the extent of the incremental cash required to pay the higher benefits, there would be a permanent reduction in the net equity of JDS Inc., which would again, at the end of the year, reduce the value of the company and the value, percentage value owned by the plan.

(Tr. 2384:7-23.)  Zwirner testified that it was his belief that, "over a period of time," the use of the December 31 book value instead of the month-end value had "no effect" on HolliShare. (Tr. 2385:24-25.)

Lastly, defendants' expert, Grabowski, performed an extensive analysis in which he examined the effect on the Plan if it was assumed that the fair market value of HolliShare's shares was two or three times the December 31 book value and HolliShare sold its shares at the increased price.  He concluded that the benefits the participants received would have ultimately been the same regardless of whether the book value was used or a hypothetical fair market value of two or three times book value

1   was used:

2       Q. Is it your understanding what really drives the
        incremental changes in the actual benefits and cash money
3       that HolliShare participants walk out of the plan with,
        the principal driver is not what the values are, but what
4       the incremental changes are from year to year in the
        values are?

5
        A. Yes, it is. It took awhile for that sink in for me,
6       but that's the driver of the value of the participants.

7       Q. Is this showing us that whether you value at book
        value and you do it consistently or value two times book
8       value and do it consistently, if you assume that the
        rates of return on the shares is going to be the same
9       percentage rates of return, you're going to generate the
        same dollars for the participants?

10
        A. Yes.
11
        Q. Let's to go the chart, the next page, paragraph three.
12      Same analysis as the prior one except this one is at
        three times book?

13
        A. Yes.
14
        Q. You're, again, generating on the "dollars redeemed"
15      line exactly the same amount of dollars?

16      A. Yes.

17      Q. This is saying if it's three times book at the
        beginning and three times book at the end, what the
18      HolliShare participants are going to walk away with when
        they retire from this company is the same amount of
19      dollars?

20      A. That's correct.  On the previous page, going back to
        that, one of the things we did determine was the
21      variability that actually occurred in the book value
        increases in HolliShare, in the JDS common stock was, in
22      fact, a lot lower volatility than what the public shares
        of the guideline companies were.  So its not just a
23      matter of the average over a period of time, it's -- the
        volatility is different and it's lower, so that those are
24      two factors that need to be taken into account.

25      Q. If I can translate that into terms I think I can
        understand, is what you're telling us is you're going to
26      come out with the same dollars, but you're going to have
        more stability using the book value than a market-based
27      valuation method?

28      A. Yes. That's not based on theory, but based on looking

                                    83

1   at the guideline company, change in market values each
2   year.   They go up and down.   There is a lot of
    volatility.   The JDS stock book value has not had that
3   kind of volatility.

4   (Tr. 2557:2-2558:20.)   Grabowski further explained, "So there's a

5   continuous change in how the value of the plan changes, but it's

6   really the incremental change.   If book value goes up the same

7   amount in percentage terms as market value goes up, the relative

8   wealth at the end will be the same, the relative benefit to the

9   participants."   (Tr. 2555:14-18.)

10          All of these witnesses were well-educated and had

11   training relevant to understanding the effect of using the

12   December 31 book value for HolliShare's sales under all of the

13   circumstances and dynamics relevant to HolliShare and JDS.   Their

14   consistent, credible, and unchallenged testimony was that the use

15   of the December 31 book value did not cause long-term harm to the

16   Plan.   Based on their testimony and the evidence presented at

17   trial, including the dynamics of the Plan and JDS, the court is

18   persuaded that HolliShare's sale of JDS stock at the December 31

19   book value did not cause a material loss to HolliShare even if

20   the December 31 book value was something less than the fair

21   market value of the Plan's JDS shares at the time of each sale.

22          In Cigna Corp., the Supreme Court explained that "just

23   as a court of equity would not surcharge a trustee for a

24   nonexistent harm, a fiduciary can be surcharged under § 502(a)(3)

25   only upon a showing of actual harm--proved (under the default

26   rule for civil cases) by a preponderance of the evidence."   Cigna

27   Corp., 131 S. Ct. at 1881 (citation omitted); accord Eaves, 587

28   F.2d at 463 ("The law clearly permits approximations as to the

84

1  extent of damage, <u>so long as the fact of damage or 'lost profits'</u>

2  <u>is certain.</u>" (emphasis added)); <u>Brock</u>, 830 F.2d at 647

3  ("[M]onetarily penalizing an honest but imprudent trustee whose

4  actions do not result in a loss to the fund will not further the

5  primary purpose of ERISA."). Accordingly, because the court

6  finds that the fiduciaries' breaches of their duties did not

7  cause a material harm to the Plan, plaintiffs are not entitled to

8  damages.

9                  3.  <u>Recovery of Excess Shares</u>

10           Consistent with the court's finding that the Trustees'

11 sale of HolliShare's JDS shares at the December 31 book value did

12 not cause a loss to the Plan over an extended period of time, the

13 court is also convinced that use of the December 31 book value

14 did not cause HolliShare to retain fewer shares than it would

15 have if a higher price was used. As McCormack, Brilliant, and

16 Zwirner testified, while use of a value lower than fair market

17 value would have caused HolliShare to sell more shares to raise

18 its cash requirements in the first year, when those shares were

19 retired, it would decrease the number of outstanding shares and

20 therefore increase the book value per share of the outstanding

21 shares in the following year. As a result, HolliShare's

22 remaining shares would have a higher value in subsequent years

23 and HolliShare would need to sell fewer shares to meet its cash

24 needs. Any loss in shares during the first year would therefore

25 even out in subsequent years. The weight of the evidence

26 therefore persuades the court that the use of the December 31

27 book value did not cause HolliShare to incur a material reduction

28

85

1  in the number of JDS shares it owned.[41]

2          Accordingly, because plaintiffs lack standing to seek

3  prospective injunctive relief and the court finds that the

4  fiduciary defendants' breaches of ERISA in failing to investigate

5  the fair market value of HolliShare's JDS shares did not cause a

6  loss to the Plan or plaintiffs, the court will enter judgment in

7  favor of defendants on plaintiffs' claims under §§ 1104(a)(1),

8  (a)(1)(B), and 1108(e).

9          E.   Remaining Claims of Breach

10          At trial, plaintiffs' claims based on HolliShare's sale

11 of its JDS shares at the December 31 book value from the prior

12 year revealed itself to be the heart of plaintiffs' case, and the

13 damages and surcharge remedy plaintiffs seek is based entirely on

14 those prohibited transactions.  Plaintiffs have nonetheless

15 alleged numerous other claims, which the court will briefly

16 address.

17          First, plaintiffs allege that the Trustees breached

18 their fiduciary duties and violated § 1104(a)(1)(D) by failing to

19 follow the Plan's requirement to invest Plan assets in JDS shares

20

21          [41]  For purposes of discussion, the court refers to the
   "number of shares," but recognizes that comparing the number of

22 shares from year to year is an oversimplification.  Since JDS
   stock was issued, there has been at least two 100-for-1 stock

23 splits and a 9-for-1 stock dividend.  Even assuming the court
   found that the use of the December 31 book value caused loss to

24 HolliShare, simply calculating the number of extra shares sold in
   a given year and requiring the Trustees to replace those shares

25 would be misguided because it would ignore the fact that one
   share in 1992 is not the same as one share in 2012 because,

26 during that time, two stock splits occurred and one dividend was
   declared.

27          The testimony at trial was that, even though it is
   continually selling shares, HolliShare can infinitely extend its

28 ownership of JDS stock through stock splits.  (See Tr. 554:16-
   555:7.)

86

1  to the maximum extent possible when they sold more shares of JDS
2  stock than necessary to meet HolliShare's cash requirements in
3  1982, 1987, and 1993.  Plaintiffs did not, however, propose or
4  seek a remedy with respect to this claim.  The evidence at trial
5  also does not persuade the court that these sales were concealed
6  from the beneficiaries, thus plaintiffs are unable to rely on the
7  "fraud or concealment" exception in § 1113 and the claims are
8  untimely.

9       Second, plaintiffs allege that the Trustees breached
10  duties owed to HolliShare when they voted HolliShare's shares in
11  favor of various amendments to the JDS Articles in 1978, 1980,
12  1984, and 1999.  In the June 2009 Order, the court held that the
13  statute of limitations foreclosed all of plaintiffs' claims based
14  on the votes in 1978, 1980, and 1984 and plaintiffs' direct
15  claims against the fiduciaries based on the votes in 1999.  See
16  Defazio, 636 F. Supp. 2d at 1058-59.  The court nonetheless held
17  that plaintiffs' co-fiduciary liability claims under § 1105(a)(3)
18  based on the votes in favor of the 1999 amendments were not time
19  barred.  As the court explained in the June 2009 Order, §
20  1105(a)(3) "makes a fiduciary liable for the breach of another
21  fiduciary if 'he has knowledge of a breach by such other
22  fiduciary, unless he makes reasonable efforts under the
23  circumstances to remedy the breach,'" and "[o]ne form of
24  remedying the breaches of a co-fiduciary would be to file a suit
25  against the breaching co-fiduciary to restore the losses to the
26  plan or redress any violations of ERISA."  Id. (quoting §
27  1105(a)(3)).  The court therefore concluded in the June 2009
28  Order that, if "HolliShare fiduciaries had actual knowledge of

87

1  the votes at the time they were cast and [] such votes

2  constituted ERISA violations," the fiduciaries would have had

3  three years to file suit and thus the claims were timely under §

4  1132(2).  Id. at 1059.

5          The 1999 amendments prohibited natural persons from

6  owning more than 10% of JDS stock, which plaintiffs contend

7  eliminated a potential market for HolliShare to sell its common

8  stock.  The 1999 amendments also added a limited indemnity

9  provision to the JDS Articles that indemnified directors from

10 personal liability to shareholders for certain breaches.  (See

11 Ex. 535 at 5.)  Even assuming these amendments constituted

12 fiduciary breaches and thus give rise to § 1105(a)(3) claims

13 against the appropriate fiduciaries,[42] plaintiffs neither offered

14

15 _____

   [42]    In holding that plaintiffs' § 1105(a)(3) claims
16 relating to the 1999 amendments were timely, the court did not
   clarify which fiduciaries plaintiffs had viable § 1105(a)(3)
17 claims against based on the 1999 amendments.  Plaintiffs seem to
   suggest they are alleging the claim based on the limitation of
18 ownership against Brilliant, Kelleher, and Zwirner and the claim
   based on the indemnity provision against Zwirner, McCormack, and
19 Karlovsky.  (See Pls.' Proposed Findings & Conclusions at 98:9-
   15.)  Defendants appear to believe both claims are against only
20 Brilliant and Kelleher.  (See Defs.' Proposed Findings &
   Conclusions at 141-44.)
21        In discussing liability in the June 2009 Order, the
   court stated that plaintiffs had viable claims under § 1105(a)(3)
22 only if the fiduciary had "knowledge of the votes at the time
   they were cast."  DeFazio, 636 F. Supp. 2d at 1059.  Here,
23 Brilliant did not become a trustee until 2000 and Kelleher did
   not become a trustee until 2004.  Even assuming Brilliant and
24 Kelleher had a duty to remedy a fiduciary breach that occurred
   before they were fiduciaries, but see 29 U.S.C. § 1109(b) ("No
25 fiduciary shall be liable with respect to a breach of fiduciary
   duty under this subchapter if such breach was committed before he
26 became a fiduciary or after he ceased to be a fiduciary."), there
   was no testimony showing that they had knowledge that the votes
27 in favor of the 1999 amendments violated ERISA.  See Cunningham,
   716 F.2d at 1475 ("Section 405 does not impose vicarious
28 liability--it requires actual knowledge by the co-fiduciary. . .
   .  '[T]he fiduciary must know the other person is a fiduciary with

                                    88

1  evidence that the amendments caused harm to the Plan or their

2  individual accounts nor requested or proposed a remedy for any

3  such harm.  <u>See</u> <u>Silverman v. Mut. Ben. Life Ins. Co.</u>, 138 F.3d

4  98, 104 (2d Cir. 1998) ("[Section 1109(a)] requires a plaintiff

5  to demonstrate in a suit for compensatory damages that the plan's

6  losses 'result[ed] from' [the fiduciary's] breach of §

7  1105(a)(3)." (second alteration in original)).  Presumably,

8  plaintiffs would suggest that their requested relief is included

9  in their request that the court appointed trustee simply "correct

10  the fiduciary breaches."  Any such relief, however, would be

11  prospective in nature, which the court has held plaintiffs lack

12  standing to seek.  <u>See</u> <u>DeFazio</u>, 636 F. Supp. 2d at 1076-77.

13  Accordingly, the court will enter judgment in favor of defendants

14  on plaintiffs' § 1105(a)(3) claims relating to the 1999

15  amendments.

16       Third, based on the fact that many of the Trustees were

17  individual shareholders and served on the JDS and Hollister

18  Boards, plaintiffs allege that the fiduciaries breached various

19  other duties and had numerous conflicts of interest.  <u>See</u>

20  <u>generally</u> <u>Pegram v. Herdrich</u>, 530 U.S. 211, 224 (2000) ("[T]he

21

22  respect to the plan, must know that he participated in the act
   that constituted a breach, and must know that it was a breach.'"
23  (quoting H.R. Rep. No. 1280, 1974 U.S. Code Cong. & Ad. News at
   5083)).
24       It therefore appears that the proper defendants would
   have been Zwirner, McCormack, and Karlovsky, who were all
25  trustees in 1999 at the time of HolliShare's vote in favor of the
   1999 amendments.  Nonetheless, the court's conclusion that
26  plaintiffs failed to offer evidence of harm or seek a remedy with
   respect to their § 1105(a)(3) claims based on the 1999 amendments
27  applies equally regardless of which defendants the claims are
   against.
28

trustee under ERISA may wear different hats, . . . [but ERISA requires that] the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."); <u>Cunningham</u>, 716 F.2d at 1465 ("ERISA clearly provides that a fiduciary may be an officer or employee of the company whose securities he purchases on behalf of a plan." (citing 29 U.S.C. § 1108(c)(3))).  For example, plaintiffs contend that, when HolliShare allegedly sold shares below the fair market value, the difference remained on the books of the company and was therefore spread equally amongst the remaining shares, including the individual shareholders.  In doing so, plaintiffs contend that the Trustees breached their duty of loyalty under § 1104(a)(1)(A) and violated § 1106(b)(1), which prohibits a fiduciary from benefitting from any transaction that harms a plan.  Plaintiffs base additional claims on the fiduciaries' alleged conflicts of interest and concealment of other potential markets for HolliShare's JDS shares.

        The court has already determined that, in failing to perform a good faith investigation to determine the fair market value of the Plan's JDS shares, the fiduciaries breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e).  This finding is sufficient to award plaintiffs the entirety of the relief they requested and have standing to seek.  The court unequivocally informed plaintiffs at trial that it would only consider the relief plaintiffs requested, and plaintiffs have not sought any relief based on any alleged profit the fiduciaries gained from their breaches.  The court will therefore enter judgment in favor of defendants on plaintiffs' claims relating to the fiduciaries'

1  alleged conflicts and personal profits.

2          Lastly, in their amended statement purporting to
3  identify all of their claims for trial, plaintiffs identified
4  several claims that they declined to address at trial, in their
5  post-trial briefing, or in their proposed findings of fact and
6  conclusions of law.  The court can only assume that plaintiffs
7  have abandoned those claims, and in any event for the reasons
8  discussed above plaintiffs are not entitled to any relief on
9  those claims.  The court will therefore enter judgment in favor
10 of defendants on those claims.  Specifically, the court will
11 enter judgment in favor of defendants on the following abandoned
12 claims: 1) plaintiffs' claim under § 1103 for defendants' alleged
13 failure to hold HolliShare assets in trust for the participants
14 and beneficiaries; 2) plaintiffs' claim under § 1104(a)(1)(C) for
15 defendants' alleged failure to diversify HolliShare's
16 investments; and 3) plaintiffs' claim under § 1110(a), which
17 declares void any plan provision that relieves ERISA fiduciaries
18 from liability.[43]

19         During the course of trial, the court also ruled in
20 favor of defendants on Defazio's and Ellis's claims under §
21 1056(d)(3) relating to payment of Defazio's benefits pursuant to
22 the qualified domestic relations orders and Defazio's and Ellis's
23 claims under § 1140 relating to defendants' filing of a motion in

24

25         [43]    The plaintiffs may have based their § 1110 claim on the
26 indemnity provision added to the JDS Articles via the 1999
   amendments, but their post-trial submissions do not reflect such
27 an intent.  Even if plaintiffs intended to attack the indemnity
   provision added via the 1999 amendments, the court's conclusion
28 that the breach did not cause harm to plaintiffs would be the
   same.

91

1  their divorce proceeding.  (<u>See</u> Tr. 2171:3-2174:8, 2175:20-
2  2176:8); <u>see generally</u> <u>Defazio</u>, 636 F. Supp. 2d at 1077-79.

3        F.   <u>Attorneys' Fees</u>

4             Both parties have requested an award of attorneys' fees
5  in this action.  Pursuant to 29 U.S.C. § 1132(g)(1), "the court
6  in its discretion may allow a reasonable attorney's fee and costs
7  of action to either party."  The Supreme Court has recently held
8  that "a fee claimant need not be a 'prevailing party' to be
9  eligible for an attorney's fees award under § 1132(g)(1)."  <u>Hardt</u>
10 <u>v. Reliance Standard Life Ins. Co.</u>, 560 U.S. ----, ----, 130 S.
11 Ct. 2149, 2156 (2010).  Because Congress did not clearly indicate
12 that it intended to abandon the American Rule, which provides for
13 each litigant to pay his or her own fees, "a fees claimant must
14 show 'some degree of success on the merits' before a court may
15 award attorney's fees under § 1132(g)(1)."  <u>Id.</u> at 2158 (quoting
16 <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 694 (1983)).  "A
17 claimant does not satisfy that requirement by achieving 'trivial
18 success on the merits' or a 'purely procedural victor[y],' but
19 does satisfy it if the court can fairly call the outcome of the
20 litigation some success on the merits without conducting a
21 'lengthy inquir[y] into the question whether a particular party's
22 success was "substantial" or occurred on a "central issue."'"
23 <u>Id.</u> (quoting <u>Ruckelshaus</u>, 463 U.S. at 688 n.9).

24             After <u>Hardt</u>, the Ninth Circuit held that a district
25 court "must consider the <u>Hummell</u> factors after they have
26 determined that a litigant has achieved 'some degree of success
27 on the merits.'"  <u>Simonia v. Glendale Nissan/Infiniti Disability</u>
28 <u>Plan</u>, 608 F.3d 1118, 1119 (9th Cir. 2010); <u>see</u> <u>Hardt</u>, 130 S. Ct.

1  at 2158 n.8 ("We do not foreclose the possibility that once a

2  claimant has satisfied this requirement, and thus becomes

3  eligible for a fees award under § 1132(g)(1), a court may

4  consider the five factors adopted by the Court of Appeals, in

5  deciding whether to award attorney's fees.").  The Hummell

6  factors include:

> (1) the degree of the opposing parties' culpability or
> bad faith; (2) the ability of the opposing parties to
> satisfy an award of fees; (3) whether an award of fees
> against the opposing parties would deter others from
> acting under similar circumstances; (4) whether the
> parties requesting fees sought to benefit all
> participants and beneficiaries of an ERISA plan or to
> resolve a significant legal question regarding ERISA; and
> (5) the relative merits of the parties' positions.

13  Hummell v. S. E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.

14  1980).

15         Here, the court found that the Trustees breached their

16  duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e) in failing to

17  perform a good faith investigation to determine the fair market

18  value of HolliShare's JDS stock and that the Hollister board

19  members failed to adequately monitor the Trustees in this

20  respect.  In the abstract, this was a significant finding in

21  favor of plaintiffs and an issue that the parties deeply

22  disputed.  The court ultimately concluded, however, that

23  plaintiffs lacked standing to seek prospective injunctive relief

24  and that the sales at the December 31 book value did not cause

25  harm to HolliShare or plaintiffs' HolliShare accounts.  This

26  finding deflates the sails of any "victory" plaintiffs achieved

27  in proving that defendants breached their fiduciary duties.

28         The outcome in this case is analogous to Farrar v.

93

1   <u>Hobby</u>, 506 U.S. 103 (1992), in which the Supreme Court explained
2   that a plaintiff who sought compensatory damages, but failed to
3   prove "actual, compensable injury" and was awarded only nominal
4   damages in the amount of $1.00 based on the violation of his
5   procedural due process rights was not entitled to attorneys'
6   fees.  <u>Farrar</u>, 506 U.S. at 115.  When evaluating the plaintiffs'
7   "degree of success," the Court explained that plaintiffs
8   "received nominal damages instead of the $17 million in
9   compensatory damages that they sought," and thus the "litigation
10  accomplished little beyond giving petitioners 'the moral
11  satisfaction of knowing that a federal court concluded that
12  [their] rights had been violated.'"  <u>Id.</u> at 114 (<u>quoting Hewitt</u>
13  <u>v. Helms</u>, 482 U.S. 755, 762 (1987)) (alteration in original).
14  The Court held, "[w]hen a plaintiff recovers only nominal damages
15  because of his failure to prove an essential element of his claim
16  for monetary relief, the only reasonable fee is usually no fee at
17  all."  <u>Id.</u> at 115; <u>see also</u> <u>id.</u> at 116 ("If ever there was a
18  plaintiff who deserved no attorney's fees at all, that plaintiff
19  is Joseph Farrar.  He filed a lawsuit demanding 17 million
20  dollars from six defendants.  After 10 years of litigation and
21  two trips to the Court of Appeals, he got one dollar from one
22  defendant.  As the Court holds today, that is simply not the type
23  of victory that merits an award of attorney's fees.") (O'Connor,
24  J., concurring).

25          Here, plaintiffs sought extraordinary damages, ranging
26  from $30,674,599.56 to $244,382,485.00, but are not entitled to
27  any award of damages.  Plaintiffs' proof of defendants' breaches
28  may give them some level of moral satisfaction, but their

94

1  inability to prove any harm or obtain injunctive relief prevented

2  them from achieving "some degree of success on the merits."

3  Accordingly, the court finds that plaintiffs are not entitled to

4  fees under § 1132(g)(1).  See Simonia, 608 F.3d at 1121 ("Only

5  after passing through the 'some degree of success on the merits'

6  door is a claimant entitled to the district court's discretionary

7  grant of fees under § 1132(g)(1).").

8           Defendants ultimately prevailed in this case and are

9  entitled to seek fees under § 1132(g)(1); thus the court must

10  determine whether to award defendants their attorneys' fees in

11  light of the Hummell factors.

12           **(1) the degree of the opposing parties' culpability or**

13           **bad faith;**

14           Based on the court's conclusion that the fiduciary

15  defendants breached their duties, the court finds that this

16  factor weighs in favor of plaintiffs and merits against awarding

17  defendants their attorneys' fees.  Although harm did not result

18  from the fiduciaries' breaches, it does not make their conduct

19  acceptable.  Defendants also argue that plaintiffs engaged in bad

20  faith in pursuing this lawsuit and that plaintiffs' counsel's

21  characterization of the defendants throughout this litigation

22  amounted to bad faith.  This case unquestionably did not proceed

23  in an expeditious fashion, the theories of liability often

24  appeared to be a moving target, and the growing animosity between

25  counsel were palpable.  The court finds, however, that both sides

26  were responsible for the prolonged litigation and levied arguably

27  personal attacks against their adversaries.

28           **(2) the ability of the opposing parties to satisfy an**

95

1      **award of fees;**

2           Although the court lacks evidence about each of

3 the plaintiffs' ability to satisfy an award of fees, nothing in

4 the record suggests that they have significant financial

5 resources.  With the exception of Ellis, even the balances of

6 plaintiffs' HolliShare accounts were minimal when compared to the

7 proceeds many of the defendants received from the sales of their

8 JDS shares.  For example, in order to keep his holding of JDS

9 shares below ten percent, Winn sold $20 million in shares on one

10 occasion, (Tr. 1858:14-15), and Herbert ultimately sold his

11 shares for about $18 million, (Tr. 19823:9-12).  Most

12 significantly, Zwirner, who, as an attorney might be expected to

13 help his fellow Trustees understand and comply with ERISA, was

14 estimated to have JDS shares value in excess of $45 million, (Tr.

15 1925:2-6), and, when asked how much he had sold in the last six

16 years to keep his holdings under ten percent, he answered that it

17 was in the "range" of five to twenty million dollars.  (Tr.

18 2017:2-18.)  The court's impression at trial was that, even

19 though defendants' fees will undoubtedly be significant,

20 defendants are fully capable of paying them and plaintiffs are

21 not.  The burden of defendants' fees should not be shifted from

22 the defendants, who breached their fiduciary duties and appear to

23 have more than adequate resources to pay their attorneys, to the

24 plaintiffs.

25           **(3) whether an award of fees against the opposing**

26           **parties would deter others from acting under similar**

27           **circumstances;**

28      An award of fees may undoubtedly deter plaintiffs from

1  pursuing such complicated and contorted ERISA cases in the

2  future.  Given that the court found that the fiduciary defendants

3  breached their duties under ERISA, however, the court cannot

4  conclude that such cases should be entirely discouraged because

5  there was at least some merit to plaintiffs' claims even if there

6  was ultimately no harm.  Similar to the Court's concern in

7  Farrar, however, counsel might be more reluctant to pursue a case

8  for almost a decade in the absence of clear loss to the Plan or a

9  plaintiff that has standing to seek prospective injunctive

10 relief.  This factor therefore weighs in favor of defendants.

11              **(4) whether the parties requesting fees sought to**

12              **benefit all participants and beneficiaries of an ERISA**

13              **plan or to resolve a significant legal question**

14              **regarding ERISA;**

15              Here, plaintiffs sought relief in favor of the Plan,

16 but clearly lacked standing to obtain an injunction affecting the

17 future management of the Plan, and the evidence at trial

18 convinced the court that the Plan did not suffer harm.  It is

19 unclear to the court why plaintiffs did not address these

20 deficiencies early in the litigation.  HolliShare was extremely

21 successful and provided returns in excess of publicly traded

22 stock and, to the extent that this action could have rendered

23 HolliShare's primary investment worthless by bankrupting JDS or

24 caused Hollister to think twice about continuing to offer the

25 Plan to its employees,[44] the lawsuit would arguably be against

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27      [44]   In enacting ERISA, "Congress sought 'to create a system
28 that is [not] so complex that administrative costs, or litigation
   expenses, unduly discourage employers from offering [ERISA] plans

1  the interests of current participants.  The court therefore finds

2  that this factor weights slightly in favor of defendants.

3           **(5) the relative merits of the parties' positions**.

4           Lastly, the court finds that the factor evaluating the

5  relative merits of the parties does not weigh in favor of either

6  party.  As previously discussed, plaintiffs proved that

7  defendants breached their fiduciary duties and, if any one of the

8  plaintiffs had standing to seek injunctive relief, the court may

9  have removed the Trustees from their positions.  At the same

10 time, however, defendants ultimately proved that their conduct

11 did not cause harm to the Plan.  At the end, this litigation

12 resulted in more of a wash than a victory for either side.

13          When balancing the factors, the court concludes that

14 the considerations weigh heavily in favor of denying defendants'

15 fees under § 1132(g)(1).  Although defendants prevailed in

16 establishing that they did not cause harm to the Plan, they

17 breached their duties and should not be able to shift the burden

18 of their defense to plaintiffs.  Accordingly, the court declines

19 to award either side their attorneys' fees.

20          For the foregoing reasons, THE COURT HEREBY FINDS in

21 favor of all defendants on all claims by all plaintiffs.  Each

22 side shall bear their own attorneys' fees.

23          The Clerk of the Court is instructed to enter judgment

24 accordingly.

25

26 in the first place.'"  Conkright v. Frommert, --- U.S. ----, ----
   , 130 S. Ct. 1640, 1649 (2010) (quoting Varity Corp. v. Howe, 516
27 U.S. 489, 497 (1996)) (alterations in original).  This case is
   only one illustration suggesting that Congress may not have
28 succeeded in this aim.

DATED:   April 5, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

99