UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JAMES P. DEFAZIO, et al.,

      Plaintiffs,

        v.

HOLLISTER, INC., et al.,

      Defendants.

_____/

NOS. CIV. 2:04-1358 WBS GGH
     2:05-0559 WBS GGH
     2:05-1726 WBS GGH
     CONSOLIDATED

MEMORANDUM OF DECISION

----oo0oo----

After conducting a fifteen-day bench trial and providing the parties with extended time to submit post-trial briefing, the court finds in favor of all defendants on all of plaintiffs' claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461.  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

1

I.     Factual and Procedural Background

        Defendant Hollister, Inc. ("Hollister") is a privately-held Illinois corporation that develops, manufactures, and markets medical devices in the fields of ostomy, continence care, and wound care.  Hollister is the wholly-owned and operating subsidiary of defendant The Firm of John Dickinson Schneider ("JDS").  JDS is an Illinois close corporation that holds all of Hollister's capital stock.

        John D. Schneider, who only had a high school education and initially began a printing business, founded JDS and developed Hollister into a prosperous company.  Schneider desired for JDS and Hollister to remain independent and employee-owned companies and wanted his employees to share in their success. Schneider accomplished these goals through a direct shareholder program and the Hollister Employee Share Ownership Trust ("HolliShare" or "Plan").

        HolliShare is a non-contributory, tax qualified defined contribution profit sharing plan designed to provide retirement benefits to Hollister's non-union employees in the United States. It is governed by a written instrument, the HolliShare Employee Share Ownership Trust ("Plan Instrument").  HolliShare's predominant asset, which totals approximately 95% of its total value, is its JDS common shares.  The Plan Instrument mandates that HolliShare's assets be invested in JDS shares to the maximum extent practicable.  When initially funded in 1974, HolliShare received 11,950 common shares of JDS that were purchased from shareholders.  In exchange, HolliShare assumed the obligation to pay the long-term promissory notes issued to the shareholders to

purchase the shares.  In late 1974, the Plan transferred 4,007 shares back to JDS along with the related promissory note obligations, leaving the Plan with 7,943 shares.  HolliShare has not purchased JDS shares since 1975, but the number of its total shares has increased due to two 100-for-1 stock splits and a 9-for-1 stock dividend.

HolliShare's ownership of JDS shares has proved to be an extraordinary investment, and the annual increases in value of JDS shares according to JDS's valuations exceeded most publicly-traded investments.  For example, from 1977 through 2010, the mean average increase in JDS's share price was 26.79% each year, whereas the mean average increase for the Standard & Poors 500 index was 8.8% per year, the mean average increase for the Mid-Cap Index was 14.09% per year, and the mean average increase for the Small-Cap Index was 15.24% per year.

HolliShare participants are neither required nor permitted to contribute to HolliShare.  HolliShare primarily raised the liquidity to pay benefits to participants through annual cash contributions from Hollister and cash paid by JDS for the repurchase of the Plan's stock.  Hollister is required to contribute 5% of the aggregate compensation of participants to HolliShare each year, but, in recent years, Hollister has contributed between 7.5% to 8.5% of the aggregate compensation, totaling approximately $33 million in contributions since 1990. Because HolliShare invests primarily in JDS common shares, the principal factor that determines the change in value of each HolliShare participant's account is the annual decline or appreciation in the value of the Plan's JDS common shares, and

the balance in each participant's account is generally based on the participant's pro-rata percentage of the value of HolliShare. Participants in HolliShare learned about the Plan and its financial condition in annual reports, which were referred to by the parties as and often bore the title of "HolliShare Highlights."

JDS has two classes of shares, preferred[1] and common, neither of which has a generally recognized public market.  The JDS Articles of Incorporation[2] ("JDS Articles") provide several restrictions on JDS shares relevant to this case.  First, under Article Five, only certain persons and entities are entitled to own JDS shares, including holders of shares as of May 5, 1978, select directors and officers of JDS or Hollister, select JDS or Hollister employees, and any deferred benefit plan maintained by

---

[1]     HolliShare does not own any preferred shares and all of the preferred shares, which have the controlling interest, were originally owned by Schneider.  Schneider placed all of his outstanding preferred shares in the 1977 Preferred Share Trust, which was set to expire in 2001.  Upon its expiration, the 1977 Preferred Share Trust provided for the shares to be distributed to the Hollister employees who owned common shares and agreed in writing to abide by Schneider's principles.  Instead of allowing the shares to be distributed, a new trust, the 1999 Preferred Share Trust, was created and, with the consent of the employees who would have received preferred shares upon expiration of the 1977 Preferred Share Trust, the JDS preferred shares were transferred to the 1999 Preferred Share Trust.
Although plaintiffs asserted claims based on these trust transactions, the court entered summary judgment in favor of defendants on these claims prior to trial in its June 26, 2009 Order ("June 2009 Order").  See DeFazio v. Hollister, Inc., 636 F. Supp. 2d 1045, 1052-54, 1072-77 (E.D. Cal. 2009).

[2]     The JDS Articles were amended multiple times between 1978 and 1999.  (See Exs. 531-36.)  Unless otherwise noted, the cited paragraphs of JDS Articles are common to all of the versions.

JDS and/or Hollister.[3]  (Ex. 533, Art. V, ¶ II.C.)

Second, Article Five restricts the manner in which holders of JDS stock may transfer ownership.  Specifically, subparagraph II.D.2.a gives JDS a right of first refusal by requiring that any holder of JDS stock who intends to transfer one or more shares must first offer to sell those shares to JDS.  Subparagraph II.D.3.b further provides that the price paid for any common share purchased by JDS under its right of first refusal "shall be its book value as of the end of the calendar month in which the Repurchase Date occurs . . . computed in accordance with generally accepted accounting principles."[4]  (Ex. 531, Art. V, ¶ II.D.3.b.)

The JDS Articles also provide that when JDS repurchases shares pursuant to its right of first refusal, it is obligated to pay only a minimal amount in cash (set originally at $5,000 and then increased to $250,000 in 1999) and can pay the remainder with a promissory note.  Not only did HolliShare's cash needs always exceeded the $5,000 and $250,000 minimums, it could not

---

[3]    Subparagraph II.C was amended in 1984 to allow a non-employee director or officer of JDS or Hollister, such as defendant Richard T. Zwirner, to own stock if the individual had "performed substantial and continuing services" for JDS or Hollister.  The JDS Articles were amended again in 1999 to allow The 1999 Preferred Share Trust to hold shares.

[4]    As noted in an earlier Order, "book value" refers to a method used to value corporate stock, but the term has no generally accepted definition.  DeFazio v. Hollister Emp. Share Ownership Trust, 406 F. Supp. 2d 1085, 1087 n.2 (E.D. Cal. 2005) (Karlton, J.) (citing 51 A.L.R. 2d 606 § 2).  "[T]he term contemplates a theoretical value resulting from depreciation or appreciation as computed upon an originally determined base." Id.  Albeit a simplified explanation, book value is generally calculated by subtracting a company's liabilities from its assets.

receive a promissory note for its sale of JDS stock because ERISA prohibited it from accepting a promissory note as payment from an employer.  See 29 U.S.C. § 1106(a)(1)(B).

In addition to the right of first refusal, subparagraph II.D.7.a provides for the sale of JDS shares under "exceptional circumstances":

> Under exceptional circumstances and in the discretion of the Corporation's Board of Directors, shares may be repurchased by the Corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner or holder of such shares may from time to time agree.

(Ex. 531, Art. V, ¶ II.D.7.a.)

The Plan Instrument permits the sale of the Plan's JDS stock and does not set the price for such sales but requires that the sales be conducted in accordance with the JDS Articles.  (Ex. 9-9.14, § 11.01(2).)  Defendants testified at trial that, since the mid-1980s, HolliShare has sold its holdings of JDS common shares to JDS pursuant to the "exceptional circumstances" provision of subparagraph II.D.7.a, not the right of first refusal embodied in subparagraph II.D.2.a.  Defendants testified that HolliShare and JDS entered into an agreement in the mid-1980s ("mid-80s agreement")[5] that has since governed JDS's repurchases of common shares from HolliShare.  Neither the mid-80s agreement nor its terms were memorialized in writing. Defendants testified that the terms of the agreement were that HolliShare would provide advance projections of the Plan's cash

---

[5]     As this litigation progressed, counsel referred to this agreement as the "mid-80s agreement," (Tr. 862:16-21), and the court will refer to it as such in this Order as well.

needs, HolliShare would sell shares back to JDS once a year, the purchase price would be the audited book value from December 31 of the prior year, JDS would purchase all of the shares HolliShare sought to sell, and JDS would pay all cash for the shares.

Although the theories underlying plaintiffs' claims have evolved as this case has progressed, the heart of plaintiffs' case at trial was that the price JDS paid for HolliShare's sales of its JDS stock should have been 1) the current month-end book value from the month in which the sale took place ("month-end book value"); or 2) a price determined to be the fair market value of the shares. Plaintiffs contend that, by selling at the December 31 book value from the year prior to the sale ("December 31 book value") instead of the month-end book value or the fair market value, the HolliShare fiduciaries breached their duties under ERISA and caused the Plan to suffer extraordinary losses.

The parties have stipulated as to a variety of details concerning the challenged transactions, including the sale date, the December 31 book value that was used for the sale price, the number of shares sold, and, for almost all of the sales, the month-end book value for the month in which the challenged transactions occurred. (See Docket No. 630 ("Stipulation of Facts").) Between 1981 and 2007, HolliShare sold its shares to JDS on nineteen occasions. The years in which sales took place, the number of shares sold, and the cash proceeds generated were as follows: 1981 (69,300 shares for $997,227.00); 1982 (38,000 shares for $723,140.00); 1985 (20,000 shares for $1,368,400.00);

1986 (180,000 shares for $12,619,800.00); 1987 (100,000 shares

for $9,756,000.00); 1993 (75,000 shares for $25,830,000.00); 1995

(30,000 shares for $14,697,300.00); 1996 (166,973 shares for

$10,000,012.97); 1997 (135,000 shares for $9,863,100.00); 1998

(250,000 shares for $21,262,500.00); 1999 (200,000 shares for

$21,332,000.00); 2000 (150,000 shares for $18,679,500.00); 2001

(220,000 shares for $29,590,000.00); 2002 (46,250 shares for

$7,174,300.00); 2003 (44,750 shares for $8,490,417.50); 2004

(50,000 shares for $11,908,000.00); 2005 (22,000 shares for

$6,335,120.00); 2006 (26,500 shares for $8,717,400.00); and 2007

(85,500 shares for $34,006,770.00).  (Id. ¶¶ 28-46.)

A.   The Parties

1.   Plaintiffs

With the exception of plaintiff James P. DeFazio, all

of the plaintiffs in this case are former employees of Hollister

and former participants in HolliShare.  The former HolliShare

participant plaintiffs and the years in which they ended their

Hollister employment and received the distribution of their

HolliShare accounts include: DeLane Humphries (1998); Brenda

Dimaro (1999); Judy Seay (1999); Hallie Lavick (2000); Michael

McNair (2002); Nancy Russell Stanton (2002); Sonya Pace (2003);

Kathleen Ellis (2004); Theresa Beetham (2006); and Cindy Worth

(2006).  All of these plaintiffs had terminated their employment

and received lump sum distributions of their HolliShare accounts

before commencing or joining this action.  James P. DeFazio is

Ellis's former husband and is an alternate payee on an account

created with funds from Ellis's HolliShare distribution.

In a fourteen-month period between 2004 and 2005, three

8

subsets of the current plaintiffs independently filed complaints against Hollister, JDS, the HolliShare Trustees, and various members of the boards of directors of both companies.[6]  The cases were consolidated by court order on May 25, 2006.  (Docket No. 87.)  All of the plaintiffs except Ellis ("DeFazio/Dimaro plaintiffs") are represented by the same counsel and filed their Fifth Amended Complaint on July 22, 2008.  (Docket No. 368.) Ellis, the only plaintiff represented by separate counsel, filed her Fourth Amended Complaint on January 23, 2008.[7]  (Docket No. 314.)  The allegations asserted against defendants are substantially similar in both operative complaints, and counsel for the DeFazio/Dimaro plaintiffs and Ellis tried the case together, with Ellis's counsel taking the lead at trial and in the post-trial briefing.

   2. <u>Defendants</u>

    a. <u>HolliShare Trustee Defendants</u>

  Defendant Richard T. Zwirner has performed legal work for Hollister and JDS since 1969, and he has been a HolliShare Trustee since 1976.  He has also provided consulting services to Hollister since the late 1970s and served as the Corporate

---

[6] This case was not brought as a class action on behalf of all past or current members of HolliShare.  The DeFazio/Dimaro plaintiffs included class allegations in their Fourth and Fifth Amended Complaints, but then filed a statement of non-opposition to defendants' motion to strike those allegations, (Docket No. 533), and thus the court granted defendants' motion to strike the class allegations.  <u>DeFazio</u>, 636 F. Supp. 2d at 1055-56.

 Plaintiffs also named HolliShare as a defendant, but have never treated it as a defendant and did not propose findings of fact or conclusions of law addressing its liability.  Thus the court will enter judgment in favor of HolliShare.

[7] As used in this Order, the term "plaintiffs" refers collectively to all eleven plaintiffs unless otherwise noted.

Secretary of JDS from 1974 to 1981, a Director of JDS and Hollister since 1978, Hollister's Vice President of Marketing and Sales from 1991 to 1994, and General Counsel to Hollister since 1977.

Hollister's chief financial officers also served as HolliShare Trustees, which, in succession, were defendants Charles H. Gunderson,[8] James J. McCormack, and Samuel P. Brilliant.  McCormack served as a HolliShare Trustee from 1989 to June 2000 and was also Hollister's Treasurer and Chief Financial Officer from 1981 to 2000, Vice President of Finance from 1981 to 1993, and a Senior Vice President from 1993 to 2000.  Brilliant became a HolliShare Trustee in July of 2000 and was still a Trustee at the time of trial.  Brilliant also served as Hollister's Vice President of Finance and Treasurer from October 1998 to July 2000 and became its Chief Financial Officer and a Vice President of Hollister in 2000.

Hollister's heads of the human resources department also served as HolliShare Trustees, which, in succession, were defendants Charles C. Schellentrager, James A. Karlovsky, and Lori Kelleher.  Although it is unclear from the testimony at trial when Schellentrager became a Trustee, his term ended in 1990 at the latest when Karlovsky succeeded him.  Karlovsky served as a Trustee from 1990 to July 2004 and also served as

---

[8]    Although plaintiffs indicate in their proposed findings of fact that Gunderson was a Trustee before McCormack (Docket No. 647 at 13:20-21), the only testimony at trial was that Gunderson was the "vice president and treasurer of the corporation" prior to his termination.  (Tr. 245:5-8.)  More importantly, the court dismissed Gunderson as a defendant in this action in the June 2009 Order.  See DeFazio, 636 F. Supp. 2d at 1059, 1080.

1  Hollister's Vice President of Human Resources from 1989 to 2003
2  and Executive Assistant to the President from 2003 to 2004.
3  Kelleher succeeded Karlovsky as a Trustee in 2004 and continued
4  to serve as a Trustee until 2011.

5          Defendant Loretta A. Stempinski also served as a
6  HolliShare Trustee from 1980 to 2001, held various positions in
7  Hollister from 1961 to 1980, and served as a Director of JDS and
8  Hollister from 1980 to 2001.[9]  Ellis has not asserted claims
9  against Stempinski.

10                 b.   <u>Non-Trustee Defendants</u>

11          Defendant Michael C. Winn served as a Director of JDS
12  and Hollister from 1979 to May 2001 and as Hollister's Vice
13  President of Legal Affairs from 1974 to 1977, President from 1977
14  to 2001, and Chairman and CEO from 1981 until 2001.  Ellis has
15  not asserted claims against Winn.  Defendant Alan F. Herbert
16  served on the Boards of Directors of Hollister and JDS from 1998
17  to May 2011 and also served as Hollister's President and Chief
18  Operating Officer from 1997 to 2001, President from 2001 to 2007,
19  and Chairman and CEO from 2007 until 2011.

20          Plaintiffs also named Donald J. Groneberg, Richard I.
21  Fremgen, and Donna J. Matson as defendants.  The only testimony
22  about Groneberg at trial was that he was a member of the finance
23  department at Hollister.  (Tr. 2153:21-2154:2, 2374:24-2375:1.)
24  Plaintiffs did not offer evidence at trial establishing that
25  Groneberg owed fiduciary duties to the HolliShare beneficiaries

26  _____

27          [9]   Defendants contend that plaintiffs did not adduce any
    evidence at trial with respect to Stempinski.  However, Winn
28  testified that she was a HolliShare Trustee and a Hollister and
    JDS board member.  (Tr. 46:4-11, 62:11-14, 117:7-11.)

                                11

and have not proposed findings of fact or conclusions of law
addressing his liability.  Similarly, while there was limited
testimony about Fremgen being on the Hollister Board of Directors
(Tr. 315:14-316:5, 1546:25-1547:4) and defendants have indicated
that he was on the board from 1999 until 2010, there was no
testimony about his conduct at trial and plaintiffs did not
propose any findings of fact or conclusions of law with respect
to claims against him.  Lastly, based on two passing references
to her at trial, it appears Matson may have been a HolliShare
Trustee.  (See Tr. 306, 1913.)  While the clerk's office has not
terminated her as a defendant in this action, it appears she was
dismissed in an early order in this case and neither party
appears to believe claims are still pending against her.  The
court will therefore enter judgment in favor of Groneberg,
Fremgen, and Matson.

B.   Plaintiffs' Claims

Because plaintiffs failed to sufficiently identify
their claims remaining for trial in their pretrial statement, the
Final Pretrial Order required plaintiffs to file "an amended
statement of the remaining claims that identifies, for each
claim, 1) the statutory or common law basis for the claim; 2) the
elements plaintiff must prove in order to prevail on the claim;
3) the plaintiff or plaintiffs asserting the claim; and 4) the
defendant or defendants that the claim is asserted against."
(Docket No. 583 at 3:23-28.)  In their amended statement,
plaintiffs identified twelve ERISA claims under various
subsections of 29 U.S.C. §§ 1103-1106, 1110, 1140, and 1056.
(Docket No. 588.)

1  II.  <u>Analysis</u>

2       A.  <u>Statutory Standing</u>

3            ERISA provides for a civil action to be brought only by

4  the Secretary of Labor, a participant, a beneficiary,[10] or a

5  fiduciary.  29 U.S.C. § 1132.  In the context of ERISA, a

6  "participant" means "any employee or former employee of an

7  employer . . . who is or may become eligible to receive a

8  benefit of any type from an employee benefit plan which covers

9  employees of such employer."  <u>Id.</u> § 1002(7).  "The Supreme Court

10 has interpreted this section as conferring standing on former

11 employees who 'have a reasonable expectation of returning to

12 covered employment or . . . a colorable claim to vested

13 benefits.'"  <u>Vaughn v. Bay Envtl. Mgmt., Inc.</u>, 567 F.3d 1021,

14 1025 (9th Cir. 2009) (quoting <u>Firestone Tire & Rubber Co. v.</u>

15 <u>Bruch</u>, 489 U.S. 101, 117 (1989)).

16           Relying on <u>Kuntz v. Reese</u>, 785 F.2d 1410, 1411 (9th

17 Cir. 1986), defendants have repeatedly argued during the course

18 of this litigation that plaintiffs lack statutory standing under

19 ERISA because, as retirees who have withdrawn their full account

20 balances, they no longer have a colorable claim to vested

21 benefits and thus are not "participants."  In 2006, however,

22 Judge Karlton rejected defendants' argument, concluding that the

23 Ninth Circuit has "allowed suit even when plaintiffs have

24 received their vested benefits if they allege that fiduciaries

25 'personally profited' from a breach of their duty of loyalty to

26

27           [10]  Defendants concede that, as an "alternate payee,"
   DeFazio is deemed to be a "beneficiary" under 29 U.S.C. §
28 1056(d)(3)(J).  (Docket No. 658 at 20 n.8.)

                                13

1  the plan." <u>Ellis v. Hollister, Inc.</u>, Civ. 05-559 LKK GGH, 2006
2  WL 988529, at *4 (E.D. Cal. Apr. 14, 2006) (citing <u>Amalgamated</u>
3  <u>Clothing & Textile Workers Union, AFL-CIO v. Murdock</u>, 861 F.2d
4  1406, 1418 (9th Cir. 1988)).  Defendants requested this court to
5  reconsider Judge Karlton's ruling in 2007, and the court declined
6  to do so because the ruling was not clearly erroneous.  <u>See</u>
7  <u>DeFazio v. Hollister, Inc.</u>, Civ. No. 04-1358 WBS GGH, 2007 WL
8  3231670, at *3-4 (E.D. Cal. Nov. 1, 2007).  The court again
9  declines defendants' suggestion that the court should depart from
10  Judge Karlton's 2006 decision.

11          Moreover, the Ninth Circuit has more recently
12  distinguished <u>Kuntz</u> and held that a "former employee who has
13  received a full distribution of his or her account balance under
14  a defined contribution pension plan has standing as a plan
15  participant to file suit under [ERISA] to recover losses
16  occasioned by a breach of fiduciary duty that allegedly reduced
17  the amount of his or her benefits." <u>Vaughn</u>, 567 F.3d at 1023,
18  1025-26; <u>accord</u> <u>Harris v. Amgen, Inc.</u>, 573 F.3d 728, 733 (9th
19  Cir. 2009).  In <u>Vaughn</u>, the Ninth Circuit did not require that
20  the trustees had personally profited from their breaches in order
21  for the participants to have standing, which Judge Karlton had
22  previously found would be required under the pre-<u>Vaughn</u>
23  precedent.[11]

24

25          [11]    Whether the Trustees personally profited as a result of
26  their breaches would be relevant if plaintiffs were seeking a
    constructive trust on any ill-gotten profits.  <u>See</u> <u>Amalgamated</u>
    <u>Clothing & Textile Workers Union, AFL-CIO</u>, 861 F.2d at 1414
27  ("[T]he imposition of a constructive trust on a fiduciary's
    ill-gotten profits in favor of all plan participants and
28  beneficiaries is an important, appropriate, and available form of

B.   <u>Statute of Limitations</u>

    1.   <u>"Fraud or Concealment" Exception</u>

ERISA's statute of limitations provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

<u>except that in the case of fraud or concealment</u>, such action may be commenced not later than six years after the <u>date of discovery of such breach or violation</u>.

29 U.S.C. § 1113 (emphasis added).   While § 1113 requires a plaintiff to file a claim within six years of the date of the last act constituting a part of the alleged violation, regardless of when the plaintiff actually learned of the violation, the "'fraud or concealment' exception tolls the running of the limitations period for six years from the date of discovery." <u>Barker v. Am. Mobil Power Corp.</u>, 64 F.3d 1397, 1401 (9th Cir. 1995).   "Plaintiffs bear the burden of proving 'fraud or concealment' under 29 U.S.C. § 1113." <u>Harris v. Koenig</u>, --- F. Supp. 2d ----, ----, No. 02-618, 2011 WL 4542973, at *5 (D.D.C. 2011); <u>accord</u> <u>Barker</u>, 64 F.3d at 1401 (finding the "fraud or concealment" exception inapplicable "because the plaintiffs have not produced specific evidence of fraudulent activity or concealment" by defendants).

---

relief under ERISA § 409(a).")   Plaintiffs have not, however, sought such a remedy.   (<u>See</u> Docket Nos. 650-53, 662.)

1    Here, plaintiffs rely on the "fraud or concealment"
2  exception to assert claims based on defendants' alleged breaches
3  of fiduciary duties beginning in 1982.  The "fraud or
4  concealment" exception applies only when an ERISA fiduciary
5  either "made knowingly false misrepresentations with the intent
6  to defraud the plaintiffs" or took "affirmative steps . . . to
7  conceal any alleged fiduciary breaches."  Barker, 64 F.3d at
8  1401; accord Radiology Ctr., S.C. v. Stifel, Nicolaus & Co., 919
9  F.2d 1216, 1220 (7th Cir. 1990) ("An ERISA fiduciary can delay a
10 wronged beneficiary's discovery of his claim [meriting
11 application of the 'fraud or concealment' exception] either by
12 misrepresenting the significance of facts the beneficiary is
13 aware of (fraud) or by hiding facts so that the beneficiary never
14 becomes aware of them (concealment).").

15   Courts have recognized that the "fraud or concealment"
16 exception to § 1113 incorporates the common law doctrine of
17 fraudulent concealment.  Barker, 64 F.3d at 1402.  Under that
18 common law doctrine, passive concealment alone may toll the
19 statute of limitations if the defendant has a duty to disclose
20 material information.  Thorman v. Am. Seafoods Co., 421 F.3d
21 1090, 1092 (9th Cir. 2005).  Courts that have considered the
22 issue, however, have held that the doctrine of passive
23 concealment does not apply to § 1113.  See, e.g., Ranke v.
24 Sanofi-Synthelabo Inc., 436 F .3d 197, 204 (3d Cir. 2006)
25 (stating that an ERISA fiduciary must "have taken affirmative
26 steps to hide an alleged breach of fiduciary duty from a
27 beneficiary in order for the 'fraud or concealment' exception to
28 apply"); Larson v. Northrop Corp., 21 F.3d 1164, 1174 (D.C. Cir.

16

1994) ("While a fiduciary's mere silence could, in some
circumstances, amount to fraud, it would still fall short of the
fraudulent concealment that courts have required for purposes of
§ 1113."); Schafer v. Ark. Med. Soc'y, 853 F.2d 1487, 1491 (8th
Cir. 1988) (holding that active concealment under § 1113 requires
"more than merely a failure to disclose").

        The Ninth Circuit in Barker implicitly found passive
concealment insufficient to toll the statute of limitations.
There, the Ninth Circuit recognized that an ERISA fiduciary
generally has a duty to disclose "complete and  accurate
information material to the beneficiary's circumstances," but
focused only on whether the defendants had affirmatively
concealed their breach when holding that the defendants did not
engage in "fraud or concealment" under § 1113.  See Barker, 64
F.3d at 1401, 1403.  An ERISA fiduciary's mere failure to
disclose material information thus does not merit tolling under §
1113.

        The "fraud or concealment" exception tolls the statute
of limitations only "until the plaintiff in the exercise of
reasonable diligence discovered or should have discovered the
alleged fraud or concealment." J. Geils Band Emp. Ben. Plan v.
Smith Barney Shearson, Inc., 76 F.3d 1245, 1252 (1st Cir. 1996)
(citing Larson, 21 F.3d at 1172-74).[12]  Defendants first argue
that plaintiffs cannot rely on the "fraud or concealment"

---

        [12]   In cases of active concealment, some courts have held
that a plaintiff can rely on the "fraud or concealment" exception
even in the absence of diligence by the plaintiff.  See J. Geils
Band Emp. Ben. Plan, 76 F.3d at 1254 n.10; Martin v. Consultants
& Adm'rs, Inc., 966 F.2d 1078, 1096 n.19 (7th Cir. 1992).

1  exception because none of the plaintiffs testified at trial or
2  submitted evidence establishing that they exercised reasonable
3  diligence.

4        When addressing a similar tolling provision in the
5  statute of limitations for federal securities fraud claims (28
6  U.S.C. § 1658(b)), however, the Supreme Court held that "the
7  limitations period does not begin to run until the plaintiff
8  thereafter discovers or a reasonably diligent plaintiff would
9  have discovered 'the facts constituting the violation,' . . .
10 irrespective of whether the actual plaintiff undertook a
11 reasonably diligent investigation."  Merck & Co., Inc. v.
12 Reynolds, --- U.S. ----, ----, 130 S. Ct. 1784, 1798 (2010)
13 (emphasis added).  The Court's holding applies equally to § 1113,
14 especially because the Court's analysis in Merek is centered
15 around concepts embodied in the general "discovery rule."  See
16 id. at 1793-98.  Holding otherwise could fault plaintiffs for
17 failing to exercise reasonable diligence even when the exercise
18 of reasonable diligence would not have alerted them to their
19 claims because the defendants had concealed their misconduct.
20 Therefore, assuming plaintiffs in this case were not reasonably
21 diligent, they would be precluded from relying on the "fraud or
22 concealment" exception only if a reasonably diligent plaintiff
23 would have discovered the misconduct.[13]

24

25        [13]   When addressing tolling in the context of federal
26 securities fraud claims, the Supreme Court "held that the
   ultimate burden is on the defendant to demonstrate that a
27 reasonably diligent plaintiff would have discovered the facts
   constituting the violation."  Strategic Diversity, Inc. v.
28 Alchemix Corp., 666 F.3d 1197, 1206 (9th Cir. 2012) (discussing
   Merck & Co., 130 S. Ct. at 1798).  In contrast, the First Circuit

2.   HolliShare Highlights

Plaintiffs contend that defendants concealed the sales price of HolliShare's JDS shares in the HolliShare Highlights, which were the annual reports distributed to participants to inform them about HolliShare's funding and financial condition.[14] In the June 2009 Order, this court held that, based on language in the HolliShare Highlights, a participant could have reasonably believed that HolliShare's shares of JDS stock were sold to JDS

held that, for tolling under § 1113, the plaintiff has the burden of showing reasonable diligence unless the plaintiff alleges that the statute is tolled based on the defendant's self-concealing wrong. J. Geils Band Emp. Ben. Plan, 76 F.3d at 1259; see also Truck Drivers & Helpers Union, Local No. 170 v. N.L.R.B., 993 F.2d 990, 996 (1st Cir. 1993) ("[A] plaintiff may establish a self-concealing wrong by demonstrating that the defendant 'engage[d] in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action.'" (quoting Hobson v. Wilson, 737 F.2d 1, 34-35 (D.C. Cir. 1984) (alteration in original)).

The parties have not addressed which party has the burden to establish either the existence or absence of reasonable diligence.  Nonetheless, because the court finds that the exercise of diligence would not have uncovered the alleged breaches, the court's conclusion about reasonable diligence would be the same regardless of which party had the burden on that issue.

[14]   The Ninth Circuit has held that the "fraud or concealment" exception applies "only when the defendant himself has taken steps to hide his breach of fiduciary duty." Barker, 64 F.3d at 1402.  As a result, "[p]laintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants." Id. (quoting Griffin v. McNiff, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y. 1990), aff'd, 996 F.2d 303 (2d Cir. 1993)) (internal quotation marks omitted).  The testimony from at least some of the Trustees in this case was that they read and reviewed the HolliShare Highlights before they were distributed to the participants.  (See Tr. 371:14-16, 372:9-12 (Karlovsky), 2452:16-23 (Zwirner).)  From this testimony--and in light of the fact that defendants have not argued that any of the Trustees did not read or review the HolliShare Highlights--the court finds that each Trustee approved the HolliShare Highlights and is responsible for the information provided to the beneficiaries in them.

at the month-end book value from the month in which a sale occurred. <u>DeFazio</u>, 636 F. Supp. 2d at 1061. Specifically, from 1993 to 2000, the HolliShare Highlights informed participants of the following:

> JDS common shares, which are valued at their book value, are not publicly traded. They are for all practical purposes not transferable to any person or entity other than JDS itself. They are subject to severe transfer restrictions which require that the Trust first offer them to JDS, the parent company of Hollister Incorporated, at their book value.
> To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with the needed cash.

(Exs. 4-4.18 at 7, 4-4.19 at 7, 4-4.20 at 7, 4-4.21 at 7, 4-4.22 at 7, 4-4.23 at 7, 4-4.24 at 7, 4-4.25 at 7.)[15] Based on this information, a reasonable participant could have believed that HolliShare sold its holdings of JDS common shares pursuant to the sale price specified for sales made pursuant to the "right of first refusal" in subparagraph II.D.2.a of Article 5 of the JDS Articles.

Specifically, subparagraph II.D.2.a provides:

> If any . . . trust . . . desires or intends to transfer any one or more shares of the Corporation, . . . such holder shall first offer in writing, . . . to sell to the Corporation all shares of the Corporation which such holder desires or intends to transfer . . . at the price and in the manner set forth in subparagraphs 3 and 4 of this paragraph D.

(Ex. 531, Art. V, ¶ II.D.2.a.)   Subparagraph II.D.3.b of Article

_____

[15]   Beginning in 1998 and continuing through 2000, the following underscored language was omitted: "They are subject to severe transfer restrictions which require that the Trust first offer them to JDS, <u>the parent company of Hollister Incorporated,</u> at their book value." (<u>See</u> Exs. 4.4-23 at 7, 4.4-24 at 7, 4-4.25 at 7 (emphasis added).)   This omission does not affect the court's analysis.

Five then mandates that, for sales pursuant to the right of first refusal, "[t]he price of each common share shall be its book value as of the end of the calendar month in which the Repurchase Date occurs . . . ." (Id. Art. V, ¶ II.D.3.b.)  When the explanation in the HolliShare Highlights that the transfer restrictions on its JDS shares "require that the Trust first offer them to JDS . . . at their book value" is read in conjunction with the right of first refusal in the JDS Articles, a participant could reasonably conclude that the shares were sold at the month-end book value dictated in subparagraph II.D.3.b.

Defendants argue, however, that a reasonable beneficiary would not draw this conclusion because the JDS Articles also provide for JDS to pay the purchase price for sales pursuant to the right of first refusal with a limited amount of cash and the remainder in a subordinated promissory note. (See id. Art. 5, ¶ II.D.4.a.)  In contrast to this provision, they point out that HolliShare always received payment for its shares from JDS in cash, suggesting that the sales were not conducted under the terms of the right of first refusal.  In the HolliShare Highlights, however, beneficiaries were told that "JDS has repurchased common shares from the Trust at their book value to provide the plan with the needed cash."  Although this suggests that payments may have been in cash, it does not preclude the possibility that HolliShare received a promissory note, especially because a promissory note could have been sold to a bank to obtain cash. (See Tr. 663:10-664:2.)  That HolliShare's receipt of cash only payments for its JDS stock is inconsistent with the terms of payment for a sale conducted pursuant to the

right of first refusal would therefore not prevent a reasonable participant from concluding that HolliShare's sales were conducted under the terms and at the price provided for in the right of first refusal provision.

Before 1993, however, the HolliShare Highlights did not contain similar language suggesting that HolliShare's sales of its JDS stock were pursuant to and according to the terms of the right of first refusal. Specifically, from 1983 to 1992, the HolliShare Highlights stated:

> JDS common shares, which are valued at their book value, are not publicly traded. They are subject to severe transfer restrictions and can only be sold to JDS, the parent company of Hollister Incorporated.
> To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with needed cash.

(Exs. 4-4.8 at 9, 4-4.9 at 10, 4-4.10 at 10, 4-4.11 at 6, 4-4.12 at 6, 4-4.13 at 7, 4-4.14 at 7, 4-4.15 at 7, 4-4.16 at 7, 4-4.17 at 7.).[16]  Similarly, the 1982 HolliShare Highlights explained:

> In evaluating these comparisons, it must be recognized that JDS common shares, which are valued at their book value, are not publicly traded and are subject to very severe transfer restrictions. As a practical matter, they can only be sold to JDS, the parent company of Hollister Incorporated.
> To date, JDS has repurchased common shares from the Trust at their book value in order to provide the Trust with needed cash.

(Ex. 4-4.7 at 7.)

The explanations from 1982 to 1992 are silent with

---

[16]    From 1983 to 1987, the first sentence of the explanation varied slightly.  (See Exs. 4-4.8 at 9, 4-4.9 at 10, 4-4.10 at 10 ("As you evaluate these comparisons, remember that JDS common shares, which are valued at their book value, are not publicly traded."); Exs. 4-4.11 at 6, 4-4.12 at 6 ("Remember that JDS common shares, which are valued at their book value, are not publicly traded.").)

respect to whether "book value" refers to the December 31 book value or month-end book value and lack any language suggesting one or the other.  Based on the explanations, it is equally plausible that HolliShare sold its shares under the exceptional circumstances provision.  At most, the HolliShare Highlights from 1982 to 1992 omit arguably material information, which is insufficient to trigger the "fraud or concealment" exception. Plaintiffs have not satisfied the court that defendants committed any other affirmative acts of concealment during that ten-year period that would have led a reasonable participant to believe that HolliShare's sales of its JDS stock were at the month-end book value.

Accordingly, because plaintiffs are unable to rely on the "fraud or concealment" exception for any alleged misconduct between 1982 to 1992, their claims based on HolliShare's sale of JDS stock from 1982 to 1992 are time barred and the court will enter judgment in favor of defendants on those claims.[17] Further, because Schellentrager's tenure as trustee ended when Karlovsky replaced him in 1990, (Tr. 345:1-5), the entirety of plaintiffs' claims against him are untimely and the court will enter judgment in his favor.

Returning to plaintiffs' claims based on HolliShare's sale of JDS stock beginning in 1993, defendants further contend that the following language in the Plan Instrument disclosed the

---

[17]   If the court's finding that plaintiffs' claims based on defendants' conduct from 1982 to 1992 is reversed for any reason, the remainder of the court's analysis in this Order of plaintiffs' post-1992 claims would apply equally to their time-barred claims.

1  use of the December 31 book value:

2      The assets in the Trust Fund shall be valued by the
        Trustees at their respective fair market values as of
3      each December 31st.  The fair market value of Common
        Shares of JDS Inc. held in the Trust Fund shall, subject
4      to the provisions of the remainder of this Section 7.03,
        be their book value as of the valuation date as reflected
5      on the books of JDS Inc.  The Trustees shall accept such
        book value as the fair market value if such book value is
6      computed in accordance with generally accepted accounting
        principles.

7

8  (Ex. 501 § 7.03.)[18]  Article VII of the Plan Instrument, which

9  this explanation is a part of, however, is titled "Accounts and

10 Allocations of Funds" and addresses valuing each participant's

11 account in detail, not valuing JDS stock for the purpose of a

12 sale.

13      Because the first sentence addresses the "assets in the

14 Trust Fund" more broadly, the reference to the December 31 value

15 in that sentence could be interpreted as referring to the

16 valuation of all assets in the trust for purposes of determining

17 the value of each participant's account.  This is consistent with

18 the use of December 31 as the date of evaluation for

19 participant's accounts regardless of when they retire in the

20 following year.  On the other hand, the second sentence, which

21 specifically refers to the "fair market value of Common Shares of

22 JDS Inc.," omits any reference to December 31 and states that the

23 value shall be "their book value as of the <u>valuation date</u>."

24 Based on the use of "valuation date" in that sentence, a

25 ─────────────────

26      [18]   The explanation was also included in the letter sent to
    DeFazio, which is discussed below.  (Ex. 176.)  Although
27 defendants have not relied on this evidence, all of the
    HolliShare Highlights before the court also included
28 substantially similar language in the endnotes following the
    breakdown of HolliShare's financial information.

1  participant could reasonably conclude that the book value of JDS

2  stock would vary depending on when the valuation and sale

3  occurred and thus would not remain stagnant for the entire year

4  at the December 31 book value.  Although the correct

5  interpretation of this explanation is not clear, a reasonable

6  participant could still believe that HolliShare's sales of JDS

7  stock were set at the right of first refusal price of month-end

8  book value and that only the accounts were valued annually as of

9  December 31.

10      Plaintiffs have thus persuaded the court that the

11  potential inconsistency between HolliShare's receipt of cash

12  payments and the provision for a promissory note in the right of

13  first refusal and the disclosure setting the valuation date for

14  HolliShare accounts at December 31 did not amount to "storm

15  warnings" putting the plaintiffs on notice about defendants'

16  alleged breaches.  Even assuming these inconsistencies would have

17  alerted a reasonably diligent participant to defendants' alleged

18  breaches, the most a reasonable participant could be expected to

19  do in receipt of potentially conflicting information would be to

20  inquire further about the terms of the sales.  While the court

21  doubts that a reasonably diligent participant would have done

22  more than review the annual HolliShare Highlights, the court

23  finds that even additional efforts would not have led a

24  participant to discover the alleged misconduct.

25      For example, a reasonably diligent participant might

26  have inquired about the details pertaining to the Plan's sale of

27  JDS stock.  In this case, however, DeFazio made such an inquiry.

28  In a letter dated November 3, 1997, he was told that, since 1973,

"every transfer by JDS Inc[.] has been at book value; and JDS Inc[.] has always exercised its right of first refusal and repurchased such shares at book value." (Ex. 176 at 3.)  As previously discussed, the express reference to the "right of first refusal" in this letter when read in conjunction with the JDS Articles indicates that the price for the JDS stock would have been the "book value as of the end of the calendar month in which the Repurchase Date occurs." (Ex. 531.)

Additionally, if plaintiffs had pursued an investigation beyond inquiring from Hollister or HolliShare, the evidence suggests they would not have discovered the precise terms of HolliShare's sales of JDS stock.  In response to a Department of Labor investigator's request for documents evidencing HolliShare's sales of its shares to JDS, (Ex. 54 at 8), HolliShare indicated sales prices for sales from 1994 to 1998 that were the December 31 book value, but also indicated that each of the sales took place on January 1, (id. at 10).  From the information provided to the Department of Labor and available to the participants, it would be unlikely that a reasonably diligent participant would have known that the sales in 1994 to 1998 actually took place in March of each year, with a sales price that is allegedly three months, not one day, "old."

The court also doubts that additional efforts or inquiries by plaintiffs could have unveiled the dynamics and purported terms of the Plan's sales of JDS stock because even defendants' counsel seemed unaware of the terms of such sales for at least the first three years of this litigation.  In a memorandum in support of their motion to dismiss plaintiffs'

26

First Amended Complaint filed in October 2006, counsel for seven of the defendants stated, "It cannot seriously be argued that a routine and commonplace sale by HolliShare of JDS common shares involves any 'extraordinary circumstances.'" (Docket No. 148 at 11:15-17.)  A year later, the same counsel again explained that sales could not have been pursuant to the "exceptional circumstances" provision.  (See Docket No. 282 at 12:3-6 ("Plaintiffs do not suggest what 'exceptional circumstances' exist that would – or even may – justify a decision by the JDS Board to treat HolliShare's periodic offers to sell some of its JDS common shares differently from offers to sell made by all other JDS shareholders.").)  If it was unclear to at least some of defendants' counsel that the sales were pursuant to the exceptional circumstances provision, it would be unreasonable to conclude that a reasonably diligent participant would have discovered that fact about HolliShare's sales of JDS stock.

Accordingly, the court finds that a reasonably diligent participant would not have discovered the alleged misconduct at issue in this case before the plaintiffs in this case did and therefore any lack of diligence or inquiry by plaintiffs does not preclude them from relying on the "fraud or concealment" exception.  Because § 1113 tolls the statute of limitations to six years after the discovery date and the true sales prices and terms were not revealed until after this case was filed, plaintiffs' ERISA claims beginning in 1993 and continuing through 2011 are timely.

     C.   Sales of JDS Shares at December 31 Book Value

          1.   Breach of Fiduciary Duties

27

1             a.   Prohibited Transactions under ERISA

2       ERISA establishes a blanket prohibition on certain

3 transactions that "entail a high potential for abuse," including

4 the sale or exchange of property between an ERISA plan and a

5 "party in interest." Donovan v. Cunningham, 716 F.2d 1455, 1465

6 (5th Cir. 1983) (discussing 29 U.S.C. § 1106(a)(1)).  As used in

7 § 1106(a)(1), a "party in interest" includes the employer of the

8 employees covered by the ERISA plan in question.  29 U.S.C. §

9 1002(14).

10       Nevertheless, ERISA provides an exemption for

11 prohibited transactions that meet certain requirements, and §

12 1108(e) allows the sale or acquisition by a plan of employer

13 stock if three criteria are met:

14      (1) if such acquisition, sale, or lease is for adequate
     consideration (or in the case of a marketable obligation,
15      at a price not less favorable to the plan than the price
     determined under section 1107(e)(1) of this title), (2)
16      if no commission is charged with respect thereto, and (3)
     if-- (A) the plan is an eligible individual account plan
17      (as defined in section 1107(d)(3) of this title) . . . .

18 Id. § 1108(e).  The parties stipulated that HolliShare is an

19 eligible individual account plan under ERISA, (Stipulation of

20 Facts ¶ 26), and plaintiffs have not alleged that a commission

21 was charged.  Therefore, the only dispute at trial to determine

22 whether HolliShare's sales of JDS stock to JDS came within the

23 exception in § 1108(e) was whether the sales were for "adequate

24 consideration."

25       When a security has no generally recognized market, the

26 term "adequate consideration" means "the fair market value of the

27 asset as determined in good faith by the trustee or named

28 fiduciary pursuant to the terms of the plan and in accordance

with regulations promulgated by the Secretary [of Labor]."  29

U.S.C. § 1002(18); see also 29 C.F.R. § 2550.408e (cross-

referencing § 1002(18) in defining "adequate consideration" for

purposes of § 1108(e)).  The Secretary of Labor has yet to

promulgate regulations guiding a trustee's determination of fair

market value.[19]

---

[19]    In 1988, the Department of Labor proposed a regulation
that elaborated on the definition of "adequate consideration."
It states:

> First, the value assigned to an asset must reflect its
> fair market value . . . .  Second, the value assigned to
> an asset must be the product of a determination made by
> the fiduciary in good faith . . . .  The Department will
> consider that a fiduciary has determined adequate
> consideration in accordance with section 3(18)(B) of the
> Act . . . only if both of these requirements are
> satisfied.

53 Fed. Reg. 17632 (May 17, 1988).  "Although proposed
regulations have no legal effect, numerous circuit courts have
adopted the DOL's proposed definition of adequate consideration."
Henry v. Champlain Enters., Inc., 445 F.3d 610, 619 (2d Cir.
2006).  Relying on language in Howard v. Shay, 100 F.3d 1484 (9th
Cir. 1996), that is similar to the proposed regulation, the
Second Circuit has indicated that the Ninth Circuit adopted the
proposed regulation.  See Henry, 445 F.3d. at 619 ("To enforce
[ERISA fiduciary rules], the court focuses not only on the merits
of the transaction, but also on the thoroughness of the
investigation into the merits of the transaction." (quoting
Howard, 100 F.3d at 1488 (internal quotation marks omitted))).
Although the Ninth Circuit applies a standard similar to the
proposed regulation, it has not expressly adopted the proposed
regulation.
        As this court previously explained, courts "decline to
take cognizance of the proposed regulations . . . because a
proposed regulation does not represent an agency's considered
interpretation of its statute."  DeFazio, 2007 WL 3231670, at
*10; see Draper v. Baker Hughes Inc., 892 F. Supp. 1287, 1293
(E.D. Cal. 1995) (disregarding a proposed regulation issued by
the Department of the Treasury relating to the COBRA statute,
noting that "almost a decade has passed since COBRA's Enactment,
and the promised regulatory guidelines have not materialized").
The court will therefore rely on Ninth Circuit precedent, not the
Department of Labor's proposed regulation that has not, for some
reason or no reason at all, been adopted since its proposal over
twenty years ago.

1    In addition to prohibiting certain transactions, ERISA
2 also imposes on fiduciaries the "highest" duties known to law.
3 Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996).
4 Specifically, § 1104(a)(1) requires an ERISA fiduciary to "act
5 for the exclusive benefit of plan beneficiaries" and §
6 1104(a)(1)(B) requires the fiduciary to act "with the care,
7 skill, prudence, and diligence under the circumstances then
8 prevailing that a prudent man acting in like capacity and
9 familiar with such matters would use in the conduct of an
10 enterprise of a like character and with like aims." Id. (quoting
11 § 1104(a)(1)(B)) (internal quotation marks omitted).  When an
12 ERISA plan transacts in employer securities, its fiduciaries thus
13 bear the "heavy" burden of showing that the transaction satisfies
14 the requirements of § 1108(e) and that the fiduciaries fulfilled
15 their duties of loyalty and care under § 1104(a)(1) and
16 (a)(1)(B).  See id.

17    Whether a particular transaction with an interested
18 party complies with §§ 1104(a)(1), (a)(1)(B), and 1108(e) depends
19 upon the conduct of the fiduciaries.  See id. (citing Cunningham,
20 716 F.2d at 1467-68).  Fiduciaries "are obliged at a minimum to
21 engage in an intensive and scrupulous independent investigation
22 of their options."  Id. at 1488-89; see Cosgrove v. Circle K
23 Corp., 915 F. Supp. 1050, 1064 (D. Ariz. 1995) ("Good faith
24 requires that the trustees of the Plan have used a prudent method
25 of determining value."), aff'd, 107 F.3d 877 (9th Cir. 1997).
26 The precise scope and nature of the required investigation
27 depends upon the circumstances surrounding the transaction and
28 the asset.  See Keach v. U.S. Trust Co., 419 F.3d 626, 637 (7th

1   Cir. 2005) (evaluating the sufficiency of the fiduciary's

2   investigation "within the context of the totality of the

3   circumstances"); Cunningham, 716 F.2d at 1467-68 (noting that

4   fiduciaries may satisfy their burden by showing they determined

5   fair market value based upon "a prudent investigation in the

6   circumstances then prevailing"); see also Henry v. Champlain

7   Enters., Inc., 445 F.3d 610, 619 (2d Cir. 2006) ("Whether a

8   fiduciary has made a proper determination of fair market value

9   depends on whether the parties are 'well-informed about the asset

10  and the market for that asset.'" (quoting Cunningham, 716 F.2d at

11  1467)).  Failure to "investigate suspicions that one has with

12  respect to the funding and maintenance of the plan constitutes a

13  breach of" the duty to act in the best interests of the plan

14  participants.  Barker, 64 F.3d at 1403.

15              b.   *Firestone* and the *Moench* Presumption

16          Relying on Firestone, 489 U.S. 101, defendants argue

17  that the Trustees' decision to enter into and perform under the

18  terms of the mid-80s agreement--including the purported setting

19  of "fair market value" of JDS common stock in the mid-80s

20  agreement--is entitled to a presumption that the Trustees acted

21  prudently and reasonably because the Plan Instrument vested the

22  Trustees with broad discretion.  In Firestone, the Supreme Court

23  held that "a denial of benefits challenged under § 1132(a)(1)(B)

24  is to be reviewed under a de novo standard unless the benefit

25  plan gives the administrator or fiduciary discretionary authority

26  to determine eligibility for benefits or to construe the terms of

27  the plan."  Id. at 115; accord Burke v. Pitney Bowes Inc.

28  Long-Term Disability Plan, 544 F.3d 1016, 1023-24 (9th Cir. 2008)

                                31

(recognizing the holding from <u>Firestone</u> and explaining that, "[w]hen a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable" to a denial of benefit claim).

Section 1132, however, lays out several claims for relief and plaintiffs' claims are brought under subsections (a)(2) and (a)(3), not subsection (a)(1)(B).[20] Not only was <u>Firestone</u>'s holding limited to claims under § 1132(a)(1)(B), the Court explicitly indicated that its discussion was "limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations" and that it "express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." <u>Firestone</u>, 489 U.S. at 108. Accordingly, <u>Firestone</u> does not govern the conduct at issue in this case because plaintiffs are not seeking relief for a denial of their benefits under §

---

[20]     Section 1132(a) provides:

Persons empowered to bring a civil action.  A civil action may be brought--
      (1) by a participant or beneficiary-- . . .
          (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
          (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
          (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a).

1132(a)(1)(B).  See John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan, 26 F.3d 360, 369 (2d Cir. 1994) ("[W]e decline to apply the arbitrary and capricious standard [from Firestone] to the fiduciary conduct at issue here because this case does not involve a simple denial of benefits, over which the plan administrators have discretion. . . . [D]ecisions that improperly disregard the valid interests of beneficiaries in favor of third parties remain subject to the strict prudent person standard articulated in § 404 of ERISA.").

Nonetheless, courts have extended application of the deferential review applied in Firestone to claims other than those for a denial of benefits under § 1132(a)(1)(B).  In Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995), the plaintiffs sought relief under § 1132(a)(2), alleging that the fiduciaries of their employee stock option plan ("ESOP") breached their duties when they invested solely in employer common stock even though the employer was deteriorating financially.  Recognizing that "the arbitrary and capricious standard of review allowed in Firestone should not be applied mechanically to all ERISA claims," the Third Circuit reasoned that "the Court's mode of analysis is certainly relevant to determine the standard of review pertaining to all claims filed under ERISA challenging a fiduciary's performance."  Moench, 62 F.3d at 565.  Developing what has been coined as the "Moench presumption," the Third Circuit held:

> [A]n ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

33

1   Id. at 571.

2          Consistent with every circuit that has evaluated the

3   Moench presumption, the Ninth Circuit recently adopted the

4   presumption in Quan v. Computer Scis. Corp., 623 F.3d 870 (9th

5   Cir. 2010).  Similar to Moench, the plaintiffs in Quan asserted

6   claims under § 1132(a)(2), alleging that the fiduciaries of their

7   eligible individual account plan ("EIAP") made imprudent

8   investments in their employer's common stock.

9          The Third Circuit's development of the Moench

10  presumption, and the Ninth Circuit's adoption of it in Quan,

11  centered around the fact that the plaintiffs challenged the

12  fiduciaries' decisions to invest in employer stock even though

13  the plans in both cases required or encouraged the fiduciaries to

14  invest in employer stock and ERISA exempted the fiduciaries of

15  the plans from the general duty to diversify plan investments.

16  See 29 U.S.C. § 1104(a)(2) ("In the case of an eligible

17  individual account plan (as defined in section 1107(d)(3) of this

18  title), the diversification requirement of paragraph (1)(C) and

19  the prudence requirement (only to the extent that it requires

20  diversification) of paragraph (1)(B) is not violated by

21  acquisition or holding of qualifying employer real property or

22  qualifying employer securities."); Quan, 623 F.3d at 881

23  ("Congress has granted favored status to ESOPs and other EIAPs by

24  exempting them from certain ERISA requirements. . . . We adopt

25  the Moench presumption because it provides a substantial shield

26  to fiduciaries when plan terms require or encourage the fiduciary

27  to invest primarily in employer stock.").  In Moench and Quan,

28  the plaintiffs did not allege that the conduct at issue

34

1  constituted prohibited transactions under ERISA or that adequate
2  consideration was not paid for the employer stock.

3           Unlike the plans and claims at issue in Moench and
4  Quan, plaintiffs' claims do not conflict with ERISA, the terms of
5  the Plan Instrument, or the Congressional policy in favor of
6  plans that "tie employee compensation to the company's
7  success."[21]  Quan, 623 F.3d at 881.  Section 1106(a)(1)
8  unequivocally prohibits the sale of HolliShare's JDS stock to JDS
9  unless the sale was for adequate consideration.  29 U.S.C. §§
10  1106(a)(1), 1108(e).  ERISA then defines "adequate consideration"
11  as "the fair market value of the asset as determined in good
12  faith by the trustee or named fiduciary pursuant to the terms of
13  the plan and in accordance with regulations promulgated by the
14  Secretary [of Labor]."  Id. § 1002(18) (emphasis added).  As the
15  Ninth Circuit has explained, this places a heavy burden on the
16  fiduciaries "to engage in an intensive and scrupulous independent
17  investigation of their options to insure that they act in the
18  best interests of the plan beneficiaries."  Howard, 100 F.3d at
19  1488-89.

20           Not only have defendants failed to cite a single case
21  in which plaintiffs challenged a transaction as prohibited under
22  ERISA and the court applied the more deferential standard of
23  review, applying the more lenient standard would be inconsistent
24  with ERISA's explicit requirement of a good faith determination
25  and courts' application of the more exacting standard.  For

26

27           [21]   Understandably in light of Hollister and JDS's
28  exceptional performance, plaintiffs do not attack the Trustees'
    decision to primarily invest the Plan assets in JDS common stock.

35

example, when evaluating whether a plan received adequate

consideration under § 1002(18) in <u>Howard</u>, the Ninth Circuit

stated that a fiduciary had "the burden of proving that he

fulfilled his duties of care and loyalty" and discussed the

various inquiries the fiduciary must have undergone to fulfill

his burden. <u>Id.</u> at 1488-89.  The court ultimately found in favor

of plaintiffs because, even though the fiduciaries obtained an

independent assessment from a financial advisor, the fiduciaries

failed to "meaningfully review, discuss, or question the

valuation" or assumptions used. <u>Id.</u> at 1489-90.  The Ninth

Circuit neither considered nor applied a more deferential

standard, and the breaches at issue in <u>Howard</u> are similar to the

alleged breaches in this case.

It could still be argued that, because § 1002(18)

contemplates adherence to the ERISA plan in determining fair

market value, if a plan vests the fiduciary with discretion in

arriving at the fair market value, the fiduciary's valuation

would be subject to the less stringent abuse of discretion

review.  <u>See</u> 29 U.S.C. § 1002(18) ("[T]he fair market value of

the asset as determined in good faith by the trustee or named

fiduciary <u>pursuant to the terms of the plan</u> and in accordance

with regulations promulgated by the Secretary [of Labor]."

(emphasis added)).  As the Second Circuit explained, however,

reviewing "decisions that improperly disregard the valid

interests of beneficiaries in favor of third parties" under a

standard less stringent than the "the strict prudent person

standard articulated in § 404 . . . would allow plan

administrators to grant themselves broad discretion over all

matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard."  John Blair Commc'ns, Inc. Profit Sharing Plan, 26 F.3d at 369; cf. 29 U.S.C. § 1104(a)(1)(D) (requiring a fiduciary to discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]").

Lastly, even assuming the Plan Instrument vested the Trustees with discretion to determine the fair market value and that, under the reasoning of Firestone, their determination should be reviewed only for an abuse of that discretion, defendants' conduct in this case would still not be reviewed under the less stringent standard of review.  As the Moench Court recognized in response to the argument that the plan gave the trustees the discretion to interpret the plan, "the deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument and when the trustee has in fact interpreted the instrument.'"  Moench, 62 F.3d at 567 (quoting Trustees of Cent. States, Se. & Sw. Areas Health & Welfare Fund v. State Farm Mut. Auto Ins. Co., 17 F.3d 1081, 1083 (7th Cir. 1994)); see also Moench, 62 F.3d at 567-68 ("[T]his is not a case implicating the arbitrary and capricious standard of review.  The Committee points to nothing in the record indicating that it--the Committee--actually deliberated, discussed or interpreted the plan in any formal manner. . . . 'Thus, if the trustee without knowledge of or inquiry into the relevant circumstances and

37

merely as a result of his arbitrary decision or whim exercises or fails to exercise a power, the court will interpose.'" (quoting Restatement (Second) of Trusts § 187, comment (h))).

As discussed in greater detail below, however, there was no testimony that the Trustees used the December 31 book value because they determined that it reflected the "fair market value" of the JDS stock.  Without having exercised the discretion presumably afforded the Trustees in the Plan Instrument, any argument that the determination is subject to review only for an abuse of that discretion must fail.

c.  <u>Trustees' Lack of Investigation</u>

The court must therefore determine whether, at trial, the fiduciaries carried their burden of proving that they fulfilled their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e), which required them "at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." <u>Howard</u>, 100 F.3d at 1488-89 (quoting <u>Leigh v. Engle</u>, 727 F.2d 113, 125-26 (7th Cir. 1984)) (internal quotation marks omitted).  At trial, plaintiffs' central focus was that the Trustees breached their duties when they sold HolliShare's JDS shares to JDS at the December 31 book value from the prior year without determining that the sale price was for "adequate consideration" and, consequently, sold the Plan's JDS stock to JDS for less than "adequate consideration."

The consistent testimony from the Trustees who testified at trial was that, after the mid-80s agreement, the Trustees used the December 31 book value as the sale price for

38

HolliShare's JDS stock.  At trial, Winn and Zwirner testified at length about the arguably "exceptional" circumstances that led to the mid-80s agreement, including Hollister's six-year arbitration with its international distributor that put severe financial strains on the company, (Tr. 644-46, 2376), uncertainty in predicting HolliShare's liquidity needs in upcoming years, and concerns about whether JDS could satisfy HolliShare's increasing cash needs, (Tr. 656-58, 2071:15-22).  Because the controlling inquiry examines "how the fiduciary acted viewed from the perspective of the time of the [challenged] decision rather than from the vantage point of hindsight," Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994) (alteration in original) (internal quotation marks omitted), the circumstances in the mid-80s may very well have merited use of the agreement JDS and HolliShare reached.  The agreement, however, neither demonstrates that the Trustees sought to determine the fair market value of the JDS shares nor justifies the Trustees' unquestioning adherence to its terms.

Although the Trustees relied on the December 31 book value to set the sales price of HolliShare's JDS shares, the evidence at trial established that they never attempted to determine whether the December 31 book value was the fair market value for the Plan's stock.  Specifically, Karlovsky testified that it was his understanding that the fair market value in the month of sale was the December 31 book value regardless of when the sale took place.  (Tr. 406:22-407:5.)  He explained that his "recollection is that [the Trustees] accepted the audited year end valuation according to the plan as the book value and [] used

1    it." (Tr. 471:12-18.) Karlovsky also testified that he "didn't

2    have the ability or skills or the basis to determine" the fair

3    market value of JDS stock in the month of the sale because he

4    lacked "access to understanding and the ingredients to do our

5    book value valuation," which was done by the finance department.

6    (Tr. 406:9-16.) He testified that he "did not attempt to

7    calculate any other valuation" and is not aware that any of the

8    other Trustees did either. (Tr. 471:12-18.) As Judge

9    O'Scannlain has explained, "[i]f [fiduciaries] do not have all of

10   the knowledge and expertise necessary to make a prudent decision,

11   they have a duty to obtain independent advice." Howard, 100 F.3d

12   at 1490 (O'Scannlain, J., dissenting on other grounds).

13          In addition to never attempting to determine the "fair

14   market value" of HolliShare's JDS shares, the Trustees never

15   requested or obtained an independent valuation of the stock by an

16   outside auditor. Zwirner, who has been a Trustee since 1976,

17   recognized that it was within the prerogative of the Trustees to

18   obtain an outside appraisal, but did not recall a single time

19   that the Trustees obtained an independent appraisal to value the

20   Plan's JDS stock. (Tr. 1889:10-17, 2101:3-8; accord Tr.

21   393:21-23 (Karlovsky testifying that he never asked for or

22   requested an appraisal of the JDS stock).) It appears that the

23   first outside appraisal performed of HolliShare's JDS stock in

24   the history of HolliShare was done at the request of defense

25   counsel after this litigation commenced, and Zwirner, who is

26   still a HolliShare Trustee and was aware of the appraisal, did

27   not even request to review it. (Tr. 2495:14-25.)

28          Although § 1108(e) and caselaw interpreting it have

40

never required trustees to obtain an independent audit, the Ninth

Circuit has recognized that "securing an independent assessment

from a financial advisor or legal counsel is evidence of a

thorough investigation." Howard, 100 F.3d at 1489 (citing Martin

v. Feilen, 965 F.2d 660, 670-71 (8th Cir. 1992)); see also

Katsaros v. Cody, 744 F.2d 270, 275 (2d Cir. 1984) (finding that

fiduciaries breached their duties when "[t]hey lacked any

expertise in such important matters as capital adequacy, quality

of assets, liquidity, the value of the bank's stock, and the

like" and "[n]o effort was made to obtain independent

professional assistance or analysis of the financial data

presented to them").  In explaining that obtaining an independent

assessment is "not a complete defense to a charge of imprudence,"

the Ninth Circuit has also held that a trustee must "(1)

investigate the expert's qualifications, (2) provide the expert

with complete and accurate information, and (3) make certain that

reliance on the expert's advice is reasonably justified under the

circumstances." Howard, 100 F.3d at 1489 (internal citations

omitted).  In light of the Howard court's criticism of the

trustees' failure to "meaningfully review, discuss, or question

the valuation" they obtained, it would go against reason for the

court to conclude that trustees who did not even obtain an

independent audit or perform a sufficiently similar inquiry had

fulfilled their duties.

     In assessing the thoroughness of trustees'

investigation of an asset's fair market value, the Ninth Circuit

has also found fault when the trustees "completed the transaction

without negotiation." Id. at 1484; accord Chao v. Hall Holding

Co., Inc., 285 F.3d 415, 432, 434 (6th Cir. 2002) (holding that plan fiduciaries failed to prove that they had made a good faith inquiry into fair market value when they, inter alia, did not engage in a negotiation to set the price of the stock).  The evidence at trial in this case confirmed that, after the mid-80s agreement, the Trustees never attempted to negotiate a different price with JDS for the sale of its stock.  (See Tr. 898:12-899:1 (McCormack testifying that he never attempted to negotiate the price); Tr. 1299:22-1300:2 (Brilliant testifying that he never suggested negotiating the price).)  In fact, Zwirner testified that, "a few times over [his] 30 some years as trustee," HolliShare considered the possibility of selling JDS shares at a price higher than book value, but the Trustees always concluded that "JDS Inc. always repurchases at book and would not – just would not entertain that." (Tr. 2373:6-20.)  Although Zwirner's conclusion could have ultimately been correct,[22] the Trustees never attempted to determine whether § 1108(e) demanded a higher price or, assuming it did, present information to JDS in an effort to negotiate.

The Trustees also seemed to accept the terms of the mid-80s agreement without question or a consistent understanding of its terms or justifications for them.  At its inception, the mid-80s agreement did not appear to come about as a result of meaningful negotiations between JDS and HolliShare.  With respect to the price, the testimony was that JDS suggested the use of the

---

[22]    The parties never addressed the implications under ERISA and for HolliShare if JDS refused to repurchase HolliShare's shares at the fair market value or even at the December 31 book value.

December 31 book value from the prior year, (Tr. 2059:25-2060:7), and Zwirner testified that, when sales were pursuant to the "exceptional circumstances" provision, the practice was that JDS set the terms of the sale and there was no room for negotiation. (See Tr. 2114:20-22, 2115:4-7 ("When JDS's board uses its discretion and uses the exceptional circumstances clause to deviate, there's not necessarily a negotiation. . . . JDS can determine they'll permit the exceptional circumstances under conditions they specify, and then the person wanting the exception either says yes or no.  That's the way it worked in practice." ).)  Karlovsky also testified that he did not know how the mid-80s agreement came about and that Zwirner had simply told him it was the existing practice without explanation.  (Tr. 370:23-371:2.)

Not only were the Trustees unable to produce a single document memorializing the terms of the mid-80s agreement or even pinpointing the year it was consummated, but the Trustees also lacked a consistent understanding of it.  For example, defendants suggested that if the month-end book value in the month of a sale was actually lower than the December 31 book value from the prior year, HolliShare would have received the benefit of the higher value and been able to sell at the December 31 book value. Winn, on the other hand, testified that it was not his understanding that JDS would have paid the higher price if the book value in the month of sale had fallen below the December 31 book value.  (Tr. 659:19-22.)  Additionally, although one of the "terms" of the mid-80s agreement was that JDS would purchase all of the shares HolliShare offered, the Trustees felt the need to

43

1  obtain a commitment from JDS that it would continue to purchase
2  shares in 1999.  (See Ex. 41 at 68.)  After discussing the fact
3  that the commitment would not be binding on JDS, the JDS Board
4  agreed to make a commitment to HolliShare that included a
5  "restatement of the historic commitment of the company to
6  repurchase its stock and . . . a new, three-year commitment that
7  is subject to renewal annually." (Id.)  The Trustees'
8  unquestioning acceptance of an amorphous verbal agreement that
9  set the price of the Plan's most valuable asset underscores their
10 failure to perform a thorough investigation.

11       The Trustees also accepted the use of the December 31
12 book value without question even though they knew that the month-
13 end book value during the month of each sale was almost always
14 greater than the December 31 book value.  Not only did Zwirner
15 and Stempkinski receive monthly financial statements that
16 included the current month-end book value for JDS because of
17 their roles as Hollister and JDS board members, (Tr. 1107:5-11),
18 Zwirner, McCormack, Karlovsky, and Brilliant all testified that
19 they knew the December 31 book value was less than the month-end
20 book value, (Tr. 2016:6-9 (Zwirner), 767:17-19, 1034:6-9
21 (McCormack), 404:13-23 (Karlovsky), 1325:2-10 (Brilliant)).
22 Brilliant also testified that he did not recall having
23 discussions with anyone about whether selling for less than
24 month-end book value was reducing the value of HolliShare.  (Tr.
25 1344:7-14.)  In Cunningham, the Fifth Circuit held that
26 fiduciaries did not fulfill their duties when, similar to
27 HolliShare's use of an out-dated book value, the fiduciaries
28 relied on an appraisal that was "out of date" at the time of the

44

1   transaction because "the factual assumptions upon which it was

2   based were no longer valid."  Cunningham, 716 F.2d at 1469.

3          The evidence at trial also revealed that at least

4   Zwirner knew that an outside appraisal of JDS had been conducted

5   as part of a capitalization study in anticipation of the

6   termination of the 1977 Preferred Share Trust and that the

7   outside appraisal suggested that the market value of JDS stock

8   without any ownership or transfer restrictions was at least 3.4

9   times book value.  (Tr. 102:14-18, 122:24-123:22.)  Of course, a

10  valuation of JDS stock without ownership restrictions was

11  entirely hypothetical because the shares of JDS stock could not

12  be sold on the public market.  In receipt of such information,

13  however, a prudent fiduciary would at least inquire whether an

14  outside appraiser would value JDS stock above book value even

15  with the restrictions.

16          Not only did ERISA require the Trustees to ensure they

17  were receiving adequate consideration to sell HolliShare's shares

18  to JDS, the use of the December 31 book value should have

19  prompted a thorough inquiry by the Trustees because, when the

20  Plan sold its shares to JDS at the December 31 book value, the

21  evidence suggests the Trustees may have personally benefitted as

22  individual shareholders.  Zwirner acknowledged that, when

23  HolliShare sold below month-end book value and JDS retired the

24  purchased shares, the current book value for each outstanding

25  share increased and, as an owner of outstanding shares, the value

26  of his shares also increased.  (Tr. 2050:6-14.)  At a minimum, a

27  prudent fiduciary would have questioned and assessed the

28  justifications for this "transfer of value" that occurred when

45

HolliShare sold its shares for less than the month-end book value.

It appears the only Trustee who ever questioned the use of the December 31 book value was Karlovsky. When he first became Trustee, he wondered whether the use of the December 31 book value affected the Plan and "went back and [] used [his] mathematical modeling capabilities and [] work experience in benefits to do some simulation and sensitivity analysis to see if [the use of the December 31 book value] had a significant impact on the plan." (Tr. 354:9-13.)  Based on the results of his simulation, Karlovsky concluded that it did not.  Tellingly, however, Karlovsky's concern was whether use of the December 31 book value from the prior year had made "a significant difference to the overall operation of the plan," (Tr. 352:6-7), not whether the price constituted the "fair market value" of the Plan's JDS stock.  Even assuming Karlovsky's simulation was accurate, determining that a price does not have a long-term detrimental effect on the plan does not fulfill the trustee's duty to ensure that the plan receives adequate consideration under § 1108(e) for each sale.

All of the Trustees were also individual shareholders under the direct shareholder program and thus knew that they received month-end book value when they sold their shares to JDS under the right of first refusal provision.  The court's overall impression from the testimony was that the Trustees never meaningfully questioned the disparity in price between HolliShare's sales and individual shareholders' sales that occurred in the same month.  As an explanation for the use of the

46

December 31 book value from the prior year for the sale of
HolliShare's shares and the month-end book value for the sales of
the individual shareholders' shares, defendants explain that
HolliShare received the lower price because the December 31 book
value was the only audited number and HolliShare received all
cash.  The court recognizes that a prudent trustee would
generally prefer to use an audited value.  Here, however, nothing
precluded the Trustees from obtaining an audit of a month-end
book value and, because a sale generally occurred only once a
year, the burden of obtaining a single updated valuation based on
the annual audited valuation would not have been unbearably
burdensome.  Moreover, the Trustees' justification for using the
December 31 book value because it was audited was not entirely
convincing in light of Zwirner's testimony that he could not
recall a single month in his tenure as Trustee when the audited
December 31 book value differed from the December 31 book value
JDS calculated and submitted to the auditors.[23]  (Tr. 2144:8-13.)
JDS also tracked its monthly book value and McCormack testified
that, in his over ten years with Hollister, he does not recall a
single month when JDS determined its calculation of a month-end
book value had to be adjusted or was calculated incorrectly.
(Tr. 1105:7, 1106:7-13.)

_____

     [23]     It appears that the book value for 1983 was adjusted
because the 1984 HolliShare Highlights state, "A change in
Financial Accounting Standards Board requirements, implemented in
JDS' 1983 financial statements audited by Arthur Andersen & Co.,
resulted in an increase in the book value of JDS common shares
from $39.21 to $41.08 per share as of December 31, 1983."  (Ex.
4-4.9.)  Zwirner testified that he has "no recollection of this
discrepancy between the company's books and the audited figure."
(Tr. 2456:7-9.)

1    With respect to the fact that HolliShare required cash
2 payments for JDS's purchases of its shares and the JDS Articles
3 provided for the individual shareholders to receive a promissory
4 note for sales over a certain sum, the court agrees with
5 defendants that the cash payment could detrimentally affect the
6 value of HolliShare's shares and that the Trustees would be
7 required to consider this factor in determining the fair market
8 value of the Plan's shares.  Nonetheless, while a prudent trustee
9 may have determined that the significant cash need decreased the
10 fair market value of HolliShare's stock, the evidence shows that
11 the Trustees never attempted to quantify how HolliShare's cash
12 needs affected the value of its stock.  Depending on the year and
13 the month of a sale, the difference between the December 31 book
14 value and month-end book value inevitably varied.  Defendants
15 have not satisfied the court that the Trustees determined that
16 the difference between the December 31 book value and the month-
17 end book value of each sale had any correlation to the decrease
18 in value of HolliShare's stock because of their need for cash
19 payments.

20              d.  Transfer and Ownership Restrictions

21    The Trustees emphasize that they were familiar with the
22 JDS Articles and transfer and ownership restrictions on JDS stock
23 and considered these restrictions when they sold for the December
24 31 book value.[24]  With the exception of Brilliant, who had not

25

26    [24]  Judge Karlton originally rejected defendants' argument
that the settlor doctrine bars plaintiffs' claims, Ellis, 2006 WL
27 988529, at *5-6, and the undersigned declined to reconsider it a
year later.  See DeFazio, 2007 WL 3231670, at *4.  As has been
28 previously discussed in two prior orders in this case, the

48

even read the JDS Articles before this litigation commenced, (Tr. 1276-78, 1295:14-1296:1, 1280:22-24), the other Trustees were generally familiar with the JDS Articles and the transfer and ownership restrictions on JDS stock.  Although nothing in the HolliShare Trust or JDS Articles required the Trustees to sell HolliShare's shares at the December 31 book value, defendants contend that the ownership and transfer restrictions in the JDS Articles limited the value of JDS stock.

It is without question that the fair market value of JDS stock was affected by the restrictions in the JDS Articles that limited ownership to HolliShare, select employees, and the preferred share trusts and the transfer restrictions that gave JDS the right of first refusal.  As the Cunningham court explained, "[a]ppraisal of closely-held stock is a very inexact science" that has a "level of uncertainty inherent in the process and [a] variety of potential fact patterns." Cunningham, 716 F.2d at 1473; accord Rhodes v. Amoco Oil Co., 143 F.3d 1369, 1372 (10th Cir. 1998) ("[T]here is no universally infallible index of fair market value." (quoting Amerada Hess Corp. v. Comm'r, 517 F.2d 75, 83 (3d Cir. 1975) (alteration in original) (internal quotation marks omitted)).

Defendants rely heavily on Krueger International, Inc. v. Blank, 225 F.3d 806 (7th Cir. 2000), to argue that defendants complied with their fiduciary duties.  In Krueger, an employee at a privately held company had stock as part of the company's

settlor doctrine does not preclude plaintiffs' claims.  Moreover, even assuming the design of the HolliShare Plan dictated the use of book value, it did not dictate the use of December 31 book value.

Salaried Employees Retirement Plan.  <u>Krueger</u>, 225 F.3d at 808.
The company's Stockholders Agreement provided for the company to
have the "option to redeem all" of its stock when an employee
died and set the purchase price for redeemed stock at "the
proportionate value of the Appraised Value of all shares [of its
stock] as of the last day of the fiscal period . . . ending on or
immediately proceeding the date of notice of exercise of the
option."  <u>Id.</u> (quoting subsections 4.4 and 6.1 of the
Shareholders Agreement) (internal quotation marks omitted).  When
one of the company's employees died in 1996, a dispute arose
between the potential beneficiaries, and the company notified the
beneficiaries that it intended to redeem all of the employee's
shares, but would not disburse any proceeds until the appropriate
beneficiaries were determined.  <u>Id.</u> at 808-09.  When the state
supreme court resolved the entitlement disputes between the
beneficiaries four years later, the price of the company's stock
had increased substantially.  <u>Id.</u> at 809.  The beneficiaries and
company therefore disputed whether the "fair market value" of the
stock should be set at the 1996 price when the company exercised
its option or the 2000 price when the transaction was completed
and the benefits were paid.

The Seventh Circuit explained that the "repurchase
option is an inseparable part of owning" the company stock and
that, because the stock was encumbered by a purchase option at
the time of the employee's death, if the company exercised that
option, then, under the Shareholders Agreement, the purchase
price was set in 1996.  <u>Id.</u> at 812-13.  It explained, "[b]ecause
the fair market value of stock that someone else has the right to

50

purchase for $258.70 is just $258.70 (at least as long as the stock alone is worth more than that), there would be no violation of the ERISA 'adequate consideration' rules for [the company] to pay that amount per share (plus the interest, of course) to the beneficiaries."  Id. at 813.

Although the reasoning from Krueger that the restrictions in a Shareholders Agreement--or here, the JDS Articles--affects the price of the stock, the case is distinguishable.  In Krueger, the parties disputed whether adequate consideration was determined at the time the call was exercised or at the time the transaction was completed.  The parties did not dispute the valuation method used to determine the price of each share in 1996 or 2000.  Krueger therefore did not engage in the inquiry that is dispositive to plaintiffs' claims under § 1108(e)--whether the Trustees engaged in a sufficient investigation to determine the fair market value of the Plan's JDS stock.  In Krueger, because the appraised value of the stock was not at issue, the Shareholders Agreement set the purchase price of the stock at the time of the call.  In this case, while the JDS Articles undeniably affect the fair market value of JDS Stock, they never set it at the December 31 book value.

As the Second Circuit has explained, "[t]he court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Henry, 445 F.3d at 618 (quoting Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)

51

1   (alteration in original) (internal quotation marks omitted)).

2   Here, the Trustees never attempted to quantify the amount by

3   which the transfer and ownership restrictions affected the value

4   of the Plan's JDS stock.  Even assuming that use of the book

5   value system was appropriate to value JDS,[25] an inquiry into and

6   correlation between the use of the December 31 book value versus

7   the month-end book value never occurred.

e.  Hypothetical Prudent Fiduciary

9           Lastly, defendants argue that the court should follow

10  the Eighth Circuit's holding in Roth, 16 F.3d 915.  In Roth, the

11  Eighth Circuit held that, "[e]ven if a trustee failed to conduct

12  an investigation before making a decision, he is insulated from

13  liability if a hypothetical prudent fiduciary would have made the

14  same decision anyway."  16 F.3d at 919; accord Bussian v. RJR

15  Nabisco, Inc., 223 F.3d 286 (5th Cir. 2000); Herman v. Mercantile

16  Bank, N.A., 143 F.3d 419, 421 (8th Cir. 1998).  The Eighth

17  Circuit reasoned that such an exception was justified because, if

18  the Trustees actually sold assets for fair market value even in

19  the absence of an investigation to determine fair market value,

20  "there was no causal connection between their allegedly deficient

21  conduct and a loss to the ESOP."  Roth, 16 F.3d at 919.

22

23           [25]  The court is not suggesting that the use of book value
    was per se imprudent or violated ERISA.  In a closed-corporation,
24  it may very well be that book value is the most reliable and
    accurate method to assess the fair market value.  In this case,
25  use of book value was also consistent with the JDS Articles,
    Schneider's principles, and the 1999 Preferred Share Trust.
26  Here, however, the fiduciaries never investigated whether the use
    of book value was appropriate and ERISA unquestionably required
27  them to do so.  Putting aside the Trustees' failure to use the
    month-end book value, they failed to investigate whether
28  discounts or increases had to be made to the book value in order
    to arrive at the fair market value of the closely held stock.

1    When it first introduced the "hypothetical prudent
2 fiduciary" standard, the Eighth Circuit relied on a concurring
3 opinion from then-Judge Scalia in Fink v. National Savings and
4 Trust Co., 772 F.2d 951 (D.C. Cir. 1985).  Specifically, in Fink,
5 Judge Scalia commented that he did not know of a "case in which a
6 trustee who has happened--through prayer, astrology or just blind
7 luck--to make (or hold) objectively prudent investments (e.g., an
8 investment in a highly regarded 'blue chip' stock) has been held
9 liable for losses from those investments because of his failure
10 to investigate and evaluate beforehand."  Id. at 962.  Judge
11 Scalia explained that "[i]t is the imprudent investment rather
12 than the failure to investigate and evaluate that is the basis of
13 suit."  Id.

14    While reasoning that a fiduciary who happens to make a
15 prudent investment despite his lack of investigation is not
16 liable in "an action for damages arising from losing
17 investments," Judge Scalia nonetheless recognized that such a
18 "[b]reach of the fiduciary duty to investigate and evaluate would
19 sustain an action to enjoin or remove the trustee or perhaps even
20 to recover trustee fees paid for the investigative and evaluative
21 services that went unperformed."  Id. (citation omitted).  While
22 the "hypothetical prudent fiduciary" inquiry may therefore limit
23 an award of damages against a fiduciary who fails to investigate
24 but nonetheless makes a prudent investment, Judge Scalia's
25 concurring opinion in Fink does not support the conclusion that
26 the fiduciary is absolved from all liability under ERISA.

27    The Seventh Circuit similarly concluded that a plan was
28 not entitled to damages based on a fiduciary's "imprudent but

53

1  harmless conduct," but could nonetheless seek appropriate

2  equitable relief, such as an injunction.  Brock v. Robbins, 830

3  F.2d 640, 647 (7th Cir. 1987); see also id. at 647 ("[N]o court

4  has held trustees liable in money damages for imprudent conduct

5  which resulted in no loss or damages to the ERISA plan and no

6  benefit or gain to the trustees and did not put the assets of the

7  plan at risk." (emphasis added) (internal quotation marks

8  omitted)); cf. Donovan v. Bierwirth, 754 F.2d 1049, 1052 n.3 (2d

9  Cir. 1985) ("[T]here can be a breach of duty without any 'loss'

10  to a plan.").  Consistent with numerous other circuits, the Ninth

11  Circuit has also emphasized that the inquiry under §§ 1108(e) and

12  1104(a)(1)(B) is focused on the defendants' conduct, not the

13  result.  See Howard, 100 F.3d at 1488; see also Cunningham, 716

14  F.2d at 1467 ("[I]t is especially significant that the adequate

15  consideration test, like the prudent man rule, is expressly

16  focused upon the conduct of the fiduciaries.") (emphasis added);

17  Henry, 445 F.3d at 619 ("[I]n practice, the 'fair market value'

18  inquiry overlaps considerably with the 'good faith' inquiry; both

19  are 'expressly focused upon the conduct of the fiduciaries.'"

20  (quoting Cunningham, 716 F.2d at 1467)); Eyler v. Comm'r of

21  Internal Revenue, 88 F.3d 445, 455 (7th Cir. 1996) ("ESOP

22  fiduciaries will carry the burden of proving that adequate

23  consideration was paid 'by showing that they arrived at their

24  determination of fair market value by way of a prudent

25  investigation in the circumstances then prevailing.'  Thus, the

26  adequate consideration test focuses on the conduct of the

27  fiduciaries in determining the price, not the price itself."

28  (quoting Cunningham, 716 F.2d at 1467 (citation omitted)).

54

1    Accordingly, while determining whether the Trustees'
2  failure to investigate the fair market value of JDS stock caused
3  monetary loss to plaintiffs and HolliShare would affect an award
4  of <u>damages</u>, financial loss is not required to prove a breach of a
5  fiduciary duty under §§ 1108(e) and 1104(a)(1)(B) and the court
6  will not apply the "hypothetical prudent investor" exception to
7  absolve defendants from <u>liability</u>.  <u>Chao</u>, 285 F.3d at 436
8  (rejecting application of the "hypothetical reasonable fiduciary"
9  standard because doing so would "ignore" the second part of the
10  "adequate consideration" definition, which requires that the fair
11  market value is "determined in good faith by the trustee").

12       2.   <u>Claims Against Hollister Board Members & JDS</u>

13       To qualify as an ERISA fiduciary, an individual or
14  entity may either be named as a fiduciary under the terms of an
15  ERISA plan, <u>see</u> 29 U.S.C. § 1102(a), or act as a functional or <u>de</u>
16  <u>facto</u> fiduciary by exercising discretionary control over the
17  management or administration of the plan or its assets, <u>see</u> <u>id.</u> §
18  1002(21)(A).  When an individual or entity is a named fiduciary,
19  that fiduciary's liability may be limited pursuant to provisions
20  of a plan instrument that allocates responsibility among named
21  fiduciaries.  <u>See</u> <u>Walker v. Nat'l City Bank of Minneapolis</u>, 18
22  F.3d 630, 633 (8th Cir. 1994) ("[U]nless ERISA mandates
23  otherwise, division of authority in the plan determines the
24  duties of the various fiduciaries."); 29 C.F.R. § 2509.75-8(D-4)
25  (noting that a plan instrument may allocate responsibility among
26  named fiduciaries).

27       Here, the Trust Instrument specifies Hollister, the
28  HolliShare Trustees, and the Hollister Board as named

fiduciaries. (Ex. 9-9.14, § 11.11.) Hollister is responsible for administration of the Plan, (id.),[26] the Trustees are responsible for management of the Plan's assets, (id. §§ 11.01, 11.02), and the Hollister Board has the authority to appoint and remove the Trustees, (id. §§ 11.05-11.07). The Board also has the authority to inspect and audit HolliShare's records and receive reports from the Trustees. (Id. § 11.04.)

### a.  Hollister Board Members

The Trustee defendants who also served on the Hollister Board are Zwirner and Stempinski and the non-trustee defendants who served on the Hollister Board are Winn and Herbert. Plaintiffs do not dispute that the Hollister Board appointed competent individuals to serve as the HolliShare Trustees, but alleges that the Board breached its duty to monitor the Trustees it appointed. The Hollister Board's potential liability therefore arises only from its fiduciary duty to appoint and monitor[27] the HolliShare Trustees. See 29 C.F.R. § 2509.75-8

---

[26] Plaintiffs neither presented evidence at trial nor submitted proposed findings of fact and conclusions of law with respect to any claims against Hollister as the plan administrator. Although Ellis requested the court appoint a new plan administrator, the DeFazio/Dimaro plaintiffs' proposed order would have Hollister remain as the plan administrator. (Docket Nos. 650-53, 662.) The court will therefore enter judgment in favor of Hollister.

[27] After trial, defendants argued in a footnote that there "is conflicting Ninth Circuit authority regarding whether the persons who appoint fiduciaries of an ERISA plan have a fiduciary duty to monitor reasonably the actions of their appointees" and that various courts have rejected imposition of a duty to monitor appointed fiduciaries. (See Defs.' Proposed Findings & Conclusions at 167 n.397.) This position is the exact opposite of the position defendants argued in their motion for summary judgment: "Moreover, while the power to appoint plan trustees carries with it the duty to monitor the trustees' activities, the

(FR-17) ("[T]rustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards . . . ."); In re Calpine Corp., No. 03-1685, 2005 WL 1431506, at *3 (N.D. Cal. Mar. 31, 2005) (noting that the "power of appointment gives rise to a limited duty to monitor").

        Here, the vast majority of HolliShare's holdings consisted of JDS common shares, meaning that almost all of the Plan's transactions fell explicitly within ERISA's prohibited transaction provision.  ERISA unequivocally required the Trustees to conduct a good faith investigation to determine the fair market value of the Plan's shares of JDS stock and sell those shares at that value.  The evidence at trial established that the Hollister Board knew that HolliShare had been selling its shares at the December 31 book value since at least the mid-80s and that the December 31 book value was less than the month-end book

_____

Hollister Board did so as a matter of undisputed fact."  (Docket No. 484 at 3:24-25.)
        The court recognizes that there is authority suggesting that the limited duty to appoint trustees might not give rise to a duty to monitor those trustees.  See Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1325 (9th Cir. 1985) (per curiam) (holding that an employer who appointed the plan administrator was only a fiduciary and liable as such with respect to the selection of the administrator).  The court, however, previously adhered to the position both parties advanced and will not hold otherwise when there has not been a change in the controlling law.  Moreover, in addition to the duty to appoint trustees, the Hollister Board also has the authority to inspect and audit HolliShare's records and receive reports from the Trustees.  These powers are consistent with an oversight and monitoring role.

1   value.[28]  Not only did the Trustees fail to perform an adequate

2   investigation to determine the fair market value, the Hollister

3   board members understood that the December 31 book value was

4   always used and had no reason to conclude that an investigation

5   to determine the fair market value of the JDS shares led to that

6   price.  (See Tr. 1881:11-1883:22.)  The continual use of a preset

7   sales price and lack of any document or discussion suggesting

8   that the Trustees had performed an investigation to determine the

9   fair market value of the Plan's shares should have served as a

10  red flag to the Hollister board members that the Trustees were

11  not fulfilling their duties under ERISA.  The court thus finds

12  that the Hollister board members breached their duty to

13  adequately monitor the HolliShare Trustees.  Cf. Leigh, 727 F.2d

14  at 135-36 (holding that appointing fiduciaries who were aware of

15  the plan trustees' conflicting loyalties in certain transactions

16  were obliged to take extra measures to monitor the trustees'

17  actions).

18               b.   JDS

19          Unlike the Hollister Board, the Trust Instrument does

20  not name JDS as a fiduciary.  Plaintiffs contend, however, that

21  JDS was a de facto, or functional, fiduciary of HolliShare based

22  on the discretionary control and authority it exercised over the

23  management of HolliShare's main asset.  Plaintiffs rely on the

24  evidence at trial establishing that JDS, through the mid-80s

25

26          [28]   Winn also testified that he knew that JDS "had a value
    in the outside world higher than book value."  (Tr. 140:18-20.)
27  He gained this knowledge as a result of the capitalization study,
    but never shared the information with Karlovsky, one of the
28  Trustees.  (Tr. 391:22-393:23.)

agreement, proposed and established the practice of HolliShare selling its shares to JDS once per year at the December 31 book value.  At least one HolliShare Trustee testified that he did not feel HolliShare could negotiate for a higher price because JDS had always paid the December 31 book value and he did not feel that the price was open to negotiation.  (Tr. 2114:20-22, 2115:4-7.)

When determining whether a person is a de facto fiduciary, "the threshold question is not whether the actions of some person . . . adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  Pegram v. Herdrich, 530 U.S. 211, 226 (2000).  "An individual or entity performs a 'fiduciary' function with respect to a pension plan when 'exercis[ing] any discretionary authority or discretionary control respecting management of such plan or exercis[ing] any authority or control respecting management or disposition of its assets' under ERISA." Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1101 (9th Cir. 2004) (quoting 29 U.S.C. § 1002(21)(A)).

The strongest theory suggesting that JDS had discretionary control over HolliShare's shares of JDS stock is that JDS was--at least in practice--the only buyer for HolliShare's shares and therefore could render HolliShare unable to meet its cash needs by refusing to purchase its shares.  This dynamic, however, is part in parcel of the design of the HolliShare plan as a profit-sharing plan and JDS as a closely held corporation with severe ownership restrictions.  While JDS

may have proposed the price and been reluctant to negotiate for a higher price, it was acting as a corporation making business decisions in doing so, not a fiduciary to HolliShare.  Assuming the mid-80s agreement was a binding agreement between JDS and HolliShare, it was the Trustees who had the power to negotiate the terms and agree to them on behalf of the beneficiaries.  It was the Trustees who had the power and obligation to ensure that the sales were for fair market value and to negotiate on behalf of the beneficiaries.  It was also the Trustees who had the power to assess their cash needs for the year and decide how many shares to sell.

Judge Karlton previously held in this case that JDS would be an ERISA fiduciary only if it "in fact exercised any discretionary authority over plan assets." Ellis, 2006 WL 988529, at *7.  The court is not convinced from the evidence at trial that JDS had discretion or authority to make HolliShare sell shares at a given time or that it sought to exercise authority to limit the number of shares HolliShare sold.  See Assocs. In Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 570 (7th Cir. 1991) ("[T]he power to act for the plan is essential to status as a fiduciary under ERISA."); Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co., 884 F.2d 288, 292 (7th Cir. 1989) ("[C]ases which hold that the person or firm was a fiduciary have a common theme conspicuously absent here, viz., the authority to exercise control unilaterally over a portion of a plan's assets, not merely to propose investments.").  The evidence at trial was that the Trustees calculated how many shares they wanted to sell and

1   JDS bought the shares on every occasion and has provided

2   commitments to continue to do so.  (See Ex. 41 at 68.)  The

3   weight of the evidence does not persuade the court that JDS ever

4   attempted to exercise control over HolliShare's sales.

5   Accordingly, because the court is not convinced that JDS

6   exercised discretionary control over the Plan's assets sufficient

7   to render it a de facto fiduciary, the court will enter judgment

8   in favor of JDS.

9           3.   Co-Fiduciary Liability for Breaches under § 1104

10          Section 1105(a) provides for liability of a fiduciary

11  based on a breach of duty by a co-fiduciary:

12          In addition to any liability which he may have under any
            other provisions of this part, a fiduciary with respect
13          to a plan shall be liable for a breach of fiduciary
            responsibility of another fiduciary with respect to the
14          same plan in the following circumstances:

15          (1) if he participates knowingly in, or knowingly
            undertakes to conceal, an act or omission of such other
16          fiduciary, knowing such act or omission is a breach;

17          (2) if, by his failure to comply with section 1104(a)(1)
            of this title in the administration of his specific
18          responsibilities which give rise to his status as a
            fiduciary, he has enabled such other fiduciary to commit
19          a breach; or

20          (3) if he has knowledge of a breach by such other
            fiduciary, unless he makes reasonable efforts under the
21          circumstances to remedy the breach.

22  29 U.S.C. § 1105(a).  Section 1105(a) "effectively imposes on

23  every ERISA fiduciary an affirmative duty to prevent other

24  fiduciaries from breaching their duties for which they are

25  jointly and severally liable."  Stewart v. Thorpe Holding Co.

26  Profit Sharing Plan, 207 F.3d 1143, 1157 (9th Cir. 2000).

27          Plaintiffs appear to rely on § 1105(a)(2) and seek to

28  hold defendants jointly liable as co-fiduciaries for losses

                                61

1   caused by the fiduciaries' breaches of the duty of loyalty under

2   § 1104(a)(1) and duty of prudence under § 1104(a)(1)(B).  Given

3   the court's findings that the fiduciary defendants breached their

4   duties under § 1104(a)(1) and (a)(1)(B), it follows that their

5   conduct enabled their co-fiduciaries to breach the same duties.

6   See Springate v. Weighmasters Murphy, Inc. Money Purchase Pension

7   Plan, 217 F. Supp. 2d 1007, 1025 (C.D. Cal. 2002) (holding that,

8   because "each Defendant failed to comply with Section 1104(a)(1),

9   and in doing so, each Defendant enabled the other fiduciaries to

10  commit a breach," each Defendant is liable for the breaches of a

11  co-fiduciary under § 1105(a)).

12        Nonetheless, because § 1105(a) requires that the

13  fiduciary's breach "enabled such other fiduciary to commit a

14  breach," a fiduciary's liability for any losses caused by a

15  breach would be limited to the time in which that defendant

16  served as a fiduciary.  ERISA clearly limits liability to the

17  time in which a defendant served as a fiduciary, stating, "No

18  fiduciary shall be liable with respect to a breach of fiduciary

19  duty under this subchapter if such breach was committed before he

20  became a fiduciary or after he ceased to be a fiduciary."  29

21  U.S.C. § 1109(b).  Plaintiffs thus cannot simply group all the

22  fiduciaries together when they each served different terms, and

23  any award of damages would need to be broken down by the years in

24  which the various defendants served as fiduciaries.

25        D.    Requested Relief

26        Plaintiffs brought their claims under subsections

27  (a)(2) and (a)(3) of § 1132.  Subsection 1132(a)(2) provides for

28  a participant to bring a civil action "for appropriate relief"

62

under § 1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.  A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109(a).  "Under 29 U.S.C. §§ 1109(a) and 1132(a)(2), ERISA beneficiaries may bring an action against fiduciaries who breach their duties to the plan, and may recover both damages and equitable relief from them." Landwehr v. DuPree, 72 F.3d 726, 733 (9th Cir. 1995).  "The Supreme Court has held that recovery for a violation of 29 U.S.C. § 1109 for breach of fiduciary duty inures to the benefit of the plan as a whole, and not to an individual beneficiary." Paulsen v. CNF Inc., 559 F.3d 1061, 1073 (9th Cir. 2009); see also LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 256 (2008) ("[A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.").

"Neither section 409(a) [of ERISA, 29 U.S.C. § 1109(a)] nor any other section of ERISA discloses the methods which are to be used in measuring the 'losses' for which breaching fiduciaries are to be held liable." Kim v. Fujikawa, 871 F.2d 1427, 1430 (9th Cir. 1989).  "The reports of the various committees concerning this section of ERISA make it clear that Congress

intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." Eaves v. Penn, 587 F.2d 453, 462 (10th Cir. 1978); see also id. at 462-63 ("Among the factors which the court may consider in selecting a remedy are: (1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the extent of the deviation from the terms of the trust required by the adoption of each of the remedies.").

Subsection 1132(a)(3) provides for a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The Supreme Court has "interpreted the term 'appropriate equitable relief' in § 502(a)(3) [of ERISA, 29 U.S.C. § 1132(a)(3),] as referring to those categories of relief that, traditionally speaking (i.e., prior to the merger of law and equity) were typically available in equity." CIGNA Corp. v. Amara, --- U.S. ----, ----, 131 S. Ct. 1866, 1878 (2011) (quoting Sereboff v. Mid Atl. Med. Servs., Inc., 547 U.S. 356, 361 (2006)) (internal quotation marks omitted). Because § 1132(a)(3) is limited to equitable relief, compensatory damages are not available under this subsection. Mertens v. Hewitt Assocs., 508 U.S. 248, 255-56 (1993).

64

1    In Cigna Corp., however, the Supreme Court discussed,
2 in dicta, the ability to award equitable relief under §
3 1132(a)(3) that would require a plan administrator to award
4 monetary compensation to already retired beneficiaries "for a
5 loss resulting from a trustee's breach of duty, or to prevent the
6 trustee's unjust enrichment." Cigna Corp., 131 S. Ct. at 1880.[29]
7 The court referred to this as an equitable "surcharge remedy" and
8 recognized that "[t]he relevant substantive provisions of ERISA
9 do not set forth any particular standard for determining harm."
10 Id. at 1880-81.

11    As the final week of trial came to a close in this
12 case, plaintiffs could not articulate the remedy they were
13 seeking, and suggested that the court could simply fashion
14 appropriate equitable relief.  The court is not in the business
15 of divining appropriate relief absent a request from plaintiffs.
16 In five different proposed orders submitted with their post-trial
17 briefing,[30] (see Docket Nos. 650-53, 662), plaintiffs have, for
18 the first time, identified the relief they are seeking, which
19 includes:

20    1. **Removing Existing Trustees and Appointing a New Trustee**:
21 Plaintiffs request the court to issue a preliminary and permanent
22 injunction removing the HolliShare Trustees and barring them from

23
24    [29]  In Cigna Corp., the Court was addressing violations of
§§ 1022(a) and 1024(b) and the surcharge that might be awarded
based on the district court's reformation of the plan documents.
25 Cigna Corp., 131 S. Ct. at 1880-81.  Nothing in the Court's
opinion suggests that its discussion would not apply equally to
26 the breaches at issue in this case.

27    [30]  In their five proposed orders, plaintiffs do not
request damages based on any profits the fiduciaries allegedly
28 received as a result of their breaches.

serving as Plan Trustees in the future.  Plaintiffs then request the court to appoint an independent trustee "to carry out the orders of the Court to calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions."

2.  **Damages**: Plaintiffs request an award of damages against the fiduciaries individually for restitution or a surcharge from 1992 through the present.[31]  Plaintiffs' calculations are based on the difference between the actual price paid by JDS in each prohibited transaction (December 31 book value from the year prior to the sale) and (a) the month-end book value in the month the transaction took place **or** (b) the fair market value of the shares in the month the sale occurred as determined by an independent appraiser retained by the court-appointed trustee. If the month-end book value is used, Ellis calculates the amount of damages at $30,674,599.56, plus interest.[32]  (Docket No. 650.) The DeFazio/Dimaro plaintiffs used a "slightly different damage calculation" than Ellis, and are requesting an award of

---

[31]  Although fiduciaries can be jointly and severally liable for harms resulting from their breaches, see Stewart, 207 F.3d at 1157, plaintiffs erroneously seek to hold all of HolliShare's fiduciaries liable for all losses regardless of when each defendant served as a fiduciary.  See 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.").  Assuming the breaches caused loss to the Plan, damages would have been broken down by year and only the defendants who breached fiduciary duties in a particular year could be liable for losses caused that year.

[32]  Of the $30,674,599.56, plaintiffs claim that Ellis is entitled to $108,917.87.  (Docket No. 650.)

1  $244,382,485.00.[33]  (Docket No. 654.)

2      3.  **Recovery of Excess Shares**: As an alternative to an award

3  of damages, plaintiffs seek an order against the fiduciaries

4  individually requiring them to recover the excess shares redeemed

5  by JDS in the transactions from 1992 to the present and restore

6  the shares to HolliShare, with the value of the excess shares

7  distributed to each participant's account for each of the years.

8  The excess shares would be calculated based upon the difference

9  between the actual shares sold in each prohibited transaction and

10  (a) the number of shares that would have been sold in each

11  prohibited transaction if the shares were valued at the month-end

12  book value **or** (b) the number of shares that would have been sold

13  in each prohibited transaction if the shares were valued at the

14  fair market value as determined by an independent appraiser

15  retained by the court-appointed trustee.  The DeFazio/Dimaro

16  plaintiffs have calculated what they believe was the loss to the

17  Plan as the result of selling an excessive number of shares due

18  to the use of the December 31 book value.  They have calculated

19  this loss to the Plan at $729,912,295.00.  (Docket No. 654 at 4.)

20      The court now addresses each of the remedies plaintiffs

21  seek.

22      1.  Removal of Existing Trustees and Appointment of a

23          New Trustee

24  _____

25      [33]  Of the $244,382,485.00, plaintiffs claim that Beetham
is entitled to $78,032.68; DiMaro is entitled to $10,430.00;

26  Humphries is entitled to $41,537.00; Lavick is entitled to
$4,212.00; McNair is entitled to $980.00; Pace is entitled to

27  $100,345.00; Seay is entitled to $882,055.00; Stanton is entitled
to $110,803.00; Wirth is entitled to $23,414.00; and DeFazio and

28  Ellis are entitled to $5,634,083.00.  (Docket No. 654 at 4.)  The
remainder would be awarded to the Plan.

1          At the close of trial during discussions with counsel

2    about post-trial briefing, the court unequivocally raised its

3    concerns with plaintiffs' counsel about the court's ability to

4    grant any prospective injunctive relief, stating:

5          [Y]ou better be able to explain to me why any of the
          plaintiffs, any one [] of them is entitled to any
6          equitable relief when they no longer have an interest in
          the plan.  I referenced that in my ruling on the motion
7          for summary judgment, and I still fail to see how any
          modifications to the plan or putting money in the plan or
8          changing how the plan is administered or changing the
          articles or anything else is going to inure to the
9          benefit of any plaintiff in this case.  I fail to see an
          Article III context how they even have standing to ask
10         for that kind of relief when they no longer have an
          interest in the fund.

11

12   (Tr. 2658:7-17; see also DeFazio, 636 F. Supp. 2d at 1076-77

13   (citing Bendaoud v. Hodgson, 578 F. Supp. 2d 257, 267-68 (D.

14   Mass. 2008), for the holding that a plaintiff who was no longer a

15   participant in a defined contribution plan had no standing to

16   seek purely prospective relief); see generally Cent. States Se. &

17   Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,

18   L.L.C., 433 F.3d 181, 199-203 (2d Cir. 2005) (discussing Article

19   III standing in the context of ERISA claims).  Every single

20   plaintiff that was a HolliShare participant had terminated his or

21   her employment with Hollister and received a full lump sum

22   distribution of his or her HolliShare account before commencing

23   or joining this action.

24         Although plaintiffs' proposed orders request

25   prospective injunctive relief, their over 350 pages of post-trial

26   submissions are devoid of any substantive discussion addressing

27   the court's concerns about their ability to seek such relief.

28   When defendants pointed out the deficiency in plaintiffs' briefs

on this issue, plaintiffs still failed to address the issue in their reply brief.  In the face of the court's clear and direct request for  authority supporting any request for injunctive relief, the court can only construe plaintiffs' silence on this issue as an admission that their requests for injunctive relief are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

Not only would it be inappropriate in this case to order removal of the existing Trustees and appoint a new trustee, the court is quite certain that appointing a new trustee as plaintiffs request would only prolong what has already been a painfully protracted case.  The court has every reason to believe that an independent trustee will be unable to render decisions that both sides will believe are acceptable, thus requiring the parties to return to court in the same position they are in today, only several years later.  As the court explained at trial, it is neither its role nor its desire to "step in, roll up [its] sleeves and decide how to run this company or this ERISA plan."  (Tr. 2658:24-25.)

Moreover, plaintiffs do not merely request the court to appoint an independent trustee, plaintiffs also request the court to order the trustee "to calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions." (Docket Nos. 650-53.)  The purpose of the trial was for plaintiffs to put on evidence that would allow the court to "calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions."  Plaintiffs are

1  essentially asking for a second chance to do what they should
2  have done at trial.

3       This case has been pending in this court since 2004 and
4  the various judges assigned to it have issued over thirty
5  substantive orders.  Plaintiffs have had more than ample time and
6  opportunity to prove their case and could have retained experts
7  to testify at trial about the exact calculations they are asking
8  a court-appointed trustee to calculate.  Accordingly, the court
9  will deny plaintiffs' request for an injunction removing the
10 existing Trustees and appointing a new trustee.

11            2.   Damages

12       To seek damages under § 1132(a)(2) and (a)(3),
13 plaintiffs generally have the burden of proving the harm caused
14 by defendants' breaches of their fiduciary duties by a
15 preponderance of the evidence.  See Cigna Corp., 131 S. Ct. at
16 1881 ("[A] fiduciary can be surcharged under § 502(a)(3) only
17 upon a showing of actual harm—proved (under the default rule for
18 civil cases) by a preponderance of the evidence.").  However,
19 "once the ERISA plaintiff has proved a breach of fiduciary duty
20 and a prima facie case of loss to the plan or ill-gotten profit
21 to the fiduciary, the burden of persuasion shifts to the
22 fiduciary to prove that the loss was not caused by, or his profit
23 was not attributable to, the breach of duty." Martin v. Feilen,
24 965 F.2d 660, 671 (8th Cir. 1992); accord Roth, 61 F.3d at 602.
25 "In determining the amount that a breaching fiduciary must
26 restore to the [ERISA plan] as a result of a prohibited
27 transaction, the court 'should resolve doubts in favor of the
28 plaintiffs.'"  Kim, 871 F.2d at 1430-31; accord Sec'y of U.S.

70

Dep't of Labor v. Gilley, 290 F.3d 827, 830 (6th Cir. 2002)

("[T]o the extent that there is any ambiguity in determining the

amount of loss in an ERISA action, the uncertainty should be

resolved against the breaching fiduciary."); Patelco Credit Union

v. Sahni, 262 F.3d 897, 912 (9th Cir. 2001).[34]

In finding that defendants breached their duties under

§§ 1104(a)(1), (a)(1)(B), and 1108(e) by failing to perform an

investigation to determine the fair market value of HolliShare's

JDS stock, the court did not have to find--and did not find--that

the fair market value of the JDS shares at the time of each

prohibited transaction could not have been the December 31 book

value.  Surprisingly, after four weeks of trial, the court did

not hear a single expert witness estimate the value of the JDS

stock at the time of each prohibited transaction.  While

plaintiffs have suggested that the fair market value could be the

month-end book value, which was the valuation used for individual

shareholders when they sold their shares, they have alternatively

suggested that the court-appointed trustee could appoint an

appraiser to determine the fair market value of HolliShare's JDS

shares at the time of each prohibited sale.[35]  Even plaintiffs

---

[34]    In Vaughn, 567 F.3d 1021, the Ninth Circuit explained
that it has "never required that [an ERISA] claim be for an
'ascertainable amount,'" but declined to determine whether it
"should apply such a requirement, because in [the case], the
amount sought is ascertainable, despite the fact that it is not
readily apparent on the face of the First Amended Complaint."
Id. at 1026-27.

[35]    For the same reasons that the court declines to appoint
a trustee, the court declines to invite a second trial in this
case so that an expert can value the JDS stock at the time of
each prohibited transaction to determine the fair market value.
Any evidence the outside appraiser would consider could have been

1  are unsure what value should have been used to ensure HolliShare

2  received adequate consideration.

3         Not only did the parties present insufficient evidence

4  to establish the fair market value of the JDS shares for each

5  prohibited transaction, the weight of the evidence presented at

6  trial does not persuade the court that the fair market value

7  exceeded the December 31 book value.  Most significantly, the JDS

8  Articles severely restricted who could purchase JDS shares and

9  thus the only market for HolliShare's sales was JDS or one of the

10  select individuals authorized to purchase shares under the direct

11  shareholder program.  (See Ex. 531-36 Art. 5, ¶ II.C.)  Each

12  year, offering circulars were distributed to the eligible direct

13  shareholders in the second or third quarter that provided them

14  with options to purchase JDS stock at the audited December 31

15  book value from the prior year.  (Tr. 558:6-559:1, 725:3-731:4,

16  1272:20-1273:14, 1710:5-7; see also Tr. 557:22-559:5 (Karlovsky

17  explaining that the ability to purchase JDS shares at the

18  December 31 book value even when sales were made during the

19  following year "was considered to be one of the benefits of the

20  direct share program").)[36]  It would therefore be unreasonable to

21

22  presented at trial and used to guide the court in its

23  determination.

24        [36]    The Trustees never investigated whether any individuals
   eligible to purchase JDS shares were interested in purchasing
25  shares from HolliShare.  Brilliant testified that his "best
   logic" was that there was not an eligible buyer who had
26  sufficient funds to purchase the amount of JDS stock HolliShare
   sold each year, but recognized that nothing precluded the
27  Trustees from selling smaller quantities of its JDS stock to
   multiple buyers.  (Tr. 1304:20-1305:19.)  The court agrees with
28  plaintiffs that a prudent trustee would have at least explored
   the option of selling shares to individual shareholders,

conclude that the direct shareholders would have been willing to purchase stock from HolliShare at a price that exceeded the December 31 book value.  When the only other "market" for JDS shares was set at the December 31 book value, it is at least possible that the fair market value of those shares was the December 31 book value.  Cf. Krueger Int'l, Inc., 225 F.3d at 812-13.

Furthermore, the fact that individual shareholders who were part of the direct shareholder program were able to sell their shares at the month-end book value does not invariably lead to the conclusion that the fair market value of HolliShare's shares was also the month-end book value.  The direct shareholders sold their shares pursuant to the right of first refusal provision in the JDS Articles, which set the sales price at the month-end book value, but also required the seller to receive most of the payment in the form of a promissory note.  In contrast to the individual shareholders who sold their shares under the right of first refusal, HolliShare received payment in all cash.  Winn testified about an occasion in the 1980s when he sold shares to JDS and received $5,000 in cash and the balance in a promissory note.  (Tr. 663:11-14.)  Because he needed all cash to satisfy an obligation, he sold the promissory note to a bank that was familiar with Hollister.  (Tr. 663:20-25.)  The bank,

---

especially because nothing precluded HolliShare from selling smaller quantities of shares to multiple buyers.  Nonetheless, because eligible employees were offered options to purchase shares at the December 31 book value around the same time HolliShare sold its shares, the court finds it unlikely that an eligible employee would have paid more than the December 31 book value for HolliShare's shares.

nonetheless, only paid Winn around 90% of the note's principal amount, thus illustrating that the receipt of all cash gave a significant benefit to HolliShare that direct shareholders did not receive.[37]   (Tr. 663:15-664:2, 2393:20-2394:8.)   Defendants' expert, Roger Grabowski, also testified at trial that the value the direct shareholders received would have to be discounted to its cash equivalent in order to compare it to the price HolliShare received.   (Tr. 2537:9-23, 2543:8-15.)

Moreover, the only testimony at trial valuing JDS stock during the time-period at issue came from defendants' expert, Grabowski.  Grabowski is an accredited senior appraiser with the American Society of Appraisers who has been performing business appraisals for about thirty-five years and is currently a managing director at a valuation and financial consulting firm. (Tr. 2510:1-7, 2512:6-11, 2518:15-17.)  Grabowski had also been a finance professor at a university and has authored five books pertaining to valuation, including one about valuation of closely held entities that was used in a course he taught for continuing education for certified public accountants.  (Tr. 2517:9-22, 2518:25-2519:4.)

Grabowski was asked to "render an opinion of the fair

---

[37]   It is worth noting that the increase in the book value of JDS stock from the December 31 book value to the month-end book value in the month of each prohibited transaction between 1993 to 2007 was almost always under ten percent.  Specifically, for the years in which the parties stipulated to the month-end book value in the month HolliShare sold shares, the book value of JDS stock had increased by the following percentages from December 31 to the month-end at the time of the sale: 1993 (1.2% increase); 1996 (7.88% increase); 1998 (4.16% increase); 1999 (5.34% increase); 2000 (3.6% increase); 2001 (3.24% increase); 2002 (9.7% increase); 2003 (9.45% increase); 2005 (7.21% increase); 2006 (8.33% increase); and 2007 (11.55% increase).

market value of the common shares of JDS that were held by the
HolliShare plan for the period '74 through 2007." (Tr. 2527:19-
25.) He concluded that the fair market value was the "formula
price, which was book value," explaining:

> It is our opinion that the fair market value in this case
> is determined by and is equal to generally accepted
> accounting principles, GAAP, book value of the subject
> shares pursuant to the stipulated formula pricing in
> place and corroborated by the historical practice. . . .
> Formula, practice and right of first refusal at book
> value establish and limit the market. No reasonable
> financial investor [] would pay more. It is our opinion
> that the fair market value of the subject shares from '74
> through 2007 is equal to their book value.

(Tr. 2528:18-2529:8 (reading from the "Summary of Conclusions" in
Grabowski's expert report).)[38]

        The only expert testimony plaintiffs offered about the
fair market value of HolliShare's shares of JDS stock came from
their expert, John Calvin Korschot. Korschot's appraisal,
however, was limited to the fair market value of JDS stock as of
December 31, 2003. To appraise the JDS stock, Korschot relied on
the market and income approaches to come up with an initial value
and then discounted that value by fifteen percent to account for
the lack of marketability of JDS stock. The resulting value,
however, relied on two "critical" assumptions. (Tr. 1975:11-12.)

_____

[38] Grabowski's valuation does not distinguish between the
December 31 book value or the month-end book value because, at
the time defendants requested his opinion, plaintiffs' theory did
not distinguish between the two book values. His explanation
about favors affecting his valuation are nonetheless relevant.
        Grabowski also testified about a "hypothetical fair
market value" of JDS shares from 1997 to 2007, which he estimated
exceeded the book value by 1.1 to 1.8 times depending on the
year. This valuation is not relevant because Grabowski
calculated this "hypothetical fair market value" as if the
restrictions in the JDS Articles did not exist and there could be
"freely open trading" of the stock. (Tr. 2572:7-10.)

75

First, Korschot assumed the use of book value for HolliShare's sales of JDS shares would not be required, but would still be used for sales from individual shareholders under the right of first refusal.  (<u>See</u> Tr. 1701-1706, 1729:6-10, 1795:7-12.) Second, Korschot assumed that JDS would continue its practice of buying back shares on a regular basis from the Plan at the determined "fair market value."  (Tr. 1692:10-12, 1730:19-1731:4.)  Not only did Korschot appraise HolliShare stock as of a single date,[39] but the court also finds his assumptions to be flawed and is not persuaded that an evaluation of JDS stock could vary so drastically for sales by HolliShare at his estimated "fair market value" and sales by direct shareholders set at the book value.

Plaintiffs recognize that, "[t]he testimony of the experts does not provide a complete analysis of the difference between the previous December 31 book value and the properly appraised fair market value on the dates of the transactions from years 1982 through the present."  (Pls.' Proposed Findings &

---

[39]   Even if the court found Korschot's testimony and appraisal credible, his evaluation of the fair market value of JDS stock on December 31, 2003 is barely relevant to calculating damages because, in 2003, HolliShare sold shares to JDS in June, not December.  (<u>See</u> Stipulation of Facts ¶ 42.)  At most, Korschot's testimony established that the fair market value of JDS stock as of December 31, 2003 exceeded the audited book value for that month, which could support the inference that the "fair market value" of JDS stock exceeded the book value during other months.

An additional flaw is that a persuasive explanation was not offered about how JDS's purchase of shares from HolliShare at the increased fair market value Korschot calculated would have affected the fair market value of JDS shares in subsequent years. Simple math reveals that even the book value of JDS would have decreased if it was paying a significantly higher price for its shares.

1    Conclusions 57:24-58:1.)  With both parties' experts, the

2    insufficiency of the evidence stemmed not from a lack of

3    qualifications, but from the counsels' failure to request

4    opinions on the relevant issues and ensure that the experts did

5    not rely on assumptions that rendered their opinions irrelevant.

6    Although the court must resolve any ambiguities in favor of

7    plaintiffs, the inadequacy of the evidence on this issue resulted

8    not from ambiguities or difficulty in computations but from the

9    parties' failure to ask their experts the appropriate

10   questions.[40]

11        With these considerations in mind, the court is not

12   persuaded from the evidence at trial that the fair market value

13   of HolliShare's JDS shares at the time of each prohibited

14   transaction was anything more than the preceding December 31 book

15   value.  Moreover, even if the court were to assume that the fair

16   market value of HolliShare's sales at the time of each prohibited

17   transaction exceeded the December 31 book value, the court still

18   finds that the sales at the December 31 book value did not cause

19   harm to the Plan.  The court is persuaded that the use of the

20   December 31 book value did not have a detrimental effect on

21   HolliShare when evaluated over an extended duration of time.  As

22   discussed in more detail below, four defendants and one expert

23   credibly and consistently testified that, based on the dynamics

24

25        [40]   The fact that this issue was not appropriately
     addressed with the experts stems from the fact that plaintiffs'
26   theory in this case has changed over the course of this
     litigation.
27        Along this same vein, because the court ultimately
     finds in favor of defendants on damages, defendants' argument
28   that plaintiffs failed to timely disclose their surcharge theory
     or damages calculations is moot.

1  of the HolliShare Plan, the closely held nature of JDS, and the
2  fact that JDS retired shares it purchased, HolliShare's sale of
3  its JDS stock at the December 31 book value did not cause a
4  material loss to HolliShare.

5          As a threshold matter, the court agrees with defendants
6  that any loss to the Plan must be assessed on a long-term basis,
7  not isolated annual inquiries that ignore the dynamics of the
8  Plan and various factors affecting its growth.  When determining
9  whether trustees' purchase of employer stock in an attempt to
10 prevent a tender offer by another company caused a loss to a
11 plan, the Second Circuit held that the appropriate measure of
12 loss compared what the plan earned on the challenged investment
13 and what it would have earned if the funds had been available for
14 other purposes.  Donovan v. Bierwirth, 754 F.2d 1049, 1056-57 (2d
15 Cir. 1985).  In performing this inquiry, the Second Circuit
16 explained that the comparisons of the respective investments must
17 be considered over an extended period of time and not limited to
18 the date of the challenged transaction.  Id.  "Donovan thus
19 stands squarely for the proposition that loss must be determined
20 by examining the assets of the plan as a whole, not at an instant
21 . . . , but over a period of time."  Roth, 61 F.3d at 604; see
22 also id. at 602-03 (rejecting the district court's "snapshot"
23 assessment of loss and explaining that it "failed to consider the
24 time frame component of the loss calculation, and so doing
25 implicitly focused upon too narrow a time frame").

26         Turning to the evidence presented at trial, Karlovsky
27 first testified about the simulation he performed to determine
28 whether the use of the December 31 book value had an impact on

78

the Plan.  Karlovsky has a Bachelor of Arts in systems
engineering and a Master's degree in industrial engineering
management, had previously worked as a strategic planning
analyst, and had performed extensive research dealing with
employee relations and compensation.  (Tr. 336:1-337:25.)  He
explained:

> So when I joined the company and was evaluating the
> plan, I went back and used, for my own satisfaction, I
> went back and I used my mathematical modeling
> capabilities and my work experience in benefits to do
> some simulation and sensitivity analysis to see if it had
> a significant impact on the plan. . . .
>
> [T]he plan has a plan design that's almost -- first
> of all, it's very elegantly simple.  You're taking the
> profits of the company and spreading it across the
> ownership shares.  It's reciprocating, in that if you
> were to sell [] too many shares, for example, we would
> have cash left over at the end of the year.  The price
> would be affected for the following year if we [sold] too
> much shares because the profits of the coming year would
> be spread over fewer shares.  So the price within the
> plan goes up for the next year.
>
> And if we had [sold] too many shares, as we estimate
> the next year, we would have cash in the plan and we
> would have a higher price for it and we would be selling
> fewer shares -- we would be asking to sell fewer shares
> the following year.
>
> If you simulate that over time and you look at the
> decisions that may be affected by the associates as well
> because there's behavioral impact in the dynamics of the
> plan, you find that when you're looking at a retirement
> plan, that isn't a one year event. You're looking at
> someone working 15, 20, 25 years to receive a benefit.
>
> The plan will moderate itself so that the
> individuals are receiving a just benefit over time, and
> materially it doesn't have a significant impact. . . .
> In my simulation that I had done, . . . what would happen
> if we sold fewer shares in the middle of the year or the
> converse was what I did, I said we sold more shares, that
> would affect succeeding years in terms of the number of
> shares we would be buying back.
>
> You can't just add them independently year after
> year.  One year has an impact on the others. They
> reciprocate for each other because the price has gone up
> and we need fewer shares at a higher price the following
> year.
>
> It's kind of a self-correcting model over time where
> one year makes an adjustment for the prior year, and the
> simulation process is what you would have to do.  You

1  cannot just do an additive of one year on top of the
2  other on top of the other without involving the dynamics.

3  (Tr. 354:8-355:13, 361:1-14.)  Karlovsky ultimately concluded

4  that use of the December 31 book value did not cause a "material

5  difference" to the Plan.  (Tr. 357:15-16, 435:2-4, 438:1-8.)

6          McCormack, who has a Bachelor of Arts in social studies

7  with a focus in economics and a Masters in Business

8  Administration with an emphasis in finance, explained that, based

9  on the closely held nature of JDS and the fact that JDS was not

10  reissuing new shares, the financial effect of selling more shares

11  one year (because the December 31 book value was used) evened out

12  over time because there would be fewer outstanding shares the

13  following year:

15          [I]n public companies we have a dilution of
    shareholder interest or a shareholder stock value,
16  because in public companies, the shares are -- you have
    an initial public offering and then you issue new shares,
    and that happens.
17          And then what happens, it dilutes the share
    ownership interest and the value of stock over time,
18  everything else being equal.
            At Hollister it was a very unique situation. We had
19  the reverse dilution effect that we were always, as we
    have discussed, sir, retiring the shares over time. So
20  therefore, the more shares that we sold, the more shares
    that we retired. You add the impact of earnings of the
21  corporation plus the number of shares being reduced and
    you've got a higher value.
22          However, at Hollister, there was what we call the
    counterintuitive reverse dilution effect, and if I can
23  attempt to explain that. The people in the plan would
    plan their account, would have a target, if you will, for
24  the account balance they wanted to retire at. That
    retirement balance would be such that they would make a
25  decision each year on whether or not they would leave,
    leave early or when they wanted to do.
26          On the other hand, if we sold the shares at June
    30th [month-end book value for a sale in June], we
27  have to sell them at a higher price, and the consequence would
    be that they would receive a lesser benefit over time.
28          What we discovered through various analysis in

                            80

discussion with my treasury department, that this
counterintuitive effect based upon the number of shares
outstanding -- and this also took into consideration the
direct share ownerships also -- over time, this would
balance out.

So I understand where you're coming from because
you're coming from a public company knowledge. But the
uniqueness of Hollister and the HolliShare plan and the
direct ownership plan makes your conclusion [that selling
at the December 31 book value harmed the plan], I think,
erroneous.

(Tr. 768:9-769:20.)

Brilliant, who has a Bachelor of Arts in industrial

management and a Masters in Business Administration from the

Wharton Business School and had been a certified public

accountant since 1975, (Tr. 1264:3-7, 1356:11-12), reached the

same conclusion as McCormack, explaining:

By selling shares at the December 31st book value,
as has been stated several times, versus the current book
value, there are more shares that the plan is selling.
At the end of the subsequent year, the next December
31st, there will be -- by selling more shares back to the
company, there will be less outstanding -- there would be
less outstanding common shares as of 12/31.
And when those outstanding shares are then divided
into the shareholders' equity, which was unchanged
because the dollar amount had already been subtracted
under any share -- at any share price or book value
price, mathematically it would have the book value per
share going up as of 12/31 because you'd have less shares
in the denominator. So all common shareholders, both
direct and the plan, would have a higher book value than
they would have otherwise had if they had sold -- if they
had sold less shares.
And the plan participation account, the account
balances from year to year, the dollar amount of a
participant's account balance is increased by the change
in the value, the total value of the company. The
predominant portion of that is the -- of the change in
the assets of the plan, and the predominant asset is the
JDS -- their ownership of the stock.
So if the book value increases 18 percent, and that
same calculation at a different share value would have
been 17 and a half percent, the participants, at the end
of the following year, their individual account balance
in that example would go up by 18 percent instead of
going up by 17 percent.

(Tr. 1367:19-1368:22.)

Zwirner who has a Bachelor of Arts in economics and a Juris Doctorate, (Tr. 1982:20-23), echoed McCormack and Brilliant's conclusion:

> [I]f you were to use the month end value, in the first year you would be selling back fewer shares, and at the end of that calendar year the plan would own more shares, which means it would own a larger percentage of the net equity of the company, which means the plan would be worth more and the account balances would be worth more.
>
> What starts to happen in the second and subsequent years, however, is that when those -- with those larger account balances, when people retire, the amounts required to pay out benefits are higher, which would then require HolliShare to sell back more shares than they do today, and that would have the opposite effect of reducing their ownership interest.
>
> Also, to the extent of the incremental cash required to pay the higher benefits, there would be a permanent reduction in the net equity of JDS Inc., which would again, at the end of the year, reduce the value of the company and the value, percentage value owned by the plan.

(Tr. 2384:7-23.)   Zwirner testified that it was his belief that, "over a period of time," the use of the December 31 book value instead of the month-end value had "no effect" on HolliShare. (Tr. 2385:24-25.)

Lastly, defendants' expert, Grabowski, performed an extensive analysis in which he examined the effect on the Plan if it was assumed that the fair market value of HolliShare's shares was two or three times the December 31 book value and HolliShare sold its shares at the increased price.  He concluded that the benefits the participants received would have ultimately been the same regardless of whether the book value was used or a hypothetical fair market value of two or three times book value

82

1  was used:

2      Q. Is it your understanding what really drives the
       incremental changes in the actual benefits and cash money
3      that HolliShare participants walk out of the plan with,
       the principal driver is not what the values are, but what
4      the incremental changes are from year to year in the
       values are?

5
       A. Yes, it is. It took awhile for that sink in for me,
6      but that's the driver of the value of the participants.

7      Q. Is this showing us that whether you value at book
       value and you do it consistently or value two times book
8      value and do it consistently, if you assume that the
       rates of return on the shares is going to be the same
9      percentage rates of return, you're going to generate the
       same dollars for the participants?

10
       A. Yes.
11
       Q. Let's to go the chart, the next page, paragraph three.
12     Same analysis as the prior one except this one is at
       three times book?
13
       A. Yes.
14
       Q. You're, again, generating on the "dollars redeemed"
15     line exactly the same amount of dollars?

16     A. Yes.

17     Q. This is saying if it's three times book at the
       beginning and three times book at the end, what the
18     HolliShare participants are going to walk away with when
       they retire from this company is the same amount of
19     dollars?

20     A. That's correct.  On the previous page, going back to
       that, one of the things we did determine was the
21     variability that actually occurred in the book value
       increases in HolliShare, in the JDS common stock was, in
22     fact, a lot lower volatility than what the public shares
       of the guideline companies were.  So its not just a
23     matter of the average over a period of time, it's -- the
       volatility is different and it's lower, so that those are
24     two factors that need to be taken into account.

25     Q. If I can translate that into terms I think I can
       understand, is what you're telling us is you're going to
26     come out with the same dollars, but you're going to have
       more stability using the book value than a market-based
27     valuation method?

28     A. Yes. That's not based on theory, but based on looking

                                   83

1    at the guideline company, change in market values each
2    year.   They go up and down.   There is a lot of
3    volatility.   The JDS stock book value has not had that
     kind of volatility.

4  (Tr. 2557:2-2558:20.)  Grabowski further explained, "So there's a

5  continuous change in how the value of the plan changes, but it's

6  really the incremental change.  If book value goes up the same

7  amount in percentage terms as market value goes up, the relative

8  wealth at the end will be the same, the relative benefit to the

9  participants."  (Tr. 2555:14-18.)

10         All of these witnesses were well-educated and had

11  training relevant to understanding the effect of using the

12  December 31 book value for HolliShare's sales under all of the

13  circumstances and dynamics relevant to HolliShare and JDS.  Their

14  consistent, credible, and unchallenged testimony was that the use

15  of the December 31 book value did not cause long-term harm to the

16  Plan.  Based on their testimony and the evidence presented at

17  trial, including the dynamics of the Plan and JDS, the court is

18  persuaded that HolliShare's sale of JDS stock at the December 31

19  book value did not cause a material loss to HolliShare even if

20  the December 31 book value was something less than the fair

21  market value of the Plan's JDS shares at the time of each sale.

22         In Cigna Corp., the Supreme Court explained that "just

23  as a court of equity would not surcharge a trustee for a

24  nonexistent harm, a fiduciary can be surcharged under § 502(a)(3)

25  only upon a showing of actual harm--proved (under the default

26  rule for civil cases) by a preponderance of the evidence."  Cigna

27  Corp., 131 S. Ct. at 1881 (citation omitted); accord Eaves, 587

28  F.2d at 463 ("The law clearly permits approximations as to the

84

extent of damage, <u>so long as the fact of damage or 'lost profits'</u> <u>is certain.</u>" (emphasis added)); <u>Brock</u>, 830 F.2d at 647 ("[M]onetarily penalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA."). Accordingly, because the court finds that the fiduciaries' breaches of their duties did not cause a material harm to the Plan, plaintiffs are not entitled to damages.

### 3.   Recovery of Excess Shares

Consistent with the court's finding that the Trustees' sale of HolliShare's JDS shares at the December 31 book value did not cause a loss to the Plan over an extended period of time, the court is also convinced that use of the December 31 book value did not cause HolliShare to retain fewer shares than it would have if a higher price was used. As McCormack, Brilliant, and Zwirner testified, while use of a value lower than fair market value would have caused HolliShare to sell more shares to raise its cash requirements in the first year, when those shares were retired, it would decrease the number of outstanding shares and therefore increase the book value per share of the outstanding shares in the following year. As a result, HolliShare's remaining shares would have a higher value in subsequent years and HolliShare would need to sell fewer shares to meet its cash needs. Any loss in shares during the first year would therefore even out in subsequent years. The weight of the evidence therefore persuades the court that the use of the December 31 book value did not cause HolliShare to incur a material reduction

in the number of JDS shares it owned.[41]

Accordingly, because plaintiffs lack standing to seek prospective injunctive relief and the court finds that the fiduciary defendants' breaches of ERISA in failing to investigate the fair market value of HolliShare's JDS shares did not cause a loss to the Plan or plaintiffs, the court will enter judgment in favor of defendants on plaintiffs' claims under §§ 1104(a)(1), (a)(1)(B), and 1108(e).

E.   <u>Remaining Claims of Breach</u>

At trial, plaintiffs' claims based on HolliShare's sale of its JDS shares at the December 31 book value from the prior year revealed itself to be the heart of plaintiffs' case, and the damages and surcharge remedy plaintiffs seek is based entirely on those prohibited transactions.  Plaintiffs have nonetheless alleged numerous other claims, which the court will briefly address.

First, plaintiffs allege that the Trustees breached their fiduciary duties and violated § 1104(a)(1)(D) by failing to follow the Plan's requirement to invest Plan assets in JDS shares

_____

[41]   For purposes of discussion, the court refers to the "number of shares," but recognizes that comparing the number of shares from year to year is an oversimplification.  Since JDS stock was issued, there has been at least two 100-for-1 stock splits and a 9-for-1 stock dividend.  Even assuming the court found that the use of the December 31 book value caused loss to HolliShare, simply calculating the number of extra shares sold in a given year and requiring the Trustees to replace those shares would be misguided because it would ignore the fact that one share in 1992 is not the same as one share in 2012 because, during that time, two stock splits occurred and one dividend was declared.

The testimony at trial was that, even though it is continually selling shares, HolliShare can infinitely extend its ownership of JDS stock through stock splits.  (<u>See</u> Tr. 554:16-555:7.)

1   to the maximum extent possible when they sold more shares of JDS

2   stock than necessary to meet HolliShare's cash requirements in

3   1982, 1987, and 1993.   Plaintiffs did not, however, propose or

4   seek a remedy with respect to this claim.   The evidence at trial

5   also does not persuade the court that these sales were concealed

6   from the beneficiaries, thus plaintiffs are unable to rely on the

7   "fraud or concealment" exception in § 1113 and the claims are

8   untimely.

9         Second, plaintiffs allege that the Trustees breached

10  duties owed to HolliShare when they voted HolliShare's shares in

11  favor of various amendments to the JDS Articles in 1978, 1980,

12  1984, and 1999.   In the June 2009 Order, the court held that the

13  statute of limitations foreclosed all of plaintiffs' claims based

14  on the votes in 1978, 1980, and 1984 and plaintiffs' direct

15  claims against the fiduciaries based on the votes in 1999.   See

16  Defazio, 636 F. Supp. 2d at 1058-59.   The court nonetheless held

17  that plaintiffs' co-fiduciary liability claims under § 1105(a)(3)

18  based on the votes in favor of the 1999 amendments were not time

19  barred.   As the court explained in the June 2009 Order, §

20  1105(a)(3) "makes a fiduciary liable for the breach of another

21  fiduciary if 'he has knowledge of a breach by such other

22  fiduciary, unless he makes reasonable efforts under the

23  circumstances to remedy the breach,'" and "[o]ne form of

24  remedying the breaches of a co-fiduciary would be to file a suit

25  against the breaching co-fiduciary to restore the losses to the

26  plan or redress any violations of ERISA." Id. (quoting §

27  1105(a)(3)).   The court therefore concluded in the June 2009

28  Order that, if "HolliShare fiduciaries had actual knowledge of

87

1   the votes at the time they were cast and [] such votes

2   constituted ERISA violations," the fiduciaries would have had

3   three years to file suit and thus the claims were timely under §

4   1132(2).  Id. at 1059.

5       The 1999 amendments prohibited natural persons from

6   owning more than 10% of JDS stock, which plaintiffs contend

7   eliminated a potential market for HolliShare to sell its common

8   stock.  The 1999 amendments also added a limited indemnity

9   provision to the JDS Articles that indemnified directors from

10  personal liability to shareholders for certain breaches.  (See

11  Ex. 535 at 5.)  Even assuming these amendments constituted

12  fiduciary breaches and thus give rise to § 1105(a)(3) claims

13  against the appropriate fiduciaries,[42] plaintiffs neither offered

14

15      [42]   In holding that plaintiffs' § 1105(a)(3) claims
16  relating to the 1999 amendments were timely, the court did not
    clarify which fiduciaries plaintiffs had viable § 1105(a)(3)
17  claims against based on the 1999 amendments.  Plaintiffs seem to
    suggest they are alleging the claim based on the limitation of
18  ownership against Brilliant, Kelleher, and Zwirner and the claim
    based on the indemnity provision against Zwirner, McCormack, and
19  Karlovsky.  (See Pls.' Proposed Findings & Conclusions at 98:9-
    15.)  Defendants appear to believe both claims are against only
20  Brilliant and Kelleher.  (See Defs.' Proposed Findings &
    Conclusions at 141-44.)
21      In discussing liability in the June 2009 Order, the
    court stated that plaintiffs had viable claims under § 1105(a)(3)
22  only if the fiduciary had "knowledge of the votes at the time
    they were cast."  DeFazio, 636 F. Supp. 2d at 1059.  Here,
23  Brilliant did not become a trustee until 2000 and Kelleher did
    not become a trustee until 2004.  Even assuming Brilliant and
24  Kelleher had a duty to remedy a fiduciary breach that occurred
    before they were fiduciaries, but see 29 U.S.C. § 1109(b) ("No
25  fiduciary shall be liable with respect to a breach of fiduciary
    duty under this subchapter if such breach was committed before he
26  became a fiduciary or after he ceased to be a fiduciary."), there
    was no testimony showing that they had knowledge that the votes
27  in favor of the 1999 amendments violated ERISA.  See Cunningham,
    716 F.2d at 1475 ("Section 405 does not impose vicarious
28  liability--it requires actual knowledge by the co-fiduciary. . .
    . '[T]he fiduciary must know the other person is a fiduciary with

88

evidence that the amendments caused harm to the Plan or their individual accounts nor requested or proposed a remedy for any such harm.  See Silverman v. Mut. Ben. Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998) ("[Section 1109(a)] requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'result[ed] from' [the fiduciary's] breach of § 1105(a)(3)." (second alteration in original)).  Presumably, plaintiffs would suggest that their requested relief is included in their request that the court appointed trustee simply "correct the fiduciary breaches."  Any such relief, however, would be prospective in nature, which the court has held plaintiffs lack standing to seek.  See DeFazio, 636 F. Supp. 2d at 1076-77.  Accordingly, the court will enter judgment in favor of defendants on plaintiffs' § 1105(a)(3) claims relating to the 1999 amendments.

Third, based on the fact that many of the Trustees were individual shareholders and served on the JDS and Hollister Boards, plaintiffs allege that the fiduciaries breached various other duties and had numerous conflicts of interest.  See generally Pegram v. Herdrich, 530 U.S. 211, 224 (2000) ("[T]he

respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach.'" (quoting H.R. Rep. No. 1280, 1974 U.S. Code Cong. & Ad. News at 5083)).

It therefore appears that the proper defendants would have been Zwirner, McCormack, and Karlovsky, who were all trustees in 1999 at the time of HolliShare's vote in favor of the 1999 amendments.  Nonetheless, the court's conclusion that plaintiffs failed to offer evidence of harm or seek a remedy with respect to their § 1105(a)(3) claims based on the 1999 amendments applies equally regardless of which defendants the claims are against.

trustee under ERISA may wear different hats, . . . [but ERISA requires that] the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."); Cunningham, 716 F.2d at 1465 ("ERISA clearly provides that a fiduciary may be an officer or employee of the company whose securities he purchases on behalf of a plan." (citing 29 U.S.C. § 1108(c)(3))).  For example, plaintiffs contend that, when HolliShare allegedly sold shares below the fair market value, the difference remained on the books of the company and was therefore spread equally amongst the remaining shares, including the individual shareholders.  In doing so, plaintiffs contend that the Trustees breached their duty of loyalty under § 1104(a)(1)(A) and violated § 1106(b)(1), which prohibits a fiduciary from benefitting from any transaction that harms a plan.  Plaintiffs base additional claims on the fiduciaries' alleged conflicts of interest and concealment of other potential markets for HolliShare's JDS shares.

        The court has already determined that, in failing to perform a good faith investigation to determine the fair market value of the Plan's JDS shares, the fiduciaries breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e).  This finding is sufficient to award plaintiffs the entirety of the relief they requested and have standing to seek.  The court unequivocally informed plaintiffs at trial that it would only consider the relief plaintiffs requested, and plaintiffs have not sought any relief based on any alleged profit the fiduciaries gained from their breaches.  The court will therefore enter judgment in favor of defendants on plaintiffs' claims relating to the fiduciaries'

alleged conflicts and personal profits.

Lastly, in their amended statement purporting to
identify all of their claims for trial, plaintiffs identified
several claims that they declined to address at trial, in their
post-trial briefing, or in their proposed findings of fact and
conclusions of law.  The court can only assume that plaintiffs
have abandoned those claims, and in any event for the reasons
discussed above plaintiffs are not entitled to any relief on
those claims.  The court will therefore enter judgment in favor
of defendants on those claims.  Specifically, the court will
enter judgment in favor of defendants on the following abandoned
claims: 1) plaintiffs' claim under § 1103 for defendants' alleged
failure to hold HolliShare assets in trust for the participants
and beneficiaries; 2) plaintiffs' claim under § 1104(a)(1)(C) for
defendants' alleged failure to diversify HolliShare's
investments; and 3) plaintiffs' claim under § 1110(a), which
declares void any plan provision that relieves ERISA fiduciaries
from liability.[43]

During the course of trial, the court also ruled in
favor of defendants on Defazio's and Ellis's claims under §
1056(d)(3) relating to payment of Defazio's benefits pursuant to
the qualified domestic relations orders and Defazio's and Ellis's
claims under § 1140 relating to defendants' filing of a motion in

---

[43]   The plaintiffs may have based their § 1110 claim on the
indemnity provision added to the JDS Articles via the 1999
amendments, but their post-trial submissions do not reflect such
an intent.  Even if plaintiffs intended to attack the indemnity
provision added via the 1999 amendments, the court's conclusion
that the breach did not cause harm to plaintiffs would be the
same.

1   their divorce proceeding.  (<u>See</u> Tr. 2171:3-2174:8, 2175:20-

2   2176:8); <u>see generally</u> <u>Defazio</u>, 636 F. Supp. 2d at 1077-79.

3        F.   <u>Attorneys' Fees</u>

4        Both parties have requested an award of attorneys' fees

5   in this action.  Pursuant to 29 U.S.C. § 1132(g)(1), "the court

6   in its discretion may allow a reasonable attorney's fee and costs

7   of action to either party."  The Supreme Court has recently held

8   that "a fee claimant need not be a 'prevailing party' to be

9   eligible for an attorney's fees award under § 1132(g)(1)."  <u>Hardt</u>

10  <u>v. Reliance Standard Life Ins. Co.</u>, 560 U.S. ----, ----, 130 S.

11  Ct. 2149, 2156 (2010).  Because Congress did not clearly indicate

12  that it intended to abandon the American Rule, which provides for

13  each litigant to pay his or her own fees, "a fees claimant must

14  show 'some degree of success on the merits' before a court may

15  award attorney's fees under § 1132(g)(1)."  <u>Id.</u> at 2158 (quoting

16  <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 694 (1983)).  "A

17  claimant does not satisfy that requirement by achieving 'trivial

18  success on the merits' or a 'purely procedural victor[y],' but

19  does satisfy it if the court can fairly call the outcome of the

20  litigation some success on the merits without conducting a

21  'lengthy inquir[y] into the question whether a particular party's

22  success was "substantial" or occurred on a "central issue."'"

23  <u>Id.</u> (quoting <u>Ruckelshaus</u>, 463 U.S. at 688 n.9).

24       After <u>Hardt</u>, the Ninth Circuit held that a district

25  court "must consider the <u>Hummel</u> factors after they have

26  determined that a litigant has achieved 'some degree of success

27  on the merits.'"  <u>Simonia v. Glendale Nissan/Infiniti Disability</u>

28  <u>Plan</u>, 608 F.3d 1118, 1119 (9th Cir. 2010); <u>see</u> <u>Hardt</u>, 130 S. Ct.

at 2158 n.8 ("We do not foreclose the possibility that once a claimant has satisfied this requirement, and thus becomes eligible for a fees award under § 1132(g)(1), a court may consider the five factors adopted by the Court of Appeals, in deciding whether to award attorney's fees.").  The Hummell factors include:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

Hummell v. S. E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir. 1980).

Here, the court found that the Trustees breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e) in failing to perform a good faith investigation to determine the fair market value of HolliShare's JDS stock and that the Hollister board members failed to adequately monitor the Trustees in this respect.  In the abstract, this was a significant finding in favor of plaintiffs and an issue that the parties deeply disputed.  The court ultimately concluded, however, that plaintiffs lacked standing to seek prospective injunctive relief and that the sales at the December 31 book value did not cause harm to HolliShare or plaintiffs' HolliShare accounts.  This finding deflates the sails of any "victory" plaintiffs achieved in proving that defendants breached their fiduciary duties.

The outcome in this case is analogous to Farrar v.

93

1   <u>Hobby</u>, 506 U.S. 103 (1992), in which the Supreme Court explained

2   that a plaintiff who sought compensatory damages, but failed to

3   prove "actual, compensable injury" and was awarded only nominal

4   damages in the amount of $1.00 based on the violation of his

5   procedural due process rights was not entitled to attorneys'

6   fees.  <u>Farrar</u>, 506 U.S. at 115.  When evaluating the plaintiffs'

7   "degree of success," the Court explained that plaintiffs

8   "received nominal damages instead of the $17 million in

9   compensatory damages that they sought," and thus the "litigation

10  accomplished little beyond giving petitioners 'the moral

11  satisfaction of knowing that a federal court concluded that

12  [their] rights had been violated.'"  <u>Id.</u> at 114 (<u>quoting Hewitt</u>

13  <u>v. Helms</u>, 482 U.S. 755, 762 (1987)) (alteration in original).

14  The Court held, "[w]hen a plaintiff recovers only nominal damages

15  because of his failure to prove an essential element of his claim

16  for monetary relief, the only reasonable fee is usually no fee at

17  all."  <u>Id.</u> at 115; <u>see also</u> <u>id.</u> at 116 ("If ever there was a

18  plaintiff who deserved no attorney's fees at all, that plaintiff

19  is Joseph Farrar.  He filed a lawsuit demanding 17 million

20  dollars from six defendants.  After 10 years of litigation and

21  two trips to the Court of Appeals, he got one dollar from one

22  defendant.  As the Court holds today, that is simply not the type

23  of victory that merits an award of attorney's fees.") (O'Connor,

24  J., concurring).

25          Here, plaintiffs sought extraordinary damages, ranging

26  from $30,674,599.56 to $244,382,485.00, but are not entitled to

27  any award of damages.  Plaintiffs' proof of defendants' breaches

28  may give them some level of moral satisfaction, but their

1  inability to prove any harm or obtain injunctive relief prevented

2  them from achieving "some degree of success on the merits."

3  Accordingly, the court finds that plaintiffs are not entitled to

4  fees under § 1132(g)(1).  See Simonia, 608 F.3d at 1121 ("Only

5  after passing through the 'some degree of success on the merits'

6  door is a claimant entitled to the district court's discretionary

7  grant of fees under § 1132(g)(1).").

8          Defendants ultimately prevailed in this case and are

9  entitled to seek fees under § 1132(g)(1); thus the court must

10  determine whether to award defendants their attorneys' fees in

11  light of the Hummell factors.

12          **(1) the degree of the opposing parties' culpability or**

13          **bad faith;**

14          Based on the court's conclusion that the fiduciary

15  defendants breached their duties, the court finds that this

16  factor weighs in favor of plaintiffs and merits against awarding

17  defendants their attorneys' fees.  Although harm did not result

18  from the fiduciaries' breaches, it does not make their conduct

19  acceptable.  Defendants also argue that plaintiffs engaged in bad

20  faith in pursuing this lawsuit and that plaintiffs' counsel's

21  characterization of the defendants throughout this litigation

22  amounted to bad faith.  This case unquestionably did not proceed

23  in an expeditious fashion, the theories of liability often

24  appeared to be a moving target, and the growing animosity between

25  counsel were palpable.  The court finds, however, that both sides

26  were responsible for the prolonged litigation and levied arguably

27  personal attacks against their adversaries.

28          **(2) the ability of the opposing parties to satisfy an**

95

1          **award of fees;**

2              Although the court lacks evidence about each of

3    the plaintiffs' ability to satisfy an award of fees, nothing in

4    the record suggests that they have significant financial

5    resources.  With the exception of Ellis, even the balances of

6    plaintiffs' HolliShare accounts were minimal when compared to the

7    proceeds many of the defendants received from the sales of their

8    JDS shares.  For example, in order to keep his holding of JDS

9    shares below ten percent, Winn sold $20 million in shares on one

10   occasion, (Tr. 1858:14-15), and Herbert ultimately sold his

11   shares for about $18 million, (Tr. 19823:9-12).  Most

12   significantly, Zwirner, who, as an attorney might be expected to

13   help his fellow Trustees understand and comply with ERISA, was

14   estimated to have JDS shares value in excess of $45 million, (Tr.

15   1925:2-6), and, when asked how much he had sold in the last six

16   years to keep his holdings under ten percent, he answered that it

17   was in the "range" of five to twenty million dollars.  (Tr.

18   2017:2-18.)  The court's impression at trial was that, even

19   though defendants' fees will undoubtedly be significant,

20   defendants are fully capable of paying them and plaintiffs are

21   not.  The burden of defendants' fees should not be shifted from

22   the defendants, who breached their fiduciary duties and appear to

23   have more than adequate resources to pay their attorneys, to the

24   plaintiffs.

25          **(3) whether an award of fees against the opposing**

26          **parties would deter others from acting under similar**

27          **circumstances;**

28       An award of fees may undoubtedly deter plaintiffs from

96

1  pursuing such complicated and contorted ERISA cases in the

2  future.  Given that the court found that the fiduciary defendants

3  breached their duties under ERISA, however, the court cannot

4  conclude that such cases should be entirely discouraged because

5  there was at least some merit to plaintiffs' claims even if there

6  was ultimately no harm.  Similar to the Court's concern in

7  Farrar, however, counsel might be more reluctant to pursue a case

8  for almost a decade in the absence of clear loss to the Plan or a

9  plaintiff that has standing to seek prospective injunctive

10 relief.  This factor therefore weighs in favor of defendants.

11         **(4) whether the parties requesting fees sought to**

12         **benefit all participants and beneficiaries of an ERISA**

13         **plan or to resolve a significant legal question**

14         **regarding ERISA;**

15         Here, plaintiffs sought relief in favor of the Plan,

16 but clearly lacked standing to obtain an injunction affecting the

17 future management of the Plan, and the evidence at trial

18 convinced the court that the Plan did not suffer harm.  It is

19 unclear to the court why plaintiffs did not address these

20 deficiencies early in the litigation.  HolliShare was extremely

21 successful and provided returns in excess of publicly traded

22 stock and, to the extent that this action could have rendered

23 HolliShare's primary investment worthless by bankrupting JDS or

24 caused Hollister to think twice about continuing to offer the

25 Plan to its employees,[44] the lawsuit would arguably be against

26

27         [44]   In enacting ERISA, "Congress sought 'to create a system
28 that is [not] so complex that administrative costs, or litigation
   expenses, unduly discourage employers from offering [ERISA] plans

1   the interests of current participants.  The court therefore finds

2   that this factor weights slightly in favor of defendants.

3               **(5) the relative merits of the parties' positions**.

4               Lastly, the court finds that the factor evaluating the

5   relative merits of the parties does not weigh in favor of either

6   party.  As previously discussed, plaintiffs proved that

7   defendants breached their fiduciary duties and, if any one of the

8   plaintiffs had standing to seek injunctive relief, the court may

9   have removed the Trustees from their positions.  At the same

10  time, however, defendants ultimately proved that their conduct

11  did not cause harm to the Plan.  At the end, this litigation

12  resulted in more of a wash than a victory for either side.

13              When balancing the factors, the court concludes that

14  the considerations weigh heavily in favor of denying defendants'

15  fees under § 1132(g)(1).  Although defendants prevailed in

16  establishing that they did not cause harm to the Plan, they

17  breached their duties and should not be able to shift the burden

18  of their defense to plaintiffs.  Accordingly, the court declines

19  to award either side their attorneys' fees.

20              For the foregoing reasons, THE COURT HEREBY FINDS in

21  favor of all defendants on all claims by all plaintiffs.  Each

22  side shall bear their own attorneys' fees.

23              The Clerk of the Court is instructed to enter judgment

24  accordingly.

25  _____

26  in the first place.'"  Conkright v. Frommert, --- U.S. ----, ----

27  , 130 S. Ct. 1640, 1649 (2010) (quoting Varity Corp. v. Howe, 516
    U.S. 489, 497 (1996)) (alterations in original).  This case is
    only one illustration suggesting that Congress may not have

28  succeeded in this aim.

DATED:   April 5, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE